```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3

     UNITED STATES OF AMERICA,)
 4        Plaintiff,          )   CRIMINAL CASE NO.
          vs.                 )   RDB-20-139
 5                            )
     ANDRE RICARDO BRISCOE,   )   MOTIONS HEARING - DAY 1
 6        Defendant.          )   11:07 a.m.
     _____)
 7                                Baltimore, Maryland

 8                   Transcript of Proceedings
                   Wednesday, January 19, 2022
 9                        Courtroom 5D
                       Baltimore, Maryland
10

11   BEFORE:  THE HONORABLE RICHARD D. BENNETT, Judge

12   For the Plaintiff:

13     Dana Brusca, AUSA

14     Paul Budlow, AUSA

15

     For the Defendant:
16
       Teresa Whalen, Esq.
17
       William Purpura, Esq.
18

19   Also Present:

20   Javon Weaver, Special Agent - ATF

21   _____

22
                          Reported by:
23
                     Melissa L. Clark, RPR
24             Federal Official Court Reporter
               101 W. Lombard Street, 4th Floor
25               Baltimore, Maryland  21201
                      410-962-4474
```

```
1                        I N D E X

2
                                            PAGE
3      Direct Examination
         Detective Brian Lewis
4          By Ms. Brusca                      58

5      Certificate                           169

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2          THE CLERK:  This court is now in session.  The
3    Honorable Richard D. Bennett presiding.
4          THE COURT:  Good morning, everyone.
5       (Collective greeting.)
6          THE COURT:  This is calling the case of United
7    States vs. Andre Ricardo Briscoe, Criminal No. RDB-20-0139.
8    The defendant was indicted in a first indictment, a first
9    superseding indictment, a second superseding indictment and
10   now has been indicted in a third superseding indictment.  And
11   I noted this morning to my law clerk that there has not yet
12   been an initial appearance or an arraignment on the third
13   superseding indictment, presumably there is not going to be a
14   fourth superseding indictment.  So we're going to need to
15   attend to that today as well.
16      The record will reflect that the standing orders of this
17   court require the wearing of masks in all public areas of the
18   courthouse with the exception that in the courtroom, in the
19   discretion of the presiding judge, counsel and witnesses may
20   remove their mask while speaking.
21      The record will reflect that I'm behind a wall of
22   Plexiglas here at the bench, and I have been fully vaccinated
23   and had my booster shot and I'm going to pull my mask down.  I
24   will not be wearing my mask during these proceedings.  As
25   counsel identify themselves for the record, we will determine
```

```
 1        their vaccination status.
 2             So with that, if counsel would identify themselves for
 3        the record, please.
 4             MS. BRUSCA:  Good morning, Your Honor.  Dana Brusca
 5        on behalf of the United States, and I have with me my
 6        colleague, Paul Budlow, and Special Agent Javon Weaver from --
 7             THE COURT:  Yes, Ms. Brusca, nice to see you.
 8        Mr. Budlow, good morning to you, and Agent Weaver from the
 9        ATF, I believe, good morning to you.
10             Ms. Brusca, you have been fully vaccinated, I gather?
11             MS. BRUSCA:  I have, Your Honor.
12             THE COURT:  All right.  So it's your choice, you
13        don't have to pull your mask down, but you're free to do so.
14             Mr. Budlow, you've been fully vaccinated?
15             MR. BUDLOW:  Yes, I have.
16             THE COURT:  And Agent Weaver, have you been fully
17        vaccinated?
18             AGENT WEAVER:  Yes, I have, Your Honor.
19             THE COURT:  So fine.  So to the extent that you're a
20        witness or whatever, you can pull your mask down.  So thank
21        you.  And with that, you-all may be seated for a moment.
22             And on behalf of the defendant?
23             MS. WHALEN:  Teresa Whalen.  Good morning, Your
24        Honor.
25             THE COURT:  Good morning, Ms. Whalen.  Nice to see
```

1    you.  And with you is your co-counsel, Mr. Purpura?

2            **MR. PURPURA:**  Your Honor, good morning.  William

3    Purpura.

4            **THE COURT:**  Yes, Mr. Purpura.  I've seen your

5    younger brother here recently, so it's nice to have you here.

6        You have been fully vaccinated, correct, Ms. Whalen?

7            **MS. WHALEN:**  I have, Your Honor.

8            **THE COURT:**  And Mr. Purpura, you have been fully

9    vaccinated?

10           **MR. PURPURA:**  I have, Your Honor.

11           **THE COURT:**  And then finally last but not least,

12   good morning to you, Mr. Briscoe.

13           **THE DEFENDANT:**  Good morning, sir.

14           **THE COURT:**  And sir, have you been fully vaccinated?

15           **THE DEFENDANT:**  No, sir.

16           **THE COURT:**  No, you have not.  So you should keep

17   your mask on at all times during these proceedings.  If you'll

18   remain standing, I would just note that, first of all, you

19   were indicted in a third superseding indictment that was filed

20   on December the 8th of last month.

21       And Ms. Brusca, in all seriousness, I assume there is not

22   going to be a fourth superseding indictment; correct?

23           **MS. BRUSCA:**  No, Your Honor.  We do not --

24           **THE COURT:**  That's fine.

25       And for whatever reason, there has never been an initial

1    appearance on arraignment and really no one picked up on it,

2    but from my trusty law clerk, Mr. Demetriou, that noted that

3    the government -- no one had noted, nor the clerk's office had

4    noted that there had not been an initial appearance on this

5    charge.  So we need to go over the third superseding

6    indictment with the defendant.

7        Mr. Purpura, I assume I don't need to read the entire

8    indictment to him; is that correct?

9        **MR. PURPURA:**  You do not, Your Honor.  We waive the

10   reading of the indictment.

11       **THE COURT:**  All right.  And basically, the third

12   superseding indictment, Mr. Briscoe, essentially added with it

13   a notice and special findings, I think is what was added to

14   the third superseding indictment.  And specifically, that

15   notes that the allegations of Counts 5 and 6, at Count 5

16   charging you, Mr. Briscoe, with use and carry of a firearm

17   during and in relation to a drug trafficking crime, and a

18   crime of violence causing death of a person in violation of 18

19   United States Code, Section 924(c) and 18 United States Code,

20   Section 924(j)(1), as well as Sections 2 and Section 3559 of

21   Title 18 as set forth in Count 5.

22       Count 6 has charged you previously in the second

23   superseding indictment with killing a witness to prevent

24   communication to law enforcement in violation of 18 United

25   States Code Section 1512(a), 18 United States Code Section 2,

1    and 18 United States Code Section 3559(2)(C) -- rather (C)(2)

2    and the subparts.

3        The third superseding indictment added a notice of

4    special findings, and essentially it provides that the

5    allegations of Counts 5 and 6 of this third superseding

6    indictment are hereby realleged as if fully set forth herein

7    and incorporated by reference.  And it notes it as to each of

8    Counts 5 and 6 of this third superseding indictment and

9    charging those crimes as I've noted that the Grand Jury finds

10   that the victim of the offense by the initial KB had not yet

11   obtained 14 years of age.

12       The victim, KB, died as a result of the offense and it

13   charges that you, Andre Ricardo Briscoe, in the course of

14   committing the offense, intentionally killed the victim,

15   intentionally inflicted serious bodily injury that resulted in

16   the death of the victim, intentionally participated in an act

17   contemplating that the life of a person would be taken and

18   intending that lethal force would be used in connection with a

19   person, other than one of the participants in the offense, and

20   the victim, KB, died as a result.  And furthermore, that in

21   committing this offense, that you, Mr. Briscoe, intentionally

22   and specifically engaged in an act of violence knowing that

23   the act created a grave risk of death to a person, other than

24   one of the participants in the offense, such that

25   participation in the act constituted a reckless disregard for

```
1      human life and the victim, KB, died as a direct result.  And
2      it further notes that you, as the defendant, you were 18 years
3      or older at the time that the offense was charged,
4      specifically on or about May 27, 2015.  And then there is a
5      forfeiture allegation, which I think had already been
6      contained in the second superseding indictment.
7           So I think I have summarized for the defendant any
8      additional charges in the third; is that correct, Ms. Brusca?
9                MS. BRUSCA:  That's correct.
10               THE COURT:  Okay.  All right.  You understand the
11     nature of those charges against you, Mr. Briscoe?
12               THE DEFENDANT:  Yes, sir.
13               THE COURT:  I'm sorry.  Do you understand the nature
14     of those charges?
15               THE DEFENDANT:  Yes, sir.
16               THE COURT:  And you have had a chance to discuss
17     those charges with your counsel, Ms. Whalen and Mr. Purpura,
18     both acting as court-appointed counsel; is that correct?
19               THE DEFENDANT:  Yes, sir.
20               THE COURT:  All right.  You'll need to -- because
21     your mask is on, you're going to need to bring that microphone
22     closer to you and lean over and speak into the microphone so
23     that Ms. Clark, the court reporter, I make sure she can get
24     your responses.
25          You understand the nature of those charges?
```

1          **THE DEFENDANT:**  Yes, sir.

2          **THE COURT:**  All right.  And you've discussed those

3    with your attorney?

4          **THE DEFENDANT:**  Yes, sir.

5          **THE COURT:**  And in terms of an initial appearance

6    under Rule 5 of the Federal Rules of Criminal Procedure, you

7    understand the nature of the charge against you and you have a

8    right to employ counsel or request the assignment of counsel.

9    In that regard, you have been appointed counsel because of

10   your inability to pay for counsel.  You have a right to a

11   preliminary hearing on this charge, and you're not required to

12   make any statement in connection with this charge.

13       Do you understand that?

14         **THE DEFENDANT:**  Yes, sir.

15         **THE COURT:**  And Mr. Purpura, with respect to this

16   third superseding indictment as to the initial appearance and

17   arraignment on that charge, the plea is not guilty; correct?

18         **MR. PURPURA:**  The plea is not guilty to each and all

19   counts of the indictment.

20         **THE COURT:**  All Right.  Thank you very much.

21       Is there anything further from the point of view of the

22   government that I need to address on this, Ms. Brusca?

23         **MS. BRUSCA:**  Your Honor, we just wanted to note that

24   the penalties had changed as result of those findings, so now

25   there is a -- on Counts 5 and 6 a mandatory minimum of life

1    imprisonment.

2         **THE COURT:**  Yes, okay.  The mandatory minimum life

3    imprisonment is only as to Counts 5 and 6; correct?

4         **MS. BRUSCA:**  Correct, Your Honor.

5         **THE COURT:**  All right.  I'll make sure -- in case

6    you have not been previously advised of that, Counts 5 and 6

7    were charged in the second superseding indictment; correct,

8    Ms. Brusca?

9         **MS. BRUSCA:**  They were, Your Honor.

10         **THE COURT:**  So they have the same mandatory

11   minimums, did they not, at that time?

12         **MS. BRUSCA:**  They did not, Your Honor.  We haven't

13   -- arguably they did, but we hadn't alleged a special finding.

14         **THE COURT:**  That's fine.  I'm not sure whether the

15   magistrate judge for whom you appeared on the previous

16   indictments explained this to you, Mr. Briscoe, but in the

17   event of a conviction on Count 5 -- in the event of a

18   conviction on Count 5 or Count 6 that there is a mandatory

19   minimum sentence of life without parole.

20      Do you understand that, sir.

21         **THE DEFENDANT:**  Yes, sir.

22         **THE COURT:**  That is the penalty; correct, Ms.

23   Brusca?

24         **MS. BRUSCA:**  Yes, Your Honor.

25         **THE COURT:**  There is no discretion afforded to me as

```
1    a judge.  If the jury convicts you on Count 5 or Count 6, or
2    both, there is automatically -- you have -- you face a prison
3    sentence of life in prison without the possibility of parole.
4        Do you understand that?
5               THE DEFENDANT:  Yes, sir.
6               THE COURT:  Anything further, Ms. Brusca, from your
7    point of view on that?
8               MS. BRUSCA:  No, Your Honor.
9               THE COURT:  Mr. Purpura, anything you want me to
10   address on that?
11              MR. PURPURA:  Nothing further.  Thank you, Your
12   Honor.
13              THE COURT:  Thank you very much.  So with that, you
14   may be seated, Mr. Briscoe.  And let me just go over here just
15   a few preliminary matters.
16       In prior discussions with counsel off the record, there's
17   been an issue of the matter of *Giglio* material with respect to
18   any material within the amblet -- ambit, rather, of *Giglio*
19   *versus the United States* as to any exculpatory or any
20   impeaching material, rather, as to any witness who testifies.
21       I've reviewed the witness list here and I have reviewed
22   the materials, and it's my understanding that all of the
23   materials that were submitted for my review in terms of *Giglio*
24   material, it has already all been handed over to defense
25   counsel.
```

1      Is that correct, Ms. Brusca.

2           **MS. BRUSCA:**  That's correct, with the exception of,

3      like, a negative response -- like ATF, for example, said we

4      didn't have anything in our files.

5           **THE COURT:**  That's fine.  But saying there is not

6      material is -- okay.  That's fine.

7           **MS. BRUSCA:**  Correct.

8           **THE COURT:**  Okay.  That's fine.

9           In many cases, as counsel may know, I've taken the

10     position that I review any internal discipline files as to

11     police officers or law enforcement agents and conduct my own

12     analysis.  And if I think it's *Giglio*, I just summarize it for

13     defense counsel.  I never require the confidential internal

14     records to be turned over, but I review the material and make

15     a determination.  I think counsel agreed, when I spoke with

16     them on the phone last week, that that really is somewhat moot

17     here because it's all been turned over, which means that

18     defense counsel is free to cross-examine any government agents

19     with respect to any of the material here for purposes of this

20     hearing.

21          Obviously, under the Federal Rules of Evidence here, and

22     specifically as to Rule 1101, as well as Rule 104A on

23     preliminary questions of admissibility in terms of this

24     motions hearing, the formal rules of evidence do not apply.

25     The reason I make that note is, is that I'm certainly going to

```
 1    accord latitude to counsel in cross-examining any agents in
 2    light of the government's open policy of handing over all of
 3    this material.  That does not mean that that same latitude
 4    will or will not be accorded at the time of trial.  We'll have
 5    to wait and see how that plays out, but as long as that's
 6    understood, that's perfectly fine.
 7         Is that good from the point of view of the government,
 8    Ms. Brusca.
 9         MS. BRUSCA:  Yes, Your Honor.  And I don't believe
10    there is anyone in the court, but just to the extent if people
11    come in, if there are materials that would be shown to the
12    public, we maybe just ask for some heads-up.
13         THE COURT:  That's fine.  I'll keep an eye out for
14    it.  I mean, I'd ask the case agent -- I'm assuming it's just
15    personnel that are here, but if that's the case, alert me.
16         Ms. Whalen and Mr. Purpura, from your point of view, is
17    that understood?  You're free to take the material,
18    cross-examine agents on it to attack their credibility.  I'll
19    make determinations here at this motions hearing today and if
20    we go over to tomorrow, but that doesn't mean that's going to
21    necessarily be the case at trial.  We'll have to wait and see
22    what I deem to be relevant.
23         Is that fair from your point of view?
24         MS. WHALEN:  That is, Your Honor.  That's my
25    understanding.  And I can further advise the Court that the
```

1    only *Giglio* material that I saw that may come up is with

2    Corporal Foster, but I don't know that he's going to testify

3    or not.

4                **THE COURT:**  Okay.  That would be former law

5    enforcement agent Jarnell, J-a-r-n-e-l-l, Foster; is that

6    correct?

7                **MS. WHALEN:**  That's correct.

8                **THE COURT:**  All right.  That's fine.  So that's the

9    only possible *Giglio* examination.

10        Okay.  So with that, there is -- we're ready to proceed

11   with this motions hearing in a minute, but let me just throw

12   out some thoughts here to you here.  With respect to the

13   six-count third superseding indictment in this case, there are

14   essentially some 10 or 11 motions.  Actually, I think it's 10

15   open motions according to my review here.

16        Yes, I only see 10 open motions here, Paper Nos. -- we'll

17   summarize these in a minute, but Paper Nos. 69, 70, 71, 72,

18   73, 74, 94, 95, 96, and 101, and what I'm going to propose to

19   do is some of these matters, I think, can be resolved

20   reasonably quickly and some of them are, in fact, moot.  And

21   what I propose to do when we get started is cull through some

22   of those initially and see where we are and then get into some

23   of the motions that, I think, require a great deal of

24   attention, both in terms of presentation of testimony and

25   evidence and legal argument.

1    Clearly, the controlling burden of proof at a suppression

2    hearing is bourne upon the government, the government bears

3    the burden of proof and that burden is no greater than proof

4    by a preponderance of evidence here, and we will be proceeding

5    accordingly with the government proceeding in a few moments

6    here.

7         This case obviously involves the murders of Jennifer

8    Jeffrey -- Jennifer Jeffrey and her seven-year-old son, the

9    initials here for the record KB -- as in kitchen and boy -- on

10   May 27, 2015.  And the series of motions here before me, some

11   of these I think can be, at least, addressed preliminarily and

12   then we can move forward.

13   First of all, the defendant's motion to suppress search

14   of a residence and person, Paper No. 69, as supplemented by

15   Paper No. 101 is a motion we're going to need to -- I'm going

16   to be hearing testimony on and evidence and legal argument.

17   There is -- there are a few that I think we can just indicate

18   for the record that can be addressed.

19   First of all, there is a motion for notice of Rule 404(b)

20   evidence, Paper No. 70.  And it is my understanding that --

21   I'm not really certain whether the government has indicated it

22   intends to introduce any 404(b) evidence against the

23   defendant, Briscoe.

24   Does the government have any 404(b) evidence that it's

25   noticing to the defendant, Ms. Brusca?

1      **MS. BRUSCA:**  Thank you, Your Honor.  We have

2  produced all of the underlying evidence.  We have not yet

3  provided a notice of whether we intend to produce any.  I do

4  not believe we do, with some limited exceptions, but we can

5  submit such a notice to defense counsel promptly.

6      **THE COURT:**  That's fine.

7      So from that point of view, Ms. Whalen, it would seem to

8  me to be that that, at present, is a moot motion and we'll

9  just wait whether there is any, and the government will

10  certainly provide notice of -- I think in fairness to the

11  defense, we need to put some time frame on that.  So when

12  would be -- when would you propose -- if you do intend to file

13  a Rule 404(b) notice, when would you be doing so, Ms. Brusca?

14      **MS. BRUSCA:**  We can do so within the next month if

15  that makes --

16      **THE COURT:**  That's fine.  The trial date in this

17  case is May the 23rd.  Pretrial conference is scheduled for

18  Wednesday, March the 9th.  So my thinking is, is that if you

19  would certainly notify government counsel by Friday, February

20  the 18th.

21      Is that good for the defense, Ms. Whalen?

22      **MS. WHALEN:**  Yes, sir.

23      **THE COURT:**  All right.  So we can treat this matter

24  as moot at this time without -- subject to further review.

25  Does that work for everyone?  That that's how that would be

1      worded.

2              **MS. BRUSCA:**   Thank you, Your Honor.

3              **THE COURT:**   And we'll handle this order --

4      Ms. Maldeis, we'll handle this from chambers here, from my

5      chambers.   So the motion for notice of 404(b) evidence ECF No.

6      70 is moot subject to notification by the government to the

7      defense by February the 18th of its intention, or lack of

8      intention to do so.

9          Then there is the motion to file additional motions,

10     Paper No. 71, which is pending before the Court, and it -- the

11     -- as to that motion, it essentially can be granted, but I

12     would need to put a time frame on that as well, Ms. Whalen, I

13     think.

14         What additional motions do you think that you want to

15     file and what kind of time frame would you need, do you think?

16             **MS. WHALEN:**   Judge, at this present moment, we don't

17     know of any additional motions that we would want to file.

18             **THE COURT:**   Okay.

19             **MS. WHALEN:**   However, in the event that something

20     comes forward, a search, for instance -- there is still a

21     question of one search -- then we'll probably be filing that.

22             **THE COURT:**   Well, it seems to me that as to that,

23     that is eventually moot as well subject to any further notice

24     by defense.   You're certainly free to file additional motions

25     that you have --

1          **MS. WHALEN:**  Thank you.

2          **THE COURT:**  -- and we have the gambit of what we

3    have now before us.  It doesn't preclude you from filing

4    additional motions, even though I find that it's still moot,

5    but I'm not going to put a specific time on that, because in

6    fairness to the defense, you don't know what develops, but

7    we'll find it's moot for now and there is really nothing as to

8    Paper No. 70 or 71 for the Court to address here.

9          Then there is the matter of the defendant's motion to

10   suppress cell phone evidence, Paper No. 74.  So I understand

11   that we have three cell phones involved in this matter, and at

12   least through my review of the materials with my law clerk,

13   we've classified them as a Samsung cell phone, the Alcatel, if

14   it I'm pronouncing that correctly, A-l-c-a-t-e-l, the Alcatel.

15         Am I pronouncing that correctly?

16         **MS. WHALEN:**  I think so.

17         **THE COURT:**  The youngest person in the room to --

18   Mr. Demetriou, am I pronouncing that correctly?

19         **MR. DEMETRIOU:**  Alcatel.

20         **THE COURT:**  Alcatel, okay.  Usually the youngest

21   person in the room can get the spelling.

22         I'm sorry, Mr. Purpura, I didn't mean to offend you on

23   that.

24         And then the third cell phone is a Blade, what I'm

25   calling a Blade cell phone.

1    So I believe that the motion to suppress evidence, the

2    seizure of the cell phone, Paper No. 74, relates to the

3    Samsung cell phone, and the government has indicated that it

4    is not going to be introducing that -- is essentially not even

5    going to be introducing that.  It's been determined that that

6    phone did not belong to Mr. Briscoe.

7        Is that correct from the point of view of the government,

8    Ms. Brusca?

9        **MS. BRUSCA:**  I believe that's correct, Your Honor.

10   I'm caveating it, only because I don't have in my head which

11   phone was which warrant.

12       **THE COURT:**  I'm pretty sure that's right.

13       I mean, is that correct from your view, Ms. Whalen?

14       **MS. WHALEN:**  I believe it is.  The Samsung we have

15   been informed really belonged to a cousin of our client.

16       **THE COURT:**  That's fine.  So I'm going to basically

17   find that that motion is now moot as well.

18       **MS. BRUSCA:**  Right.

19       **THE COURT:**  If I'm wrong about it, you'll correct

20   me, Ms. Brusca.  Sometime during today's proceedings, if I

21   have that wrong, let me know.  Maybe Agent Weaver can help

22   with that.  Bottom line is, I'm pretty sure that Paper No. 74,

23   that motion to suppress, relates to the Samsung phone, which

24   is no longer at issue, okay?  So then that is moot as well and

25   then there -- as to the Paper No. 95 -- as to Paper No. 95,

1    which is the motion to suppress the June 2020 cell phone

2    search, which I believe relates to the third cell phone, the

3    Blade cell phone, it was seized when the defendant was

4    arrested on May 22, 2020, so it was seized incident to the

5    arrest of the defendant.  And I don't know that the --

6    essentially as to that, it was seized on May 22, 2020.

7         On July 13th, Special Agent Weaver of the ATF applied for

8    and received a warrant signed by U.S. Magistrate Judge Thomas

9    DiGirolamo of this Court to search the contents of that, but

10   that was a -- that was the Alcatel cell phone.  I'm just

11   trying to clarify where we are on Paper No. 95 which relates

12   to the Blade cell phone?

13        **MS. BRUSCA:**  Sure, Your Honor.  If I may, I believe

14   that's Government's Exhibit 18.  That was the search warrant

15   that Special Agent Weaver obtained June 2nd, 2020, so I guess

16   about ten days after Mr. Briscoe is --

17        **THE COURT:**  Yes, I'm sorry.  I misspoke.  I

18   misspoke.  As to the -- again, as to the Blade telephone, the

19   third of the three, within a matter of -- certainly within 10

20   or 11 days, Agent Weaver applied for and received a warrant

21   signed by Magistrate Judge Charles Day of this court to search

22   the contents of that phone which was seized incident to his

23   arrest.

24        Now, Ms. Whalen, as to that, we have a lot of issues in

25   terms of fruits of the poisonous tree or whatever, but as to

1    that itself, exactly what are we going to deal with today on

2    that?

3             **MS. WHALEN:**  I think that that is very quick

4    argument, and it's a four corners review by Your Honor.

5             **THE COURT:**  Okay.  So that -- as to that, we would

6    essentially just have, I guess, a challenge to the search

7    warrant, probable cause, whatever, just for the record?

8             **MS. WHALEN:**  That's correct.

9             **THE COURT:**  And we will deal with that accordingly

10   when we deal with the other issues here.  All right.  So that

11   cannot be disposed of quite that quickly.  One that can

12   clearly be close, precluded now is Paper No. 96, the motion to

13   sever filed by the defendant, Briscoe, as to the co-defendant

14   Haynes, who has now pled guilty as a matter of record.  So

15   that is clearly now moot, correct, from the point of view of

16   the defense, Ms. Whalen?

17            **MS. WHALEN:**  Yes.

18            **THE COURT:**  So that is now moot.  So clearly, 70,

19   71, 74, and 96 are moot and will be so indicated in an order

20   that we will file for the reasons set forth on the record, and

21   by agreement of counsel, those are now moot and have been

22   dealt with accordingly this morning.

23        It leaves us with five subsequent motions that we'll be

24   addressing here.  And as to the -- I guess, the sixth, the

25   motion to suppress the Blade phone, perhaps, in the interest

1     of getting this focused, because my goal is to really focus

2     upon the arguments as to the Alcatel cell phone.  So we're

3     clear on the record, that's really what we're going to be

4     dealing with today in terms of the cell phone.

5          Correct from the point of view of the government?

6          **MS. BRUSCA:**  Correct, Your Honor.

7          **THE COURT:**  Ms. Whalen, from your point of view?

8          **MS. WHALEN:**  Correct.

9          **THE COURT:**  So maybe what we can do is we can have

10    quick argument, to start, on the matter.  Essentially, there

11    is no evidence to be submitted on that.  There is an agreement

12    of facts as to that, and we can just have quick legal argument

13    on that and I can indicate in ruling, perhaps, here, and then

14    we'll be able to focus upon the five remaining substantive

15    motions, so that references to the cell phone, once we address

16    the Blade phone in Paper No. 95, the future references during

17    this hearing today as to the cell phone will be as to the

18    Alcatel phone so the record is clear.

19         Is that good for you?

20         **MS. BRUSCA:**  Yes, Your Honor.  And I just -- I'm

21    sorry, maybe one of the phones was -- I just want to make

22    sure.  You would like quick argument on the Blade now?  And

23    the --

24         **THE COURT:**  Yes.

25         **MS. BRUSCA:**  Okay.  Thank you.

1          **THE COURT:**  That's what I'm saying.  We're not going

2   to do Alcatel yet.  I'm just going to deal with the Blade

3   phone.

4          **MS. BRUSCA:**  Yes.  Perfect.

5          **THE COURT:**  Samsung is clearly out now, which is

6   Paper No. 74.  We're dealing with the Blade phone which is the

7   -- you have quickly corrected me, Ms. Brusca, is just for the

8   record so we're clear, that Mr. Briscoe has moved to suppress

9   the evidence following his -- the May 22, 2020, arrest and

10  seizure of his cell phone, which is the Blade telephone.  And

11  on June 2, 2020, ATF Special Agent Jason Weaver applied for

12  and received a warrant signed by U.S. Magistrate Judge Charles

13  B. Day to search the contents of that black smartphone with

14  the word "Blade" on the back, which was then in the custody of

15  the ATF and the Government's Exhibit 18 is the warrant issued

16  in connection with that, and that was seized incident to his

17  arrest on May 22nd.

18      So Ms. Whalen, are you prepared to address that now just

19  in terms of some legal argument on that?

20          **MS. WHALEN:**  That's fine.

21          **THE COURT:**  Why don't we have your legal argument

22  just on that.  There is no dispute about the facts.  I think

23  I've properly summarized the facts.  Any dispute on the facts

24  as to that, Ms. Whalen?

25          **MS. WHALEN:**  No sir.

1          **THE COURT:**  All right.  So with that, I'll be glad

2    to hear from you in legal argument, and then I'll hear from

3    the government and then, perhaps, I'll just rule accordingly

4    or I'll wait, but why don't we have argument on that right

5    now.

6          **MS. WHALEN:**  Your Honor, just two things.  One,

7    we've raised probable cause and lack of probable cause in the

8    warrant itself, and I'll submit on that on the pleadings that

9    are there and your review of the warrant.

10         And the second is that this was a warrant for everything,

11   the entire contents of the Blade cell phone, and if I could

12   put it in context, the Blade cell phone was the phone that my

13   client had in 2020 when he was arrested.  The crime occurred

14   in 2015.  In fact, it was almost exactly five years prior to

15   his arrest that the crime had occurred.

16         By that time, I suggest that you've had ATF and you've

17   had Baltimore Police Department studying and investigating the

18   crimes as they were.  And it's by that time, they had gone to

19   search warrants for phones that they believe that my client

20   had in 2015, which may or may not have had relevant

21   information about the murders.  But here, five years later, I

22   would suggest they didn't have information that there would be

23   anything relevant on the phone to the murders and that they

24   could have -- in the probable cause, they mentioned the

25   murders, but they begin talking about how he had -- he had

1   admitted to using drugs and that he had a small baggy on him

2   at the time of arrest.

3        I would suggest that they could have narrowed down this

4   general warrant and looked for the three specific things that

5   they mentioned.  They also said there was a possibility in the

6   future of obstruction of justice with one potential witness.

7   They could have narrowed down their searches and requested

8   only records or search limited to that which they really were

9   looking for and that which they had probable cause to look

10  for.  But instead, they just took a whole copy of the phone

11  and then went through and looked at everything in the phone,

12  and I would suggest that that is the type of general warrant

13  that should fail.  And for that reason, Your Honor, I would

14  submit on the rest of the --

15            **THE COURT:**  Thank you very much, Ms. Whalen.

16       And you have briefed that accordingly?  Have you briefed

17  that completely.

18            **MS. WHALEN:**  I believe so, yes.  I mean, I didn't --

19            **THE COURT:**  I understand.

20            **MS. WHALEN:**  I didn't brief in detail --

21            **THE COURT:**  I understand.  I understand the issue.

22            **MS. WHALEN:**  -- but I raised the issue, yes.

23            **THE COURT:**  Thank you.

24       Ms. Brusca or Mr. Budlow?  Ms. Brusca?

25            **MS. BRUSCA:**  Thank you, Your Honor.

1         So as we set forth in our opposition as well, the Fourth

2    Circuit has held that it's impossible for law enforcement

3    officers to know in advance exactly how the defendant is going

4    to have his files.  And so the Court has held that a warrant

5    may, quote, satisfy the particularity requirements either by

6    identifying the items to be seized by reference to a suspected

7    criminal event or by describing them in a manner that allows

8    an executing officer to know precisely what he's been

9    authorized to search for and seize.  And that's precisely what

10   we did in Attachment B for this warrant.

11        We've identified the offenses, which include distribution

12   and possession of narcotics.  We've described why he has been

13   charged with and suspected of murder and how he has engaged in

14   phone conversations while he was incarcerated, even during

15   that short ten-day period between his arrest on May 22nd,

16   2020, and in the search warrant with individuals who are not

17   incarcerated in a manner that suggests he is still

18   communicating with them, had been communicating with them, and

19   potentially going to obstruct justice.

20        So we have both described the offenses and then set forth

21   in Attachment B the types of items that could be seized, for

22   example, text messages about those crimes relevant to the

23   subject matter of this affidavit.

24        So it is not just all text messages.  It's not possible

25   for the government to say, it will be text messages one, two,

1  and three that will be seized, but in the course of reviewing,

2  for example, text messages, this is what -- the kind of

3  message that the agent is authorized to seize, and similarly

4  with photographs and the like, you can't search for those.

5  It's not relevant here, to our knowledge, but you don't know

6  how somebody who has child exploitation materials is going to

7  label those files.  They're probably not going to label them

8  "nudie photo child one."  They're going to label them

9  something else, so you can't predict in advance.

10      And so we think we've met the Fourth Circuit

11  particularity requirements as set forth both in Attachment B

12  in our papers, Your Honor.

13          **THE COURT:**  Thank you, Ms. Brusca.

14      And one point that -- I want to ask Ms. Whalen one other

15  question.  The events leading up to the murders of Jennifer

16  Jeffrey and her seven-year-old son, KB, on May 27, 2015,

17  definitely involved narcotics activity between the Eastern

18  Shore of Maryland and Baltimore; correct?

19          **MS. BRUSCA:**  Correct, Your Honor.

20          **THE COURT:**  And then the allegation is that the

21  co-defendant has pled guilty in this case, Ms. Haynes, as well

22  -- as well as Ms. Jeffrey were involved in drug activity with

23  Mr. Briscoe and others.  That's the gravamen of the genesis of

24  what happened here; isn't that correct?

25          **MS. BRUSCA:**  Correct.  And then further --

1          **THE COURT:**  That's how it's charged?

2          **MS. BRUSCA:**  Correct, Your Honor.  Although we also

3    argued and we set forth why we think in 2020, after he's been

4    incarcerated for a pretty lengthy period, he is likely to go

5    back to his prior sources and his prior customers.

6          **THE COURT:**  Well, the record, I think, will reflect

7    down the road that he was incarcerated ultimately for a period

8    from what, I think, it was June of 2018 to January of 2020 for

9    some year and a half on a probation violation.

10         Is that right?

11         **MS. BRUSCA:**  Correct.  And even prior to that from

12   August of 2016.

13         **THE COURT:**  And was that probation violation

14   relating to narcotics activity?

15         **MS. BRUSCA:**  No.  That was possession of ammunition.

16         **THE COURT:**  Okay.  Thank you very much.

17         Ms. Whalen, just generally, is not the gravamen of the

18   charge here in terms of the underlying facts that there was

19   drug activity with which Ms. Jeffrey was involved with

20   Mr. Briscoe, that's the alleged; is it not?

21         **MS. WHALEN:**  I don't dispute that the government has

22   alleged that the motive for the murder was related somehow to

23   drugs.

24         **THE COURT:**  And there was an allegation that there

25   was prior drug activity prior to the murders in May of 2015,

1    right?

2            **MS. WHALEN:**  There is information that the

3    government had developed, yes.

4            **THE COURT:**  Okay.  All right.  And I think that's

5    essentially woven into the allegations.  All right.  Well,

6    thank you very much.  And on that, we'll do our best to -- we

7    may just issue a quick separate opinion just on that motion

8    separate from other matters that we need to address now that

9    go into a little more detailed substance.

10          So, Adam, on that, we might do that separately, on Paper

11   No. 95.

12           **MR. DEMETRIOU:**  Okay.

13          **THE COURT:**  All right.  Well, let me now just

14   summarize where we are as to the five other motions that I'll

15   be addressing here for this hearing today.  They are defendant

16   Briscoe's motion to suppress search of residence and person,

17   Paper No. 69, and I would note that in relation to that, there

18   is a supplemental motion to suppress the searches, Paper No.

19   101.  Those two are woven together.  Then the third, fourth,

20   and fifth matters are the defendant Briscoe's motion to

21   suppress statements, Paper No. 72; the defendant's motion to

22   suppress Facebook records, Paper No. 73, and the defendant's

23   motion to suppress the July 20, 2021, cell phone search, Paper

24   No. 94, and that's specifically relates to the Alcatel cell

25   phone.

```
 1          Have I correctly summarized where we are from the point
 2     of view of the government, Ms. Brusca, on that?
 3             MS. BRUSCA:  Yes.
 4             THE COURT:  Ms. Whalen, have I correctly summarized
 5     that?
 6             MS. WHALEN:  Yes.
 7             THE COURT:  All right.  So with that, we are ready
 8     to proceed, and I think that that's been productive here for
 9     the last 50-something minutes to zero in on all of these
10     matters.  So with that, we are ready to proceed.
11          Is there anything further that I need to address or
12     discuss before we proceed with presentation of evidence or
13     testimony by the government from the government's point of
14     view?
15             MS. BRUSCA:  Your Honor, I guess the only thing
16     might be if the Court would find it beneficial to hear an
17     overview of, sort of, the --
18             THE COURT:  That would be fine.  That would be fine.
19     We're ready to come out of the gate in a minute here.
20          Ms. Whalen, anything else I need to preliminarily address
21     before we get started?
22             MS. WHALEN:  Yes.  I don't know, to be honest, with
23     Your Honor, whether the local rule on the admission of
24     exhibits applies to the motions hearing.  I've never had it
25     apply.  But just an abundance of caution, there are some
```

```
 1      exhibits that have been attached to the Government's motion
 2      that we would object to their coming in at the motions hearing
 3      because we are not able to cross-examine, for instance, those
 4      witnesses.  I can list --
 5              THE COURT:  Do you agree the formal rules of
 6      evidence under 1101 and 1104 do not apply here at a motions
 7      hearing in terms of admissibility of evidence; correct?
 8              MS. WHALEN:  However, our client's confrontation
 9      clause does apply, I think.
10              THE COURT:  That's fine.  Sure.
11              MS. WHALEN:  For instance, there's Grand Jury
12      testimony that's been attached as exhibits and those people
13      are not being brought in to testify today.  So we would object
14      to those exhibits coming in without any cross-examination.
15              THE COURT:  Okay.  Anything else besides the Grand
16      Jury transcript?
17              MS. WHALEN:  There are -- I don't know exactly what
18      the Cambridge Police officers will testify.  There may be a
19      few Cambridge reports of police officers that would apply, but
20      I can flag them when we know where we're going.
21              THE COURT:  Well, all right.  From that, again, the
22      matter of admissibility of some of these records is not
23      binding on the Court in terms of admissibility at trial before
24      the jury as well.  So that's another prophylactic approach
25      that I'll take here, but I'm not real sure how we can rule on
```

1      this in a vacuum.

2          What exhibits -- what Grand Jury transcripts are we

3      talking about that you intend to introduce, Ms. Brusca?

4              **MS. BRUSCA:**  Your Honor, they were attached to our

5      written opposition --

6              **THE COURT:**  Yeah.

7              **MS. BRUSCA:**  -- and they're portions of testimony

8      relating to the defendant's standing to challenge whatever

9      evidence was recovered from Apartment 202, 502 Greenwood

10     Avenue, two individuals who resided in the apartment, and

11     their testimony on that.  And I guess, again, I would disagree

12     with the defense in that hearsay is admissible.  There is

13     no -- I don't think there is any requirement that a witness be

14     called at a motions hearing that I'm aware of.  So I'm not

15     sure why the confrontation clause ought to come into play.

16     Although, of course, it would come into play at a trial.

17             **THE COURT:**  Right.  Well we'll have to go step by

18     step, Ms. Whalen.  It's very likely I'll just admit it over

19     your objection, but it doesn't mean it's going to come in that

20     fashion at trial.  I don't know whether it's -- I guess your

21     point is, for example, to the extent that, as I understand it,

22     there was an individual in Apartment 202, that the government

23     contends consented to law enforcement officers entering, and

24     your objection is you don't have any opportunity to

25     cross-examine that person on whether or not he did give

```
 1        consent.
 2                  MS. WHALEN:  That's correct, Your Honor.
 3                  THE COURT:  All right.  Well, then --
 4                  MS. WHALEN:  These are findings of fact, I think,
 5        that we're entitled to challenge --
 6                  THE COURT:  Right.
 7                  MS. WHALEN:  -- and that the government has the
 8        burden to prove.  And so by truncating it, by just putting in
 9        the Government's view of what happened without any
10        cross-examination is not --
11                  THE COURT:  Ms. Brusca -- let me just ask
12        Ms. Brusca.  On that, for example, I don't know the exact name
13        of the individual who's alleged to have consented, whoever the
14        person was in Apartment 202.  As I understand the facts, there
15        was an initial search of Apartment 101 in that building, the
16        defendant was not located there, then the agents went to
17        Apartment 202.
18             The allegation of the government is, is that they knocked
19        on the door, someone opened the door, someone consented to
20        their entry, so they entered the apartment with the consent.
21        And the defense is challenging whether or not that is, in
22        fact, correct, that there was consent.
23             I must tell you that in terms of ruling on certain issues
24        here, I'm going to have to make findings of fact here as to
25        that.  And the formal rules of evidence do not apply, but
```

1    just, hypothetically, where are we if the witness on the

2    witness stand at trial does not indicate that he consented --

3    I assume it's a gentleman -- or equivocates about whether he

4    consented?  It affects my ruling in terms of admissibility of

5    evidence.

6         So as to that, it would seem to me that I'm not going to

7    say that summarily all witnesses in terms of Grand Jury

8    testimony need to be produced, but it would seem to me that it

9    would be a far safer practice for me here in this matter to

10   have that person testify, it seems to me, because that person

11   has been -- apparently has testified under oath before the

12   Grand Jury.  But as we all know, sometimes things take turns

13   in a courtroom in front of a jury.

14        So what is the Government's response on that, if we need

15   to have that person come forward?

16             **MS. BRUSCA:**  Your Honor, I think we would say two

17   things.  First, we think that goes to weight.  We don't think

18   at a motions hearing that the government -- excuse me, the

19   defense is entitled to testimony.  The burden is on the

20   government.  I'm not aware --

21             **THE COURT:**  By preponderance of evidence?

22             **MS. BRUSCA:**  Correct.  That requires production of

23   testimony.  That is a practice with respect to law enforcement

24   witnesses.  I don't believe it's typically the practice with

25   respect to civilians.  But in any event, as the Court noted,

1      it is sworn testimony that can be accorded whatever weight

2      that the Court would give it.

3          Second, we would say that if the Court were to find that

4      based on the testimony that is presented there is not

5      sufficient evidence or at least there is an open issue as to

6      consent without the testimony of that individual, I do think

7      the Court could rule preliminarily, subject to the witness's

8      testimony.

9          **THE COURT:**  Well, again, you've anticipated my

10     concern.  My concern is that it certainly affects the status

11     of my rulings if suddenly at trial someone equivocates with

12     respect to giving consent.  To me, it's not that complicated.

13     Somebody comes forward and says, I'm the one that leased the

14     apartment.  My name is on the lease, you know, however it

15     plays out, and I consented to them arriving.  And,

16     hypothetically, the witness says Mr. Briscoe was in the

17     apartment, but he doesn't live here.  He's not on the lease.

18     It's my apartment, and yes, they knocked on the door and I

19     said, yes, come in.  That doesn't seem very complicated to me.

20     And to the extent that there are facts that I need to

21     determine in terms of legal issue, because as I note, the

22     government in terms of the matter of the motions before me, I

23     think, essentially, have noted ultimately also a *Leon*

24     exception in good faith, for example, search warrants are

25     being executed.

1          I guess my question is this:  You have the witness who

2     has testified to the Grand Jury as to consent.  It's a limited

3     framework in terms of the person gets on the witness stand and

4     says, I consented.  And the government, I think, can prove

5     that he had the legal capacity to consent, or lack thereof,

6     and the defense can challenge that.  I think it would be a

7     safer process here, from my point of view, if the government

8     is prepared to have that person testify either today or

9     tomorrow in some fashion.

10          Now, is that person available to testify?

11          **MS. BRUSCA:**  Not today or tomorrow, Your Honor.  And

12     we would have -- we don't think the Court needs that person's

13     testimony, but again, very similarly --

14          **MR. BUDLOW:**  May I consult with Ms. Brusca?

15          **THE COURT:**  Sure.  Go ahead, Mr. Budlow.

16          **MR. BUDLOW:**   Thank you, Your Honor.

17          **THE COURT:**  Let me throw this out to you.  Here is

18     the bottom line on this.  This case is going to trial on May

19     the 23rd, okay, some four months from now.  I'm trying to rule

20     on all of these motions as best I can, but we've got plenty of

21     time on this, and I think that it -- I don't want to issue a

22     ruling I'm going to require it, but it seems to me that it's a

23     much safer practice for the record to do it that way.  And you

24     have -- you get in dangerous waters if suddenly someone is

25     equivocating on something as important.

1     This is an important matter in terms of -- of I don't

2     know what the evidence is going to be as to whether or not

3     Mr. Briscoe ever resided at 202.  If he did not, then the

4     issue comes up as to standing.  He has no standing to

5     challenge the search as we well know.

6     So it seems is to me that it's important to nail down

7     what the facts are before the Court.  It's a basis of the

8     Court's ruling that to the extent there is someone that had

9     their name on the lease and they were living there, and

10    Mr. Briscoe was or was not, all of that relates to standing.

11    All of these issues, I need to make sure I resolve prior to

12    trial.

13    So if we have to continue the matter on that, then maybe

14    we would.  I don't know.  We could -- I could schedule another

15    quick hearing just on that matter, if necessary.

16    I just think it's an important T to cross and I to dot is

17    what I'm saying, Ms. Brusca.  You can talk to Mr. Budlow for a

18    second here, just -- and council each other for a minute if

19    you'd like.  Go ahead.

20    (Attorneys Brusca and Budlow confer.)

21          **THE COURT:**  Yes, Ms. Brusca?

22          **MS. BRUSCA:**  Thank you, Your Honor.  So I think --

23    what we were discussing was, from the government's point of

24    view, the consent that matters here and understanding that

25    matters is that of the officers.  It's not the person who

1   opened the door.  We have provided that evidence because both

2   it -- there is one witness's testimony that helps the

3   government.  There is a second witness's testimony that is,

4   perhaps, a bit contradictory on that point and helps the

5   defense.  But at the end of the day, it's frankly what the

6   officers understood that is the standard.

7       With respect to living in the apartment, we'd also just

8   add on to that, although the government has the burden overall

9   in this suppression hearing, the defense actually has the

10  burden to prove standing.  And frankly, if there were

11  witnesses that they thought ought to be called, they also had

12  the power to call witnesses at this hearing.

13      And then last but not least, we would say we understand

14  the Court's concern over the facts and certainly appreciate

15  the seriousness of the issues.  But just in terms of process,

16  I think the Court can, if it so choses, at least admit

17  exhibits preliminarily.  There's certainly nothing -- if there

18  were items seized from the house or to that effect that the

19  government intended to introduce, we could certainly flag

20  those for the Court.

21          **THE COURT:**  Here is the way to deal with this, I

22  think, Counsel is, I'm going to permit -- to the extent that

23  that comes up, Ms. Whalen, in terms of Grand Jury testimony,

24  I'll permit the Grand Jury testimony to be introduced in terms

25  of an individual testifying under oath as to what occurred.

 1          Having said that -- having said that, let me just hear

 2     the testimony and evidence here today, and presumably we're

 3     going to go to tomorrow as well, and I'll make a determination

 4     that it may be -- it may be that, on this matter before I can

 5     rule, I have to make certain findings of credibility between

 6     the testimony of law enforcement personnel, and the testimony

 7     of others who were at the door in terms of who said what to

 8     whom, and whether or not there could be that good faith

 9     understanding by law enforcement that they were allowed to

10     enter.  And to me, that's the safest way to handle it.

11          There is no prejudice to the defendant in terms of my

12     hearing the testimony and making preliminary findings, but it

13     may be that I don't rule on certain matters until I get

14     further evidence, and to that extent, if necessary, the

15     government will be -- it will be noted that I need to hear

16     from the Grand Jury witness.  And to that extent, Ms. Whalen,

17     you would then be free to cross-examine on that, just limited

18     on that point.  That would be fine.

19          Does that work for the defense, I think?

20          **MS. WHALEN:**  I understand where Your Honor is going

21     with that, and I have no objection to keeping this open.

22          **THE COURT:**  Yes, it's a wait and see.  Let me just

23     see how it plays out.  And I understand what your point is and

24     that it depends -- I don't know how the evidence is going to

25     break on this, but it's obviously an important matter.

1      The government is correct that you have the burden on the

2 matter of standing, but I'm not going to view this in a

3 vacuum.  What I'm trying to avoid, so that the record is

4 clear, is having us be at trial starting in May, opening

5 statements, and suddenly here on the witness stand somebody --

6 somebody's testimony, perhaps, is not what the government

7 anticipated, and then we have this huge issue of evidence

8 that's been referenced and rulings that I've already made that

9 would be affected if suddenly that were to happen.

10      So we're not going to wait until trial for that to

11 happen, Ms. Brusca, so it's very likely -- it's very likely

12 that with respect to that matter, you're going to notify the

13 witness and it's very likely we'll have another hearing on

14 that and we'll have that person come in.  And I think that's

15 the fairest way to do it from the point of view of both the

16 government, as well as the defense from my point of view.

17      **MS. WHALEN:**  If I could just clarify that.  I fully

18 understand the ruling and where this is going and the Court's

19 reasoning for it.  I just didn't mean that to mean that I am

20 withdrawing the objection.

21      **THE COURT:**  No, I know that.  Your objection has

22 been noted.  I'm going to -- over that objection, I will admit

23 the -- and consider the Grand Jury testimony, but it may be

24 that I require further presentation of evidence by the

25 government on it, and then your objection would be pretty much

1    moot because I would bring the person in and have them have to

2    testify in terms of what events occurred and what was said at

3    the door of the apartment, that being Apartment 202, is what

4    we're talking about, so...

5            **MS. WHALEN:**  Thank you.

6            **THE COURT:**  Thank you very much, Ms. Whalen.

7    Any other issues before we get started from your point of

8    view.

9            **MS. WHALEN:**  I think that's it.

10           **THE COURT:**  All right.  So with that, it's been a

11    productive first hour.  We're going to go to like around ten

12    minutes of 1:00 before we break for lunch.  I've got a bench

13    meeting with the -- with my colleagues at 1 o'clock on

14    Wednesdays, and because it's going to be virtual, it takes a

15    little bit longer.  But we'll break around 10 minutes of 1:00

16    then break for lunch and start again a little bit after

17    2 o'clock.

18    So with that, as the government has suggested,

19    Ms. Brusca, I'll be glad to hear from you on a general opening

20    statement and then I'll hear from defense counsel as to an

21    opening statement, and we'll proceed in that regard.

22    I would note, it might be a good idea also at this

23    point -- many times I do this at motions hearing.  It's a

24    safer practice.  We mentioned the Rule 1101 of the Federal

25    Rules of Evidence, and those rules note that certain rules,

```
 1        except for privilege, do not apply, specifically, a Court's
 2        determination under Rule 104(a) on preliminary questions of
 3        fact in terms of governing admissibility.
 4             I found it useful, over the years, to also make sure that
 5        this is clearly understood and stated, that on preliminary
 6        questions under Rule 104, and specifically proffering of
 7        evidence by the defense, a defendant, by testifying on a
 8        preliminary question, does not become subject to
 9        cross-examination on other issues in the case.  I just make
10        sure that that's clearly set forth here on the record so that
11        the defendant understands that.
12             What that means is -- and defense counsel can advise
13        Mr. Briscoe.  What that means is that if Mr. Briscoe chooses
14        to testify on one topic alone in terms of whether or not he
15        heard someone consent or not or whether he was or was not
16        under a bed, whatever, it can be a very brief testimony.  The
17        government is only free to cross-examine just on that
18        testimony and does not have carte blanche to then
19        cross-examine on other issues, and I just put that on the
20        record.
21             Have I correctly stated that from the point of view -- as
22        to Rule 104 from the point of view of the government,
23        Ms. Brusca?
24                  MS. BRUSCA:  I believe so, Your Honor.
25                  THE COURT:  Correct from your point of view, Ms.
```

```
 1   Whalen?
 2              MS. WHALEN:  Yes.
 3              THE COURT:  All right.  So we put that on the record
 4   just so it's understood, and I don't think more needs to be
 5   said about it at this point in time.
 6         So from that, I'll be glad to hear opening statements
 7   from the government and then from defense counsel, and we will
 8   proceed.
 9              MS. BRUSCA:  Thank you, Your Honor.
10         So I think just as the Court has pointed out, the real
11   crux of the dispute between the parties is this moment at
12   Apartment 202.  It's really -- it all comes down to this
13   really quick number of minutes.  The Baltimore Police
14   Department finds the bodies of Jennifer Jeffrey and her son on
15   May 28th.
16         And between May 28th and June 4th, they obtain a number
17   of warrants and orders.  And for the most part, those are not
18   challenged with one exception, the exception being a tracking
19   warrant that BPD got to find Mr. Briscoe's phone.  And the
20   government has explained that that order -- that equivalent to
21   a warrant absolutely provides a basis for the government to be
22   on the doorstep of Apartment 202.  That's the first argument
23   that the defendant makes.
24         And we have explained that we think that that warrant,
25   which points out that Mr. Briscoe had seen Jennifer the night,
```

 1    two nights before the bodies were discovered into the morning

 2    of the day before her body was discovered, he sees her and

 3    he's there with her, and is the last person to communicate

 4    with her.  And according to the victim's family member, has

 5    plans to see her again, so he's supposed to see her.  He is,

 6    in fact, the last person ever to communicate with her.  Nobody

 7    ever hears from her again.  And so that's what's put in this

 8    order.  The order gets Baltimore to the doorstep of 502

 9    Greenwood Avenue.  And they're using a technology at that time

10    that suggests the defendant's in Apartment 101.

11         They get a warrant.  Nobody is challenging that warrant

12    because nothing was found, but there is also, we would say,

13    probable cause in that warrant.  They knock on the door, he's

14    not there, and there is a scramble.  It really is a scramble.

15         The Court, we expect, will hear some testimony about

16    that, to find this phone which is still clearly in the area,

17    but now the police have lost the element of surprise, and

18    they're looking for, you know, who they believe to be someone

19    potentially who killed a woman and her child, executed them,

20    so he's dangerous, and they're going around knocking on doors.

21         At the moment they knock on the door, we anticipate that

22    the Court will hear three -- two or three different officers

23    describe the individual who opens it and gives consent, steps

24    back and gestures for the folks to come in.  And as that

25    moment is happening, the occupants of the apartment, one of

1    them at least runs opposite of -- opposite of being

2    cooperative, runs to the back of the apartment and slams a

3    door.  And the officers, at that point, absolutely have reason

4    to be concerned for their safety.  They are sort of at their

5    most exposed.  They don't have a search warrant.  They are

6    caught, sort of, on their back foot, and there is individuals

7    believed to be engaged in drug dealing, potentially involved

8    in these murders who are inside, and they come inside and they

9    secure the apartment.

10            And so at that point, in securing Mr. Briscoe, he's

11   lifted up.  There is a cell phone underneath him.  It's not on

12   his person.  It's a cell phone.  And we anticipate that the --

13            **THE COURT:**  This is the Alcatel cell phone; correct?

14            **MS. BRUSCA:**  Correct, Your Honor.

15            -- that the Court will hear that that cell phone is moved

16   out of the way, basically, so it doesn't get broken in the

17   middle of the securing process.  There is a protective sweep

18   of the couch to make sure there is no weapons under

19   Mr. Briscoe, and there is the phone and it's put to the side.

20   And ultimately, BPD takes possession of that phone.

21            There is, subsequently, a search warrant obtained for the

22   apartment, the search warrant that's been the subject of much

23   consternation, but ultimately not a search warrant that the

24   government is relying upon, because what is found in that

25   house as a result of the search are suspected drugs, and

 1    they're found in a bedroom.  And we're going to show the Court

 2    some photos, we expect, of where the suspected drugs were

 3    found.  In a dresser drawer, in a shoe, tucked inside of a

 4    shoe.  There is no evidence that Mr. Briscoe had any items.

 5    The male in that room is related to two other occupants in the

 6    house, not Mr. Briscoe.  And so frankly, he doesn't have

 7    standing to challenge the finding of those drugs.

 8              He's subsequently arrested --

 9              **THE COURT:**  In Apartment 202?

10              **MS. BRUSCA:**  Correct, in Apartment 202.

11         And he is subsequently arrested, along with some other

12    individuals, back to the Cambridge Police Department where he

13    is on an audio and video-recorded interview.  He is provided

14    his Miranda rights, and he signs and initials each of the

15    rights.  He waives them.

16         This is not Mr. Briscoe's first interaction with police.

17    He has already been convicted of a crime and arrested for many

18    more, and he waives them, and he provides a statement.  And

19    that's kind of the crux of 2015, this moment at the doorstep.

20    Do the police have a right to be there?

21         Do they have a right to enter?  And does Mr. Briscoe have

22    any sort of right to challenge what they find inside?

23         And we argue that they did have a right to be there.

24    They did have a right to come inside.  They did so lawfully,

25    and Mr. Briscoe doesn't have standing in any event to

1    challenge what's found in his bedroom.  With respect to the

2    statement, it's voluntary and otherwise admissible.

3         After -- after the June 5th, 2015, warrant and statement,

4    Baltimore takes possession of the phone, and the phone is

5    searched.  That's Government's Exhibit 45, which we will put

6    on.  It is extracted on June 15th, 2015.  We cannot locate a

7    warrant, and the parties have agreed that the government has

8    tried to locate this warrant.  We have --

9         **THE COURT:**  You're proffering that the warrant was

10   from a judge of the Circuit Court for Baltimore City; is that

11   correct?

12        **MS. BRUSCA:**  Correct, Your Honor.  Oh, excuse me.

13   I'm sorry.  I was just going to say not Circuit or District,

14   but a court of Baltimore City.

15        **THE COURT:**  Right.  Right.

16        **MS. BRUSCA:**  And so we have looked or we've asked

17   the clerk's office to look, and they've explained their

18   process in Baltimore City, how warrants are not filed in any

19   way by the date they are issued.  They are filed by the date

20   that they are returned.  And returned means both when there is

21   a return receipt --

22        **THE COURT:**  That cell phone search as to the Alcatel

23   telephone was when?

24        **MS. BRUSCA:**  June 15th -- ten days later -- 2015.

25        **THE COURT:**  2015.

1          **MS. BRUSCA:**  Correct, Your Honor.

2      And so we anticipate that both Detective Lewis and the

3  individual who searched the phone who was an ATF -- FBI,

4  excuse me, TFO will testify that the policy, their practice at

5  that time was to obtain a warrant and the TFO who dumped the

6  phone will, we expect, testify that he would not have done so

7  without confirming that there was a warrant, but nonetheless,

8  we do not have the warrant.

9      And so prior to today, the government had agreed and

10  continues to agree that we will not rely on the extraction

11  from June 15th, 2015, but with respect to *Pratt* that the

12  defense has raised, we do think it's relevant that this

13  activity was conducted, that there wasn't --

14          **THE COURT:**  You're referring to the *Pratt* case in

15  terms of the six-year delay?

16          **MS. BRUSCA:**  Correct, Your Honor.

17      We do think it is relevant as to the defendant's argument

18  that really nothing happened with this phone for six years or

19  that under the *Pratt* line of --

20          **THE COURT:**  Because there was a subsequent search

21  warrant in connection with June of 2021 as to that cell phone;

22  correct?

23          **MS. BRUSCA:**  Correct.  Exactly, Your Honor.

24      So there would be -- that part one of our *Pratt* argument,

25  is it was searched.  We believe there was a warrant.  Of

1   course, we do not -- we readily acknowledge have a warrant in

2   hand.

3       Then secondarily, we would argue that the defendants --

4   and we do argue the defendant's possessory interest in that

5   phone that was taken from him is minimal.  He is incarcerated

6   for much of 2015 after it's seized, the second half of 2016,

7   we believe at least part of 2017, and as the Court noted, from

8   2018 to 2020, and then he's arrested, that's January 2020.

9   Arrested again on these charges in May of 2020.

10      So while he's incarcerated, we believe he doesn't have

11  any possessory interest in the phone, and we believe that the

12  record will reflect there is no evidence he's ever asked for

13  it back.  And what's especially important on this point is

14  that during that 2015, June 5th recorded interview after he's

15  picked up from Apartment 202, BPD officers show Mr. Briscoe

16  his phone.  They show it to him.  He opens it.  He pulls a

17  phone number out of it, and he says, you know, can I get some

18  numbers out of there?  And they say, no, no, it's evidence.

19  So they're not unaware who has the phone.  They say, we're

20  taking it.  We have a warrant to take it.  They take it, and

21  he's never asked for it back again.  And again, the defendant

22  here, as we've provided in our exhibit, he actually knows how

23  to exercise his rights when he wants to.

24      He has gone ahead and moved to have that June 5th, 2015,

25  arrest expunged from his record, together with other cases.

1    So this is not somebody who isn't aware of ways in which the

2    system can work for him if he wants it to.

3        So we would argue in addition to the fact that we believe

4    there was a search done in a timely fashion after it was

5    seized, that the defendant's possessory interest in this phone

6    is minimal.

7        And finally, that separate and apart from *Pratt*, *Pratt*

8    sort of carved out or declined to decide whether a phone in

9    that case could fall into this category of, like, inherently

10   important evidence, basically.  So the idea that you found a

11   car in somebody's possession in that case, it was *United*

12   *States v. Carter*, a suitcase, in the fact that it found in

13   somebody's possession, it is a piece of evidence you want to

14   show the jury, right?

15       This is something that has inherent value.  It can be

16   retained indefinitely.  And the Court says, we're not going to

17   rely on that line of cases because here what has evidentiary

18   value is the image on the phone and the content of the phone.

19       And we would say in this case, we think the phone itself,

20   separate and apart from whatever it may contain, has

21   substantial evidentiary value.  It is a phone that BPD goes to

22   track.  It does, in fact, lead them to Mr. Briscoe.  It is

23   located underneath him.  This is the last phone ever to

24   communicate with Ms. Jeffrey, and Mr. Briscoe had it.

25       So we would --

```
1              THE COURT:  In terms of tracking that ultimately is
2    done of the phone?
3              MS. BRUSCA:  I'm sorry?
4              THE COURT:  In terms of the tracking that is
5    ultimately done?
6              MS. BRUSCA:  Correct.  And --
7              THE COURT:  And that tracking was actually conducted
8    when again?
9              MS. BRUSCA:  The order is obtained June 4th, 2015,
10   and they located him the next morning in Apartment 202.  The
11   time is a bit unclear, but sometime after 8:55 a.m., we think
12   before the 9:07 a.m.  That's basically where we believe we are
13   headed, and then we do expect to call -- and we expect the
14   presentation to, sort of, follow that chronology.  We expect
15   to start with the BPD officers and then to move into our CPD
16   folks, and to conclude, sort of, independently with the 2020
17   statement that's been challenged.
18             THE COURT:  Thank you, Ms. Brusca.
19         And with respect to -- if I can, just one last question
20   and then I'll hear from Mr. Whalen or Mr. Purpura in terms of
21   their opening statement.
22         With respect to the matter of the tracking, the
23   government has noted that the Baltimore Police Department
24   obtained what you called a functional equivalent of a warrant
25   to track the phone, and that that tracking order, not warrant,
```

1    but tracking order established probable cause.  The warrant

2    and/or the tracking order would date to 2021; is that right,

3    or was it in 2015?

4         My point is this, that the case we're going to be

5    discussing, there's certainly been -- and the materials

6    briefed is the *Carpenter* case with respect to tracking cell

7    phone tower information and the state of the law changed,

8    clearly, to some extent, after *Carpenter* and cell tower

9    information, for example.

10        In fact, an opinion that I had in -- the defendants named

11   Graham and Jordan went to the Fourth Circuit, and then it was,

12   as I recall it, remanded back, but there is a great deal of

13   development of the law in that area in 2018, or the aftermath

14   of 2018.

15        So my question is, in terms of the tracking that was

16   conducted pursuant to what the government contends was a

17   functional equivalent of a warrant, that was actually done,

18   again, in -- the date of that tracking was exactly when?

19             **MS. BRUSCA:**  June 4th, 2015, Your Honor.

20             **THE COURT:**  '15, okay.  Pre *Carpenter*.

21             **MS. BRUSCA:**  Correct, Your Honor.

22             **THE COURT:**  Although I know that you proffered that,

23   the Baltimore Police Department has said they actually got a

24   warrant, that is, from the point of the government, is of no

25   moment because it was pre *Carpenter* and they got an order that

```
 1        it was a functional equivalent of a warrant is the position of

 2        the government.

 3                MS. BRUSCA:  Correct, Your Honor.

 4            And to the extent it's not, we would argue good faith.

 5                THE COURT:  I understand.  I understand.  No, I

 6        understand.  All right.  With that, Thank you very much.

 7            Ms. Whalen or Mr. Purpura, I'd be glad to hear from you,

 8        just generally your view of where we're headed on this and

 9        some general thoughts you think I should be looking for as we

10        start.

11                MS. WHALEN:  Thank you, Your Honor.

12            So in the first place, the tracking warrant we maintain

13        had very, very flimsy facts to establish any probable cause.

14        So that it is not a functional equivalent of a warrant.

15        Essentially the same language was used in the later apartment

16        warrants as well.  First, they go to Apartment 101.  They

17        execute the warrant, which is a loud banging --

18                THE COURT:  Just stop for a second.  The warrant

19        we're talking about is a search warrant as to Apartment 101?

20                MS. WHALEN:  Yes.

21                THE COURT:  And there was no search warrant as to

22        Apartment 202?  And with respect to tracking, you concur that

23        the facts are going to indicate that the tracking that was

24        done, or whatever moment it was, it was not -- it was clearly

25        in 2015 initially; correct?
```

```
 1            MS. WHALEN:  That's correct.

 2            THE COURT:  Certainly before Carpenter?

 3            MS. WHALEN:  Way before Carpenter.

 4            THE COURT:  Okay.

 5            MS. WHALEN:  Right.  So June 4th tracking order that

 6    we maintain had no probable cause.  Then there is a search

 7    warrant that's done at Apartment 101 without success, if you

 8    will.  And then they go up to another apartment, actually 201,

 9    and it's arguable that they went to yet a third -- or really a

10    fourth apartment, total.  Then they go to Apartment 202.

11            I think the evidence is going to show that there was

12    banging on the door and words such as "Cambridge Police, open

13    up," and that the individual opened the door.  I think there

14    is a dispute as to whether he consented or whether he was

15    reacting to the force that was actually being exhibited at the

16    door.  And within, I think, the moment that the door is open,

17    I think the testimony will be that the officers come in,

18    because they saw someone running to the back.  Perfectly

19    reasonable that they saw somebody running to the back, they

20    act.  And whether it's reasonable that it would be a

21    protective sweep of the entire apartment, I'll argue that

22    later.

23            However, a protective sweep does not allow you to take

24    anything out of the apartment.  The government has now said

25    they're not relying upon any search warrant that was later
```

1    obtained, and thus it's their burden to demonstrate that there

2    was probable cause to take anything out of that apartment and

3    to search at all.

4        I would suggest to Your Honor that my client has standing

5    to challenge all of the search, and that relies upon his

6    basically being asleep on the couch.  He was an overnight

7    guest in his cousin's apartment.  And that aside from the

8    entire apartment, let's say he didn't have standing for the --

9        **THE COURT:**  You'll proffer that the evidence will

10   indicate that Apartment 202 at 502 Greenwood Avenue in

11   Cambridge, Maryland, was his cousin's apartment?

12       **MS. WHALEN:**  That's right.

13       And so let's say he doesn't have standing to search the

14   entire apartment, he certainly has standing to challenge a

15   search of himself and challenge of the seizure of his phone

16   that the officers knew was his phone.  There is no probable

17   cause to take that phone at the time, and they then take all

18   of the men in the apartment out of the apartment down to the

19   station for further questioning and leave an officer there,

20   maybe one officer while Detective Lewis gets a search warrant

21   for 202.

22       So they've actually arrested everyone, taken them to the

23   station, taken my client's person and his cell phone to the

24   station without probable cause.  We maintain that those

25   actions do not later cure this missing search warrant, that

1    the law is, I think, that the government has to demonstrate

2    that they had a legal search.  If there is no warrant, there

3    is no warrant and it's an illegal search.

4        And so you've got that first illegal search of the

5    Alcatel.  And then the search warrant we maintain in 2020 --

6    excuse me, '21 also is the fruit of the original seizure of

7    the phone that was unlawful in the first place.  There are

8    delay issues as well that Your Honor noted that I will argue

9    later with regard to the facts as they come out.

10       Thank you.

11           **THE COURT:**  Thank you very much, Ms. Whalen.  That's

12   been helpful.  And with that, I think we are ready to proceed

13   with the first witness, and we'll be going for about, I guess,

14   maybe about 25 minutes until ten minutes of 1:00, and then

15   we'll stop at ten minutes of 1:00.

16       Ms. Brusca, first witness.

17           **MS. BRUSCA:**  Thank you, Your Honor.

18       The government calls Detective Brian Lewis, and it will

19   just take me a moment to set up, Your Honor.

20           **THE COURT:**  Come forward, sir, and be sworn.

21           **THE CLERK:**  Please stand and raise your right hand.

22                       *   *   *

23   **DETECTIVE BRIAN LEWIS**, having been duly sworn, was

24   examined and testified as follows:

25           **THE WITNESS:**  I do.

```
 1              THE CLERK:  You may be seated.  Speaking directly
 2      into the microphone, can you please state your full name and
 3      spell your last name for the record.
 4              THE WITNESS:  Detective Brian Lewis, B-r-i-a-n,
 5      L-e-w-i-s.
 6              THE COURT:  Mr. Lewis, you weren't in the courtroom,
 7      I think, when I explained that the standing orders of this
 8      Court require that masks be worn in all public areas of the
 9      courthouse.  However, in the courtroom, in the discretion of
10      the trial judge, the Court participants, including witnesses
11      and counsel, may pull their masks down if they've been fully
12      vaccinated.
13          Have you been fully vaccinated, sir?
14              THE WITNESS:  Yes, Your Honor.
15              THE COURT:  Well, then you don't have to pull your
16      mask down, but you're free to do so if you so choose.
17              THE WITNESS:  Thank you, sir.
18              THE COURT:  Thank you.
19              MS. BRUSCA:  Madam deputy, can I ask you to switch
20      the presentation?
21              THE COURT:  Ms. Maldeis, how are we doing here.  Can
22      you --
23              THE CLERK:  It should be connected to your laptop
24      currently.
25              MS. BRUSCA:  Your Honor, is it okay if I take off my
```

```
1    mask?
2              THE COURT:  Again, that's why I ask the -- have the
3    initial inquiry.  You don't have to, but you're certainly free
4    to because you've been fully vaccinated.
5              MS. BRUSCA:  Thank you, Your Honor.
6              THE COURT:  And also the record will reflect, there
7    is Plexiglas around the podium from which the lawyers are
8    speaking, and there is Plexiglas at their tables.  But again,
9    you can stand at your table or at the podium.  Probably in
10   terms of COVID precautions, it's better if counsel use the
11   podium there to ask questions.
12             MS. BRUSCA:  Thank you, Your Honor.
13                        DIRECT EXAMINATION
14   BY MS. BRUSCA:
15   Q.   Good morning, Detective Lewis.
16   A.   Good afternoon.
17   Q.   Is it afternoon?
18        Where do you work, Detective Lewis?
19   A.   I currently work for the Baltimore City Police
20   Department.
21   Q.   And how long have you worked there?
22   A.   Twenty-four years.
23   Q.   And currently what's your title?
24   A.   Detective, homicide detective.
25   Q.   So you're currently assigned to the homicide unit?
```

```
 1    A.    Yes.
 2    Q.    Did you have any assignments prior to homicide?
 3    A.    Prior to coming to homicide, I worked ten years in the
 4    southwestern district of the -- Baltimore City for the
 5    police department, the first six years in uniform patrol --
 6    I'm sorry, the first four years in uniform patrol, the
 7    following six years as a district detective unit detective.
 8    Q.    So I think you said 24 years, so that's about 14 in
 9    homicide?
10    A.    Yes, ma'am.
11    Q.    And how many homicides have you investigated as a primary
12    detective during your 14 years?
13    A.    About a hundred.
14    Q.    And are those the only homicides that you've
15    investigated?
16    A.    As a primary detective, yes, but I'm in a squad of five
17    other detectives where I assist when needed.
18    Q.    And about how many homicides were you a part of in an
19    assisting role?
20    A.    Over the 14-year span?
21    Q.    Yes.
22    A.    Hundreds.
23    Q.    And do you recall in 2015 investigating the murders of
24    Jennifer Jeffrey and her son, KB?
25    A.    Yes.
```

```
 1    Q.    And what was the date in 2015 that Jennifer's and K's

 2    bodies were discovered?

 3    A.    May 28th of 2015.

 4    Q.    What day of the week was May 28th, 2015?

 5    A.    That was a Thursday, I believe it was.

 6    Q.    And how did you learn about the deaths?

 7    A.    Police dispatch contacted the homicide unit -- that

 8    particular day I was the up detective for the next

 9    investigation -- and advised me that southwestern district

10    patrol officers were at that location, which I believe was 103

11    Upmanor Road in the southwest district part of the city.

12    Q.    I was just going to ask you where the bodies were.  You

13    said, 103 Upmanor Road?

14    A.    Yes, ma'am.

15    Q.    And you said you were the up detective.  What does that

16    mean?

17    A.    We have a rotation-type policy.  The detective with the

18    oldest murder investigation is the first one up for the next

19    investigation, or the next murder.

20    Q.    A way of allocating cases, in other words, or

21    investigations?

22    A.    Yes.

23    Q.    So where in the city is 103 Upmanor Road located?

24    A.    It's in the southwest corner of Baltimore City.

25    Q.    And I'm going to show you Exhibit 33, Government's 33.
```

1      Can you see Government's 33, Detective Lewis?

2  A.   Yes, I do.

3  Q.   And up in the left-hand corner there where the red pin

4  is, what is that location?

5  A.   103 Upmanor Road.

6  Q.   And were you familiar with this area of the city?

7  A.   Yes.  As I stated earlier, I worked ten years in the

8  southwest district which covered that neighborhood as well.

9  Q.   What kind of neighborhood was it?

10  A.   A quiet, residential neighborhood.  Mainly two-story

11  brick row homes.

12  Q.   When you were a patrol officer, did you respond to a lot

13  of crime in that area?

14  A.   No, I did not.

15  Q.   And does it have a neighborhood name, that area of

16  Baltimore?

17  A.   Uplands.

18  Q.   Is it Edmonson Village?  Does that sound familiar?

19  A.   I guess it would be considered part of Edmonson Village,

20  I guess the southern -- the southern part of Edmonson Village,

21  yes.

22  Q.   Okay.  And so were you told, when dispatch told you you

23  were the up detective, what the scene was at 103 Upmanor Road?

24  How many victims, for example?

25  A.   Yes.  We were advised that there were two victims inside

```
 1    of the location.
 2    Q.   And when you show up at 103 Upmanor, who do you meet?
 3    A.   Upon arrival to Upmanor Road, I was met by a patrol
 4    officer by the name of Bass, I believe his last name was.
 5    Officer Bass directed me to the front door of 103 Upmanor and
 6    walked me into the front living room area.
 7    Q.   So Officer Bass is there to kind of show you the scene?
 8    A.   Yes, he was the primary patrol officer.  He got the
 9    original call.  He responded first.  And when myself and my
10    partner arrived to take over the control of the investigation,
11    he is the one that directed us inside of the home to show us
12    where the victims were.
13    Q.   And who was your partner at that time?
14    A.   Detective Vernon Parker.
15    Q.   And can you describe, as you walk into 103 Upmanor Road,
16    just generally what the layout of the residence was?
17    A.   Sure.  When you walk in through the front door -- again,
18    this is a two-story brick row home.  When you walk in through
19    the front door, you're immediately in the living room.  To
20    your right, there is a stairwell to go to the second floor.
21    Straight ahead as you walk through the living room, there is
22    an open doorway, for lack of a better term, that enters into
23    the kitchen area.  From there, I believe if you go up the
24    steps to the right when you first walk into the house, the
25    second floor when you get to the landing, there is a bedroom
```

```
1      right at the top of the steps.
2      Q.   And I'm showing you on the screen there, Government's
3      Exhibit 34.  What's depicted in Government's Exhibit 34 there?
4      A.   This is the location that we responded to, 103 Upmanor
5      Road.
6      Q.   And where on the screen, if you could describe it, left,
7      right, or center is 103?
8      A.   It's center.  It's center on the screen.
9      Q.   Where my mouse is where I just pulled up?
10     A.   Yes, uh-huh.
11     Q.   And moving to page 2 of the exhibit, what do you see on
12     page 2?
13     A.   Again, a closer photograph or view of 103 Upmanor Road.
14     Q.   And you can actually see the house number there on the
15     front left?
16     A.   Yes.
17     Q.   And then page 3?
18     A.   And then, again, a closer view of the front door with the
19     numbers to the left of the door.
20     Q.   And you testified that as you walk into the front door
21     there, you enter into the living room; is that correct?
22     A.   Yes.
23     Q.   And on page 4 of Government's Exhibit 34, what do you see
24     in that photo?
25     A.   The front living room.
```

```
1    Q.   And you had described that there was an open doorway into
2    the kitchen; is that correct?
3    A.   Yes.
4    Q.   And where is that in this photo?  Is this where my cursor
5    is?
6    A.   Yes.
7    Q.   And as to page 5, so the left wall there, is that the
8    edge of the residence --
9    A.   Yes.
10   Q.   -- where the white couch is?
11   A.   Yes.
12   Q.   And on page 6, what's in that photo?
13   A.   As I described earlier, when you walked through the front
14   door to the right is the stairwell leading to the second
15   floor.
16   Q.   And so just for a moment, I'm going to jump to page 10.
17   And what's the view in picture 10?
18   A.   Again, another view of the front door and the stairwell
19   leading up to the second floor.
20   Q.   So you're from the other side of the living room, in
21   other words --
22   A.   Yes.
23   Q.   -- in that view, closest to the kitchen?
24   A.   Yes.
25   Q.   And as you walk into the living room, what are you
```

1    seeing?

2    A.   Furniture, couches, chairs.  Everything seemed to

3    somewhat be in order.

4    Q.   I'm sorry.  You said to be somewhat?

5    A.   In order.  I'm sorry.

6    Q.   In order.

7         And as you walk into the kitchen, what do you see there?

8    A.   Once I entered the kitchen, that's where Ms. Jennifer

9    Jeffrey's body was located.  There was blood, coagulated

10   blood, dried blood near her body.  There was a chair knocked

11   over.  And outside of that, nothing to be seen, quote,

12   unquote, out of the ordinary.  Everything else seemed be to

13   pretty orderly.

14   Q.   And I'm showing you page 7 of Government's Exhibit 34.

15   You testified there was a chair knocked over.  Can you just --

16   you can mark it just there on the screen where the chair is.

17   A.   Yes, to the right of Ms. Jennifer Jeffrey's body.

18   Q.   And that's Ms. Jeffrey laying there to the left; correct?

19   A.   Yes.

20   Q.   And as you leave the kitchen -- I'm just going to go to a

21   different view.  What do you see on page 8 of the kitchen

22   there?

23   A.   This is the sink area of the same kitchen.  This portion

24   of the kitchen is just -- if you're looking at Ms. Jeffrey's

25   body from the living room, this portion of the kitchen is to

```
 1     your right.
 2     Q.   So are you -- in page -- if you go back to page 7 for a
 3     moment, there is a door on the back there?
 4     A.   Yes.
 5     Q.   Is that an exterior door?
 6     A.   I believe it was, yes.
 7     Q.   And so the view from page 8 is, basically, sort of, in
 8     front of that exterior door looking towards the house?
 9     A.   Yes.
10     Q.   And there on page 9, just a third view of the kitchen?
11     A.   Right.
12     Q.   And did you recover any ballistic evidence from the
13     kitchen that day?
14     A.   I believe there were three large caliber casings
15     recovered.  And there was a projectile, if my memory is
16     correct, a projectile in the wall of the kitchen.
17     Q.   And we just looked at three photos of the kitchen.  You
18     testified that there was some coagulated blood near the body.
19     Was there any other indications of blood that you noted
20     throughout the kitchen or living room?
21     A.   Not that I remember, no.
22     Q.   It was limited to the kitchen?
23     A.   Correct.
24     Q.   Okay.  And turning to upstairs, you testified that you
25     walked up the hallway and you were pretty close to the
```

1   bedroom.

2       How many bedrooms were in 103 Upmanor Road?

3   A.   I believe there was three.

4   Q.   And were you able to determine which one was

5   Ms. Jeffrey's room?

6   A.   Yes.  So again, as I was describing earlier, when you go

7   up the steps to the second floor, once you reach the second

8   floor, there is a room immediately at the top of the steps.

9   And then to the left of that room, there was another room that

10  looked like a child's bedroom.  It had children's furniture

11  and I believe some toys and things like that, and then you,

12  sort of, make a quick U-turn and then the front bedroom, which

13  is, I guess, closest to the -- closest to the front of the

14  house, we determined that that was Jennifer Jeffrey's bedroom.

15  Q.   The front of the house, the one sort of being over top of

16  the living room?

17  A.   Correct.

18  Q.   And going to page, I believe it's 11 of Government's

19  Exhibit 34, what's that a view of there?

20  A.   That's the view of the first bedroom once you get to the

21  top of the steps, or the landing of the steps.

22  Q.   And at page -- page 12, what do you see?

23  A.   Again, a closer view of the front -- the first bedroom at

24  the top of the steps.

25  Q.   That's with the pink door.  And page 13, I believe,

```
1    what's in page 13?  Is that the same room?
2    A.   Same bedroom, yes.  Just again, a more detailed view of
3    that room at the top of the stairs.
4    Q.   Just for ease of reference, I'm going to call this the
5    pink bedroom.
6    A.   Yes.
7    Q.   And then the next page you're looking down the stairs?
8    A.   Yes.
9    Q.   With your back towards the pink bedroom?
10   A.   Yes.
11   Q.   And then when you're looking at -- down the stairs, there
12   is an open doorway to the right there.  Which room was that?
13   A.   I believe that was Ms. Jeffrey's room.
14   Q.   And when you go into Ms. Jeffrey's room, what did you
15   find?
16   A.   The second victim, KB, Jennifer's son.  He was on the bed
17   that's to the right of -- in this particular photograph, the
18   bed is to the right and that's where he was found.
19   Q.   So flipping to the next -- the next photograph then.  Is
20   that -- what bedroom is this photo from?
21   A.   Again, this is Ms. Jeffrey's room.  What we're looking at
22   here with the white chair, the white chair is at the foot of
23   Ms. Jeffrey's bed.
24   Q.   And then, I believe, this is page 18, page 17.  That's a
25   view of the bed?
```

```
 1    A.    Yes.

 2    Q.    And also where you found the second victim, KB?

 3    A.    Yes.

 4    Q.    And up on top of the pillow here, what is that?  That's a

 5    little hard to see in the photo.

 6    A.    I think you can go back to that picture.  I just -- the

 7    angle that the screen is, that's why I had to move, but I do

 8    see it.  It was a plate of food, breakfast food.

 9    Q.    And then finally -- oops, my apologizes.

10          At page 19, was this the third bedroom that's depicted?

11    A.    Yes.

12    Q.    And at page 20, what do you see there?

13    A.    There was -- in this bedroom, again, I believe there were

14    toys, but there is video games, there is CDs on the -- I

15    guess, bookshelf, for lack of a better term, as well as a

16    photograph.

17    Q.    This is the one that appears to be the child's bedroom?

18    A.    Yes, there is a Spider-Man headset there as well.

19    Q.    And then at page 22, what's depicted at page 22?

20    A.    This is the rear of the location of 103 Upmanor Road.

21    Q.    And after you had done your initial walk-through, did you

22    have any sort of working theory, just based on your initial

23    walk-through, anything that stood out to you about the crime

24    scene?

25    A.    The -- I believe I made a note of the rear -- the rear
```

```
 1        door was unlocked.  It was closed, but it was unlocked.  We
 2        had learned that the front door was locked from -- we learned
 3        that from a family member that was on scene.  And what stood
 4        out to me was the way Ms. Jeffrey was dressed.  Meaning that
 5        she was in a T-shirt, in her underwear.  So at this point,
 6        given -- meaning that there was very little disturbed in the
 7        house, I believe that it may have been someone that was known
 8        to her.
 9   Q.   And you said that was based in part on the way
10        Ms. Jeffrey was dressed?
11   A.   Yes.
12   Q.   In a T-shirt and underwear?
13   A.   Yes.
14   Q.   And you said the front door was locked and the back door
15        was closed but unlocked when you arrived?
16   A.   That's right.
17   Q.   So were there any other signs in the windows or anywhere
18        else of a forced entry?
19   A.   There were no signs of forced entry.  From what I
20        remember, the windows were closed.  I don't remember if they
21        were locked or unlocked, but I know they were -- I remember
22        they were closed.
23   Q.   And you mentioned Jennifer's state of dress, how was K
24        dressed when you found him?
25   A.   He was in his pajama pants.
```

1    Q.    And he was located in Jennifer's room?

2    A.    Correct.

3    Q.    Just on the bed?

4    A.    Yes.

5    Q.    And did that -- his being located on the bed indicate

6    anything to you about K?

7    A.    Just that he was comfortable.  He was in his mother's

8    bedroom having breakfast.

9    Q.    And we talked about forensic or ballistic evidence that

10   had been recovered from the kitchen.  Did you recover any

11   ballistic evidence from the bedroom?

12   A.    We did.  We found casings on the bed and I believe there

13   was a projectile in the floor underneath the bed.  We actually

14   had to move the bed.  Once we got further into the

15   investigation, we had to move the bed, and we saw that the

16   appearance -- that the projectile had gone through the bed,

17   the mattress and box spring and lodged into the floor and we

18   recovered that as well.

19   Q.    And so is it clear to you, based on the recovery of the

20   shell casings and the bullet fragment, and the nature of the

21   victims' injuries, how you thought they died?

22   A.    I'm sorry?

23   Q.    How you thought they died?  How they were killed?

24   A.    To me, there was no doubt they were gunshot wounds.

25   Q.    And generally can you describe the gunshot wounds to

```
1    Ms. Jeffrey?

2    A.   Ms. Jeffrey had wounds to her chest and head and I

3    believe to her wrist as well.

4    Q.   Do you recall if it was the front or back of

5    Ms. Jeffrey's head?

6    A.   It was the back of her head.

7    Q.   And just generally can you describe the wounds that you

8    could see to K?

9    A.   K had a wound, a bullet wound to his shoulder.  He had a

10   bullet wound to his face, the left side of his face, and a

11   partial wound to his mouth.

12   Q.   And --

13   A.   Those were the wounds that I remember.

14   Q.   And what caliber were the casings that you recovered.

15   A.   .45 caliber.

16   Q.   And later, not that day, did you obtain an analysis of

17   those shell casings from the ballistic experts at BPD?

18   A.   Yes.

19   Q.   And was there a conclusion from those folks as to how

20   many firearms had been used?

21   A.   Yes.

22   Q.   How many?

23   A.   One firearm.

24   Q.   And were there any firearms located in 103 Upmanor Road

25   that day?
```

1    A.    Yes, there was.

2    Q.    What caliber was that firearm?

3    A.    There was a 22 -- .22-caliber Derringer pistol.

4    Q.    And where was that located?

5    A.    That was under -- it was in between the mattress and box

6    spring of Ms. Jeffrey's bed.

7    Q.    Do you recall any suspected narcotics in the home that

8    were found?

9    A.    I do not.  There may have been.  I just don't remember if

10   there was any drugs found -- or suspected narcotics, I'm

11   sorry.

12   Q.    At least nothing -- nothing -- not some large quantity

13   that's notable to you today?

14   A.    Correct.

15   Q.    And what about cash, same question?

16   A.    No, nothing that -- nothing that I can recall, no.

17   Q.    And when you arrived at the home, you described meeting

18   Officer Bass and walking through the home.  Was it searched

19   during that time when you -- when you walked through the home

20   or was that simply a walk-thru?

21   A.    No.  Once we established that the crime scene was inside

22   of 103 Upmanor, at that point, I asked Officer Bass to back

23   out, and I came out, and I asked him to stand by outside the

24   front of the home, outside the front door to make sure that no

25   one was to go in or out to disturb the crime scene and at that

1    point, contacted one of my squad mates and asked them to draft

2    a search and seizure warrant or crime scene warrant.

3    Q.   And then it was subsequently -- the house was

4    subsequently searched in a more thorough manner at that time

5    after the warrant was obtained?

6    A.   Yes.

7    Q.   How did -- did you learn that day how the bodies had been

8    discovered?

9    A.   Ms. Jeffrey's brother, a gentleman by the name of Kevin

10   Wilder, responded to the location.  He received a call -- that

11   we later learned he received a call to come check on Jennifer

12   and K.  When he responded to the home, he had a key to the

13   home, entered the front door where he located Ms. Jeffrey's

14   body.  Went upstairs, saw K's body, and came out of this --

15   came out of the house very upset and called 911.

16   Q.   And was Jennifer's brother on the scene when you arrived

17   at 103 Upmanor Road?

18   A.   Yes, he was.

19   Q.   And you spoke to him yourself?

20   A.   Yes.

21   Q.   And he told you that he had arrived that morning with the

22   key and unlocked the door?

23   A.   Correct.

24   Q.   And did he also tell you, either at that time -- well,

25   who else was on scene?  Let's do that first.  Were there other

1    relatives as well?

2    A.    I believe Danielle Wilder, who is Kevin's sister, and I

3    believe there was a neighbor as well who, from what I

4    remember, was either on her front porch or in her front yard

5    just observing what the police were doing.

6    Q.    And were some number of the folks that were on scene

7    actually transported that day back to BPD?

8    A.    Yes, Mr. Wilder was transported back.  I believe one of

9    the neighbors or maybe two of the neighbors were transported

10   to Baltimore headquarters to a homicide unit to be interviewed

11   formally.

12   Q.    And you said Kevin told you he had received a call to

13   come check on Jennifer.  Do I have it right?

14         Is that what you said?

15   A.    Yes.

16   Q.    Did you ever find out why he was being called to come

17   check on her?

18   A.    According to the neighbor, who was also transported and

19   interviewed, that neighbor said because they're row homes and

20   she typically would hear K playing, or running up and down the

21   steps, she didn't hear anything for, you know, a significant

22   amount of time and she was worried, because it was unusual

23   because Jennifer would play music and K would be in and out of

24   the house, you know, playing out front, or again, if he was

25   inside, she could hear him, you know, throughout the house.

```
 1     And she felt that it was unusual that she did not hear any

 2     activity and was worried and contacted Mr. Wilder.

 3             THE COURT:  With that, we'll stop here now.  It's

 4     ten minutes of 1:00.

 5         Detective Lewis, you should not discuss your testimony

 6     with anyone during this lunch break.

 7         We will reconvene at five minutes after 2:00.  This Court

 8     stands in recess for an hour and 15 minutes.

 9             THE CLERK:  All rise.  This Honorable Court is now

10     in recess.

11         (Lunch recess taken.)

12             THE COURT:  Good afternoon, everyone.

13         (Collective greeting.)

14             THE COURT:  Sorry to keep you waiting for a few

15     minutes.  We're ready to continue.  If we will bring Detective

16     Lewis back to the witness stand.  Thank you.

17         By the way, from the marshals' point of view, what time

18     is best for you all in terms of taking Mr. Briscoe back?  What

19     is the time frame?  Is 4:30 -- does that work for you?  I

20     don't want to go to 5 o'clock.  Is 4:30 workable for everyone

21     here?

22             THE MARSHAL:  Yes, Your Honor.

23             THE COURT:  All right.  So we'll go until 4:30.  We

24     won't take a break.  We'll go right straight to 4:30 and then

25     we'll break for the day because they have to return.  I hope
```

```
 1        that works for you guys.  Okay.  That's good.
 2             Thank you, Detective Lewis.  Sir, you're still under
 3        oath.  You may continue, Ms. Brusca.
 4        BY MS. BRUSCA:
 5        Q.   Detective Lewis, before the break, you testified in
 6        substance that Kevin Wilder told you on May 28th that he had
 7        received a call to do a, sort of, wellness check on Jennifer
 8        and her son because a neighbor hadn't heard sounds through the
 9        walls, hadn't seen activity for a bit of time; is that
10        correct?
11        A.   Yes.
12        Q.   Did Kevin Wilder also tell you when he, himself, had last
13        spoken to Jennifer?
14        A.   He did, but I can't recall the time or day --
15        Q.   That's okay.
16        A.   -- at this point, but I remember him telling us that he
17        had communications with her.  I just can't recall the day or
18        time.
19        Q.   Okay.  Did the family members tell you about any other
20        individuals living at 103 Upmanor Road apart from Jen and K?
21        A.   Yes.
22        Q.   And who were they?
23        A.   It was her niece, Brianna Street.  We spoke to her, and
24        she advised us that there was a young guy by the name of CJ or
25        Curtis that lived in the basement.
```

```
1    Q.   And were you able to speak with CJ?

2    A.   Yes.

3    Q.   And do you know, do you recall CJ's actual name?

4    A.   Curtis Williams, I believe it was.

5    Q.   And what was that -- what was the date that you spoke to

6    CJ, if you recall?

7    A.   It was on the 28th.  It was later in the afternoon.  I

8    want to say about 5 o'clock p.m.

9    Q.   Where was that interview conducted?

10   A.   Baltimore County Detention Center.

11   Q.   Why was it conducted there?

12   A.   He was incarcerated at the time under an unrelated charge

13   and was awaiting -- I guess, awaiting charge.

14   Q.   And the "he" there is CJ?

15   A.   I'm sorry?

16   Q.   The "he" in your testimony was CJ?  He was awaiting

17   trial?

18   A.   Yes.  Yes.

19   Q.   And what was the nature of CJ's relationship with

20   Jennifer?

21   A.   He said he was friends.  He said he -- that they had

22   known each other a while.  From what I remember of the

23   interview, he wouldn't fully commit to saying that they were

24   intimate in any way.  I remember asking him if he was intimate

25   with her and I don't remember him giving a definitive answer,
```

```
 1    so at most friends.
 2    Q.   And what about apart from friendship, was there any
 3    business aspect, for lack of a better term, between CJ and
 4    Jen?
 5    A.   I remember him telling us in an indirect way that they
 6    were dealing in CDS activity.
 7    Q.   And did other individuals who you spoke with on May 28th
 8    say so in a more direct way?
 9    A.   Yes.
10    Q.   Do you recall who those folks were?
11    A.   From what I remember, Danielle Wilder, who was Jennifer's
12    sister, and Brianna Street, the niece of Jennifer, Jennifer
13    Jeffrey.
14    Q.   And you said CDS.  What does that stand for?
15    A.   Controlled dangerous substance.
16    Q.   They were dealing drugs together?
17    A.   Yes.
18    Q.   And you said CJ admitted that in an indirect way, how so?
19    A.   He didn't come out directly and say, yes, I was dealing
20    drugs and Jennifer was dealing drugs.  From what I can
21    remember, I believe it was, like, work or putting in work or
22    something to that effect.
23    Q.   So apart from his relationship with Jennifer, both
24    socially and potentially through drug trafficking, did CJ tell
25    you when he had last spoken to Jennifer?
```

```
 1    A.    Yes.

 2    Q.    And when was that?

 3    A.    It was Tuesday, the 26th of May, 2015.

 4    Q.    And CJ was in jail.  Did you obtain evidence about how

 5    frequently CJ had been communicating with Jennifer while he

 6    was in jail?

 7    A.    Yes.  He advises that he was speaking to her regularly,

 8    as much as he could is what -- from what I remember from the

 9    interview.

10    Q.    And was that just social or was there another reason?

11    A.    He was trying to get her to raise bail money for him.

12    Q.    Okay.  And he told you the last time he spoke to her was

13    Tuesday night, May 26th?

14    A.    Correct.

15    Q.    Working backward from the date of May 28th when the

16    bodies were discovered?

17    A.    Correct.

18    Q.    And what about any attempted phone calls?  Did CJ tell

19    you if he had attempted any later phone calls to Jennifer?

20    A.    Yes, he did.

21    Q.    And when were those?

22    A.    He said that he tried basically all day Wednesday from

23    about lunchtime as much as he could get to the phone.

24    Q.    And when he attempted to call Jennifer, what did CJ say

25    happened?
```

1    A.   He got no response whatsoever.  Matter of fact, said that

2    the phone went straight to voicemail, that it didn't even

3    ring.

4    Q.   So you spoke to CJ, you said, around the afternoon of

5    May 28th.  Did you also speak to the other individual who

6    lived in the home, Brianna Street?

7    A.   Yes.

8    Q.   And when did you speak with her?

9    A.   We spoke to Brianna later that evening, I believe it was,

10   around 9 o'clock p.m.

11   Q.   And what was Brianna's relationship to Jen and K?

12   A.   She was the niece of Jennifer, and she was K's -- I'm

13   trying to think of the relationship.  I guess cousin would

14   have been her -- K, the third, would have been her cousin and

15   she was the niece to Jennifer -- yeah, to Jennifer Jeffrey.

16   Q.   And how frequently was Brianna staying over with Jen, did

17   she say?

18   A.   Very regularly.  As a matter of fact, the room that we

19   spoke about earlier when you first go up the steps to the

20   second floor, that first room on the landing was the room that

21   Brianna stayed in.

22   Q.   Was that the one that I said we can refer to as the pink

23   bedroom?

24   A.   Yes.

25   Q.   And was Brianna able at that time to provide any

```
 1    background on what was going on in Jen's life prior to the
 2    murders?
 3    A.   Yes.
 4    Q.   And what was going on in Jen's life?
 5    A.   She stated that she was dealing with, quote, unquote, the
 6    Cambridge Boys or the guys from Cambridge or from the Eastern
 7    Shore -- I'm sorry, the Eastern Shore Boys, and that Tuesday
 8    -- Tuesday evening Andre -- well, she knew him at the time as
 9    Poo, that Poo was coming over that night, that Tuesday, the
10    26th around 11 o'clock.
11    Q.   So when you say "she," you mean Jen?
12    A.   Jen told Brianna that Poo was coming over at 11 o'clock
13    that Tuesday, the 26th, yes.
14    Q.   And just stepping back for a moment, you first said that
15    Brianna told you that Jen was dealing with the Cambridge Boys?
16    A.   Yes.
17    Q.   And when you say "dealing with," what do you mean by
18    that?
19    A.   Dealing in narcotics, dealing in CDS transactions going
20    back and forth from the Eastern Shore of Maryland to
21    Baltimore.
22    Q.   And was there also a social aspect to Jen's relationship
23    with the Cambridge Boys?
24    A.   Yes.
25    Q.   And what was that?
```

```
1    A.   That she was, I don't want to say direct quote, but

2    sleeping with one of the guys.

3    Q.   And which man was that?

4    A.   Tony Harris.

5    Q.   And we said that the Cambridge Boys -- one of them, you

6    said, was Tony Harris.  Who was the other according to

7    Brianna?

8    A.   Andre Briscoe.

9    Q.   And how did Brianna refer to Briscoe?

10   A.   Referred to him as Poo.

11   Q.   And in addition to those three folks, was there a fourth

12   member of the Cambridge group?

13   A.   She mentioned a man named Zack.  And she said that Zack

14   was a white man, but she didn't know too much about him.

15   Q.   So Jen and Tony had an intimate relationship.  Did Poo

16   have an intimate relationship with anyone?

17   A.   Yes.

18   Q.   Who is that?

19   A.   With Jen and with a young lady by the name of Kiara.

20   Q.   And did Brianna tell you who Kiara was?

21   A.   Yes.  She --

22   Q.   And what -- go ahead.

23   A.   I'm sorry.  Kiara was a good friend of Jennifer's.  They

24   had known each other since they were in high school, I believe

25   she told us.  And she was also blood related to Tony and to
```

```
 1    Andre.
 2    Q.    And where was Kiara living at that point, if you recall,
 3    according to Brianna?
 4    A.    According to Brianna, she lived not too far in an
 5    apartment.  I can't remember if she told us the street name,
 6    but when we figured out where she lived, she lived just a few
 7    blocks away from Upmanor Road.
 8    Q.    So in Baltimore, not Cambridge?
 9    A.    Yes.  Correct.
10    Q.    So Brianna said that the Cambridge Boys, Tony and the
11    defendant, Mr. Briscoe, were coming back and forth to see Jen
12    and Kiara?
13    A.    Yes.
14    Q.    Both socially and there was a drug aspect as well?
15    A.    Yes.
16    Q.    You also testified that the defendant, Mr. Briscoe, might
17    have had an intimate relationship with Jen?
18    A.    Yes.
19    Q.    And that's what Brianna said?
20    A.    Yes.
21    Q.    Was Brianna certain about that or she just believed it?
22    A.    From what I remember, I think she believed it.  I don't
23    know that she was certain of it.
24    Q.    And you also testified that Brianna said that Poo came
25    over on Tuesday night, May 26th; is that correct?
```

```
1    A.   Yes.

2    Q.   Did Brianna tell you why Mr. Briscoe was coming over?

3    A.   Yes, she did.

4    Q.   Why was that?

5    A.   That he was spending some time with Kiara, that Kiara was

6    acting crazy and that he wanted to get away from her.  Decided

7    that he was going to come over to Jen's so that he could hang

8    out with her and then hopefully get a ride back to the Eastern

9    Shore by Jennifer.

10   Q.   And did Briscoe offer to pay Jennifer any money for the

11   ride?

12   A.   Yes, I believe it was, like, $50.

13   Q.   What did Brianna say about whether Briscoe actually came

14   over that Tuesday night?  This is what Jen told her; did it

15   happen?

16   A.   Yes.  According to Brianna, it did.

17   Q.   She actually saw Mr. Briscoe on Tuesday night?

18   A.   Yes.

19   Q.   And about what time did Brianna believe that Mr. Briscoe

20   had come over on Tuesday?

21   A.   It was around 11:00 -- excuse me, around 11:00 p.m.

22   Q.   And after Mr. Briscoe came over, what did Brianna do?

23   A.   She said she went to bed with her daughter, her young

24   child.

25   Q.   Did anything happen that night, according to Brianna,
```

```
 1    after Mr. Briscoe arrived?

 2    A.   Yes.

 3    Q.   What happened?

 4    A.   According to Brianna, according to her, she -- Brianna,

 5    she said that around 4 o'clock, she was awakened by loud

 6    knocking at the front door.

 7    Q.   And did -- was it loud enough for Brianna to come out of

 8    her room?

 9    A.   Yes.  She -- Brianna said that she went to Jen's room

10    where she saw Mr. Briscoe in the white chair in Jennifer's

11    room and asked Jennifer -- or Jennifer asked her to go down to

12    see who it was.

13    Q.   And who was it at the door?

14    A.   Kiara.  Kiara Haynes, I believe her last name was.

15    Q.   And Kiara was banging on the door.  Was Kiara saying

16    anything according to Brianna?

17    A.   Yes.

18    Q.   What was she saying?  What was Kiara saying?

19    A.   Tell Andre to come out.  I know Andre's there.  She kept

20    repeating to Brianna, tell Andre to come out of there.  I know

21    Andre is in there.  And according to Brianna, that's how she

22    knew what Poo's real name was, because she heard Kiara calling

23    for Andre.

24    Q.   And what was Brianna's response when she figured out it

25    was Kiara?
```

```
 1    A.    She denied that Andre was there and that she should leave
 2    or she was going to call the police.
 3    Q.    Did Brianna open the door?
 4    A.    No.  This was all through the door.  She said that, you
 5    know, Kiara was being very disrespectful and that she should
 6    leave or she was going to call the police.
 7    Q.    And did that stop Kiara from banging?
 8    A.    No.
 9    Q.    She continued to bang?
10    A.    She continued for a while, yes.
11    Q.    And were you able to confirm during your investigation if
12    there was, in fact, a 911 call made on May 27th in relation to
13    this incident?
14    A.    Yes.
15    Q.    And what was that call?
16    A.    That was a 911 call.  I can't remember what they coded as
17    far as a disturbance, but the call came in to police dispatch
18    approximately 5 o'clock a.m. on the 27th, Wednesday, the 27th
19    for someone making a lot of noise at that location, which was
20    103 Upmanor.
21    Q.    Was there any indication in the records that you found
22    that police actually responded?
23    A.    No.
24    Q.    And so how did the confrontations with Kiara at 103
25    Upmanor Road end?
```

1   A.   Ultimately Kiara left the location, and I believe went

2   back home, so she stopped and -- and either went back home or

3   went somewhere, but she left the neighborhood.

4   Q.   And what did Brianna do?

5   A.   Brianna went back to bed until it was time for her to

6   actually get up and go to work.

7   Q.   And what happened the next morning, according to Brianna,

8   when she woke up?

9   A.   Brianna told us that she had to go to work.  She told us

10  that she left the location around 10:26 a.m. -- 10:26 a.m.

11  She said that she left to go to work.

12  Q.   Brianna said that she left 103 Upmanor Road at

13  10:26 a.m.?

14  A.   Yes.

15  Q.   And did Brianna tell you who was in the residence at that

16  time?

17  A.   At the time she told us that it was Jennifer and K.

18  Q.   Had Jen said anything to Brianna about Briscoe?

19  A.   Yes.

20  Q.   What did she say?

21  A.   That he had left, but she said that they had made plans

22  for -- basically for later.  Basically they had made plans for

23  her to take Andre back to the Eastern Shore for about 50

24  bucks.

25  Q.   That's what Jennifer had told Brianna the night before.

```
 1    Do you know if she said it again in the morning?
 2    A.   I don't know if she said it again in the morning.  I
 3    don't remember if she said it again in the morning when
 4    Brianna left.
 5    Q.   And so -- and she says -- just to be clear, she left.
 6    She says Jen and K are in the house, Briscoe is not in the
 7    house?
 8    A.   Yes.
 9    Q.   Jen told her he left or something to that effect?
10    A.   Yes.  Correct.
11    Q.   And before Brianna leaves, does Jen ask Brianna to do
12    anything on her way out?
13    A.   She asked her to get -- put money on a Green Dot card and
14    for the life of me, I don't know why or what that was for.  I
15    can't remember what that was for, but I remember her saying --
16    I remember Brianna telling us that Jennifer wanted to put --
17    to have Brianna put money on a Green Dot card, and Brianna was
18    upset because she did it and she didn't get a response back
19    from Jennifer, like a thank you or acknowledging the fact that
20    she did this.
21    Q.   And after Brianna had finished up work on Wednesday,
22    May 27th, where did she sleep on the night of Wednesday,
23    May 27th, Brianna?
24    A.   I believe it was -- the address where we found her, which
25    was, I believe, Parkwood Road in Catonsville, Maryland, which
```

1    is just outside of west Baltimore on the county side of the

2    city/county line.

3    Q.   So that was not 103 Upmanor Road?

4    A.   Correct.

5    Q.   And during the interview on May 28th, was Brianna able to

6    provide any information about Jennifer's phones?

7    A.   Yes.  She told us that there were two phones.  She told

8    us -- I believe she told us the phone numbers to each phone as

9    well.

10   Q.   And was the information that Brianna provided you the

11   same or different than information, if any, that CJ provided

12   you about Jen's phones?

13   A.   No, it was the same as far as the number of phones she

14   had and the phone numbers themselves.

15   Q.   And that number was two phones?

16   A.   Correct.

17   Q.   And did Brianna describe the two phones in any way?

18   A.   Brianna told us that there was a flip phone and she told

19   us that there was a, I believe, Android phone.

20   Q.   Which phone, if either, did Brianna indicate was a

21   primary phone?

22   A.   The Android phone was, according to Brianna.

23   Q.   The smartphone or the --

24   A.   The smartphone, yes.

25   Q.   Had you or other officers recovered any phones from 103

```
1    Upmanor Road earlier that day when you searched it?
2    A.   Yes.
3    Q.   And which phone or phones had you recovered?
4    A.   We recovered a flip phone that we later found out was
5    Jennifer's second phone.
6    Q.   And how did you find that out?
7    A.   (Coughing) excuse me, I'm sorry.  Excuse me.
8         We found out -- we got confirmation through Mr. Wilder,
9    Mr. Kevin Wilder, who was on scene.  He directed us -- from my
10   memory, he directed us and told us that that was Jennifer's
11   phone, the flip phone.
12   Q.   And was that phone shown to anyone who you later spoke
13   with on the 28th?
14   A.   I believe that was Brianna, and I can't remember if we
15   showed CJ or not.  I remember showing Brianna, and I think
16   maybe it was Danielle Wilder who was also on the scene.
17   Q.   And those witness or witnesses confirmed that was Jen's
18   flip phone?
19   A.   Yes.
20   Q.   So you had one of the phones.  What steps were taken with
21   respect to the missing phone, the smartphone?
22   A.   At that point, we realized that her phone was missing not
23   in the house, couldn't be accounted for, so we decided to get
24   a Court order to see if we could locate the phone and to see
25   if it was actually on and working.
```

1    Q.   And so I'm going to put up Government's Exhibit 2, and

2    I'll just page through a little bit, but on the first page of

3    Government's Exhibit 2, what is that?  What is that exhibit?

4    A.   It's a trap and trace order, or a pen register trap and

5    trace order, Court order.

6    Q.   And what kind of information does a pen register trap and

7    trace typically get you?

8    A.   It -- you're looking for cell site information, call

9    detail, meaning the ingoing, outgoing calls, text messages,

10   anything that we could provide or the phone could provide to

11   assist in --

12   Q.   So primarily --

13   A.   -- the investigation.

14   Q.   -- numbers dialed?  And is that both historical and

15   prospective?

16   A.   Yes.

17   Q.   And so continuing down to page 6 of Exhibit 2, pages 1

18   through 5 were the order provided by the judge; is that

19   correct?

20   A.   Yes.

21   Q.   It's actually signed there on page 5 by the judge?

22   A.   Yes.

23   Q.   And then pages 6 through 12 are your application for the

24   order; is that right?

25   A.   Yes, it is.

```
1    Q.   And you've signed it on page 12; is that correct?  That's
2    your signature there?
3    A.   Yes, it is.
4    Q.   So in this pen register and trap and trace order on --
5    did you have to make sort of a factual allocution as to why
6    you needed it?
7    A.   Yes.
8    Q.   And turning to page 8, do you see in the middle there,
9    starting with family member on the second line, what did you
10   write?
11   A.   "Family member Kevin Wilder advised that he last spoke
12   with Ms. Jeffrey via cell phone on 27 May, 2015 at
13   approximately 1015 hours.  Ms. Jeffrey was found on 28 May,
14   2015 in her kitchen at approximately 0821 hours by emergency
15   personnel."
16   Q.   And so having read that, does that refresh your
17   recollection that Kevin told you that he last spoke to
18   Jennifer on Wednesday, May 27th at about 10:15 a.m.?
19   A.   Yes, it does.
20   Q.   And does the application further note that you had tried
21   calling the same number, Jennifer's number with no answer?
22   A.   Yes.
23   Q.   Was that correct?
24   A.   Yes, it was.
25   Q.   In addition to the pen register and trap and trace, did
```

```
1    you also obtain a location order for Jen's phone?

2    A.   Yes.

3    Q.   Turning to page 13 of Exhibit 2, first two pages, what is

4    this document?

5    A.   This is the application to get the location information

6    for the phone.

7    Q.   And on pages 15 through 18, that's your affidavit in

8    support of the application, and I'll flip through 16, 17, and

9    18 here for you.

10   A.   Yes.

11   Q.   And that's your signature there on page 18?

12   A.   Yes, it is.

13   Q.   And the judge signed it below?

14   A.   Yes.

15   Q.   And going back up to your affidavit -- we'll go through

16   that in a moment -- why would you get a location order

17   separate and apart from a trap and trace?  What kind of

18   information did you hope to get?

19   A.   We were hoping to get the actual physical location of the

20   phone, knowing that it hadn't been in her home.  We believed

21   that whoever was responsible for this crime may have taken the

22   phone with them, so we wanted to actually locate the phone

23   itself.

24   Q.   And, in fact, you say that in so many words at page 17 in

25   your affidavit; is that correct?
```

```
 1    A.    Yes.
 2    Q.    Can you read that last sentence there of the double
 3    spaced portion of the affidavit?
 4    A.    Starting at based?
 5    Q.    That's correct.
 6    A.    "Based on your affiant's training and expertise, it is
 7    known that suspects typically use cellular phones until
 8    service is terminated or the phone becomes non-functional."
 9    Q.    I'm sorry, I did say base, but I actually meant the
10    sentence before, I apologize.
11    A.    Starting with "therefore"?
12    Q.    Correct.
13    A.    "Therefore, your affiant believes that the suspect may
14    have taken the cell phone during commission of the crime."
15    Q.    And why might a person who was involved in a crime take
16    the victim's cell phone, in your experience?
17    A.    To basically hide any information if there was any
18    conversation between the suspect and the victim prior to the
19    murder itself, if there were any type of communication,
20    whether it be text messaging or, I don't know, messaging
21    between social media accounts, again, phone calls.  Back then,
22    it was more phone calls and text messaging.
23    Q.    And so I guess putting it differently, to conceal the
24    perpetrator's involvement with the victim?
25    A.    Yes.
```

```
1    Q.    And what did Jen's call records from the trap and trace
2    show about her communications?
3    A.    That -- I'm sorry.  Ask your question again.  I'm sorry.
4    Q.    I'm sorry.  That was a bad question.
5          What did -- you obtained this pen trap and trace and the
6    location order for a particular number, is that correct, a
7    particular phone number?
8    A.    Yes.
9    Q.    And as that's set out in both the application and the
10   order, what phone number was that?
11   A.    Target number one, (240) 580-4057.
12   Q.    And that was Jen's -- the number for Jen's smartphone?
13   A.    Yes.
14   Q.    That hadn't been recovered?
15   A.    That's correct.
16   Q.    And what did the records that you received for that 4057
17   reflect about Jen's communication?
18   A.    One, that it was off.  Two -- I'm sorry, I'm having
19   trouble answering your question.  Could you rephrase it?
20   Q.    When was the last phone call according to the phone
21   records?
22   A.    Okay.  So the phone call showed that Jennifer called
23   Andre Briscoe's phone at 11:41 a.m. on Wednesday, the 27th.
24   After that, there were no other calls or -- from her to
25   anyone.
```

```
1    Q.   And you said that was a call at 11:41 a.m. to whom?

2    A.   Mr. Briscoe.

3    Q.   And how did -- did the phone records say it was a call to

4    Mr. Briscoe or it was to a phone number?

5    A.   It was to a phone number, I'm sorry.

6    Q.   That's okay.

7         What was the phone number?

8    A.   It was a (443) 621 -- I believe -- 2413.  2413 number.

9    Q.   And who was that subscribed to?

10   A.   Mr. Briscoe.

11   Q.   How long was that 11:41 a.m. call?

12   A.   I remember it being just under two minutes.  I think it

13   was like 111 seconds, something to that effect, 110, 111

14   seconds, I believe.  So roughly just under two minutes.

15   Q.   And there were no completed calls to or from Jennifer's

16   4057 phone after that?

17   A.   Correct.

18   Q.   And you said that was on Wednesday, May 27th?

19   A.   Yes.

20   Q.   And when were the bodies discovered?

21   A.   Thursday morning, the 28th.

22   Q.   All right.  And you also said the phone was off.  Was

23   that your testimony?

24   A.   Yes.

25   Q.   And did it actually -- do the records reflect whether a
```

```
1    phone is off or on or just you can tell whether calls are

2    completed or not?

3    A.   From what I remembered, the phone was off.  And I don't

4    re- -- from what I remember, the phone was off.

5    Q.   You don't remember how that shows up in the records?

6    A.   Correct.

7    Q.   Okay.  You reviewed them as the phone was off?

8    A.   Yes.

9    Q.   Okay.  In addition to obtaining the records for the 4057

10   number, were you able to obtain any information from Jen's

11   flip phone that you actually recovered?

12   A.   Yes.

13   Q.   And how did you do that?

14   A.   Actually because it was a flip phone, we're able to open

15   it and view the call log history, I believe her contacts that

16   were in that phone, and I believe a text message or two.

17   Q.   And while you were reviewing it, did you make any records

18   of what you saw in the phone?

19   A.   Yes.  I remember writing down the contacts, the way they

20   were displayed on the phone, the -- I guess the contact name

21   and number associated with that name.  Also, there was a text

22   message that I wrote down as well.

23   Q.   And I put on the screen Government's Exhibit 1A.  Do you

24   recognize the first page of Government's Exhibit 1A?

25   A.   I do.
```

1   Q.    What is that?

2   A.    This is the notepad that was used by my partner,

3   Detective Vernon Parker at the time.

4   Q.    And on page 2, what's reflected on page 2?

5   A.    This is the notes that I took in Detective Parker's

6   notebook that I just described with the contacts, the name to

7   the left and the phone numbers associated to those names on

8   the right.

9   Q.    And why did -- two of these contacts are highlighted.

10  Beginning with the bottom highlighting line, why did you

11  highlight that line?

12  A.    By this time, we had realized that Poo, a/k/a Andre

13  Briscoe, was a person that we needed to locate and interview

14  in reference to this case.  So when we saw Poo, and I realized

15  that this was the number of Andre Briscoe, that this number

16  was something that I needed to highlight so that it would

17  stand out for me as I continued the investigation.

18  Q.    Was the number that you wrote down from Jen's flip phone

19  the same number as the 11:41 a.m. call from Jen's smartphone

20  that you had gotten records for?

21  A.    Yes, it was.

22  Q.    The 2413 number?

23  A.    Yes.

24  Q.    And you also highlighted a second contact.  We've only

25  excerpted here one page of notes.  Do you recall making more

```
 1     than one page of notes as you reviewed the phone?

 2     A.   I believe so, yes.

 3     Q.   So you wrote down some text messages maybe and things?

 4     A.   Yes.

 5     Q.   And do you recall why the second number was highlighted?

 6     A.   I remember this number in particular was associated with

 7     Tony Harris.

 8     Q.   And were there any messages from this number that stood

 9     out to you?

10     A.   Yes.

11     Q.   And what message was that?

12     A.   It was something to the effect of, call me back.  I'm not

13     playing or something to that effect.  And given the time frame

14     of when that text message was, that stood out to me and I

15     thought that that may be important in the case.

16     Q.   What was the time frame of the message?

17     A.   If memory serves, it was the -- I believe it was the 29th

18     of May.  I want to say sometime in the a.m.  I want to say,

19     like, 9:00 a.m.  I could be wrong, but I believe it was the

20     29th of May, which would have been that Friday after the

21     discovery of the victims.

22     Q.   And do you -- would it be helpful -- you believe that you

23     had extra pages of notes?

24     A.   I believe so.  I believe there was more than one page

25     that I wrote down in this notepad.
```

1    Q.   Would it be helpful to look at those notes?

2    A.   Is it okay?

3    Q.   Do you have them with you?

4    A.   I do have the notepad here with me, yes.

5    Q.   Please do.

6         **THE COURT:**   Just for the record, the witness is

7    looking at Government's Exhibit 1A, the notepad of his

8    partner, Vernon Parker; is that correct, Ms. Brusca?

9         Is that what he's looking at?

10        **MS. BRUSCA:**   Correct, Your Honor.

11        **THE WITNESS:**   Okay.  I'm at the page on the screen

12   now, and it's okay to flip to the next page?

13   **BY MS. BRUSCA:**

14   Q.   Sure, if it would refresh your recollection in your

15   review of the phone.

16   A.   Yes.  This was, just as I wrote "contacts continued."

17   Yes, this is my handwriting.  Again, with more contacts names

18   into the right of those corresponding numbers.

19   Q.   And Detective Lewis, I'm sorry, I'm just asking

20   specifically about that text message.

21   A.   Oh, okay.  I'm sorry.

22   Q.   That's okay.

23   A.   I'm sorry.  I was mistaken about the date and time.

24   Q.   What was the date and time of the message?

25   A.   It was Wednesday, May 27th of 2015 at 2128 hours.  That's

```
1    9:28 p.m.

2    Q.   And in substance, what was the message?

3    A.   "Call me.  I'm not playing.  Call me now."

4    Q.   And do you recall -- I believe you testified that that

5    number was associated with Tony Harris.  Do you know if you

6    were aware whether that was the case as you were reviewing the

7    phone or only later?

8    A.   I believe it was some time later.

9    Q.   Okay.  But at the time it stood out to you because of the

10   nature of the message?

11   A.   Yes.

12   Q.   And after you were done reviewing the phone, what did you

13   -- the flip phone, what did you do with it?

14   A.   The flip phone, I believe, was kept in the case file.

15   Q.   Was it ever checked into evidence?

16   A.   To my recollection, I believe I kept the flip phone with

17   the case file in my desk basically.

18   Q.   All right.  And were you -- after you review the phone,

19   you've now reviewed the phone.  I don't think -- actually,

20   turning back a moment to Government's Exhibit 2, do you recall

21   the date of the pen register and location order for Jen's

22   phone?  I can pull it up if you don't recall from memory.

23   A.   Not without reviewing the actual order itself.

24   Q.   Reviewing the document, what was the date that it was

25   signed?
```

```
 1    A.    June 1st of 2015.
 2    Q.    So at this point, you've obtained Jen's phone records and
 3    reviewed her flip phone and you've spoken to CJ and Brianna
 4    and you find out from Brianna about the relationship with the
 5    Cambridge Boys; is that correct?
 6    A.    Yes.
 7    Q.    And did you ever speak to Kiara Haynes?
 8    A.    Yes.
 9    Q.    And when was that?
10    A.    That was the 29th of May, 2015.
11    Q.    The day after you spoke to Brianna?
12    A.    Yes.
13    Q.    And how did the information Kiara gave you compare to the
14    information that Brianna gave you?
15    A.    It was -- it was very similar.  The fact that Kiara knew
16    that -- and was emphatic when she went over to Upmanor Road
17    and banged on the door.  She knew that Andre was there.  That
18    was --
19    Q.    She admitted that she had gone over to Jen's house?
20    A.    Yes, she did.  And she admitted that she was the one
21    banging on the door, because she was upset and she wanted to
22    see Andre.
23    Q.    And why was Kiara upset, as you understood it?
24    A.    She had feelings for him.  Although, they were relatives,
25    she had romantic feelings for him and was somewhat jealous of
```

```
 1        the fact that he decided to go to spend time with Jennifer and
 2        not spend time with her.
 3        Q.   And during the interview with Kiara, did Kiara have any
 4        information about what Jen kept in her house in terms of
 5        contraband?
 6        A.   During the exchange between Kiara and Brianna when Kiara
 7        was knocking at the door, at one point, again, Brianna said
 8        that she would call the police and Kiara told us during her
 9        interview that she said, you know, well, I'll call the police
10        because I know what she has in that house.
11        Q.   And the "she" Kiara was referring to was who?
12        A.   I'm sorry?
13        Q.   You said, Kiara said, "I know what she has in the house."
14        Who is the "she"?
15        A.   Jennifer.
16        Q.   And what did Kiara say Jen had in the house?
17        A.   Drugs and money.
18        Q.   And what about weapons?
19        A.   And I believe she had mentioned a gun.
20        Q.   And where did Kiara go after she banged on 103 Upmanor
21        Road at 5:00 a.m. on May 27th?
22        A.   She told us that she went back to her home.
23        Q.   And --
24        A.   I --
25        Q.   Sorry.  Go ahead.
```

```
 1    A.   I believe it was -- Diener Place was the street name of
 2    where her apartment was, which, again, was only but a few
 3    blocks away from Upmanor Road.
 4    Q.   And I believe you testified -- about how far was that
 5    location, Diener Road to 103 Upmanor Road?
 6    A.   Just a few blocks.
 7    Q.   Was it walking distance?
 8    A.   Yes.
 9    Q.   And what did Kiara say about when she, Kiara, saw
10    Mr. Briscoe again?
11    A.   Oh, geez.  I'm sorry, I --
12    Q.   That's fine if you don't remember.
13    A.   I don't remember.
14    Q.   After speaking to Kiara, did you go view any video
15    surveillance?
16    A.   Yes.
17    Q.   And why was that?
18    A.   She had mentioned during the interview that she walked a
19    portion of the way to go -- to go, I think, on the east side
20    of town because she had a relative on the east side of town,
21    and that she walked past a store on Frederick Avenue and, I
22    believe it was, Collins Avenue.
23         Again, I spent a good portion of my career in that area
24    of the city of my career and I remembered that that -- the
25    corner store at Frederick and Collins had cameras.  So I
```

1    wanted to see if what she was telling us was true in terms of

2    her walking by.  So I believe she gave us a time frame and my

3    partner and I went to this corner store to check their

4    cameras.

5    Q.   And was Kiara alone when she was walking over to the

6    corner store according to her?

7    A.   According to her, no, she was with Andre and I want to

8    say there was a Hack, or they attempted to get a Hack around

9    that area.  So that was -- again, that was the reason why I

10   went to the corner store, because I remembered that particular

11   store had cameras that showed that corner.

12   Q.   And were you able to confirm what the footage showed?

13   Did you review it?

14   A.   I reviewed the footage for the time period and I did not

15   see them in that area from those particular cameras.

16   Q.   And so you weren't able to confirm that -- when Briscoe

17   had left the area based on Kiara's statement?

18   A.   Correct.  Correct.

19   Q.   And so did you obtain any records for that 2413 for Poo

20   when we looked at the contact earlier?

21   A.   Yes.

22   Q.   And I'm going to put up Exhibit 3.  And just flipping

23   through a couple of pages, what is the first page here of

24   Exhibit 3?

25   A.   This is the cover page to the pen register/trap and trace

```
 1    court records.
 2    Q.   And for what number?
 3    A.   (443) 621-240 -- 2413, excuse me.
 4    Q.   And who is that number subscribed to again?
 5    A.   I'm sorry, Andre Briscoe.
 6    Q.   I think we used to have water.  Do you -- I don't think
 7    we do.  Are you okay?
 8    A.   Yes.  Yes.  I'm fine.
 9    Q.   And below the application in the exhibit, is there also
10    an order for that number?
11    A.   Yes.
12    Q.   And just to continue on then, after -- this is a pen
13    register and trap and trace, the same that you had obtained
14    for Jennifer's phone?
15    A.   Yes.
16    Q.   For things like dial call numbers?
17    A.   Yes.
18    Q.   Cell site information?
19    A.   Yes.
20    Q.   And did you also obtain a location tracking order as you
21    had for Jennifer's phone?
22    A.   Yes, I did.
23    Q.   And that was for Mr. Briscoe's 2413 number?
24    A.   Yes.
25    Q.   I'm going to put up Government's 4M2.  And on page 1 and
```

```
 1      page 2, what do we have there?
 2      A.   Again, this is the application for the location of the
 3      cell phone.
 4      Q.   And that was for what target number?
 5      A.   (443) 621-2413.
 6      Q.   And that's your signature on page 2 of the application?
 7      A.   Yes, it is.
 8      Q.   And what was the date of the application?
 9      A.   The 4th of June, 2015.
10      Q.   And following the application, did you similarly, like
11      you had for Jennifer, submit an affidavit to the Court?
12      A.   Yes.
13      Q.   And then the affidavit, was it signed?
14      A.   It is not.
15      Q.   Below the space for your signature, can you read the
16      sentence with the date, please?
17      A.   Starting with "sworn"?
18      Q.   Correct.
19      A.   "Sworn to me and subscribed in my presence, this 4th day
20      of June, 2015."
21      Q.   When you obtain a location information order, were you
22      sworn before you --
23      A.   Yes.
24      Q.   -- got and obtained the order?
25      A.   Yes.
```

1    Q.    And do you recall this particular order or is it just

2    judges always swear you in is the practice?

3    A.    Judges always swear in -- swear us in.

4    Q.    Why might it have been not signed?

5    A.    I -- honestly, I don't know.  Again, I'm swearing to it

6    in front of the judge.  It's -- I don't know.  I wish I had an

7    answer as to why I didn't sign it.  I normally signed where

8    I'm supposed to that particular day in swearing it to the

9    judge that this information was true.  I did not and I really

10   can't recall or remember why I didn't sign this particular

11   order.

12   Q.    All right.  It could have just been oversight?

13   A.    Possibly.

14   Q.    And turning to pages 7 and 8 and 9, is this the order

15   that you obtained to locate Mr. Briscoe's phone?

16   A.    Yes, it is.

17   Q.    That's the number ending 2413?

18   A.    Yes.

19   Q.    And I'd like to turn to your application for this

20   tracking order at page 5.  And could you read this

21   double-spaced paragraph beginning with the "during the

22   course"?

23   A.    During the course of the investigation, it was

24   ascertained that the target number -- phone number, excuse me,

25   (443) 621-2413 Metro PCS belongs to Mr. Andre Briscoe, male

1   black, 31, 10/5/83, a/k/a Poo.  Mr. Briscoe was the last

2   person to see the victim -- I'm sorry, it should say to see --

3   see the victim according to the victim's family and was the

4   last person to speak with the victim via cell phone on 27 May,

5   2015 at 11:41 a.m.

6       Mr. Briscoe discontinued calling the victim's phone after

7   11:41, breaking a pattern of calls to the victim.  This

8   information was obtained through the victim's phone records.

9   Mr. Briscoe has not been located since the murder and has not

10  spoken to the family.

11  Q.   And just, again, at the top, the second sentence you

12  wrote, "Mr. Briscoe was the last person to see the victim,

13  according to the victim's family" and you noted the "to" is

14  missing, but to see.

15      What did you mean when you wrote Mr. Briscoe was the last

16  person to see the victim according to the victim's family?

17  A.   When speaking with Brianna Street, she explained to us

18  the events from late Tuesday night into early Wednesday

19  morning.  She also explained to us that Jennifer was going to

20  -- had planned on taking Mr. Briscoe back to the Eastern Shore

21  for $50.  So there was a plan for them to get together so that

22  Jennifer could do that, and again, that was according to

23  Brianna Street.

24      So when we viewed the phone records of Ms. Jennifer

25  Jeffrey and saw that call at 11:41 a.m. to Mr. Briscoe's phone

and then no communication afterwards, and given the totality

of our investigation up until that point, that there was --

she wasn't dealing with anyone else, there was a plan for her

to get with Mr. Briscoe again to, you know, take him back to

the Eastern Shore.  And again, there was no -- as far as we

could see, there was no other communication after that 11:41

phone call.

Q.   So you just testified, I believe, that when you spoke to

Brianna, she left 103 Upmanor Road at around 10:26 a.m. on

Wednesday, May 27th?

A.   Uh-huh, yes.

Q.   And she told you who was left in the house when she left?

A.   Yes.

Q.   And that was Jen and K?

A.   Yes.

Q.   So did you have any reason at that point to think that

Brianna had called Jen and K?

A.   No.

Q.   So in your view, was Brianna going to be someone -- was

she the killer?

A.   No.

Q.   So she left, so what do you think happens?

A.   I believe that --

          **MS. WHALEN:**  Objection.

          **THE COURT:**  Sustained.  Federal rules apply here,

1   Ms. Brusca.  That's an inappropriate question.

2              **MS. BRUSCA:**  I apologize, Your Honor.

3   **BY MS. BRUSCA:**

4   Q.   So when you say the last person to see the victim, I

5   mean, what we're getting at -- what I'm trying to ask you is,

6   did you think that Brianna was the last person to see the

7   victim?

8   A.   No.

9   Q.   Who did you think --

10  A.   I believe --

11  Q.   Well, let me withdraw that.

12       So Mr. Briscoe, you said, had plans to meet up with

13  Jennifer according to Brianna?

14  A.   Yes.

15  Q.   And then there is this 11:41 a.m. call between the two of

16  them?

17  A.   Yes.

18  Q.   And then there is no other communication with Jennifer?

19  A.   Right.

20  Q.   Were there any attempted communications with -- between

21  Jen's number and Briscoe's number?

22  A.   No.

23  Q.   You also wrote then -- so that's what you meant when you

24  said, I guess, the last person to see him.  So you also wrote

25  in here that "Mr. Briscoe discontinued calling the victim's

1    phone after 11:41, breaking a pattern of calls to the victim."

2         What did you mean by that?

3    A.    Prior to Mr. Briscoe coming over to the house that

4    Tuesday night at 11:00, there were back and forth calls.

5    There were attempted calls back and forth.  When I say back

6    and forth, I mean between Jennifer and Mr. Briscoe.  I believe

7    there was maybe one or two connected calls and I believe one

8    or two attempted calls, which I think we wrote "attempted" in

9    our notes because the calls didn't connect.

10   Q.    And then you wrote Mr. Briscoe has not been located since

11   the murder and has not spoken to the family?

12   A.    Yes.

13   Q.    And what was that based on?

14   A.    Speaking to the family members.  Speaking to Danielle.

15   Speaking to Kevin.  Speaking to Brianna.  They hadn't heard

16   anything and by all accounts they knew that he was with her.

17   Q.    And then last you concluded, therefore, Mr. Briscoe may

18   have vital information that could assist in this information.

19   And what evidence were you seeking to recover by locating

20   Briscoe's phone?

21   A.    Any possible information that may have assisted, just

22   like I put in the affidavit, whether it be, you know, text

23   messaging to not just Jennifer's phone but to anyone he was in

24   communication with during that time period.

25   Q.    And turning back to the pen register from Mr. Briscoe's

```
 1    phone, Government's Exhibit 3, the second-to-last sentence
 2    beginning with therefore, could you please read that?
 3    A.    "Therefore, your affiant believes that Mr. Briscoe may
 4    have vital information in his cell phone that may assist this
 5    investigation."
 6    Q.    And following the issuance of those two orders,
 7    logistically, how do you go about obtaining the data?
 8    A.    From the actual phone itself or for --
 9    Q.    Excuse me, the pen register data and the location
10    tracking data?
11    A.    We are assisted by our Advanced Technical Team or ATT as
12    we call them.
13    Q.    And what is ATT or the Advanced Technical Team?  What do
14    they do?
15    A.    They're responsible once we give orders to them to help
16    track and locate cell phones.
17    Q.    And ATT is actually -- is it a unit within BPD?
18    A.    Yes, it is.  I'm sorry.  It is a specialized unit that,
19    again, will assist homicide detectives, non-fatal shooting
20    detectives, robbery detectives.  They are a separate unit that
21    is responsible for electronic devices and locating same and
22    helping to assist investigations like this.
23    Q.    So they're not the service provider AT&T, in other words?
24    A.    Correct.  Again, ATT is just something that the police
25    officers and detectives use to -- rather than saying Advance
```

1    Technical Team.

2    Q.    In 2015, how would you send a request for information and

3    tracking information for a phone, other information ATT was

4    going to help you get?  How would you make that request to

5    ATT?

6    A.    A lot of times it was via fax or sometimes e-mail, but

7    typically with orders like this, we would fax over the order

8    so they had a physical copy of it.

9    Q.    And let me show you Government's Exhibit 35.  And what is

10   Government's Exhibit 35 here?

11   A.    It is the cover sheet and the work order for the Advanced

12   Technical Team.  The work order is basically a request from

13   the primary detective to the Advanced Technical Team

14   explaining what's needed and very basically why it's needed.

15   Q.    And in the note section of this work order, what did --

16   what is written?

17   A.    Starting with "The target"?

18   Q.    Correct.

19   A.    "The target number belongs to the person of interest who

20   has been missing since the murder of the victim and her

21   eight-year-old son.  Family is unaware of the location of the

22   phone.  It is believed that the suspect or suspects may have

23   information in his phone that may assist in this

24   investigation."

25   Q.    After -- and at the top there, is there an approximate

1    time of this fax?

2    A.   Yes.

3    Q.   And what time was that?

4    A.   10:45 a.m. and 43 seconds a.m.

5    Q.   On what date?

6    A.   June 4th, 2015.

7    Q.   After submitting this order, did you subsequently receive

8    from ATT information about Mr. Briscoe's phone?

9    A.   Yes.

10   Q.   And what -- what did you learn?

11   A.   We learned that the phone was, for lack of a better term,

12   pinging.  The signal of the phone was pinging in Cambridge,

13   Maryland.

14   Q.   And after that information was conveyed to you, what did

15   you do?

16   A.   My partner and I contacted the Cambridge Police

17   Department, advised them of the investigation that we were

18   conducting and that we would be coming there to continue our

19   investigation and we were requesting their assistance in

20   helping us locate that phone.

21   Q.   That same day, June -- so that was June 4th, 2015, that

22   you learned Briscoe's phone was pinging in Cambridge?

23   A.   Yes.

24   Q.   And you said that you called Cambridge and you planned

25   to go down to Cambridge the next day?

```
 1    A.    Yes.

 2    Q.    That would be June 5th, 2015?

 3    A.    Yes.

 4    Q.    And on the evening of June 4th, 2015, did you also obtain

 5    a warrant for Mr. Briscoe's DNA?

 6    A.    For what?  I'm sorry.  I didn't hear the last.

 7    Q.    I apologize, Mr. Briscoe's DNA.

 8    A.    Yes, we did.

 9    Q.    I'm going to put up Government's Exhibit 5.  And what is

10    Government's Exhibit 5?

11    A.    This is the cover sheet for the search and seizure

12    warrant for Mr. Andre Briscoe's DNA.

13    Q.    And what time was that application signed?

14    A.    At 6:40 p.m.

15    Q.    On what day?

16    A.    I'm sorry, on the 4th of June, 2015.

17    Q.    And why were you interested in obtaining Mr. Briscoe's

18    DNA?

19    A.    Again, given the fact that there was a possibility that

20    he may have been intimate with Ms. Jennifer Jeffrey, the

21    victim in this case, we felt that there may be a comparison of

22    his DNA to anything that we recover, any, you know, swabs that

23    we may have recovered during the autopsy of Ms. Jennifer, as

24    well as Mr. -- KB.  Again, we don't know if there was any

25    contact prior to or during the murders of these two people.
```

1    Q.   So after you obtained the DNA warrant, did you head on

2    June 5th to Cambridge as you had planned?

3    A.   Yes, we did.

4    Q.   And about what time did you arrive?

5    A.   Don't remember the time.  I know it was early morning

6    hours of the 5th.

7    Q.   And who went to Cambridge?

8    A.   Myself, Detective Parker, at the time our sergeant,

9    Sergeant Lamar Howard, members of the Advanced Technical Team

10   and I believe members of the Cambridge Police Department.

11   Q.   That was who was in Cambridge with you?

12   A.   Yes, I'm sorry.  We met up -- the Advanced Technical

13   Team, my partner, and my supervisor met with the Cambridge PD

14   prior to -- just to brief everyone on what was going to happen

15   next.

16   Q.   And when you say you were going to brief everyone, what

17   information did you provide or what was the briefing?

18   A.   According to AT&T, they have a very strong signal in a

19   particular part of Cambridge and we actually received

20   information from Cambridge PD about the whereabouts of

21   Mr. Briscoe.

22   Q.   And did you ultimately locate Mr. Briscoe on June 5th,

23   2015?

24   A.   Yes.

25   Q.   And where was Mr. Briscoe found?

1    A.    In, I believe it was called the Greenwood Apartments.  I

2    could be wrong, but I believe it was 502 Greenwood Avenue,

3    Apartment 202.

4    Q.    And so at the briefing, had Mr. -- you said that you were

5    prepared to tell them the plan.  What was the plan?

6    A.    To get a search and seizure warrant for the apartment

7    that we first were given information about his whereabouts.

8    Q.    And first given information about by whom?

9    A.    I'm sorry?  One more time.

10   Q.    You said you were first given information about his

11   whereabouts by whom?

12   A.    Members of the Cambridge PD.  Specifically, I don't

13   remember which officer/detective it was.

14   Q.    So when you arrive in Cambridge, did you have a sense of

15   where Briscoe was?

16   A.    Yes, and that was because of our Advanced Technical Team.

17   They were -- they were -- again, lack of a better term, they

18   were getting a signal that this phone was pinging off of the

19   equipment that the ATT team uses, which brought us to the

20   apartment complex off of Greenwood Avenue, I believe it was.

21   Q.    And you testified that Mr. Briscoe was found on June 5th

22   in Apartment 202; is that correct?

23   A.    Yes.

24   Q.    Where was the phone pinging, according to ATT, when you

25   first arrived in Cambridge?  Did they tell what apartment?

```
1    A.    We were told initially that it was Apartment 101.

2    Q.    And after you received that information, what did you do

3    with it?

4    A.    I drafted a search and seizure warrant for Apartment 101.

5    Due to the nature of this incident and how violent it was,

6    it's -- it's procedure for homicide detectives to consult with

7    a SWAT team when it comes to search and seizure warrants,

8    again, when you're dealing with homicide investigations.  We

9    consult with the SWAT teams -- at this particular

10   investigation, we consulted with the Cambridge Police

11   Department SWAT team, and they did assemble.

12   Q.    Okay.  So after learning from ATT that the phone was in

13   Apartment 101 at 502 Greenwood Avenue, you obtained a search

14   warrant for that apartment?

15   A.    Yes.

16   Q.    And you obtained that search warrant in Cambridge?

17   A.    Yes.

18   Q.    Do you recall about what time that was?

19   A.    I believe it was 8:00 in the morning, between 8:00 and

20   9:00 a.m.

21   Q.    And pausing for a second on what happens after you obtain

22   the warrant, you've just been testifying about Mr. Briscoe's

23   phone and how it was pinging.  During the course of your

24   24 years at BPD, have you obtained -- was this the only

25   tracking order that you obtained?
```

```
1    A.    No.

2    Q.    Are you familiar with what a ping from a phone -- what

3    kind of information is obtained from a phone company?

4    A.    Yes.

5    Q.    In connection with those pings?

6    A.    Yes.

7    Q.    And as the detective on the case, do you also receive the

8    information related to the pings?

9    A.    Yes.  So whenever the signal or the ping would occur, ATT

10   would send me an e-mail saying that the phone is pinging here,

11   the phone is pinging there.  That e-mail actually had latitude

12   and longitude coordinates to show where the pinging was

13   occurring.

14   Q.    And the latitude and longitude that's provided, that's

15   from ATT or that's from the underlying service provider?

16   A.    The underlying service provider.

17   Q.    And I'm going to put up Government's Exhibit 36.  What is

18   Government's Exhibit 36 here?

19   A.    This is one of the e-mails that I described earlier that,

20   again, shows the latitude and longitude of the ping or the

21   signal that's transmitting.

22   Q.    So you said typically when you get pings, you would get

23   an e-mail from the ATT group?

24   A.    Yes.

25   Q.    Is your e-mail here on this ping that we're looking at,
```

```
1     Exhibit 36, page 1?
2     A.    In reference to this case, yes.
3     Q.    Is your e-mail on this e-mail here in front -- on the
4     screen in front of you?
5     A.    Oh, no, no, no, no, no.  I'm sorry, it's to Janie Leger
6     at T-Mobile.
7     Q.    And under the cell phone, do you know the e-mail for
8     CellTrak?
9     A.    Yes, that says CellTrak there, yes.  I'm sorry.  What was
10    the question for --
11    Q.    The question is, do you know -- that e-mail CellTrak, is
12    that your ATT group?
13    A.    Yes.
14    Q.    So you didn't receive this particular e-mail, but this
15    information was --
16    A.    Correct.  I'm sorry.  And I may have been confused by
17    your question.  So ATT gets the e-mail.  They, in turn, would
18    forward the information to me basically telling me, hey, we're
19    getting this information coming in.
20    Q.    Okay.  But you received in substance the coordinate type
21    of information here in 36, Government's Exhibit 36, page 1?
22    A.    Yes.
23    Q.    And for this particular exhibit, page 1, what phone
24    number were you -- was BPD obtaining information for?
25    A.    (443) 621-2413.
```

```
1    Q.   That was the number subscribed to Andre Briscoe?

2    A.   Yes.

3    Q.   And what was the date and time of the ping?

4    A.   That was June 4th of 2015 at 9:06 and 47 seconds p.m.

5    Q.   P.m., what was the time zone that the information is

6    provided?

7    A.   Is that -- I'm sorry, Pacific time.

8    Q.   And so what's the time of the e-mail?

9    A.   I'm sorry.  June 5th, 2015, at 12:07 a.m.

10   Q.   So this is a ping for that 2413 number at just after

11   midnight on June 5th?

12   A.   Correct.

13   Q.   And in terms of the coordinates, is that -- where are the

14   coordinates in the e-mail?

15   A.   Just below categories and to the right of the location of

16   the phone number, and the latitude was 38.566421 and the

17   longitude was negative 76.081738.

18   Q.   And following the coordinates, there is a portion of the

19   e-mail that says, uncertainty 24 meters.  Do you see that?

20   A.   Yes.

21   Q.   Just generally, what is your understanding of what that

22   uncertainty 24 meters means?

23   A.   That it's approximate.  It's not -- from my

24   understanding, it's not down to the very point of where a

25   person would be or where that phone would be.
```

```
 1    Q.   The coordinates, in other words, were approximate?

 2    A.   Yes.

 3    Q.   And this particular ping that we just looked at on page 1

 4    was for 12:07 a.m.  Have you also reviewed later pings for the

 5    2413 number that BPD was receiving, the ATT number was

 6    receiving, and that you were receiving on June 5th, 2015?

 7    A.   Yes.

 8    Q.   And scrolling through to the last page of Government's

 9    Exhibit 36, when was the last ping in this exhibit?

10    A.   7:22 a.m.

11    Q.   And I think you testified that you received an e-mail

12    with a ping about how frequently?

13    A.   15 to 20 minutes, I believe it was.

14    Q.   And can you summarize for us what the ping -- and apart

15    from these e-mails, did you do anything with the coordinates

16    that were provided to you?

17    A.   Yes, I Googled -- if you -- if you put those coordinates,

18    the latitude and longitude coordinates into Google, it

19    actually gives you a map in response to show you what that

20    latitude and longitude coordinate is and shows you on a pin

21    map where those coordinates are.

22    Q.   So turning to page 16 of Government's Exhibit 36, what

23    was the date and time of this ping for Mr. Briscoe's phone?

24    A.   June 5th, 2015, at 3:52 a.m.

25    Q.   And was this 3:52 a.m. ping one of the ones that you put
```

```
1   in Google maps?

2   A.   Yes.

3   Q.   And I'm going to put up Government's Exhibit 36A, and

4   what is shown in Government's Exhibit 36A?

5   A.   As I described earlier, it's -- once you put those

6   coordinates into Google, it gives you a map of where the

7   coordinating -- the coordinates land, and the red pin

8   represents that coordinate, the coordinates of the phone.

9   Q.   The red pin here next to Hardee's?

10  A.   Yes, just to the left of the Hardee's on the map here.

11  Q.   And turning to Government's Exhibit 36B, what's shown in

12  Government's Exhibit 36B?

13  A.   Again, it's a red pin map of -- again, of the

14  coordinates, and it's sort of zoomed out a little bit further.

15  Q.   In the upper left-hand corner of the map, is there a gray

16  dot?

17  A.   Yes.

18  Q.   And where is that gray dot, approximately, on the map?

19  A.   On Greenwood Avenue.

20  Q.   You testified earlier that on June 5th, Mr. Briscoe is

21  found at 502 Greenwood Avenue?

22  A.   Correct.

23  Q.   Later on June 5th, 2015?

24  A.   Yes.

25  Q.   And the ping we were just looking at, going back to
```

1   Government's Exhibit 36 at page 16, what was the date and time

2   of that ping?

3   A.    June 5th, 2015, at 3:52 a.m.

4   Q.    Government's Exhibit 36 at page 16 side by side with

5   Government's Exhibit 36B at page 16 are the coordinates from

6   the ping at 3:52 a.m., the coordinates that you mapped in 36B,

7   reflected on the map in 36B?

8   A.    Yes.

9   Q.    And turning to just Government's 36 at pages 17 through

10  19, starting with page 16, is this an e-mail from T-Mobile to

11  AT&T?

12  A.    Yes.

13  Q.    Dated June 5th, 2015, at 4:07 a.m.?

14  A.    Correct.

15  Q.    Sorry.  I'm rusty.

16        And is there a map or any coordinates for this particular

17  ping?

18  A.    No.

19  Q.    What does it say at the bottom?

20  A.    It says "absent subscriber."

21  Q.    So did you -- did BPD receive any location information

22  for Briscoe's phone at 4:07 a.m. on June 5th, 2015?

23  A.    No.

24  Q.    And turning to page 18, is that a ping to Mr. Briscoe's

25  phone for (443) 621-2413 at 4:22 a.m.?

```
 1   A.    Yes.
 2   Q.    Was there any information, location information, for the
 3   phone received at 4:22 a.m. on June 5th?
 4   A.    No.
 5   Q.    What about on page 19 at 4:37 a.m.?
 6   A.    No.
 7   Q.    And at page 20, at 4:52 a.m. on June 5th, did BPD start
 8   receiving information for Mr. Briscoe's location information,
 9   2413 phone number again?
10   A.    Yes.
11   Q.    And that was the coordinate information reflected in this
12   e-mail?
13   A.    Yes, it is.
14   Q.    That latitude -- can you read that latitude?
15   A.    Sure.   Latitude 38.570627, longitude negative 76.088798.
16   Q.    And the uncertainty on that?
17   A.    Is 718 meters.
18   Q.    So that's higher than the last one we looked at which I
19   think was about 24?
20   A.    Right.
21   Q.    I'm pulling up Government's Exhibit 36C.
22         What's depicted in Government's Exhibit 36C here?
23   A.    On the map itself, a red pin that's, I believe,
24   829.79 feet from the far right pin, which is gray at Bay
25   Country Apartments.
```

1   Q.   And the red pin, were those the coordinates that we were

2   just looking at in Government's Exhibit 36 over on the

3   left-hand corner there?

4   A.   Yes.

5   Q.   All right.  And what street is that gray pin on if you

6   could read it in the map?

7   A.   Greenwood Avenue.

8   Q.   All right.  And then turning back to Government's 36 the

9   final time at page 21, does this e-mail show pinging

10  information for Mr. Briscoe, 2413, at 5:07 a.m., on June 5th,

11  2015?

12  A.   Yes.

13  Q.   And did you also plot in Google maps the coordinates

14  reflected in page 21 of Government's 36?

15  A.   Yes.

16  Q.   And I'm going to pull up Government's 36D.  And what's

17  reflected by the red pin on this map?

18  A.   Red pin shows that the ping is coming right from the Bay

19  Country Apartments off of Greenwood Avenue.

20  Q.   And we just looked at it.  We could pull it back up, but

21  that was the ping from Mr. Briscoe's phone at 5:07 a.m. on

22  June 5th?

23  A.   Yes.

24  Q.   All right.  So turning back to what you were doing on

25  actually the day of June 5th, 2015, you testified that you

1    arrived in Cambridge and subsequently obtained a warrant for

2    502 Greenwood Avenue, Apartment 101; is that correct?

3    A.   Yes.

4    Q.   And what happened after you got the warrant?

5    A.   Again, after meeting up with ATT and with Cambridge

6    Police Department, we executed the search and seizure warrant

7    for Apartment 101, 502 Greenwood Avenue, Apartment 101.

8    Q.   And what was your role in the execution of that apartment

9    at 101?

10   A.   Again, I was the affiant on the warrant.  Cambridge PD,

11   ATT were acting on my behalf to assist in the investigation.

12   Q.   Were you part of the team that, sort of, went through the

13   door?

14   A.   No, ma'am.  No, ma'am.  Again, due to the nature of this

15   investigation, the execution itself is performed by the SWAT

16   team, and that was the SWAT team of Cambridge Police

17   Department.

18   Q.   Okay.  At any point that morning, did you actually go

19   into Apartment 101?

20   A.   Yes.

21   Q.   And who was inside?

22   A.   It was a female.  And I remember a female.  I don't

23   remember her name.

24   Q.   Was Mr. Briscoe inside Apartment 101?

25   A.   No, he was not.

1    Q.   And so what happened after there is entry into Apartment

2    101 and Mr. Briscoe is not located?

3    A.   Once we realized that Mr. Briscoe was not in there, not

4    in Apartment 101, the team backed out.  However, our ATT team

5    advised us that there was still a strong signal here, hitting

6    in this area here.  I believe at that point the team went up

7    to Apartment 201.  The team meaning the SWAT team and ATT

8    because the signal was still very strong in that area of the

9    apartment building.  Went up to 201, and I believe they made

10   entry into Apartment 201.

11   Q.   And when you say made entry into Apartment 201, what do

12   you mean?

13   A.   They knocked on the door.  There was a resident there,

14   from what I remember.  They opened the door and spoke to the

15   members that were entering the apartment.

16   Q.   And could you -- were you there?  Were you present?

17   Could you hear what was being said?

18   A.   I could not.  I was there.  I was not at the door when

19   they made entry.  From my recollection, I believe I was still

20   in -- either in 101 or coming -- or coming up the steps to go

21   to the second floor.

22   Q.   And did you learn what happened in Apartment 201?

23   A.   Yes.  And again, this was all very fluid.  This was

24   happening very quickly.  The resident there, they were

25   explained by the SWAT team why we were there, and we're trying

1    to get consent to search for this phone that we were pinging

2    off of, and we were denied consent.

3    Q.   After consent was denied, what did the law enforcement

4    officers do?

5    A.   Again, working off the ATT -- I'm sorry?

6    Q.   No, it was a bad question.

7         With respect to Apartment 201, what did the officers do?

8    A.   Backed out.  They came out of 201 and advised me that the

9    residents there were denying consent to search that apartment.

10   From there, I took it upon myself to go back to Cambridge PD

11   to draft another search and seizure warrant for Apartment 201.

12   Q.   And why did you go back to Cambridge PD to do that?

13   A.   Again, once we were denied consent to search, you know,

14   for the signal, we realized, okay, these folks basically

15   aren't going to give us consent to go in, so we need to get a

16   search warrant for this place, due largely because of the

17   strong signal that we were still getting in that immediate

18   area.

19   Q.   And, like, practically how are you drafting the search

20   warrant?

21   A.   I -- what I remember from this is that I drove back and

22   sat down at Cambridge PD's office.  I had a flash drive with

23   me with a copy of the search warrant -- or I'm sorry, with a

24   copy of the -- yeah, a copy of the search warrant for 101, I

25   believe changed the apartment numbers to 201, and then got a

1    call as I was in the middle of doing that.  From there -- I

2    got a call from, I believe it was either my sergeant or my

3    partner that called me and said, no, it's not 201, it's 202.

4    We have him at 202.

5         Again, this was a very fluid thing.  This is not, you

6    know, a half hour passed by or anything like that.  It was

7    very fluid.

8    Q.   And what did you do after you learned that Mr. Briscoe

9    had been found in Apartment 202?

10   A.   Draft the warrant for Apartment 202.

11   Q.   And I'm going to put up Government's Exhibit 13M.  And

12   the first page of Government's 13M, what is this?

13   A.   Again, that would be a cover page to the search and

14   seizure warrant to Apartment 202.

15   Q.   502 Greenwood Avenue?

16   A.   I'm sorry?  I didn't hear you.

17   Q.   502 Greenwood Avenue?

18   A.   Yes.  Yes.

19   Q.   And going to page 2, what's page 2 of Government's

20   Exhibit 13M?

21   A.   The second page explaining that we're trying to get a

22   search and seizure warrant in reference to the homicide that

23   occurred in Baltimore to 502 Greenwood Avenue, Apartment 202.

24   Q.   This is actually the warrant?

25   A.   Yes.

Q.   And at Page 3, what's this page of Government's 13 now?

A.   This is my affidavit, basically, my statement of probable cause to go into Apartment 202, 502 Greenwood Avenue in Cambridge.

Q.   And at the bottom of that warrant, starting with further, can you read that sentence?

A.   "Further investigation revealed that the cell phone that belonged to Mr. Andre Briscoe was located at 502 Greenwood Avenue, Apartment 201, Cambridge, Maryland 21613.  And although officers can see and hear movement, residents are refusing to open the door for police.  This location and persons of interest were secured by Baltimore City officers of the Advanced Technical Team and members of the Cambridge Police Department in lieu of a search and seizure warrant."

Q.   And with respect to the sentence beginning "further" and ending, "refusing to open the door for the police," is that sentence true and accurate?

A.   Yes.

Q.   With respect to what apartment?

A.   Apartment 201.

Q.   And when did you first realize that this sentence with respect to 201 is in this affidavit for Apartment 202?

A.   Reviewing -- reviewing the case.  It was, again, very fluid.  I changed the bold face lines for the apartment, but forgot to change the number in the body of the probable --

1    statement of probable cause.

2    Q.   Did you ultimately -- it's signed, this warrant for

3    Apartment 202, at page 2 of Government's 13M; is that correct?

4    A.   Yes.

5    Q.   And so what did you do with the warrant once you had

6    obtained it?

7    A.   Went back to 202 and had us execute the scene.  I'm

8    pretty sure, from what I remember, I called the team and

9    advised them that the warrant was signed so that we could go

10   forward.

11   Q.   And did you return to 502 Greenwood Avenue?

12   A.   Yes.

13   Q.   And where was Mr. Briscoe when you got to apartment --

14   you got back to 502 Greenwood Avenue?

15   A.   From what I remember, I was coming up the steps, and I

16   believe a member of the Cambridge PD was bringing him down the

17   stairs and securing him into one of their patrol vehicles.

18   Q.   And did you actually go into Apartment 202?

19   A.   Yes.

20   Q.   And what did you see happening inside?

21   A.   There were -- aside from the police, there were several

22   people that were -- that were being detained in the living

23   room.  I believe it was a couch.  There was a -- I want to say

24   a table to the right-hand side.

25   Q.   And where was Detective Parker, to your recollection, as

1    you are getting the warrant for Apartment 202 signed?

2    A.   Physically as in was he inside after the warrant was

3    executed?  I'm not sure.  I'm sorry.

4    Q.   Was he physically with you?

5    A.   No.  No.  He stayed with the team while I went back to

6    the Cambridge PD to draft the warrants.

7    Q.   And when you entered 202, Apartment 202, after you got

8    the warrant, did you see Detective Parker?

9    A.   I'm sure I did, but from my recollection, I couldn't tell

10   you if he was in the living room, the kitchen.  I don't know

11   what his position was.  I do know that he was there.

12   Q.   Okay.  And were you present during the search of

13   Apartment 202?

14   A.   Yes.

15   Q.   And do you recall what was found?

16   A.   From what I remember, there was suspected CDS or

17   suspected narcotics in the apartment, and I remember that

18   because the Cambridge PD was calling out when they found the

19   suspected CDS that they had found something.  And I basically

20   sort of walked over to take a peek to see exactly what it was

21   that they found.

22   Q.   And who seized the drugs that were found?  Members of BPD

23   or members of the Cambridge Police Department?

24   A.   From my recollection, I believe it was Cambridge PD.

25   Q.   And why was it CPD who seized that evidence?

```
 1    A.   We were in their jurisdiction and, you know, we were
 2    there, you know, to look for specific things, and CDS at that
 3    point wasn't one of the things that we were looking for.
 4    Q.   So it wasn't your jurisdiction?
 5    A.   Correct.
 6    Q.   And were folks arrested after the suspected CDS was
 7    found?
 8    A.   Yes.
 9    Q.   And charged?
10    A.   Yes.
11    Q.   And who made the decision about who was to be arrested
12    and who was to be charged?
13    A.   I believe the supervisors for Cambridge PD.
14    Q.   Did you interact with Mr. Briscoe at all while you were
15    at 502 Greenwood Avenue, Apartment 202?
16    A.   No.
17    Q.   Were you aware if anyone read Mr. Briscoe his Miranda
18    rights while he was there?
19    A.   I'm not aware of that.
20    Q.   You didn't?
21    A.   I did not, no.
22    Q.   And how is Mr. -- you say when you saw him,
23    Mr. Briscoe, he was being secured in a patrol vehicle?
24    A.   Yes.
25    Q.   And where was Mr. Briscoe transported after that?
```

```
 1    A.    Back to Cambridge Police Department.

 2    Q.    And where did you go following the search of Apartment

 3    202?

 4    A.    Back to Cambridge Police Department.

 5    Q.    And what did you do while you were there?

 6    A.    Once everyone was secured and brought back to the

 7    Cambridge PD, myself and Detective Parker conducted interviews

 8    of the individuals that were brought back to Cambridge PD.

 9    Q.    Did you have a plan for the order in which you would

10    conduct your interviews?

11    A.    Yes.  We wanted to speak to -- and I apologize, I don't

12    -- can't remember the names off the top of my head, but we

13    wanted to speak to the other individuals that were brought to

14    the Cambridge PD and charged first, just basically to get some

15    background information, given why we were there in the first

16    place.

17    Q.    And could you see where Mr. Briscoe was being held while

18    you were conducting your interviews?

19    A.    Yes.  So Cambridge PD has monitors within their offices

20    that you can actually look at and watch individuals that are

21    being held in holding rooms and interview rooms.

22    Q.    So you were able to see Mr. Briscoe on the monitors?

23    A.    Yes.

24    Q.    And after you had conducted the interviews with other

25    folks, did you speak to Mr. Briscoe?
```

1    A.   Yes.

2    Q.   And are you aware whether Mr. Briscoe was restrained

3    while he was waiting in that room while you were doing your

4    other interviews?

5    A.   Yes.

6    Q.   And are you aware if Mr. Briscoe was provided with

7    bathroom or food or drink during that interim period?

8    A.   Yes.

9    Q.   And when, to your knowledge, was he provided those

10   things:  Bathroom, food, and drink?

11   A.   Prior to the start of our interview with him.

12   Q.   And was he provided all three things:  Bathroom, food,

13   and drink, or only some?

14   A.   From what I remember, we got him to the bathroom first,

15   then he was given a drink.  I don't remember food.  I don't

16   remember him eating.

17   Q.   And about what time on June 5th did you conduct your

18   interview with Mr. Briscoe?

19   A.   It was afternoon.  I want to say about 2 o'clock,

20   2:00 p.m.

21   Q.   Was the interview with Mr. Briscoe recorded?

22   A.   Yes, it was.

23   Q.   And have you reviewed that audio and video recording

24   prior to your testimony today?

25   A.   Yes.

```
1    Q.   And I'm going to show you Government's Exhibit 15.

2    Starting -- I'm going to play from zero seconds to about --

3              MR. BUDLOW:  Excuse me, Your Honor.  May I consult

4    with Ms. Brusca?

5              THE COURT:  Yeah, I'm sorry.  I can't hear you, Mr.

6    Budlow.  I'm sorry.

7              MR. BUDLOW:  May I consult with --

8              THE COURT:  Sure.  Sure.

9              MR. BUDLOW:  -- Ms. Brusca one second about a

10   logistical matter?

11             THE COURT:  Sure.

12             MR. BUDLOW:  Do you mind if I just step out for

13   about a minute?  I'll be right back.  You don't need to stop.

14             THE COURT:  That's fine.  As long as Ms. Brusca can

15   continue, that's fine.

16             MS. BRUSCA:  Thank you, Your Honor.  I think we were

17   about to play portion 0 to 18.

18             THE COURT:  Government's Exhibit 15 being the video

19   recording of the June 5, 2015, interview of the defendant,

20   Andre Briscoe.

21             MS. BRUSCA:  Thank you, Your Honor.

22        (Video recording played.)

23   BY MS. BRUSCA:

24   Q.   And Detective Lewis, who is present in Government's

25   Exhibit 15 in the video?
```

```
1    A.   The defendant, Mr. Briscoe.

2    Q.   And was there another individual who came in and out of

3    the room during the clip we just played?

4    A.   Yes.  In the orange shirt, that was myself.

5    Q.   Okay.  And in front of Mr. Briscoe, there is a yellow

6    bottle.  Do you see that?

7    A.   Yes.

8    Q.   What's that?

9    A.   Some type of drink that was provided to him.  I don't

10   know if it was Gatorade or what, but it was some type of

11   beverage for Mr. Briscoe.

12   Q.   And that's Mr. Briscoe in the black and white shirt?

13   A.   Yes.

14   Q.   And do you see Mr. Briscoe in the courtroom today?

15   A.   Yes, I do.

16   Q.   And where is he?

17   A.   At --

18          MR. PURPURA:  We'll stipulate that he could

19   identify --

20          THE COURT:  So stipulated by defense counsel.  Thank

21   you, Mr. Purpura.  The record will reflect the witness has

22   identified the defendant, Andre Briscoe.

23          MS. BRUSCA:  Thank you.

24   BY MS. BRUSCA:

25   Q.   So following the -- this interaction at the beginning of
```

```
1    the audio and video recording, did you provide Mr. Briscoe
2    with Miranda rights?
3    A.   Yes.
4    Q.   And was that the first thing that you did or was there an
5    information sheet that was completed first?
6    A.   There was an information sheet completed first.
7    Q.   And what's the purpose of an information sheet?
8    A.   To gather information from the person that we're
9    interviewing, as well as to see if the person that we're
10   speaking to understands what's going on, understands what's
11   happening as far as the interview process goes, and to make
12   sure, again, that the person is coherent and not, you know,
13   under any influence or if there is a mental incapacity, just
14   to get a feel of who we're speaking to.  If that person
15   doesn't understand what's going on, there is no sense to go
16   forward.
17        In this case, we did the information sheet for those
18   reasons and we realized that Mr. Briscoe clearly was, you
19   know, coherent and understood what was happening.
20   Q.   I'm showing you Government's Exhibit 40.  What is
21   Government's Exhibit 40?
22             THE COURT:  I'm sorry, Government's Exhibit -- what
23   number?
24             MS. BRUSCA:  Forty, Your Honor.  4-0.
25   BY MS. BRUSCA:
```

1    Q.   Detective Lewis, Government's Exhibit 40, what is that

2    there?

3    A.   That is the information sheet that I just referred to.

4    Q.   And completed for Mr. Briscoe?

5    A.   Yes.

6    Q.   During your interview with him on June 5th, 2015?

7    A.   Yes.

8    Q.   And what was the time that the information sheet was

9    completed?

10   A.   1:50 p.m.

11   Q.   And so following this information sheet, you advised

12   Mr. Briscoe of his Miranda rights?

13   A.   Yes.

14   Q.   And did you do that in written format?

15   A.   Yes.

16   Q.   And I'm going to put up Government's Exhibit 14.  And at

17   the top there, what is this form?

18   A.   This is the advice of Miranda rights that we provided or

19   read to Mr. Briscoe.  This was a form that we received from

20   Cambridge Police Department.

21   Q.   And did you read these rights or did Detective Parker?

22   A.   My partner, Detective Parker, read the rights.

23   Q.   And how did --

24   A.   I'm sorry.  When you said read the rights, do you mean

25   did we read them out loud?

```
1      Q.    Correct.

2      A.    No, Mr. Briscoe read them out loud.

3      Q.    After each numbered statement here, he read each one of

4      those out loud; Mr. Briscoe did?

5      A.    Yes.

6      Q.    And there are initials at the end of each line.  Do you

7      see that?

8      A.    Yes.

9      Q.    And what are those initials?

10     A.    AB.

11     Q.    And who put those initials on the sheet?

12     A.    Mr. Briscoe.

13     Q.    And below each of those five lines, can you read the

14     statement there right above the signature about halfway

15     through the page?

16     A.    Sure.  I have read or have had these rights read to me

17     and I fully understand each of my rights.

18     Q.    And whose signature is below that statement?

19     A.    Andre Briscoe.

20     Q.    And what was the date and time?

21     A.    June 5th, 2015, at 2 o'clock.

22     Q.    And then beneath the five different rights enumerated

23     above where it says, waiver of Miranda rights, what does the

24     form state?

25     A.    "I fully understand each of these rights and I'm willing
```

1   to answer questions without consulting a lawyer or having a

2   lawyer present at this time.  My decision to answer questions

3   and make statements is entirely free and voluntary, and I have

4   not been promised anything, nor have I been threatened or

5   intimidated in any manner."

6   Q.   And where is says "signature," who signed right next to

7   the signature?

8   A.   Andre Briscoe.

9   Q.   And what date and time was that?

10  A.   June 5th, 2015, at 2:01 p.m.

11  Q.   And below the signature line where it says "witnessed

12  by," who signed there?

13  A.   I did.

14  Q.   And that's your signature in the -- on the line actually?

15  A.   Yes.

16  Q.   And below the line, that's your printed name?

17  A.   Yes.

18  Q.   And what date and time did you sign the form?

19  A.   June 5th, 2015, at 2:02 p.m.

20  Q.   And we just looked at a brief clip of the video, but can

21  you describe the room where the interview took place?

22  A.   It's a pretty basic interview room, four walls, desk, a

23  couple of chairs, no windows.  The door, I can't remember if

24  the door had a window in it or not.  I don't remember.  But

25  that's pretty standard for an interview room for just about

1    any police department in this country.

2    Q.   And while you were completing the information sheet and

3    subsequently interviewing Mr. Briscoe, was the door open or

4    closed?

5    A.   It was closed.

6    Q.   And was there -- who was in the room?

7    A.   Myself, Mr. Briscoe, and Detective Parker.

8    Q.   And during the interview, was Mr. Briscoe in custody?

9    Was he restrained?

10   A.   At the beginning, but from what I remember, we needed him

11   to put the initials and sign his name, so we decided to have

12   the cuffs removed so that he could have freedom to move his

13   arms in order to sign and initial.

14   Q.   So following -- you took off the cuffs so that he could

15   sign the Advice of Rights that we just went through?

16   A.   Yes.

17   Q.   And they remained off at that point?

18   A.   Yes.

19   Q.   And was the defendant told that the interview was being

20   recorded?

21   A.   I don't recall.  I don't remember if we told him or not,

22   I don't remember.

23   Q.   And the statement there, the sheet that we just looked

24   at, the Advice of Rights, had rights at the top and then a

25   section entitled "waiver of rights."  So it was signed by

```
 1     Mr. Briscoe; is that correct?

 2     A.   Yes.

 3     Q.   And he agreed to speak with you?

 4     A.   Yes.

 5     Q.   How long did that interview last on June 5th, 2015?

 6     A.   I believe it was about an hour and a half, hour and

 7     40 minutes, something to that effect.

 8     Q.   And generally, how did the interview proceed, if you

 9     recall, just in terms of topics?

10     A.   It was, in my opinion, question and answers.  There was

11     some, I guess, background information that Mr. Briscoe

12     provided as far as relationship goes with the decedent,

13     Ms. Jeffrey.

14     Q.   Did Mr. Briscoe provide any information about his

15     whereabouts May 26th and May 27th, Tuesday and Wednesday,

16     2015?

17     A.   He did confirm for us that he was there, but had left.

18     Q.   Had left where?

19     A.   He had left Ms. Jeffrey's home.

20     Q.   And when did he leave?

21     A.   I'm sorry?

22     Q.   When did he say he left?

23     A.   I believe it was that morning.  That morning meaning

24     Wednesday morning.

25     Q.   And did Mr. Briscoe also provide information about drug
```

1    trafficking with Jennifer Jeffrey?

2    A.   Yes.

3    Q.   And what did he say?

4    A.   Didn't specifically say drugs.  Again, from what I

5    remember, something regarding work.  But I actually -- from

6    what I remember, I initiated that saying that we knew that

7    Jennifer was, you know, dealing with drugs.  From what I

8    remember of the interview, Mr. Briscoe said that the stuff was

9    no good or, you know -- or something to that effect.  I don't

10   want to quote at this point, but I believe it was something to

11   the effect that the stuff that she had was no good.

12   Q.   And by "stuff" you mean?

13   A.   Drugs.

14   Q.   Okay.  And during the approximate two-hour interview, did

15   Mr. Briscoe ask to take any breaks?

16   A.   I don't remember him asking for a break.

17   Q.   At any point during the interview, did you and Detective

18   Parker leave the room?

19   A.   Yes.

20         THE COURT:  I could not understand you.  I'm sorry.

21   BY MS. BRUSCA:

22   Q.   Did you and Detective Parker leave the room?

23   A.   Yes.

24   Q.   And why did you leave?

25   A.   I think partly was to use the restroom and partly was to

1    bring in Mr. Briscoe's cell phone.

2    Q.   And where had that cell phone come from?

3    A.   So the phone was recovered from Apartment 202 where

4    Mr. Briscoe was found and brought back to Cambridge PD.

5    Q.   Did you take the phone from the apartment to CPD to the

6    best of your recollection?

7    A.   I don't believe I did.  I honestly don't remember who

8    actually physically had the phone and brought it back, but I

9    do know that it was brought back to Cambridge PD and secured

10   until we picked it up to bring it into the interview.

11   Q.   Okay.  And I'm going to play a portion where you bring in

12   the phone, but before we do that, I'm going to play Exhibit 15

13   starting at six minutes and 50 seconds.

14        (Video recording played.)

15        **MS. BRUSCA:**  Six minutes and 48 seconds, Your Honor.

16   Is that playing through the Court system?  May I just

17   consult on the technical matter for a second?

18        **THE COURT:**  Sure.  Sure.

19        (Technical difficulties.)

20        **THE COURT:**  I assume there is sound with this.

21   That's why I don't -- I don't hear any sound with this at all.

22        **MR. BUDLOW:**  You have the wrong cord.

23        **MS. WHALEN:**  Oh, correct, Your Honor.  I'm sorry.  I

24   have the wrong cord, I guess.

25        (Technical difficulties.)

1        **MR. BUDLOW:**  I found a use for today.

2        **THE COURT:**  Thank you, Mr. Budlow.  You've been

3   resting up for that, I gather.

4        **MS. BRUSCA:**  Your Honor, it does have audio, the

5   recording, but it is difficult to hear.

6        **THE COURT:**  Okay.

7        **MS. BRUSCA:**  And I'm just going to back this up just

8   a touch, 652.

9        **MR. BUDLOW:**  Ms. Maldeis, do you know if there is a

10  different setting for the HDMI cable versus the VGA that we

11  need?

12       **THE CLERK:**  No, it's all the same.

13       **MR. BUDLOW:**  We're plugged into HDMI now, and it

14  doesn't seem to be communicating.

15       (Technical difficulties.)

16       **MR. PURPURA:**  Judge, I'd help, but I'm useless at

17  this.

18       **THE COURT:**  We're laughing, Mr. Purpura.  We can

19  strike that from the record.  I would never want you to say

20  that you're useless in a courtroom, so that will be stricken.

21  Let us say you're the most -- you're the second least apt

22  person with respect to technology, I being the first and most

23  least apt.

24       **MS. WHALEN:**  I'm right up there.

25       **THE COURT:**  All right.  Okay.  Well, at our age

**Melissa L. Clark, RPR – Federal Official Court Reporter**

```
 1    that's to be expected of Mr. Purpura and I, but not you,

 2    Ms. Whalen.

 3            MS. WHALEN:  Thank you, Your Honor.

 4            MS. BRUSCA:  Third time is a charm, Your Honor.

 5    Let's see.

 6            THE WITNESS:  Ms. Brusca?

 7            MS. BRUSCA:  Yes, Your Honor.

 8            THE WITNESS:  It's the witness -- I'm sorry.  Your

 9    Honor --

10            THE COURT:  Mr. Lewis, you want a chance to speak?

11            THE WITNESS:  Yes, I have a -- I have snow on my

12    screen.  I can't see it.

13            THE COURT:  You can't see it.

14            THE WITNESS:  I can hear it, but I can't see it just

15    to let you guys know.

16            THE COURT:  Wait a minute.

17            THE WITNESS:  There it is, okay.

18            THE COURT:  We're good.  Thank you, Ms. Maldeis.

19            MS. BRUSCA:  Thank you, Detective Lewis.

20        All right.  At 648, Your Honor, here we go.

21        (Video recording played.)

22    BY MS. BRUSCA:

23    Q.  And Detective Lewis, who is speaking at that point in the

24    video?

25    A.  That's Detective Parker.
```

```
1    Q.   And he's the individual with the -- I'll call it gray --

2    gray hair?

3    A.   Yes.

4         (Video recording played.)

5    BY MS. BRUSCA:

6    Q.   Detective Lewis, I'm just going to pause for a minute at

7    914.  Mr. -- Detective Parker just said, "You understand that

8    you can stop at any time;" is that correct?

9    A.   Yes.

10   Q.   And to your recollection, did Mr. Briscoe ask to stop at

11   any time during this interview?

12   A.   Not that I recall, no.

13        MS. BRUSCA:   I'm going to keep playing.

14        (Video recording played.)

15   BY MS. BRUSCA:

16   Q.   And it was a little bit low there, but could you hear

17   what you just said on the video there?

18   A.   Yes, I was advising Mr. Briscoe of the date and the time.

19   Q.   And prior to your testimony here today, have you reviewed

20   a portion of the draft transcript that the government has

21   submitted as Government's 28?

22   A.   Yes.

23   Q.   And that's the portion dealing with the Miranda rights?

24   A.   Yes.

25   Q.   And based on your review of the video and your review of
```

```
1     the transcript, is that portion of the transcript relating to
2     the Miranda rights accurate?
3     A.   Yes, it is.
4          (Video recording played.)
5     BY MS. BRUSCA:
6     Q.   All right.  And at 201, what are you doing in the video
7     there?
8     A.   I'm witnessing by placing my signature and printing my
9     name.
10    Q.   Is that on that form that we looked at, Government's
11    Exhibit 14, a few moments ago?
12    A.   Yes.
13    Q.   And then prior to going back to this clip in Government's
14    15, you testified that there was a time that you stepped out
15    of the interview room with Mr. Briscoe?
16    A.   Yes.
17    Q.   You stepped out of the room in the interview of
18    Mr. Briscoe, I should say?
19    A.   Yes.  Correct.
20    Q.   And why was that again?
21    A.   I believe to recover his phone and bring it back into the
22    interview room as -- yes, to recover his phone and show him
23    that we had his phone.
24    Q.   All right.  And why were you showing Mr. Briscoe his
25    phone if you recall?
```

1    A.    What I recall, I believe we were just letting him know

2    that, you know, this was going to be evidence in reference to

3    our investigation.

4    Q.    Did Mr. Briscoe provide any information from the phone at

5    that time?

6    A.    I believe he gave us a number of a female.  I can't

7    remember her name, but I believe he gave us a number to a

8    female.

9    Q.    All right.  And do you recall if anyone else came into

10   the room besides you and Detective Parker when you went to get

11   the phone?

12   A.    I don't recall anybody else coming into the room besides

13   myself and Detective Parker.

14   Q.    And we'll continue towards that portion in a moment, but

15   do you recall -- can you describe the defendant's demeanor

16   during his interview with you on June 5th, 2015?

17   A.    He was -- he was -- he seemed very relaxed and matter of

18   fact.  When, you know, we asked him direct questions, he

19   answered.  But, I mean, nothing -- nothing out of the

20   ordinary, I guess.

21   Q.    And what about the defendant's physical appearance?  How

22   did his health appear?

23   A.    He seemed fine.  He -- again, he was coherent.  He seemed

24   like he was physically fine and didn't need any type of

25   medical attention.

```
 1    Q.   And when you were asking him questions, Mr. Briscoe
 2    appeared to understand them?
 3    A.   Yes.
 4    Q.   And he provided appropriate responses to the questions?
 5    A.   Yes.
 6    Q.   Relevant answers to the questions, in other words?
 7    A.   Yes.
 8    Q.   And did he appear under the influence of any drugs or
 9    medications?
10    A.   No.
11    Q.   And earlier during the interview when you were going
12    through that information sheet, was Mr. Briscoe able to
13    provide you with his, sort of, biographical information on
14    that sheet?
15    A.   Yes.
16    Q.   Addresses and phone numbers and the like?
17    A.   Yes.
18    Q.   And did Mr. Briscoe appear to have a decent memory about
19    what had happened?
20    A.   Yes.
21    Q.   You testified he made statements about his whereabouts on
22    May 26th and May 27, 2015?
23    A.   Yes.
24    Q.   And in your experience as a homicide detective, have you
25    encountered individuals who were under the influence of
```

1    alcohol or narcotics?

2    A.   Yes.

3    Q.   And in your opinion, during the interview on June 5th,

4    2015, that began at 2:00 p.m., did the defendant, Mr. Briscoe,

5    appear to be under the influence of drugs or alcohol?

6    A.   No.

7    Q.   And do you recall how old the defendant was at the time

8    of this interview?

9    A.   I believe -- 30, I believe, or close to 30.

10   Q.   And you testified earlier, I believe -- were you aware of

11   whether Mr. Briscoe had had any prior interactions with law

12   enforcement?

13   A.   Yes.

14   Q.   And what interactions were those?

15   A.   He had been arrested for attempted murder, as well as

16   some other charges on his arrest record.

17   Q.   And during the course of the interview, did Mr. Briscoe

18   ever ask anything about an attorney?

19   A.   No.

20   Q.   Did he ever ask to speak to an attorney?

21   A.   No.

22   Q.   Was the defendant threatened in any way to get him to

23   provide information?

24   A.   No, ma'am.

25   Q.   Was he promised anything in exchange for providing the

1    information?

2    A.    No.

3    Q.    And towards the end of the interview, how did it

4    conclude?

5    A.    He -- we actually executed the DNA search warrant that we

6    had for him and collected DNA swabs.

7    Q.    So you -- we showed an Exhibit 5 earlier, the DNA search

8    warrant that you obtained from Mr. Briscoe.

9    A.    Yes.

10   Q.    And you actually executed that at the end of this

11   interview?

12   A.    Yes.

13   Q.    It's there on the end of the video?

14   A.    Yes.

15   Q.    How do you execute a DNA warrant?

16   A.    There is a package containing Q-tip swabs, a pair of

17   gloves and an envelope to package or to -- once the swabs are

18   taken.  And basically, you swab the inside cheek of the person

19   that you're trying to get the DNA from.

20        I believe we got a bottle of water as well so that he

21   could basically have a drink of water prior to actually

22   swabbing his cheek.

23   Q.    All right.  And now in following the DNA swab, that was

24   it for speaking with Mr. Briscoe that day?

25   A.    From what I remember, yes.

1    Q.    Okay.  I'm going to turn now to Government's Exhibit 15,

2    1 hour, 5 minutes and 11 seconds or so in.  And at this

3    moment, are you and Detective Parker in the room?

4    A.    No, we're not.  We're just now coming back in.

5          (Video recording played.)

6    **BY MS. BRUSCA:**

7    Q.    And Detective Lewis, do you see the cell phone belonging

8    to Andre Briscoe in that video there?

9    A.    Yes.

10   Q.    Where is it?

11   A.    It's on the table just to the right of Detective Parker's

12   right arm.

13   Q.    Right where my cursor is swirling about?

14   A.    Yep.

15         (Video recording played.)

16   **BY MS. BRUSCA:**

17   Q.    Now, I'm going to pause it at an hour five and about

18   54 seconds.  Did you also review this portion of the draft

19   transcript, Government's 28, related to the very beginning of

20   when Mr. Briscoe was giving his phone?

21   A.    Yes.

22   Q.    And that's at Government's 28, page 24.  I believe it's

23   line 1507, and did you confirm that this portion of the

24   transcript was also accurate where it was marked intelligible?

25   A.    Yes.

```
1              (Video recording played.)

2      BY MS. BRUSCA:

3      Q.   Can you tell whether the phone was off or on when it was

4      handed to Mr. Briscoe?

5      A.   I could not.  When it was handed to him, was it on?  I

6      could not tell if it was off or on at that time.  I don't...

7      Q.   Let's just play it one more time.

8              (Video recording played.)

9      BY MS. BRUSCA:

10     Q.   Can you tell what Mr. Briscoe is doing with his hands

11     there?

12     A.   It looks like he was powering up the phone.

13     Q.   And then --

14     A.   Now there is a --

15     Q.   -- the screen changes color about 1557; is that accurate?

16     A.   Yes.

17     Q.   All right.  And I'm stopping at 1607.  Toward the end of

18     the interview, did Mr. Briscoe ask you if he could have the

19     phone for any reason?

20     A.   Yes.

21     Q.   Why was that?

22     A.   He wanted to get numbers out of his phone, I guess

23     contacts that he had out of his phone.

24     Q.   And was he permitted to do that?

25     A.   No.
```

1    Q.   Why not?

2    A.   We advised him that the phone was evidence in this

3    investigation.

4    Q.   And did you say specifically that you had a warrant for

5    the phone?

6    A.   Yes.

7    Q.   Did you have a warrant for the phone at that moment?

8    A.   At that moment, no.

9    Q.   And why did you tell Mr. Briscoe that you had a warrant

10   for the phone?

11   A.   Because there was every intention to get a warrant to

12   check his phone.

13   Q.   Who maintained custody of Mr. Briscoe's phone after the

14   interview?

15   A.   It was either myself or Detective Parker, I honestly

16   don't remember whether it was myself or him, but it was one of

17   the two of us.

18   Q.   And in terms of location, was it removed from Cambridge?

19   A.   Yes, it was.

20   Q.   And taken where?

21   A.   Back to Baltimore.

22   Q.   And was -- were the contents of the phone ultimately

23   extracted?

24   A.   Yes, they were.

25   Q.   I'm going to show you Government's Exhibit 45.  And what

1  is Government's Exhibit 45 here?

2  A.    I believe this is the cover sheet for the extraction

3  report of Mr. Briscoe's cell phone.

4  Q.    And under examiner name, what does this report reflect?

5  A.    Detective task force officer Michael Baier.

6  Q.    And are you familiar with Michael Baier, detective task

7  force officer of BPD?

8  A.    Yes.

9  Q.    Do you recall asking him, in particular, to perform this

10  extraction?

11  A.    I do.

12  Q.    You do?

13  A.    I take that back.  I -- I know that I needed to speak to

14  the people that extracted, and Michael was the person at the

15  time -- during that time period that was doing them.  I

16  honestly do not remember calling him or picking up a phone and

17  saying, hey, Mike, I got this phone that I need you to take

18  care of this.  I know that there was a communication.  Whether

19  it was myself or Detective Parker or my supervisor at the

20  time, someone reached out to Detective Baier.

21  Q.    And you said that you -- I think you said that you needed

22  somebody to, like, extract the phone.  Is that what you said?

23  A.    Yes.

24  Q.    And were you able to do that yourself?

25  A.    No, I do not have the training for that.

1    Q.   What about the equipment?  Do you have the equipment to

2    do it if you wanted to?

3    A.   No, I do not.

4    Q.   And at the time the phone was extracted, did you get a

5    warrant to search it?

6    A.   Yes.

7    Q.   Do you have a specific recollection of doing that?

8    A.   I know I got a warrant.  Who I got the warrant signed by,

9    I don't remember, but I do know that I had to get a warrant in

10    order to get this information.

11    Q.   When you say that you had to get a warrant, had to get a

12    warrant according to whom?

13    A.   Policy of the police department.  I know that the

14    examiners that are able to extract it, they cannot perform

15    their duty in terms of extracting information from warrants

16    without having a search and seizure warrant signed by a judge.

17    Q.   Have you looked for a warrant to search that cell phone

18    that was seized from Mr. Briscoe on June 5th, 2015?

19    A.   Yes, I have.

20    Q.   Have you located a warrant for the phone?

21    A.   Unfortunately, I have not.

22    Q.   And following this extraction -- does the extraction have

23    a date in the report of the extraction?

24    A.   June 15th, 2015.

25    Q.   Does it have a time?

```
 1    A.    I'm sorry, 6:15:21 p.m.

 2    Q.    And the negative four there, does that indicate a time

 3    zone?

 4    A.    Yes.

 5    Q.    So after this extraction was performed, what did you --

 6    did you receive a copy of it at the time?

 7    A.    Yes, I did.

 8    Q.    And what did you do with the report?

 9    A.    The actual extraction report itself?

10    Q.    Yes.

11    A.    I believe I put it -- well, I checked the records during

12    the time period of the murder.

13    Q.    And -- but physically, did you receive a paper report or

14    did you receive the report on a device of some kind

15    electronically?

16    A.    I believe it was on a disk.

17    Q.    And I'm going to show you Government's Exhibit 44.  And

18    at page 1, what's in page 1 there?

19    A.    That is the evidence envelope with my business card

20    attached to it with the report number, the type of case it is,

21    and it says phone dumped and claimant on there is Andre

22    Briscoe.  My name is on the bottom, B. Lewis.

23    Q.    And at page 2 underneath the business card first, I

24    guess, whose name is reflected on the business card attached

25    to or appearing to be attached to this envelope?
```

```
1    A.    My name.

2    Q.    And underneath it, there is a number beginning 15H106.

3    What is that?

4    A.    That is the case number that was assigned to this case.

5    Q.    And was that your handwriting on that envelope?

6    A.    Yes, it was.

7    Q.    Did you -- where did you find this envelope in 2021?

8    A.    This was within the case file that was in my desk -- at

9    my desk.

10   Q.    Your desk at BPD?

11   A.    Yes.

12   Q.    And I think we actually have the physical --

13            THE COURT:   This would be an appropriate point where

14   to stop here.  It's now 4:30 and I want to allow time for the

15   marshals to be able to return to -- the defendant to the

16   pretrial detention facility.

17       Thank you very much, Detective Lewis.  You have to come

18   back again tomorrow.

19       Becca, we might try to start earlier.  I think you had us

20   down here for    11 o'clock tomorrow.  What else am I doing

21   in the morning?  I've got a sentencing at -- I have nothing

22   else, do I?  Is there any reason why we can't start at 10:00

23   as opposed to 11:00.

24            MR. PURPURA:   Judge Bennett, if I may on that?

25   Because we started at 11:00, I had a plea in Greenbelt at 9:00
```

1     in the morning.

2             THE COURT:  That's why -- I think we jockied.  We'll

3     just keep it 11 o'clock.  All right.

4         Thank you very much, Detective Lewis.  We will -- you

5     would return to the witness stand at 11 o'clock tomorrow.

6     We'll start at 11 o'clock as scheduled, and we're due to go

7     the rest of the day.  So just don't discuss your testimony

8     with anyone this evening because you'll be back on the witness

9     stand tomorrow.

10            THE WITNESS:  Yes, sir.

11            THE COURT:  Thank you very much.

12        Now, for scheduling purposes, Ms. Brusca and Mr. Budlow,

13    I note that Detective Lewis was one of 11 people listed as a

14    government witness who may be called at the motions hearing

15    set for today and tomorrow.  At this pace, we clearly aren't

16    going to get all of those people covered, so I think we need

17    to be looking at scheduling.  How much longer are you going to

18    be, Ms. Brusca?

19            MS. BRUSCA:  With Detective --

20            THE COURT:  I'm sorry.  I can't hear you.  I'm

21    sorry.

22            MS. BRUSCA:  With Detective Lewis, Your Honor, I

23    expect maybe five, ten minutes more.

24            THE COURT:  How many more witnesses?  Are you going

25    to call all of these witnesses, all ten of these witnesses?

1          **MS. BRUSCA:**  We're not, Your Honor.

2          **THE COURT:**  Who is going to be called tomorrow?  I'm

3    operating on the assumption we're not going to finish

4    tomorrow, so I'm going to try to get calendars out.

5          **MS. BRUSCA:**  Sure, Your Honor.  I think we have six

6    more witnesses, Your Honor.

7          **THE COURT:**  Well, clearly at this pace, we won't get

8    to all of them.  So who are the six witnesses being called

9    tomorrow?

10         **MS. BRUSCA:**  After Detective Lewis, I expect it will

11   be Michael Baier.

12         **THE COURT:**  Michael Baier, B-a-i-e-r, okay.

13         **MS. BRUSCA:**  And then four members of the Cambridge

14   Police Department.  It will be Greg McCray.

15         **THE COURT:**  One second.  One minute.  Yeah, go

16   ahead.

17         **MS. BRUSCA:**  Corporal Howard, Edward Howard; Steven

18   Daniel, Jennifer Benton, and David Azur.

19         **THE COURT:**  And David Azur.  So we're looking at

20   finishing Detective Lewis, then we have Detective Azur,

21   Cambridge Police Department Benton, Cambridge Police

22   Department Steve Daniel, Cambridge Police Department Edward

23   Howard, Cambridge Police Department Greg McCray, and former

24   Baltimore City Police Detective Baier.

25         Well, what I suggest you all do is that we will start

```
 1    tomorrow at 11.  We'll go until 1:00.  We'll take a break and
 2    we'll go to, like, 4:30 tomorrow.  I suggest that -- why don't
 3    you all coordinate your calendars in terms of a series of
 4    suggested dates here for continuing the motion hearing,
 5    because we clearly will not finish tomorrow.  It doesn't
 6    appear that we will, but we have time.
 7         The pretrial conference is scheduled for Wednesday, March
 8    the 9th.  Proposed voir dire is Monday, April the 11th.  I'll
 9    make sure we have plenty of time in light of the nature of
10    this case and the voir dire and the COVID precautions, and
11    then the trial is due to start Monday, May 23rd.  So we have
12    the luxury of time here, but I would suggest that you-all come
13    up with a series of dates starting next week through the end
14    of February.
15         I'll be away during portions of February sitting by
16    destination on the West Coast.  So I'll be out the week of
17    February 14th, for example.  So my suggestion is you-all get
18    your calendars together, come up with some series of dates and
19    then I'll get my calendar in here and we'll see what we can
20    work out about sometime tomorrow what the other -- the third
21    day.  We're going to need a third day of this motions hearing,
22    it's obvious to me.
23              MS. BRUSCA:  Thank you, Your Honor.
24              THE COURT:  You-all just get your calendars together
25    and give me a series of dates.  I'll see what I can work out.
```

1    **MR. BUDLOW:**  Your Honor, just so there is no

2    surprises, there is one additional witness who I don't think

3    we're going to need, but I just want to let you know.  It's

4    retired Detective Vernon Parker.  I think -- I'm going to talk

5    to defense counsel and I don't think we'll need him.  If we

6    do, it would be brief, but I just wanted to give you a

7    heads-up.

8         **THE COURT:**  That's fine.  Well, I'm not listening

9    yet.  I mean, it's fine.  I'm just -- my point is it doesn't

10   make that much difference.  We're not going to finish all of

11   those people tomorrow, obviously.

12        So you'll be about five more minutes and then Ms. Whalen

13   or Mr. Purpura will then cross-examine Detective Lewis.  So is

14   there anything else from the point of view of the government?

15        **MS. BRUSCA:**  Not today, Your Honor.  Thank you.

16        **THE COURT:**  Anything further from your point of

17   view?

18        **MS. WHALEN:**  Just with respect to cross-examination.

19   We split up -- searches I'll be doing, and Mr. Purpura will do

20   statements.

21        **THE COURT:**  That's fine.  I'll give you leave from

22   the local rule one person usually keeps the witness.  You all

23   can divide that up.  There's not a problem.

24        **MS. WHALEN:**  Thank you.

25        **THE COURT:**  That's within the discretion of the

1    Court.

2       All right.  So with that, we are adjourned for the day

3    and we'll start tomorrow at 11 o clock.

4       Mr. Purpura, I hope that gives you enough time.  Before

5    which judge are you appearing.

6          **MR. PURPURA:**  Judge Chung.

7          **THE COURT:**  Okay.  You should be fine.  If you start

8    right at 9:00, you should be able to get back in time.  I

9    mean, your driver would be able to get you back in time.

10      This Court stands adjourned for the day.

11          **THE CLERK:**  All rise.  This Honorable Court is now

12   adjourned.

13      (At 4:36 p.m., the proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    CERTIFICATE OF OFFICIAL REPORTER
 3         I, Melissa L. Clark, a Registered Professional Reporter,
 4    in and for the United States District Court for the District
 5    of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753,
 6    that the foregoing is a true and correct transcript of the
 7    stenographically-reported proceedings held in the
 8    above-entitled matter and the transcript page format is in
 9    conformance with the regulations of the Judicial Conference of
10    the United States.
11
12
13                            Dated this **25th** day of **January 2022**
14
15                      _____/s_____
16                         Melissa L. Clark, RPR
17                        Federal Official Reporter
18
19
20
21
22
23
24
25
```

**Melissa L. Clark, RPR – Federal Official Court Reporter**

**$**

**$50** [2] - 85:12, 110:21

**'**

**'15** [1] - 52:20
**'21** [1] - 56:6

**/**

**/s** [1] - 169:15

**0**

**0** [1] - 139:17
**0821** [1] - 93:14

**1**

**1** [11] - 1:5, 41:13, 92:17, 107:25, 122:1, 122:21, 122:23, 124:3, 157:2, 162:18
**10** [7] - 14:14, 14:16, 20:19, 41:15, 64:16, 64:17
**10/5/83** [1] - 110:1
**101** [22] - 1:24, 14:18, 15:15, 29:19, 33:15, 44:10, 53:16, 53:19, 54:7, 120:1, 120:4, 120:13, 129:2, 129:7, 129:9, 129:19, 129:24, 130:2, 130:4, 130:20, 131:24
**1015** [1] - 93:13
**103** [25] - 60:10, 60:13, 60:23, 61:5, 61:23, 62:2, 62:5, 62:15, 63:4, 63:7, 63:13, 67:2, 69:20, 72:24, 73:22, 74:17, 77:20, 87:20, 87:24, 88:12, 90:3, 90:25, 104:20, 105:5, 111:9
**104** [2] - 42:6, 42:22
**104(a** [1] - 42:2
**104A** [1] - 12:22
**10:00** [1] - 163:22
**10:15** [1] - 93:18
**10:26** [4] - 88:10, 88:13, 111:9
**10:45** [1] - 116:4
**11** [13] - 14:14, 20:20, 67:18, 82:10, 82:12, 157:2, 163:20, 164:3, 164:5, 164:6,

164:13, 166:1, 168:3
**110** [1] - 97:13
**1101** [3] - 12:22, 31:6, 41:24
**1104** [1] - 31:6
**111** [2] - 97:13
**11:00** [5] - 85:21, 113:4, 163:23, 163:25
**11:07** [1] - 1:6
**11:41** [10] - 96:23, 97:1, 97:11, 99:19, 110:5, 110:7, 110:25, 111:6, 112:15, 113:1
**11th** [1] - 166:8
**12** [3] - 67:22, 92:23, 93:1
**12:07** [2] - 123:9, 124:4
**13** [4] - 67:25, 68:1, 94:3, 133:1
**13M** [4] - 132:11, 132:12, 132:20, 134:3
**13th** [1] - 20:7
**14** [5] - 7:11, 59:8, 59:12, 142:16, 152:11
**14-year** [1] - 59:20
**14th** [1] - 166:17
**15** [9] - 76:8, 94:7, 124:13, 139:1, 139:18, 139:25, 148:12, 152:14, 157:1
**1507** [1] - 157:23
**1512(a** [1] - 6:25
**1557** [1] - 158:15
**15H106** [1] - 163:2
**15th** [4] - 47:6, 47:24, 48:11, 161:24
**16** [6] - 94:8, 124:22, 126:1, 126:4, 126:5, 126:10
**1607** [1] - 158:17
**169** [1] - 2:5
**17** [4] - 68:24, 94:8, 94:24, 126:9
**18** [15] - 6:18, 6:19, 6:21, 6:24, 6:25, 7:1, 8:2, 20:14, 23:15, 68:24, 94:7, 94:9, 94:11, 126:24, 139:17
**18th** [2] - 16:20, 17:7
**19** [4] - 1:8, 69:10, 126:10, 127:5
**1:00** [6] - 41:12, 41:15, 56:14, 56:15, 76:4,

166:1
**1:50** [1] - 142:10
**1A** [3] - 98:23, 98:24, 101:7
**1st** [1] - 103:1

**2**

**2** [21] - 6:20, 6:25, 23:11, 41:17, 63:11, 63:12, 92:1, 92:3, 92:17, 94:3, 99:4, 102:20, 108:1, 108:6, 132:19, 134:3, 138:19, 143:21, 162:23
**20** [4] - 29:23, 69:12, 124:13, 127:7
**201** [15] - 54:8, 130:7, 130:9, 130:10, 130:11, 130:22, 131:7, 131:8, 131:11, 131:25, 132:3, 133:9, 133:20, 133:22, 152:6
**2015** [61] - 8:4, 15:10, 24:14, 24:20, 27:16, 28:25, 46:19, 47:3, 47:6, 47:24, 47:25, 48:11, 49:6, 49:14, 49:24, 51:9, 52:3, 52:19, 53:25, 59:23, 60:1, 60:3, 60:4, 80:3, 93:12, 93:14, 101:25, 103:1, 103:10, 108:9, 108:20, 110:5, 115:2, 116:6, 116:21, 117:2, 117:4, 117:16, 118:23, 123:4, 123:9, 124:6, 124:24, 125:23, 126:3, 126:13, 126:22, 128:11, 128:25, 139:19, 142:6, 143:21, 144:10, 144:19, 146:5, 146:16, 153:16, 154:22, 155:4, 161:18, 161:24
**2016** [2] - 28:12, 49:6
**2017** [1] - 49:7
**2018** [4] - 28:8, 49:8, 52:13, 52:14
**202** [36] - 32:9, 32:22, 33:14, 33:17, 37:3, 41:3, 43:12, 43:22,

46:9, 46:10, 49:15, 51:10, 53:22, 54:10, 55:10, 55:21, 119:3, 119:22, 132:3, 132:4, 132:9, 132:10, 132:14, 132:23, 133:3, 133:22, 134:3, 134:7, 134:18, 135:1, 135:7, 135:13, 136:15, 137:3, 148:3
**2020** [15] - 20:1, 20:4, 20:6, 20:15, 23:9, 23:11, 24:13, 26:16, 28:3, 28:8, 49:8, 49:9, 51:16, 56:5
**2021** [4] - 29:23, 48:21, 52:2, 163:7
**2022** [2] - 1:8, 169:13
**21** [2] - 128:9, 128:14
**21201** [1] - 1:25
**2128** [1] - 101:25
**21613** [1] - 133:9
**22** [6] - 20:4, 20:6, 23:9, 69:19, 73:3
**22-caliber** [1] - 73:3
**22nd** [2] - 23:17, 26:15
**23rd** [3] - 16:17, 36:19, 166:11
**24** [6] - 59:8, 120:24, 123:19, 123:22, 127:19, 157:22
**240** [1] - 96:11
**2413** [11] - 97:8, 99:22, 106:19, 107:3, 107:23, 109:17, 123:10, 124:5, 127:9, 128:10
**25** [1] - 56:14
**25th** [1] - 169:13
**26th** [7] - 80:3, 80:13, 82:10, 82:13, 84:25, 146:15, 154:22
**27** [6] - 8:4, 15:10, 27:16, 93:12, 110:4, 154:22
**27th** [12] - 87:12, 87:18, 89:22, 89:23, 93:18, 96:23, 97:18, 101:25, 104:21, 111:10, 146:15
**28** [5] - 93:13, 151:21, 157:19, 157:22, 169:5
**28th** [12] - 43:15, 43:16, 60:3, 60:4, 77:6, 78:7, 79:7, 80:15, 81:5, 90:5, 91:13, 97:21

**29th** [3] - 100:17, 100:20, 103:10
**2:00** [3] - 76:7, 138:20, 155:4
**2:01** [1] - 144:10
**2:02** [1] - 144:19
**2nd** [1] - 20:15

**3**

**3** [5] - 63:17, 106:22, 106:24, 114:1, 133:1
**30** [2] - 155:9
**31** [1] - 110:1
**33** [3] - 60:25, 61:1
**34** [5] - 63:3, 63:23, 65:14, 67:19
**35** [2] - 115:9, 115:10
**3559** [1] - 6:20
**3559(2)(C** [1] - 7:1
**36** [13] - 121:17, 121:18, 122:1, 122:21, 124:9, 124:22, 126:1, 126:4, 126:9, 128:2, 128:8, 128:14
**36A** [2] - 125:3, 125:4
**36B** [5] - 125:11, 125:12, 126:5, 126:6, 126:7
**36C** [2] - 127:21, 127:22
**36D** [1] - 128:16
**38.566421** [1] - 123:16
**38.570627** [1] - 127:15
**3:52** [4] - 124:24, 124:25, 126:3, 126:6

**4**

**4** [2] - 63:23, 86:5
**4-0** [1] - 141:24
**40** [4] - 141:20, 141:21, 142:1, 146:7
**404(b** [5] - 15:19, 15:22, 15:24, 16:13, 17:5
**4057** [3] - 96:16, 97:16, 98:9
**410-962-4474** [1] - 1:25
**43** [1] - 116:4
**44** [1] - 162:17
**443** [6] - 97:8, 107:3, 108:5, 109:25, 122:25, 126:25
**45** [4] - 47:5, 72:15, 159:25, 160:1
**47** [1] - 123:4
**48** [1] - 148:15

**4:07** [2] - 126:13, 126:22
**4:22** [1] - 126:25, 127:3
**4:30** [6] - 76:19, 76:20, 76:23, 76:24, 163:14, 166:2
**4:36** [1] - 168:13
**4:37** [1] - 127:5
**4:52** [1] - 127:7
**4M2** [1] - 107:25
**4th** [12] - 1:24, 43:16, 51:9, 52:19, 54:5, 108:9, 108:19, 116:6, 116:21, 117:4, 117:16, 123:4

---

# 5

**5** [24] - 6:15, 6:21, 7:5, 7:8, 9:6, 9:25, 10:3, 10:6, 10:17, 10:18, 11:1, 64:7, 76:20, 78:8, 87:18, 92:18, 92:21, 109:20, 117:9, 117:10, 139:19, 156:7, 157:2
**50** [2] - 88:23, 148:13
**50-something** [1] - 30:9
**502** [16] - 32:9, 44:8, 55:10, 119:2, 120:13, 125:21, 129:2, 129:7, 132:15, 132:17, 132:23, 133:3, 133:8, 134:11, 134:14, 136:15
**54** [1] - 157:18
**58** [1] - 2:4
**580-4057** [1] - 96:11
**5:00** [1] - 104:21
**5:07** [2] - 128:10, 128:21
**5D** [1] - 1:9
**5th** [31] - 47:3, 49:14, 49:24, 117:2, 118:2, 118:6, 118:22, 119:21, 123:9, 123:11, 124:6, 124:24, 125:20, 125:23, 126:3, 126:13, 126:22, 127:3, 127:7, 128:10, 128:22, 128:25, 138:17, 142:6, 143:21, 144:10, 144:19, 146:5, 153:16, 155:3, 161:18

---

# 6

**6** [12] - 6:15, 6:22, 7:5, 7:8, 9:25, 10:3, 10:6, 10:18, 11:1, 64:12, 92:17, 92:23
**621** [1] - 97:8
**621-240** [1] - 107:3
**621-2413** [4] - 108:5, 109:25, 122:25, 126:25
**648** [1] - 150:20
**652** [1] - 149:8
**69** [3] - 14:17, 15:14, 29:17
**6:15:21** [1] - 162:1
**6:40** [1] - 117:14

---

# 7

**7** [3] - 65:14, 66:2, 109:14
**70** [5] - 14:17, 15:20, 17:6, 18:8, 21:18
**71** [4] - 14:17, 17:10, 18:8, 21:19
**718** [1] - 127:17
**72** [2] - 14:17, 29:21
**73** [2] - 14:18, 29:22
**74** [6] - 14:18, 18:10, 19:2, 19:22, 21:19, 23:6
**753** [1] - 169:5
**76.081738** [1] - 123:17
**76.088798** [1] - 127:15
**7:22** [1] - 124:10

---

# 8

**8** [4] - 65:21, 66:7, 93:8, 109:14
**829.79** [1] - 127:24
**8:00** [2] - 129:10
**8:55** [1] - 51:11
**8th** [1] - 5:20

---

# 9

**9** [3] - 66:10, 81:10, 109:14
**911** [3] - 74:15, 87:12, 87:16
**914** [1] - 151:7
**924(c** [1] - 6:19
**924(j)(1** [1] - 6:20
**94** [2] - 14:18, 29:24
**95** [6] - 14:18, 19:25, 20:11, 22:16, 29:11
**96** [3] - 14:18, 21:12, 21:19

---

**9:00** [4] - 100:19, 120:20, 163:25, 168:8
**9:06** [1] - 123:4
**9:07** [1] - 51:12
**9:28** [1] - 102:1
**9th** [2] - 16:18, 166:8

---

# A

**a.m** [37] - 1:6, 51:11, 51:12, 87:18, 88:10, 88:13, 93:18, 96:23, 97:1, 97:11, 99:19, 100:18, 100:19, 104:21, 110:5, 110:25, 111:9, 112:15, 116:4, 120:20, 123:9, 124:4, 124:10, 124:24, 124:25, 126:3, 126:6, 126:13, 126:22, 126:25, 127:3, 127:5, 127:7, 128:10, 128:21
**a/k/a** [2] - 99:12, 110:1
**AB** [1] - 143:10
**able** [18] - 22:14, 31:3, 67:4, 78:1, 81:25, 87:11, 90:5, 98:10, 98:14, 106:12, 106:16, 137:22, 154:12, 160:24, 161:14, 163:15, 168:8, 168:9
**above-entitled** [1] - 169:8
**absent** [1] - 126:20
**absolutely** [2] - 43:21, 45:3
**abundance** [1] - 30:25
**accord** [1] - 13:1
**accorded** [2] - 13:4, 35:1
**according** [25] - 14:15, 44:4, 75:18, 83:6, 84:3, 84:4, 85:16, 85:25, 86:4, 86:16, 86:21, 88:7, 90:22, 96:20, 106:6, 106:7, 110:3, 110:13, 110:16, 110:22, 112:13, 118:18, 119:24, 161:12
**accordingly** [5] - 15:5, 21:9, 21:22, 24:3, 25:16
**accounted** [1] - 91:23

---

**accounts** [2] - 95:21, 113:16
**accurate** [4] - 133:17, 152:2, 157:24, 158:15
**acknowledge** [1] - 49:1
**acknowledging** [1] - 89:19
**act** [5] - 7:16, 7:22, 7:23, 7:25, 54:20
**acting** [3] - 8:18, 85:6, 129:11
**actions** [1] - 55:25
**activity** [9] - 27:17, 27:22, 28:14, 28:19, 28:25, 48:13, 76:2, 77:9, 79:6
**actual** [5] - 78:3, 94:19, 102:23, 114:8, 162:9
**Adam** [1] - 29:10
**add** [1] - 38:8
**added** [3] - 6:12, 6:13, 7:3
**addition** [4] - 50:3, 83:11, 93:25, 98:9
**additional** [7] - 8:8, 17:9, 17:14, 17:17, 17:24, 18:4, 167:2
**address** [9] - 9:22, 11:10, 18:8, 22:15, 23:18, 29:8, 30:11, 30:20, 89:24
**addressed** [2] - 15:11, 15:18
**addresses** [1] - 154:16
**addressing** [2] - 21:24, 29:15
**adjourned** [3] - 168:2, 168:10, 168:12
**admissibility** [6] - 12:23, 31:7, 31:22, 31:23, 34:4, 42:3
**admissible** [2] - 32:12, 47:2
**admission** [1] - 30:23
**admit** [3] - 32:18, 38:16, 40:22
**admitted** [4] - 25:1, 79:18, 103:19, 103:20
**Advance** [1] - 114:25
**advance** [2] - 26:3, 27:9
**Advanced** [8] - 114:11, 114:13, 115:11, 115:13, 118:9, 118:12,

---

119:16, 133:13
**advice** [1] - 142:18
**Advice** [2] - 145:15, 145:24
**advise** [2] - 13:25, 42:12
**advised** [11] - 10:6, 60:9, 61:25, 77:24, 93:11, 116:17, 130:5, 131:8, 134:9, 142:11, 159:2
**advises** [1] - 80:7
**advising** [1] - 151:18
**affected** [1] - 40:9
**affects** [2] - 34:4, 35:10
**affiant** [2] - 95:13, 114:3, 129:10
**affiant's** [1] - 95:6
**affidavit** [10] - 26:23, 94:7, 94:15, 94:25, 95:3, 108:11, 108:13, 113:22, 133:2, 133:22
**afforded** [1] - 10:25
**aftermath** [1] - 52:13
**afternoon** [6] - 58:16, 58:17, 76:12, 78:7, 81:4, 138:19
**afterwards** [1] - 111:1
**age** [2] - 7:11, 149:25
**AGENT** [1] - 4:18
**Agent** [9] - 1:20, 4:6, 4:8, 4:16, 19:21, 20:7, 20:15, 20:20, 23:11
**agent** [3] - 13:14, 14:5, 27:3
**agents** [5] - 12:11, 12:18, 13:1, 13:18, 33:16
**ago** [1] - 152:11
**agree** [2] - 31:5, 48:10
**agreed** [4] - 12:15, 47:7, 48:9, 146:3
**agreement** [2] - 21:21, 22:11
**ahead** [7] - 36:15, 37:19, 49:24, 62:21, 83:22, 104:25, 165:16
**Alcatel** [11] - 18:13, 18:14, 18:19, 20:10, 22:2, 22:18, 23:2, 29:24, 45:13, 47:22, 56:5
**ALCATEL** [1] - 18:14
**alcatel** [1] - 18:20
**alcohol** [2] - 155:1, 155:5

alert [1] - 13:15
allegation [4] - 8:5, 27:20, 28:24, 33:18
allegations [3] - 6:15, 7:5, 29:5
alleged [4] - 10:13, 28:20, 28:22, 33:13
allocating [1] - 60:20
allocution [1] - 93:5
allow [2] - 54:23, 163:14
allowed [1] - 39:9
allows [1] - 26:7
almost [1] - 24:14
alone [2] - 42:14, 106:5
ambit [1] - 11:18
amblet [1] - 11:18
AMERICA [1] - 1:3
ammunition [1] - 28:15
amount [1] - 75:22
analysis [2] - 12:12, 72:16
ANDRE [1] - 1:5
Andre [28] - 3:7, 7:13, 82:8, 83:8, 84:1, 86:19, 86:20, 86:21, 86:23, 87:1, 88:23, 96:23, 99:12, 99:15, 103:17, 103:22, 106:7, 107:5, 109:25, 117:12, 123:1, 133:8, 139:20, 140:22, 143:19, 144:8, 157:8, 162:21
Andre's [1] - 86:19
Android [2] - 90:19, 90:22
angle [1] - 69:7
answer [5] - 78:25, 93:21, 109:7, 144:1, 144:2
answered [1] - 153:19
answering [1] - 96:19
answers [2] - 146:10, 154:6
anticipate [3] - 44:21, 45:12, 48:2
anticipated [2] - 35:9, 40:7
apart [7] - 50:7, 50:20, 77:20, 79:2, 79:23, 94:17, 124:14
Apartment [53] - 32:9, 32:22, 33:14, 33:15, 33:17, 41:3, 43:12, 43:22, 44:10, 46:9, 46:10, 49:15, 51:10,

53:16, 53:19, 53:22, 54:7, 54:10, 55:10, 119:3, 119:22, 120:1, 120:4, 120:13, 129:2, 129:7, 129:19, 129:24, 130:1, 130:4, 130:7, 130:10, 130:11, 130:22, 131:7, 131:11, 132:9, 132:10, 132:14, 132:23, 133:3, 133:9, 133:20, 133:22, 134:3, 134:18, 135:1, 135:7, 135:13, 136:15, 137:2, 148:3
apartment [39] - 32:10, 33:20, 35:14, 35:17, 35:18, 38:7, 41:3, 44:25, 45:2, 45:9, 45:22, 53:15, 54:8, 54:10, 54:21, 54:24, 55:2, 55:7, 55:8, 55:11, 55:14, 55:18, 84:5, 105:2, 119:6, 119:20, 119:25, 120:14, 129:8, 130:9, 130:15, 131:9, 131:25, 133:19, 133:24, 134:13, 135:17, 148:5
Apartments [3] - 119:1, 127:25, 128:19
apologize [4] - 95:10, 112:2, 117:7, 137:11
apologizes [1] - 6:19
appear [5] - 153:22, 154:8, 154:18, 155:5, 166:6
appearance [7] - 3:12, 6:1, 6:4, 9:5, 9:16, 71:16, 153:21
appeared [2] - 10:15, 154:2
appearing [2] - 162:25, 168:5
application [12] - 92:23, 93:20, 94:5, 94:8, 96:9, 107:9, 108:2, 108:6, 108:8, 108:10, 109:19, 117:13
applied [3] - 20:7, 20:20, 23:11
applies [1] - 30:24
apply [8] - 12:24,

30:25, 31:6, 31:9, 31:19, 33:25, 42:1, 111:25
appointed [2] - 8:18, 9:9
appreciate [1] - 38:14
approach [1] - 31:24
appropriate [2] - 154:4, 163:13
approximate [4] - 115:25, 123:23, 124:1, 147:14
April [1] - 166:8
apt [2] - 149:21, 149:23
area [15] - 44:16, 52:13, 61:6, 61:13, 61:15, 62:6, 62:23, 65:23, 105:23, 106:9, 106:15, 106:17, 130:6, 130:8, 131:18
areas [2] - 3:17, 57:8
arguable [1] - 54:9
arguably [1] - 10:13
argue [7] - 46:23, 49:3, 49:4, 50:3, 53:4, 54:21, 56:8
argued [1] - 28:3
argument [13] - 14:25, 15:16, 21:4, 22:10, 22:12, 22:22, 23:19, 23:21, 24:2, 24:4, 43:22, 48:17, 48:24
arguments [1] - 22:2
arm [1] - 157:12
arms [1] - 145:13
arraignment [3] - 3:12, 6:1, 9:17
arrest [9] - 20:5, 20:23, 23:9, 23:17, 24:15, 25:2, 26:15, 49:25, 155:16
arrested [1] - 20:4, 24:13, 46:8, 46:11, 46:17, 49:8, 49:9, 55:22, 136:6, 136:11, 155:15
arrival [1] - 62:3
arrive [2] - 118:4, 119:14
arrived [8] - 62:10, 70:15, 73:17, 74:16, 74:21, 86:1, 119:25, 129:1
arriving [1] - 35:15
ascertained [1] - 109:24
aside [1] - 55:7, 134:21

asleep [1] - 55:6
aspect [3] - 79:3, 82:22, 84:14
assemble [1] - 120:11
assigned [2] - 58:25, 163:4
assignment [1] - 9:8
assignments [1] - 59:2
assist [8] - 59:17, 92:11, 113:18, 114:4, 114:19, 114:22, 115:23, 129:11
assistance [1] - 116:19
assisted [2] - 113:21, 114:11
assisting [1] - 59:19
associated [4] - 98:21, 99:7, 100:6, 102:5
assume [4] - 5:21, 6:7, 34:3, 148:20
assuming [1] - 13:14
assumption [1] - 165:3
AT&T [3] - 114:23, 118:18, 126:11
ATF [8] - 1:20, 4:9, 12:3, 20:7, 23:11, 23:15, 24:16, 48:3
ATT [21] - 114:11, 114:13, 114:17, 114:24, 115:3, 115:5, 116:8, 119:19, 119:24, 120:12, 121:9, 121:15, 121:23, 122:12, 122:17, 124:5, 129:5, 129:11, 130:4, 130:7, 131:5
attached [6] - 31:1, 31:12, 32:4, 162:20, 162:24, 162:25
Attachment [3] - 26:10, 26:21, 27:11
attack [1] - 13:18
attempted [9] - 80:18, 80:19, 80:24, 106:8, 112:20, 113:5, 113:8, 155:15
attend [1] - 3:15
attention [2] - 14:24, 153:25
attorney [3] - 9:3, 155:18, 155:20
Attorneys [1] - 37:20
audio [4] - 46:13,

138:23, 141:1, 149:4
August [1] - 28:12
AUSA [2] - 1:13, 1:14
authorized [2] - 26:9, 27:3
automatically [1] - 11:2
autopsy [1] - 117:23
available [1] - 36:10
Avenue [22] - 32:10, 44:9, 55:10, 105:21, 105:22, 119:2, 119:20, 120:13, 125:19, 125:21, 128:7, 128:19, 129:2, 129:7, 132:15, 132:17, 132:23, 133:3, 133:9, 134:11, 134:14, 136:15
avoid [1] - 40:3
awaiting [3] - 78:13, 78:16
awakened [1] - 86:5
aware [9] - 32:14, 34:20, 50:1, 102:6, 136:17, 136:19, 138:2, 138:6, 155:10
Azur [3] - 165:18, 165:19, 165:20

**B**

backed [2] - 130:4, 131:8
background [3] - 82:1, 137:15, 146:11
backward [1] - 80:15
bad [2] - 96:4, 131:6
baggy [1] - 25:1
Baier [6] - 160:5, 160:6, 160:20, 165:11, 165:12, 165:24
BAIER [1] - 165:12
bail [1] - 80:11
ballistic [4] - 66:12, 71:9, 71:11, 72:17
Baltimore [26] - 1:7, 1:9, 1:25, 24:17, 27:18, 43:13, 44:8, 47:4, 47:10, 47:14, 47:18, 51:23, 52:23, 58:19, 59:4, 60:24, 61:16, 75:10, 78:10, 82:21, 84:8, 90:1, 132:23, 133:12, 159:21, 165:24
bang [1] - 87:9
banged [2] - 103:17,

104:20
**banging** [5] - 53:17, 54:12, 86:15, 87:7, 103:21
**base** [1] - 95:9
**based** [9] - 35:4, 69:22, 70:9, 71:19, 95:4, 95:6, 106:17, 113:13, 151:25
**basement** [1] - 77:25
**basic** [1] - 144:22
**basis** [2] - 37:7, 43:21
**Bass** [5] - 62:4, 62:5, 62:7, 73:18, 73:22
**bathroom** [4] - 138:7, 138:10, 138:12, 138:14
**Bay** [2] - 127:24, 128:18
**bears** [1] - 15:2
**Becca** [1] - 163:19
**become** [1] - 42:8
**becomes** [1] - 95:8
**bed** [15] - 42:16, 68:16, 68:18, 68:23, 68:25, 71:3, 71:5, 71:12, 71:13, 71:14, 71:15, 71:16, 73:6, 85:23, 88:5
**bedroom** [19] - 46:1, 47:1, 62:25, 67:1, 67:10, 67:12, 67:14, 67:20, 67:23, 68:2, 68:5, 68:9, 68:20, 69:10, 69:13, 69:17, 71:8, 71:11, 81:23
**bedrooms** [1] - 67:2
**BEFORE** [1] - 1:11
**began** [1] - 155:4
**begin** [1] - 24:25
**beginning** [8] - 99:10, 109:21, 114:2, 133:15, 140:25, 145:10, 157:19, 163:2
**behalf** [3] - 4:5, 4:22, 129:11
**behind** [1] - 3:21
**believes** [2] - 95:13, 114:3
**belong** [1] - 19:6
**belonged** [2] - 19:15, 133:8
**belonging** [1] - 157:7
**belongs** [2] - 109:25, 115:19
**below** [8] - 94:13, 107:9, 108:15, 123:15, 143:13, 143:18, 144:11,

144:16
**bench** [2] - 3:22, 41:12
**beneath** [1] - 143:22
**beneficial** [1] - 30:16
**Bennett** [2] - 3:3, 163:24
**BENNETT** [1] - 1:11
**Benton** [2] - 165:18, 165:21
**best** [4] - 29:6, 36:20, 76:18, 148:6
**better** [6] - 58:10, 62:22, 69:15, 79:3, 116:11, 119:17
**between** [14] - 26:15, 27:17, 39:5, 43:11, 43:16, 73:5, 79:3, 95:18, 95:21, 104:6, 112:15, 112:20, 113:6, 120:19
**beverage** [1] - 140:11
**binding** [1] - 31:23
**biographical** [1] - 154:13
**bit** [8] - 38:4, 41:15, 41:16, 51:11, 77:9, 92:2, 125:14, 151:16
**black** [3] - 23:13, 110:1, 140:12
**Blade** [14] - 18:24, 18:25, 20:3, 20:12, 20:18, 21:25, 22:16, 22:22, 23:2, 23:6, 23:10, 23:14, 24:11, 24:12
**blanche** [1] - 42:18
**blocks** [3] - 84:7, 105:3, 105:6
**blood** [6] - 65:9, 65:10, 66:18, 66:19, 83:25
**bodies** [7] - 43:14, 44:1, 60:2, 60:12, 74:7, 80:16, 97:20
**bodily** [1] - 7:15
**body** [9] - 44:2, 65:9, 65:10, 65:17, 65:25, 66:18, 74:14, 133:25
**bold** [1] - 133:24
**bookshelf** [1] - 69:15
**booster** [1] - 3:23
**bottle** [2] - 140:6, 156:20
**bottom** [6] - 19:22, 36:18, 99:10, 126:19, 133:5, 162:22
**bourne** [1] - 15:2
**box** [2] - 71:17, 73:5

**boy** [1] - 15:9
**Boys** [7] - 82:6, 82:7, 82:15, 82:23, 83:5, 84:10, 103:5
**BPD** [16] - 43:19, 45:20, 49:15, 50:21, 51:15, 72:17, 75:7, 114:17, 120:24, 122:24, 124:5, 126:21, 127:7, 135:22, 160:7, 163:10
**break** [10] - 39:25, 41:12, 41:15, 41:16, 76:6, 76:24, 76:25, 77:5, 147:16, 166:1
**breakfast** [2] - 69:8, 71:8
**breaking** [2] - 110:7, 113:1
**breaks** [1] - 147:15
**Brian** [3] - 2:3, 56:18, 57:4
**BRIAN** [2] - 56:23, 57:4
**Brianna** [70] - 77:23, 79:12, 81:6, 81:9, 81:16, 81:21, 81:25, 82:12, 82:15, 83:7, 83:9, 83:20, 84:3, 84:4, 84:10, 84:19, 84:21, 84:24, 85:2, 85:13, 85:16, 85:19, 85:22, 85:25, 86:4, 86:7, 86:9, 86:16, 86:20, 86:21, 87:3, 88:4, 88:5, 88:7, 88:9, 88:12, 88:15, 88:18, 88:25, 89:4, 89:11, 89:16, 89:17, 89:21, 89:23, 90:5, 90:10, 90:17, 90:18, 90:20, 90:22, 91:14, 91:15, 103:3, 103:4, 103:11, 103:14, 104:6, 104:7, 110:17, 110:23, 111:9, 111:17, 111:19, 112:6, 112:13, 113:15
**Brianna's** [2] - 81:11, 86:24
**brick** [2] - 61:11, 62:18
**brief** [6] - 25:20, 42:16, 118:14, 118:16, 144:20, 167:6
**briefed** [3] - 25:16, 52:6

**briefing** [2] - 118:17, 119:4
**bring** [7] - 8:21, 41:1, 76:15, 148:1, 148:10, 148:11, 152:21
**bringing** [1] - 134:16
**BRISCOE** [1] - 1:5
**Briscoe** [143] - 3:7, 5:12, 6:12, 6:16, 7:13, 7:21, 8:11, 10:16, 11:14, 15:23, 19:6, 20:16, 21:13, 23:8, 27:23, 28:20, 35:16, 37:3, 37:10, 42:13, 43:25, 45:10, 45:19, 46:4, 46:6, 46:21, 46:25, 49:15, 50:22, 50:24, 76:18, 83:8, 83:9, 84:11, 84:16, 85:2, 85:10, 85:13, 85:17, 85:19, 85:22, 86:1, 86:10, 88:18, 89:6, 97:2, 97:4, 97:10, 99:13, 99:15, 105:10, 106:16, 107:5, 109:25, 110:1, 110:6, 110:9, 110:12, 110:15, 110:20, 111:4, 112:12, 112:25, 113:3, 113:6, 113:10, 113:17, 114:3, 118:21, 118:22, 118:25, 119:15, 119:21, 123:1, 125:20, 128:10, 129:24, 130:2, 130:3, 132:8, 133:8, 134:13, 136:14, 136:17, 136:23, 136:25, 137:17, 137:22, 137:25, 138:2, 138:6, 138:18, 138:21, 139:20, 140:1, 140:5, 140:11, 140:12, 140:14, 140:22, 141:1, 141:18, 142:4, 142:12, 142:19, 143:2, 143:4, 143:12, 143:19, 144:8, 145:3, 145:7, 145:8, 146:1, 146:11, 146:14, 146:25, 147:8, 147:15, 148:4, 151:10,

151:18, 152:15, 152:18, 152:24, 153:4, 154:1, 154:12, 154:18, 155:4, 155:11, 155:17, 156:8, 156:24, 157:8, 157:20, 158:4, 158:10, 158:18, 159:9, 161:18, 162:22
**Briscoe's** [26] - 29:16, 29:20, 43:19, 46:16, 96:23, 107:23, 109:15, 110:25, 112:21, 113:20, 113:25, 116:8, 116:22, 117:5, 117:7, 117:12, 117:17, 120:22, 124:23, 126:22, 126:24, 127:8, 128:21, 148:1, 159:13, 160:3
**broken** [1] - 45:16
**brother** [3] - 5:5, 74:9, 74:16
**brought** [8] - 31:13, 119:19, 137:6, 137:8, 137:13, 148:4, 148:8, 148:9
**Brown** [1] - 2:8
**BRUSCA** [96] - 4:4, 4:11, 5:23, 8:9, 9:23, 10:4, 10:9, 10:12, 10:24, 11:8, 12:2, 12:7, 13:9, 16:1, 16:14, 17:2, 19:9, 19:18, 20:13, 22:6, 22:20, 22:25, 23:4, 25:25, 27:19, 27:25, 28:2, 28:11, 28:15, 30:3, 30:15, 32:4, 32:7, 34:16, 34:22, 36:11, 37:22, 42:24, 43:9, 45:14, 46:10, 47:12, 47:16, 47:24, 48:1, 48:16, 48:23, 51:3, 51:6, 51:9, 52:19, 52:21, 53:3, 56:17, 57:19, 57:25, 58:5, 58:12, 58:14, 77:4, 101:10, 101:13, 112:2, 112:3, 139:16, 139:21, 139:23, 140:23, 140:24, 141:24, 141:25, 147:21, 148:15, 149:4, 149:7, 150:4,

150:7, 150:19, 150:22, 151:5, 151:13, 151:15, 152:5, 157:6, 157:16, 158:2, 158:9, 164:19, 164:22, 165:1, 165:5, 165:10, 165:13, 165:17, 166:23, 167:15
**Brusca** [43] - 1:13, 2:4, 4:4, 4:7, 4:10, 5:21, 8:8, 9:22, 10:8, 10:23, 11:6, 12:1, 13:8, 15:25, 16:13, 19:8, 19:20, 23:7, 25:24, 27:13, 30:2, 32:3, 33:11, 33:12, 36:14, 37:17, 37:20, 37:21, 40:11, 41:19, 42:23, 51:18, 56:16, 77:3, 101:8, 112:1, 139:4, 139:9, 139:14, 150:6, 164:12, 164:18
**bucks** [1] - 88:24
**BUDLOW** [12] - 4:15, 36:14, 36:16, 139:3, 139:7, 139:9, 139:12, 148:22, 149:1, 149:9, 149:13, 167:1
**Budlow** [11] - 1:14, 4:6, 4:8, 4:14, 25:24, 36:15, 37:17, 37:20, 139:6, 149:2, 164:12
**building** [2] - 33:15, 130:9
**bullet** [3] - 71:20, 72:9, 72:10
**burden** [9] - 15:1, 15:3, 33:8, 34:19, 38:8, 38:10, 40:1, 55:1
**business** [4] - 79:3, 162:19, 162:23, 162:24
**BY** [16] - 58:14, 77:4, 101:13, 112:3, 139:23, 140:24, 141:25, 147:21, 150:22, 151:5, 151:15, 152:5, 157:6, 157:16, 158:2, 158:9

## C

**C)(2** [1] - 7:1
**cable** [1] - 149:10

**calendar** [1] - 166:19
**calendars** [4] - 165:4, 166:3, 166:18, 166:24
**caliber** [4] - 66:14, 72:14, 72:15, 73:2
**Cambridge** [62] - 31:18, 31:19, 46:12, 54:12, 55:11, 82:6, 82:15, 82:23, 83:5, 83:12, 84:8, 84:10, 103:5, 116:12, 116:16, 116:22, 116:24, 116:25, 118:2, 118:7, 118:10, 118:11, 118:13, 118:19, 118:20, 119:12, 119:14, 119:25, 120:10, 120:16, 129:1, 129:5, 129:10, 129:16, 131:10, 131:12, 131:22, 133:4, 133:9, 133:13, 134:16, 135:6, 135:18, 135:23, 135:24, 136:13, 137:1, 137:4, 137:7, 137:8, 137:14, 137:19, 142:20, 148:4, 148:9, 159:18, 165:13, 165:21, 165:22, 165:23
**cameras** [4] - 105:25, 106:4, 106:11, 106:15
**cannot** [3] - 21:11, 47:6, 161:14
**capacity** [1] - 36:5
**car** [1] - 50:11
**card** [5] - 89:13, 89:17, 162:19, 162:23, 162:24
**care** [1] - 160:18
**career** [2] - 105:23, 105:24
**Carpenter** [6] - 52:6, 52:8, 52:20, 52:25, 54:2, 54:3
**carry** [1] - 6:16
**carte** [1] - 42:18
**Carter** [1] - 50:12
**carved** [1] - 50:8
**case** [32] - 3:6, 10:5, 13:14, 13:15, 13:21, 15:7, 16:17, 16:17, 27:21, 36:18, 42:9, 48:14, 50:9, 50:11,

50:19, 52:4, 52:6, 99:14, 100:15, 102:6, 102:14, 102:17, 117:21, 121:7, 122:2, 133:23, 141:17, 162:20, 163:4, 163:8, 166:10
**CASE** [1] - 1:4
**cases** [4] - 12:9, 49:25, 50:17, 60:20
**cash** [1] - 73:15
**casings** [5] - 66:14, 71:12, 71:20, 72:14, 72:17
**categories** [1] - 123:15
**category** [1] - 50:9
**Catonsville** [1] - 89:25
**caught** [1] - 45:6
**causing** [1] - 6:18
**caution** [1] - 30:25
**caveating** [1] - 19:10
**CDs** [1] - 69:14
**CDS** [7] - 79:6, 79:14, 82:19, 135:16, 135:19, 136:2, 136:6
**cell** [46] - 18:10, 18:11, 18:13, 18:24, 18:25, 19:2, 19:3, 20:1, 20:2, 20:3, 20:10, 20:12, 22:2, 22:4, 22:15, 22:17, 23:10, 24:11, 24:12, 29:23, 29:24, 45:11, 45:12, 45:13, 45:15, 47:22, 48:21, 52:6, 52:8, 55:23, 92:8, 93:12, 95:14, 95:16, 107:18, 108:3, 110:4, 114:4, 114:16, 122:7, 133:7, 148:1, 148:2, 157:7, 160:3, 161:17
**CellTrak** [3] - 122:8, 122:9, 122:11
**cellular** [1] - 95:7
**Center** [1] - 78:10
**center** [3] - 63:7, 63:8
**certain** [7] - 15:21, 33:23, 39:5, 39:13, 41:25, 84:21, 84:23
**certainly** [13] - 12:25, 16:10, 16:19, 17:24, 20:19, 35:10, 38:14, 38:17, 38:19, 52:5, 54:2, 55:14, 58:3
**CERTIFICATE** [1] - 169:2
**certificate** [1] - 2:5

**certify** [1] - 169:5
**chair** [6] - 65:10, 65:15, 65:16, 68:22, 86:10
**chairs** [2] - 65:2, 144:23
**challenge** [11] - 21:6, 32:8, 33:5, 36:6, 37:5, 46:7, 46:22, 47:1, 55:5, 55:14, 55:15
**challenged** [2] - 43:18, 51:17
**challenging** [2] - 33:21, 44:11
**chambers** [2] - 17:4, 17:5
**chance** [2] - 8:16, 150:10
**change** [1] - 133:25
**changed** [4] - 9:24, 52:7, 131:25, 133:24
**changes** [1] - 158:15
**charge** [8] - 6:5, 9:7, 9:11, 9:12, 9:17, 28:18, 78:12, 78:13
**charged** [8] - 6:22, 8:3, 10:7, 26:13, 28:1, 136:9, 136:12, 137:14
**charges** [8] - 7:13, 8:8, 8:11, 8:14, 8:17, 8:25, 49:9, 155:16
**charging** [2] - 6:16, 7:9
**Charles** [2] - 20:21, 23:12
**charm** [1] - 150:4
**check** [6] - 74:11, 75:13, 75:17, 77:7, 106:3, 159:12
**checked** [2] - 102:15, 162:11
**cheek** [2] - 156:18, 156:22
**chest** [1] - 72:2
**child** [4] - 27:6, 27:8, 44:19, 85:24
**child's** [2] - 67:10, 69:17
**children's** [1] - 67:10
**choice** [1] - 4:12
**choose** [1] - 57:16
**chooses** [1] - 42:13
**choses** [1] - 38:16
**chronology** [1] - 51:14
**Chung** [1] - 168:6
**Circuit** [5] - 26:2, 27:10, 47:10, 47:13,

52:11
**city** [4] - 60:11, 60:23, 61:6, 105:24
**City** [8] - 47:10, 47:14, 47:18, 58:19, 59:4, 60:24, 133:12, 165:24
**city/county** [1] - 90:2
**civilians** [1] - 34:25
**CJ** [16] - 77:24, 78:1, 78:6, 78:14, 78:16, 79:3, 79:18, 79:24, 80:4, 80:5, 80:18, 80:24, 81:4, 90:11, 91:15, 103:3
**CJ's** [2] - 78:3, 78:19
**claimant** [1] - 162:21
**clarify** [2] - 20:11, 40:17
**Clark** [4] - 1:23, 8:23, 169:3, 169:16
**classified** [1] - 18:13
**clause** [2] - 31:9, 32:15
**clear** [6] - 22:3, 22:18, 23:8, 40:4, 71:19, 89:5
**clearly** [14] - 15:1, 21:12, 21:15, 21:18, 23:5, 42:5, 42:10, 44:16, 52:8, 53:24, 141:18, 164:15, 165:7, 166:5
**CLERK** [7] - 3:2, 56:21, 57:1, 57:23, 76:9, 149:12, 168:11
**clerk** [3] - 3:11, 6:2, 18:12
**clerk's** [2] - 6:3, 47:17
**client** [4] - 19:15, 24:13, 24:19, 55:4
**client's** [2] - 31:8, 55:23
**clip** [3] - 140:3, 144:20, 152:13
**clock** [1] - 168:3
**close** [3] - 21:12, 66:25, 155:9
**closed** [6] - 70:1, 70:15, 70:20, 70:22, 145:4, 145:5
**closer** [4] - 8:22, 63:13, 63:18, 67:23
**closest** [2] - 64:23, 67:13
**co** [3] - 5:1, 21:13, 27:21
**co-counsel** [1] - 5:1
**co-defendant** [2] - 21:13, 27:21

**coagulated** [2] - 65:9, 66:18
**Coast** [1] - 166:16
**Code** [5] - 6:19, 6:25, 7:1
**coded** [1] - 87:16
**coherent** [3] - 141:12, 141:19, 153:23
**colleague** [1] - 4:6
**colleagues** [1] - 41:13
**collected** [1] - 156:6
**Collective** [2] - 3:5, 76:13
**Collins** [2] - 105:22, 105:25
**color** [1] - 158:15
**comfortable** [1] - 71:7
**coming** [16] - 31:2, 31:14, 59:3, 82:9, 82:12, 84:11, 85:2, 113:3, 116:18, 122:19, 128:18, 130:20, 134:15, 153:12, 157:4
**commission** [1] - 95:14
**commit** [1] - 78:23
**committing** [2] - 7:14, 7:21
**communicate** [3] - 44:3, 44:6, 50:24
**communicating** [4] - 26:18, 80:5, 149:14
**communication** [8] - 6:24, 95:19, 96:17, 111:1, 111:6, 112:18, 113:24, 160:18
**communications** [3] - 77:17, 96:2, 112:20
**company** [1] - 121:3
**compare** [1] - 103:13
**comparison** [1] - 117:21
**completed** [6] - 97:15, 98:2, 141:5, 141:6, 142:4, 142:9
**completely** [1] - 25:17
**completing** [1] - 145:2
**complex** [1] - 119:20
**complicated** [2] - 35:12, 35:19
**conceal** [1] - 95:23
**concern** [3] - 35:10, 38:14
**concerned** [1] - 45:4
**conclude** [2] - 51:16, 156:4
**concluded** [2] - 113:17, 168:13

**conclusion** [1] - 72:19
**concur** [1] - 53:22
**conduct** [3] - 12:11, 137:10, 138:17
**conducted** [7] - 48:13, 51:7, 52:16, 78:9, 78:11, 137:7, 137:24
**conducting** [2] - 116:18, 137:18
**confer** [1] - 37:20
**conference** [2] - 16:17, 166:7
**Conference** [1] - 169:9
**confidential** [1] - 12:13
**confirm** [5] - 87:11, 106:12, 106:16, 146:17, 157:23
**confirmation** [1] - 91:8
**confirmed** [1] - 91:17
**confirming** [1] - 48:7
**conformance** [1] - 169:9
**confrontation** [2] - 31:8, 32:15
**confrontations** [1] - 87:24
**confused** [1] - 122:16
**connect** [1] - 113:9
**connected** [2] - 57:23, 113:7
**connection** [5] - 7:18, 9:12, 23:16, 48:21, 121:5
**consent** [16] - 33:1, 33:20, 33:22, 35:6, 35:12, 36:2, 36:5, 37:24, 42:15, 44:23, 131:1, 131:2, 131:3, 131:9, 131:13, 131:15
**consented** [8] - 32:23, 33:13, 33:19, 34:2, 34:4, 35:15, 36:4, 54:14
**consider** [1] - 40:23
**considered** [1] - 61:19
**consternation** [1] - 45:23
**constituted** [1] - 7:25
**consult** [6] - 36:14, 120:6, 120:9, 139:3, 139:7, 148:17
**consulted** [1] - 120:10
**consulting** [1] - 144:1
**contact** [4] - 98:20, 99:24, 106:20, 117:25

**contacted** [4] - 60:7, 74:1, 76:2, 116:16
**contacts** [7] - 98:15, 98:19, 99:6, 99:9, 101:16, 101:17, 158:23
**contain** [1] - 50:20
**contained** [1] - 8:6
**containing** [1] - 156:16
**contemplating** [1] - 7:17
**contends** [2] - 32:23, 52:16
**content** [1] - 50:18
**contents** [5] - 20:9, 20:22, 23:13, 24:11, 159:22
**context** [1] - 24:12
**continue** [7] - 37:13, 76:15, 77:3, 107:12, 116:18, 139:15, 153:14
**continued** [4] - 87:9, 87:10, 99:17, 101:16
**continues** [1] - 48:10
**continuing** [2] - 92:17, 166:4
**contraband** [1] - 104:5
**contradictory** [1] - 38:4
**control** [1] - 62:10
**controlled** [1] - 79:15
**controlling** [1] - 15:1
**conversation** [1] - 95:18
**conversations** [1] - 26:14
**conveyed** [1] - 116:14
**convicted** [1] - 46:17
**conviction** [2] - 10:17, 10:18
**convicts** [1] - 11:1
**cooperative** [1] - 45:2
**coordinate** [5] - 122:20, 124:20, 125:8, 127:11, 166:3
**coordinates** [18] - 121:12, 123:13, 123:14, 123:18, 124:1, 124:15, 124:17, 124:18, 124:21, 125:6, 125:7, 125:8, 125:14, 126:5, 126:6, 126:16, 128:1, 128:13
**coordinating** [1] - 125:7

**copy** [6] - 25:10, 115:8, 131:23, 131:24, 162:6
**cord** [2] - 148:22, 148:24
**corner** [9] - 60:24, 61:3, 105:25, 106:3, 106:6, 106:10, 106:11, 125:15, 128:3
**corners** [1] - 21:4
**Corporal** [2] - 14:2, 165:17
**correct** [99] - 5:6, 5:22, 6:8, 8:8, 8:9, 8:18, 9:17, 10:3, 10:7, 10:22, 12:1, 12:2, 12:7, 14:6, 14:7, 19:7, 19:9, 19:13, 19:19, 21:8, 21:15, 22:5, 22:6, 22:8, 27:18, 27:19, 27:24, 27:25, 28:2, 28:11, 31:7, 33:2, 33:22, 34:22, 40:1, 42:25, 45:13, 45:14, 46:10, 47:11, 47:12, 48:1, 48:16, 48:22, 48:23, 51:6, 52:21, 53:3, 53:25, 54:1, 63:21, 64:2, 65:18, 66:16, 66:23, 67:17, 71:2, 73:14, 74:23, 77:10, 80:14, 80:17, 84:9, 84:25, 89:10, 90:4, 90:16, 92:19, 93:1, 93:23, 94:25, 95:5, 95:12, 96:6, 96:15, 97:17, 98:6, 101:8, 101:10, 103:5, 106:18, 108:18, 114:24, 115:18, 119:22, 122:16, 123:12, 125:22, 126:14, 129:2, 134:3, 136:5, 143:1, 146:1, 148:23, 151:8, 152:19, 169:6
**Correct** [1] - 10:4
**corrected** [1] - 23:7
**correctly** [6] - 18:14, 18:15, 18:18, 30:1, 30:4, 42:21
**corresponding** [1] - 101:18
**couch** [4] - 45:18, 55:6, 64:10, 134:23
**couches** [1] - 65:2
**coughing** [1] - 91:7

**council** [1] - 37:18
**counsel** [27] - 3:19, 3:25, 4:2, 5:1, 8:17, 8:18, 9:8, 9:9, 9:10, 11:16, 11:25, 12:9, 12:13, 12:15, 12:18, 13:1, 16:5, 16:19, 21:21, 41:20, 42:12, 43:7, 57:11, 58:10, 140:20, 167:5
**Counsel** [1] - 38:22
**count** [1] - 14:13
**Count** [8] - 6:15, 6:21, 6:22, 10:17, 10:18, 11:1
**Country** [2] - 127:25, 128:19
**country** [1] - 145:1
**Counts** [6] - 6:15, 7:5, 7:8, 9:25, 10:3, 10:6
**counts** [1] - 9:19
**County** [1] - 78:10
**county** [1] - 90:1
**couple** [2] - 106:23, 144:23
**course** [8] - 7:13, 27:1, 32:16, 49:1, 109:22, 109:23, 120:23, 155:17
**Court** [36] - 1:24, 13:25, 17:10, 18:8, 20:9, 26:4, 30:16, 31:23, 34:25, 35:2, 35:3, 35:7, 36:12, 37:7, 38:16, 38:20, 43:10, 44:15, 44:22, 45:15, 46:1, 47:10, 49:7, 50:16, 57:8, 57:10, 76:7, 76:9, 91:24, 92:5, 108:11, 148:16, 168:1, 168:10, 168:11, 169:4
**COURT** [165] - 1:1, 3:4, 3:6, 4:7, 4:12, 4:16, 4:19, 4:25, 5:4, 5:8, 5:11, 5:14, 5:16, 5:24, 6:11, 8:10, 8:13, 8:16, 8:20, 9:2, 9:5, 9:15, 9:20, 10:2, 10:5, 10:10, 10:14, 10:22, 10:25, 11:6, 11:9, 11:13, 12:5, 12:8, 13:13, 14:4, 14:8, 16:6, 16:16, 16:23, 17:3, 17:18, 17:22, 18:2, 18:17, 18:20, 19:12, 19:16, 19:19, 20:17, 21:5, 21:9, 21:18, 22:7,

22:9, 22:24, 23:1,
23:5, 23:21, 24:1,
25:15, 25:19, 25:21,
25:23, 27:13, 27:20,
28:1, 28:6, 28:13,
28:16, 28:24, 29:4,
29:13, 30:4, 30:7,
30:18, 31:5, 31:10,
31:15, 31:21, 32:6,
32:17, 33:3, 33:6,
33:11, 34:21, 35:9,
36:15, 36:17, 37:21,
38:21, 39:22, 40:21,
41:6, 41:10, 42:25,
43:3, 45:13, 46:9,
47:9, 47:15, 47:22,
47:25, 48:14, 48:20,
51:1, 51:4, 51:7,
51:18, 52:20, 52:22,
53:5, 53:18, 53:21,
54:2, 54:4, 55:9,
56:11, 56:20, 57:6,
57:15, 57:18, 57:21,
58:2, 58:6, 76:3,
76:12, 76:14, 76:23,
101:6, 111:25,
139:5, 139:8,
139:11, 139:14,
139:18, 140:20,
141:22, 147:20,
148:18, 148:20,
149:2, 149:6,
149:18, 149:25,
150:10, 150:13,
150:16, 150:18,
163:13, 164:2,
164:11, 164:20,
164:24, 165:2,
165:7, 165:12,
165:15, 165:19,
166:24, 167:8,
167:16, 167:21,
167:25, 168:7
**court** [8] - 3:2, 3:17,
8:18, 8:23, 13:10,
20:21, 47:14, 107:1
**Court's** [4] - 37:8,
38:14, 40:18, 42:1
**court-appointed** [1] -
8:18
**courthouse** [2] - 3:18,
57:9
**Courtroom** [1] - 1:9
**courtroom** [6] - 3:18,
34:13, 57:6, 57:9,
140:14, 149:20
**cousin** [3] - 19:15,
81:13, 81:14
**cousin's** [2] - 55:7,
55:11

**cover** [5] - 106:25,
115:11, 117:11,
132:13, 160:2
**covered** [2] - 61:8,
164:16
**COVID** [2] - 58:10,
166:10
**CPD** [3] - 51:15,
135:25, 148:5
**crazy** [1] - 85:6
**created** [1] - 7:23
**credibility** [2] - 13:18,
39:5
**crime** [13] - 6:17, 6:18,
24:13, 24:15, 46:17,
61:13, 69:23, 73:21,
73:25, 74:2, 94:21,
95:14, 95:15
**crimes** [3] - 7:9,
24:18, 26:22
**CRIMINAL** [1] - 1:4
**Criminal** [2] - 3:7, 9:6
**criminal** [1] - 26:7
**cross** [14] - 12:18,
13:1, 13:18, 31:3,
31:14, 32:25, 33:10,
37:16, 39:17, 42:9,
42:17, 42:19,
167:13, 167:18
**cross-examination** [4]
- 31:14, 33:10, 42:9,
167:18
**cross-examine** [8] -
12:18, 13:18, 31:3,
32:25, 39:17, 42:17,
42:19, 167:13
**cross-examining** [1] -
13:1
**crux** [2] - 43:11, 46:19
**cuffs** [2] - 145:12,
145:14
**cull** [1] - 14:21
**cure** [1] - 55:25
**cursor** [2] - 64:4,
157:13
**Curtis** [2] - 77:25, 78:4
**custody** [3] - 23:14,
145:8, 159:13
**customers** [1] - 28:5

## D

**Dana** [2] - 1:13, 4:4
**dangerous** [3] - 36:24,
44:20, 79:15
**Daniel** [2] - 165:18,
165:22
**Danielle** [4] - 75:2,
79:11, 91:16, 113:14
**data** [3] - 114:7, 114:9,

114:10
**date** [23] - 16:16,
47:19, 52:2, 52:18,
60:1, 78:5, 80:15,
101:23, 101:24,
102:21, 102:24,
108:8, 108:16,
116:5, 123:3,
124:23, 126:1,
143:20, 144:9,
144:18, 151:18,
161:23
**Dated** [1] - 169:13
**dated** [1] - 126:13
**dates** [4] - 166:4,
166:13, 166:18,
166:25
**daughter** [1] - 85:23
**David** [2] - 165:18,
165:19
**DAY** [1] - 1:5
**days** [3] - 20:16,
20:20, 47:24
**deal** [7] - 14:23, 21:1,
21:9, 21:10, 23:2,
38:21, 52:12
**dealing** [16] - 22:4,
23:6, 45:7, 79:6,
79:16, 79:19, 79:20,
82:5, 82:15, 82:17,
82:19, 111:3, 120:8,
147:7, 151:23
**dealt** [1] - 21:22
**death** [3] - 6:18, 7:16,
7:23
**deaths** [1] - 60:6
**decedent** [1] - 146:12
**December** [1] - 5:20
**decent** [1] - 154:18
**decide** [1] - 50:8
**decided** [4] - 85:6,
91:23, 104:1, 145:11
**decision** [2] - 136:11,
144:2
**declined** [1] - 50:8
**deem** [1] - 13:22
**Defendant** [2] - 1:6,
1:15
**DEFENDANT** [10] -
5:13, 5:15, 8:12,
8:15, 8:19, 9:1, 9:4,
9:14, 10:21, 11:5
**defendant** [31] - 3:8,
4:22, 6:6, 8:2, 8:7,
15:23, 15:25, 20:3,
20:5, 21:13, 26:3,
27:21, 29:15, 29:20,
33:16, 39:11, 42:7,
42:11, 43:23, 49:21,
84:11, 84:16,

139:19, 140:1,
140:22, 145:19,
155:4, 155:7,
155:22, 163:15
**defendant's** [11] -
15:13, 18:9, 29:21,
29:22, 32:8, 44:10,
48:17, 49:4, 50:5,
153:15, 153:21
**defendants** [2] - 49:3,
52:10
**defense** [25] - 11:24,
12:13, 12:18, 16:5,
16:11, 16:21, 17:7,
17:24, 18:6, 21:16,
32:12, 33:21, 34:19,
36:6, 38:5, 38:9,
39:19, 40:16, 41:20,
42:7, 42:12, 43:7,
48:12, 140:20, 167:5
**definitely** [1] - 27:17
**definitive** [1] - 78:25
**delay** [2] - 48:15, 56:8
**demeanor** [1] - 153:15
**Demetriou** [2] - 6:2,
18:18
**DEMETRIOU** [2] -
18:19, 29:12
**demonstrate** [2] -
55:1, 56:1
**denied** [4] - 87:1,
131:2, 131:3, 131:13
**denying** [1] - 131:9
**department** [3] - 59:5,
145:1, 161:13
**Department** [21] -
24:17, 43:14, 46:12,
51:23, 52:23, 58:20,
116:17, 118:10,
120:11, 129:6,
129:17, 133:14,
135:23, 137:1,
137:4, 142:20,
165:14, 165:21,
165:22, 165:23
**depicted** [4] - 63:3,
69:10, 69:19, 127:22
**deputy** [1] - 57:19
**Derringer** [1] - 73:3
**describe** [8] - 44:23,
62:15, 63:6, 71:25,
72:7, 90:17, 144:21,
153:15
**described** [8] - 26:12,
26:20, 64:1, 64:13,
73:17, 99:6, 121:19,
125:5
**describing** [2] - 26:7,
67:6
**desk** [5] - 102:17,

144:22, 163:8,
163:9, 163:10
**destination** [1] -
166:16
**detail** [2] - 25:20, 92:9
**detailed** [2] - 29:9,
68:2
**detained** [1] - 134:22
**Detective** [48] - 2:3,
48:2, 55:20, 56:18,
58:15, 58:18, 61:1,
76:5, 76:15, 77:2,
99:3, 99:5, 101:19,
118:8, 134:25,
135:8, 137:7,
139:24, 142:1,
142:21, 142:22,
145:7, 147:17,
147:22, 150:19,
150:23, 150:25,
151:6, 151:7,
153:10, 153:13,
157:3, 157:7,
157:11, 159:15,
160:19, 160:20,
163:17, 164:4,
164:13, 164:19,
164:22, 165:10,
165:20, 165:24,
167:4, 167:13
**DETECTIVE** [1] -
56:23
**detective** [18] - 57:4,
58:24, 59:7, 59:12,
59:16, 60:8, 60:15,
60:17, 61:23, 62:14,
77:5, 115:13, 121:7,
154:24, 160:5, 160:6
**detectives** [6] - 59:17,
114:19, 114:20,
114:25, 120:6
**detention** [1] - 163:16
**Detention** [1] - 78:10
**determination** [3] -
12:15, 39:3, 42:2
**determinations** [1] -
13:19
**determine** [3] - 3:25,
35:21, 67:4
**determined** [2] - 19:5,
67:14
**developed** [1] - 29:3
**development** [1] -
52:13
**develops** [1] - 18:6
**device** [1] - 162:14
**devices** [1] - 114:21
**dial** [1] - 107:16
**dialed** [1] - 92:14
**died** [5] - 7:12, 7:20,

8:1, 71:21, 71:23
**Diener** [2] - 105:1, 105:5
**difference** [1] - 167:10
**different** [5] - 44:22, 65:21, 90:11, 143:22, 149:10
**differently** [1] - 95:23
**difficult** [1] - 149:5
**difficulties** [3] - 148:19, 148:25, 149:15
**DiGirolamo** [1] - 20:9
**dire** [2] - 166:8, 166:10
**DIRECT** [1] - 58:13
**direct** [4] - 8:1, 79:8, 83:1, 153:18
**Direct** [1] - 2:3
**directed** [4] - 62:5, 62:11, 91:9, 91:10
**directly** [2] - 57:1, 79:19
**disagree** [1] - 32:11
**discipline** [1] - 12:10
**discontinued** [2] - 110:6, 112:25
**discovered** [6] - 44:1, 44:2, 60:2, 74:8, 80:16, 97:20
**discovery** [1] - 100:21
**discretion** [4] - 3:19, 10:25, 57:9, 167:25
**discuss** [4] - 8:16, 30:12, 76:5, 164:7
**discussed** [1] - 9:2
**discussing** [2] - 37:23, 52:5
**discussions** [1] - 11:16
**disk** [1] - 162:16
**dispatch** [3] - 60:7, 61:22, 87:17
**displayed** [1] - 98:20
**disposed** [1] - 21:11
**dispute** [5] - 23:22, 23:23, 28:21, 43:11, 54:14
**disregard** [1] - 7:25
**disrespectful** [1] - 87:5
**distance** [1] - 105:7
**distribution** [1] - 26:11
**District** [3] - 47:13, 169:4
**DISTRICT** [2] - 1:1, 1:1
**district** [5] - 59:4, 59:7, 60:9, 60:11, 61:8

**disturb** [1] - 73:25
**disturbance** [1] - 87:17
**disturbed** [1] - 70:6
**divide** [1] - 167:23
**DIVISION** [1] - 1:2
**DNA** [12] - 117:5, 117:7, 117:12, 117:18, 117:22, 118:1, 156:5, 156:6, 156:7, 156:15, 156:19, 156:23
**document** [2] - 94:4, 102:24
**don't..** [1] - 158:6
**done** [9] - 48:6, 50:4, 51:2, 51:5, 52:17, 53:24, 54:7, 69:21, 102:12
**door** [49] - 33:19, 35:18, 38:1, 39:7, 41:3, 44:13, 44:21, 45:3, 54:12, 54:13, 54:16, 62:5, 62:17, 62:19, 63:18, 63:19, 63:20, 64:14, 64:18, 66:3, 66:5, 66:8, 67:25, 70:1, 70:2, 70:14, 73:24, 74:13, 74:22, 86:6, 86:13, 86:15, 87:3, 87:4, 103:17, 103:21, 104:7, 129:13, 130:13, 130:14, 130:18, 133:11, 133:16, 144:23, 144:24, 145:3
**doors** [1] - 44:20
**doorstep** [3] - 43:22, 44:8, 46:19
**doorway** [3] - 62:22, 64:1, 68:12
**Dot** [2] - 89:13, 89:17
**dot** [3] - 37:16, 125:16, 125:18
**double** [2] - 95:2, 109:21
**double-spaced** [1] - 109:21
**doubt** [1] - 71:24
**down** [26] - 3:23, 4:13, 4:20, 25:3, 25:7, 28:7, 37:6, 43:12, 55:18, 57:11, 57:16, 68:7, 68:11, 75:20, 86:11, 92:17, 98:19, 98:22, 99:18, 100:3, 100:25, 116:25, 123:24, 131:22, 134:16, 163:20

**draft** [6] - 74:1, 131:11, 132:10, 135:6, 151:20, 157:18
**drafted** [1] - 120:4
**drafting** [1] - 131:19
**drawer** [1] - 46:3
**dress** [1] - 70:23
**dressed** [3] - 70:4, 70:10, 70:24
**dresser** [1] - 46:3
**dried** [1] - 65:10
**drink** [6] - 138:7, 138:10, 138:13, 138:15, 140:9, 156:21
**drive** [1] - 131:22
**driver** [1] - 168:9
**drove** [1] - 131:21
**drug** [8] - 6:17, 27:22, 28:19, 28:25, 45:7, 79:24, 84:14, 146:25
**drugs** [16] - 25:1, 28:23, 45:25, 46:2, 46:7, 73:10, 79:16, 79:20, 104:17, 135:22, 147:4, 147:7, 147:13, 154:8, 155:5
**due** [5] - 120:5, 129:14, 131:16, 164:6, 166:11
**duly** [1] - 56:23
**dumped** [2] - 48:5, 162:21
**during** [38] - 3:24, 5:17, 6:17, 19:20, 22:16, 26:14, 49:14, 59:12, 73:19, 76:6, 87:11, 90:5, 95:14, 104:3, 104:6, 104:8, 105:18, 109:21, 109:23, 113:24, 117:23, 117:25, 120:23, 135:12, 138:7, 140:3, 142:6, 145:8, 147:14, 147:17, 151:11, 153:16, 154:11, 155:3, 155:17, 160:15, 162:11, 166:15
**duty** [1] - 161:15

---

# E

**e-mail** [18] - 115:6, 121:10, 121:11, 121:23, 121:25, 122:3, 122:7,

122:11, 122:14, 122:17, 123:8, 123:14, 123:19, 124:11, 126:10, 127:12, 128:9
**e-mails** [2] - 121:19, 124:15
**early** [2] - 110:18, 118:5
**ease** [1] - 68:4
**east** [2] - 105:19, 105:20
**Eastern** [8] - 27:17, 82:6, 82:7, 82:20, 85:8, 88:23, 110:20, 111:5
**eating** [1] - 138:16
**ECF** [1] - 17:5
**edge** [1] - 64:8
**Edmonson** [3] - 61:18, 61:19, 61:20
**Edward** [2] - 165:17, 165:22
**effect** [9] - 38:18, 79:22, 89:9, 97:13, 100:12, 100:13, 146:7, 147:9, 147:11
**eight** [1] - 115:21
**eight-year-old** [1] - 115:21
**either** [9] - 26:5, 36:8, 74:24, 75:4, 88:2, 90:20, 130:20, 132:2, 159:15
**electronic** [1] - 114:21
**electronically** [1] - 162:15
**element** [1] - 44:17
**emergency** [1] - 93:14
**emphatic** [1] - 103:16
**employ** [1] - 9:8
**encountered** [1] - 154:25
**end** [8] - 38:5, 87:25, 143:6, 156:3, 156:10, 156:13, 158:17, 166:13
**ending** [2] - 109:17, 133:16
**enforcement** [10] - 6:24, 12:11, 14:5, 26:2, 32:23, 34:23, 39:6, 39:9, 131:3, 155:12
**engaged** [3] - 7:22, 26:13, 45:7
**enter** [3] - 39:10, 46:21, 63:21
**entered** [4] - 33:20, 65:8, 74:13, 135:7

**entering** [2] - 32:23, 130:15
**enters** [1] - 62:22
**entire** [5] - 6:7, 24:11, 54:21, 55:8, 55:14
**entirely** [1] - 144:3
**entitled** [4] - 33:5, 34:19, 145:25, 169:8
**entry** [7] - 33:20, 70:18, 70:19, 130:1, 130:10, 130:11, 130:19
**enumerated** [1] - 143:22
**envelope** [5] - 156:17, 162:19, 162:25, 163:5, 163:7
**equipment** [2] - 119:19, 161:1
**equivalent** [5] - 43:20, 51:24, 52:17, 53:1, 53:14
**equivocates** [2] - 34:3, 35:11
**equivocating** [1] - 36:25
**especially** [1] - 49:13
**Esq** [2] - 1:16, 1:17
**essentially** [11] - 6:12, 7:4, 14:14, 17:11, 19:4, 20:6, 21:6, 22:10, 29:5, 35:23, 53:15
**establish** [1] - 53:13
**established** [2] - 52:1, 73:21
**evening** [4] - 81:9, 82:8, 117:4, 164:8
**event** [6] - 10:17, 17:19, 26:7, 34:25, 46:25
**events** [3] - 27:15, 41:2, 110:18
**eventually** [1] - 17:23
**Evidence** [2] - 12:21, 41:25
**evidence** [46] - 12:24, 14:25, 15:4, 15:16, 15:20, 15:22, 15:24, 16:2, 17:5, 18:10, 19:1, 22:11, 23:9, 30:12, 31:6, 31:7, 32:9, 33:25, 34:5, 34:21, 35:5, 37:2, 38:1, 39:2, 39:14, 39:24, 40:7, 40:24, 42:7, 46:4, 49:12, 49:18, 50:10, 50:13, 54:11, 55:9, 66:12, 71:9, 71:11, 80:4,

102:15, 113:19,
135:25, 153:2,
159:2, 162:19
**evidentiary** [2] -
50:17, 50:21
**exact** [1] - 33:12
**exactly** [7] - 21:1,
24:14, 26:3, 31:17,
48:23, 52:18, 135:20
**Examination** [1] - 2:3
**EXAMINATION** [1] -
58:13
**examination** [5] -
14:9, 31:14, 33:10,
42:9, 167:18
**examine** [8] - 12:18,
13:18, 31:3, 32:25,
39:17, 42:17, 42:19,
167:13
**examined** [1] - 56:24
**examiner** [1] - 160:4
**examiners** [1] -
161:14
**examining** [1] - 13:1
**example** [9] - 12:3,
26:22, 27:2, 32:21,
33:12, 35:24, 52:9,
61:24, 166:17
**except** [1] - 42:1
**exception** [5] - 3:18,
12:2, 35:24, 43:18
**exceptions** [1] - 16:4
**excerpted** [1] - 99:25
**exchange** [2] - 104:6,
155:25
**exculpatory** [1] -
11:19
**excuse** [10] - 34:18,
47:12, 48:4, 56:6,
85:21, 91:7, 107:3,
109:24, 114:9
**Excuse** [1] - 139:3
**execute** [3] - 53:17,
134:7, 156:15
**executed** [6] - 35:25,
44:19, 129:6, 135:3,
156:5, 156:10
**executing** [1] - 26:8
**execution** [2] - 129:8,
129:15
**exercise** [1] - 49:23
**Exhibit** [57] - 20:14,
23:15, 47:5, 60:25,
63:3, 63:23, 65:14,
67:19, 92:1, 92:3,
92:17, 94:3, 98:23,
98:24, 101:7,
102:20, 106:22,
106:24, 114:1,
115:9, 115:10,

117:9, 117:10,
121:17, 121:18,
122:1, 122:21,
124:9, 124:22,
125:3, 125:4,
125:11, 125:12,
126:1, 126:4, 126:5,
127:21, 127:22,
128:2, 132:11,
132:20, 139:1,
139:18, 139:25,
141:20, 141:21,
141:22, 142:1,
142:16, 148:12,
152:11, 156:7,
157:1, 159:25,
160:1, 162:17
**exhibit** [6] - 49:22,
63:11, 92:3, 107:9,
122:23, 124:9
**exhibited** [1] - 54:15
**exhibits** [6] - 30:24,
31:1, 31:12, 31:14,
32:2, 38:17
**expect** [8] - 44:15,
46:2, 48:6, 51:13,
51:14, 164:23,
165:10
**expected** [1] - 150:1
**experience** [2] -
95:16, 154:24
**expertise** [1] - 95:6
**experts** [1] - 72:17
**explained** [8] - 10:16,
43:20, 43:24, 47:17,
57:7, 110:17,
110:19, 130:25
**explaining** [2] -
115:14, 132:21
**exploitation** [1] - 27:6
**exposed** [1] - 45:5
**expunged** [1] - 49:25
**extent** [4] - 4:19,
13:10, 32:21, 35:20,
37:8, 38:22, 39:14,
39:16, 52:8, 53:4
**exterior** [2] - 66:5,
66:8
**extra** [1] - 100:23
**extract** [2] - 160:22,
161:14
**extracted** [4] - 47:6,
159:23, 160:14,
161:4
**extracting** [1] - 161:15
**extraction** [8] - 48:10,
160:2, 160:10,
161:22, 161:23,
162:5, 162:9
**eye** [1] - 13:13

# F

**face** [4] - 11:2, 72:10,
133:24
**Facebook** [1] - 29:22
**facility** [1] - 163:16
**fact** [20] - 14:20,
24:14, 33:4, 33:22,
33:24, 42:3, 44:6,
50:3, 50:12, 50:22,
52:10, 81:1, 81:18,
87:12, 89:19, 94:24,
103:15, 104:1,
117:19, 153:18
**facts** [12] - 22:12,
23:22, 23:23, 28:18,
33:14, 35:20, 37:7,
38:14, 53:13, 53:23,
56:9
**factual** [1] - 93:5
**fail** [1] - 25:13
**fair** [1] - 13:23
**fairest** [1] - 40:15
**fairness** [2] - 16:10,
18:6
**faith** [3] - 35:24, 39:8,
53:4
**fall** [1] - 50:9
**familiar** [4] - 61:6,
61:18, 121:2, 160:6
**family** [12] - 44:4,
70:3, 77:19, 93:9,
93:11, 110:3,
110:10, 110:13,
110:16, 113:11,
113:14, 115:21
**far** [9] - 34:9, 84:4,
87:17, 90:13, 105:4,
111:5, 127:24,
141:11, 146:12
**fashion** [3] - 32:20,
36:9, 50:4
**fatal** [1] - 114:19
**fax** [3] - 115:6, 115:7,
116:1
**FBI** [1] - 48:3
**February** [5] - 16:19,
17:7, 166:14,
166:15, 166:17
**Federal** [6] - 1:24, 9:6,
12:21, 41:24,
111:25, 169:17
**feelings** [2] - 103:24,
103:25
**feet** [1] - 127:24
**felt** [2] - 76:1, 117:21
**female** [4] - 129:22,
153:6, 153:8
**few** [9] - 11:15, 15:5,
15:17, 31:19, 76:14,

84:6, 105:2, 105:6,
152:11
**fifth** [1] - 29:20
**figured** [2] - 84:6,
86:24
**file** [9] - 16:12, 17:9,
17:15, 17:17, 17:24,
21:20, 102:14,
102:17, 163:8
**filed** [4] - 5:19, 21:13,
47:18, 47:19
**files** [4] - 12:4, 12:10,
26:4, 27:7
**filing** [2] - 17:21, 18:3
**final** [1] - 128:9
**finally** [3] - 5:11, 50:7,
69:9
**findings** [7] - 6:13,
7:4, 9:24, 33:4,
33:24, 39:5, 39:12
**fine** [27] - 4:19, 5:24,
10:14, 12:5, 12:6,
12:8, 13:6, 13:13,
14:8, 16:6, 16:16,
19:16, 23:20, 30:18,
31:10, 39:18,
105:12, 107:8,
139:14, 139:15,
153:23, 153:24,
167:8, 167:9,
167:21, 168:7
**finish** [3] - 165:3,
166:5, 167:10
**finished** [1] - 89:21
**finishing** [1] - 165:20
**firearm** [3] - 6:16,
72:23, 73:2
**firearms** [2] - 72:20,
72:24
**first** [44] - 3:8, 5:18,
15:13, 15:19, 34:17,
41:11, 43:22, 46:16,
53:12, 53:16, 56:4,
56:7, 56:13, 56:16,
59:5, 59:6, 60:18,
62:9, 62:24, 67:20,
67:23, 74:25, 81:19,
81:20, 82:14, 92:2,
94:3, 98:24, 106:23,
119:7, 119:8,
119:10, 119:25,
132:12, 133:21,
137:14, 137:15,
138:14, 141:4,
141:5, 141:6,
149:22, 162:23
**five** [21] - 21:23,
22:14, 24:14, 24:21,
29:14, 59:16, 76:7,
143:13, 143:22,

157:17, 164:23,
167:12
**flag** [2] - 31:20, 38:19
**flash** [1] - 131:22
**flimsy** [1] - 53:13
**flip** [13] - 90:18, 91:4,
91:11, 91:18, 94:8,
98:11, 98:14, 99:18,
101:12, 102:13,
102:14, 102:16,
103:3
**flipping** [2] - 68:19,
106:22
**Floor** [1] - 1:24
**floor** [10] - 62:20,
62:25, 64:15, 64:19,
67:7, 67:8, 71:13,
71:17, 81:20, 130:21
**fluid** [4] - 130:23,
132:5, 132:7, 133:24
**focus** [2] - 22:1, 22:14
**focused** [1] - 22:1
**folks** [9] - 44:24,
51:16, 72:19, 75:6,
79:10, 83:11,
131:14, 136:6,
137:25
**follow** [1] - 51:14
**following** [11] - 23:9,
59:7, 108:10, 114:6,
123:18, 137:2,
140:25, 142:11,
145:14, 156:23,
161:22
**follows** [1] - 56:24
**food** [6] - 69:8, 138:7,
138:10, 138:12,
138:15
**foot** [2] - 45:6, 68:22
**footage** [2] - 106:12,
106:14
**FOR** [1] - 1:1
**force** [4] - 7:18, 54:15,
160:5, 160:7
**forced** [2] - 70:18,
70:19
**foregoing** [1] - 169:6
**forensic** [1] - 71:9
**forfeiture** [1] - 8:5
**forgot** [1] - 133:25
**form** [5] - 142:17,
142:19, 143:24,
144:18, 152:10
**formal** [3] - 12:24,
31:5, 33:25
**formally** [1] - 75:11
**format** [2] - 142:14,
169:8
**former** [2] - 14:4,
165:23

**forth** [13] - 6:21, 7:6, 21:20, 26:1, 26:20, 27:11, 28:3, 42:10, 82:20, 84:11, 113:4, 113:5, 113:6
**Forty** [1] - 141:24
**forward** [8] - 15:12, 17:20, 34:15, 35:13, 56:20, 122:18, 134:10, 141:16
**Foster** [2] - 14:2, 14:5
**four** [7] - 21:4, 36:19, 58:22, 59:6, 144:22, 162:2, 165:13
**Fourth** [3] - 26:1, 27:10, 52:11
**fourth** [5] - 3:14, 5:22, 29:19, 54:10, 83:11
**fragment** [1] - 71:20
**frame** [7] - 16:11, 17:12, 17:15, 76:19, 100:13, 100:16, 106:2
**framework** [1] - 36:3
**frankly** [3] - 38:5, 38:10, 46:6
**Frederick** [2] - 105:21, 105:25
**free** [9] - 4:13, 12:18, 13:17, 17:24, 39:17, 42:17, 57:16, 58:3, 144:3
**freedom** [1] - 145:12
**frequently** [3] - 80:5, 81:16, 124:12
**Friday** [2] - 16:19, 100:20
**friend** [1] - 83:23
**friends** [2] - 78:21, 79:1
**friendship** [1] - 79:2
**front** [30] - 34:13, 62:5, 62:6, 62:17, 62:19, 63:15, 63:18, 63:20, 63:25, 64:13, 64:18, 66:8, 67:12, 67:13, 67:15, 67:23, 70:2, 70:14, 72:4, 73:24, 74:13, 75:4, 75:24, 86:6, 109:6, 122:3, 122:4, 140:5
**fruit** [1] - 56:6
**fruits** [1] - 20:25
**full** [1] - 57:2
**fully** [15] - 3:22, 4:10, 4:14, 4:16, 5:6, 5:8, 5:14, 7:6, 40:17, 57:11, 57:13, 58:4, 78:23, 143:17, 143:25

**functional** [5] - 51:24, 52:17, 53:1, 53:14, 95:8
**furniture** [2] - 65:2, 67:10
**furthermore** [1] - 7:20
**future** [2] - 22:16, 25:6

## G

**gambit** [1] - 18:2
**games** [1] - 69:14
**gate** [1] - 30:19
**gather** [3] - 4:10, 141:8, 149:3
**Gatorade** [1] - 140:10
**geez** [1] - 105:11
**general** [4] - 25:4, 25:12, 41:19, 53:9
**generally** [7] - 28:17, 53:8, 62:16, 71:25, 72:7, 123:21, 146:8
**genesis** [1] - 27:23
**gentleman** [2] - 34:3, 74:9
**gestures** [1] - 44:24
**Giglio** [6] - 11:17, 11:18, 11:23, 12:12, 14:1, 14:9
**given** [9] - 70:6, 100:13, 111:1, 117:19, 119:7, 119:8, 119:10, 137:15, 138:15
**glad** [4] - 24:1, 41:19, 43:6, 53:7
**gloves** [1] - 156:17
**goal** [1] - 22:1
**Google** [4] - 124:18, 125:1, 125:6, 128:13
**Googled** [1] - 124:17
**governing** [1] - 42:3
**government** [56] - 6:3, 9:22, 12:18, 13:7, 15:2, 15:5, 15:21, 15:24, 16:9, 16:19, 17:6, 19:3, 19:7, 22:5, 24:3, 26:25, 28:21, 29:3, 30:2, 30:13, 32:22, 33:7, 33:18, 34:18, 34:20, 35:22, 36:4, 36:7, 38:3, 38:8, 38:19, 39:15, 40:1, 40:6, 40:16, 40:25, 41:18, 42:17, 42:22, 43:7, 43:20, 43:21, 45:24, 47:7, 48:9, 51:23, 52:16, 52:24, 53:2, 54:24, 56:1, 56:18,

151:20, 164:14, 167:14
**government's** [3] - 13:2, 30:13, 37:23
**Government's** [66] - 20:14, 23:15, 31:1, 33:9, 34:14, 47:5, 60:25, 61:1, 63:2, 63:3, 63:23, 65:14, 67:18, 92:1, 92:3, 98:23, 98:24, 101:7, 102:20, 107:25, 114:1, 115:9, 115:10, 117:9, 117:10, 121:17, 121:18, 122:21, 124:8, 124:22, 125:3, 125:4, 125:11, 125:12, 126:1, 126:4, 126:5, 126:9, 127:21, 127:22, 128:2, 128:8, 128:14, 128:16, 132:11, 132:12, 132:19, 133:1, 134:3, 139:1, 139:18, 139:24, 141:20, 141:21, 141:22, 142:1, 142:16, 151:21, 152:10, 152:13, 157:1, 157:19, 157:22, 159:25, 160:1, 162:17
**Graham** [1] - 52:11
**Grand** [1] - 7:9, 31:11, 31:15, 32:2, 34:7, 34:12, 36:2, 38:23, 38:24, 39:16, 40:23
**granted** [1] - 17:11
**gravamen** [2] - 27:23, 28:17
**grave** [1] - 7:23
**gray** [6] - 125:15, 125:18, 127:24, 128:5, 151:1, 151:2
**great** [2] - 14:23, 52:12
**greater** [1] - 15:3
**Green** [2] - 89:13, 89:17
**Greenbelt** [1] - 163:25
**Greenwood** [21] - 32:9, 44:9, 55:10, 119:1, 119:2, 119:20, 120:13, 125:19, 125:21, 128:7, 128:19, 129:2, 129:7,

132:15, 132:17, 132:23, 133:3, 133:8, 134:11, 134:14, 136:15
**greeting** [2] - 3:5, 76:13
**Greg** [2] - 165:14, 165:23
**group** [3] - 83:12, 121:23, 122:12
**guess** [22] - 20:15, 21:6, 21:24, 30:15, 32:11, 32:20, 36:1, 56:13, 61:19, 61:20, 67:13, 69:15, 78:13, 81:13, 95:23, 98:20, 112:24, 146:11, 148:24, 153:20, 158:22, 162:24
**guest** [1] - 55:7
**guilty** [4] - 9:17, 9:18, 21:14, 27:21
**gun** [1] - 104:19
**gunshot** [2] - 71:24, 71:25
**guy** [1] - 77:24
**guys** [4] - 77:1, 82:6, 83:2, 150:15

## H

**Hack** [2] - 106:8
**hair** [1] - 151:2
**half** [4] - 28:9, 49:6, 132:6, 146:6
**halfway** [1] - 143:14
**hallway** [1] - 66:25
**hand** [6] - 49:2, 56:21, 61:3, 125:15, 128:3, 134:24
**handed** [3] - 11:24, 158:4, 158:5
**handing** [1] - 13:2
**handle** [3] - 17:3, 17:4, 39:10
**hands** [1] - 158:10
**handwriting** [2] - 101:17, 163:5
**hang** [1] - 85:7
**hard** [1] - 69:5
**Hardee's** [2] - 125:9, 125:10
**Harris** [4] - 83:4, 83:6, 100:7, 102:5
**Haynes** [4] - 21:14, 27:21, 86:14, 103:7
**HDMI** [2] - 149:10, 149:13
**head** [6] - 19:10, 72:2, 72:5, 72:6, 118:1,

137:12
**headed** [2] - 51:13, 53:8
**headquarters** [1] - 75:10
**heads** [2] - 13:12, 167:7
**heads-up** [2] - 13:12, 167:7
**headset** [1] - 69:18
**health** [1] - 153:22
**hear** [27] - 24:2, 30:16, 39:1, 39:15, 41:19, 41:20, 43:6, 44:15, 44:22, 45:15, 51:20, 53:7, 75:20, 75:21, 75:25, 76:1, 117:6, 130:17, 132:16, 133:10, 139:5, 148:21, 149:5, 150:14, 151:16, 164:20
**heard** [4] - 42:15, 77:8, 86:22, 113:15
**hearing** [23] - 9:11, 12:20, 12:24, 13:19, 14:11, 15:2, 15:16, 22:17, 29:15, 30:24, 31:2, 31:7, 32:14, 34:18, 37:15, 38:9, 38:12, 39:12, 40:13, 41:23, 164:14, 166:4, 166:21
**HEARING** [1] - 1:5
**hears** [1] - 44:7
**hearsay** [1] - 32:12
**held** [5] - 26:2, 26:4, 137:17, 137:21, 169:7
**help** [4] - 19:21, 114:15, 115:4, 149:16
**helpful** [3] - 56:12, 100:22, 101:1
**helping** [2] - 114:22, 116:20
**helps** [2] - 38:2, 38:4
**hereby** [2] - 7:6, 169:5
**herein** [1] - 7:6
**hide** [1] - 95:17
**high** [1] - 83:24
**higher** [1] - 127:18
**highlight** [2] - 99:11, 99:16
**highlighted** [3] - 99:9, 99:24, 100:5
**highlighting** [1] - 99:10
**himself** [2] - 55:15, 77:12

**historical** [1] - 92:14
**history** [1] - 98:15
**hitting** [1] - 130:5
**holding** [1] - 137:21
**home** [15] - 62:11, 62:18, 73:7, 73:17, 73:18, 73:19, 73:24, 74:12, 74:13, 81:6, 88:2, 94:20, 104:22, 146:19
**homes** [2] - 61:11, 75:19
**homicide** [12] - 58:24, 58:25, 59:2, 59:3, 59:9, 60:7, 75:10, 114:19, 120:6, 120:8, 132:22, 154:24
**homicides** [3] - 59:11, 59:14, 59:18
**honest** [1] - 30:22
**honestly** [4] - 109:5, 148:7, 159:15, 160:16
**Honor** [81] - 4:4, 4:11, 4:18, 4:24, 5:2, 5:7, 5:10, 5:23, 6:9, 9:23, 10:4, 10:9, 10:12, 10:24, 11:8, 11:12, 13:9, 13:24, 16:1, 17:2, 19:9, 20:13, 21:4, 22:6, 22:20, 24:6, 25:13, 25:25, 27:12, 27:19, 28:2, 30:15, 30:23, 32:4, 33:2, 34:16, 36:11, 36:16, 37:22, 39:20, 42:24, 43:9, 45:14, 47:12, 48:1, 48:16, 48:23, 52:19, 52:21, 53:3, 53:11, 55:4, 56:8, 56:17, 56:19, 57:14, 57:25, 58:5, 58:12, 76:22, 101:10, 112:2, 139:3, 139:16, 139:21, 141:24, 148:15, 148:23, 149:4, 150:3, 150:4, 150:7, 150:9, 150:20, 164:22, 165:1, 165:5, 165:6, 166:23, 167:1, 167:15
**HONORABLE** [1] - 1:11
**Honorable** [3] - 3:3, 76:9, 168:11
**hope** [3] - 76:25, 94:18, 168:4

**hopefully** [1] - 85:8
**hoping** [1] - 94:19
**hour** [8] - 41:11, 76:8, 132:6, 146:6, 147:14, 157:2, 157:17
**hours** [4] - 93:13, 93:14, 101:25, 118:6
**house** [23] - 38:18, 45:25, 46:6, 62:24, 63:14, 66:8, 67:14, 67:15, 70:7, 74:3, 74:15, 75:24, 75:25, 89:6, 89:7, 91:23, 103:19, 104:4, 104:10, 104:13, 104:16, 111:12, 113:3
**Howard** [4] - 118:9, 165:17, 165:23
**huge** [1] - 40:7
**human** [1] - 8:1
**hundred** [1] - 59:13
**hundreds** [1] - 59:22
**hypothetically** [2] - 34:1, 35:16

## I

**idea** [2] - 41:22, 50:10
**identified** [2] - 26:11, 140:22
**identify** [3] - 3:25, 4:2, 140:19
**identifying** [1] - 26:6
**illegal** [2] - 56:3, 56:4
**image** [1] - 50:18
**immediate** [1] - 131:17
**immediately** [2] - 62:19, 67:8
**impeaching** [1] - 11:20
**important** [8] - 36:25, 37:1, 37:6, 37:16, 39:25, 49:13, 50:10, 100:15
**impossible** [1] - 26:2
**imprisonment** [2] - 10:1, 10:3
**IN** [1] - 1:1
**inability** [1] - 9:10
**inappropriate** [1] - 112:1
**incapacity** [1] - 141:13
**incarcerated** [7] - 26:14, 26:17, 28:4, 28:7, 49:5, 49:10, 78:12
**incident** [5] - 20:4,

20:22, 23:16, 87:13, 120:5
**include** [1] - 26:11
**including** [1] - 57:10
**incorporated** [1] - 7:7
**indefinitely** [1] - 50:16
**independently** [1] - 51:16
**indicate** [8] - 15:17, 22:13, 34:2, 53:23, 55:10, 71:5, 90:20, 162:2
**indicated** [3] - 15:21, 19:3, 21:19
**indication** [1] - 87:21
**indications** [1] - 66:19
**indicted** [3] - 3:8, 3:10, 5:19
**indictment** [22] - 3:8, 3:9, 3:10, 3:13, 3:14, 5:19, 5:22, 6:6, 6:8, 6:10, 6:12, 6:14, 6:23, 7:3, 7:6, 7:8, 8:6, 9:16, 9:19, 10:7, 14:13
**indictments** [1] - 10:16
**indirect** [2] - 79:5, 79:18
**individual** [10] - 32:22, 33:13, 35:6, 38:25, 44:23, 48:3, 54:13, 81:5, 140:2, 151:1
**individuals** [10] - 26:16, 32:10, 45:6, 46:12, 77:20, 79:7, 137:8, 137:13, 137:20, 154:25
**inflicted** [1] - 7:15
**influence** [4] - 141:13, 154:8, 154:25, 155:5
**information** [72] - 24:21, 24:22, 29:2, 52:7, 52:9, 90:6, 90:10, 90:11, 92:6, 92:8, 94:5, 94:18, 95:17, 98:10, 103:13, 103:14, 104:4, 107:18, 108:21, 109:9, 110:8, 113:18, 113:21, 114:4, 115:2, 115:3, 115:23, 116:8, 116:14, 118:17, 118:20, 119:7, 119:8, 119:10, 120:2, 121:3, 121:8, 122:15, 122:18, 122:19, 122:21,

122:24, 123:5, 126:21, 127:2, 127:8, 127:11, 128:10, 137:15, 141:5, 141:6, 141:7, 141:8, 141:17, 142:3, 142:8, 142:11, 145:2, 146:11, 146:14, 146:25, 153:4, 154:12, 154:13, 155:23, 156:1, 161:10, 161:15
**informed** [1] - 19:15
**ingoing** [1] - 92:9
**inherent** [1] - 50:15
**inherently** [1] - 50:9
**initial** [11] - 3:12, 5:25, 6:4, 7:10, 9:5, 9:16, 33:15, 58:3, 69:21, 69:22, 145:13
**initials** [6] - 15:9, 46:14, 143:6, 143:9, 143:11, 145:11
**initiated** [1] - 147:6
**injuries** [1] - 71:21
**injury** [1] - 7:15
**inquiry** [1] - 58:3
**inside** [14] - 45:8, 46:3, 46:22, 46:24, 61:25, 62:11, 73:21, 75:25, 129:21, 129:24, 134:20, 135:2, 156:18
**instance** [3] - 17:20, 31:3, 31:11
**instead** [1] - 25:10
**intelligible** [1] - 157:24
**intend** [3] - 16:3, 16:12, 32:3
**intended** [1] - 38:19
**intending** [1] - 7:18
**intends** [1] - 15:22
**intention** [3] - 17:7, 17:8, 159:11
**intentionally** [4] - 7:14, 7:15, 7:16, 7:21
**interact** [1] - 136:14
**interaction** [2] - 46:16, 140:25
**interactions** [2] - 155:11, 155:14
**interest** [6] - 21:25, 49:4, 49:11, 50:5, 115:19, 133:12
**interested** [1] - 117:17
**interim** [1] - 138:7
**internal** [2] - 12:10,

12:13
**interview** [41] - 46:13, 49:14, 78:9, 78:23, 80:9, 90:5, 99:13, 104:3, 104:9, 105:18, 137:21, 138:11, 138:18, 138:21, 139:19, 141:11, 142:6, 144:21, 144:22, 144:25, 145:8, 145:19, 146:5, 146:8, 147:8, 147:14, 147:17, 148:10, 151:11, 152:15, 152:17, 152:22, 153:16, 154:11, 155:3, 155:8, 155:17, 156:3, 156:11, 158:18, 159:14
**interviewed** [2] - 75:10, 75:19
**interviewing** [2] - 141:9, 145:3
**interviews** [5] - 137:7, 137:10, 137:18, 137:24, 138:4
**intimate** [6] - 78:24, 83:15, 83:16, 84:17, 117:20
**intimidated** [1] - 144:5
**introduce** [3] - 15:22, 32:3, 38:19
**introduced** [1] - 38:24
**introducing** [2] - 19:4, 19:5
**investigated** [2] - 59:11, 59:15
**investigating** [2] - 24:17, 59:23
**investigation** [20] - 60:9, 60:18, 60:19, 62:10, 71:15, 87:11, 92:13, 99:17, 109:23, 111:2, 114:5, 115:24, 116:17, 116:19, 120:10, 129:11, 129:15, 133:7, 153:3, 159:3
**investigations** [3] - 60:21, 114:22, 120:8
**involved** [6] - 18:11, 27:17, 27:22, 28:19, 45:7, 95:15
**involvement** [1] - 95:24
**involves** [1] - 15:7
**issuance** [1] - 114:6

**issue** [10] - 11:17, 19:24, 25:21, 25:22, 29:7, 35:5, 35:21, 36:21, 37:4, 40:7
**issued** [2] - 23:15, 47:19
**issues** [9] - 20:24, 21:10, 33:23, 37:11, 38:15, 41:7, 42:9, 42:19, 56:8
**items** [4] - 26:6, 26:21, 38:18, 46:4
**itself** [10] - 21:1, 24:8, 50:19, 94:23, 95:19, 102:23, 114:8, 127:23, 129:15, 162:9

## J

**jail** [2] - 80:4, 80:6
**Janie** [1] - 122:5
**January** [4] - 1:8, 28:8, 49:8, 169:13
**Jarnell** [1] - 14:5
**JARNELL** [1] - 14:5
**Jason** [1] - 23:11
**Javon** [2] - 1:20, 4:6
**jealous** [1] - 103:25
**Jeffrey** [21] - 15:8, 27:16, 27:22, 28:19, 43:14, 50:24, 59:24, 65:18, 70:4, 70:10, 72:1, 72:2, 79:13, 81:15, 93:12, 93:13, 110:25, 117:20, 146:13, 147:1
**Jeffrey's** [14] - 65:9, 65:17, 65:24, 67:5, 67:14, 68:13, 68:14, 68:21, 68:23, 72:5, 73:6, 74:9, 74:13, 146:19
**Jen** [20] - 77:20, 79:4, 81:11, 81:16, 82:11, 82:12, 82:15, 83:15, 83:19, 84:11, 84:17, 85:14, 88:18, 89:6, 89:9, 89:11, 104:4, 104:16, 111:14, 111:17
**Jen's** [19] - 82:1, 82:4, 82:22, 85:7, 86:9, 90:12, 91:17, 94:1, 96:1, 96:12, 96:17, 98:10, 99:18, 99:19, 102:21, 103:2, 103:19, 112:21
**Jennifer** [50] - 15:7, 15:8, 27:15, 43:14,

43:25, 59:24, 65:8, 65:17, 67:14, 74:11, 75:13, 75:23, 77:7, 77:13, 78:20, 79:12, 79:20, 79:23, 79:25, 80:5, 80:19, 80:24, 81:12, 81:15, 85:9, 85:10, 86:11, 88:17, 88:25, 89:16, 89:19, 93:18, 96:22, 104:1, 104:15, 108:11, 110:19, 110:22, 110:24, 112:13, 112:18, 113:6, 117:20, 117:23, 147:1, 147:7, 165:18
**Jennifer's** [16] - 60:1, 68:16, 70:23, 71:1, 74:16, 79:11, 83:23, 86:10, 90:6, 91:5, 91:10, 93:21, 97:15, 107:14, 107:21, 113:23
**jockied** [1] - 164:2
**Jordan** [1] - 52:11
**judge** [14] - 3:19, 10:15, 11:1, 17:16, 47:10, 57:10, 92:18, 92:21, 94:13, 109:6, 109:9, 161:16, 168:5, 168:6
**Judge** [6] - 1:11, 20:8, 20:21, 23:12, 149:16, 163:24
**judges** [2] - 109:2, 109:3
**Judicial** [1] - 169:9
**July** [2] - 20:7, 29:23
**jump** [1] - 64:16
**June** [53] - 20:1, 20:15, 23:11, 28:8, 43:16, 47:3, 47:6, 47:24, 48:11, 48:21, 49:14, 49:24, 51:9, 52:19, 54:5, 103:1, 108:9, 108:20, 116:6, 116:21, 117:2, 117:4, 117:16, 118:2, 118:22, 119:21, 123:4, 123:9, 123:11, 124:6, 124:24, 125:20, 125:23, 126:3, 126:13, 126:22, 127:3, 127:7, 128:10, 128:22, 128:25, 138:17, 139:19, 142:6, 143:21, 144:10,

144:19, 146:5, 153:16, 155:3, 161:18, 161:24
**jurisdiction** [2] - 136:1, 136:4
**jury** [4] - 11:1, 31:24, 34:13, 50:14
**Jury** [11] - 7:9, 31:11, 31:16, 32:2, 34:7, 34:12, 36:2, 38:23, 38:24, 39:16, 40:23
**justice** [2] - 25:6, 26:19

## K

**K's** [3] - 60:1, 74:14, 81:12
**KB** [1] - 2:8, 7:10, 7:12, 7:20, 8:1, 15:9, 27:16, 59:24, 68:16, 69:2, 117:24
**keep** [5] - 5:16, 13:13, 76:14, 151:13, 164:3
**keeping** [1] - 39:21
**keeps** [1] - 167:22
**kept** [4] - 86:19, 102:14, 102:16, 104:4
**Kester** [2] - 2:7, 2:8
**Kevin** [8] - 74:9, 75:12, 77:6, 77:12, 91:9, 93:11, 93:17, 113:15
**Kevin's** [1] - 75:2
**key** [2] - 74:12, 74:22
**Kiara** [35] - 83:19, 83:20, 83:23, 84:2, 84:12, 85:5, 86:14, 86:15, 86:18, 86:22, 86:25, 87:5, 87:7, 87:24, 88:1, 103:7, 103:13, 103:15, 103:23, 104:3, 104:6, 104:8, 104:11, 104:13, 104:16, 104:20, 105:9, 105:14, 106:5
**Kiara's** [1] - 106:17
**killed** [3] - 7:14, 44:19, 71:23
**killer** [1] - 111:20
**killing** [1] - 6:23
**kind** [9] - 17:15, 27:2, 46:19, 61:9, 62:7, 92:6, 94:17, 121:3, 162:14
**kitchen** [20] - 15:9, 62:23, 64:2, 64:23, 65:7, 65:8, 65:20,

65:21, 65:23, 65:24, 65:25, 66:10, 66:13, 66:16, 66:17, 66:20, 66:22, 71:10, 93:14, 135:10
**knock** [2] - 44:13, 44:21
**knocked** [5] - 33:18, 35:18, 65:10, 65:15, 130:13
**knocking** [3] - 44:20, 86:6, 104:7
**knowing** [2] - 7:22, 94:20
**knowledge** [2] - 27:5, 138:9
**known** [4] - 70:7, 78:22, 83:24, 95:7
**knows** [1] - 49:22

## L

**L-e-w-i-s** [1] - 57:5
**label** [3] - 27:7, 27:8
**lack** [8] - 17:7, 24:7, 36:5, 62:22, 69:15, 79:3, 116:11, 119:17
**lady** [1] - 83:19
**Lamar** [1] - 118:9
**land** [1] - 125:7
**landing** [3] - 62:25, 67:21, 81:20
**language** [1] - 53:15
**laptop** [1] - 57:23
**large** [2] - 66:14, 73:12
**largely** [1] - 131:16
**last** [3] - 5:11, 5:20, 12:16, 30:9, 38:13, 44:3, 44:6, 50:23, 51:19, 57:3, 62:4, 77:12, 79:25, 80:12, 86:14, 93:11, 93:17, 95:2, 96:20, 110:1, 110:4, 110:12, 110:15, 112:4, 112:6, 112:24, 113:17, 114:1, 117:6, 124:8, 124:9, 127:18, 146:5
**late** [1] - 110:18
**latitude** [11] - 13:1, 13:3, 121:11, 121:14, 121:20, 123:16, 124:18, 124:20, 127:14, 127:15
**laughing** [1] - 149:18
**law** [16] - 3:11, 6:2, 6:24, 12:11, 14:4,

18:12, 26:2, 32:23, 34:23, 39:6, 39:9, 52:7, 52:13, 56:1, 131:3, 155:11
**lawfully** [1] - 46:24
**lawyer** [2] - 144:1, 144:2
**lawyers** [1] - 58:7
**laying** [1] - 65:18
**layout** [1] - 62:16
**lead** [1] - 50:22
**leading** [3] - 27:15, 64:14, 64:19
**lean** [1] - 8:22
**learn** [4] - 60:6, 74:7, 116:10, 130:22
**learned** [6] - 70:2, 74:11, 116:11, 116:22, 132:8
**learning** [1] - 120:12
**lease** [3] - 35:14, 35:17, 37:9
**leased** [1] - 35:13
**least** [11] - 5:11, 15:11, 18:12, 35:5, 38:13, 38:16, 45:1, 49:7, 73:12, 149:21, 149:23
**leave** [1] - 55:19, 65:20, 87:1, 87:6, 146:20, 147:18, 147:22, 147:24, 167:21
**leaves** [2] - 21:23, 89:11
**left** [30] - 61:3, 63:6, 63:15, 63:19, 64:7, 65:18, 67:9, 72:10, 88:1, 88:3, 88:10, 88:11, 88:12, 88:21, 89:4, 89:5, 89:9, 99:7, 106:17, 111:9, 111:12, 111:22, 125:10, 125:15, 128:3, 146:17, 146:18, 146:19, 146:22
**left-hand** [3] - 61:3, 125:15, 128:3
**legal** [9] - 14:25, 15:16, 22:12, 23:19, 23:21, 24:2, 35:21, 36:5, 56:2
**Leger** [1] - 122:5
**lengthy** [1] - 28:4
**Leon** [1] - 35:23
**lethal** [1] - 7:18
**letting** [1] - 153:1
**Lewis** [29] - 2:3, 48:2, 55:20, 56:18, 57:4,

57:6, 58:15, 58:18, 61:1, 76:5, 76:16, 77:2, 77:5, 101:19, 139:24, 142:1, 150:10, 150:19, 150:23, 151:6, 157:7, 162:22, 163:17, 164:4, 164:13, 164:22, 165:10, 165:20, 167:13

**LEWIS** [1] - 56:23

**lieu** [1] - 133:14

**life** [9] - 7:17, 8:1, 9:25, 10:2, 10:19, 11:3, 82:1, 82:4, 89:14

**lifted** [1] - 45:11

**light** [2] - 13:2, 166:9

**likely** [5] - 28:4, 32:18, 40:11, 40:13

**limited** [5] - 16:4, 25:8, 36:2, 39:17, 66:22

**line** [13] - 19:22, 36:18, 48:19, 50:17, 90:2, 93:9, 99:10, 99:11, 143:6, 144:11, 144:14, 144:16, 157:23

**lines** [2] - 133:24, 143:13

**list** [2] - 11:21, 31:4

**listed** [1] - 164:13

**listening** [1] - 167:8

**live** [1] - 35:17

**lived** [5] - 77:25, 81:6, 84:4, 84:6

**living** [16] - 37:9, 38:7, 62:6, 62:19, 62:21, 63:21, 63:25, 64:20, 64:25, 65:25, 66:20, 67:16, 77:20, 84:2, 134:22, 135:10

**local** [2] - 30:23, 167:22

**locate** [9] - 47:6, 47:8, 91:24, 94:22, 99:13, 109:15, 114:16, 116:20, 118:22

**located** [15] - 33:16, 50:23, 51:10, 60:23, 65:9, 71:1, 71:5, 72:24, 73:4, 74:13, 110:9, 113:10, 130:2, 133:8, 161:20

**locating** [2] - 113:19, 114:21

**location** [27] - 60:10, 61:4, 62:1, 63:4,

69:20, 74:10, 87:19, 88:1, 88:10, 94:1, 94:5, 94:16, 94:19, 96:6, 102:21, 105:5, 107:20, 108:2, 108:21, 114:9, 115:21, 123:15, 126:21, 127:2, 127:8, 133:11, 159:18

**locked** [3] - 70:2, 70:14, 70:21

**lodged** [1] - 71:17

**log** [1] - 98:15

**logistical** [1] - 139:10

**logistically** [1] - 114:7

**Lombard** [1] - 1:24

**longitude** [7] - 121:12, 121:14, 121:20, 123:17, 124:18, 124:20, 127:15

**look** [5] - 25:9, 47:17, 101:1, 136:2, 137:20

**looked** [13] - 25:4, 25:11, 47:16, 66:17, 67:10, 106:20, 124:3, 127:18, 128:20, 144:20, 145:23, 152:10, 161:17

**looking** [17] - 25:9, 44:18, 53:9, 65:24, 66:8, 68:7, 68:11, 68:21, 92:8, 101:7, 101:9, 121:25, 125:25, 128:2, 136:3, 164:17, 165:19

**looks** [1] - 158:12

**lost** [1] - 44:17

**loud** [6] - 53:17, 86:5, 86:7, 142:25, 143:2, 143:4

**low** [1] - 151:16

**lunch** [3] - 41:12, 41:16, 76:6

**Lunch** [1] - 76:11

**lunchtime** [1] - 80:23

**luxury** [1] - 166:12

## M

**ma'am** [5] - 59:10, 60:14, 129:14, 155:24

**Madam** [1] - 57:19

**magistrate** [1] - 10:15

**Magistrate** [3] - 20:8, 20:21, 23:12

**mail** [18] - 115:6,

121:10, 121:11, 121:23, 121:25, 122:3, 122:7, 122:11, 122:14, 122:17, 123:8, 123:14, 123:19, 124:11, 126:10, 127:12, 128:9

**mails** [2] - 121:19, 124:15

**maintain** [4] - 53:12, 54:6, 55:24, 56:5

**maintained** [1] - 159:13

**Maldeis** [3] - 57:21, 149:9, 150:18

**maldeis** [1] - 17:4

**male** [2] - 46:5, 109:25

**man** [3] - 83:3, 83:13, 83:14

**Man** [1] - 69:18

**mandatory** [4] - 9:25, 10:2, 10:10, 10:18

**manner** [4] - 26:7, 26:17, 74:4, 144:5

**map** [12] - 124:19, 124:21, 125:6, 125:10, 125:13, 125:15, 125:18, 126:7, 126:16, 127:23, 128:6, 128:17

**mapped** [1] - 126:6

**maps** [2] - 125:1, 128:13

**March** [2] - 16:18, 166:7

**mark** [1] - 65:16

**marked** [1] - 157:24

**MARSHAL** [1] - 76:22

**marshals** [1] - 163:15

**marshals'** [1] - 76:17

**MARYLAND** [1] - 1:1

**Maryland** [10] - 1:7, 1:9, 1:25, 27:18, 55:11, 82:20, 89:25, 116:13, 133:9, 169:5

**mask** [9] - 3:20, 3:23, 3:24, 4:13, 4:20, 5:17, 8:21, 57:16, 58:1

**masks** [3] - 3:17, 57:8, 57:11

**material** [10] - 11:17, 11:18, 11:20, 11:24, 12:6, 12:14, 12:19, 13:3, 13:17, 14:1

**materials** [6] - 11:22, 11:23, 13:11, 18:12, 27:6, 52:5

mates [1] - 74:1

**matter** [25] - 11:17, 16:23, 18:9, 18:11, 20:19, 21:14, 22:10, 26:23, 31:22, 34:9, 35:22, 37:1, 37:13, 37:15, 39:4, 39:25, 40:2, 40:12, 51:22, 81:1, 81:18, 139:10, 148:17, 153:17, 169:8

**matters** [8] - 11:15, 14:19, 29:8, 29:20, 30:10, 37:24, 37:25, 39:13

**mattress** [2] - 71:17, 73:5

**McCray** [2] - 165:14, 165:23

**mean** [22] - 13:3, 13:14, 13:20, 18:22, 19:13, 25:18, 32:19, 40:19, 60:16, 82:11, 82:17, 110:15, 112:5, 113:2, 113:6, 130:12, 142:24, 147:12, 153:19, 167:9, 168:9

**meaning** [5] - 70:4, 70:6, 92:9, 130:7, 146:23

**means** [5] - 12:17, 42:12, 42:13, 47:20, 123:22

**meant** [2] - 95:9, 112:23

**media** [1] - 95:21

**medical** [1] - 153:25

**medications** [1] - 154:9

**meet** [2] - 62:2, 112:12

**meeting** [3] - 41:13, 73:17, 129:5

**melissa** [1] - 1:23

**Melissa** [2] - 169:3, 169:16

**member** [6] - 44:4, 70:3, 83:12, 93:9, 93:11, 134:16

**members** [10] - 77:19, 113:14, 118:9, 118:10, 119:12, 130:15, 133:13, 135:22, 135:23, 165:13

**memory** [5] - 66:15, 91:10, 100:17, 102:22, 154:18

**men** [1] - 55:18

**mental** [1] - 141:13

**mentioned** [7] - 24:24, 25:5, 41:24, 70:23, 83:13, 104:19, 105:18

**message** [10] - 27:3, 98:16, 98:22, 100:11, 100:14, 100:16, 101:20, 101:24, 102:2, 102:10

**messages** [7] - 26:22, 26:24, 26:25, 27:2, 92:9, 100:3, 100:8

**messaging** [4] - 95:20, 95:22, 113:23

**met** [4] - 27:10, 62:3, 118:12, 118:13

**meters** [3] - 123:19, 123:22, 127:17

**Metro** [1] - 109:25

**Michael** [5] - 160:5, 160:6, 160:14, 165:11, 165:12

**microphone** [3] - 8:21, 8:22, 57:2

**middle** [3] - 45:17, 93:8, 132:1

**midnight** [1] - 123:11

**might** [7] - 29:10, 30:16, 41:22, 84:16, 95:15, 109:4, 163:19

**Mike** [1] - 160:17

**mind** [1] - 139:12

**minimal** [2] - 49:5, 50:6

**minimum** [3] - 9:25, 10:2, 10:19

**minimums** [1] - 10:11

**minute** [8] - 14:11, 14:17, 30:19, 37:18, 139:13, 150:16, 151:6, 165:15

**minutes** [20] - 30:9, 41:12, 41:15, 43:13, 56:14, 56:15, 76:4, 76:7, 76:8, 76:15, 97:12, 97:14, 124:13, 146:7, 148:13, 148:15, 157:2, 164:23, 167:12

**Miranda** [8] - 46:14, 136:17, 141:2, 142:12, 142:18, 143:23, 151:23, 152:2

**missing** [5] - 55:25, 91:21, 91:22, 110:14, 115:20

**misspoke** [2] - 20:17,

20:18
**mistaken** [1] - 101:23
**Mobile** [2] - 122:6, 126:10
**moment** [19] - 4:21, 17:16, 43:11, 44:21, 44:25, 46:19, 52:25, 53:24, 54:16, 56:19, 64:16, 66:3, 82:14, 94:16, 102:20, 153:14, 157:3, 159:7, 159:8
**moments** [2] - 15:5, 152:11
**Monday** [2] - 166:8, 166:11
**money** [5] - 80:11, 85:10, 89:13, 89:17, 104:17
**monitors** [2] - 137:19, 137:22
**month** [2] - 5:20, 16:14
**months** [1] - 36:19
**moot** [15] - 12:16, 14:20, 16:8, 16:24, 17:6, 17:23, 18:4, 18:7, 19:17, 19:24, 21:15, 21:18, 21:19, 21:21, 41:1
**morning** [29] - 3:4, 3:11, 4:4, 4:8, 4:9, 4:23, 4:25, 5:2, 5:12, 5:13, 21:22, 44:1, 51:10, 58:15, 74:21, 88:7, 89:1, 89:2, 89:3, 97:21, 110:19, 118:5, 120:19, 129:18, 146:23, 146:24, 163:21, 164:1
**most** [5] - 43:17, 45:5, 79:1, 149:21, 149:22
**mother's** [1] - 71:7
**motion** [22] - 15:13, 15:15, 15:19, 16:8, 17:5, 17:9, 17:11, 18:9, 19:1, 19:17, 19:23, 20:1, 21:12, 21:25, 29:7, 29:16, 29:18, 29:20, 29:21, 29:23, 31:1, 166:4
**motions** [26] - 12:24, 13:19, 14:11, 14:14, 14:15, 14:16, 14:23, 15:10, 17:9, 17:14, 17:17, 17:24, 18:4, 21:23, 22:15, 29:14, 30:24, 31:2, 31:6, 32:14, 34:18, 35:22,

36:20, 41:23, 164:14, 166:21
**MOTIONS** [1] - 1:5
**motive** [1] - 28:22
**mouse** [1] - 63:9
**mouth** [1] - 72:11
**move** [6] - 15:12, 51:15, 69:7, 71:14, 71:15, 145:12
**moved** [3] - 23:8, 45:15, 49:24
**movement** [1] - 133:10
**moving** [1] - 63:11
**MR** [23] - 4:15, 5:2, 5:10, 6:9, 9:18, 11:11, 18:19, 29:12, 36:14, 36:16, 139:3, 139:7, 139:9, 139:12, 140:18, 148:22, 149:1, 149:9, 149:13, 149:16, 163:24, 167:1, 168:6
**MS** [143] - 4:4, 4:11, 4:23, 5:7, 5:23, 8:9, 9:23, 10:4, 10:9, 10:12, 10:24, 11:8, 12:2, 12:7, 13:9, 13:24, 14:7, 16:1, 16:14, 16:22, 17:2, 17:16, 17:19, 18:1, 18:16, 19:9, 19:14, 19:18, 20:13, 21:3, 21:8, 21:17, 22:6, 22:8, 22:20, 22:25, 23:4, 23:20, 23:25, 24:6, 25:18, 25:20, 25:22, 25:25, 27:19, 27:25, 28:2, 28:11, 28:15, 28:21, 29:2, 30:3, 30:6, 30:15, 30:22, 31:8, 31:11, 31:17, 32:4, 32:7, 33:2, 33:4, 33:7, 34:16, 34:22, 36:11, 37:22, 39:20, 40:17, 41:5, 41:9, 42:24, 43:2, 43:9, 45:14, 46:10, 47:12, 47:16, 47:24, 48:1, 48:16, 48:23, 51:3, 51:6, 51:9, 52:19, 52:21, 53:3, 53:11, 53:20, 54:1, 54:3, 54:5, 55:12, 56:17, 57:19, 57:25, 58:5, 58:12, 58:14, 77:4, 101:10, 101:13, 111:24, 112:2, 112:3,

139:16, 139:21, 139:23, 140:23, 140:24, 141:24, 141:25, 147:21, 148:15, 148:23, 149:4, 149:7, 149:24, 150:3, 150:4, 150:7, 150:19, 150:22, 151:5, 151:13, 151:15, 152:5, 157:6, 157:16, 158:2, 158:9, 164:19, 164:22, 165:1, 165:5, 165:10, 165:13, 165:17, 166:23, 167:15, 167:18, 167:24
**murder** [10] - 26:13, 28:22, 60:18, 60:19, 95:19, 110:9, 113:11, 115:20, 155:15, 162:12
**murders** [10] - 15:7, 24:21, 24:23, 24:25, 27:15, 28:25, 45:8, 59:23, 82:2, 117:25
**music** [1] - 75:23
**must** [1] - 33:23

# N

**nail** [1] - 37:6
**name** [28] - 33:12, 35:14, 37:9, 57:2, 57:3, 61:15, 62:4, 74:9, 77:24, 78:3, 83:19, 84:5, 86:14, 86:22, 98:20, 98:21, 99:6, 105:1, 129:23, 144:16, 145:11, 152:9, 153:7, 160:4, 162:22, 162:24, 163:1
**named** [2] - 52:10, 83:13
**names** [3] - 99:7, 101:17, 137:12
**narcotics** [8] - 26:12, 27:17, 28:14, 73:7, 73:10, 82:19, 135:17, 155:1
**narrowed** [2] - 25:3, 25:7
**nature** [10] - 8:11, 8:13, 8:25, 9:7, 71:20, 78:19, 102:10, 120:5, 129:14, 166:9

**near** [2] - 65:10, 66:18
**necessarily** [1] - 13:21
**necessary** [2] - 37:15, 39:14
**need** [27] - 3:14, 6:5, 6:7, 8:20, 8:21, 9:22, 15:15, 16:11, 17:12, 17:15, 29:8, 30:11, 30:20, 34:8, 34:14, 35:20, 37:11, 39:15, 131:15, 139:13, 149:11, 153:24, 160:17, 164:16, 166:21, 167:3, 167:5
**needed** [9] - 59:17, 93:6, 99:13, 99:16, 115:14, 145:10, 160:13, 160:21
**needs** [2] - 36:12, 43:4
**negative** [4] - 12:3, 123:17, 127:15, 162:2
**neighbor** [4] - 75:3, 75:18, 75:19, 77:8
**neighborhood** [5] - 61:8, 61:9, 61:10, 61:15, 88:3
**neighbors** [2] - 75:9
**never** [5] - 5:25, 12:13, 30:24, 49:21, 149:19
**next** [15] - 16:14, 51:10, 60:8, 60:18, 60:19, 68:7, 68:19, 88:7, 101:12, 116:25, 118:15, 125:9, 144:6, 166:13
**nice** [2] - 4:7, 5:5
**Nice** [1] - 4:25
**niece** [4] - 77:23, 79:12, 81:12, 81:15
**night** [11] - 43:25, 80:13, 82:9, 84:25, 85:14, 85:17, 85:25, 88:25, 89:22, 110:18, 113:4
**nights** [1] - 44:1
**NO** [1] - 1:4
**nobody** [2] - 44:6, 44:11
**noise** [1] - 87:19
**non** [2] - 95:8, 114:19
**non-fatal** [1] - 114:19
**non-functional** [1] - 95:8
**nonetheless** [1] - 48:7
**normally** [1] - 109:7
**NORTHERN** [1] - 1:2
**Nos** [2] - 14:16, 14:17
**notable** [1] - 73:13
**note** [11] - 5:18, 9:23,

12:25, 29:17, 35:21, 41:22, 41:25, 69:25, 93:20, 115:15, 164:13
**notebook** [1] - 99:6
**noted** [14] - 3:11, 6:2, 6:3, 6:4, 7:9, 34:25, 35:23, 39:15, 40:22, 49:7, 51:23, 56:8, 66:19, 110:13
**notepad** [4] - 99:2, 100:25, 101:4, 101:7
**notes** [9] - 6:15, 7:7, 8:2, 99:5, 99:25, 100:1, 100:23, 101:1, 113:9
**nothing** [13] - 11:11, 18:7, 38:17, 44:12, 48:18, 65:11, 73:12, 73:16, 153:19, 163:21
**notice** [9] - 6:13, 7:3, 15:19, 16:3, 16:5, 16:10, 16:13, 17:5, 17:23
**noticing** [1] - 15:25
**notification** [1] - 17:6
**notify** [2] - 16:19, 40:12
**nudie** [1] - 27:8
**number** [54] - 43:13, 43:16, 49:17, 63:14, 75:6, 90:13, 90:15, 93:21, 96:6, 96:7, 96:10, 96:11, 96:12, 97:4, 97:5, 97:7, 97:8, 98:10, 98:21, 99:15, 99:18, 99:19, 99:22, 100:5, 100:6, 100:8, 102:5, 107:2, 107:4, 107:10, 107:23, 108:4, 109:17, 109:24, 112:21, 115:19, 122:24, 123:1, 123:10, 123:16, 124:5, 127:9, 133:25, 141:23, 153:6, 153:7, 162:20, 163:2, 163:4
**numbered** [1] - 143:3
**numbers** [11] - 49:18, 63:19, 90:8, 90:14, 92:14, 99:7, 101:18, 107:16, 131:25, 154:16, 158:22

# O

**o'clock** [15] - 41:13,

41:17, 76:20, 78:8, 81:10, 82:10, 82:12, 86:5, 87:18, 138:19, 143:21, 163:20, 164:3, 164:5, 164:6
**oath** [3] - 34:11, 38:25, 77:3
**object** [2] - 31:2, 31:13
**objection** [8] - 32:19, 32:24, 39:21, 40:20, 40:21, 40:22, 40:25, 111:24
**observing** [1] - 75:5
**obstruct** [1] - 26:19
**obstruction** [1] - 25:6
**obtain** [11] - 43:16, 48:5, 72:16, 80:4, 94:1, 98:10, 106:19, 107:20, 108:21, 117:4, 120:21
**obtained** [22] - 7:11, 20:15, 45:21, 51:9, 51:24, 55:1, 74:5, 96:5, 103:2, 107:13, 108:24, 109:15, 110:8, 118:1, 120:13, 120:16, 120:24, 120:25, 121:3, 129:1, 134:6, 156:8
**obtaining** [4] - 98:9, 114:7, 117:17, 122:24
**obvious** [1] - 166:22
**obviously** [4] - 12:21, 15:7, 39:25, 167:11
**occupants** [2] - 44:25, 46:5
**occur** [1] - 121:9
**occurred** [5] - 24:13, 24:15, 38:25, 41:2, 132:23
**occurring** [1] - 121:13
**OF** [3] - 1:1, 1:3, 169:2
**offend** [1] - 18:22
**offense** [7] - 7:10, 7:12, 7:14, 7:19, 7:21, 7:24, 8:3
**offenses** [2] - 26:11, 26:20
**offer** [1] - 85:10
**office** [3] - 6:3, 47:17, 131:22
**Officer** [4] - 62:5, 62:7, 73:18, 73:22
**officer** [8] - 26:8, 55:19, 55:20, 61:12, 62:4, 62:8, 160:5, 160:7

**officer/detective** [1] - 119:13
**officers** [20] - 12:11, 26:3, 31:18, 31:19, 32:23, 37:25, 38:6, 44:22, 45:3, 49:15, 51:15, 54:17, 55:16, 60:10, 90:25, 114:25, 131:4, 131:7, 133:10, 133:12
**offices** [1] - 137:19
**OFFICIAL** [1] - 169:2
**Official** [2] - 1:24, 169:17
**old** [4] - 15:8, 27:16, 115:21, 155:7
**older** [1] - 8:3
**oldest** [1] - 60:18
**once** [13] - 22:15, 65:8, 67:7, 67:20, 71:14, 73:21, 114:15, 125:5, 130:3, 131:13, 134:5, 137:6, 156:17
**one** [58] - 6:1, 6:3, 7:19, 7:24, 17:21, 21:11, 22:21, 24:6, 25:6, 26:25, 27:8, 27:14, 35:13, 38:2, 42:14, 43:18, 44:25, 48:24, 51:19, 55:20, 60:18, 62:11, 67:4, 67:15, 69:17, 72:23, 73:25, 74:1, 75:8, 81:22, 83:2, 83:5, 91:20, 96:11, 96:18, 99:25, 100:1, 100:24, 103:20, 104:7, 113:7, 119:9, 121:19, 124:25, 127:18, 134:17, 136:3, 139:9, 143:3, 158:7, 159:16, 164:13, 165:15, 167:2, 167:22
**ones** [1] - 124:25
**oops** [1] - 69:9
**open** [15] - 13:2, 14:15, 14:16, 35:5, 39:21, 54:12, 54:16, 62:22, 64:1, 68:12, 87:3, 98:14, 133:11, 133:16, 145:3
**opened** [4] - 33:19, 38:1, 54:13, 130:14
**opening** [5] - 40:4, 41:19, 41:21, 43:6, 51:21
**opens** [2] - 44:23,

49:16
**operating** [1] - 165:3
**opinion** [4] - 29:7, 52:10, 146:10, 155:3
**opportunity** [1] - 32:24
**opposed** [1] - 163:23
**opposite** [2] - 45:1
**opposition** [2] - 26:1, 32:5
**orange** [1] - 140:4
**order** [44] - 17:3, 21:19, 43:20, 44:8, 51:9, 51:25, 52:1, 52:2, 52:25, 54:5, 65:3, 65:5, 65:6, 91:24, 92:4, 92:5, 92:18, 92:24, 93:4, 94:1, 94:16, 96:6, 96:10, 102:21, 102:23, 107:10, 107:20, 108:21, 108:24, 109:1, 109:11, 109:14, 109:20, 115:7, 115:11, 115:12, 115:15, 116:7, 120:25, 137:9, 145:13, 161:10
**orderly** [1] - 65:13
**orders** [6] - 3:16, 43:17, 57:7, 114:6, 114:15, 115:7
**ordinary** [2] - 65:12, 153:20
**original** [2] - 56:6, 62:9
**otherwise** [1] - 47:2
**ought** [2] - 32:15, 38:11
**outgoing** [1] - 92:9
**outside** [4] - 65:11, 73:23, 73:24, 90:1
**overall** [1] - 38:8
**overnight** [1] - 55:6
**oversight** [1] - 109:12
**overview** [1] - 30:17
**own** [1] - 12:11

**P**

**p.m** [14] - 78:8, 81:10, 85:21, 102:1, 117:14, 123:4, 123:5, 138:20, 142:10, 144:10, 144:19, 155:4, 162:1, 168:13
**pace** [2] - 164:15, 165:7

**Pacific** [1] - 123:7
**package** [2] - 156:16, 156:17
**Page** [1] - 133:1
**page** [76] - 63:11, 63:12, 63:17, 63:23, 64:7, 64:12, 64:16, 65:14, 65:21, 66:2, 66:7, 66:10, 67:18, 67:22, 67:25, 68:1, 68:7, 68:24, 69:10, 69:12, 69:19, 92:2, 92:17, 92:21, 93:1, 93:8, 94:3, 94:11, 94:24, 98:24, 99:4, 99:25, 100:1, 100:24, 101:11, 101:12, 106:23, 106:25, 107:25, 108:1, 108:6, 109:20, 122:1, 122:21, 122:23, 124:3, 124:8, 124:22, 126:1, 126:4, 126:5, 126:10, 126:24, 127:5, 127:7, 128:9, 128:14, 132:12, 132:13, 132:19, 132:21, 133:1, 134:3, 143:15, 157:22, 162:18, 162:23, 169:8
**PAGE** [1] - 2:2
**pages** [8] - 92:17, 92:23, 94:3, 94:7, 100:23, 106:23, 109:14, 126:9
**pair** [1] - 156:16
**pajama** [1] - 70:25
**pants** [1] - 70:25
**Paper** [22] - 14:16, 14:17, 15:14, 15:15, 15:20, 17:10, 18:8, 18:10, 19:2, 19:22, 19:25, 20:11, 21:12, 22:16, 23:6, 29:10, 29:17, 29:18, 29:21, 29:22, 29:23
**paper** [1] - 162:13
**papers** [1] - 27:12
**paragraph** [1] - 109:21
**Parker** [20] - 62:14, 99:3, 101:8, 118:8, 134:25, 135:8, 137:7, 142:21, 142:22, 145:7, 147:18, 147:22, 150:25, 151:7, 153:10, 153:13,

157:3, 159:15, 160:19, 167:4
**Parker's** [2] - 99:5, 157:11
**Parkwood** [1] - 89:25
**parole** [2] - 10:19, 11:3
**part** [10] - 43:17, 48:24, 49:7, 59:18, 60:11, 61:19, 61:20, 70:9, 118:19, 129:12
**partial** [1] - 72:11
**participants** [3] - 7:19, 7:24, 57:10
**participated** [1] - 7:16
**participation** [1] - 7:25
**particular** [17] - 60:8, 68:17, 96:6, 96:7, 100:6, 106:10, 106:15, 109:1, 109:8, 109:10, 118:19, 120:9, 122:14, 122:23, 124:3, 126:16, 160:9
**particularity** [2] - 26:5, 27:11
**parties** [2] - 43:11, 47:7
**partly** [2] - 147:25
**partner** [9] - 62:10, 62:13, 99:2, 101:8, 106:3, 116:16, 118:13, 132:3, 142:22
**passed** [1] - 132:6
**past** [1] - 105:21
**patrol** [8] - 59:5, 59:6, 60:10, 61:12, 62:3, 62:8, 134:17, 136:23
**pattern** [2] - 110:7, 113:1
**Paul** [2] - 1:14, 4:6
**pause** [2] - 151:6, 157:17
**pausing** [1] - 120:21
**pay** [2] - 9:10, 85:10
**PCS** [1] - 109:25
**PD** [17] - 118:13, 118:20, 119:12, 129:10, 131:10, 131:12, 134:16, 135:6, 135:18, 135:24, 136:13, 137:7, 137:8, 137:14, 137:19, 148:4, 148:9
**PD's** [1] - 131:22
**peek** [1] - 135:20
**pen** [10] - 92:4, 92:6,

93:4, 93:25, 96:5,
102:21, 106:25,
107:12, 113:25,
114:9
**penalties** [1] - 9:24
**penalty** [1] - 10:22
**pending** [1] - 17:10
**people** [8] - 13:10,
31:12, 117:25,
134:22, 160:14,
164:13, 164:16,
167:11
**perfect** [1] - 23:4
**perfectly** [2] - 13:6,
54:18
**perform** [2] - 160:9,
161:14
**performed** [2] -
129:15, 162:5
**perhaps** [5] - 21:25,
22:13, 24:3, 38:4,
40:6
**period** [6] - 26:15,
28:4, 28:7, 106:14,
113:24, 138:7,
160:15, 162:12
**permit** [2] - 38:22,
38:24
**permitted** [1] - 158:24
**perpetrator's** [1] -
95:24
**person** [42] - 6:18,
7:17, 7:19, 7:23,
15:14, 18:17, 18:21,
29:16, 32:25, 33:14,
34:10, 34:15, 36:3,
36:8, 36:10, 37:25,
40:14, 41:1, 44:3,
44:6, 45:12, 55:23,
95:15, 99:13, 110:2,
110:4, 110:12,
110:16, 112:4,
112:6, 112:24,
115:19, 123:25,
141:8, 141:9,
141:12, 141:14,
149:22, 156:18,
160:14, 167:22
**person's** [1] - 36:12
**personnel** [3] - 13:15,
39:6, 93:15
**persons** [1] - 133:12
**phone** [220] - 12:16,
18:10, 18:13, 18:24,
18:25, 19:2, 19:3,
19:6, 19:11, 19:23,
20:1, 20:2, 20:3,
20:10, 20:12, 20:22,
21:25, 22:2, 22:4,
22:15, 22:16, 22:17,

22:18, 23:3, 23:6,
23:10, 24:11, 24:12,
24:23, 25:10, 25:11,
26:14, 29:23, 29:25,
43:19, 44:16, 45:11,
45:12, 45:13, 45:15,
45:19, 45:20, 47:4,
47:22, 48:3, 48:6,
48:18, 48:21, 49:5,
49:11, 49:16, 49:17,
49:19, 50:5, 50:8,
50:18, 50:19, 50:21,
50:23, 51:2, 51:25,
52:7, 55:15, 55:16,
55:17, 55:23, 56:7,
80:18, 80:19, 80:23,
81:2, 90:8, 90:14,
90:18, 90:19, 90:20,
90:21, 90:22, 91:3,
91:4, 91:5, 91:11,
91:12, 91:18, 91:21,
91:22, 91:24, 92:10,
93:12, 94:1, 94:6,
94:20, 94:22, 95:8,
95:14, 95:16, 95:21,
95:22, 96:7, 96:10,
96:20, 96:22, 96:23,
97:3, 97:4, 97:5,
97:7, 97:16, 97:22,
98:1, 98:3, 98:4,
98:7, 98:11, 98:14,
98:16, 98:18, 98:20,
99:7, 99:18, 100:1,
101:15, 102:7,
102:12, 102:13,
102:14, 102:16,
102:18, 102:19,
102:22, 103:2,
103:3, 107:14,
107:21, 108:3,
109:15, 109:24,
110:4, 110:6, 110:8,
110:24, 110:25,
111:7, 113:1,
113:20, 113:23,
114:1, 114:4, 114:8,
115:3, 115:22,
115:23, 116:8,
116:11, 116:12,
116:20, 116:22,
119:18, 119:24,
120:12, 120:23,
121:2, 121:3,
121:10, 121:11,
122:7, 122:23,
123:16, 123:25,
124:23, 125:8,
126:22, 126:25,
127:3, 127:9,
128:21, 131:1,
133:7, 148:1, 148:2,

148:3, 148:5, 148:8,
148:12, 152:21,
152:22, 152:23,
152:25, 153:4,
153:11, 154:16,
157:7, 157:20,
158:3, 158:12,
158:19, 158:22,
158:23, 159:2,
159:5, 159:7,
159:10, 159:12,
159:13, 159:22,
160:3, 160:16,
160:17, 160:22,
161:4, 161:17,
161:20, 162:21
**phones** [14] - 18:11,
22:21, 24:19, 90:6,
90:7, 90:12, 90:13,
90:15, 90:17, 90:25,
91:3, 91:20, 95:7,
114:16
**photo** [6] - 27:8,
63:24, 64:4, 64:12,
68:20, 69:5
**photograph** [4] -
63:13, 68:17, 68:19,
69:16
**photographs** [1] -
27:4
**photos** [2] - 46:2,
66:17
**physical** [4] - 94:19,
115:8, 153:21,
163:12
**physically** [5] - 135:2,
135:4, 148:8,
153:24, 162:13
**picked** [3] - 6:1, 49:15,
148:10
**picking** [1] - 160:16
**picture** [2] - 64:17,
69:6
**piece** [1] - 50:13
**pillow** [1] - 69:4
**pin** [11] - 61:3, 124:20,
125:7, 125:9,
125:13, 127:23,
127:24, 128:1,
128:5, 128:17,
128:18
**ping** [19] - 121:2,
121:9, 121:20,
121:25, 123:3,
123:10, 124:3,
124:9, 124:12,
124:14, 124:23,
124:25, 125:25,
126:2, 126:6,
126:17, 126:24,

128:18, 128:21
**pinging** [11] - 116:12,
116:22, 119:18,
119:24, 120:23,
121:10, 121:11,
121:12, 128:9, 131:1
**pings** [4] - 121:5,
121:8, 121:22, 124:4
**pink** [4] - 67:25, 68:5,
68:9, 81:22
**pistol** [1] - 73:3
**place** [5] - 53:12, 56:7,
131:16, 137:16,
144:21
**Place** [1] - 105:1
**placing** [1] - 152:8
**plaintiff** [1] - 1:4
**Plaintiff** [1] - 1:12
**plan** [5] - 110:21,
111:3, 119:5, 137:9
**planned** [3] - 110:20,
116:24, 118:2
**plans** [4] - 44:5, 88:21,
88:22, 112:12
**plate** [1] - 69:8
**play** [8] - 32:15, 32:16,
75:23, 139:2,
139:17, 148:11,
148:12, 158:7
**played** [11] - 139:22,
140:3, 148:14,
150:21, 151:4,
151:14, 152:4,
157:5, 157:15,
158:1, 158:8
**playing** [6] - 75:20,
75:24, 100:13,
102:3, 148:16,
151:13
**plays** [3] - 13:5, 35:15,
39:23
**plea** [3] - 9:17, 9:18,
163:25
**pleadings** [1] - 24:8
**pled** [2] - 21:14, 27:21
**plenty** [2] - 36:20,
166:9
**Plexiglas** [3] - 3:22,
58:7, 58:8
**plot** [1] - 128:13
**plugged** [1] - 149:13
**podium** [3] - 58:7,
58:9, 58:11
**point** [55] - 9:21, 11:7,
13:7, 13:16, 13:23,
16:7, 19:7, 21:15,
22:5, 22:7, 27:14,
30:1, 30:13, 32:21,
36:7, 37:23, 38:4,
39:18, 39:23, 40:15,

128:18, 128:21
**pinging** 40:16, 41:7, 41:23,
42:21, 42:22, 42:25,
43:5, 45:3, 45:10,
49:13, 52:4, 52:24,
70:5, 73:22, 74:1,
76:17, 77:16, 84:2,
91:22, 103:2, 104:7,
111:2, 111:16,
123:24, 129:18,
130:6, 136:3,
145:17, 147:10,
147:17, 150:23,
163:13, 167:9,
167:14, 167:16
**pointed** [1] - 43:10
**points** [1] - 43:25
**poisonous** [1] - 20:25
**Police** [24] - 24:17,
31:18, 43:13, 46:12,
51:23, 52:23, 54:12,
58:19, 116:16,
118:10, 120:10,
129:6, 129:16,
133:14, 135:23,
137:1, 137:4,
142:20, 165:14,
165:21, 165:22,
165:23, 165:24
**police** [20] - 12:11,
31:19, 44:17, 46:16,
46:20, 59:5, 60:7,
75:5, 87:2, 87:6,
87:17, 87:22, 104:8,
104:9, 114:24,
133:11, 133:16,
134:21, 145:1,
161:13
**policy** [4] - 13:2, 48:4,
60:17, 161:13
**Poo** [10] - 82:9, 82:12,
83:10, 83:15, 84:24,
99:12, 99:14,
106:19, 110:1
**Poo's** [1] - 86:22
**porch** [1] - 75:4
**portion** [14] - 65:23,
65:25, 95:3, 105:19,
105:23, 123:18,
139:17, 148:11,
151:20, 151:23,
152:1, 153:14,
157:18, 157:23
**portions** [2] - 32:7,
166:15
**position** [3] - 12:10,
53:1, 135:11
**possession** [6] -
26:12, 28:15, 45:20,
47:4, 50:11, 50:13
**possessory** [3] - 49:4,

49:11, 50:5
**possibility** [3] - 11:3, 25:5, 117:19
**possible** [3] - 14:9, 26:24, 113:21
**possibly** [1] - 109:13
**potential** [1] - 25:6
**potentially** [4] - 26:19, 44:19, 45:7, 79:24
**power** [1] - 38:12
**powering** [1] - 158:12
**practically** [1] - 131:19
**practice** [7] - 34:9, 34:23, 34:24, 36:23, 41:24, 48:4, 109:2
**Pratt** [6] - 48:11, 48:14, 48:19, 48:24, 50:7
**pre** [2] - 52:20, 52:25
**precautions** [2] - 58:10, 166:10
**precisely** [2] - 26:8, 26:9
**preclude** [1] - 18:3
**precluded** [1] - 21:12
**predict** [1] - 27:9
**prejudice** [1] - 39:11
**preliminarily** [4] - 15:11, 30:20, 35:7, 38:17
**preliminary** [7] - 9:11, 11:15, 12:23, 39:12, 42:2, 42:5, 42:8
**prepared** [3] - 23:18, 36:8, 119:5
**preponderance** [2] - 15:4, 34:21
**presence** [1] - 108:19
**Present** [1] - 1:19
**present** [6] - 16:8, 17:16, 130:16, 135:12, 139:24, 144:2
**presentation** [5] - 14:24, 30:12, 40:24, 51:14, 57:20
**presented** [1] - 35:4
**presiding** [2] - 3:3, 3:19
**presumably** [2] - 3:13, 39:2
**pretrial** [3] - 16:17, 163:16, 166:7
**pretty** [9] - 19:12, 19:22, 28:4, 40:25, 65:13, 66:25, 134:8, 144:22, 144:25
**prevent** [1] - 6:23
**previous** [1] - 10:15

**previously** [2] - 6:22, 10:6
**primarily** [1] - 92:12
**primary** [5] - 59:11, 59:16, 62:8, 90:21, 115:13
**printed** [1] - 144:16
**printing** [1] - 152:8
**prison** [2] - 11:2, 11:3
**privilege** [1] - 42:1
**probable** [5] - 21:7, 24:7, 24:24, 25:9, 44:13, 52:1, 53:13, 54:6, 55:2, 55:16, 55:24, 133:2, 133:25, 134:1
**probation** [2] - 28:9, 28:13
**problem** [1] - 167:23
**procedure** [1] - 120:6
**Procedure** [1] - 9:6
**proceed** [8] - 14:10, 30:8, 30:10, 30:12, 41:21, 43:8, 56:12, 146:8
**proceeding** [2] - 15:4, 15:5
**Proceedings** [1] - 1:8
**proceedings** [5] - 3:24, 5:17, 19:20, 168:13, 169:7
**process** [5] - 36:7, 38:15, 45:17, 47:18, 141:11
**produce** [1] - 16:3
**produced** [2] - 16:2, 34:8
**production** [1] - 34:22
**productive** [2] - 30:8, 41:11
**Professional** [1] - 169:3
**proffer** [1] - 55:9
**proffered** [1] - 52:22
**proffering** [2] - 42:6, 47:9
**projectile** [4] - 66:15, 66:16, 71:13, 71:16
**promised** [2] - 144:4, 155:25
**promptly** [1] - 16:5
**pronouncing** [3] - 18:14, 18:15, 18:18
**proof** [3] - 15:1, 15:3
**properly** [1] - 23:23
**prophylactic** [1] - 31:24
**propose** [3] - 14:18, 14:21, 16:12
**proposed** [1] - 166:8

**prospective** [1] - 92:15
**protective** [3] - 45:17, 54:21, 54:23
**prove** [3] - 33:8, 36:4, 38:10
**provide** [12] - 16:10, 81:25, 90:6, 92:10, 118:17, 141:1, 146:14, 146:25, 153:4, 154:13, 155:23
**provided** [17] - 16:3, 38:1, 46:13, 49:22, 90:10, 90:11, 92:18, 121:14, 123:6, 124:16, 138:6, 138:9, 138:12, 140:9, 142:18, 146:12, 154:4
**provider** [3] - 114:23, 121:15, 121:16
**provides** [2] - 7:4, 43:21, 46:18
**providing** [1] - 155:25
**public** [3] - 3:17, 13:12, 57:8
**pull** [8] - 3:23, 4:13, 4:20, 57:11, 57:15, 102:22, 128:16, 128:20
**pulled** [1] - 63:9
**pulling** [1] - 127:21
**pulls** [1] - 49:16
**purpose** [1] - 141:7
**purposes** [2] - 12:19, 164:12
**Purpura** [19] - 1:17, 5:1, 5:3, 5:4, 5:8, 6:7, 8:17, 9:15, 11:9, 13:16, 18:22, 51:20, 53:7, 140:21, 149:18, 150:1, 167:13, 167:19, 168:4
**PURPURA** [9] - 5:2, 5:10, 6:9, 9:18, 11:11, 140:18, 149:16, 163:24, 168:6
**pursuant** [2] - 52:16, 169:5
**put** [28] - 16:11, 17:12, 18:5, 24:12, 42:19, 43:3, 44:7, 45:19, 47:5, 89:13, 89:16, 89:17, 92:1, 98:23, 106:22, 107:25, 113:22, 117:9, 121:17, 124:17,

124:25, 125:3, 125:5, 132:11, 142:16, 143:11, 145:11, 162:11
**putting** [3] - 33:8, 79:21, 95:23

## Q

**Q-tip** [1] - 156:16
**quantity** [1] - 73:12
**questioning** [1] - 55:19
**questions** [10] - 12:23, 42:2, 42:6, 58:11, 144:1, 144:2, 153:18, 154:1, 154:4, 154:6
**quick** [8] - 21:3, 22:10, 22:12, 22:22, 29:7, 37:15, 43:13, 67:12
**quickly** [4] - 14:20, 21:11, 23:7, 130:24
**quiet** [1] - 61:10
**quite** [1] - 21:11
**quote** [5] - 26:5, 65:11, 82:5, 83:1, 147:10

## R

**raise** [2] - 56:21, 80:11
**raised** [3] - 24:7, 25:22, 48:12
**rather** [4] - 7:1, 11:18, 11:20, 114:25
**RDB-20-0139** [1] - 3:7
**RDB-20-139** [1] - 1:4
**re** [1] - 98:4
**reach** [1] - 67:7
**reached** [1] - 160:20
**reacting** [1] - 54:15
**read** [20] - 6:7, 93:16, 95:2, 108:15, 109:20, 114:2, 127:14, 128:6, 133:6, 136:17, 142:19, 142:21, 142:22, 142:24, 142:25, 143:2, 143:3, 143:13, 143:16
**readily** [1] - 49:1
**reading** [1] - 6:10
**ready** [6] - 14:10, 30:7, 30:10, 30:19, 56:12, 76:15
**real** [3] - 31:25, 43:10, 86:22
**realize** [1] - 133:21

**realized** [6] - 91:22, 99:12, 99:14, 130:3, 131:14, 141:18
**realleged** [1] - 7:6
**really** [14] - 6:1, 12:16, 15:21, 18:7, 19:15, 22:1, 22:3, 25:8, 43:12, 43:13, 44:14, 48:18, 54:9, 109:9
**rear** [3] - 69:20, 69:25
**reason** [9] - 5:25, 12:25, 25:13, 45:3, 80:10, 106:9, 111:16, 158:19, 163:22
**reasonable** [2] - 54:19, 54:20
**reasonably** [1] - 14:20
**reasoning** [1] - 40:19
**reasons** [2] - 21:20, 141:18
**receipt** [1] - 47:21
**receive** [7] - 116:7, 121:7, 122:14, 126:21, 162:6, 162:13, 162:14
**received** [14] - 20:8, 20:20, 23:12, 74:10, 74:11, 75:12, 77:7, 96:16, 118:19, 120:2, 122:20, 124:11, 127:3, 142:19
**receiving** [4] - 124:5, 124:6, 127:8
**recently** [1] - 5:5
**recess** [3] - 76:8, 76:10, 76:11
**reckless** [1] - 7:25
**recognize** [1] - 98:24
**recollection** [10] - 93:17, 101:14, 102:16, 130:19, 134:25, 135:9, 135:24, 148:6, 151:10, 161:7
**reconvene** [1] - 76:7
**record** [27] - 3:16, 3:21, 3:25, 4:3, 11:16, 15:9, 15:18, 21:7, 21:14, 21:20, 22:3, 22:18, 23:8, 28:6, 36:23, 40:3, 42:10, 42:20, 43:3, 49:12, 49:25, 57:3, 58:6, 101:6, 140:21, 149:19, 155:16
**recorded** [4] - 46:13, 49:14, 138:21, 145:20

**recording** [14] - 138:23, 139:19, 139:22, 141:1, 148:14, 149:5, 150:21, 151:4, 151:14, 152:4, 157:5, 157:15, 158:1, 158:8
**records** [20] - 12:14, 25:8, 29:22, 31:22, 87:21, 96:1, 96:16, 96:21, 97:3, 97:25, 98:5, 98:9, 98:17, 99:20, 103:2, 106:19, 107:1, 110:8, 110:24, 162:11
**recover** [6] - 66:12, 71:10, 113:19, 117:22, 152:21, 152:22
**recovered** [12] - 32:9, 66:15, 71:10, 71:18, 72:14, 90:25, 91:3, 91:4, 96:14, 98:11, 117:23, 148:3
**recovery** [1] - 71:19
**red** [8] - 61:3, 125:7, 125:9, 125:13, 127:23, 128:1, 128:17, 128:18
**refer** [2] - 81:22, 83:9
**reference** [7] - 7:7, 26:6, 68:4, 99:14, 122:2, 132:22, 153:2
**referenced** [1] - 40:8
**references** [2] - 22:15, 22:16
**referred** [2] - 83:10, 142:3
**referring** [2] - 48:14, 104:11
**reflect** [9] - 3:16, 3:21, 28:6, 49:12, 58:6, 96:17, 97:25, 140:21, 160:4
**reflected** [6] - 99:4, 126:7, 127:11, 128:14, 128:17, 162:24
**refresh** [2] - 93:16, 101:14
**refusing** [2] - 133:11, 133:16
**regard** [3] - 9:9, 41:21, 56:9
**regarding** [1] - 147:5
**register** [8] - 92:4, 92:6, 93:4, 93:25, 102:21, 107:13,

113:25, 114:9
**register/trap** [1] - 106:25
**Registered** [1] - 169:3
**regularly** [2] - 80:7, 81:18
**regulations** [1] - 169:9
**related** [5] - 28:22, 46:5, 83:25, 121:8, 157:19
**relates** [6] - 19:2, 19:23, 20:2, 20:11, 29:24, 37:10
**relating** [3] - 28:14, 32:8, 152:1
**relation** [3] - 6:17, 29:17, 87:12
**relationship** [10] - 78:19, 79:23, 81:11, 81:13, 82:22, 83:15, 83:16, 84:17, 103:4, 146:12
**relative** [1] - 105:20
**relatives** [2] - 75:1, 103:24
**relaxed** [1] - 153:17
**relevant** [8] - 13:22, 24:20, 24:23, 26:22, 27:5, 48:12, 48:17, 154:6
**relies** [1] - 55:5
**rely** [2] - 48:10, 50:17
**relying** [2] - 45:24, 54:25
**remain** [1] - 5:18
**remained** [1] - 145:17
**remaining** [1] - 22:14
**remanded** [1] - 52:12
**remember** [61] - 66:21, 70:20, 70:21, 72:13, 73:9, 75:4, 77:16, 78:22, 78:24, 78:25, 79:5, 79:11, 79:21, 80:8, 84:5, 84:22, 87:16, 89:3, 89:15, 89:16, 91:14, 91:15, 97:12, 98:4, 98:5, 98:19, 100:6, 105:12, 105:13, 109:10, 118:5, 119:13, 129:22, 129:23, 130:14, 131:21, 134:8, 134:15, 135:16, 135:17, 137:12, 138:14, 138:15, 138:16, 144:23, 144:24, 145:10, 145:21, 145:22, 147:5, 147:6, 147:8,

147:16, 148:7, 153:7, 156:25, 159:16, 160:16, 161:9
**remembered** [3] - 98:3, 105:24, 106:10
**remove** [1] - 3:20
**removed** [2] - 145:12, 159:18
**repeating** [1] - 86:20
**rephrase** [1] - 96:19
**report** [8] - 160:3, 160:4, 161:23, 162:8, 162:9, 162:13, 162:14, 162:20
**Reported** [1] - 1:22
**reported** [1] - 169:7
**Reporter** [3] - 1:24, 169:3, 169:17
**REPORTER** [1] - 169:2
**reporter** [1] - 8:23
**reports** [1] - 31:19
**represents** [1] - 125:8
**request** [4] - 9:8, 115:2, 115:4, 115:12
**requested** [1] - 25:7
**requesting** [1] - 116:19
**require** [6] - 3:17, 12:13, 14:23, 36:22, 40:24, 57:8
**required** [1] - 9:11
**requirement** [1] - 32:13
**requirements** [2] - 26:5, 27:11
**requires** [1] - 34:22
**resided** [2] - 32:10, 37:3
**residence** [5] - 15:14, 29:16, 62:16, 64:8, 88:15
**resident** [2] - 130:13, 130:24
**residential** [1] - 61:10
**residents** [2] - 131:9, 133:10
**resolve** [1] - 37:11
**resolved** [1] - 14:19
**respect** [22] - 9:15, 11:17, 12:19, 14:12, 34:23, 34:25, 35:12, 38:7, 40:12, 47:1, 48:11, 51:19, 51:22, 52:6, 53:22, 91:21, 131:7, 133:15, 133:19, 133:22, 149:22, 167:18

**respond** [1] - 61:12
**responded** [5] - 62:9, 63:4, 74:10, 74:12, 87:22
**response** [6] - 12:3, 34:14, 81:1, 86:24, 89:18, 124:19
**responses** [2] - 8:24, 154:4
**responsible** [3] - 94:21, 114:15, 114:21
**rest** [2] - 25:14, 164:7
**resting** [1] - 149:3
**restrained** [2] - 138:2, 145:9
**restroom** [1] - 147:25
**result** [5] - 7:12, 7:20, 8:1, 9:24, 45:25
**resulted** [1] - 7:15
**retained** [1] - 50:16
**retired** [1] - 167:4
**return** [5] - 47:21, 76:25, 134:11, 163:15, 164:5
**returned** [2] - 47:20
**revealed** [1] - 133:7
**review** [14] - 11:23, 12:10, 12:14, 14:15, 16:24, 18:12, 21:4, 24:9, 101:15, 102:18, 106:13, 151:25, 157:18
**reviewed** [10] - 11:21, 98:7, 100:1, 102:19, 103:3, 106:14, 124:4, 138:23, 151:19
**reviewing** [8] - 27:1, 98:17, 102:6, 102:12, 102:23, 102:24, 133:23
**Ricardo** [2] - 3:7, 7:13
**RICARDO** [1] - 1:5
**Richard** [1] - 3:3
**RICHARD** [1] - 1:11
**ride** [2] - 85:8, 85:11
**right-hand** [1] - 134:24
**Rights** [2] - 145:15, 145:24
**rights** [19] - 46:14, 46:15, 49:23, 136:18, 141:2, 142:12, 142:18, 142:21, 142:22, 142:24, 143:16, 143:17, 143:22, 143:23, 143:25, 145:24, 145:25,

151:23, 152:2
**ring** [1] - 81:3
**rise** [2] - 76:9, 168:11
**risk** [1] - 7:23
**Road** [26] - 60:11, 60:13, 60:23, 61:5, 61:23, 62:3, 62:15, 63:5, 63:13, 67:2, 69:20, 72:24, 74:17, 77:20, 84:7, 87:25, 88:12, 89:25, 90:3, 91:1, 103:16, 104:21, 105:3, 105:5, 111:9
**road** [1] - 28:7
**robbery** [1] - 114:20
**role** [2] - 59:19, 129:8
**romantic** [1] - 103:25
**room** [46] - 18:17, 18:21, 46:5, 62:6, 62:19, 62:21, 63:21, 63:25, 64:20, 64:25, 65:25, 66:20, 67:5, 67:8, 67:9, 67:16, 68:1, 68:3, 68:12, 68:13, 68:14, 68:21, 71:1, 81:18, 81:20, 86:8, 86:9, 86:11, 134:23, 135:10, 138:3, 140:3, 144:21, 144:22, 144:25, 145:6, 147:18, 147:22, 152:15, 152:17, 152:22, 153:10, 153:12, 157:3
**rooms** [2] - 137:21
**rotation** [1] - 60:17
**rotation-type** [1] - 60:17
**roughly** [1] - 97:14
**row** [3] - 61:11, 62:18, 75:19
**RPR** [2] - 1:23, 169:16
**Rule** [9] - 9:6, 12:22, 15:19, 16:13, 41:24, 42:2, 42:6, 42:22
**rule** [8] - 24:3, 30:23, 31:25, 35:7, 36:19, 39:5, 39:13, 167:22
**rules** [6] - 12:24, 31:5, 33:25, 41:25, 111:25
**Rules** [3] - 9:6, 12:21, 41:25
**ruling** [6] - 22:13, 33:23, 34:4, 36:22, 37:8, 40:18
**rulings** [2] - 35:11, 40:8
**running** [3] - 54:18,

54:19, 75:20
**runs** [2] - 45:1, 45:2
**rusty** [1] - 126:15

## S

**safer** [4] - 34:9, 36:7, 36:23, 41:24
**safest** [1] - 39:10
**safety** [1] - 45:4
**Samsung** [5] - 18:13, 19:3, 19:14, 19:23, 23:5
**sat** [1] - 131:22
**satisfy** [1] - 26:5
**saw** [12] - 14:1, 54:18, 54:19, 71:15, 74:14, 85:17, 86:10, 98:18, 99:14, 105:9, 110:25, 136:22
**scene** [13] - 61:23, 62:7, 69:24, 70:3, 73:21, 73:25, 74:2, 74:16, 74:25, 75:6, 91:9, 91:16, 134:7
**schedule** [1] - 37:14
**scheduled** [3] - 16:17, 164:6, 166:7
**scheduling** [2] - 164:12, 164:17
**school** [1] - 83:24
**scramble** [2] - 44:14
**screen** [10] - 63:2, 63:6, 63:8, 65:16, 69:7, 98:23, 101:11, 122:4, 150:12, 158:15
**scrolling** [1] - 124:8
**search** [67] - 15:13, 17:20, 17:21, 20:2, 20:9, 20:14, 20:21, 21:6, 23:13, 24:19, 25:8, 26:9, 26:16, 27:4, 29:16, 29:23, 33:15, 35:24, 37:5, 45:5, 45:21, 45:22, 45:23, 45:25, 47:22, 48:20, 50:4, 53:19, 53:21, 54:6, 54:25, 55:3, 55:5, 55:13, 55:15, 55:20, 55:25, 56:2, 56:3, 56:4, 56:5, 74:2, 117:11, 119:6, 120:4, 120:7, 120:13, 120:16, 129:6, 131:1, 131:9, 131:11, 131:13, 131:16, 131:19, 131:23, 131:24, 132:13, 132:22,

133:14, 135:12, 137:2, 156:5, 156:7, 161:5, 161:16, 161:17
**searched** [6] - 47:5, 48:3, 48:25, 73:18, 74:4, 91:1
**searches** [3] - 25:7, 29:18, 167:19
**seated** [3] - 4:21, 11:14, 57:1
**second** [32] - 3:9, 6:22, 8:6, 10:7, 24:10, 35:3, 37:18, 38:3, 49:6, 53:18, 62:20, 62:25, 64:14, 64:19, 67:7, 68:16, 69:2, 81:20, 91:5, 93:9, 99:24, 100:5, 110:11, 114:1, 120:21, 130:21, 132:21, 139:9, 148:17, 149:21, 165:15
**second-to-last** [1] - 114:1
**secondarily** [1] - 49:3
**seconds** [9] - 97:13, 97:14, 116:4, 123:4, 139:2, 148:13, 148:15, 157:2, 157:18
**section** [2] - 115:15, 145:25
**Section** [6] - 6:19, 6:20, 6:25, 7:1
**Sections** [1] - 6:20
**secure** [1] - 45:9
**secured** [4] - 133:12, 136:23, 137:6, 148:9
**securing** [3] - 45:10, 45:17, 134:17
**see** [57] - 4:7, 4:25, 13:5, 13:21, 14:16, 14:22, 39:22, 39:23, 44:5, 61:1, 63:11, 63:14, 63:23, 65:7, 65:21, 67:22, 69:5, 69:8, 69:12, 72:8, 84:11, 86:12, 91:24, 93:8, 103:22, 106:1, 106:15, 110:2, 110:3, 110:12, 110:14, 110:16, 111:6, 112:4, 112:6, 112:24, 123:19, 133:10, 134:20, 135:8, 135:20, 137:17, 137:22, 140:6, 140:14,

141:9, 143:7, 150:5, 150:12, 150:13, 150:14, 157:7, 166:19, 166:25
**seeing** [1] - 65:1
**seeking** [1] - 113:19
**seem** [5] - 16:7, 34:6, 34:8, 35:19, 149:14
**sees** [1] - 44:2
**seize** [2] - 26:9, 27:3
**seized** [14] - 20:3, 20:4, 20:6, 20:22, 23:16, 26:6, 26:21, 27:1, 38:18, 49:6, 50:5, 135:22, 135:25, 161:18
**seizure** [15] - 19:2, 23:10, 55:15, 56:6, 74:2, 117:11, 119:6, 120:4, 120:7, 129:6, 131:11, 132:14, 132:22, 133:14, 161:16
**send** [2] - 115:2, 121:10
**sense** [2] - 119:14, 141:15
**sentence** [11] - 10:19, 11:3, 95:2, 95:10, 108:16, 110:11, 114:1, 133:6, 133:15, 133:17, 133:21
**sentencing** [1] - 163:21
**separate** [6] - 29:7, 29:8, 50:7, 50:20, 94:17, 114:20
**separately** [1] - 29:10
**sergeant** [2] - 118:8, 132:2
**Sergeant** [1] - 118:9
**series** [5] - 15:10, 166:3, 166:13, 166:18, 166:25
**serious** [1] - 7:15
**seriousness** [2] - 5:21, 38:15
**serves** [1] - 100:17
**service** [4] - 95:8, 114:23, 121:15, 121:16
**session** [1] - 3:2
**set** [11] - 6:21, 7:6, 21:20, 26:1, 26:20, 27:11, 28:3, 42:10, 56:19, 96:9, 164:15
**setting** [1] - 149:10
**seven** [2] - 15:8, 27:16
**seven-year-old** [2] -

15:8, 27:16
**sever** [1] - 21:13
**several** [1] - 134:21
**sheet** [15] - 115:11, 117:11, 141:5, 141:6, 141:7, 141:17, 142:3, 142:8, 142:11, 143:11, 145:2, 145:23, 154:12, 154:14, 160:2
**shell** [1] - 71:20, 72:17
**shirt** [4] - 70:5, 70:12, 140:4, 140:12
**shoe** [2] - 46:3, 46:4
**shooting** [1] - 114:19
**Shore** [8] - 27:18, 82:7, 82:20, 85:9, 88:23, 110:20, 111:5
**short** [1] - 26:15
**shot** [1] - 3:23
**shoulder** [1] - 72:9
**show** [18] - 46:1, 49:15, 49:16, 50:14, 54:11, 60:25, 62:2, 62:7, 62:11, 96:2, 115:9, 121:12, 124:19, 128:9, 139:1, 152:22, 159:25, 162:17
**showed** [5] - 91:15, 96:22, 106:11, 106:12, 156:7
**showing** [5] - 63:2, 65:14, 91:15, 141:20, 152:24
**shown** [4] - 13:11, 91:12, 125:4, 125:11
**shows** [4] - 98:5, 121:20, 124:20, 128:18
**side** [9] - 45:19, 64:20, 72:10, 90:1, 105:19, 105:20, 126:4, 134:24
**sign** [6] - 109:7, 109:10, 144:18, 145:11, 145:13, 145:15
**signal** [9] - 116:12, 118:18, 119:18, 121:9, 121:21, 130:5, 130:8, 131:14, 131:17
**signature** [1] - 93:2, 94:11, 108:6, 108:15, 143:14, 143:18, 144:6, 144:7, 144:11, 144:14, 152:8

**signed** [19] - 20:8, 20:21, 23:12, 92:21, 93:1, 94:13, 102:25, 108:13, 109:4, 109:7, 117:13, 134:2, 134:9, 135:1, 144:6, 144:12, 145:25, 161:8, 161:16
**significant** [1] - 75:21
**signs** [3] - 46:14, 70:17, 70:19
**similar** [1] - 103:15
**similarly** [3] - 27:3, 36:13, 108:10
**simply** [1] - 73:20
**sink** [1] - 65:23
**sister** [2] - 75:2, 79:12
**site** [2] - 92:8, 107:18
**sitting** [1] - 166:15
**six** [9] - 14:13, 48:15, 48:18, 59:5, 59:7, 148:13, 148:15, 165:5, 165:8
**six-count** [1] - 14:13
**six-year** [1] - 48:15
**sixth** [1] - 21:24
**slams** [1] - 45:2
**sleep** [1] - 89:22
**sleeping** [1] - 83:2
**small** [1] - 25:1
**smartphone** [6] - 23:13, 90:23, 90:24, 91:21, 96:12, 99:19
**snow** [1] - 150:11
**so..** [1] - 41:4
**social** [3] - 80:10, 82:22, 95:21
**socially** [1] - 79:24, 84:14
**someone** [12] - 33:19, 35:11, 36:24, 37:8, 42:15, 44:18, 54:18, 70:7, 87:19, 111:19, 160:20
**sometime** [4] - 19:20, 51:11, 100:18, 166:20
**sometimes** [2] - 34:12, 115:6
**somewhat** [4] - 12:16, 65:3, 65:4, 103:25
**somewhere** [1] - 88:3
**son** [7] - 15:8, 27:16, 43:14, 59:24, 68:16, 77:8, 115:21
**sorry** [55] - 8:13, 18:22, 20:17, 22:21, 47:13, 51:3, 59:6, 65:4, 65:5, 71:22,

73:11, 78:15, 82:7, 83:23, 91:7, 95:9, 96:3, 96:4, 96:18, 97:5, 101:19, 101:21, 101:23, 104:12, 104:25, 105:11, 107:5, 110:2, 114:18, 117:6, 117:16, 118:12, 119:9, 122:5, 122:9, 122:16, 123:7, 123:9, 126:15, 131:5, 131:23, 132:16, 135:3, 139:5, 139:6, 141:22, 142:24, 146:21, 147:20, 148:23, 150:8, 162:1, 164:20, 164:21

**Sorry** [1] - 76:14
**sort** [17] - 30:17, 45:4, 45:6, 46:22, 50:8, 51:14, 51:16, 66:7, 67:12, 67:15, 69:22, 77:7, 93:5, 125:14, 129:12, 135:20, 154:13
**sound** [3] - 61:18, 148:20, 148:21
**sounds** [1] - 77:8
**sources** [1] - 28:5
**southern** [2] - 61:20
**southwest** [3] - 60:11, 60:24, 61:8
**southwestern** [2] - 59:4, 60:9
**space** [1] - 108:15
**spaced** [2] - 95:3, 109:21
**span** [1] - 59:20
**speaking** [14] - 3:20, 57:1, 58:8, 80:7, 105:14, 110:17, 113:14, 113:15, 141:10, 141:14, 150:23, 156:24
**Special** [5] - 1:20, 4:6, 20:7, 20:15, 23:11
**special** [3] - 6:13, 7:4, 10:13
**specialized** [1] - 114:18
**specific** [4] - 18:5, 25:4, 136:2, 161:7
**specifically** [11] - 6:14, 7:22, 8:4, 12:22, 29:24, 42:1, 42:6, 101:20,

119:12, 147:4, 159:4
**spell** [1] - 57:3
**spelling** [1] - 18:21
**spend** [2] - 104:1, 104:2
**spending** [1] - 85:5
**spent** [1] - 105:23
**Spider** [1] - 69:18
**Spider-Man** [1] - 69:18
**split** [1] - 167:19
**spoken** [5] - 77:13, 79:25, 103:3, 110:10, 113:11
**spring** [2] - 71:17, 73:6
**squad** [2] - 59:16, 74:1
**stairs** [4] - 68:3, 68:7, 68:11, 134:17
**stairwell** [3] - 62:20, 64:14, 64:18
**stand** [11] - 34:2, 36:3, 40:5, 56:21, 58:9, 73:23, 76:16, 79:14, 99:17, 164:5, 164:9
**standard** [2] - 38:6, 144:25
**standing** [15] - 3:16, 5:18, 32:8, 37:4, 37:10, 38:10, 40:2, 46:7, 46:25, 55:4, 55:8, 55:13, 55:14, 57:7
**stands** [2] - 76:8, 168:10
**start** [13] - 22:10, 41:16, 51:15, 53:10, 127:7, 138:11, 163:19, 163:22, 164:6, 165:25, 166:11, 168:3, 168:7
**started** [4] - 14:21, 30:21, 41:7, 163:25
**starting** [11] - 40:4, 93:9, 95:4, 95:11, 108:17, 115:17, 126:10, 133:5, 139:2, 148:13, 166:13
**state** [4] - 52:7, 57:2, 70:23, 143:24
**statement** [15] - 9:12, 41:20, 41:21, 46:18, 47:2, 47:3, 51:17, 51:21, 106:17, 133:2, 134:1, 143:3, 143:14, 143:18, 145:23
**statements** [6] - 29:21, 40:5, 43:6,

144:3, 154:21, 167:20
**States** [11] - 3:7, 4:5, 6:19, 6:25, 7:1, 11:19, 50:12, 169:4, 169:10
**STATES** [2] - 1:1, 1:3
**station** [3] - 55:19, 55:23, 55:24
**status** [2] - 4:1, 35:10
**stayed** [2] - 81:21, 135:5
**staying** [1] - 81:16
**stenographically** [1] - 169:7
**stenographically-reported** [1] - 169:7
**step** [3] - 32:17, 32:18, 139:12
**stepped** [2] - 152:14, 152:17
**stepping** [1] - 82:14
**steps** [13] - 44:23, 62:24, 63:1, 67:7, 67:8, 67:21, 67:24, 75:21, 81:19, 91:20, 130:20, 134:15
**Steve** [1] - 165:22
**Steven** [1] - 165:17
**still** [9] - 17:20, 18:4, 26:17, 44:16, 77:2, 130:5, 130:8, 130:19, 131:17
**stipulate** [1] - 140:18
**stipulated** [1] - 140:20
**stood** [5] - 69:23, 70:3, 100:8, 100:14, 102:9
**stop** [8] - 53:18, 56:15, 76:3, 87:7, 139:13, 151:8, 151:10, 163:14
**stopped** [1] - 88:2
**stopping** [1] - 158:17
**store** [6] - 105:21, 105:25, 106:3, 106:6, 106:10, 106:11
**story** [2] - 61:10, 62:18
**straight** [3] - 62:21, 76:24, 81:2
**street** [3] - 84:5, 105:1, 128:5
**Street** [6] - 1:24, 77:23, 79:12, 81:6, 110:17, 110:23
**stricken** [1] - 149:20
**strike** [1] - 149:19
**strong** [4] - 118:18,

130:5, 130:8, 131:17
**studying** [1] - 24:17
**stuff** [3] - 147:8, 147:11, 147:12
**subject** [7] - 16:24, 17:6, 17:23, 26:23, 35:7, 42:8, 45:22
**submit** [4] - 16:5, 24:8, 25:14, 108:11
**submitted** [3] - 11:23, 22:11, 151:21
**submitting** [1] - 116:7
**subparts** [1] - 7:2
**subscribed** [4] - 97:9, 107:4, 108:19, 123:1
**subscriber** [1] - 126:20
**subsequent** [2] - 21:23, 48:20
**subsequently** [8] - 45:21, 46:8, 46:11, 74:3, 74:4, 116:7, 129:1, 145:3
**substance** [5] - 29:9, 77:6, 79:15, 102:2, 122:20
**substantial** [1] - 50:21
**substantive** [1] - 22:14
**success** [1] - 54:7
**suddenly** [4] - 35:11, 36:24, 40:5, 40:9
**sufficient** [1] - 35:5
**suggest** [8] - 24:16, 24:22, 25:3, 25:12, 55:4, 165:25, 166:2, 166:12
**suggested** [2] - 41:18, 166:4
**suggestion** [1] - 166:17
**suggests** [2] - 26:17, 44:10
**suitcase** [1] - 50:12
**summarily** [1] - 34:7
**summarize** [4] - 12:12, 14:17, 29:14, 124:14
**summarized** [4] - 8:7, 23:23, 30:1, 30:4
**superseding** [18] - 3:9, 3:10, 3:13, 3:14, 5:19, 5:22, 6:5, 6:12, 6:14, 6:23, 7:3, 7:5, 7:8, 8:6, 9:16, 10:7, 14:13
**supervisor** [2] - 118:13, 160:19
**supervisors** [1] - 136:13

**supplemental** [1] - 29:18
**supplemented** [1] - 15:14
**support** [1] - 94:8
**supposed** [2] - 44:5, 109:8
**suppress** [12] - 15:13, 18:10, 19:1, 19:23, 20:1, 21:25, 23:8, 29:16, 29:18, 29:21, 29:22, 29:23
**suppression** [2] - 15:1, 38:9
**surprise** [1] - 44:17
**surprises** [1] - 167:2
**surveillance** [1] - 105:15
**suspect** [3] - 95:13, 95:18, 115:22
**suspected** [10] - 26:6, 26:13, 45:25, 46:2, 73:7, 73:10, 135:16, 135:17, 135:19, 136:6
**suspects** [2] - 95:7, 115:22
**sustained** [1] - 111:25
**swab** [2] - 156:18, 156:23
**swabbing** [1] - 156:22
**swabs** [4] - 117:22, 156:6, 156:16, 156:17
**SWAT** [7] - 120:7, 120:9, 120:11, 129:15, 129:16, 130:7, 130:25
**swear** [3] - 109:2, 109:3
**swearing** [2] - 109:5, 109:8
**sweep** [3] - 45:17, 54:21, 54:23
**swirling** [1] - 157:13
**switch** [1] - 57:19
**sworn** [6] - 35:1, 56:20, 56:23, 108:17, 108:19, 108:22
**system** [2] - 50:2, 148:16

---

# T

**T-Mobile** [2] - 122:6, 126:10
**T-shirt** [2] - 70:5, 70:12
**table** [3] - 58:9,

134:24, 157:11
**tables** [1] - 58:8
**target** [5] - 96:11,
108:4, 109:24,
115:17, 115:19
**task** [2] - 160:5, 160:6
**team** [14] - 119:19,
120:7, 120:11,
129:12, 129:16,
130:4, 130:6, 130:7,
130:25, 134:8, 135:5
**Team** [9] - 114:11,
114:13, 115:1,
115:12, 115:13,
118:9, 118:13,
119:16, 133:13
**teams** [1] - 120:9
**technical** [2] - 148:17,
148:19
**Technical** [11] -
114:11, 114:13,
115:1, 115:12,
115:13, 118:9,
118:12, 119:16,
133:13, 148:25,
149:15
**technology** [2] - 44:9,
149:22
**telephone** [3] - 20:18,
23:10, 47:23
**ten** [11] - 20:16, 26:15,
41:11, 47:24, 56:14,
56:15, 59:3, 61:7,
76:4, 164:23, 164:25
**ten-day** [1] - 26:15
**Teresa** [2] - 1:16, 4:23
**term** [5] - 62:22,
69:15, 79:3, 116:11,
119:17
**terminated** [1] - 95:8
**terms** [39] - 9:5, 11:23,
12:23, 14:24, 20:25,
22:4, 23:19, 28:18,
31:7, 31:23, 33:23,
34:4, 34:7, 35:21,
35:22, 36:3, 37:1,
38:15, 38:23, 38:24,
39:7, 39:11, 41:2,
42:3, 42:14, 48:15,
51:1, 51:4, 51:20,
52:15, 58:10, 76:18,
104:4, 106:1,
123:13, 146:9,
159:18, 161:15,
166:3
**testified** [20] - 34:11,
36:2, 56:24, 63:20,
65:15, 66:18, 66:24,
77:5, 84:16, 84:24,
102:4, 105:4, 111:8,

119:21, 124:11,
125:20, 128:25,
152:14, 154:21,
155:10
**testifies** [1] - 11:20
**testify** [10] - 14:2,
31:13, 31:18, 34:10,
36:8, 36:10, 41:2,
42:14, 48:4, 48:6
**testifying** [3] - 38:25,
42:7, 120:22
**testimony** [34] - 14:24,
15:16, 30:13, 31:12,
32:7, 32:11, 34:8,
34:19, 34:23, 35:1,
35:4, 35:6, 35:8,
36:13, 38:2, 38:3,
38:23, 38:24, 39:2,
39:6, 39:12, 40:6,
40:23, 42:16, 42:18,
44:15, 54:17, 76:5,
78:16, 97:23,
138:24, 151:19,
164:7
**text** [13] - 26:22,
26:24, 26:25, 27:2,
92:9, 95:20, 95:22,
98:16, 98:21, 100:3,
100:14, 101:20,
113:22
**TFO** [2] - 48:4, 48:5
**THE** [196] - 1:1, 1:1,
1:11, 3:2, 3:4, 3:6,
4:7, 4:12, 4:16, 4:19,
4:25, 5:4, 5:8, 5:11,
5:13, 5:14, 5:15,
5:16, 5:24, 6:11,
8:10, 8:12, 8:13,
8:15, 8:16, 8:19,
8:20, 9:1, 9:2, 9:4,
9:5, 9:14, 9:15, 9:20,
10:2, 10:5, 10:10,
10:14, 10:21, 10:22,
10:25, 11:5, 11:6,
11:9, 11:13, 12:5,
12:8, 13:13, 14:4,
14:8, 16:6, 16:16,
16:23, 17:3, 17:18,
17:22, 18:2, 18:17,
18:20, 19:12, 19:16,
19:19, 20:17, 21:5,
21:9, 21:18, 22:7,
22:9, 22:24, 23:1,
23:5, 23:21, 24:1,
25:15, 25:19, 25:21,
25:23, 27:13, 27:20,
28:1, 28:6, 28:13,
28:16, 28:24, 29:4,
29:13, 30:4, 30:7,
30:18, 31:5, 31:10,

31:15, 31:21, 32:6,
32:17, 33:3, 33:6,
33:11, 34:21, 35:9,
36:15, 36:17, 37:21,
38:21, 39:22, 40:21,
41:6, 41:10, 42:25,
43:3, 45:13, 46:9,
47:9, 47:15, 47:22,
47:25, 48:14, 48:20,
51:1, 51:4, 51:7,
51:18, 52:20, 52:22,
53:5, 53:18, 53:21,
54:2, 54:4, 55:9,
56:11, 56:20, 56:21,
56:25, 57:1, 57:4,
57:6, 57:14, 57:15,
57:17, 57:18, 57:21,
57:23, 58:2, 58:6,
76:3, 76:9, 76:12,
76:14, 76:22, 76:23,
101:6, 101:11,
111:25, 139:5,
139:8, 139:11,
139:14, 139:18,
140:20, 141:22,
147:20, 148:18,
148:20, 149:2,
149:6, 149:12,
149:18, 149:25,
150:6, 150:8,
150:10, 150:11,
150:13, 150:14,
150:16, 150:17,
150:18, 163:13,
164:2, 164:10,
164:11, 164:20,
164:24, 165:2,
165:7, 165:12,
165:15, 165:19,
166:24, 167:8,
167:16, 167:21,
167:25, 168:7,
168:11
**themselves** [3] - 3:25,
4:2, 90:14
**theory** [1] - 69:22
**therefore** [5] - 95:11,
95:13, 113:17,
114:2, 114:3
**thereof** [1] - 36:5
**they've** [3] - 47:17,
55:22, 57:11
**thinking** [1] - 16:18
**third** [23] - 3:10, 3:12,
5:19, 6:5, 6:11, 6:14,
7:3, 7:5, 7:8, 8:8,
9:16, 14:13, 18:24,
20:2, 20:19, 29:19,
54:9, 66:10, 69:10,
81:14, 150:4,

166:20, 166:21
**Thomas** [1] - 20:8
**thorough** [1] - 74:4
**thoughts** [2] - 14:12,
53:9
**threatened** [2] - 144:4,
155:22
**three** [11] - 18:11,
20:19, 25:4, 27:1,
44:22, 66:14, 66:17,
67:3, 83:11, 138:12
**throughout** [2] -
66:20, 75:25
**throw** [2] - 14:11,
36:17
**Thursday** [2] - 60:5,
97:21
**timely** [1] - 50:4
**tip** [1] - 156:16
**Title** [1] - 6:21
**title** [1] - 58:23
**today** [18] - 3:15,
13:19, 21:1, 22:4,
22:17, 29:15, 31:13,
36:8, 36:11, 39:2,
48:9, 73:13, 138:24,
140:14, 149:1,
151:19, 164:15,
167:15
**today's** [1] - 19:20
**together** [6] - 29:19,
49:25, 79:16,
110:21, 166:18,
166:24
**tomorrow** [18] - 13:20,
36:9, 36:11, 39:3,
163:18, 163:20,
164:5, 164:9,
164:15, 165:2,
165:4, 165:9, 166:1,
166:2, 166:5,
166:20, 167:11,
168:3
**Tony** [7] - 83:4, 83:6,
83:15, 83:25, 84:10,
100:7, 102:5
**took** [5] - 25:10, 99:5,
131:10, 144:21,
145:14
**top** [12] - 63:1, 67:8,
67:15, 67:21, 67:24,
68:3, 69:4, 110:11,
115:25, 137:12,
142:17, 145:24
**topic** [1] - 42:14
**topics** [1] - 146:9
**total** [1] - 54:10
**totality** [1] - 111:1
**touch** [1] - 149:8
**toward** [1] - 158:17

**towards** [4] - 66:8,
68:9, 153:14, 156:3
**tower** [2] - 52:7, 52:8
**town** [2] - 105:20
**toys** [2] - 67:11, 69:14
**trace** [12] - 92:4, 92:5,
92:7, 93:4, 93:25,
94:17, 96:1, 96:5,
106:25, 107:13
**track** [3] - 50:22,
51:25, 114:16
**tracking** [20] - 43:18,
51:1, 51:4, 51:7,
51:22, 51:25, 52:1,
52:2, 52:6, 52:15,
52:18, 53:12, 53:22,
53:23, 54:5, 107:20,
109:20, 114:10,
115:3, 120:25
**trafficking** [3] - 6:17,
79:24, 147:1
**training** [2] - 95:6,
160:25
**transactions** [1] -
82:19
**transcript** [8] - 31:16,
151:20, 152:1,
157:19, 157:24,
169:6, 169:8
**Transcript** [1] - 1:8
**transcripts** [1] - 32:2
**transmitting** [1] -
121:21
**transported** [5] - 75:7,
75:8, 75:9, 75:18,
136:25
**trap** [9] - 92:4, 92:6,
93:4, 93:25, 94:17,
96:1, 96:5, 107:13
**treat** [1] - 16:23
**tree** [1] - 20:25
**trial** [15] - 13:4, 13:21,
16:16, 31:23, 32:16,
32:20, 34:2, 35:11,
36:18, 37:12, 40:4,
40:10, 57:10, 78:17,
166:11
**tried** [3] - 47:8, 80:22,
93:20
**trouble** [1] - 96:19
**true** [4] - 106:1, 109:9,
133:17, 169:6
**truncating** [1] - 33:8
**trusty** [1] - 6:2
**try** [2] - 163:19, 165:4
**trying** [9] - 20:11,
36:19, 40:3, 80:11,
81:13, 112:5,
130:25, 132:21,
156:19

tucked [1] - 46:3
Tuesday [13] - 80:3,
80:13, 82:7, 82:8,
82:9, 82:13, 84:25,
85:14, 85:17, 85:20,
110:18, 113:4,
146:15
turn [4] - 67:12,
109:19, 122:17,
157:1
turned [2] - 12:14,
12:17
turning [12] - 66:24,
93:8, 94:3, 102:20,
109:14, 113:25,
124:22, 125:11,
126:9, 126:24,
128:8, 128:24
turns [1] - 34:12
Twenty [1] - 58:22
Twenty-four [1] -
58:22
two [28] - 24:6, 26:25,
29:19, 32:10, 34:16,
44:1, 44:22, 46:5,
61:10, 61:25, 62:18,
75:9, 90:7, 90:15,
90:17, 94:3, 96:18,
97:12, 97:14, 98:16,
99:9, 112:15, 113:7,
113:8, 114:6,
117:25, 147:14,
159:17
two-hour [1] - 147:14
two-story [2] - 61:10,
62:18
type [8] - 25:12, 60:17,
95:19, 122:20,
140:9, 140:10,
153:24, 162:20
types [1] - 26:21
typically [6] - 34:24,
75:20, 92:7, 95:7,
115:7, 121:22

## U

U-turn [1] - 67:12
U.S [2] - 20:8, 23:12
U.S.C [1] - 169:5
ultimately [10] - 28:7,
35:23, 45:20, 45:23,
51:1, 51:5, 88:1,
118:22, 134:2,
159:22
unaware [2] - 49:19,
115:21
uncertainty [3] -
123:19, 123:22,
127:16

unclear [1] - 51:11
under [21] - 9:6, 12:21,
31:6, 34:11, 38:25,
42:2, 42:6, 42:16,
45:18, 48:19, 73:5,
77:2, 78:12, 97:12,
97:14, 122:7,
141:13, 154:8,
154:25, 155:5, 160:4
underlying [4] - 16:2,
28:18, 121:15,
121:16
underneath [5] -
45:11, 50:23, 71:13,
162:23, 163:2
understood [7] - 13:6,
13:17, 38:6, 42:5,
43:4, 103:23, 141:19
underwear [2] - 70:5,
70:12
unfortunately [1] -
161:21
uniform [2] - 59:5,
59:6
unit [7] - 58:25, 59:7,
60:7, 75:10, 114:17,
114:18, 114:20
United [1] - 3:6, 4:5,
6:19, 6:24, 6:25, 7:1,
11:19, 50:11, 169:4,
169:10
UNITED [2] - 1:1, 1:3
unlawful [1] - 56:7
unlocked [5] - 70:1,
70:15, 70:21, 74:22
unquote [2] - 65:12,
82:5
unrelated [1] - 78:12
unusual [2] - 75:22,
76:1
up [61] - 6:1, 13:12,
14:1, 27:15, 37:4,
38:23, 45:11, 49:15,
54:8, 54:13, 56:19,
60:8, 60:15, 60:18,
61:3, 61:23, 62:2,
62:23, 63:9, 64:19,
66:25, 67:7, 69:4,
75:20, 81:19, 88:6,
88:8, 89:21, 92:1,
94:15, 98:5, 102:22,
106:22, 107:25,
111:2, 112:12,
117:9, 118:12,
121:17, 125:3,
127:21, 128:16,
128:20, 129:5,
130:6, 130:9,
130:20, 132:11,
134:15, 142:16,

148:10, 149:3,
149:7, 149:24,
158:12, 160:16,
166:13, 166:18,
167:7, 167:19,
167:23
uplands [1] - 61:17
Upmanor [28] - 60:11,
60:13, 60:23, 61:5,
61:23, 62:2, 62:3,
62:5, 62:15, 63:4,
63:13, 67:2, 69:20,
72:24, 73:22, 74:17,
77:20, 84:7, 87:20,
87:25, 88:12, 90:3,
91:1, 103:16,
104:20, 105:3,
105:5, 111:9
upper [1] - 125:15
upset [4] - 74:15,
89:18, 103:21,
103:23
upstairs [2] - 66:24,
74:14
useful [1] - 42:4
useless [2] - 149:16,
149:20
uses [1] - 119:19

## V

vaccinated [10] - 3:22,
4:10, 4:14, 4:17, 5:6,
5:9, 5:14, 57:12,
57:13, 58:4
vaccination [1] - 4:1
vacuum [2] - 32:1,
40:3
value [3] - 50:15,
50:18, 50:21
vehicle [1] - 136:23
vehicles [1] - 134:17
Vernon [4] - 62:14,
99:3, 101:8, 167:4
versus [2] - 11:19,
149:10
VGA [1] - 149:10
via [3] - 93:12, 110:4,
115:6
victim [21] - 7:10,
7:12, 7:14, 7:16,
7:20, 8:1, 68:16,
69:2, 95:18, 95:24,
110:2, 110:3, 110:4,
110:7, 110:12,
110:16, 112:4,
112:7, 113:1,
115:20, 117:21
victim's [8] - 44:4,
95:16, 110:3, 110:6,

110:8, 110:13,
110:16, 112:25
victims [4] - 61:24,
61:25, 62:12, 100:21
victims' [1] - 71:21
Video [2] - 157:15,
158:1
video [22] - 46:13,
69:14, 105:14,
138:23, 139:18,
139:22, 139:25,
141:1, 144:20,
148:14, 150:21,
150:24, 151:4,
151:14, 151:17,
151:25, 152:4,
152:6, 156:13,
157:5, 157:8, 158:8
video-recorded [1] -
46:13
view [43] - 9:21, 11:7,
13:7, 13:16, 13:23,
16:7, 19:7, 19:13,
21:15, 22:5, 22:7,
30:2, 30:14, 33:9,
36:7, 37:24, 40:2,
40:15, 40:16, 41:8,
42:21, 42:22, 42:25,
53:8, 63:13, 63:18,
64:17, 64:18, 64:23,
65:21, 66:7, 66:10,
67:19, 67:20, 67:23,
68:2, 68:25, 76:17,
98:15, 105:14,
111:19, 167:14,
167:17
viewed [1] - 110:24
Village [8] - 61:18,
61:19, 61:20
violation [4] - 6:18,
6:24, 28:9, 28:13
violence [2] - 6:18,
7:22
violent [1] - 120:5
virtual [1] - 41:14
vital [2] - 113:18,
114:4
voicemail [1] - 81:2
voir [2] - 166:8, 166:10
voluntary [2] - 47:2,
144:3
vs [2] - 1:4, 3:7

## W

wait [7] - 13:5, 13:21,
16:9, 24:4, 39:22,
40:10, 150:16
waiting [2] - 76:14,
138:3

waive [1] - 6:9
waiver [2] - 143:23,
145:25
waives [2] - 46:15,
46:18
walk [11] - 62:15,
62:17, 62:18, 62:21,
62:24, 63:20, 64:25,
65:7, 69:21, 69:23,
73:20
walk-through [2] -
69:21, 69:23
walk-thru [1] - 73:20
walked [7] - 62:6,
64:13, 66:25, 73:19,
105:18, 105:21,
135:20
walking [4] - 73:18,
105:7, 106:2, 106:5
wall [3] - 3:21, 64:7,
66:16
walls [2] - 77:9,
144:22
wants [2] - 49:23, 50:2
warrant [103] - 19:11,
20:8, 20:14, 20:20,
21:7, 23:12, 23:15,
24:8, 24:9, 24:10,
25:4, 25:12, 26:4,
26:10, 26:16, 43:19,
43:21, 43:24, 44:11,
44:13, 45:5, 45:21,
45:22, 45:23, 47:3,
47:7, 47:8, 47:9,
48:5, 48:7, 48:8,
48:21, 48:25, 49:1,
49:20, 51:24, 51:25,
52:1, 52:17, 52:24,
53:1, 53:12, 53:14,
53:17, 53:18, 53:19,
53:21, 54:7, 54:25,
55:20, 55:25, 56:2,
56:3, 56:5, 74:2,
74:5, 117:5, 117:12,
118:1, 119:6, 120:4,
120:14, 120:16,
120:22, 129:1,
129:4, 129:6,
129:10, 131:11,
131:16, 131:20,
131:23, 131:24,
132:10, 132:14,
132:22, 132:24,
133:5, 133:14,
134:2, 134:5, 134:9,
135:1, 135:2, 135:8,
156:5, 156:8,
156:15, 159:4,
159:7, 159:9,
159:11, 161:5,

161:8, 161:9,
161:11, 161:12,
161:16, 161:17,
161:20
**warrants** [8] - 24:19,
35:24, 43:17, 47:18,
53:16, 120:7, 135:6,
161:15
**watch** [1] - 137:20
**water** [3] - 107:6,
156:20, 156:21
**waters** [1] - 36:24
**ways** [1] - 50:1
**weapons** [2] - 45:18,
104:18
**wearing** [2] - 3:17,
3:24
**Weaver** [9] - 1:20, 4:6,
4:8, 4:16, 19:21,
20:7, 20:15, 20:20,
23:11
**WEAVER** [1] - 4:18
**Wednesday** [15] - 1:8,
16:18, 80:22, 87:18,
89:21, 89:22, 93:18,
96:23, 97:18,
101:25, 110:18,
111:10, 146:15,
146:24, 166:7
**Wednesdays** [1] -
41:14
**week** [4] - 12:16, 60:4,
166:13, 166:16
**weight** [2] - 34:17,
35:1
**wellness** [1] - 77:7
**West** [1] - 166:16
**west** [1] - 90:1
**WHALEN** [47] - 4:23,
5:7, 13:24, 14:7,
16:22, 17:16, 17:19,
18:1, 18:16, 19:14,
21:3, 21:8, 21:17,
22:8, 23:20, 23:25,
24:6, 25:18, 25:20,
25:22, 28:21, 29:2,
30:6, 30:22, 31:8,
31:11, 31:17, 33:2,
33:4, 33:7, 39:20,
40:17, 41:5, 41:9,
43:2, 53:11, 53:20,
54:1, 54:3, 54:5,
55:12, 111:24,
148:23, 149:24,
150:3, 167:18,
167:24
**Whalen** [30] - 1:16,
4:23, 4:25, 5:6, 8:17,
13:16, 16:7, 16:21,
17:12, 19:13, 20:24,

21:16, 22:7, 23:18,
23:24, 25:15, 27:14,
28:17, 30:4, 30:20,
32:18, 38:23, 39:16,
41:6, 43:1, 51:20,
53:7, 56:11, 150:2,
167:12
**whatsoever** [1] - 81:1
**whereabouts** [5] -
118:20, 119:7,
119:11, 146:15,
154:21
**white** [6] - 64:10,
68:22, 83:14, 86:10,
140:12
**whole** [1] - 25:10
**Wilder** [11] - 74:10,
75:2, 75:8, 76:2,
77:6, 77:12, 79:11,
91:8, 91:9, 91:16,
93:11
**William** [2] - 1:17, 5:2
**Williams** [1] - 78:4
**willing** [1] - 143:25
**window** [1] - 144:24
**windows** [3] - 70:17,
70:20, 144:23
**wish** [1] - 109:6
**withdraw** [1] - 112:11
**withdrawing** [1] -
40:20
**witness** [26] - 4:20,
6:23, 11:20, 11:21,
25:6, 32:13, 34:1,
34:2, 35:16, 36:1,
36:3, 39:16, 40:5,
40:13, 56:13, 56:16,
76:16, 91:17, 101:6,
140:21, 150:8,
164:5, 164:8,
164:14, 167:2,
167:22
**WITNESS** [11] - 56:25,
57:4, 57:14, 57:17,
101:11, 150:6,
150:8, 150:11,
150:14, 150:17,
164:10
**witness's** [3] - 35:7,
38:2, 38:3
**witnessed** [1] - 144:11
**witnesses** [13] - 3:19,
31:4, 34:7, 34:24,
38:11, 38:12, 57:10,
91:17, 164:24,
164:25, 165:6, 165:8
**witnessing** [1] - 152:8
**woke** [1] - 88:8
**woman** [1] - 44:19
**word** [1] - 23:14

**worded** [1] - 17:1
**words** [7] - 54:12,
60:20, 64:21, 94:24,
114:23, 124:1, 154:6
**workable** [1] - 76:20
**works** [1] - 77:1
**worn** [1] - 57:8
**worried** [2] - 75:22,
76:2
**wound** [4] - 72:9,
72:10, 72:11
**wounds** [5] - 71:24,
71:25, 72:2, 72:7,
72:13
**woven** [2] - 29:5,
29:19
**wrist** [1] - 72:3
**write** [1] - 93:10
**writing** [1] - 98:19
**written** [3] - 32:5,
115:16, 142:14
**wrote** [11] - 98:22,
99:18, 100:3,
100:25, 101:16,
110:12, 110:15,
112:23, 112:24,
113:8, 113:10

## Y

**yard** [1] - 75:4
**year** [5] - 15:8, 27:16,
28:9, 48:15, 115:21
**years** [15] - 7:11, 8:2,
24:14, 24:21, 42:4,
48:18, 58:22, 59:3,
59:5, 59:6, 59:7,
59:8, 59:12, 61:7,
120:24
**yellow** [1] - 140:5
**you-all** [4] - 4:21,
166:12, 166:17,
166:24
**young** [3] - 77:24,
83:19, 85:23
**younger** [1] - 5:5
**youngest** [2] - 18:17,
18:20
**yourself** [2] - 74:19,
160:24

## Z

**Zack** [2] - 83:13
**zero** [2] - 30:9, 139:2
**zone** [2] - 123:5, 162:3
**zoomed** [1] - 125:14

## §

**§** [1] - 169:5