```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
2                         NORTHERN DIVISION

3
     UNITED STATES OF AMERICA,)
4           Plaintiff,        )   CRIMINAL CASE NO.
                              )
5           vs.               )   RDB-20-139
                              )
6    ANDRE RICARDO BRISCOE,    )   MOTIONS HEARING – DAY 3
            Defendant.        )   12:13 p.m.
7    _____)

8                      Transcript of Proceedings
                     Wednesday, January 26, 2022
9                          Courtroom 5D
                        Baltimore, Maryland
10

11   BEFORE:  THE HONORABLE RICHARD D. BENNETT, Judge

12   For the Plaintiff:

13     Dana Brusca, AUSA

14     Paul Budlow, AUSA

15
     For the Defendant:
16
       Teresa Whalen, Esq.
17
       William B. Purpura, Jr., Esq.
18

19   Also Present:

20   Javon Weaver, Special Agent – ATF

21   _____

22
                          Reported by:
23
                      Melissa L. Clark, RPR
24              Federal Official Court Reporter
                101 W. Lombard Street, 4th Floor
25                Baltimore, Maryland  21201
                        410-962-4474
```

**P R O C E E D I N G S**

**THE COURT:**  Good afternoon, everyone.  This is calling the matter of the continued motions hearing in the matter of United States versus Andre Briscoe, Criminal No. RDB-20-139.  We have conducted two days of motions hearings thus far on January 19th and 20th, and we're now here today proceeding as well.

As I've already previously indicated, the masking rules of this Court requires masks be worn in all public areas with the exception of the courtroom in the discretion of the presiding judge.  I have been fully vaccinated and boosted, and I'm behind a wall of plexiglas up here on the bench.  Just show I've already previously inquired of counsel of their vaccination status and they've all previously indicated that they've been vaccinated, and so we will proceed accordingly.

I would note that we'll go until, like, around ten after 1:00 today and we'll stop for lunch and we'll start again a quarter after 2:00, and then we can go as late as you want to continue with this.  And I apologize we're running a little bit late here.

So with that, if counsel would identify themselves on behalf of the government.

**MS. BRUSCA:**  Thank you, Your Honor.  Dana Brusca and my colleague Paul Budlow on behalf of the United States with Special Agent Weaver as well.

```
 1          THE COURT:  Yes, Ms. Brusca.  Nice to see you and
 2  good morning or good afternoon to all of you.
 3      And on behalf of the defendant?
 4          MS. WHALEN:  Teresa Whalen here on behalf of
 5  Mr. Briscoe.
 6          MR. PURPURA:  Your Honor, William Purpura also on
 7  behalf of Mr. Briscoe.
 8          THE COURT:  Yes, nice to see both of you.
 9  Ms. Whalen, I don't think you're coming in on the microphone
10  for some reason.  Your microphone is dead.
11      And finally, last but not least, good afternoon to you,
12  Mr. Briscoe.
13          THE DEFENDANT:  Good afternoon, Your Honor.
14          THE COURT:  Good afternoon to you, sir.
15      So with that, we are ready to proceed with the next
16  government witness.  Who will the witness be, Mr. Budlow?
17          MS. BRUSCA:  Your Honor, the witness is task force
18  officer David Azur, A-z-u-r.
19          THE COURT:  All right.  Thank you very much.
20          THE CLERK:  Sir, please remain standing and raise
21  your right hand.
22      DAVID AZUR, having been duly sworn, was examined and
23  testified as follows:
24          THE WITNESS:  Yes, ma'am, I do.
25          THE CLERK:  You may be seated in the witness box.
```

 1          Now, speaking directly into the microphone, can you

 2     please state your full name and spell your last name for the

 3     record.

 4               THE WITNESS:  Sure.  My name is David Azur.  It's

 5     A-z-u-r.

 6               THE COURT:  Yes.  Officer Azur, I just wanted to

 7     note to you that the standing orders of this Court require

 8     masks be worn in all public areas, but in the discretion of

 9     the presiding judge, masks may be pulled down if in the case

10     of witnesses or counsel or parties who have been fully

11     vaccinated.

12          Have you been vaccinated, sir?

13               THE WITNESS:  Yes, sir, I have.

14               THE COURT:  All right.  Then you may pull your mask

15     down when answering questions.  You don't have to, but you're

16     certainly welcome to do that.  Whatever makes you more

17     comfortable.

18               THE WITNESS:  Thank you, sir.

19               THE COURT:  Welcome.  Nice to have you.

20                         DIRECT EXAMINATION

21     BY MR. BUDLOW:

22     Q.   Good afternoon.

23     A.   Afternoon.

24     Q.   Can you tell us how you're currently employed?

25     A.   Sure.  I'm a detective with the Baltimore Police

 1    Department.

 2    Q.   Are you also a task force officer with ATF?

 3    A.   I am.

 4    Q.   And how long have you been a detective -- or how long

 5    have you been on the Baltimore City Police Department and also

 6    how long have you been a task force officer?

 7    A.   I'm in my 29th year with the police department and I've

 8    spent over the last 14 and a half years as a TFO with the ATF.

 9    Q.   And what were your -- just very briefly, your assignments

10    prior to being with the task force, an officer with the ATF,

11    and then what do you do as a task force officer with ATF?

12    A.   Sure.  Initially started out in patrol and then I became

13    a member of the regional auto theft task force.  And then I

14    became a TFO with the ATF where I investigate federal firearm

15    and narcotic violations.

16    Q.   And what was your assignment in May of 2020?

17    A.   I was assigned to the ATF as a TFO.

18    Q.   Drawing your attention specifically to May 22nd, 2020,

19    did you participate in the arrest and then later interview of

20    Andre Briscoe?

21    A.   Yes.

22    Q.   Do you see Mr. Briscoe in the courtroom here today?

23           MR. PURPURA:   Again, we'll stipulate he can identify

24    the defendant.

25           THE COURT:   So stipulated that he's referring to the

1    defendant in this case, Mr. Andre Briscoe.

2                **MR. BUDLOW:**  Yes.  Thank you, Counsel and Your

3    Honor.

4    **BY MR. BUDLOW:**

5    Q.   Was the arrest pursuant to a federal search warrant?

6    A.   A federal arrest warrant.

7    Q.   A federal arrest warrant.  Thank you.

8    A.   Yes.

9    Q.   And do you know when that arrest warrant was issued?

10   A.   Two days earlier on May 20th.

11   Q.   And can you walk us through the arrest that morning,

12   starting with the arrangements that were made to take the

13   defendant into custody?

14   A.   Sure.  It was my understanding that the defendant was

15   working at a construction site in Baltimore County.

16   Arrangements had been made with the foreman, his immediate

17   boss, to have him transported from the construction site to an

18   off -- like a trailer office location.  We were waiting at

19   that location for him to be transported.  Once the --

20   Q.   Where was the work site?

21   A.   It was --

22   Q.   Was that Bethlehem Road in Edgemere?

23   A.   Yes.

24   Q.   And did you arrive at that location after a time when you

25   believed the defendant would already have arrived at work?

 1    A.   Yes.

 2    Q.   Then did other members or other employees go to get the

 3    defendant?

 4    A.   Yes.

 5    Q.   Okay.  And tell us what happened from what you observed.

 6    A.   Sure.  There were several of us as an arrest team that

 7    were at the location.  When the defendant was brought to that

 8    location by his foreman in, like, a motorized Gator vehicle,

 9    kind of, like a four-wheel vehicle, the foreman exited and

10    went inside to the trailer, at which point we converged on

11    that vehicle and placed the defendant under arrest.

12    Q.   The trailer was large enough that this cart or Gator

13    could drive into it?

14    A.   No, it drove to it.  And then the foreman got out of the

15    vehicle, went inside the trailer, and then we converged on the

16    Gator.

17    Q.   And you, being the arrest team, were outside?

18    A.   Yes.

19    Q.   Where was the defendant in the Gator?

20    A.   Sitting in the passenger's seat, the front passenger's

21    seat.

22    Q.   About what time of day was this?

23    A.   It was around 8 o'clock in the morning.

24    Q.   Do you know what time the defendant arrived that day?

25    A.   Arrived to work?

```
1    Q.    Yes.

2    A.    I do not know.

3    Q.    So when the employee who was driving this cart went

4    inside the trailer, could you describe in a little more detail

5    what occurred next?

6    A.    Sure.  Several of us, the arrest team, approached the

7    vehicle, ordered the defendant to put his hands up, at which

8    point he was removed from the vehicle and handcuffed.

9    Q.    And were you armed?

10   A.    Yes.

11   Q.    Was your weapon -- what was the status of your --

12   A.    I did not draw my weapon.

13   Q.    What about other officers?

14   A.    I believe other officers did have their weapons drawn.

15   Q.    And what was the tone of the approach and commands to the

16   defendant?

17   A.    They were vocal commands.  You know, hands up.  Let me

18   see your hands.  Hands up.  You know, we were ordering him to

19   put his hands up.  He complied and was removed from the

20   vehicle and handcuffed.

21   Q.    When you said "he compiled," can you describe his

22   demeanor from the moment you-all approached this vehicle?

23   A.    He was surprised.  He didn't offer any kind of

24   resistance.

25   Q.    And was he placed in handcuffs?
```

```
 1    A.    Yes.

 2    Q.    Where were the handcuffs?  How were they positioned?

 3    A.    I believe they were positioned behind his back.

 4    Q.    Would that be standard in this situation?

 5    A.    Yes.

 6    Q.    All right.  And are you familiar with Special Agent Javon

 7    Weaver seated over here to the left at trial table?

 8    A.    I am.

 9    Q.    Is he the primary investigator for the Andre Briscoe

10    investigation as far as you know?

11    A.    Yes.

12    Q.    Was he present when the defendant was arrested?

13    A.    Yes, he was.

14    Q.    At the time of the arrest, was the defendant outside of

15    the trailer shortly after being placed into cuffs?  Was he

16    advised of his Miranda Rights?

17    A.    Yes.

18    Q.    Who advised him?

19    A.    Agent Weaver did.

20    Q.    And were you present when that occurred?

21    A.    Yes, I was.

22    Q.    Did Agent Weaver use anything to assist him in the

23    advisement of the defendant of his Miranda Rights?

24    A.    Yes, he read from a card.

25    Q.    And, approximately, how long after the defendant was
```

 1    placed in custody did Special Agent Weaver advise him of his

 2    Miranda Rights?

 3    A.    It was within minutes.

 4    Q.    I'm going to show you Exhibit 29, page 5.  The screen in

 5    front of you is working?

 6    A.    Yes, it is.

 7    Q.    Do you see that on the screen in front of you?

 8    A.    I do.

 9    Q.    Is this the card that was used to advise the defendant of

10    his Miranda Rights?

11    A.    Yes.

12    Q.    Was a copy of the card made and it was placed as part of

13    the report documenting the arrest and interview?

14    A.    Yes.

15    Q.    Can you -- the way Agent Weaver did it, can you review

16    for us the way Agent Weaver reviewed this card for the

17    defendant?

18    A.    Sure.  Agent Weaver advised him that he's going to advise

19    him of his Miranda Rights, and he read from the card.  He

20    said, you are hereby advised that you have the absolute right

21    to remain silent.  Anything you say can and will be used

22    against you in a court of law.  You have the right to talk

23    with a lawyer at any time before or during any questioning.

24    If you want a lawyer and cannot afford one, you can request

25    the Court to appoint a lawyer prior to any questioning.  If

1   you agree to answer questions, you may stop at any time and no

2   further questions will be asked of you.

3   Q.   And then there is a section underneath of it.  Was that

4   read or discussed by Agent Weaver?

5   A.   No.  Agent Weaver asked him if he understood what his

6   rights were and he said, yes, I understand what my rights are.

7   Q.   The defendant said, yes, I understand what my rights are?

8   A.   Yes.

9   Q.   And where did this advisement take place?

10  A.   Inside a vehicle.

11  Q.   Which vehicle?

12  A.   Agent Weaver's vehicle.

13  Q.   So the defendant was taken from the place where he was

14  placed in custody and moved to an ATF vehicle?

15  A.   Yes.

16  Q.   And was he still handcuffed at the time?

17  A.   Yes.

18  Q.   Can you describe, if you remember, Agent Weaver's tone of

19  voice during the advisement of the rights?

20  A.   He was calm.

21  Q.   And what about the defendant's demeanor during that same

22  time?

23  A.   He was calm.  He was -- wanted to know why he was being

24  placed under arrest and agitated about that, but he was calm.

25  Q.   Did the defendant indicate if he understood his rights?

```
 1   A.   Yes, he did.

 2   Q.   Did he agree to speak with you and Agent Weaver?

 3   A.   Yes.  I -- I'm sorry.

 4   Q.   Was there any hesitation by him?

 5   A.   No.

 6   Q.   During this interaction, both at the vehicle where he was

 7   placed in custody and when he was advised of his Miranda

 8   Rights in the ATF vehicle, did the defendant ever mention an

 9   attorney?

10   A.   No.

11   Q.   How long did the defendant remain at his place of

12   employment in that general area in the ATF vehicle after being

13   initially arrested?

14   A.   Not long.  I would say maybe 15 minutes.

15   Q.   Was he transported to another location for an interview?

16   A.   Yes, we were transported to the ATF office at the federal

17   building.

18   Q.   And when you say "we," who is it that transported him?

19   A.   Agent Weaver was the operator of the vehicle, and I was

20   in the vehicle with the defendant as well.

21   Q.   And do you know what time it was that you all arrived at

22   the ATF building?

23   A.   I don't.  I'm going to guess around 8:30 to -- 8:30, a

24   quarter to 9:00 or so.

25   Q.   How far is the ATF building from Edgemere?
```

1    A.    Maybe 15 or 20 minutes.

2    Q.    What happened when you first arrived at the ATF building?

3    A.    We took him up to our floor and asked him if he needed to

4    use the bathroom, and we took him into a cell facility where

5    the handcuffs were moved to his front.  He remained in his

6    cell while Agent Weaver and I went back to our office and took

7    off our tactical gear.

8    Q.    And how much time passed before you saw the defendant

9    again?

10    A.    It was not long, just minutes.

11    Q.    And where was the defendant during those minutes?  Was he

12    still in that room?

13    A.    Yes.

14    Q.    And did there come a time when you and Agent Weaver went

15    back to that room and conducted a recorded interview of the

16    defendant?

17    A.    Yes.  We took him out of that cell room and placed him

18    into an interview room.

19    Q.    And was it just you and Agent Weaver that did that or did

20    anybody else participate in moving the defendant?

21    A.    No, it was just the two of us.

22    Q.    When did the recording begin?

23    A.    Shortly after 9:00 a.m.

24    Q.    And I'm going to show you now Government's Exhibit 21.

25          Do you recognize this document?

 1    A.    Yes.

 2    Q.    Was that document displayed for the defendant and

 3    reviewed during the interview?

 4    A.    Yes.

 5    Q.    Towards the beginning?

 6    A.    Yes.

 7    Q.    At the beginning -- at the bottom of the document under

 8    waiver, there is a small paragraph and then there is a

 9    signature.  Do you know who signed that?

10    A.    The defendant did.

11    Q.    And who else signed it?

12    A.    Agent Weaver and I witnessed it.

13    Q.    And what time -- did you note the time when you signed it

14    as a witness?

15    A.    Yes, I signed it at 9:08 a.m.

16    Q.    Showing you Grand Jury Exhibit 20, this is just, at least

17    for now, page 1.  Is this a draft transcript of the recording

18    of that interview?

19    A.    Yes.

20          **THE COURT:**  I think you said grand jury.  You mean

21    Court exhibit, Government exhibit.

22          **MR. BUDLOW:**  Yes.  Did I say grand jury?

23          **THE COURT:**  That's quite all right.  Exhibit 20.

24          **MR. BUDLOW:**  I haven't been in a courtroom much

25    lately.

| | |
|---|---|
| 1 | **THE COURT:**  That's all right.  And I haven't been in |
| 2 | a grand jury room since I've been on the bench either, |
| 3 | Mr. Budlow. |
| 4 | **MR. BUDLOW:**  Understood. |
| 5 | **THE COURT:**  We'll note we're smiling here.  We know |
| 6 | judges don't go into the grand jury rooms.  Although some |
| 7 | people suggest we should, we don't.  So, you know... |
| 8 | **BY MR. BUDLOW:** |
| 9 | Q.   Detective, can you describe the room where the interview |
| 10 | took place? |
| 11 | A.   Sure.  It's a small room.  There is a table and there is |
| 12 | one chair where the defendant sat on one side and we sat |
| 13 | across from the defendant and there were two chairs there for |
| 14 | us to sit at. |
| 15 | Q.   Okay.  And I just want to remind you, keep your voice up |
| 16 | just a little bit. |
| 17 | A.   Yes, I'm sorry. |
| 18 | Q.   Was the door -- was there a door and was it closed? |
| 19 | A.   Yes, there is a door and it was closed. |
| 20 | Q.   And who, in total, was in the room? |
| 21 | A.   The three of us:  Myself, Agent Weaver, and the |
| 22 | defendant. |
| 23 | Q.   And can you describe where each of you sat relative to |
| 24 | each other? |
| 25 | A.   Once you walk into the room, the table was in the middle |

1    of the wall to our left.  The defendant sat on -- like, across

2    from the door and we sat across from the table facing the

3    defendant.

4    Q.   And what was the status of the defendant's restraints or

5    handcuffs during the interview?

6    A.   He was -- I believe he was shackled at the ankles and he

7    was handcuffed in the front.

8    Q.   And was the defendant told that he had to participate,

9    answer questions?

10   A.   No.

11   Q.   Was he told that the interview was being recorded?

12   A.   Yes.

13   Q.   Why was he advised of his Miranda Rights for a second

14   time?

15   A.   So we could have it in writing.

16   Q.   All right.  And did he appear to understand then when

17   they were read for him in this interview room?

18   A.   Yes.

19   Q.   Did he agree to speak with you?

20   A.   Yes.

21   Q.   And have you listened to a recording of that interview?

22   A.   Yes.

23        **MR. BUDLOW:**  Your Honor, at this time, Government's

24   Exhibit 30.  I'm going to go play a small portion at the

25   beginning.

| 1 | **THE COURT:**  That's fine. |
|---|---|
| 2 | **MR. BUDLOW:**  We had a small issue with the sound; |

1          **THE COURT:**  That's fine.

2          **MR. BUDLOW:**  We had a small issue with the sound;

3    however, I believe that between playing it from my laptop and

4    being near this microphone, it's going to be clearly audible.

5          (Recording played.)

6    **BY MR. BUDLOW:**

7    Q.   Detective, I'm going to play a little more, but before I

8    do, could you identify the voices that we've heard so far?

9    A.   Agent Weaver's voice and it's the defendant's voice.

10         (Recording played.)

11   **BY MR. BUDLOW:**

12   Q.   Detective, do you recall -- or you recently have listened

13   to the recording.  Approximately, how long did the interview

14   last?

15   A.   Just over an hour.

16   Q.   And can you just describe, generally, how the interview

17   proceeded in terms of the format?

18   A.   It was a question and answer.

19   Q.   And during that little over an hour, were there any

20   breaks taken where you left the room or stopped the recording

21   or anything like that?

22   A.   No.

23   Q.   Was the defendant given the opportunity to take a break

24   for a smoke or the rest room or anything?

25   A.   Not during the interview.

1    Q.   But prior to the interview?

2    A.   Yes.  Prior to the interview, he went to the bathroom.

3    Q.   And during the interview, did he ever ask to take a

4    break?

5    A.   No.

6    Q.   During the time of this interview, did anyone ever enter

7    or leave the room besides the three of you being in there?

8    A.   No.

9    Q.   Can you describe the defendant's demeanor throughout the

10   interview?

11   A.   Initially, he was agitated.  He wanted to know why he was

12   under arrest, but he was calm.  He didn't give us a hard time.

13   He answered the questions.

14   Q.   Can you describe his physical appearance that morning?

15   A.   Much like it is -- much like it is today.

16   Q.   When Special Agent Weaver questioned the defendant, did

17   the defendant appear to comprehend the questions and provide

18   appropriate responses?

19   A.   Yes.

20   Q.   Did he appear to be intelligent to you?

21   A.   Yes.

22   Q.   Did he appear to have a good memory of the facts that he

23   was being asked about?

24   A.   Yes.  He referenced that it had been several years and he

25   had been using drugs at some point in time, but he was able to

1    recall events.

2    Q.   In your 29 years now as a law enforcement officer, have

3    you encountered individuals who appeared to be under the

4    influence of narcotics or alcohol?

5    A.   Yes.

6    Q.   And in your opinion, that morning, did the defendant

7    appear to be under the influence of narcotics or alcohol or

8    drugs?

9    A.   No.

10   Q.   And this was in the morning, you said, right?

11   A.   Yes.

12   Q.   The defendant had already been to work when you arrived

13   and saw him?

14   A.   Yes.

15   Q.   How old was the defendant at the time, if you know?

16   A.   Thirty-seven, 38-ish.

17   Q.   And can you describe yours and Agent Weaver's demeanor

18   throughout the interview that's on that recording?

19   A.   Much like we are now, Agent Weaver was calm.

20   Q.   At any time during the interview, did the defendant ask

21   to stop the recording or stop the interview process?

22   A.   Towards the end -- I'm sorry.  Towards the end of the

23   interview, he said that he didn't want to answer any more

24   questions.

25   Q.   And then what happened?

```
1    A.    We stopped the interview.

2    Q.    Other than that time at the end, did he ever refuse to

3    answer any of your questions?

4    A.    No.

5    Q.    Would you describe him as being cooperative during the

6    interview?

7    A.    Yes.

8    Q.    Did you or Agent Weaver display your firearms during the

9    interview?

10   A.    No.  We didn't even have them with us.

11   Q.    At any time during that morning, did the defendant ask to

12   speak to an attorney?

13   A.    No.

14   Q.    Did he ask anything about an attorney or a lawyer?

15   A.    No.

16   Q.    Was the defendant threatened in any way to get him to

17   provide information?

18   A.    No.

19   Q.    Was he promised anything in exchange for providing

20   information?

21   A.    No.

22   Q.    You mentioned that the -- at some point towards the end,

23   the defendant indicated he didn't want to answer any more --

24   any questions?

25   A.    That's correct.
```

```
 1    Q.   What happened after that?
 2    A.   We ended the interview, turned the recorder off, and
 3    exited the room.
 4           MR. BUDLOW:  Court's indulgence.
 5    BY MR. BUDLOW:
 6    Q.   The transcript that you reviewed earlier, that's
 7    Exhibit 20, have you reviewed that generally --
 8    A.   Yes.
 9    Q.   -- along with the recording?
10    A.   Yes.
11    Q.   And is it a generally accurate transcript of the
12    interview that took place that day?
13    A.   I believe so.
14    Q.   You haven't gone through it with a fine-tooth comb to
15    make sure every single line is right?
16    A.   No.
17    Q.   As part of your investigation, Detective, did you learn
18    that the defendant, prior to his arrest by you and Agent
19    Weaver in 2020, had interactions with law enforcement,
20    including arrests?
21    A.   Yes.
22    Q.   Could you provide a summary of the defendant's various
23    arrests with law enforcement, starting with the first arrest
24    that you had?
25    A.   Sure.  So his first arrest, I believe, was in 2010.  It
```

```
 1    was a crime of violence.  I believe there was an attempted
 2    first degree murder charge.  He had several convictions for
 3    crimes of violence.  Prior to 2015 and after 2015, he was
 4    arrested in both Baltimore City and Cambridge.  I can review
 5    the -- I have a copy of his criminal history if you'd like me
 6    to --
 7    Q.   Could you check on the -- I want to start with the --
 8    we're not going to go through every one in detail, but the
 9    attempted murder, the year that that arrest and conviction
10    occurred?
11    A.   Sure.  So his first arrest was in 2010.  That was in
12    Baltimore City.  One of the charges included assault, first
13    degree, as well as attempted first degree murder.  And he was
14    convicted of -- oh, I'm sorry, 2000.  It was in 2000.
15    Q.   2000?
16    A.   Yes, I'm sorry, it was in 2000.
17    Q.   And then were there also a variety of arrests --
18              THE COURT:  I'm sorry.  Is this 2010 or 2000?
19              THE WITNESS:  I'm sorry, sir.  It was in 2000.  It
20    was in October of 2000.
21              THE COURT:  All right.
22    BY MR. BUDLOW:
23    Q.   And did that arrest result in a conviction and prison
24    sentence?
25    A.   Yes, he was convicted of attempted first degree murder.
```

```
 1    Q.   Were there also arrests in 2009 relating to assault,
 2    robbery, and possession of CDS?
 3              THE COURT:  I'm sorry, Mr. Budlow, I've got to get
 4    the chronology here.  The witness first said 2010, then he
 5    corrected himself and he said 2000.
 6              MR. BUDLOW:  That's right.
 7              THE COURT:  Now you're asking 2009.  If we're going
 8    to do a chronology, I want to stay on a chronology here.  It
 9    would be helpful to me.  So we're at 2000, and you -- the
10    testimony is that he was convicted of attempted first degree
11    murder in October of 2000.
12              THE WITNESS:  So in October of 2000 -- I'm sorry,
13    Your Honor.  In October of 2000 was when he was arrested and
14    charged with the attempted first degree murder, as well as
15    other violent charges.  His conviction appears to have maybe
16    occurred in 2001.  He was arrested in 2000.  It looks like he
17    was convicted in 2001 and that's when he was sentenced to
18    20 years.
19              THE COURT:  All right.  Okay.
20    BY MR. BUDLOW:
21    Q.   And a portion of that was suspended; is that correct?
22    A.   Yes.
23    Q.   Now I'm going to move to 2009.  Were there additional
24    arrests in 2009, separate arrests for assault, robbery, and
25    narcotics?
```

1    A.    So the next arrest that I have was in 2010 and that was

2    for false imprisonment and assault.  Those were steaded.  In

3    2013, I have another attempted first degree murder charge,

4    attempted second degree murder charge, an armed robbery

5    charge, and a robbery charge.  He was found guilty of assault

6    in the second degree on those sets of charges.

7    Q.    You can continue moving forward from there.

8    A.    Yes, sir.  In 2016, he was charged with assault second

9    degree, and dangerous weapon with intent to injure.  He was

10   convicted of that assault, second degree.  In 2017, he was

11   arrested and charged with assault, second degree.  In 2018, he

12   was charged with assault, second degree.

13   Q.    Is that the last arrest you show prior to your arrest in

14   2020?

15   A.    So on January 13th of 2018, he was charged with assault,

16   second degree.  The next entry I have is in March 2nd of 2018,

17   it was a second degree assault, and that appears to be the --

18   in which he was convicted of, and it says it was domestic

19   related.

20   Q.    Okay.

21   A.    That is the last charge that I have for him.

22        **MR. BUDLOW:**  Thank you, Detective.  Your Honor, I

23   have no further questions.

24        **THE COURT:**  Thank you, Mr. Budlow.

25        Mr. Purpura?

```
 1              MR. PURPURA:  Thank you, Your Honor.
 2                      CROSS-EXAMINATION
 3    BY MR. PURPURA:
 4    Q.   Good afternoon, Detective.
 5    A.   Good afternoon, sir.
 6    Q.   Taking you back to May 22nd of 2020, you arrived at, I
 7    believe it was, Bethlehem Avenue in Edgemere.  That was a
 8    construction site; is that right?
 9    A.   Yes.
10    Q.   And you were accompanied by, I guess, is it eight other
11    agents, officers?
12    A.   There were several other agents there.  I don't know if
13    it was exactly eight or not, but there were several -- several
14    of us there.
15    Q.   Several -- should I go -- we can go briefly through the
16    names and you can tell me if they were there or not, okay?
17    A.   Yes, sir.
18    Q.   Great.  There is a group supervisor, Dan Spelzer, Special
19    Agent Javon Weaver, Timothy Moore, Gwendolyn Toy, Brendan
20    Plasha, Daniel May, yourself, Max Poma, and Shawn Rickberg.
21    Sound about right?
22    A.   Yes, sir.
23    Q.   Nine people all tolled; correct?
24    A.   Sure.
25    Q.   Now, you arrived after Mr. Briscoe was already working;
```

1      is that correct?

2      A.   Correct.

3      Q.   And so he didn't see you-all pull up; correct?

4      A.   I assume.

5      Q.   To your knowledge?

6      A.   To my knowledge, he did not see us pull up.

7      Q.   And when you went there, then you spoke with the

8      construction site manager.  Is that fair to say?

9      A.   I did not; another agent did.  They made the arrangements

10     with them.

11     Q.   And as a result of that, your decision was to send the

12     manager out in a Gator to go pick Mr. Briscoe up; correct?

13     A.   Not my decision.  The decision was made to do that, yes.

14     Q.   All right.  Without law enforcement to accompany the

15     manager, right?

16     A.   That's correct.

17     Q.   Did the manager at that point he -- obviously he saw,

18     like -- whoever spoke to the manager, how many agents were

19     around him at that time?

20     A.   I don't know when arrangements were made with the

21     manager.

22     Q.   Okay.  And you have no idea what the manager said, the

23     supervisor said to Mr. Briscoe when he went out to pick him

24     up, do you?

25     A.   That's correct, I do not.

```
 1    Q.   Or when he took him back; correct?

 2    A.   That's correct.

 3    Q.   And how long was this supervisor/manager gone during this

 4    period of time?

 5    A.   Just a few minutes.

 6    Q.   And when they came back in the Gator, Mr. Briscoe was the

 7    passenger, right?

 8    A.   Yes.

 9    Q.   And at that point, where were you-all, the nine of you?

10    A.   We were in our vehicles.

11    Q.   And these vehicles, they weren't BPD vehicles?  They were

12    unmarked?

13    A.   That's correct.  They were, like, rental cars, I guess.

14    Q.   And was your intent at that time to look inconspicuous?

15    A.   Yes.

16    Q.   So when the Gator pulls up, the manager goes into the

17    trailer, right?

18    A.   Yes.

19    Q.   Do you have any idea what the manager was told to tell

20    Mr. Briscoe?

21    A.   I do not.

22    Q.   So when Mr. Briscoe is sitting by himself in the Gator,

23    then you-all converge on him; correct?

24    A.   That's correct.

25    Q.   You didn't have your gun out, but others did; correct?
```

```
 1    A.    Yes.
 2    Q.    And at that point there, just at that point there, did
 3    Mr. Briscoe make any attempt to get out of the Gator?
 4    A.    No.
 5    Q.    Did he make any effort to resist?
 6    A.    No.
 7    Q.    And he was -- you told him at that point or someone was
 8    yelling at him, hands up, hands up; correct?
 9    A.    Yes.
10    Q.    And Mr. Briscoe at that point complied and put his hands
11    up.  Is that fair to say?
12    A.    Yes.
13    Q.    And he was compliant during the whole arrest procedure
14    when he put his hands behind his back; correct?
15    A.    Yes.
16    Q.    He didn't try to struggle or get away at that point?
17    A.    No.
18    Q.    And how far away were the cars from the Gator when you
19    pulled up?
20    A.    Different locations.  Maybe a few car lengths, maybe.  I
21    couldn't tell you exactly.  And they are our regular vehicles.
22    We weren't using inconspicuous vehicles.  They're just the
23    normal vehicles that we drive.
24    Q.    Normal vehicles driving to the Acme or normal vehicles
25    you drive as part of the ATF task force?
```

```
1    A.    As part of the ATF.

2    Q.    What type of vehicles were they?  Were they the black

3    Suburbans?

4    A.    Sedans.  Oh, no, no, no, no Suburbans, sedans.  They

5    might be a sport utility vehicle, but...

6    Q.    But back to square one on this was that when y'all

7    started exiting at that point, Mr. Briscoe just remained in

8    the Gator; correct?

9    A.    Yes.

10   Q.    And he was then transported by yourself and Agent Weaver

11   to DEA headquarters?

12   A.    To the ATF office.

13   Q.    ATF, excuse me.

14         And where is that located now?

15   A.    The federal building.

16   Q.    And during that transportation time, this is already post

17   Miranda warnings, as you already indicated on direct

18   examination, that Mr. Briscoe was advised of his Miranda

19   warnings; correct?

20   A.    That's correct.

21   Q.    And during this transportation, were there any

22   conversations or was there any conversation?

23   A.    Nothing about the case.  I don't recall if there was

24   conversation about how he was -- I think -- so maybe there may

25   have been, like, how are you feeling because it was with COVID
```

```
 1     time, but there was no conversation about the case.

 2     Q.   Well, how about things such as, did you or Detective --

 3     or excuse me, Special Agent Weaver ever suggest you should be

 4     cooperative because that goes a long way in this type of case?

 5     A.   No.

 6     Q.   No suggestions whatsoever then?

 7     A.   No.

 8     Q.   No promises or inducements at that point?

 9     A.   No, sir.

10     Q.   And then when you arrived at your headquarters or your

11     location, he was then taken to a room; right?

12     A.   Yes.

13     Q.   And he was left there for a short period of time?

14     A.   Yes.

15     Q.   Still handcuffed?

16     A.   Yes.

17     Q.   And during the interrogation, were the cuffs still on or

18     not?

19     A.   Yes, the cuffs were on during the interview, yes.

20     Q.   Were they at least moved to the front or left in the

21     rear?

22     A.   They were moved to the front.

23     Q.   And the person who actually conducted the interrogation

24     or the questioning, I should say, was Special Agent Weaver.

25          Is that fair to say?
```

```
 1    A.    Yes.

 2    Q.    And I listened to the tape.  I don't recall ever hearing

 3    you ask a question.  Did you ask any questions whatsoever?

 4    A.    I did not.

 5    Q.    Okay.  Now, prior to the actual arrest on the 22nd, you

 6    knew there was a BPD investigation; correct?

 7    A.    I may have generally known that there was a BPD

 8    investigation.  I was not a part of that investigation.

 9    Q.    Well, how long were you involved in the investigation

10    involving Mr. Briscoe just before the arrest?

11    A.    So I was -- I have not been a part of the investigation

12    itself.  I assisted with the arrest and I assisted with the

13    interview.

14    Q.    Right.  Very good.

15          And then you don't know if -- do you know, was there a

16    general debriefing before or a meeting before when you

17    discussed what the case is about and the information that you

18    had about the defendant?

19    A.    There is typically a briefing beforehand with defendant's

20    criminal history and -- yes.

21    Q.    And at that time, did Agent Weaver ever tell you that he

22    reviewed BPD's files on this case or that he reviewed anything

23    about this case?

24    A.    Nothing.  I don't remember him specifically saying

25    anything like that.
```

1    Q.   And your participation, again, goes to the arrest and the

2    interview itself; correct?

3    A.   Yes.  I assisted with the arrest and I assisted with the

4    interview.

5    Q.   And as far as the interview, were you aware that there

6    was a prior interview of Mr. Briscoe by BPD, in particular, by

7    homicide detectives Lewis and Parker?

8    A.   I was not aware of that at the time.

9    Q.   Okay.  And you indicated that the interview lasted

10   approximately one hour.  That's about right, right?

11   A.   A little over an hour, yes.

12   Q.   A little over an hour.

13        And as you did indicate, he was allowed to use the

14   bathroom in the beginning and I believe at the very end, he

15   asked to use the facilities and you said you would accommodate

16   him before he's transported; correct?

17   A.   Yes.

18   Q.   And he was, right?

19   A.   Yes.

20   Q.   And as you also indicated that he was -- at least in the

21   beginning, he was somewhat antagonistic.  Is that fair to say?

22   A.   I don't know if he was antagonistic.  He wanted to know

23   why he was under arrest.

24   Q.   And I'll get to that in a second.

25        When the interview ended, approximately, according to the

1    transcript, about 10:18, it ended, I believe is when

2    Mr. Briscoe said, "And I don't want to continue to talk about

3    it, please."

4        Do you remember something like that?

5    A.   Yes.

6    Q.   And at that point, Detective -- or excuse me, Agent

7    Weaver indicated, well, then this conversation is over, and

8    you at that point said, we're now going to move you on your

9    way; fair to say?

10   A.   Yes.

11   Q.   So when he said, I don't want to continue, please, you

12   actually did comply with that; correct?

13   A.   Yes.

14   Q.   And when you indicated that he was compliant and

15   cooperative, that's part of his compliance and his cooperation

16   in the way that he spoke to you-all, is that fair to say?

17   A.   Yes.  He was not disrespectful with us.

18   Q.   Actually, I believe Agent Weaver indicated that in the

19   transcript itself that you have been very respectful during

20   this interview, is that fair to say as well?

21   A.   Yes.

22   Q.   He did want to know what the whole thing was about when

23   he got arrested, is that fair to say?

24   A.   Yes.

25   Q.   I think very -- right in the very beginning of the

```
1    interview he indicates, can I please find out what this is all
2    about, right?
3    A.   Yes.
4    Q.   And at that point, Agent Weaver said, we'll get to that,
5    but let's get through the preliminary questions, in essence;
6    is that correct?
7    A.   Yes, he wanted to get through Miranda and then explain to
8    him what was going on.
9    Q.   And you did or did not know that he has a history of
10   alcohol or drugs?
11   A.   I have no knowledge of that.
12   Q.   And was that discussed between yourself and Special Agent
13   Weaver at all?
14   A.   No.
15   Q.   There was a time, I believe, right around page 10 of the
16   transcript where Agent Weaver says, I want to jog your memory.
17   And the response, I believe, by Mr. Briscoe was, I get high.
18   I use Percocets.  I drink all of the time.
19   A.   Yes.  I believe he was speaking in a past tense.  I don't
20   think that...
21   Q.   It's something that may or may not affect his memory;
22   correct?  That's what he told you at that point?
23   A.   Yes.
24   Q.   But then even after that, you continued -- or Agent
25   Weaver asked questions, he seemed to remember things, and he
```

```
 1    answered those questions; is that correct?
 2    A.   Yes.
 3    Q.   And he continued to be cooperative despite what he
 4    indicated was a memory issue; correct?
 5    A.   Yes.
 6    Q.   At least to the best of his ability?
 7    A.   Yes.  And he referenced that it had been several years
 8    earlier, which is why he may not remember as well.
 9    Q.   And what you were asking him at that point was several
10    years earlier.  It was dating back to 2015, right?
11    A.   Yes.
12    Q.   So we're talking literally close to four to five years
13    earlier, right?
14    A.   Yes.
15    Q.   Thank you.  And just were there any -- when he was
16    arrested and you took out -- and you memorialized, I believe,
17    everything which was seized from Mr. Briscoe; is that correct?
18    A.   Agent Weaver memorialized it.
19    Q.   And do you remember coming up with a yellow packet which
20    contained residue of drugs when he was seized?
21    A.   I remember the yellow zip -- yellow baggie.  I don't
22    remember there being residue in it.
23    Q.   And what are those yellow Zippies used for, other than
24    stamp collectors?
25    A.   So typically in the city, they're used to package drugs.
```

1    I cannot say if that's what that was for.  It was empty.

2    Q.   Might have been used?

3    A.   It was an empty Ziplock bag.

4         **MR. PURPURA:**  I have no further questions.

5         **THE COURT:**  Thank you, Mr. Purpura.

6    Any redirect, Mr. Budlow?

7         **MR. BUDLOW:**  Nothing, Your Honor.  Thank you.

8         **THE COURT:**  Thank you very much, Detective Azur.

9    You may step down.  You shouldn't discuss your testimony with

10   anyone in the event that you're called back to the witness

11   stand until this motions hearing is concluded.

12        **THE WITNESS:**  Yes, Your Honor.

13        **THE COURT:**  Thank you very much.

14   All right.  Counsel, for scheduling purposes, it's

15   approaching 1 o'clock.  We were going to try to stop at ten

16   after 1:00, but I don't see any sense in starting with a

17   witness just for ten minutes unless you have a ten-minute

18   witness, Ms. Brusca.

19        **MS. BRUSCA:**  We don't, Your Honor.  I guess there is

20   a stipulation we could read to the Court.  We have it ready.

21        **THE COURT:**  Okay.  That's fine.  I'm sorry, I'm

22   having trouble hearing you.  Go ahead, though.

23        **MS. BRUSCA:**  I'm sorry.  There is a stipulation the

24   parties reached.

25        **THE COURT:**  That's fine.  Why don't we go over that

```
 1        then.
 2                  MS. BRUSCA:  Okay.  Perfect.  So I have copies and
 3        we can also just read it in, whatever the Court prefers.
 4                  THE COURT:  Well, I'd like for it -- if I can -- I
 5        want the stipulation to be an exhibit for this hearing, as
 6        well as you can read from it.  What is the exhibit number for
 7        the stipulation?
 8                  MS. BRUSCA:  I believe it will be Exhibit 47.  We
 9        had stamped it 46, but we didn't put it in, so we'll call it
10        Exhibit 47.
11                  THE COURT:  Government Exhibit 47, and it is a
12        stipulation.
13                  MS. BRUSCA:  Correct, Your Honor.
14                  THE COURT:  All right.  Thank you very much.  Are
15        you going to read the stipulation now?
16            How long of a stipulation is it?
17                  MS. BRUSCA:  It's a full page.  So I can hand it up.
18                  THE COURT:  Just one page?
19                  MS. BRUSCA:  Correct.
20                  THE COURT:  Okay.  If I can have a copy.  Do you
21        have an additional copy for me?
22                  MS. BRUSCA:  Yes.
23                  THE COURT:  Just approach the clerk's desk, and
24        we'll mark that as Government's Exhibit 1.
25            Thank you, Ms. Brusca.  If I could just see that,
```

1    Ms. Maldeis, that would be great.  Thank you.  Thank you so

2    much, Becca.

3        All right.  It is -- well, I've got -- I don't need two.

4    I just need one of them.

5            **THE CLERK:**  Sorry, Your Honor.

6            **THE COURT:**  That's all right.  Okay.  That's fine.

7    Thank you.  You may proceed.

8            **MS. BRUSCA:**  Thank you, Your Honor.  So there is two

9    slightly different but related stipulations relating efforts

10   made by the government -- efforts made by the government to

11   locate the 2015 June search warrant for the phones seized from

12   Mr. Briscoe.

13       So the first begins, "The parties hereby stipulate and

14   agree that on September 21st, 2021, the U.S. District Court

15   for the District of Maryland issued a subpoena to the

16   Baltimore City Police Department for production prior to

17   January 19th, 2022, of various records, including a search

18   warrant for the cell phone with the number 443" -- and that

19   should be -- that's a typo there, I believe -- "621-2413

20   seized from Andre Briscoe in Cambridge, Maryland, on June 5th,

21   2015.

22       The subpoena issued by the U.S. District Court to BPD is

23   attached hereto as Exhibit 1."  And we will provide that to

24   the Court.  The printer was just giving us some difficulties.

25       "On January 13, 2022, BPD notified the government that

```
1    the search undertaken by BPD of its own files, particularly
2    e-mails, did not result in the location of the search warrant.
3         The parties further stipulate and agree that on
4    September 28th, 2021, the U.S. District Court for the District
5    of Maryland issued a subpoena to the Circuit Court Clerk of
6    Court for Baltimore City, Maryland, hereafter the Baltimore
7    City Clerk's Office.
8         The subpoena to the Baltimore City Clerk's Office
9    requested the production of a list or log of every search
10   warrant application and order sought and obtained between
11   June 4th, 2015, and June 15th, 2015, and a copy of any and all
12   warrants obtained by the Baltimore Police Department in its
13   investigation of the murders of Jennifer Jeffrey and K.B. in
14   May 2015, and specifically to include a search warrant for a
15   cell phone obtained by the Baltimore Police Department that
16   was seized from Andre Briscoe.
17        The subpoena issued by the U.S. District Court to the
18   Baltimore City Clerk's Office is attached to the stipulation
19   as Exhibit 2.  The Office of the Attorney General for the
20   State of Maryland subsequently explained that the Baltimore
21   City Clerk's Office does not maintain a log of warrants based
22   on the date that a warrant was applied for, issued, or
23   executed; rather, the Baltimore City Clerks Office logs a
24   warrant only by the date on which the clerk's office received
25   it from the issuing judge.
```

1          The OAG further explained that typically when a warrant

2    is issued by a circuit or district judge in Baltimore City,

3    the issuing judge maintains the original warrant until the

4    judge receives a return reflecting execution of the warrant.

5    At that point, the issuing judge is supposed to mail or walk

6    the full warrant package to the Baltimore City Clerk's Office

7    to be logged and maintained.

8          After receiving the subpoena attached as Exhibit 2, a

9    representative of the Baltimore City Clerk's Office, in

10   consultation with the OAG, undertook an exhaustive and

11   reasonable search for affidavits received by the Baltimore

12   City Clerk's Office from, approximately, June 15th, 2015 to

13   approximately August 15, 2015, and did not locate an affidavit

14   returned to the Baltimore City Clerk's Office during that

15   period which appeared to relate to a phone seized by BPD from

16   Andre Briscoe."

17             **THE COURT:**  Thank you very much, Ms. Brusca.

18        And that is a stipulation that's agreed to by the

19   defense.

20        Is that correct, Ms. Whalen?

21             **MS. WHALEN:**  Yes, Your Honor.

22             **THE COURT:**  And you discussed that with your client,

23   Mr. Briscoe; is that correct?

24             **MS. WHALEN:**  Yes.

25             **THE COURT:**  All right.  With that, I think this will

1    conclude our first session here.  I'm going to break for a

2    meeting with the other judges here on Wednesday, a bench

3    meeting, and we will start at ten minutes after 2:00.  We'll

4    take an hour-and-five-minute break for lunch.  We'll start at

5    ten minutes after 2:00.

6         This Court stands in recess.

7         **THE CLERK:**  All rise.  This Honorable Court is now

8    in recess.

9         (Lunch recess taken.)

10        **THE CLERK:**  This Court resumes its session.

11        **THE COURT:**  Good afternoon, everyone.  Sorry to keep

12   you waiting.  I got caught up with someone with one of the

13   other judges and I apologize.

14        All right.  This is continuing on with the hearing in the

15   United States versus Briscoe, Criminal No. RDB-20-139.  It's

16   my understanding that there are no further witnesses.  Is that

17   right from the point of view of the government, Ms. Brusca; is

18   that correct?

19        **MS. BRUSCA:**  That's correct, Your Honor.

20        **THE COURT:**  Are there any witnesses to be called by

21   the defense, Ms. Whalen?

22        **MS. WHALEN:**  No, Your Honor.  Thank you.

23        **THE COURT:**  All right.  So we're ready to hear legal

24   argument; is that correct?

25        Just so I'm clear on this, we -- let me look at the

 1    motions we still have.  Let me try to zero in on these here.

 2    We still have pending the defendant Briscoe's motion to

 3    suppress search of residence and person, as well as -- that's

 4    Paper No. 69, as well as the supplemental motion to suppress

 5    that search, Paper No. 101.  They are integrated with respect

 6    to the search of the residence, as well as the person from the

 7    point of view of the government; correct, Ms. Brusca?

 8              **MS. BRUSCA:**  Correct.

 9              **THE COURT:**  Correct, Ms. Whalen, from your point of

10    view?

11              **MS. WHALEN:**  Yes.

12              **THE COURT:**  I would like, if I can, to bifurcate

13    these a little bit unless counsel has a problem.  I'd like to

14    focus on certain ones seriatim and then gradually get to those

15    with respect to the statements and the cell phone searches.

16    The motion to suppress the statements are combined in one

17    motion, Paper No. 72.

18        Is that correct, Ms. Whalen?

19              **MS. WHALEN:**  Yes.

20              **THE COURT:**  One motion as to both statements.  Why

21    don't we do that one first, if we can.  Do you have any

22    objection to doing that as to the -- is there any further

23    legal argument on that or not?

24              **MR. PURPURA:**  We'll submit.

25              **THE COURT:**  You'll submit on your submission.

1          Any further legal argument from the point of view of the

2     government, Ms. Brusca?

3          **MS. BRUSCA:**  No, Your Honor.

4          **THE COURT:**  Okay.  On that then, we'll go ahead and

5     we'll prepare -- I'm not going to rule from the bench on

6     these, but we'll get a memorandum out pretty quickly.

7     Whenever I do that, my law clerks moan.  I hear them moaning

8     off to the left whenever I -- one of these days I'm going to

9     have a law clerk yell out, "What do you mean we," you know.

10    We're laughing here, but we'll get on that pretty quickly.

11    All right.  So that's one of the remaining five.  Then we

12    have -- make a note of that, Adam.

13         All right.  Then the next motion is the motion to

14    suppress Facebook records, Paper No. 73, and is there any

15    further legal argument on that, apart from what is in the

16    papers from the point of view of the defendant, Ms. Whalen?

17         **MS. WHALEN:**  No, Your Honor.  Thank you.

18         **THE COURT:**  Ms. Brusca, from the point of view of

19    the government?

20         **MS. BRUSCA:**  Then we'll submit as well, Your Honor.

21         **THE COURT:**  That's on the matter of the motion to

22    suppress Facebook records, Paper No. 73.

23         Anything from the government's point of view?

24         **MS. BRUSCA:**  No, Your Honor.  Thank you.

25         **THE COURT:**  So as to that, we'll address that pretty

```
 1    quickly as well.

 2         Okay.  So that's coming down now to the matter of the

 3    cell phone evidence.  Paper No. 74 I've already ruled upon.

 4    Paper No. 94 is what -- well, we have the -- first of all,

 5    I've already ruled, I think -- I'm looking at my notes here.

 6    I've already ruled on the matter of cell phone evidence as to

 7    Paper No. 74; have I not?  It's not the Alcatel phone, it's

 8    the other phone.  I've already ruled on that as well.

 9              MS. BRUSCA:  Correct.  That was ruled on.

10              THE COURT:  So then the three that are remaining

11    here for me to address are the motion to suppress the

12    July 2021 cell phone search and the June 2020 --

13              MS. BRUSCA:  I think Your Honor may have ruled on --

14              THE COURT:  I ruled on the -- I ruled on No. 95 as

15    well, did I not, Adam?  I think.

16              MR. DEMETRIOU:  Yes.

17              THE COURT:  Yes, okay, I have.  So I'm just trying

18    to clarify.  Where we are is that we've got the -- hold on

19    here.  We have the search of the residence and the person and

20    the intended supplement, that's Papers No. 69 and 101.  And

21    then we have the motion to suppress the July 2021 cell phone

22    search.  They are the -- I'm sorry, the motion to suppress the

23    June -- give me the numbers here.  We've got too many numbers.

24              MR. DEMETRIOU:  It's 94.

25              THE COURT:  What is the Alcatel number?  What's the
```

```
 1        number of the motion?

 2                MR. DEMETRIOU:  Ninety-four.

 3                THE COURT:  It's 94.  Okay.  The matter to suppress

 4        the July 2021 cell phone search as to what I'm calling the

 5        Alcatel phone, and that is Paper No. 94.  The others I've

 6        either ruled on or the parties are prepared just to submit on

 7        the record.  So that is what we're having legal argument on,

 8        is the defendant Briscoe's motion to suppress search of

 9        residence and person, Paper No. 69 as supplemented by Paper

10        No. 101.  And then we have defendant Briscoe's motion to

11        suppress the July 2021 cell phone search, Paper No. 94.

12        That's what we're having legal argument on; correct?

13                MS. WHALEN:  There is also the tracking order which

14        is, I think, both in 69 and in 101.

15                THE COURT:  Yes.  No, I concur.  I understand.  The

16        motion to suppress the search warrant, as well as the tracking

17        order related; is that correct?

18                MS. WHALEN:  Well, the search warrant, actually the

19        government has said they're not intending to rely upon the

20        search warrant.

21                THE COURT:  Right.  Right.

22                MS. WHALEN:  So I think for all practical purposes,

23        it's really the tracking warrant and the search and arrest of

24        Mr. Briscoe --

25                THE COURT:  Yes.
```

```
 1              MS. WHALEN:  -- in the apartment.

 2              THE COURT:  I understand.  The arrest in June of

 3    2020 --

 4              MS. WHALEN:  Yes, June of 2015.

 5              THE COURT:  The arrest on May 22, 2020?

 6              MS. WHALEN:  No, 2015, Your Honor.

 7              THE COURT:  2015.  All right.  Well, we'll clarify

 8    that.  We've got 69, 101, and 94 are the motions as to which

 9    we're going to -- we will now hear legal argument, okay.

10         And with that, Ms. Whalen, I will be glad to hear from

11    you.  You can stand there at the table or use the podium,

12    whatever makes you more comfortable, or Mr. Purpura, whatever

13    you want to do.

14              MS. WHALEN:  Your Honor, I am going to argue them,

15    although I think it's the government's burden.  So I think --

16              THE COURT:  I'm sorry.  You're right.  I'm sorry.

17    I'm going through my notes here.  The government bears the

18    burden of proof here on this, and so with that, the burden is

19    no greater than by a preponderance of the evidence, but the

20    burden is with the government, correct, Ms. Whalen.  I'm

21    sorry.

22         And Ms. Brusca, I'll be glad to hear from you on this.

23    And you can stay at the table or go to the podium, whatever

24    makes you more comfortable.

25              MS. BRUSCA:  Sure.  Thank you, Your Honor.  I think
```

 1    unfortunately this go round I have a lot of different papers,

 2    so I'm going to stay here at the moment.

 3            THE COURT:  That's fine.  Go right ahead.  I've got

 4    the same problem up here.

 5            MS. BRUSCA:  So, yes, Your Honor.  So we're going to

 6    proceed, I think, in this argument chronologically, much the

 7    same way we did when we gave you our opening argument before

 8    the testimony and the way that our evidence proceeded.

 9            THE COURT:  What I would like to do, though, is that

10    in terms of the search of the residence and the person and the

11    tracking, I'd like to deal with it separately from the cell

12    phone matter if we can.  I'd like to keep 94 separate from 69

13    and 101, if we could.

14            MS. BRUSCA:  Understood.

15            THE COURT:  Let me hear argument first on 69 and

16    101.

17            MS. BRUSCA:  Okay, Your Honor.  So with respect

18    to -- with respect to what I would say, again, is the event

19    culminating in the arrest of Andre Briscoe on June 5th, 2015.

20    And its really a couple of different orders and warrants and

21    events that go from June 4th into June 5th.  So we've kind of

22    started our argument, the defense has started its challenges

23    with the June 4th, 2015, tracking order for Mr. Briscoe's

24    phone.  And that leads them, of course, to Cambridge.

25            So what we've said about this moment on the doorstep, on

 1     June 5th, 2015, when they find Andre Briscoe is that the
 2     government's view is the police had a right to be there.  This
 3     tracking order is in and of itself valid.  It provides
 4     probable cause.  It satisfies the requirements of the Fourth
 5     Amendment, and I'm going to go back through each of these
 6     things in detail, but just to outline it for you.
 7         The tracking order is equivalent to a warrant.  It
 8     provides probable cause.  Even if this court disagreed that
 9     the tracking warrant -- the tracking order did not set forth
10     probable cause, there is good faith because although --
11             **THE COURT:**  Under *Leon.*
12             **MS. BRUSCA:**  Under *Leon,* exactly, Your Honor.  And
13     even though the defense has, sort of, raised the factor of
14     *Franks* here, we don't think they've met their burden even to
15     get to testimony on that.  But even listening to what the
16     detective had to say, there is absolutely nothing
17     intentionally false and misleading about it.
18             **THE COURT:**  I want to just make sure we're clear.  I
19     don't mean to interrupt, but as you all know, I'm fairly
20     interactive because I want you to know I'm thinking as we go
21     step by step.
22         The point is, from the point of view of the government,
23     that there was a functional equivalent of a warrant to track
24     Briscoe's phone, and that this was in 2015 and this was pre
25     Carpenter, that in terms of the manner of the juris prudence

1     that changed after the *Carpenter* case with respect to the

2     process as to seeking a warrant, probable cause, judicial

3     review, et cetera, was not attended there at that time, and

4     from the government's point of view, I know there's been some

5     testimony that it was the practice, perhaps, to do X, Y, and

6     Z, but the reality is, from a legal point of view, the

7     government's position is, is that there wasn't a requirement,

8     per se, to get a warrant, a search warrant from a judge and

9     the tracking order was the functional equivalent of it in

10    terms of what the law was in existence as of 2015.  In a

11    nutshell, that's the government's position on that, right?

12          **MS. BRUSCA:**  Correct.  I would say both, Your Honor,

13    that the law did not require them to get a warrant because

14    Carpenter hadn't been decided yet.

15          **THE COURT:**  Carpenter was 2017 or 2018, I believe.

16          **MS. BRUSCA:**  Correct.  Exactly, Your Honor, 2018.

17    And so there was no requirement under the law that they get

18    one, but they, in any event, did get one.  They got this

19    tracking order, it set forth probable cause, and they were

20    entitled to rely on that warrant or order in good faith Under

21    *Leon* because there is really no *Franks* issue there as we've

22    already explained it.  And I'll go through that in detail, but

23    that's just step one.

24        So argument one is this tracking warrant, lawful in all

25    respects, gets the police to the doorstep of Apartment 202.

```
 1        And when they are at Apartment 202, the uncontroverted

 2     evidence that we heard from three different Cambridge police

 3     officers is that there was a knock on the door.  And there was

 4     earlier a louder, faster, more stressful and intense execution

 5     of a search warrant that had ended.

 6              THE COURT:  In another location?

 7              MS. BRUSCA:  At a different apartment.

 8              THE COURT:  We're talking about with respect to the

 9     issue of Apartment 202?

10              MS. BRUSCA:  Well, right.  Exactly.  So the

11     testimony was, Apartment 101, there is an execution of a

12     warrant that happens with a stack.  It proceeds in a tactical

13     manner.  And after that, there is a lull.  I think the

14     testimony of the officers was that it was actually slower.  We

15     were kind of standing around, waiting to see what to do next.

16     That one of the officers said, I actually hid myself because I

17     didn't want these ordinary citizens to be in fear of, or

18     something like that.  And, quote, they said, well, you said

19     you intentionally stayed off the landing.  Why did you do

20     that?  What were you trying to avoid?  Basically, that people

21     don't look out and see something, see somebody in full

22     tactical gear at their peephole and, you know, get concerned.

23     And so there is a shift.  The kind of excitement of the

24     morning has now ended because they enter 101, there is no

25     Briscoe, and they go around and they start knocking on doors.
```

1    And three different officers say, you know, we weren't close

2    enough to hear what happened because there was only one guy at

3    the door, the CPD officer.

4         One guy at the door, and he knocks on the door with this

5    device in his hand and the door opens and there is some

6    conversation.  We can't hear what's said, but there is no

7    yelling.

8         There is no outward demonstration of a confrontation

9    that's aggressive in any way.  And ultimately, the door is

10   opened and we saw the demonstration after some consternation

11   of somebody stepping back, both with their body and opening

12   the door more fully.  And the BPD officer gestures to his

13   other guys, like, come on over.  And the understanding, which

14   is a reasonable understanding, which is the standard here, the

15   reasonable -- what a reasonable officer would have thought

16   under the circumstances.  And again, I'm going to go back

17   through each one of these and cite some cases for Your Honor,

18   but effectively that there is consent in all meaning of the

19   word.  If nobody can hear the words but what they can see,

20   what the physical action that's happening between these two

21   individuals is consent.  And so there is consent to enter the

22   apartment.

23        At that point, there is really -- there is no search

24   warrant.  It's just consent to enter.  And upon entry, the

25   officers see an individual on the couch.  It's unclear how

 1    quickly they know whether or not that's the defendant they're

 2    looking for, because pretty much contemporaneously with

 3    entering the apartment and seeing this individual on the

 4    couch, there is, you know, a movement, a furtive movement is

 5    how it's described by the officer, as somebody who runs into a

 6    bedroom and closed the door.

 7            THE COURT:   And the individual on the couch was, in

 8    fact, the defendant Briscoe?

 9            MS. BRUSCA:   He was, in fact.

10            THE COURT:   The evidence is not that Mr. Briscoe was

11    one of those moving into the back room and shutting the door?

12            MS. BRUSCA:   Correct.  But I think under *Terry*, I

13    think at the moment these officers are here, they're here in a

14    high-risk neighborhood, which they have testified, you know,

15    that there have been shootings, there have been homicides.

16    There have been all kinds of calls.  They're there because of

17    a murder, involving a gun, of a woman and her child, and then

18    somebody at the sight of police, flees.

19        So you have the combination of a high-risk neighborhood

20    and immediate flight upon seeing the law enforcement, and not

21    just flight, but flight and closing the door.  And two

22    officers, both Detective Howard and Sergeant McCray, testified

23    that under those circumstances, what you're thinking is that

24    person's getting a weapon, they're destroying evidence, or

25    they're jumping out the back window.  And so there is

1  immediate concern about safety and about protecting what's
2  going on.
3          **THE COURT:**  Not by actions which Mr. Briscoe took,
4  but by actions that others in the apartment took?
5          **MS. BRUSCA:**  Correct.  But I think it's part and
6  parcel of the same.  I don't think the officers were required
7  to just let, potentially, somebody come out shooting at them
8  at this moment.  They have to protect themselves and protect
9  the area that they're in.  And they don't move forward into
10 the apartment.  They all say, we stay there and call, come
11 out.  Come out of the bedroom.  You know, show hands, show
12 hands.  And everyone kind of freezes until those folks come
13 out of the bedroom, at which point there is a protective sweep
14 that's done, and a pat down of these folks for weapons totally
15 consistent with *Terry* and those line of cases to pat these
16 folks down.
17         So we have BPD get to Cambridge under the tracking order
18 lawfully, gain entry into the apartment, not to search it, but
19 gain entry through consent, and then they conduct this
20 entirely reasonable and proportional protective sweep.  They
21 don't search anything at that moment.  They don't go through
22 the room.  They just do immediate -- one of the officers said,
23 the wing span of the individuals, and they are placed in --
24 placed in restraints.  Again, there is nothing unlawful about
25 that.  It's a momentary stop.  And, in fact, the Fourth

 1    Circuit handbook, the Supreme Court has said --

 2          THE COURT:   In fairness to Magistrate Judge --

 3    retired Magistrate Judge Horne, we should refer to him as the

 4    author of this.  We all remain in his debt.

 5          MS. BRUSCA:  Absolutely, Your Honor.  It is a go-to

 6    reference.

 7          THE COURT:  I refer to it as the Bible of the Fourth

 8    Circuit quite frankly.

 9          MS. BRUSCA:  Exigent circumstances permit the

10    warrantless entry and control of property while a search

11    warrant is obtained.  That's *United States v. Davis, Fourth*

12    *Circuit 2001.*  It goes on to say the Supreme Court in Illinois

13    v. McArthur permits the warrantless detention or control of

14    individuals associated with property while a search warrant is

15    obtained or the property is searched.

16          And it's clear they had attempted to get a search warrant

17    that morning.  Detective Lewis testified he had gone back,

18    after the denial at Apartment 201 to start drafting another

19    search warrant.  It's clearly the intent of every law

20    enforcement there to search the location where Mr. Briscoe is

21    found.  And on top of that, it is worth noting that in

22    Michigan v. Summers, the Supreme Court also said that if you

23    have a search warrant for a person, you can do an

24    investigative stop of them.

25          So in cases where there is a search warrant for a

1    residence, and an individual is seen coming out of the

2    apartment just prior to the execution of the warrant, you're

3    entitled to stop the individual coming out.  In this case it

4    is worth noting, and the defense has challenged it, but the

5    officers had a DNA warrant, so they were entitled, sort of

6    irrespective, to detain him for at least some period of time.

7    And in this case, ultimately, they get a search warrant, they

8    search the apartment, and they find suspected narcotics, and

9    they arrest Mr. Briscoe, and they certainly have probable

10    cause.

11            **THE COURT:**  Among others.  They arrest a group of

12    people.

13            **MS. BRUSCA:**  They did.  They charged, I think,

14    ultimately three people:  Mr. Briscoe, Mr. Harris, and a third

15    individual at the apartment.  And I think at the moment when

16    he is transported to the station really doesn't matter,

17    because we're talking about a period of an hour or two hours.

18    There's no real outside time, except we know Apartment 101 was

19    hit at 8:55.  We know the interview of Mr. Briscoe begins at

20    2 o'clock.  At some point in there, suspected drugs are

21    recovered, Mr. Briscoe is arrested and he -- whether he's

22    transported to the station before or after frankly really

23    doesn't matter.  He's detained either way.  That's true.

24        So by the time he is spoken to by the detectives here,

25    certainly there is probable cause to arrest him.  There is

 1    probable cause to detain him and there is probable cause to

 2    keep him detained for that -- at the outside, five-hour period

 3    until they speak to him.  So that's kind of getting from the

 4    doorstep of Cambridge into the apartment.  He is patted down

 5    and detained and then he's detained and he's spoken to.  And

 6    I'm going to -- I can go back through that in a little bit

 7    more detail.  I don't know if Your Honor wanted to stop at the

 8    statements or talk about --

 9         THE COURT:  Let's stop.  We're up to the statements.

10    We're not going to need further legal argument on the

11    statement according to you-all, but that's fine.

12         MS. BRUSCA:  Then I just want to go back a moment to

13    this idea of the consent.  And I think what the defense has

14    said here is -- and what I think they're going to argue is

15    that there has been this show of force and no reasonable

16    person could have consented under those circumstances.  And

17    our response to that --

18         THE COURT:  The consent in question -- the consent

19    in question is the individual at the door.  Apart from the

20    matter of whether or not Mr. Briscoe had an expectation of

21    privacy in Apartment 202, the consent that's at issue here is

22    the individual at the door, opening the door and responding to

23    a police officer knocking, which you've already addressed in

24    terms of manifesting.  And from the government's point of

25    view, manifesting a consent to come on into the apartment.

 1              **MS. BRUSCA:**  Yes, Your Honor.  And I mean, I think

 2    it goes even further than that where it's clear under the law

 3    that there is no inherent Fourth Amendment interest in a

 4    consensual police encounter.  And we've put forward in our

 5    brief what the particular individual who opened the door said,

 6    but, yes, everybody knew the police was there.  They all heard

 7    them.  They knew when they opened the door that it was going

 8    to be the police.  They could have not opened the door.  They

 9    could have refused entry.  In fact, the folks right next door

10    did exactly that and the police backed out.  So I think the

11    idea that at search warrant is --

12              **THE COURT:**  In Apartment 201 where there was not

13    consent?

14              **MS. BRUSCA:**  Exactly.  And so the fact that there

15    was a search warrant executed at this apartment complex should

16    not, thereafter, prevent any possibility of consent, simply

17    because there are -- there is a police presence and there had

18    to be, you know, a loud search warrant that had been executed

19    below, and we think that's the case, which then brings us back

20    around exactly to what Your Honor is saying about the

21    expectation of privacy.  And we would just point out -- we

22    showed in the Google map of the pings for Mr. Briscoe's phone

23    that he can't be in the area.  His phone is not in that area

24    of 502 Greenwood Avenue any earlier than 4:52 a.m. on

25    June 5th.

1          **THE COURT:**  And that is -- just so it's clear, the

2   cell phone to which you're referring on the pings is which

3   telephone?  Which telephone?

4          **MS. BRUSCA:**  The 2413 number.  That's the subject of

5   the tracking order.

6          **THE COURT:**  It would be good for me in terms of

7   Samsung, Alcatel, whatever to distinguish.

8          **MS. BRUSCA:**  The Alcatel, Your Honor.

9          **THE COURT:**  Okay.

10          **MS. BRUSCA:**  So that's the one they had obtained the

11   order to track and what that tracking order -- the data from

12   that tracking order shows, is that he doesn't show up at that

13   apartment any earlier than 4:52 a.m. on the morning of

14   June 5th, 2015.

15          And on top of that, there was that Mirandized statement

16   of the cousin whose apartment it was.  And what it said was,

17   she woke up at 7:50.  There was nobody in the apartment but me

18   and her boyfriend and her kids.  She put the kids on the bus.

19   She came back and went back to sleep, and she wakes up,

20   basically, to the police saying, show hands.  And she was

21   described, by Detective Howard, as visibly upset that this is

22   all going on.

23          So it's, you know, certainly possible that Mr. Briscoe

24   was at the apartment for some period of time, but he doesn't

25   get there any earlier than 4:52.  At 7:50 when the cousin

1   wakes up, he's not there, and then he's back by about

2   9 o'clock when these knock-and-talks started to occur.

3       So there is no evidence of any property belonging to

4   Mr. Briscoe in this back bedroom.  There is mail in the name

5   of one of the occupants of the home.  There is mail in the

6   name of another one of the occupants, not Mr. Briscoe.  It was

7   Tyrell Harris, Tony Harris.  You know, there's no evidence

8   there is any clothing, other than the clothing that

9   Mr. Briscoe was seen on the video wearing, a black and white

10  shirt.  He was dressed when the police came in.  No evidence

11  that he had to go anywhere within the apartment to retrieve

12  anything before he's transported or to get clothes, and there

13  is just no reason to think that he's staying there.  And, in

14  fact, I think it's worth noting that during the almost

15  two-hour interview with BPD that he did, Mr. Briscoe doesn't

16  say anything like, and I've been staying with my cousin or --

17  he gives a different address back in Baltimore.  He doesn't

18  put himself, really, in that apartment at all.

19      So we don't think he had an expectation of privacy in

20  the apartment, generally.  But even if he did, the Fourth

21  Circuit has said that, you know, nothing about being an

22  overnight guest gives the guest an expectation of privacy in

23  every area of the apartment.  And with respect to the

24  suspected narcotics and mail and other items found in that

25  back bedroom, there's just simply nothing to think that

1    somebody who -- even assuming he had slept overnight on the

2    couch and was afforded the rights and protections of an

3    overnight guest, that he had an expectation of privacy in that

4    back bedroom.

5         And I think the way that it's been put is -- the

6    ultimate inquiry is whether the host has so liberally shared

7    his own privacy interest with his guest, that it shelters the

8    guest against unreasonable government intrusion.  And I think

9    in this case, clearly Mr. Briscoe knows the occupants, but

10   there is just no reason to think that the woman whose

11   apartment it is, who's written a statement that says, I was

12   angry he was there.  I didn't know he was there.  He wasn't

13   there when I was asleep.  He wasn't there when he spoke up,

14   that she has shared and sheltered this guest against

15   unreasonable government inclusion, and certainly not within

16   the shoe or drawer of somebody else.  So that's with respect

17   to the expectation of privacy.

18        So again, just stepping back, I don't know if the Court

19   wants to hear on the tracking order.  I think it is worth

20   mentioning and reiterating what is in that affidavit.

21             THE COURT:  Let me just ask you if I can.

22             MS. BRUSCA:  Sure.

23             THE COURT:  With respect to the matter of the search

24   of Apartment 202, just so I'm clear, to the extent that you

25   summarized the matter ultimately to obtain a warrant and the

```
 1        search itself, the only evidence from any search of the
 2        Alcatel phone which ends in 2413 has to do with his ping
 3        locations; correct?  That's the only evidence from that search
 4        that would in any way affect the matter of the search of the
 5        apartment at 202; is that right?
 6             MS. BRUSCA:  I just want to make sure I understand
 7        Your Honor's questions.
 8             THE COURT:  I'm just trying to say, in terms of the
 9        various factors that you're listing, we have a series of -- we
10        have a series of motions to suppress both cell phones,
11        residences, two cell phones, residences and what have you.
12           I'm trying to clarify, so I don't miss something.  From
13        the point of view of the government in terms of the probable
14        cause to support the warrant and the search of Apartment 202,
15        the only factor that I've heard you list in which the matter
16        of the Alcatel cell phone ending in 2413 offers any evidence
17        has to do with just the location in terms of ping numbers, is
18        that right?
19             MS. BRUSCA:  I think, Your Honor, it's the ping
20        locations, and then, of course, at the point where that phone
21        is seized by Baltimore.  They want to search it.  We obviously
22        have an argument about whether they did not -- well, they
23        did search --
24             THE COURT:  What I'm trying to do is keep them
25        separate.  I'm trying to be able to analyze separately.  Do
```

1    you understand?  And what I'm trying to clarify -- and

2    Mr. Budlow is certainly free to respond.  I'm not going to

3    hold either one of you to it, as Ms. Whalen and Mr. Purpura

4    can respond.  I'm trying to clarify here in terms of -- with

5    respect to the arrest on June 5th, 2015, and the search of

6    Apartment 202 and the factors that you've listed.  From what

7    I've seen thus far and from what you just argued, the only

8    evidence coming from the search, actually, of the 2413

9    telephone, not the seizing of the phone, and the fact that he

10   has a telephone that's seized and it has this number, the only

11   thing that I've heard you say in terms of the contents of the

12   Alcatel phone is with respect to ping locations.

13            **MS. BRUSCA:**  Correct.

14            **THE COURT:**  Other than that, there is no other

15   evidence that is utilized in support of the search of

16   Apartment 202 in any way, other than that, in terms of the

17   contents?

18            **MS. BRUSCA:**  Correct.  So maybe just to make sure if

19   I put it differently, there is nothing else derivative from

20   that tracking --

21            **THE COURT:**  That's right.  I'm just trying to

22   clarify.

23            **MS. BRUSCA:**  Yes.  Yes.

24            **THE COURT:**  I mean, I'm not talking about the actual

25   arrest and seizure of the phone that actually proves to have

1    the number 2413.  I'm going about -- going as to the contents

2    of the phone itself, that in terms of the only thing I've

3    heard you reference in terms of the search of Apartment 202 is

4    a matter of ping locations there, and that's all I've heard

5    you mention thus far, right?

6             **MS. BRUSCA:**  I think you're saying, what did we

7    seize from that location apart from the ping?

8             **THE COURT:**  I guess I'll -- maybe I'll just make it

9    very simple then.

10        What was the evidence that was seized from the search of

11   that telephone --

12            **MS. BRUSCA:**  Oh, yes.

13            **THE COURT:**  -- in terms of derivative use?  Because

14   clearly we're going to be getting to some of these things.

15   It's a matter of derivative use.  What, if anything, is in the

16   matter of the search of the telephone which in any way

17   supports or does not support -- or if it's totally irrelevant,

18   I need to address that?

19            **MS. BRUSCA:**  Yes, Your Honor.

20            **THE COURT:**  Do you understand we're doing the -- all

21   of these cases have a Wong Sun analysis and derivative use,

22   and I'm trying to clarify where the laws are in these

23   different searches, okay?

24            **MS. BRUSCA:**  Yes, Your Honor.

25            **THE COURT:**  I don't know how else I can make myself

1        more clear.

2               **MS. BRUSCA:**  No, no.  I understand, Your Honor, and

3        we do agree.  It's just -- it was a tracking.

4               **THE COURT:**  I'm not stating a position I'm taking

5        --

6               **MS. BRUSCA:**  No.  No.

7               **THE COURT:**  -- I'm trying to understand what your

8        position is.

9               **MS. BRUSCA:**  Yes, that is our position.

10              **THE COURT:**  Not that you agree with me.  I'm just

11       trying to make sure I'm clear on it.  Wong Sun talks about

12       derivative use.  And all of these -- all of these suppression

13       motions weave in and out, and many times there's an allegation

14       that there's a derivative use here that flows through

15       everything that follows.  I don't think that's the case here,

16       and I'm just trying to clarify that.  That's my point.

17              **MS. BRUSCA:**  Yes, Your Honor.  We think the only

18       thing taken from the phone prior to 2021 is the location data.

19              **THE COURT:**  And the fact that it was on -- it's

20       alleged that it was on his person, that that phone with that

21       number was on his person?

22              **MS. BRUSCA:**  Correct, Your Honor.

23              **THE COURT:**  Okay.  All right.

24              **MS. BRUSCA:**  Yes.  Exactly.

25          So I think I just wanted to turn back to that tracking

 1     warrant --

 2               **THE COURT:**  Okay.  Go ahead.

 3               **MS. BRUSCA:**  -- just for a moment.  Let me just

 4     reorganize my papers here for just a second.  So going back to

 5     that warrant.  And obviously the Court -- Your Honor knows

 6     what probable cause is, but it is a fluid concept, and it's

 7     supposed to take into account the whole picture that is

 8     painted and not facts in isolation.  And here what the

 9     affidavit sets forth in support of probable cause was that

10     there was a plan for Mr. Briscoe to see Ms. Jeffrey.  That he

11     was, in fact, the last person to speak with her at all.  That

12     that last known call was quite a while before her body is

13     recovered, I think almost 24 hours, about 21 hours or so.  And

14     that after this last phone call following the plan to see one

15     another, Mr. Briscoe breaks a pattern and never attempts to

16     contact Jennifer again, which gives rise, we think, to the

17     reasonable inference he knows that attempting to contact her

18     is futile because she's dead.

19          On top of that, Mr. Briscoe doesn't reach out to the

20     family.  This is a woman who, you know, he had seen once or

21     twice a week for several months, that he's believed to have

22     been intimate with.  And based on those facts taken together,

23     we think that there is probable cause.

24          Now, the defense has correctly pointed out that the

25     affidavit doesn't say Mr. Briscoe's family was the last person

 1    with plans to see her, according to the victim's family.  But

 2    we think there is a little bit of a fallacy in the circularity

 3    there in the argument that the defense is making.  And the way

 4    they put it is, the last person to see -- to see a victim

 5    before the murder, that's a trigger for a homicide case.  The

 6    last person to see them, there's like a -- there's a suspicion

 7    there.  You want to talk to that person.  And by saying

 8    Mr. Briscoe is the last person to see Ms. Jeffrey, there's

 9    a -- there is a mischaracterization of him in the judge's eye.

10    But we want to point out here that in every case, the last

11    person to see a homicide victim is the killer.

12        And so if the defense -- if the detective had said

13    Brianna Street was the last person to see the victim, that

14    would be a mischaracterization as well, because there was no

15    understanding or suspicion by anyone that Brianna Street had

16    killed Jennifer Jeffrey and her son.  It's always the case

17    that the last person -- the second-to-last person, that

18    Brianna Street, the person other than the killer to see the

19    victim has to give their -- effectively -- prediction as to

20    who the last person is.

21        There is no -- there is the last person and the

22    second-to-last person.  The last person is the killer.  So

23    whether or not the detective had said Mr. Briscoe was the last

24    person with plans to see Ms. Jeffrey or Mr. Briscoe was the

25    last person to see Ms. Jeffrey, the understanding for the

1    judge would have been the same.  This is the person who we

2    think saw her last before her death, and therefore, you know,

3    we have concerns about why he's not coming forward, especially

4    since he's the last person to talk to her.  He breaks his

5    pattern of calls.  He doesn't reach out to the family and all

6    of the other things in the affidavit.  So whether he had added

7    those two words or not, the meaning to the judge reading the

8    affidavit would have been the same.

9        So we really don't think there is anything at all

10   misleading about that characterization.  Could it have been

11   written better, yes, but you heard Detective Lewis.  You know,

12   they're in the middle of, kind of, craziness in the city.

13   They're dealing with all kinds of things.  They're getting

14   warrant after warrant, conducting interview after interview.

15       On the day these bodies are discovered, they literally go

16   up to Baltimore County Jail to interview one person, go back

17   to interviewing Ms. Street at 9 o'clock at night in their car,

18   and there is just no reason to think anything about that

19   affidavit was intentionally misleading.

20       If Your Honor would just give me a second.  I apologize

21   for jumping around just a little bit.  But the last thing I

22   would add is just the probable cause to seize Mr. Briscoe's

23   phone.  We talked about the probable cause to seize and detain

24   him and the other circumstances, but not necessarily his

25   phone.  We think it's clear, based on all of the reasons set

forth in the tracking order and the DNA warrant, ultimately

why there was probable cause to seize the phone of Mr. Briscoe

when it's found based on the homicide.  This was the last

phone known to communicate with her.  There was this

communication at 11:41.  There had been text messages between

Mr. Briscoe and Jeffrey seen on Ms. Jeffrey's flip phone.

There is every reason to think there might have been those

kind of messages.

     And then on top of all of that, there is also probable

cause to seize the phone based on the drug dealing.  There had

been numerous witnesses who told the police that these two

folks were involved in heroin trafficking, and then they get

to the apartment and, in fact, there are suspected narcotics.

And as he is arrested, Mr. Briscoe admits that he -- that he

was, in fact, getting work from Jennifer Jeffery.  So there

was every reason to seize that phone.  Mr. Briscoe admits it's

his phone when he stands up and the officer says, is this your

phone?  And he says, yes, and it's moved out of the way.

There is every reason -- at that moment, there was probable

cause to seize it.

     So I think unless the Court wants to address more issues

further, I think that's what we have.

               **THE COURT:**  All right.  Just to clarify one other

thing for me, to the extent, the murders occurred on May 27,

2015; correct?

```
 1              MS. BRUSCA:  That's what we've alleged.

 2              THE COURT:  And then in terms of the June 5th arrest

 3    in 2015, I understand that the testimony of Detective Lewis

 4    was that they could not find -- he could not find a copy of

 5    what he contends was the 2015 search warrant in his computer.

 6    There is evidence of -- apart from going into the contents of

 7    the Alcatel phone, which is a phone ending in 2413, there is

 8    evidence of the fact that that's the number.  There is

 9    evidence, the government contends, as to contacts with that

10    phone in connection with drug dealing; correct, apart from

11    going into the contents of it?

12              MS. BRUSCA:  Well, correct, Your Honor.  These folks

13    were meeting once to two times a week.

14              THE COURT:  My question is:  Is that in terms of the

15    evidence with respect to that phone, the government's

16    proffering, and the testimony is there is evidence of contacts

17    between other phones and that phone in connection with drug

18    dealing, that's your argument.  And, again, it doesn't get

19    into the contents of the phone necessarily, but just the

20    existence of the phone?

21              MS. BRUSCA:  Correct.  Just the fact that this

22    phone --

23              THE COURT:  Thank you very much.  Thank you,

24    Ms. Brusca.

25         Ms. Whalen, I'll be glad to hear from you on this.
```

 1                **MS. WHALEN:**  Thank you, Your Honor.

 2        Let me start with the tracking warrant.  It's our

 3    position that, obviously, you did need a warrant to

 4    actually --

 5                **THE COURT:**  Pre *Carpenter*?

 6                **MS. WHALEN:**  Yes.

 7                **THE COURT:**  What is the basis of that?

 8                **MS. WHALEN:**  *Carpenter* actually says you need --

 9                **THE COURT:**  I know it did, but I'm saying that this

10    was 2015 in terms of the *Leon* exception.

11                **MS. WHALEN:**  I agree.

12                **THE COURT:**  Clearly carpenter was a very important

13    case that from that point forward it established the need for

14    a warrant.  Carpenter was some two or three years after 2015.

15                **MS. WHALEN:**  I agree with that.  And so that kicks

16    this into another level, which is, you do need a warrant;

17    however, the government argues this was the functional

18    equivalent of a warrant because it had probable cause and/or

19    good faith.

20                **THE COURT:**  And clearly the law enforcement wasn't

21    on notice to the specific need of a warrant until *Carpenter*

22    came along, was it, Ms. Whalen?

23                **MS. WHALEN:**  No.  In fact, there -- in fact, I think

24    they routinely -- now, there is a whole different issue here

25    about what was told to judges in subsequent warrants, but

```
 1   we're not there.
 2          THE COURT:  Yeah, right.
 3          MS. WHALEN:  However, on the tracking warrant, our
 4   position is that there was more probably than not, information
 5   in the affidavit that would give the police reason to want to
 6   talk to Mr. Briscoe rather than any evidence that the police
 7   could -- or put forth that the phone itself and the location
 8   of the phone itself, in some way, was an instrument of crime
 9   or was evidence of a crime.  And that's what you need, that's
10   the test.
11       It's not just simply, we want to find him and we're
12   allowed to get an order to find him.  Instead it's whether --
13   if you're going to argue it's probable cause, it's got to be
14   more probable than not that that phone and the location of
15   that phone are in some way evidence of a crime, and they just
16   didn't have that here.
17          They wanted to talk to him.  They, I suggest, took the
18   easy way out, which was to get a tracking warrant to try to
19   find out where he was.  There is no testimony that they
20   couldn't find him before or anything along those lines.  Be
21   that as it may, they do get the tracking warrant, and I would
22   suggest to Your Honor that it is misleading, at best, to say
23   that our client was the person that -- the last person that
24   saw the victim.  And we can play around with words and what
25   was in the mind of the officer, but it was misleading.  And
```

1    the import of that is, if you take that statement out of the

2    affidavit, then I would suggest there is not any probable

3    cause that would suggest that somehow our client had anything

4    to do with the murder.  He was just -- happened to be someone

5    that his phone was contacted at 11:41 by the victim, and he

6    happened to be someone that had seen her before, and that's

7    really it.

8         So the tracking warrant itself, we say, is not the

9    functional equivalent of probable cause, because when you take

10   a look at it, it does not rise to what the real test is, and

11   that is that the phone or its location would have -- would

12   bear evidence.

13        Your Honor --

14        **THE COURT:**  Now, that has really -- your argument

15   really addresses the matter of the phone itself seized from

16   Mr. Briscoe when he was arrested, and just the fact of his

17   having that phone, that being his phone, the Alcatel 2413

18   number, it's that argument that I understand, but your

19   argument -- that doesn't address in any way actually what the

20   contents of the phone were.

21        **MS. WHALEN:**  I'm not there yet.  That's correct.

22        Now, with regard -- although in our papers we did argue

23   that just the very nature -- so I'm not waiving that argument,

24   but I'll just submit on the papers, just the very nature of

25   getting a trafficking order --

```
 1              THE COURT:  Tracking order, yeah.

 2              MS. WHALEN:  Did I say trafficking?

 3              THE COURT:  You said trafficking order.

 4              MS. WHALEN:  Sorry about that.  Tracking order.

 5              THE COURT:  Tracking order.

 6              MS. WHALEN:  And then the very nature of finding out

 7    where he is and the like.  I think there is case law that

 8    supports Riley -- that supports that that is, in fact, a

 9    search of his person, his location similar to the beeper on

10    the car in the Riley case.  And that it is also a search of

11    the location.  However, I'm going to just submit on --

12              THE COURT:  That's fine.  You've submitted the

13    papers.  I'm just trying to make sure we're clear.  It has

14    nothing to do with the actual contents of the 2413 phone?

15              MS. WHALEN:  Right.  That comes later.

16              THE COURT:  Comes later.  That's right.  I

17    understand.

18              MS. WHALEN.  So with regard to the tracking warrant

19    in good faith, the government cited to you other district

20    opinions, Judge Blake and Judge Hollander, who found good

21    faith, because I don't think there is a Fourth Circuit case

22    that deals specifically with this issue.  I haven't found one

23    and I don't think there is one cited to you by the government,

24    but they talk about Judge Blake's case.  And I want to point

25    out that this case is different than those two cases.
```

1          In Judge Blake, it was a civil case, a 1983 action,

2     *Andrews versus Baltimore Police Department,* and Judge Blake

3     found that there was good faith reliance in a similar kind of

4     situation, a tracking order, where there was an arrest warrant

5     for an individual, Mr. Andrews I believe his name is.  And

6     there was also -- the police had determined who -- what his

7     cell phone number was, and they actually put in the warrant,

8     "suspects contact people on cells to assist hiding from

9     police."

10         That was, I think, what Judge Blake found to be probable

11    cause that the phone itself, and the location of the phone

12    itself may be evidence of a crime.  That's different than what

13    we have here.  There is no nexus.  There is nothing that ties

14    in the phone with the actual crimes in this case.

15         In Judge Hollander's case, she found -- and that's

16    cited -- I forgot to put the name down on my papers, but it's

17    cited in the government's response.  But she found that there

18    was -- actually, the phone was that of a codefendant and so

19    there was no standing.  So totally different set of

20    circumstances for the finding of good faith, and I only point

21    that out because I think in this case it's slightly different.

22         You have an officer -- or an argument now that there is

23    good-faith reliance, but he says -- and I think this undercuts

24    probable cause extensively.  He says that there -- and I'm

25    going to quote, he may -- Mr. Briscoe -- may have information

1    regarding this investigation.  And that's a whole different --

2    different game than it is more probable than not that this

3    person has evidence of a crime or that his phone contains

4    evidence of a crime.  And so I think there is a very big

5    distinction going on with good faith in this case as well.

6         Your Honor, the next issue, I think, in time would be

7    standing.  And let me point out, if I can, what I believe the

8    standing is in this case.  First of all, let's --

9         **THE COURT:**  With respect to Apartment 202?

10        **MS. WHALEN:**  Let's talk about first Mr. Briscoe.

11   It's obvious, it's clear he has standing to challenge any

12   search of himself and any items seized from him, which would

13   be the cell phone.  So we got that issue, and I would suggest

14   that there is just no argument against his standing there.

15        On the apartment itself, here is what I view the evidence

16   to be.  While we objected to Grand Jury transcripts without

17   any cross-examination, I will point out that in this issue,

18   there is a grand jury transcript that's Exhibit 25, page 23,

19   where the lessee's father, and I can tell Your Honor his name

20   is Mr. Harris, Tyrell Harris.  He basically says when the

21   police came in -- or when he came into the apartment prior to

22   the police coming in, Mr. Briscoe was on the couch.  He tells

23   Mr. Briscoe, kind of, what's going on, and Mr. Briscoe says,

24   I'm going to just go back to sleep.  So he is asleep on the

25   couch when the lessee's father comes in.  And he also was

asked questions and he said, he stayed a couple of nights and

he also said, he's there every night.

So the government put in evidence that at least at 4:52

he was in the apartment complex, if you believe the pinging of

his phone. Prior to that, I think there was just no

information about where the phone was at 3 -- and I think the

earlier time was 3:52. So he could have been in the apartment

as early as 3:52 in the morning, but it seems clearer from the

government's evidence that it's 3:52 -- or excuse me, 4:52 in

the morning. I may have my -- maybe 4:51.

The test is not, were you there overnight all night? The

test is whether you have an interest in the place that you lie

your head. I sometimes find it easier to, sort of, keep it

simple, stupid, and go back to the Supreme Court and see what

they said. And I took a look, again, at *Minnesota versus

Olson.* And in that case where it was -- or the Supreme Court

did say a houseguest has standing. The Supreme Court said,

from the overnight -- excuse me, overnight guest's

perspective, he seeks shelter in another's home, precisely

because it provides him with privacy. We are at our most

vulnerable when we are asleep because we can't monitor our own

safety or the security.

They also reference Katz meaning that a very temporary

private place gives you an expectation of privacy, and that

was in a phone booth. So if you're in there making a short

1    phone call or you're asleep on a couch, you've got a privacy

2    interest in the location.

3         Now, the government, again, makes hay with the Grand Jury

4    transcript of the lessee who testified before the Grand Jury

5    that she did not -- I think it was she did not see them at

6    7:50 in the morning.

7         If you contrast that with her father's testimony, then

8    somebody is wrong, all right.  And who has the interest to not

9    tell the full truth, and I would suggest it's the lessee whose

10   house is being searched and drugs are being found in the

11   house.  And she has reason, I think, to distance herself from

12   Mr. Briscoe and Tony Harris, who she knows that the police are

13   looking for, either for drugs and/or a violent crime.

14        Certainly by the time she comes to Grand Jury and

15   testifies she knows exactly what's going on.  She knows that

16   they're looking at Mr. Briscoe for a murder, so she's

17   certainly going to distance herself from them, I would

18   suggest.  So our position is that there's adequate -- and you

19   only need a slight privacy interest.  You just need a privacy

20   interest, and there are a couple of other things I'll point

21   out for this.

22        Detective Lewis testified that this was the cousin's

23   house.  And he also testified that he knew prior to this that

24   Mr. Briscoe was staying in Cambridge and Baltimore.  Corporal

25   Howard testified that the defendant was -- Mr. Briscoe was in

1    athletic wear, as if for sleeping.  So I think we've

2    established adequately, Your Honor, that he has an interest in

3    the property, or privacy interest in his person and the

4    location.

5         Now, I want to point out, again, I went back to *Minnesota*

6    *versus Olson.*  And with the issue about whether he has privacy

7    interest in the rest of the apartment, what the Supreme Court

8    said is, the houseguest is there with permission of his host

9    who is willing to share his house and his privacy with his

10   guests.  It is unlikely that the guest will be confined to a

11   restricted area of the house, and when the host is away or

12   asleep, the guest will have a measure of control over the

13   premises.

14        So I think the Supreme Court didn't split hairs in the

15   way in which the government is now splitting hairs and saying

16   he doesn't have an interest in the back bedroom where drugs

17   were found.  Certainly he was charged with that, those drugs,

18   so at least the officers thought he had a possessory interest

19   and charged him and, in fact, he was incarcerated for many

20   months on those charges.

21        I think the next in time, Your Honor, that I would go to

22   is, we believe that the evidence is very strong that

23   Mr. Briscoe was arrested without probable cause, and that his

24   phone was taken based upon and as an incident to that arrest.

25   The evidence is that around 8:55, there was a knock and

```
1    announce on Apartment 101.  All of this is happening very
2    quickly.  Shortly thereafter, they go to other apartments and
3    ultimately end up at Apartment 202.
4         Detective Lewis is off to the station to get another
5    warrant.  Officer Daniels testified that he was the person who
6    transported Mr. Briscoe after everyone was placed in handcuffs
7    and controlled, and he was there about 30 minutes, he said.
8    And we now know that's probably about 9:30 based on his
9    calculation of timing.  He transports Mr. Briscoe out of the
10   apartment, and at that same time Detective Lewis is coming
11   back to that apartment somewhere around 9:30.  He's taken out.
12        We know the search from Sergeant Benton happened around
13   10:35 in the morning, she believes.  So the search is much
14   later.  So at this point, they've just taken him out because
15   he's a suspect.  In fact, I think one of the detectives
16   actually said that.  There was no arrest warrant.  There was
17   no -- you know, nothing except for he was a suspect.  So he's
18   arrested at that point.  He's in handcuffs continually, taken
19   to the station and his gun is taken incident to that -- his
20   phone is taken incident to that arrest.
21        Detective Lewis also testified he was present at the time
22   of the search, so we know the search was after Mr. Briscoe was
23   taken to the station under arrest.  The government argues for
24   the first time, I believe, here that somehow the phone itself
25   was properly seized based on probable cause.  There was
```

1    nothing in this record that I suggest that presented that

2    somehow Cambridge police officers or Detective Lewis had

3    information that would have given them grounds to believe the

4    phone itself was such that they could seize.  It's not more

5    probable than not that somehow the phone itself contained

6    anything, and I would suggest that that is a last -- you know,

7    a late argument for a reason, and that's because all of the

8    officers said, we took them down there without -- without

9    waiting for there to be a search of the apartment and drugs to

10   be found.

11        Court's indulgence just one moment.

12            **THE COURT:**  Take your time.

13            **MS. WHALEN:**  I think that that leads us to the

14   consent issue.  I'll tell Your Honor that I think the record

15   is clear in regards to what officers were thinking.  And if

16   there were a missing witness rule, it should be applied today

17   about that Baltimore police officer who stood at the door and

18   talked to Mr. Harris who opened the door, because no one knows

19   what was said.  All they know is what they could see from the

20   stairwell, but if you take a look at Government's Exhibit 27

21   and 31, those are police reports of an interview of the person

22   who opened the door, and his testimony in the Grand Jury.  And

23   in the interview he says, the police were there with guns and

24   flashlights.  And then in his testimony he says, we heard a --

25   I heard a big boom and "Cambridge Police Department, open the

1      door."  And then they asked where Mr. Briscoe was and he

2      pointed to Mr. Briscoe.  Not that he invited them in, not that

3      he stepped aside, nothing that would suggest that he consented

4      to them coming in.

5            However, if you look about what, you know, the standard,

6      I think, was whether it's reasonable for him to feel that he

7      was able to freely and voluntarily give consent.  You've got

8      police banging on doors.  It's clear they're there.  They've

9      got a battering ram.  There is multiple police, anywhere

10     between six and ten, I think, it was of Cambridge, and then

11     the police from the Baltimore City Police.  And Mr. Harris is

12     at the apartment.  Frankly, it's not his apartment, but I

13     don't think that matters in this argument that we're making.

14     But Mr. Harris sees that it's the police, hears that it's the

15     police, and they ask if Mr. Briscoe is there.  It's not, can

16     we come in and look for Mr. Briscoe or anything along those

17     lines.

18           So if you just take what he says happened in his Grand

19     Jury testimony, it appears that it was a show of force such

20     that there was not really the voluntary consent to come in.

21     Even if there was, it's not a consent to search.  They still

22     need -- even with a protective sweep, they still need a legal

23     basis to search that apartment.  A protective sweep gets you

24     in the door to secure, and it's similar to Terry, and Maryland

25     versus Bowie talks about a Terry search.

 1          So if you can pat someone down and you find something in
 2     plain view or based on the pat-down, then you have a legal
 3     basis to seize.  If you see something in plain view in the
 4     house, then you have a legal basis to seize, but not if you do
 5     a protective sweep, you haul the person out and arrest him and
 6     you take his cell phone with him.  That's not -- that can't be
 7     based upon a protective sweep.  That can't be based upon
 8     Terry, and that can't be based upon any other grounds, I would
 9     suggest, that the government can put forth as to taking that
10     phone.
11          Now, the government didn't argue here but did in their
12     response argue inevitable discovery, and so I'll address that
13     as well.  And they also, I think, in a footnote, mentioned
14     inventory based on the arrest from the drugs.
15          Let's start with inventory.  Inventory searches, it's
16     clear that you have to have a legal basis to take the item to
17     even inventory it.  And in this case, that's not what
18     occurred.  Instead, the phone was just seized without probable
19     cause based upon his arrest, Mr. Briscoe's arrest.  And let's
20     talk about inevitable discovery.
21          **THE COURT:**  If I can, Ms. Whalen, just before you
22     move on with that.  The evidence in the case does indicate,
23     does it not, that shortly thereafter the murder occurring on
24     May 27, 2015, that a family member of the victim, the mother,
25     Jennifer, had confirmed a relationship with both Mr. Briscoe

```
1    and Mr. Harris involving drug activity; correct?

2            MS. WHALEN:  The detective testified -- actually, I

3    don't think he did testify to that.

4            THE COURT:  I'm saying, does not the record of this

5    case reflect that there was an interview of a member of --

6    I'll call it Jennifer's family, very quickly after the murder

7    at some point in time?

8            MS. WHALEN:  My recollection, to be honest with Your

9    Honor, is that that may well come in at trial, but my

10   recollection is that's not what was testified to here.  The

11   interview of the family and the room -- I guess, it would be

12   the niece and roommate dealt with what they knew in an effort

13   to explain why the detective would have said he was the last

14   person to see --

15           THE COURT:  I'm just trying -- I want to make sure

16   the record is clear.  If I need more evidence, I'll require

17   it.  I'm just saying, to me, the evidence in this case, as I

18   understand it, is prior to the June 5th, 2015, arrest of the

19   defendant, that the law enforcement authorities had

20   interviewed family members of one of the victims, the mother,

21   and that there was information with respect to the matter of

22   drug activity between what I'll refer to as Ms. -- I don't

23   like referring to a victim by her first name, but that seems

24   like all of the pleadings has not referred to her as

25   Ms. Jeffrey, it's always Jennifer.  Her name was Jennifer
```

1    Jeffrey.  And there was -- the record in the case, I thought,

2    reflects that there were interviews -- so you're saying there

3    was no interviews?

4            **MS. WHALEN:**  I could have missed it.

5            **THE COURT:**  Just a quick answer on that, Ms. Brusca,

6    is there not evidence of interviews sometime after the murder

7    prior to the June 5th, 2015, arrest of Mr. Briscoe where the

8    authorities had been advised that there was drug activity

9    between the two of them?

10           **MS. BRUSCA:**  Yes, Your Honor.  And this is at

11    Page 79 of Day 1 of the transcript, and this is Detective --

12           **THE COURT:**  I'm sorry, Page 79 of which transcript?

13           **MS. BRUSCA:**  Day 1, Your Honor.  "Apart from

14    friendships, was there a business aspect, for lack of a better

15    term, between CJ and Jen?"  Answer:  "I remember him telling

16    us" --

17           **THE COURT:**  Again, which exhibit are you reading

18    from?

19           **MS. BRUSCA:**  This is from the transcript from the

20    hearing, Your Honor.  And then I'll point you also to --

21           **THE COURT:**  What exhibit that has been introduced

22    here in evidence contains that?  I'm just trying to clarify

23    for the record.

24           **MS. BRUSCA:**  I'm sorry, Your Honor.  There is two

25    different things.  There is an exhibit of the interview with

 1     Brianna Street -- and let me just pull up --

 2              **THE COURT:**   What exhibit number is that?

 3              **MS. BRUSCA:**   Let me just pull it up.   I'm sorry,

 4     Your Honor, give me one moment.   So that's Exhibit 22, and her

 5     name is redacted, but...

 6              **THE COURT:**   All right.   That is Exhibit 22 which has

 7     been offered into evidence and submitted to the Court as a

 8     draft transcript of the May 28, 2015, interview of Jennifer

 9     Jeffrey's niece, Brianna.

10              **MS. BRUSCA:**   And then separately, Your Honor, we had

11     ordered -- both parties have, and I believe the Court may

12     have -- through your clerk -- the hearing, the testimony

13     transcript.

14              **THE COURT:**   Yes.

15              **MS. BRUSCA:**   Detective Lewis testified, Question:

16     "Did other individuals who you spoke with on May 28th say, in

17     a more direct way, that they were dealing in CDS activity?"

18     Answer:  "Yes."  Question:  "Who were those folks?"  Answer:

19     "From what I remember, Danielle Wilder, who is Jennifer's

20     sister, and Brianna" --

21              **THE COURT:**   I'm looking at my notes from the

22     testimony proffered to me, the first witness last week on

23     January 19th, where he referred to another individual CJ, who

24     was in jail --

25              **MS. BRUSCA:**   Exactly.

1      **THE COURT:**  -- had known Jennifer.  There is

2    evidence of Jennifer -- of the allegations that Mr. Briscoe

3    was known as Poo, and there is evidence that in the immediate

4    aftermath, in addition to Brianna, the niece, that there was

5    evidence of drug activity between Ms. Jeffrey and

6    Mr. Briscoe.

7      **MS. BRUSCA:**  Exactly, Your Honor.  Exactly.

8      **THE COURT:**  Ms. Whalen, before you move on, I think

9    I'm just trying to make sure there is no dispute about that.

10      **MS. WHALEN:**  Your Honor, if the record reflects

11    that, then the record reflects that.  I --

12      **THE COURT:**  So apart from the murders -- apart from

13    the murder of Ms. Jeffrey, there was clearly evidence that

14    authorities had with respect to drug activity; correct?

15      **MS. WHALEN:**  Well, I can't say it's correct, drug

16    activity.  Yes, there was an interview of a roommate that

17    talked about a relationship between Mr. Briscoe.  We objected

18    to that coming in and --

19      **THE COURT:**  I understand.  The objection is

20    overruled.  But what I'm saying, but the evidence before me is

21    clearly -- just so we're going chronologically before we go

22    off on this.

23      Apart from the matter of the murder of Ms. Jeffrey and

24    her child, there was evidence that the authorities had as to

25    drug activity between Ms. Jeffrey and Mr. Briscoe and others;

1    correct.

2          MS. WHALEN:  And there was nothing to my

3    recollection, and nor was there testimony that they were using

4    the phone in order to carry out their drug transactions.

5          THE COURT:  Well, I don't know if -- well, I

6    understand what your argument is, I don't know if that's

7    required.  I'm just trying to verify there is no -- so the

8    record is abundantly clear.  This was not just in a vacuum

9    investigating a murder.  There was evidence of drug activity

10   and the record will reflect that there is evidence of drug

11   activity between Ms. Jeffrey and Mr. Briscoe and others.

12      Well, I'm making that finding, Ms. -- proceed with your

13   next argument, I just want to concede it.  You don't need to

14   concede it, it's before me.  The evidence is clearly before

15   me.  That's the evidence.

16          MS. WHALEN:  That's exactly what I understand.

17          THE COURT:  Okay.  That's the evidence.  I just want

18   to make sure before we move on to the next point.  I

19   understand what your arguments are in terms of Mr. Briscoe and

20   whether there's any probable cause as to -- an inquiry as to

21   him on the murders or whatever totally apart from that.  The

22   record is clear that there was drug activity, so I'm just

23   trying to clarify that.

24      All right.  You may continue.  I didn't mean to interrupt

25   you.  I'm just trying to -- before we moved on, that -- and

 1    that's definitely before the June 5th arrest, and it's on or

 2    about May 29th or May 28th in the aftermath of the murders.

 3         **MS. WHALEN:**  So I think where I left off, Your

 4    Honor, was with the argument that the government has made, at

 5    least in their pleadings, that the phone itself inevitably

 6    would have been discovered.  But that also means that the

 7    phone had to have been discovered by lawful means.  And their

 8    argument is very circular, in a way.  They're saying by the

 9    time it got back to the station, they had found drugs and he's

10    getting placed under arrest for the drugs.

11         However, if you didn't have a warrant, which the record

12    is that they did not have -- even though technically they

13    obtained a warrant, the government is not relying on it, so

14    the evidence is not that they are relying on a warrant to

15    search that house or search that apartment.  So if you don't

16    search, either finding it in plain view, which that's not the

17    case here, everything was in closed containers, or if you have

18    probable cause otherwise to search the apartment, then you

19    don't have a lawful means of saying that we would have found

20    it otherwise because we placed him under arrest for drugs,

21    because the drug seizure itself was illegal.  And if the drug

22    seizure itself was illegal, then the arrest falls for the

23    drugs as well.

24         **MS. BRUSCA:**  So I would suggest that it's -- they

25    put the cart before the horse with regard to the phone, and

1      that there is no justification for the phone.

2           I think that takes me to what?  The aftermath.  So we

3      have challenged in addition the search of the Alcatel.

4               **THE COURT:**  I'm not -- we're not there yet.

5               **MS. WHALEN:**  Oh, I'm sorry.

6               **THE COURT:**  That's okay.  I want to do it step by

7      step.

8           Apart from the matter of what was in the contents of the

9      Alcatel -- and that's why I was trying to be clear what the

10     lay of the land is apart from what the actual contents of the

11     Alcatel are in this matter.

12          So is there anything further on the matter of the -- and

13     I'll come back in a minute on that, Ms. Whalen -- with respect

14     to the matter of the seizure of evidence at the 502 Greenwood

15     Avenue, Apartment 202 location in terms of the tracking

16     warrant, the issues as to *Leon*, expectation of privacy and the

17     matter of statements that are just being submitted on the

18     record, is there anything else that the government wants to be

19     heard on before we get to the matter of the -- the matter of

20     the search of the telephone itself.

21              **MS. BRUSCA:**  No, Your Honor.  I just would point out

22     just because its now come up a couple of times, and I don't

23     think we've said it on the record.  It's the government's

24     view, of course, that the confrontation clause is a trial

25     right.  The Supreme Court has so indicated in several

1    plurality opinions, which I can provide.  Most recently in

2    2021, the Seventh Circuit confirmed its view that the

3    confrontation clause is a trial right, and in 2014, the Fourth

4    Circuit affirmed a Southern District of -- excuse me, a --

5            **THE COURT:**  West Virginia, I guess.

6            **MS. BRUSCA:**  I think it was either West Virginia or

7    North --

8            **THE COURT:**  The only southern district in the Fourth

9    Circuit is West Virginia.  They have east, west, and central

10   North Carolina, you have Maryland.  You have east and west in

11   Virginia.  You have North Carolina and South Carolina.  I

12   think the only one that actually has a southern division is

13   West Virginia.

14           **MS. BRUSCA:**  Correct, Your Honor.  It's *U.S. v.*

15   *Wellman*.  The Fourth Circuit affirmed the Southern District of

16   West Virginia case, holding that the confrontation clause was

17   a trial right.  And that it did not bar an out-of-court

18   statement by a witness at a suppression hearing.  So I just

19   wanted to point that out for, Your Honor.  We've obviously --

20   everyone taking from the Grand Jury testimony what they may,

21   but I just wanted to point that out.

22           **THE COURT:**  All right.  Thank you very much,

23   Ms. Brusca.  So let's next go, if we can, I think it's --

24   unless there is anything further on motions Paper No. 69 and

25   the supplement 101, I think we're now to the matter of Paper

1    No. 94, which is specifically -- Paper No. 94 is specifically

2    the defendant Briscoe's motion to suppress the July 2021 cell

3    search with respect to the Alcatel phone ending in telephone

4    number 2413.  And with that, Ms. Brusca, I'll be glad to hear

5    from you.

6            **MS. BRUSCA:**  Thank you, Your Honor.

7        So with respect to the 2021 search warrant and the

8    probable cause in that search warrant as set forth by Agent

9    Weaver, I'm going to put that to the side because I think

10   maybe Ms. Whalen will disagree with me, but I think at that

11   point, the probable cause to search this phone is really

12   nothing short of overwhelming.

13       At that point, the government has obtained several

14   witnesses who've stated that Mr. Briscoe confessed these

15   killings to them.  There's been admissions by Mr. Briscoe that

16   he was dealing drugs.

17           **THE COURT:**  Let me ask you, if I can, on the matter

18   of the Alcatel phone.  Essentially the Alcatel phone was

19   seized on June 5th, 2015.  And the testimony is that -- of

20   Agent -- of Detective Lewis was that the normal procedure

21   would be -- with respect to that phone would be that there

22   would be, essentially, a warrant that would be issued before

23   they searched the phone, okay.  And that he does not have any

24   explanation to what happened to the -- and I know the

25   stipulation indicates that they can't find any indication of a

1    search warrant or whatever.

2        Let me clarify first, if I can, what is -- what is the

3    evidence that is seeking to be suppressed here prior to the

4    issuance of the search warrant in July of -- in July of 2021?

5    What evidence was taken from that phone that was utilized

6    before we get to the matter --

7            MS. BRUSCA:  Nothing, Your Honor.  Nothing.  And all

8    of the testimony that the government solicited with respect to

9    the existence of a search warrant was really very, very narrow

10   for the point of addressing *Pratt*, which was that this phone

11   did not just sit untouched.

12           THE COURT:  I understand.  And I'm going to get

13   there.  We're going to get there.

14           MS. BRUSCA:  But nothing.  Nothing.

15           THE COURT:  All right.  Ms. Whalen or Mr. Purpura,

16   in terms of the matter of the credibility of Detective Lewis

17   in terms of his just candidly saying, we can't find the

18   warrant and we would normally have done so, and this was the

19   procedure that we follow, he has -- there is -- it is what it

20   is.  We're trying to move on to the matter of the July 2021

21   search warrant.  But what evidence is it that you're

22   contending should be suppressed as a result of if there was a

23   warrant or what was -- what is your contention as to what

24   should be suppressed?  We're going to get up to July of 2021

25   and what flowed thereafter, but what is your argument, if

1    there is any, as to what evidence do you -- the government

2    contends there was not necessarily any evidence that was

3    actually seized or to be utilized.

4         Now, in a nutshell, that's what the government's position

5    is.  Is that right, Ms. Brusca, as to what was taken --

6    whatever was taken from the Alcatel phone ending in 2413?  I'm

7    clear what it is.  We're going to deal with the matter of what

8    occurred in July of 2021, but I'm just trying to clarify what

9    evidence the government contends, if any, it's actually going

10   to introduce from that search, and basically you're saying

11   nothing.

12              **MS. BRUSCA:**  June 2015, nothing, Your Honor.

13              **THE COURT:**  All right.  Fine.

14        Ms. Whalen, is that correct?

15              **MS. WHALEN:**  That's my understanding, yes.

16              **THE COURT:**  Okay.  And so your motion -- I'm going

17   to get to your motion to suppress.  We're not really seeking

18   to suppress anything that was taken from the phone with

19   respect to Detective Lewis's statement, this what we would

20   normally do.  We don't know why we can't find the warrant.  We

21   just can't find the warrant, but that's what the state of it

22   is, and we're going to get to the issue of the delay, the

23   six-year delay.  But in terms of evidence that is being

24   presented in this case, there is nothing with respect to the

25   phone that they had in June of 2015 with respect to anything

 1    that's being extracted from it up until we get to July of

 2    2021; correct?

 3              **MS. WHALEN:**  That's right.

 4              **THE COURT:**  Okay.

 5              **MS. WHALEN:**  The previous argument was that the

 6    phone itself --

 7              **THE COURT:**  I understand.  Just the phone itself and

 8    seizure.

 9              **MS. WHALEN:**  And the government has said they're not

10    going to use anything that was taken from it, so --

11              **THE COURT:**  Well, the government is saying there is

12    no evidence they're presenting, so that's fine.  I'm just

13    trying to clarify.  I'll hear your argument in a minute.  I'm

14    just trying to make sure the lay of the land is clear on this.

15    We're dealing with the July 2021 search warrant and we move

16    from there, because I found Detective Lewis tested credibly on

17    it, and it is what it is, and the stipulation clearly

18    indicates that there's been effort to find the records, and

19    it -- they can't be found.

20        And so absent a need to try to get to some credibility

21    issue that Detective Lewis is just not telling the truth,

22    which there is no basis for me to find that.  He seemed to be

23    honorable and answering candidly with the question.  It's not

24    that it's not an issue, but it really doesn't crystalize as an

25    issue in terms of evidence being presented, we need to get up

1    to July of 2021.  And I understand what your motion is, and

2    we're going to address it in a minute here, but that's where

3    we are.

4        So let's get to July 2021, and there is a search warrant

5    that's prepared as the government gets ready for this case,

6    and then they suddenly realize that they can't find the

7    warrant in some way, so that's where we are.

8              **MS. WHALEN:**  Your Honor, if I could just clarify.

9              **THE COURT:**  Sure.  Sure.

10             **MS. WHALEN:**  You're absolutely right, that's what

11   we're challenging is the search from July of 2021.  However, I

12   think the credibility or recall -- I'm not even going to call

13   it credibility -- but recall of Detective Lewis with regard to

14   whether there was a warrant is an issue, because if there was

15   no warrant, which we believe that there wasn't --

16             **THE COURT:**  I understand.

17             **MS. WHALEN:**  -- then there may be an illegal taint

18   from the earlier search to the July --

19             **THE COURT:**  Well, what is the evidence of taint, I

20   guess my question is.

21             **MS. WHALEN:**  They searched it, and it was there, and

22   it was actually given -- the contents were actually given to

23   Special Agent Weaver.  Defense exhibit shows it was given to

24   him in July of 2021 before he got the search warrant.

25             **THE COURT:**  I understand.

1      **MS. WHALEN:**  So to the extent there was an illegal

2  search and that was then -- and that taints the later warrant

3  and --

4      **THE COURT:**  I understand.

5      **MS. WHALEN:**  -- and whether that's actually --

6      **THE COURT:**  You have preserved that for the record,

7  Ms. Whalen.

8      **MS. WHALEN:**  Sure.

9      **THE COURT:**  I understand.  But as a practical

10  matter, the lay of the land here in terms of -- so the record

11  is clear is there is nothing that is being introduced by the

12  government with respect to extracting anything from the phone

13  until we get to July of 2021, and then we get to the matter of

14  evidence being extracted as a result of the search warrant.

15  And as to that, we'll now hear argument from the government

16  and then I'll hear from Ms. Whalen on that.

17      **MS. BRUSCA:**  Thank you, Your Honor.  So on the issue

18  of the 2021 search warrant, with respect to probable cause, we

19  think the affidavit here is very clear that there is

20  overwhelming probable cause to search this cell phone.

21      At this point in the government's investigation, there

22  have been numerous witnesses who confirmed that Mr. Briscoe

23  confessed killing Ms. Jeffrey and her son.  That Mr. Briscoe

24  himself had admitted dealing narcotics with her.  And, in

25  fact, said he came to Baltimore on May 26, 2015, to get drugs,

1    albeit from another source of supply, he says.

2        At that point -- I'm just flipping back to the warrant to

3    make sure I have what's in here.  Ms. Haynes had testified

4    that Mr. Briscoe left her home with what she believed to be a

5    gun to go back over to Jennifer's house that morning, that

6    subsequent to that, we had a recorded jail call from the

7    evening of May 26th when Ms. Haynes is talking to an

8    incarcerated relative and asks him for a gun so that they can

9    take 100 grams from a girl who is just sitting on them.  And

10   after that call, we see Mr. Briscoe's cell site traveling from

11   one side of Baltimore back to Ms. Haynes's apartment, and

12   that's the night he goes over to Ms. Jeffrey's house.  And we

13   actually have testimony from an individual who said he does

14   recall driving Kiara Haynes, with a male, to go pick up a gun.

15       And so there is just no question at this point that the

16   government has every reason to believe that Mr. Briscoe has

17   committed these crimes and that he has done so through the use

18   of this phone, which that same witness who is driving them

19   says, both the male and Ms. Haynes are on their phones all the

20   time.  Again, we still haven't ever found Ms. Jeffrey's

21   missing smartphone.  So to the extent that there are

22   communications between the two of them, there is every reason

23   to think that they're on Mr. Briscoe's 2015 Alcatel.

24       So just in terms of probable cause, we'd submit on the

25   papers, but also say it's just frankly overwhelming.  Turning

1    for a moment to the idea of *Pratt* and then finally taint,

2    because I think this is the first time the defense has raised

3    taint; there is just simply no evidence in the record.  And

4    we'd represent to the Court that no federal agent has looked

5    at anything related to the 2015 extraction.

6            **THE COURT:**  I'm sorry, what did you say?

7            **MS. BRUSCA:**  Nobody, no federal employee had

8    reviewed the 2015 extraction prior to obtaining this warrant.

9    So it's simply not possible for there to have been a Taint

10   because it wasn't reviewed.

11       But putting that aside, on the issue of delay, we put in

12   our letter, and we just say again, we really have three

13   separate arguments.  The first is that *Pratt* just doesn't

14   apply here because there was no unreasonable delay.  Baltimore

15   got the search warrant prior to the extraction of the phone.

16   In 2000- --

17           **THE COURT:**  Yeah, but the delay here is six years,

18   Ms. --

19           **MS. BRUSCA:**  Well, no, Your Honor.  We'd say there

20   is not because there was an extraction conducted in June of

21   2015 pursuant to a warrant.  That warrant can't be found, but

22   this is just really kismet, but there is a 2011 case, also

23   *U.S. v. Pratt,* an Eleventh Circuit case from 2006.

24       The Eleventh Circuit holds, when a search warrant is lost

25   after it is executed and is missing at a suppression hearing,

1    does the Fourth Amendment prohibit the use of other evidence

2    to prove the warrant's existence and descriptive language.

3         We hold the Fourth Amendment does not prohibit the use of

4    other evidence to establish the existence and contents of a

5    lost search warrant.  So it was indisputably the law,

6    *California v. Riley*, 2014, a year before these events

7    occurred, you had to get a search warrant to search a phone.

8    And despite the, sort of, problems that the defense has

9    pointed out, what has happened here over an eight-day period

10   is that BPD has done everything it's supposed to do.  There is

11   no indication that they would have just flouted the law.  I

12   mean, there were sloppy moments, but they have gotten orders,

13   they have gotten warrants, they have, you know...

14        **THE COURT:**  What actual evidence was actually the

15   result of this search of the Alcatel phone?

16        **MS. BRUSCA:**  The evidence was this extraction that

17   we are not using.

18        **THE COURT:**  And I'm trying to go over exactly what

19   we're talking about.  What is the evidence?  What is the

20   evidence we're talking about that they're seeking to --

21        **MS. BRUSCA:**  Now?

22        **THE COURT:**  What is the evidence that the defendant

23   is seeking to suppress?  I.e., what is the evidence that was

24   extracted as a result of the search warrant in July of 2021?

25        **MS. BRUSCA:**  There are messages between Mr. Briscoe

1    and his family members immediately after the murders

2    indicative of drug dealing.  That he has drugs to sell, that

3    he is selling those drugs.  There are also messages between

4    himself and --

5         **THE COURT:**  So as to that, the first step is, there

6    is evidence that he was in drug dealing?

7         **MS. BRUSCA:**  Yes.

8         **THE COURT:**  Apart from the evidence the police had

9    in the aftermath of the murders and apart from the evidence

10   from the family members of Ms. Jeffrey, Jennifer Jeffrey,

11   apart from that evidence there is additional evidence of his

12   drug dealing?

13        **MS. BRUSCA:**  Correct.

14        **THE COURT:**  And what else is there that comes out of

15   the phone?

16        **MS. BRUSCA:**  There are also messages between

17   Mr. Briscoe and Ms. Haynes which we would say are indicative

18   of the crime of the homicide.  So Ms. Haynes says, for

19   example, something like, I love you, cuz.  We're bonded

20   forever now because of that.  And what are you going to be

21   bonded forever over?  We're going to say this is May 29th or

22   May 30th.  It's over the murder that you've just committed.

23        **THE COURT:**  There is no references specifically to a

24   murder?

25        **MS. BRUSCA:**  There is not.

1      **THE COURT:**  It just has to do with the relationship

2   between Ms. Haynes and Mr. Briscoe?

3      **MS. BRUSCA:**  Correct.

4      **THE COURT:**  Presumably there is other evidence you

5   have of that, apart from that, obviously?

6      **MS. BRUSCA:**  Correct, Your Honor.

7      **THE COURT:**  Okay.  What else is there that comes out

8   of the phone as a result of the search?

9      **MS. BRUSCA:**  I think we have to go back.  We think,

10   actually, it is telling there is no evidence on the phone

11   whatsoever.  It's been deleted entirely.  No evidence of

12   calls, messages, location data, anything, social app data,

13   from May 26 to May 28, 2015 as if it's been deleted.  That

14   will be our argument.

15      So the fact that there is no evidence on the phone --

16   there is evidence before, then there is just no data evidence

17   after, we think is indicative --

18      **THE COURT:**  All right.  What else is there?

19      **MS. BRUSCA:**  I think for the moment the messages of

20   the drug dealing, the messages of the relationship between Ms.

21   Haynes and Mr. Briscoe, and the --

22      **THE COURT:**  You have other evidence of the

23   relationship between Ms. Haynes and Mr. Briscoe; correct --

24      **MS. BRUSCA:**  We do, Your Honor.

25      **THE COURT:**  -- and drug dealing?  So we're just

1      going around in circles.  I'm just trying to ask, what else is

2      there?  I don't know how more specific I can be.  What else is

3      there?  This is a whole lot, as far as I'm concerned, because

4      you're going over a pretty amazing situation here, I must tell

5      you.

6              **MS. BRUSCA:**  Well, Your Honor --

7              **THE COURT:**  I mean, these other cases -- I know the

8      government wants to distinguish *Pratt*, and *Pratt* involved the

9      delay of 31 days.  We spent a fair amount of time back in

10     chambers going through this, and a delay of six years is

11     really extraordinary.

12             **MS. BRUSCA:**  Again, we would not say there was a

13     delay of six years.  We'd say there was a delay of --

14             **THE COURT:**  The bottom line is that law enforcement

15     had the phone and there was no search warrant executed, and

16     obviously the government thought we needed to go back and

17     cross the T and dot an I and have a search warrant prepared in

18     July of 2021, over six years after the government had the

19     phone.

20             **MS. BRUSCA:**  Yeah, I would make a -- I would just

21     make a quick distinction which is the federal government

22     didn't have the phone, Your Honor.  The federal government --

23             **THE COURT:**  All right.  I misspoke, okay.  The

24     Baltimore Police Department has the phone, okay.  And I

25     understand Detective Lewis very candidly saying, I just can't

1    find it.  So Judge, we had it, but I can't find it, and that's

2    what I was trying to clarify.

3              **MS. BRUSCA:**  Yes.

4              **THE COURT:**  There is no evidence being offered as to

5    that?

6              **MS. BRUSCA:**  Correct.

7              **THE COURT:**  So the evidence now just comes up in

8    July of 2021 with respect to --

9              **MS. BRUSCA:**  Is that it hasn't been searched.

10             **THE COURT:**  I understand.  I understand.  So then

11   there is a search.  And I'm trying to clarify exactly what

12   evidence the defendant is seeking to suppress and what that

13   is, because this is a rather extraordinary path down which the

14   government would lead this Court.

15             **MS. BRUSCA:**  I understand.

16             **THE COURT:**  In the context of this case that, well,

17   six years is just unfortunate, well, it's a little bit more

18   than unfortunate, and I'm not so quickly inclined to

19   distinguish *Pratt* quite so quickly.

20        Just for the record, the defense has relied upon the

21   *United States versus Pratt,* an opinion of the Fourth Circuit

22   in 2019, in which the Fourth Circuit held that a 31-day delay

23   in obtaining a warrant to search the content of a cell phone

24   after law enforcement had seized the phone without a warrant

25   was unreasonable.  And that the District Court erred denying

1    the motion -- the defendant's motion to dismiss.  There are

2    other cases with which I'm familiar -- and it's a rather

3    precarious legal road that the government would have this

4    Court go down with respect to this search as far as I'm

5    concerned, given the implications of this case.

6        So anything else you want me to be heard on this, and

7    then I'll hear from Mr. Whalen or Mr. Purpura on this?

8        **MS. BRUSCA:**  No.  We would just add that, as a

9    secondary argument, we would say that Mr. Briscoe was

10   incarcerated for the vast majority of that period, so he

11   didn't have a possessory interest --

12       **THE COURT:**  It would affect his possessory interest?

13   I understand.

14       **MS. BRUSCA:**  Correct.

15       **THE COURT:**  I understand what the argument is.

16       **MS. BRUSCA:**  And then finally that the phone itself

17   has this inherently -- is inherently evidence in our case,

18   sort of like the stolen suitcase.

19       **THE COURT:**  I understand.  This is not the -- the

20   issue before me here on this motion number -- Paper No. 94 is

21   not the phone itself and the taking of the phone and then the

22   termination of the 2413 number and the Alcatel phone, it's as

23   to the contents --

24       **MS. BRUSCA:**  Understood.

25       **THE COURT:**  -- that were extracted from it by the

 1    government in terms of that being introduced.

 2         So Ms. Whalen, with that, I'll be glad to hear from you.

 3             **MS. WHALEN:**  As to?

 4             **THE COURT:**  It sounds like you're kind of ahead on

 5    this game.  You can talk as long as you want, but you --

 6             **MS. WHALEN:**  And my co-counsel says, don't even

 7    stand up.

 8             **THE COURT:**  I understand that.  My point is, in

 9    terms of the contents -- I understood what your motion here

10    is, is that there is this delay in the aftermath with *Pratt*

11    and there is some other cases that talk about delays, and

12    there is a six-year delay.  And as to that, you're saying this

13    is really -- totally flies in the face of *Pratt* and other

14    cases, essentially, is what you're saying.

15         Again, it's not to the fact -- you preserved your

16    argument as to the seizure of the phone, but apart from the

17    matter of the seizure of the phone, and that that's his

18    telephone and this is his telephone number, to the extent that

19    the contents of that are then searched six years later, your

20    motion directly focuses upon the contents, them seizing from

21    that phone?

22             **MS. WHALEN:**  Correct.

23             **THE COURT:**  Okay.

24             **MS. WHALEN:**  So with regard to the *Pratt* line of

25    cases, et cetera, Your Honor, I think, has hit the nail on the

1   head that this is -- that is totally different because it's a

2   six-year delay.

3        Two things I wanted to point out.  One is that the

4   government tries to rely, I think, in their arguments that it

5   wasn't really a delay in terms of the fact that it was

6   actually searched by Baltimore City Police.  And I think that

7   minimizes what happened.  Search, whether legal or not, based

8   on a warrant, very, very nice.  And I think the detective

9   clearly had some issues, I think, with following policy in

10  this case, and I don't mean that to --

11          **THE COURT:**  I understand.

12          **MS. WHALEN:**  -- in any way, shape or form to take

13  away from the kind of person I think he presented as.  But

14  those issues, I think, fly in the face of the government's

15  argument that, you know, the police -- all of the police, were

16  taking reasonable steps to search the phone.  And some of the

17  issues he said were related to this phone.  For instance, he

18  said that he went through his drawer and found the victim's

19  phone, and then -- that was in, I think, September of 2018,

20  and then he placed that into evidence, clearly against policy.

21       Then ATF Agent Weaver requests -- I guess, we don't know

22  what the words were, but requests the phone, and he goes back

23  into that drawer and finds the defendant's phone.  Why he

24  didn't find it in the first place and put it in evidence in

25  2018 and they had to wait until 2021 is, again, violating

1    policy, and I would suggest that there is just -- you can't

2    rely if you're -- on this particular phone, if you are

3    violating policy and you are, kind of, sloppily handling

4    evidence, I would say, that you can't now rely and say, oh,

5    but you know what, the police were not sitting on their

6    laurels; they were.  Baltimore was sitting on their laurels in

7    this, and it wasn't until Agent Weaver, who finally finds the

8    phone -- and I will tell Your Honor, Agent Weaver was looking

9    for the phone, but he finally finds the right phone and he

10   does act upon it.  But I would suggest that's too late, and

11   the contents of this phone should be -- should not be allowed

12   to be used against my client.

13       I just want to -- and maybe I don't have to, my

14   co-counsel would say, shut up.

15            **THE COURT:**  That's all right.

16            **MS. WHALEN:**  And Your Honor wrote an opinion in

17   *United States versus Dorsey* on cell phones, and I raise that

18   because Your Honor found in that case that there was an

19   abandonment issue.

20       I would suggest that we have no testimony at all on the

21   record about abandonment, number 1.  And number 2, I think if

22   that issue in this case were before the Fourth Circuit

23   following, like, the opinions in *Riley* and *Carpenter*, I think

24   it's a horse of a different color.  And that's because a

25   phone, the contents generally is preserved and stays.  And so

```
1    you don't lose an interest in the -- a privacy interest in the

2    contents of your phone like you might -- and Your Honor cited

3    to some cases where the defendant just let a lease, for

4    instance, lapse.  And so he had no standing -- not no

5    standing, he had no privacy interest.

6             THE COURT:  Totally remember Dorsey.  I think it may

7    have involved what would be defined colloquially as a burner

8    phone or something in terms of one phone and then another.

9    I'm not sure.  I can't remember.

10            MS. WHALEN:  That I'm not sure what the type of

11   phone it was.  But I just wanted to make that clear that we

12   think there's been nothing to support that kind of saving the

13   contents of the phone in this case.

14            THE COURT:  All right.  Thank you very much.

15   Anything further?  Any other arguments to be presented here?

16   I think we're winding it up for the day.

17        Anything else from the point of view of the government,

18   Ms. Brusca?

19            MS. BRUSCA:  Your Honor, I'm going to be very, very,

20   very brief, but I just feel I have to reiterate for the

21   record.

22        So Pratt is concerned with the delay between the seizure

23   of a phone and a warrant to search it.  In this case, if the

24   Court were to find that there -- Detective Lewis is credible

25   and it's not just Detective Lewis as you already had, also TFO
```

1    Michael Baier, that he would not have extracted a phone

2    without a warrant, then there is a delay of, at most, ten days

3    between the seizure of the phone and a warrant to search it.

4    And if the Court finds, by a preponderance of the evidence

5    that there was a warrant to search it, that's it for *Pratt.*

6    It makes absolutely no difference whatsoever under *Pratt* how

7    long it would have been between that first warrant and

8    whenever the federal government got its warrant.

9         Once there is a warrant for the phone, *Pratt* is satisfied

10   and *Pratt* has nothing to say about how long thereafter the

11   phone may be maintained.  So I just wanted to put that --

12             **THE COURT:**  Well, I will just note that there -- in

13   terms of some other cases here, that I think, essentially, one

14   of the cases we have found noted in a federal appendix opinion

15   by the Fourth Circuit in 2011 in *United States versus Watts,*

16   *W-a-t-t-s,* the Fourth Circuit noted that it had not had

17   occasion to address the appropriate standard for searches

18   involving a subsequently lost warrant.  And *Watts* then quoted

19   the Eleventh Circuit case with respect to -- and it

20   actually -- it quoted *Pratt.*  And I will note that there is a

21   Seventh Circuit case, *United States versus Burgard*, 675 F.3d

22   1029.  It's a Seventh Circuit opinion in terms of these kinds

23   of delays which cause -- should cause all of us some pause

24   here, and I'll deal with that in a separate memorandum and a

25   separate ruling on that.

1       So anything else, though?  Any other matters to address

2    from the point of view of the government, Ms. Brusca?

3         **MS. BRUSCA:**  No, thank you.

4         **THE COURT:**  Anything else, Ms. Whalen, from your

5    point of view?

6         **MS. WHALEN:**  No, thank you, Your Honor.

7         **THE COURT:**  Thank you.  We will do our best to get

8    an opinion out within the next week on these matters.  I do

9    note that while you're all here before we finish is that we've

10   got pretrial conferences scheduled for Wednesday, March

11   the 9th.  Proposed voir dire is due Monday, April the 11th,

12   and the jury trial remains firmly set now for Monday, May

13   the 23rd.  And I'm very confident that we're going to be able

14   to push forward on that date in terms of the operations of the

15   Court.  So that's pretty much etched in stone.

16       Ms. Whalen, you've indicated that you got a conflict with

17   the pre-trial conference date set for March 9th.  What I'd

18   suggest you do is, my assistant -- judicial assistant, Kris

19   Foster is out this week, I'd suggest you send an e-mail to

20   Ms. Brusca and Mr. Budlow and just coordinate a time to --

21   pick another time for a pretrial conference.  I definitely

22   want to have it be well in advance of the proposed voir dire.

23   We did that for a reason in terms of any issues that may come

24   up.  So just -- I don't care.  We'll make it work with your

25   schedule, but I haven't ignored your note in that regard.

1    **MS. WHALEN:**  No.  In fact, your very able law clerk

2    has responded and suggested dates.

3         **THE COURT:**  We'll work it out.  I mean, we're busy

4    with some other things, but when Kris gets back, when

5    Ms. Foster gets back, we can coordinate that, we'll just get

6    another date.  I just don't want it to be the week before the

7    trial.  If we've got this well ahead, even before the posture

8    of this case changed, we still want it to be certainly a good

9    two months out from the trial because there's all of these

10   kinds of issues that come up.  So with that --

11        All right.  Thank you all very much.

12        And Mr. Purpura and Mr. Budlow, whenever I have lawyers

13   that have not actually argued before me on a particular

14   date -- I will never recall when I was a young Assistant U.S.

15   Attorney, I was before the Fourth Circuit, and I felt I was

16   ahead and so I stood up and said, unless you have any

17   questions, I submit on the record.  And Judge Winter -- he

18   used to like to needle me -- said that I've never been more

19   eloquent at that moment.  So we're laughing here, so I want to

20   compliment Mr. Purpura and Mr. Budlow on their eloquence here

21   today in their silence.

22        **MR. PURPURA:**  Thank you, Your Honor.

23        **THE COURT:**  We're laughing.  That's just a

24   lighthearted memory that I have of not speaking and one time

25   being told, you've never been more eloquent than right now.

1        So that's just the way it is.

2            All right.  With that, we'll finish on that note,

3    laughing here, and this Court stands adjourned for the day.

4    Thank you all very much.

5            (Proceedings concluded at 4:01 p.m.)

6

7

8

9            I, Melissa L. Clark, RPR, do hereby certify that

10   the foregoing is a correct transcript from the stenographic

11   record of proceedings in the above-entitled matter.

12

13                    *Melissa L. Clark*
                     _____
14                        Melissa L. Clark
                       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

**1**

**1** [7] - 14:17, 36:15, 37:24, 38:23, 84:11, 84:13, 107:21
**10** [1] - 34:15
**100** [1] - 97:9
**101** [13] - 1:24, 42:5, 44:20, 45:10, 45:14, 46:8, 47:13, 47:16, 50:11, 50:24, 55:18, 79:1, 90:25
**1029** [1] - 109:22
**10:18** [1] - 33:1
**10:35** [1] - 79:13
**11:41** [2] - 68:5, 72:5
**11th** [1] - 110:11
**12:13** [1] - 1:6
**13** [1] - 38:25
**13th** [1] - 24:15
**14** [1] - 5:8
**15** [3] - 12:14, 13:1, 40:13
**15th** [2] - 39:11, 40:12
**1983** [1] - 74:1
**19th** [3] - 2:6, 38:17, 85:23
**1:00** [2] - 2:17, 36:16

**2**

**2** [4] - 39:19, 40:8, 55:20, 107:21
**20** [5] - 13:1, 14:16, 14:23, 21:7, 23:18
**2000** [14] - 22:14, 22:15, 22:16, 22:18, 22:19, 22:20, 23:5, 23:9, 23:11, 23:12, 23:13, 23:16, 98:16
**2001** [3] - 23:16, 23:17, 54:12
**2006** [1] - 98:23
**2009** [4] - 23:1, 23:7, 23:23, 23:24
**201** [2] - 54:18, 57:12
**2010** [5] - 21:25, 22:11, 22:18, 23:4, 24:1
**2011** [2] - 98:22, 109:15
**2013** [1] - 24:3
**2014** [2] - 90:3, 99:6
**2015** [38] - 22:3, 35:10, 38:11, 38:21, 39:11, 39:14, 40:12, 40:13, 46:4, 46:6, 46:7, 47:19, 47:23, 48:1, 48:24, 49:10, 58:14, 62:5, 68:25, 69:3,

69:5, 70:10, 70:14, 82:24, 83:18, 84:7, 85:8, 91:19, 93:12, 93:25, 96:25, 97:23, 98:5, 98:8, 98:21, 101:13
**2016** [1] - 24:8
**2017** [2] - 24:10, 49:15
**2018** [7] - 24:11, 24:15, 24:16, 49:15, 49:16, 106:19, 106:25
**2019** [1] - 103:22
**202** [13] - 49:25, 50:1, 50:9, 56:21, 60:24, 61:5, 61:14, 62:6, 62:16, 63:3, 75:9, 79:3, 89:15
**2020** [8] - 5:16, 5:18, 21:19, 24:14, 25:6, 44:12, 46:3, 46:5
**2021** [26] - 38:14, 39:4, 44:12, 44:21, 45:4, 45:11, 64:18, 90:2, 91:2, 91:7, 92:4, 92:20, 92:24, 93:8, 94:2, 94:15, 95:1, 95:4, 95:11, 95:24, 96:13, 96:18, 99:24, 102:18, 103:8, 106:25
**2022** [3] - 1:8, 38:17, 38:25
**20th** [2] - 2:6, 6:10
**21** [2] - 13:24, 65:13
**21201** [1] - 1:25
**21st** [1] - 38:14
**22** [3] - 46:5, 85:4, 85:6
**22nd** [3] - 5:18, 25:6, 31:5
**23** [1] - 75:18
**23rd** [1] - 110:13
**24** [1] - 65:13
**2413** [11] - 58:4, 61:2, 61:16, 62:8, 63:1, 69:7, 72:17, 73:14, 91:4, 93:6, 104:22
**25** [1] - 75:18
**26** [3] - 1:8, 96:25, 101:13
**26th** [1] - 97:7
**27** [3] - 68:24, 80:20, 82:24
**28** [2] - 85:8, 101:13
**28th** [3] - 39:4, 85:16, 88:2
**29** [2] - 10:4, 19:2
**29th** [3] - 5:7, 88:2, 100:21

**2:00** [3] - 2:18, 41:3, 41:5
**2nd** [1] - 24:16

**3**

**3** [2] - 1:6, 76:6
**30** [2] - 16:24, 79:7
**30th** [1] - 100:22
**31** [2] - 80:21, 102:9
**31-day** [1] - 103:22
**38-ish** [1] - 19:16
**3:52** [3] - 76:7, 76:8, 76:9

**4**

**410-962-4474** [1] - 1:25
**443** [1] - 38:18
**46** [1] - 37:9
**47** [3] - 37:8, 37:10, 37:11
**4:51** [1] - 76:10
**4:52** [5] - 57:24, 58:13, 58:25, 76:3, 76:9
**4th** [4] - 1:24, 39:11, 47:21, 47:23

**5**

**5** [1] - 10:4
**502** [2] - 57:24, 89:14
**5D** [1] - 1:9
**5th** [12] - 38:20, 47:19, 47:21, 48:1, 57:25, 58:14, 62:5, 69:2, 83:18, 84:7, 88:1, 91:19

**6**

**621-2413** [1] - 38:19
**675** [1] - 109:21
**69** [8] - 42:4, 44:20, 45:9, 45:14, 46:8, 47:12, 47:15, 90:24

**7**

**72** [1] - 42:17
**73** [2] - 43:14, 43:22
**74** [2] - 44:3, 44:7
**79** [2] - 84:11, 84:12
**7:50** [3] - 58:17, 58:25, 77:6

**8**

**8** [1] - 7:23

**8:30** [2] - 12:23
**8:55** [2] - 55:19, 78:25

**9**

**9** [2] - 59:2, 67:17
**94** [10] - 44:4, 44:24, 45:3, 45:5, 45:11, 46:8, 47:12, 91:1, 104:20
**95** [1] - 44:14
**9:00** [2] - 12:24, 13:23
**9:08** [1] - 14:15
**9:30** [2] - 79:8, 79:11
**9th** [2] - 110:11, 110:17

**A**

**A-z-u-r** [2] - 3:18, 4:5
**a.m** [4] - 13:23, 14:15, 57:24, 58:13
**abandonment** [2] - 107:19, 107:21
**ability** [1] - 35:6
**able** [5] - 18:25, 61:25, 81:7, 110:13, 111:1
**above-entitled** [1] - 112:11
**absent** [1] - 94:20
**absolute** [1] - 10:20
**absolutely** [4] - 48:16, 54:5, 95:10, 109:6
**abundantly** [1] - 87:8
**accommodate** [1] - 32:15
**accompanied** [1] - 25:10
**accompany** [1] - 26:14
**according** [3] - 32:25, 56:11, 66:1
**accordingly** [1] - 2:15
**account** [1] - 65:7
**accurate** [1] - 21:11
**Acme** [1] - 28:24
**act** [1] - 107:10
**action** [2] - 51:20, 74:1
**actions** [2] - 53:3, 53:4
**activity** [11] - 83:1, 83:22, 84:8, 85:17, 86:5, 86:14, 86:16, 86:25, 87:9, 87:11, 87:22
**actual** [6] - 31:5, 62:24, 73:14, 74:14, 89:10, 99:14
**Adam** [2] - 43:12,

44:15
**add** [2] - 67:22, 104:8
**added** [1] - 67:6
**addition** [2] - 86:4, 89:3
**additional** [3] - 23:23, 37:21, 100:11
**address** [10] - 43:25, 44:11, 59:17, 63:18, 68:21, 72:19, 82:12, 95:2, 109:17, 110:1
**addressed** [1] - 56:23
**addresses** [1] - 72:15
**addressing** [1] - 92:10
**adequate** [1] - 77:18
**adequately** [1] - 78:2
**adjourned** [1] - 112:3
**admissions** [1] - 91:15
**admits** [2] - 68:14, 68:16
**admitted** [1] - 96:24
**advance** [1] - 110:22
**advise** [3] - 10:1, 10:9, 10:18
**advised** [8] - 9:16, 9:18, 10:18, 10:20, 12:7, 16:13, 29:18, 84:8
**advisement** [3] - 9:23, 11:9, 11:19
**affect** [3] - 34:21, 61:4, 104:12
**affidavit** [10] - 40:13, 60:20, 65:9, 65:25, 67:6, 67:8, 67:19, 71:5, 72:2, 96:19
**affidavits** [1] - 40:11
**affirmed** [2] - 90:4, 90:15
**afford** [1] - 10:24
**afforded** [1] - 60:2
**aftermath** [5] - 86:4, 88:2, 89:2, 100:9, 105:10
**afternoon** [9] - 2:2, 3:2, 3:11, 3:13, 3:14, 4:22, 25:4, 25:5, 41:11
**Afternoon** [1] - 4:23
**agent** [4] - 12:19, 17:9, 26:9, 98:4
**Agent** [42] - 1:20, 2:25, 9:6, 9:19, 9:22, 10:1, 10:15, 10:16, 10:18, 11:4, 11:5, 11:12, 11:18, 12:2, 13:6, 13:14, 13:19, 14:12, 15:21, 18:16, 19:17, 19:19, 20:8,

21:18, 25:19, 29:10, 30:3, 30:24, 31:21, 33:6, 33:18, 34:4, 34:12, 34:16, 34:24, 35:18, 91:8, 91:20, 95:23, 106:21, 107:7, 107:8

**agents** [3] - 25:11, 25:12, 26:18

**aggressive** [1] - 51:9

**agitated** [2] - 11:24, 18:11

**agree** [9] - 11:1, 12:2, 16:19, 38:14, 39:3, 64:3, 64:10, 70:11, 70:15

**agreed** [1] - 40:18

**ahead** [7] - 36:22, 43:4, 47:3, 65:2, 105:4, 111:7, 111:16

**albeit** [1] - 97:1

**Alcatel** [20] - 44:7, 44:25, 45:5, 58:7, 58:8, 61:2, 61:16, 62:12, 69:7, 72:17, 89:3, 89:9, 89:11, 91:3, 91:18, 93:6, 97:23, 99:15, 104:22

**alcohol** [3] - 19:4, 19:7, 34:10

**allegation** [1] - 64:13

**allegations** [1] - 86:2

**alleged** [2] - 64:20, 69:1

**allowed** [3] - 32:13, 71:12, 107:11

**almost** [2] - 59:14, 65:13

**amazing** [1] - 102:4

**Amendment** [4] - 48:5, 57:3, 99:1, 99:3

**AMERICA** [1] - 1:3

**amount** [1] - 102:9

**analysis** [1] - 63:21

**analyze** [1] - 61:25

**Andre** [9] - 2:4, 5:20, 6:1, 9:9, 38:20, 39:16, 40:16, 47:19, 48:1

**ANDRE** [1] - 1:6

**Andrews** [2] - 74:2, 74:5

**angry** [1] - 60:12

**ankles** [1] - 16:6

**announce** [1] - 79:1

**another's** [1] - 76:19

**Answer** [2] - 85:18

**answer** [8] - 11:1, 16:9, 17:18, 19:23,

20:3, 20:23, 84:5, 84:15

**answered** [2] - 18:13, 35:1

**answering** [2] - 4:15, 94:23

**antagonistic** [2] - 32:21, 32:22

**apart** [16] - 43:15, 56:19, 63:7, 69:6, 69:10, 86:12, 86:23, 87:21, 89:8, 89:10, 100:8, 100:9, 100:11, 101:5, 105:16

**Apart** [1] - 84:13

**apartment** [38] - 46:1, 50:7, 51:22, 52:3, 53:4, 53:10, 53:18, 55:2, 55:8, 55:15, 56:4, 56:25, 57:15, 58:13, 58:16, 58:17, 58:24, 59:11, 59:18, 59:20, 59:23, 60:11, 61:5, 68:13, 75:15, 75:21, 76:4, 76:7, 78:7, 79:10, 79:11, 80:9, 81:12, 81:23, 88:15, 88:18, 97:11

**Apartment** [17] - 49:25, 50:1, 50:9, 50:11, 54:18, 55:18, 56:21, 57:12, 60:24, 61:14, 62:6, 62:16, 63:3, 75:9, 79:1, 79:3, 89:15

**apartments** [1] - 79:2

**apologize** [3] - 2:19, 41:13, 67:20

**app** [1] - 101:12

**appear** [5] - 16:16, 18:17, 18:20, 18:22, 19:7

**appearance** [1] - 18:14

**appeared** [2] - 19:3, 40:15

**appendix** [1] - 109:14

**application** [1] - 39:10

**applied** [2] - 39:22, 80:16

**apply** [1] - 98:14

**appoint** [1] - 10:25

**approach** [2] - 8:15, 37:23

**approached** [2] - 8:6, 8:22

**approaching** [1] - 36:15

**appropriate** [2] -

18:18, 109:17

**April** [1] - 110:11

**area** [6] - 12:12, 53:9, 57:23, 59:23, 78:11

**areas** [2] - 2:9, 4:8

**argue** [6] - 46:14, 56:14, 71:13, 72:22, 82:11, 82:12

**argued** [2] - 62:7, 111:13

**argues** [2] - 70:17, 79:23

**argument** [37] - 41:24, 42:23, 43:1, 43:15, 45:7, 45:12, 46:9, 47:6, 47:7, 47:15, 47:22, 49:24, 56:10, 61:22, 66:3, 69:18, 72:14, 72:18, 72:19, 72:23, 74:22, 75:14, 80:7, 81:13, 87:6, 87:13, 88:4, 88:8, 92:25, 94:5, 94:13, 96:15, 101:14, 104:9, 104:15, 105:16, 106:15

**arguments** [4] - 87:19, 98:13, 106:4, 108:15

**armed** [2] - 8:9, 24:4

**arrangements** [4] - 6:12, 6:16, 26:9, 26:20

**arrest** [55] - 5:19, 6:5, 6:6, 6:7, 6:9, 6:11, 7:6, 7:11, 7:17, 8:6, 9:14, 10:13, 11:24, 18:12, 21:18, 21:23, 21:25, 22:9, 22:11, 22:23, 24:1, 24:13, 28:13, 31:5, 31:10, 31:12, 32:1, 32:3, 32:23, 45:23, 46:2, 46:5, 47:19, 55:9, 55:11, 55:25, 62:5, 62:25, 69:2, 74:4, 78:24, 79:16, 79:20, 79:23, 82:5, 82:14, 82:19, 83:18, 84:7, 88:1, 88:10, 88:20, 88:22

**arrested** [13] - 9:12, 12:13, 22:4, 23:13, 23:16, 24:11, 33:23, 35:16, 55:21, 68:14, 72:16, 78:23, 79:18

**arrests** [6] - 21:20, 21:23, 22:17, 23:1, 23:24

**arrive** [1] - 6:24

**arrived** [9] - 6:25,

7:24, 7:25, 12:21, 13:2, 19:12, 25:6, 25:25, 30:10

**aside** [2] - 81:3, 98:11

**asleep** [5] - 60:13, 75:24, 76:21, 77:1, 78:12

**aspect** [1] - 84:14

**assault** [11] - 22:12, 23:1, 23:24, 24:2, 24:5, 24:8, 24:10, 24:11, 24:12, 24:15, 24:17

**assigned** [1] - 5:17

**assignment** [1] - 5:16

**assignments** [1] - 5:9

**assist** [2] - 9:22, 74:8

**Assistant** [1] - 111:14

**assistant** [2] - 110:18

**assisted** [4] - 31:12, 32:3

**associated** [1] - 54:14

**assume** [1] - 26:4

**assuming** [1] - 60:1

**ATF** [19] - 1:20, 5:2, 5:8, 5:10, 5:11, 5:14, 5:17, 11:14, 12:8, 12:12, 12:16, 12:22, 12:25, 13:2, 28:25, 29:1, 29:12, 29:13, 106:21

**athletic** [1] - 78:1

**attached** [3] - 38:23, 39:18, 40:8

**attempt** [1] - 28:3

**attempted** [9] - 22:1, 22:9, 22:13, 22:25, 23:10, 23:14, 24:3, 24:4, 54:16

**attempting** [1] - 65:17

**attempts** [1] - 65:15

**attended** [1] - 49:3

**attention** [1] - 5:18

**Attorney** [2] - 39:19, 111:15

**attorney** [3] - 12:9, 20:12, 20:14

**audible** [1] - 17:4

**August** [1] - 40:13

**AUSA** [2] - 1:13, 1:14

**author** [1] - 54:4

**authorities** [4] - 83:19, 84:8, 86:14, 86:24

**auto** [1] - 5:13

**Avenue** [3] - 25:7, 57:24, 89:15

**avoid** [1] - 50:20

**aware** [2] - 32:5, 32:8

**Azur** [4] - 3:18, 4:4, 4:6, 36:8

**AZUR** [1] - 3:22

# B

**backed** [1] - 57:10

**bag** [1] - 36:3

**baggie** [1] - 35:21

**Baier** [1] - 109:1

**Baltimore** [34] - 1:9, 1:25, 4:25, 5:5, 6:15, 22:4, 22:12, 38:16, 39:6, 39:8, 39:12, 39:15, 39:18, 39:20, 39:23, 40:2, 40:6, 40:9, 40:11, 40:14, 59:17, 61:21, 67:16, 74:2, 77:24, 80:17, 81:11, 96:25, 97:11, 98:14, 102:24, 106:6, 107:6

**banging** [1] - 81:8

**bar** [1] - 90:17

**based** [15] - 39:21, 65:22, 67:25, 68:3, 68:10, 78:24, 79:8, 79:25, 82:2, 82:7, 82:8, 82:14, 82:19, 106:7

**basis** [6] - 70:7, 81:23, 82:3, 82:4, 82:16, 94:22

**bathroom** [3] - 13:4, 18:2, 32:14

**battering** [1] - 81:9

**bear** [1] - 72:12

**bears** [1] - 46:17

**became** [2] - 5:12, 5:14

**Becca** [1] - 38:2

**bedroom** [7] - 52:6, 53:11, 53:13, 59:4, 59:25, 60:4, 78:16

**beeper** [1] - 73:9

**BEFORE** [1] - 1:11

**beforehand** [1] - 31:19

**begin** [1] - 13:22

**beginning** [6] - 14:5, 14:7, 16:25, 32:14, 32:21, 33:25

**begins** [2] - 38:13, 55:19

**behalf** [5] - 2:22, 2:24, 3:3, 3:4, 3:7

**behind** [3] - 2:12, 9:3, 28:14

**believes** [1] - 79:13

**belonging** [1] - 59:3

**below** [1] - 57:19

**bench** [4] - 2:12, 15:2,

41:2, 43:5
**BENNETT** [1] - 1:11
**Benton** [1] - 79:12
**best** [3] - 35:6, 71:22, 110:7
**Bethlehem** [2] - 6:22, 25:7
**better** [2] - 67:11, 84:14
**between** [24] - 17:3, 34:12, 39:10, 51:20, 68:5, 69:17, 81:10, 83:22, 84:9, 84:15, 86:5, 86:17, 86:25, 87:11, 97:22, 99:25, 100:3, 100:16, 101:2, 101:20, 101:23, 108:22, 109:3, 109:7
**Bible** [1] - 54:7
**bifurcate** [1] - 42:12
**big** [2] - 75:4, 80:25
**bit** [7] - 2:20, 15:16, 42:13, 56:6, 66:2, 67:21, 103:17
**black** [2] - 29:2, 59:9
**Blake** [4] - 73:20, 74:1, 74:2, 74:10
**Blake's** [1] - 73:24
**bodies** [1] - 67:15
**body** [2] - 51:11, 65:12
**bonded** [2] - 100:19, 100:21
**boom** [1] - 80:25
**boosted** [1] - 2:11
**booth** [1] - 76:25
**boss** [1] - 6:17
**bottom** [2] - 14:7, 102:14
**Bowie** [1] - 81:25
**box** [1] - 3:25
**boyfriend** [1] - 58:18
**BPD** [12] - 27:11, 31:6, 31:7, 32:6, 38:22, 38:25, 39:1, 40:15, 51:12, 53:17, 59:15, 99:10
**BPD's** [1] - 31:22
**break** [4] - 17:23, 18:4, 41:1, 41:4
**breaks** [3] - 17:20, 65:15, 67:4
**Brendan** [1] - 25:19
**Brianna** [7] - 66:13, 66:15, 66:18, 85:1, 85:9, 85:20, 86:4
**brief** [2] - 57:5, 108:20
**briefing** [1] - 31:19
**briefly** [2] - 5:9, 25:15
**brings** [1] - 57:19

**BRISCOE** [1] - 1:6
**Briscoe** [97] - 2:4, 3:5, 3:7, 3:12, 5:20, 5:22, 6:1, 9:9, 25:25, 26:12, 26:23, 27:6, 27:20, 27:22, 28:3, 28:10, 29:7, 29:18, 31:10, 32:6, 33:2, 34:17, 35:17, 38:12, 38:20, 39:16, 40:16, 40:23, 41:15, 45:24, 47:19, 48:1, 50:25, 52:8, 52:10, 53:3, 54:20, 55:9, 55:14, 55:19, 55:21, 56:20, 58:23, 59:4, 59:6, 59:9, 59:15, 60:9, 65:10, 65:15, 65:19, 66:8, 66:23, 66:24, 68:2, 68:6, 68:14, 68:16, 71:6, 72:16, 74:25, 75:10, 75:22, 75:23, 77:12, 77:16, 77:24, 77:25, 78:23, 79:6, 79:9, 79:22, 81:1, 81:2, 81:15, 81:16, 82:25, 84:7, 86:2, 86:6, 86:17, 86:25, 87:11, 87:19, 91:14, 91:15, 96:22, 96:23, 97:4, 97:16, 99:25, 100:17, 101:2, 101:21, 101:23, 104:9
**Briscoe's** [12] - 42:2, 45:8, 45:10, 47:23, 48:24, 57:22, 65:25, 67:22, 82:19, 91:2, 97:10, 97:23
**brought** [1] - 7:7
**BRUSCA** [104] - 2:23, 3:17, 36:19, 36:23, 37:2, 37:8, 37:13, 37:17, 37:19, 37:22, 38:8, 41:19, 42:8, 43:3, 43:20, 43:24, 44:9, 44:13, 46:25, 47:5, 47:14, 47:17, 48:12, 49:12, 49:16, 50:7, 50:10, 52:9, 52:12, 53:5, 54:5, 54:9, 55:13, 56:12, 57:1, 57:14, 58:4, 58:8, 58:10, 60:22, 61:6, 61:19, 62:13, 62:18, 62:23, 63:6, 63:12, 63:19, 63:24, 64:2, 64:6, 64:9, 64:17, 64:22, 64:24, 65:3, 69:1, 69:12,

69:21, 84:10, 84:13, 84:19, 84:24, 85:3, 85:10, 85:15, 85:25, 86:7, 88:24, 89:21, 90:6, 90:14, 91:6, 92:7, 92:14, 93:12, 96:17, 98:7, 98:19, 99:16, 99:21, 99:25, 100:7, 100:13, 100:16, 100:25, 101:3, 101:6, 101:9, 101:19, 101:24, 102:6, 102:12, 102:20, 103:3, 103:6, 103:9, 103:15, 104:8, 104:14, 104:16, 104:24, 108:19, 110:3
**Brusca** [19] - 1:13, 2:23, 3:1, 36:18, 37:25, 40:17, 41:17, 42:7, 43:2, 43:18, 46:22, 69:24, 84:5, 90:23, 91:4, 93:5, 108:18, 110:2, 110:20
**BUDLOW** [18] - 4:21, 6:2, 6:4, 14:22, 14:24, 15:4, 15:8, 16:23, 17:2, 17:6, 17:11, 21:4, 21:5, 22:22, 23:6, 23:20, 24:22, 36:7
**Budlow** [11] - 1:14, 2:24, 3:16, 15:3, 23:3, 24:24, 36:6, 62:2, 110:20, 111:12, 111:20
**building** [5] - 12:17, 12:22, 12:25, 13:2, 29:15
**burden** [5] - 46:15, 46:18, 46:20, 48:14
**Burgard** [1] - 109:21
**burner** [1] - 108:7
**bus** [1] - 58:18
**business** [1] - 84:14
**busy** [1] - 111:3
**but..** [2] - 29:5, 85:5
**BY** [9] - 4:21, 6:4, 15:8, 17:6, 17:11, 21:5, 22:22, 23:20, 25:3

**C**

**calculation** [1] - 79:9
**California** [1] - 99:6
**calm** [5] - 11:20,

11:23, 11:24, 18:12, 19:19
**Cambridge** [10] - 22:4, 38:20, 47:24, 50:2, 53:17, 56:4, 77:24, 80:2, 80:25, 81:10
**candidly** [3] - 92:17, 94:23, 102:25
**cannot** [2] - 10:24, 36:1
**car** [3] - 28:20, 67:17, 73:10
**card** [5] - 9:24, 10:9, 10:12, 10:16, 10:19
**care** [1] - 110:24
**Carolina** [2] - 90:10, 90:11
**Carpenter** [7] - 48:25, 49:1, 49:14, 70:5, 70:14, 70:21, 107:23
**carpenter** [3] - 49:15, 70:8, 70:12
**carry** [1] - 87:4
**cars** [2] - 27:13, 28:18
**cart** [3] - 7:12, 8:3, 88:25
**CASE** [1] - 1:4
**case** [52] - 4:9, 6:1, 29:23, 30:1, 30:4, 31:17, 31:22, 31:23, 49:1, 55:3, 55:7, 57:19, 60:9, 64:15, 66:5, 66:10, 66:16, 70:13, 73:7, 73:10, 73:21, 73:24, 73:25, 74:1, 74:14, 74:15, 74:21, 75:5, 75:8, 76:16, 82:17, 82:22, 83:5, 83:17, 84:1, 88:17, 90:16, 93:24, 95:5, 98:22, 98:23, 103:16, 104:5, 104:17, 106:10, 107:18, 107:22, 108:13, 108:23, 109:19, 109:21, 111:8
**cases** [13] - 51:17, 53:15, 54:25, 63:21, 73:25, 102:7, 104:2, 105:11, 105:14, 105:25, 108:3, 109:13, 109:14
**caught** [1] - 41:12
**CDS** [2] - 23:2, 85:17
**cell** [25] - 13:4, 13:6, 13:17, 38:18, 39:15, 42:15, 44:3, 44:6, 44:12, 44:21, 45:4, 45:11, 47:11, 58:2,

61:10, 61:11, 61:16, 74:7, 75:13, 82:6, 91:2, 96:20, 97:10, 103:23, 107:17
**cells** [1] - 74:8
**central** [1] - 90:9
**certain** [1] - 42:14
**certainly** [10] - 4:16, 55:9, 55:25, 58:23, 60:15, 62:2, 77:14, 77:17, 78:17, 111:8
**certify** [1] - 112:9
**cetera** [2] - 49:3, 105:25
**chair** [1] - 15:12
**chairs** [1] - 15:13
**challenge** [1] - 75:11
**challenged** [2] - 55:4, 89:3
**challenges** [1] - 47:22
**challenging** [1] - 95:11
**chambers** [1] - 102:10
**changed** [2] - 49:1, 111:8
**characterization** [1] - 67:10
**charge** [6] - 22:2, 24:3, 24:4, 24:5, 24:21
**charged** [8] - 23:14, 24:8, 24:11, 24:12, 24:15, 55:13, 78:17, 78:19
**charges** [4] - 22:12, 23:15, 24:6, 78:20
**check** [1] - 22:7
**child** [2] - 52:17, 86:24
**chronologically** [2] - 47:6, 86:21
**chronology** [3] - 23:4, 23:8
**circles** [1] - 102:1
**Circuit** [21] - 39:5, 54:1, 54:8, 54:12, 59:21, 73:21, 90:2, 90:4, 90:9, 90:15, 98:23, 98:24, 103:21, 103:22, 107:22, 109:15, 109:16, 109:19, 109:21, 109:22, 111:15
**circuit** [1] - 40:2
**circular** [1] - 88:8
**circularity** [1] - 66:2
**circumstances** [6] - 51:16, 52:23, 54:9, 56:16, 67:24, 74:20
**cite** [1] - 51:17

**cited** [5] - 73:19, 73:23, 74:16, 74:17, 108:2

**citizens** [1] - 50:17

**city** [2] - 35:25, 67:12

**City** [17] - 5:5, 22:4, 22:12, 38:16, 39:6, 39:7, 39:8, 39:18, 39:21, 39:23, 40:2, 40:6, 40:9, 40:12, 40:14, 81:11, 106:6

**civil** [1] - 74:1

**CJ** [2] - 84:15, 85:23

**clarify** [17] - 44:18, 46:7, 61:12, 62:1, 62:4, 62:22, 63:22, 64:16, 68:23, 84:22, 87:23, 92:2, 93:8, 94:13, 95:8, 103:2, 103:11

**Clark** [3] - 1:23, 112:9, 112:13

**clause** [1] - 89:24, 90:3, 90:16

**clear** [23] - 41:25, 48:18, 54:16, 57:2, 58:1, 60:24, 64:1, 64:11, 67:25, 73:13, 75:11, 80:15, 81:8, 82:16, 83:16, 87:8, 87:22, 89:9, 93:7, 94:14, 96:11, 96:19, 108:11

**clearer** [1] - 76:8

**clearly** [12] - 17:4, 54:19, 60:9, 63:14, 70:12, 70:20, 86:13, 86:21, 87:14, 94:17, 106:9, 106:20

**Clerk** [1] - 39:5

**CLERK** [5] - 3:20, 3:25, 38:5, 41:7, 41:10

**clerk** [3] - 43:9, 85:12, 111:1

**clerk's** [2] - 37:23, 39:24

**Clerk's** [8] - 39:7, 39:8, 39:18, 39:21, 40:6, 40:9, 40:12, 40:14

**Clerks** [1] - 39:23

**clerks** [1] - 43:7

**client** [4] - 40:22, 71:23, 72:3, 107:12

**close** [2] - 35:12, 51:1

**closed** [4] - 15:18, 15:19, 52:6, 88:17

**closing** [1] - 52:21

**clothes** [1] - 59:12

**clothing** [2] - 59:8

**co** [2] - 105:6, 107:14

**co-counsel** [2] - 105:6, 107:14

**codefendant** [1] - 74:18

**colleague** [1] - 2:24

**collectors** [1] - 35:24

**colloquially** [1] - 108:7

**color** [1] - 107:24

**comb** [1] - 21:14

**combination** [1] - 52:19

**combined** [1] - 42:16

**comfortable** [3] - 4:17, 46:12, 46:24

**coming** [11] - 3:9, 35:19, 44:2, 55:1, 55:3, 62:8, 67:3, 75:22, 79:10, 81:4, 86:18

**commands** [2] - 8:15, 8:17

**committed** [2] - 97:17, 100:22

**communicate** [1] - 68:4

**communication** [1] - 68:5

**communications** [1] - 97:22

**compiled** [1] - 8:21

**complex** [2] - 57:15, 76:4

**compliance** [1] - 33:15

**compliant** [2] - 28:13, 33:14

**complied** [2] - 8:19, 28:10

**compliment** [1] - 111:20

**comply** [1] - 33:12

**comprehend** [1] - 18:17

**computer** [1] - 69:5

**concede** [2] - 87:13, 87:14

**concept** [1] - 65:6

**concern** [1] - 53:1

**concerned** [4] - 50:22, 102:3, 104:5, 108:22

**concerns** [1] - 67:3

**conclude** [1] - 41:1

**concluded** [2] - 36:11, 112:5

**concur** [1] - 45:15

**conduct** [1] - 53:19

**conducted** [4] - 2:5,

13:15, 30:23, 98:20

**conducting** [1] - 67:14

**conference** [2] - 110:17, 110:21

**conferences** [1] - 110:10

**confessed** [2] - 91:14, 96:23

**confident** [1] - 110:13

**confined** [1] - 78:10

**confirmed** [3] - 82:25, 90:2, 96:22

**conflict** [1] - 110:16

**confrontation** [4] - 51:8, 89:24, 90:3, 90:16

**connection** [2] - 69:10, 69:17

**consensual** [1] - 57:4

**consent** [16] - 51:18, 51:21, 51:24, 53:19, 56:13, 56:18, 56:21, 56:25, 57:13, 57:16, 80:14, 81:7, 81:20, 81:21

**consented** [2] - 56:16, 81:3

**consistent** [1] - 53:15

**consternation** [1] - 51:10

**construction** [4] - 6:15, 6:17, 25:8, 26:8

**consultation** [1] - 40:10

**contact** [3] - 65:16, 65:17, 74:8

**contacted** [1] - 72:5

**contacts** [2] - 69:9, 69:16

**contained** [2] - 35:20, 80:5

**containers** [1] - 88:17

**contains** [2] - 75:3, 84:22

**contemporaneously** [1] - 52:2

**contending** [1] - 92:22

**contends** [4] - 69:5, 69:9, 93:2, 93:9

**content** [1] - 103:23

**contention** [1] - 92:23

**contents** [20] - 62:11, 62:17, 63:1, 69:6, 69:11, 69:19, 72:20, 73:14, 89:8, 89:10, 95:22, 99:4, 104:23, 105:9, 105:19, 105:20, 107:11, 107:25, 108:2,

108:13

**context** [1] - 103:16

**continually** [1] - 79:18

**continue** [2] - 2:19, 24:7, 33:2, 33:11, 87:24

**continued** [3] - 2:3, 34:24, 35:3

**continuing** [1] - 41:14

**contrast** [1] - 77:7

**control** [3] - 54:10, 54:13, 78:12

**controlled** [1] - 79:7

**converge** [1] - 27:23

**converged** [2] - 7:10, 7:15

**conversation** [5] - 29:22, 29:24, 30:1, 33:7, 51:6

**conversations** [1] - 29:22

**convicted** [6] - 22:14, 22:25, 23:10, 23:17, 24:10, 24:18

**conviction** [3] - 22:9, 22:23, 23:15

**convictions** [1] - 22:2

**cooperation** [1] - 33:15

**cooperative** [4] - 20:5, 30:4, 33:15, 35:3

**coordinate** [2] - 110:20, 111:5

**copies** [1] - 37:2

**copy** [6] - 10:12, 22:5, 37:20, 37:21, 39:11, 69:4

**corporal** [1] - 77:24

**Correct** [3] - 90:14, 101:6, 105:22

**correct** [69] - 20:25, 23:21, 25:23, 26:1, 26:2, 26:3, 26:12, 26:16, 26:25, 27:1, 27:2, 27:13, 27:23, 27:24, 27:25, 28:8, 28:14, 29:8, 29:19, 29:20, 31:6, 32:2, 32:16, 33:12, 34:6, 34:22, 35:1, 35:4, 35:17, 37:13, 37:19, 40:20, 40:23, 41:18, 41:19, 41:24, 42:7, 42:8, 42:9, 42:18, 44:9, 45:12, 45:17, 46:20, 49:12, 49:16, 52:12, 53:5, 61:3, 62:13, 62:18, 64:22, 68:25, 69:10, 69:12, 69:21, 72:21, 83:1,

86:14, 86:15, 87:1, 93:14, 94:2, 100:13, 101:3, 101:23, 103:6, 104:14, 112:10

**corrected** [1] - 23:5

**correctly** [1] - 65:24

**couch** [7] - 51:25, 52:4, 52:7, 60:2, 75:22, 75:25, 77:1

**counsel** [7] - 2:3, 2:21, 4:10, 36:14, 42:13, 105:6, 107:14

**Counsel** [1] - 6:2

**County** [2] - 6:15, 67:16

**couple** [4] - 47:20, 76:1, 77:20, 89:22

**course** [3] - 47:24, 61:20, 89:24

**COURT** [189] - 1:1, 2:2, 3:1, 3:8, 3:14, 3:19, 4:6, 4:14, 4:19, 5:25, 14:20, 14:23, 15:1, 15:5, 17:1, 22:18, 22:21, 23:3, 23:7, 23:19, 24:24, 36:5, 36:8, 36:13, 36:21, 36:25, 37:4, 37:11, 37:14, 37:18, 37:20, 37:23, 38:6, 40:17, 40:22, 40:25, 41:11, 41:20, 41:23, 42:9, 42:12, 42:20, 42:25, 43:4, 43:18, 43:21, 43:25, 44:10, 44:14, 44:17, 44:25, 45:3, 45:15, 45:21, 45:25, 46:2, 46:5, 46:7, 46:16, 47:3, 47:9, 47:15, 48:11, 48:18, 49:15, 50:6, 50:8, 52:7, 52:10, 53:3, 54:2, 54:7, 55:11, 56:9, 56:18, 57:12, 58:1, 58:6, 58:9, 60:21, 60:23, 61:8, 61:24, 62:14, 62:21, 62:24, 63:8, 63:13, 63:20, 63:25, 64:4, 64:7, 64:10, 64:19, 64:23, 65:2, 68:23, 69:2, 69:14, 69:23, 70:5, 70:7, 70:9, 70:12, 70:20, 71:2, 72:14, 73:1, 73:3, 73:5, 73:12, 73:16, 75:9, 80:12, 82:21, 83:4, 83:15, 84:5, 84:12, 84:17,

84:21, 85:2, 85:6, 85:14, 85:21, 86:1, 86:8, 86:12, 86:19, 87:5, 87:17, 89:4, 89:6, 90:5, 90:8, 90:22, 91:17, 92:12, 92:15, 93:13, 93:16, 94:4, 94:7, 94:11, 95:9, 95:16, 95:19, 95:25, 96:4, 96:6, 96:9, 98:6, 98:17, 99:14, 99:18, 99:22, 100:5, 100:8, 100:14, 100:23, 101:1, 101:4, 101:7, 101:18, 101:22, 101:25, 102:7, 102:14, 102:23, 103:4, 103:7, 103:10, 103:16, 104:12, 104:15, 104:19, 104:25, 105:4, 105:8, 105:23, 106:11, 107:15, 108:6, 108:14, 109:12, 110:4, 110:7, 111:3, 111:23

**court** [3] - 10:22, 48:8, 90:17

**Court** [40] - 1:24, 2:9, 4:7, 10:25, 14:21, 36:20, 37:3, 38:14, 38:22, 38:24, 39:4, 39:5, 39:6, 39:17, 41:6, 41:7, 41:10, 54:1, 54:12, 54:22, 60:18, 65:5, 68:21, 76:14, 76:16, 76:17, 78:7, 78:14, 85:7, 85:11, 89:25, 98:4, 103:14, 103:25, 104:4, 108:24, 109:4, 110:15, 112:3, 112:14

**court's** [2] - 21:4, 80:11

**Courtroom** [1] - 1:9

**courtroom** [3] - 2:10, 5:22, 14:24

**cousin** [3] - 58:16, 58:25, 59:16

**cousin's** [1] - 77:22

**COVID** [1] - 29:25

**CPD** [1] - 51:3

**craziness** [1] - 67:12

**credibility** [4] - 92:16, 94:20, 95:12, 95:13

**credible** [1] - 108:24

**credibly** [1] - 94:16

**crime** [9] - 22:1, 71:8, 71:9, 71:15, 74:12, 75:3, 75:4, 77:13, 100:18

**crimes** [3] - 22:3, 74:14, 97:17

**CRIMINAL** [1] - 1:4

**Criminal** [2] - 2:4, 41:15

**criminal** [2] - 22:5, 31:20

**cross** [2] - 75:17, 102:17

**CROSS** [1] - 25:2

**cross-examination** [1] - 75:17

**CROSS-EXAMINATION** [1] - 25:2

**crystalize** [1] - 94:24

**cuffs** [3] - 9:15, 30:17, 30:19

**culminating** [1] - 47:19

**custody** [4] - 6:13, 10:1, 11:14, 12:7

**cuz** [1] - 100:19

# D

**Dan** [1] - 25:18

**Dana** [2] - 1:13, 2:23

**dangerous** [1] - 24:9

**Daniel** [1] - 25:20

**Danielle** [1] - 85:19

**Daniels** [1] - 79:5

**data** [5] - 58:11, 64:18, 101:12, 101:16

**date** [6] - 39:22, 39:24, 110:14, 110:17, 111:6, 111:14

**dates** [1] - 111:2

**dating** [1] - 35:10

**David** [2] - 3:18, 4:4

**DAVID** [1] - 3:22

**Davis** [1] - 54:11

**DAY** [1] - 1:6

**days** [5] - 2:5, 6:10, 43:8, 102:9, 109:2

**DEA** [1] - 29:11

**dead** [2] - 3:10, 65:18

**deal** [3] - 47:11, 93:7, 109:24

**dealing** [13] - 67:13, 68:10, 69:10, 69:18, 85:17, 91:16, 94:15, 96:24, 100:2, 100:6, 100:12, 101:20, 101:25

**deals** [1] - 73:22

**dealt** [1] - 83:12

**death** [1] - 67:2

**debriefing** [1] - 31:16

**debt** [1] - 54:4

**decided** [1] - 49:14

**decision** [3] - 26:11, 26:13

**Defendant** [2] - 1:6, 1:15

**defendant** [61] - 3:3, 5:24, 6:1, 6:13, 6:14, 6:25, 7:3, 7:7, 7:11, 7:19, 7:24, 8:7, 8:16, 9:12, 9:14, 9:23, 9:25, 10:9, 10:17, 11:7, 11:13, 11:25, 12:8, 12:11, 12:20, 13:8, 13:11, 13:16, 13:20, 14:2, 14:10, 15:12, 15:13, 15:22, 16:1, 16:3, 16:8, 17:23, 18:16, 18:17, 19:6, 19:12, 19:15, 19:20, 20:11, 20:16, 20:23, 21:18, 31:18, 42:2, 43:16, 45:8, 45:10, 52:1, 52:8, 77:25, 83:19, 91:2, 99:22, 103:12, 108:3

**DEFENDANT** [1] - 3:13

**defendant's** [8] - 11:21, 16:4, 17:9, 18:9, 21:22, 31:19, 104:1, 106:23

**defense** [13] - 40:19, 41:21, 47:22, 48:13, 55:4, 56:13, 65:24, 66:3, 66:12, 95:23, 98:2, 99:8, 103:20

**defined** [1] - 108:7

**definitely** [2] - 88:1, 110:21

**degree** [15] - 22:2, 22:13, 22:25, 23:10, 23:14, 24:3, 24:4, 24:6, 24:9, 24:10, 24:11, 24:12, 24:16, 24:17

**delay** [16] - 93:22, 93:23, 98:11, 98:14, 98:17, 102:9, 102:10, 102:13, 103:22, 105:10, 105:12, 106:2, 106:5, 108:22, 109:2

**delays** [2] - 105:11, 109:23

**deleted** [2] - 101:11, 101:13

**demeanor** [4] - 8:22, 11:21, 18:9, 19:17

**DEMETRIOU** [3] - 44:16, 44:24, 45:2

**demonstration** [2] - 51:8, 51:10

**denial** [1] - 54:18

**denying** [1] - 103:25

**Department** [8] - 5:1, 5:5, 38:16, 39:12, 39:15, 74:2, 80:25, 102:24

**department** [1] - 5:2

**derivative** [6] - 62:19, 63:13, 63:15, 63:21, 64:12, 64:14

**describe** [10] - 8:4, 8:21, 11:18, 15:9, 15:23, 17:16, 18:9, 18:14, 19:17, 20:5

**described** [2] - 52:5, 58:21

**descriptive** [1] - 99:2

**desk** [1] - 37:23

**despite** [2] - 35:3, 99:8

**destroying** [1] - 52:24

**detail** [5] - 8:4, 22:8, 48:6, 49:22, 56:7

**detain** [3] - 55:6, 56:1, 67:23

**detained** [4] - 55:23, 56:2, 56:5

**Detective** [28] - 17:7, 21:17, 24:22, 25:4, 30:2, 33:6, 36:8, 52:22, 54:17, 58:21, 67:11, 69:3, 77:22, 79:4, 79:10, 79:21, 80:2, 84:11, 85:15, 91:20, 92:16, 93:19, 94:16, 94:21, 95:13, 102:25, 108:24, 108:25

**detective** [10] - 4:25, 5:4, 15:9, 17:12, 48:16, 66:12, 66:23, 83:2, 83:13, 106:8

**detectives** [3] - 32:7, 55:24, 79:15

**detention** [1] - 54:13

**determined** [1] - 74:6

**device** [1] - 51:5

**difference** [1] - 109:6

**different** [19] - 28:20, 38:9, 47:1, 47:20, 50:2, 50:7, 51:1, 59:17, 63:23, 70:24, 73:25, 74:12, 74:19, 74:21, 75:1, 75:2,

**demeanor** 84:25, 106:1, 107:24

**differently** [1] - 62:19

**difficulties** [1] - 38:24

**dire** [2] - 110:11, 110:22

**direct** [2] - 29:17, 85:17

**DIRECT** [1] - 4:20

**directly** [2] - 4:1, 105:20

**disagree** [1] - 91:10

**disagreed** [1] - 48:8

**discovered** [3] - 67:15, 88:6, 88:7

**discovery** [2] - 82:12, 82:20

**discretion** [2] - 2:10, 4:8

**discuss** [1] - 36:9

**discussed** [4] - 11:4, 31:17, 34:12, 40:22

**dismiss** [1] - 104:1

**display** [1] - 20:8

**displayed** [1] - 14:2

**dispute** [1] - 86:9

**disrespectful** [1] - 33:17

**distance** [2] - 77:11, 77:17

**distinction** [2] - 75:5, 102:21

**distinguish** [1] - 58:7, 102:8, 103:19

**District** [9] - 38:14, 38:15, 38:22, 39:4, 39:17, 90:4, 90:15, 103:25

**district** [2] - 40:2, 73:19, 90:8

**DISTRICT** [2] - 1:1, 1:1

**division** [1] - 90:12

**DIVISION** [1] - 1:2

**DNA** [2] - 55:5, 68:1

**document** [3] - 13:25, 14:2, 14:7

**documenting** [1] - 10:13

**domestic** [1] - 24:18

**done** [4] - 53:14, 92:18, 97:17, 99:10

**door** [26] - 15:18, 15:19, 16:2, 50:3, 51:3, 51:4, 51:5, 51:9, 51:12, 52:6, 52:11, 52:21, 56:19, 56:22, 57:5, 57:7, 57:8, 57:9, 80:17, 80:18, 80:22, 81:1, 81:24

**doors** [2] - 50:25, 81:8

**doorstep** [3] - 47:25, 49:25, 56:4
**Dorsey** [2] - 107:17, 108:6
**dot** [1] - 102:17
**down** [13] - 4:9, 4:15, 36:9, 44:2, 53:14, 53:16, 56:4, 74:16, 80:8, 82:1, 82:2, 103:13, 104:4
**draft** [2] - 14:17, 85:8
**drafting** [1] - 54:18
**draw** [1] - 8:12
**drawer** [3] - 60:16, 106:18, 106:23
**drawing** [1] - 5:18
**drawn** [1] - 8:14
**dressed** [1] - 59:10
**drink** [1] - 34:18
**drive** [3] - 7:13, 28:23, 28:25
**driving** [4] - 8:3, 28:24, 97:14, 97:18
**drove** [1] - 7:14
**drug** [21] - 68:10, 69:10, 69:17, 83:1, 83:22, 84:8, 86:5, 86:14, 86:15, 86:25, 87:4, 87:9, 87:10, 87:22, 88:21, 100:2, 100:6, 100:12, 101:20, 101:25
**drugs** [20] - 18:25, 19:8, 34:10, 35:20, 35:25, 55:20, 77:10, 77:13, 78:16, 78:17, 80:9, 82:14, 88:9, 88:10, 88:20, 88:23, 91:16, 96:25, 100:2, 100:3
**due** [1] - 110:11
**duly** [1] - 3:22
**during** [24] - 10:23, 11:19, 11:21, 12:6, 13:11, 14:3, 16:5, 17:19, 17:25, 18:3, 18:6, 19:20, 20:5, 20:8, 20:11, 27:3, 28:13, 29:16, 29:21, 30:17, 30:19, 33:19, 40:14, 59:14

---

**E**

**e-mail** [1] - 110:19
**e-mails** [1] - 39:2
**early** [1] - 76:8
**easier** [1] - 76:13
**east** [2] - 90:9, 90:10
**easy** [1] - 71:18

**Edgemere** [3] - 6:22, 12:25, 25:7
**effectively** [2] - 51:18, 66:19
**effort** [3] - 28:5, 83:12, 94:18
**efforts** [2] - 38:9, 38:10
**eight** [3] - 25:10, 25:13, 99:9
**eight-day** [1] - 99:9
**either** [7] - 15:2, 45:6, 55:23, 62:3, 77:13, 88:16, 90:6
**Eleventh** [3] - 98:23, 98:24, 109:19
**eloquence** [1] - 111:20
**eloquent** [2] - 111:19, 111:25
**employed** [1] - 4:24
**employee** [2] - 8:3, 98:7
**employees** [1] - 7:2
**employment** [1] - 12:12
**empty** [2] - 36:1, 36:3
**encounter** [1] - 57:4
**encountered** [1] - 19:3
**end** [6] - 19:22, 20:2, 20:22, 32:14, 79:3
**ended** [5] - 21:2, 32:25, 33:1, 50:5, 50:24
**ending** [4] - 61:16, 69:7, 91:3, 93:6
**ends** [1] - 61:2
**enforcement** [10] - 19:2, 21:19, 21:23, 26:14, 52:20, 54:20, 70:20, 83:19, 102:14, 103:24
**enter** [4] - 18:6, 50:24, 51:21, 51:24
**entering** [1] - 52:3
**entirely** [2] - 53:20, 101:11
**entitled** [4] - 49:20, 55:3, 55:5, 112:11
**entry** [6] - 24:16, 51:24, 53:18, 53:19, 54:10, 57:9
**equivalent** [5] - 48:7, 48:23, 49:9, 70:18, 72:9
**erred** [1] - 103:25
**especially** [1] - 67:3
**Esq** [2] - 1:16, 1:17
**essence** [1] - 34:5

**essentially** [4] - 91:18, 91:22, 105:14, 109:13
**establish** [1] - 99:4
**established** [2] - 70:13, 78:2
**et** [2] - 49:3, 105:25
**etched** [1] - 110:15
**evening** [1] - 97:7
**event** [3] - 36:10, 47:18, 49:18
**events** [3] - 19:1, 47:21, 99:6
**evidence** [92] - 44:3, 44:6, 46:19, 47:8, 50:2, 52:10, 52:24, 59:3, 59:7, 59:10, 61:1, 61:3, 61:16, 62:8, 62:15, 63:10, 69:6, 69:8, 69:9, 69:15, 69:16, 71:6, 71:9, 71:15, 72:12, 74:12, 75:3, 75:4, 75:15, 76:3, 76:9, 78:22, 78:25, 82:22, 83:16, 83:17, 84:6, 84:22, 85:7, 86:2, 86:3, 86:5, 86:13, 86:20, 86:24, 87:9, 87:10, 87:14, 87:15, 87:17, 88:14, 89:14, 92:3, 92:5, 92:21, 93:1, 93:2, 93:9, 93:23, 94:12, 94:25, 95:19, 96:14, 98:3, 99:1, 99:4, 99:14, 99:16, 99:19, 99:20, 99:22, 99:23, 100:6, 100:8, 100:9, 100:11, 101:4, 101:10, 101:11, 101:15, 101:16, 101:22, 103:4, 103:7, 103:12, 104:17, 106:20, 106:24, 107:4, 109:4
**exactly** [16] - 25:13, 28:21, 48:12, 49:16, 50:10, 57:10, 57:14, 57:20, 64:24, 77:15, 85:25, 86:7, 87:16, 99:18, 103:11
**examination** [2] - 29:18, 75:17
**EXAMINATION** [2] - 4:20, 25:2
**examined** [1] - 3:22
**example** [1] - 100:19
**except** [2] - 55:18, 79:17

**exception** [2] - 2:10, 70:10
**exchange** [1] - 20:19
**excitement** [1] - 50:23
**excuse** [6] - 29:13, 30:3, 33:6, 76:9, 76:18, 90:4
**executed** [5] - 39:23, 57:15, 57:18, 98:25, 102:15
**execution** [4] - 40:4, 50:4, 50:11, 55:2
**exhaustive** [1] - 40:10
**exhibit** [9] - 14:21, 37:5, 37:6, 84:17, 84:21, 84:25, 85:2, 95:23
**Exhibit** [17] - 10:4, 13:24, 14:16, 14:23, 16:24, 21:7, 37:8, 37:10, 37:11, 37:24, 38:23, 39:19, 40:8, 75:18, 80:20, 85:4, 85:6
**exigent** [1] - 54:9
**existence** [5] - 49:10, 69:20, 92:9, 99:2, 99:4
**exited** [2] - 7:9, 21:3
**exiting** [1] - 29:7
**expectation** [8] - 56:20, 57:21, 59:19, 59:22, 60:3, 60:17, 76:24, 89:16
**explain** [2] - 34:7, 83:13
**explained** [3] - 39:20, 40:1, 49:22
**explanation** [1] - 91:24
**extensively** [1] - 74:24
**extent** [5] - 60:24, 68:24, 96:1, 97:21, 105:18
**extracted** [5] - 94:1, 96:14, 99:24, 104:25, 109:1
**extracting** [1] - 96:12
**extraction** [5] - 98:5, 98:8, 98:15, 98:20, 99:16
**extraordinary** [2] - 102:11, 103:13
**eye** [1] - 66:9

---

**F**

**F.3d** [1] - 109:21
**face** [2] - 105:13, 106:14

**Facebook** [2] - 43:14, 43:22
**facilities** [1] - 32:15
**facility** [1] - 13:4
**facing** [1] - 16:2
**fact** [24] - 52:8, 52:9, 53:25, 57:9, 57:14, 59:14, 62:9, 64:19, 65:11, 68:13, 68:15, 69:8, 69:21, 70:23, 72:16, 73:8, 78:19, 79:15, 96:25, 101:15, 105:15, 106:5, 111:1
**factor** [2] - 48:13, 61:15
**factors** [2] - 61:9, 62:6
**facts** [3] - 18:22, 65:8, 65:22
**fair** [9] - 26:8, 28:11, 30:25, 32:21, 33:9, 33:16, 33:20, 33:23, 102:9
**fairly** [1] - 48:19
**fairness** [1] - 54:2
**faith** [9] - 48:10, 49:20, 70:19, 73:19, 73:21, 74:3, 74:20, 74:23, 75:5
**fallacy** [1] - 66:2
**falls** [1] - 88:22
**false** [2] - 24:2, 48:17
**familiar** [2] - 9:6, 104:2
**family** [10] - 65:20, 65:25, 66:1, 67:5, 82:24, 83:6, 83:11, 83:20, 100:1, 100:10
**far** [10] - 2:6, 9:10, 12:25, 17:8, 28:18, 32:5, 62:7, 63:5, 102:3, 104:4
**faster** [1] - 50:4
**father** [2] - 75:19, 75:25
**father's** [1] - 77:7
**fear** [1] - 50:17
**federal** [12] - 5:14, 6:5, 6:6, 6:7, 12:16, 29:15, 98:4, 98:7, 102:21, 102:22, 109:8, 109:14
**Federal** [1] - 1:24
**felt** [1] - 111:15
**few** [2] - 27:5, 28:20
**files** [2] - 31:22, 39:1
**finally** [5] - 3:11, 98:1, 104:16, 107:7, 107:9
**fine** [9] - 17:1, 21:14, 36:21, 36:25, 38:6,

47:3, 56:11, 73:12,
94:12
**Fine** [1] - 93:13
**fine-tooth** [1] - 21:14
**finish** [2] - 110:9,
112:2
**firearm** [1] - 5:14
**firearms** [1] - 20:8
**firmly** [1] - 110:12
**first** [28] - 13:2, 21:23,
21:25, 22:2, 22:11,
22:12, 22:13, 22:25,
23:4, 23:10, 23:14,
24:3, 38:13, 41:1,
42:21, 44:4, 47:15,
75:8, 75:10, 79:24,
83:23, 85:22, 92:2,
98:2, 98:13, 100:5,
106:24, 109:7
**five** [4] - 35:12, 41:4,
43:11, 56:2
**five-hour** [1] - 56:2
**flashlights** [1] - 80:24
**flees** [1] - 52:18
**flies** [1] - 105:13
**flight** [3] - 52:20,
52:21
**flip** [1] - 68:6
**flipping** [1] - 97:2
**floor** [1] - 13:3
**Floor** [1] - 1:24
**flouted** [1] - 99:11
**flowed** [1] - 92:25
**flows** [1] - 64:14
**fluid** [1] - 65:6
**fly** [1] - 106:14
**focus** [1] - 42:14
**focuses** [1] - 105:20
**folks** [7] - 53:12,
53:14, 53:16, 57:9,
68:12, 69:12, 85:18
**follow** [1] - 92:19
**following** [3] - 65:14,
106:9, 107:23
**follows** [2] - 3:23,
64:15
**footnote** [1] - 82:13
**FOR** [1] - 1:1
**force** [9] - 3:17, 5:2,
5:6, 5:10, 5:11, 5:13,
28:25, 56:15, 81:19
**foregoing** [1] - 112:10
**foreman** [4] - 6:16,
7:8, 7:9, 7:14
**forever** [2] - 100:20,
100:21
**forgot** [1] - 74:16
**form** [1] - 106:12
**format** [1] - 17:17
**forth** [7] - 48:9, 49:19,

65:9, 68:1, 71:7,
82:9, 91:8
**forward** [6] - 24:7,
53:9, 57:4, 67:3,
70:13, 110:14
**Foster** [2] - 110:19,
111:5
**four** [3] - 7:9, 35:12,
45:2
**four-wheel** [1] - 7:9
**Fourth** [18] - 48:4,
53:25, 54:7, 54:11,
57:3, 59:20, 73:21,
90:3, 90:8, 90:15,
99:1, 99:3, 103:21,
103:22, 107:22,
109:15, 109:16,
111:15
**frankly** [4] - 54:8,
55:22, 81:12, 97:25
**Franks** [2] - 48:14,
49:21
**free** [1] - 62:2
**freely** [1] - 81:7
**freezes** [1] - 53:12
**friendships** [1] - 84:14
**front** [7] - 7:20, 10:5,
10:7, 13:5, 16:7,
30:20, 30:22
**full** [5] - 4:2, 37:17,
40:6, 50:21, 77:9
**fully** [3] - 2:11, 4:10,
51:12
**functional** [4] - 48:23,
49:9, 70:17, 72:9
**furtive** [1] - 52:4
**futile** [1] - 65:18

## G

**gain** [2] - 53:18, 53:19
**game** [2] - 75:2, 105:5
**Gator** [11] - 7:8, 7:12,
7:16, 7:19, 26:12,
27:6, 27:16, 27:22,
28:3, 28:18, 29:8
**gear** [2] - 13:7, 50:22
**General** [1] - 39:19
**general** [2] - 12:12,
31:16
**generally** [6] - 17:16,
21:7, 21:11, 31:7,
59:20, 107:25
**gestures** [1] - 51:12
**girl** [1] - 97:9
**given** [6] - 17:23, 80:3,
95:22, 95:23, 104:5
**glad** [5] - 46:10, 46:22,
69:25, 91:4, 105:2
**go-to** [1] - 54:5

**good-faith** [1] - 74:23
**Google** [1] - 57:22
**government** [51] -
2:22, 3:16, 38:10,
38:25, 41:17, 42:7,
43:2, 43:19, 45:19,
46:17, 46:20, 48:22,
60:8, 60:15, 61:13,
69:9, 70:17, 73:19,
73:23, 76:3, 77:3,
78:15, 79:23, 82:9,
82:11, 88:4, 88:13,
89:18, 91:13, 92:8,
93:1, 93:9, 94:9,
94:11, 95:5, 96:12,
96:15, 97:16, 102:8,
102:16, 102:18,
102:21, 102:22,
103:14, 104:3,
105:1, 106:4,
108:17, 109:8, 110:2
**Government** [2] -
14:21, 37:11
**government's** [14] -
43:23, 46:15, 48:2,
49:4, 49:7, 49:11,
56:24, 69:15, 74:17,
76:9, 89:23, 93:4,
96:21, 106:14
**Government's** [4] -
13:24, 16:23, 37:24,
80:20
**gradually** [1] - 42:14
**grams** [1] - 97:9
**Grand** [8] - 14:16,
75:16, 77:3, 77:4,
77:14, 80:22, 81:18,
90:20
**grand** [5] - 14:20,
14:22, 15:2, 15:6,
75:18
**great** [2] - 25:18, 38:1
**greater** [1] - 46:19
**Greenwood** [2] -
57:24, 89:14
**grounds** [2] - 80:3,
82:8
**group** [2] - 25:18,
55:11
**guess** [9] - 12:23,
25:10, 27:13, 36:19,
63:8, 83:11, 90:5,
95:20, 106:21
**guest** [8] - 59:22,
60:3, 60:7, 60:8,
60:14, 78:10, 78:12
**guest's** [1] - 76:18
**guests** [1] - 78:10
**guilty** [1] - 24:5
**gun** [6] - 27:25, 52:17,

79:19, 97:5, 97:8,
97:14
**guns** [1] - 80:23
**guy** [2] - 51:2, 51:4
**guys** [1] - 51:13
**Gwendolyn** [1] - 25:19

## H

**hairs** [2] - 78:14,
78:15
**half** [1] - 5:8
**hand** [3] - 3:21, 37:17,
51:5
**handbook** [1] - 54:1
**handcuffed** [5] - 8:8,
8:20, 11:16, 16:7,
30:15
**handcuffs** [6] - 8:25,
9:2, 13:5, 16:5, 79:6,
79:18
**handling** [1] - 107:3
**hands** [12] - 8:7, 8:17,
8:18, 8:19, 28:8,
28:10, 28:14, 53:11,
53:12, 58:20
**hard** [1] - 18:12
**Harris** [6] - 55:14,
59:7, 75:20, 77:12,
80:18, 81:11, 81:14,
83:1
**haul** [1] - 82:5
**hay** [1] - 77:3
**Haynes** [9] - 97:3,
97:7, 97:14, 97:19,
100:17, 100:18,
101:2, 101:21,
101:23
**Haynes's** [1] - 97:11
**head** [2] - 76:13, 106:1
**headquarters** [2] -
29:11, 30:10
**hear** [17] - 41:23, 43:7,
46:9, 46:10, 46:22,
47:15, 51:2, 51:6,
51:19, 60:19, 69:25,
91:4, 94:13, 96:15,
96:16, 104:7, 105:2
**heard** [12] - 17:8, 50:2,
57:6, 61:15, 62:11,
63:3, 63:4, 67:11,
80:24, 80:25, 89:19,
104:6
**hearing** [10] - 2:3,
31:2, 36:11, 36:22,
37:5, 41:14, 84:20,
85:12, 90:18, 98:25
**HEARING** [1] - 1:6
**hearings** [1] - 2:5
**hears** [1] - 81:14

**held** [1] - 103:22
**helpful** [1] - 23:9
**hereafter** [1] - 39:6
**hereby** [3] - 10:20,
38:13, 112:9
**hereto** [1] - 38:23
**heroin** [1] - 68:12
**herself** [2] - 77:11,
77:17
**hesitation** [1] - 12:4
**hid** [1] - 50:16
**hiding** [1] - 74:8
**high** [3] - 34:17,
52:14, 52:19
**high-risk** [2] - 52:14,
52:19
**himself** [6] - 23:5,
27:22, 59:18, 75:12,
96:24, 100:4
**history** [3] - 22:5,
31:20, 34:9
**hit** [2] - 55:19, 105:25
**hold** [3] - 44:18, 62:3,
99:3
**holding** [1] - 90:16
**holds** [1] - 98:24
**Hollander** [1] - 73:20
**Hollander's** [1] - 74:15
**home** [3] - 59:5,
76:19, 97:4
**homicide** [5] - 32:7,
66:5, 66:11, 68:3,
100:18
**homicides** [1] - 52:15
**honest** [1] - 83:8
**Honor** [85] - 2:23, 3:6,
3:13, 3:17, 6:3,
16:23, 23:13, 24:22,
25:1, 36:7, 36:12,
36:19, 37:13, 38:5,
38:8, 40:21, 41:19,
41:22, 43:3, 43:17,
43:20, 43:24, 44:13,
46:6, 46:14, 46:25,
47:5, 47:17, 48:12,
49:12, 49:16, 51:17,
54:5, 56:7, 57:1,
57:20, 58:8, 61:19,
63:19, 63:24, 64:2,
64:17, 64:22, 65:5,
67:20, 69:12, 70:1,
71:22, 72:13, 75:6,
75:19, 78:2, 78:21,
80:14, 83:9, 84:10,
84:13, 84:20, 84:24,
85:4, 85:10, 86:7,
86:10, 88:4, 89:21,
90:14, 90:19, 91:6,
92:7, 93:12, 95:8,
96:17, 98:19, 101:6,

101:24, 102:6,
102:22, 105:25,
107:8, 107:16,
107:18, 108:2,
108:19, 110:6,
111:22
**Honor's** [1] - 61:7
**honorable** [1] - 94:23
**HONORABLE** [1] -
1:11
**Honorable** [1] - 41:7
**Horne** [1] - 54:3
**horse** [2] - 88:25,
107:24
**host** [3] - 60:6, 78:8,
78:11
**hour** [9] - 17:15,
17:19, 32:10, 32:11,
32:12, 41:4, 55:17,
56:2, 59:15
**hour-and-five-**
**minute** [1] - 41:4
**hours** [2] - 55:17,
65:13
**house** [9] - 77:10,
77:11, 77:23, 78:9,
78:11, 82:4, 88:15,
97:5, 97:12
**houseguest** [2] -
76:17, 78:8
**Howard** [3] - 52:22,
58:21, 77:25

---

## I

**I.e** [1] - 99:23
**idea** [5] - 26:22, 27:19,
56:13, 57:11, 98:1
**identify** [3] - 2:21,
5:23, 17:8
**ignored** [1] - 110:25
**illegal** [4] - 88:21,
88:22, 95:17, 96:1
**Illinois** [1] - 54:12
**immediate** [5] - 6:16,
52:20, 53:1, 53:22,
86:3
**immediately** [1] -
100:1
**implications** [1] -
104:5
**import** [1] - 72:1
**important** [1] - 70:12
**imprisonment** [1] -
24:2
**IN** [1] - 1:1
**incarcerated** [3] -
78:19, 97:8, 104:10
**incident** [3] - 78:24,
79:19, 79:20

**inclined** [1] - 103:18
**include** [1] - 39:14
**included** [1] - 22:12
**including** [2] - 21:20,
38:17
**inclusion** [1] - 60:15
**inconspicuous** [2] -
27:14, 28:22
**indicate** [3] - 11:25,
32:13, 82:22
**indicated** [12] - 2:8,
2:14, 20:23, 29:17,
32:9, 32:20, 33:7,
33:14, 33:18, 35:4,
89:25, 110:16
**indicates** [3] - 34:1,
91:25, 94:18
**indication** [2] - 91:25,
99:11
**indicative** [3] - 100:2,
100:17, 101:17
**indisputably** [1] - 99:5
**individual** [12] - 51:25,
52:3, 52:7, 55:1,
55:3, 55:15, 56:19,
56:22, 57:5, 74:5,
85:23, 97:13
**individuals** [5] - 19:3,
51:21, 53:23, 54:14,
85:16
**inducements** [1] -
30:8
**indulgence** [2] - 21:4,
40:11
**inevitable** [2] - 82:12,
82:20
**inevitably** [1] - 88:5
**inference** [1] - 65:17
**influence** [2] - 19:4,
19:7
**information** [8] -
20:17, 20:20, 31:17,
71:4, 74:25, 76:6,
80:3, 83:21
**inherent** [1] - 57:3
**inherently** [2] - 104:17
**injure** [1] - 24:9
**inquired** [1] - 2:13
**inquiry** [2] - 60:6,
87:20
**inside** [4] - 7:10, 7:15,
8:4, 11:10
**instance** [2] - 106:17,
108:4
**instead** [2] - 71:12,
82:18
**instrument** [1] - 71:8
**integrated** [1] - 42:5
**intelligent** [1] - 18:20
**intended** [1] - 44:20

**intending** [1] - 45:19
**intense** [1] - 50:4
**intent** [3] - 24:9,
27:14, 54:19
**intentionally** [3] -
48:17, 50:19, 67:19
**interaction** [1] - 12:6
**interactions** [1] -
21:19
**interactive** [1] - 48:20
**interest** [17] - 57:3,
60:7, 76:12, 77:2,
77:8, 77:19, 77:20,
78:2, 78:3, 78:7,
78:16, 78:18,
104:11, 104:12,
108:1, 108:5
**interrogation** [2] -
30:17, 30:23
**interrupt** [2] - 48:19,
87:24
**interview** [51] - 5:19,
10:13, 12:15, 13:15,
13:18, 14:3, 14:18,
15:9, 16:5, 16:11,
16:17, 16:21, 17:13,
17:16, 17:25, 18:1,
18:2, 18:3, 18:6,
18:10, 19:18, 19:20,
19:21, 19:23, 20:1,
20:6, 20:9, 21:2,
21:12, 30:19, 31:13,
32:2, 32:4, 32:5,
32:6, 32:9, 32:25,
33:20, 34:1, 55:19,
59:15, 67:14, 67:16,
80:21, 80:23, 83:5,
83:11, 84:25, 85:8,
86:16
**interviewed** [1] -
83:20
**interviewing** [1] -
67:17
**interviews** [3] - 84:2,
84:3, 84:6
**intimate** [1] - 65:22
**introduce** [1] - 93:10
**introduced** [3] -
84:21, 96:11, 105:1
**intrusion** [1] - 60:8
**inventory** [4] - 82:14,
82:15, 82:17
**investigate** [1] - 5:14
**investigating** [1] -
87:9
**investigation** [10] -
9:10, 21:17, 31:6,
31:8, 31:9, 31:11,
39:13, 75:1, 96:21
**investigative** [1] -

54:24
**investigator** [1] - 9:9
**invited** [1] - 81:2
**involved** [4] - 31:9,
68:12, 102:8, 108:7
**involving** [4] - 31:10,
52:17, 83:1, 109:18
**irrelevant** [1] - 63:17
**irrespective** [1] - 55:6
**isolation** [1] - 65:8
**issuance** [1] - 92:4
**issue** [22] - 17:2, 35:4,
49:21, 50:9, 56:21,
70:24, 73:22, 75:6,
75:13, 75:17, 78:6,
80:14, 93:22, 94:21,
94:24, 94:25, 95:14,
96:17, 98:11,
104:20, 107:19,
107:22
**issued** [8] - 6:9, 38:15,
38:22, 39:5, 39:17,
39:22, 40:2, 91:22
**issues** [7] - 68:21,
89:16, 106:9,
106:14, 106:17,
110:23, 111:10
**issuing** [3] - 39:25,
40:3, 40:5
**item** [1] - 82:16
**items** [2] - 59:24,
75:12
**itself** [24] - 31:12,
32:2, 33:19, 48:3,
61:1, 63:2, 71:7,
71:8, 72:8, 72:15,
74:11, 74:12, 75:15,
79:24, 80:4, 80:5,
88:5, 88:21, 88:22,
89:20, 94:6, 94:7,
104:16, 104:21

---

## J

**Jail** [1] - 67:16
**jail** [2] - 85:24, 97:6
**January** [6] - 1:8, 2:6,
24:15, 38:17, 38:25,
85:23
**Javon** [3] - 1:20, 9:6,
25:19
**Jeffery** [1] - 68:15
**Jeffrey** [17] - 39:13,
65:10, 66:8, 66:16,
66:24, 66:25, 68:6,
83:25, 84:1, 86:5,
86:13, 86:23, 86:25,
87:11, 96:23, 100:10
**Jeffrey's** [4] - 68:6,
85:9, 97:12, 97:20

**Jen** [1] - 84:15
**Jennifer** [11] - 39:13,
65:16, 66:16, 68:15,
82:25, 83:25, 85:8,
86:1, 86:2, 100:10
**Jennifer's** [3] - 83:6,
85:19, 97:5
**jog** [1] - 34:16
**Jr** [1] - 1:17
**judge** [10] - 2:11, 4:9,
39:25, 40:2, 40:3,
40:4, 40:5, 49:8,
67:1, 67:7
**Judge** [12] - 1:11,
54:2, 54:3, 73:20,
73:24, 74:1, 74:2,
74:10, 74:15, 103:1,
111:17
**judge's** [1] - 66:9
**judges** [4] - 15:6,
41:2, 41:13, 70:25
**judicial** [2] - 49:2,
110:18
**July** [21] - 44:12,
44:21, 45:4, 45:11,
91:2, 92:4, 92:20,
92:24, 93:8, 94:1,
94:15, 95:1, 95:4,
95:11, 95:18, 95:24,
96:13, 99:24,
102:18, 103:8
**jumping** [2] - 52:25,
67:21
**June** [25] - 38:11,
38:20, 39:11, 40:12,
44:12, 44:23, 46:2,
46:4, 47:19, 47:21,
47:23, 48:1, 57:25,
58:14, 62:5, 69:2,
83:18, 84:7, 88:1,
91:19, 93:12, 93:25,
98:20
**juris** [1] - 48:25
**Jury** [8] - 14:16, 75:16,
77:3, 77:4, 77:14,
80:22, 81:19, 90:20
**jury** [6] - 14:20, 14:22,
15:2, 15:6, 75:18,
110:12
**justification** [1] - 89:1

---

## K

**K.B** [1] - 39:13
**Katz** [1] - 76:23
**keep** [6] - 15:15,
41:11, 47:12, 56:2,
61:24, 76:13
**Kiara** [1] - 97:14
**kicks** [1] - 70:15

**kids** [2] - 58:18
**killed** [1] - 66:16
**killer** [3] - 66:11, 66:18, 66:22
**killing** [1] - 96:23
**killings** [1] - 91:15
**kind** [15] - 7:9, 8:23, 47:21, 50:15, 50:23, 53:12, 56:3, 67:12, 68:8, 74:3, 75:23, 105:4, 106:13, 107:3, 108:12
**kinds** [4] - 52:16, 67:13, 109:22, 111:10
**kismet** [1] - 98:22
**knock** [3] - 50:3, 59:2, 78:25
**knock-and-talks** [1] - 59:2
**knocking** [2] - 50:25, 56:23
**knocks** [1] - 51:4
**know..** [2] - 15:7, 99:13
**knowledge** [3] - 26:5, 26:6, 34:11
**known** [5] - 31:7, 65:12, 68:4, 86:1, 86:3
**knows** [7] - 60:9, 65:5, 65:17, 77:12, 77:15, 80:18
**Kris** [2] - 110:18, 111:4

**L**

**lack** [1] - 84:14
**land** [3] - 89:10, 94:14, 96:10
**landing** [1] - 50:19
**language** [1] - 99:2
**lapse** [1] - 108:4
**laptop** [1] - 17:3
**large** [1] - 7:12
**last** [31] - 3:11, 4:2, 5:8, 17:14, 24:13, 24:21, 65:11, 65:12, 65:14, 65:25, 66:4, 66:6, 66:8, 66:10, 66:13, 66:17, 66:20, 66:21, 66:22, 66:23, 66:25, 67:2, 67:4, 67:21, 68:3, 71:23, 80:6, 83:13, 85:22
**lasted** [1] - 32:9
**late** [4] - 2:18, 2:20, 80:7, 107:10
**lately** [1] - 14:25

**laughing** [4] - 43:10, 111:19, 111:23, 112:3
**laurels** [2] - 107:6
**law** [21] - 10:22, 19:2, 21:19, 21:23, 26:14, 43:7, 43:9, 49:10, 49:13, 49:17, 52:20, 54:19, 57:2, 70:20, 73:7, 83:19, 99:5, 99:11, 102:14, 103:24, 111:1
**lawful** [3] - 49:24, 88:7, 88:19
**lawfully** [1] - 53:18
**laws** [1] - 63:22
**lawyer** [4] - 10:23, 10:24, 10:25, 20:14
**lawyers** [1] - 111:12
**lay** [3] - 89:10, 94:14, 96:10
**lead** [1] - 103:14
**leads** [2] - 47:24, 80:13
**learn** [1] - 21:17
**lease** [1] - 108:3
**least** [9] - 3:11, 14:16, 30:20, 32:20, 35:6, 55:6, 76:3, 78:18, 88:5
**leave** [1] - 18:7
**left** [8] - 9:7, 16:1, 17:20, 30:13, 30:20, 43:8, 88:3, 97:4
**legal** [15] - 41:23, 42:23, 43:1, 43:15, 45:7, 45:12, 46:9, 49:6, 56:10, 81:22, 82:2, 82:4, 82:16, 104:3, 106:7
**lengths** [1] - 28:20
**Leon** [5] - 48:11, 48:12, 49:21, 70:10, 89:16
**lessee** [2] - 77:4, 77:9
**lessee's** [2] - 75:19, 75:25
**letter** [1] - 98:12
**level** [1] - 70:16
**Lewis** [18] - 32:7, 54:17, 67:11, 69:3, 77:22, 79:4, 79:10, 79:21, 80:2, 85:15, 91:20, 92:16, 94:16, 94:21, 95:13, 102:25, 108:24, 108:25
**Lewis's** [1] - 93:19
**liberally** [1] - 60:6
**lie** [1] - 76:12

**lighthearted** [1] - 111:24
**line** [4] - 21:15, 53:15, 102:14, 105:24
**lines** [2] - 71:20, 81:17
**list** [2] - 39:9, 61:15
**listed** [1] - 62:6
**listened** [3] - 16:21, 17:12, 31:2
**listening** [1] - 48:15
**listing** [1] - 61:9
**literally** [2] - 35:12, 67:15
**locate** [2] - 38:11, 40:13
**located** [1] - 29:14
**location** [23] - 6:18, 6:19, 6:24, 7:7, 7:8, 12:15, 30:11, 39:2, 50:6, 54:20, 61:17, 63:7, 64:18, 71:7, 71:14, 72:11, 73:9, 73:11, 74:11, 77:2, 78:4, 89:15, 101:12
**locations** [5] - 28:20, 61:3, 61:20, 62:12, 63:4
**log** [2] - 39:9, 39:21
**logged** [1] - 40:7
**logs** [1] - 39:23
**Lombard** [1] - 1:24
**look** [8] - 27:14, 41:25, 50:21, 72:10, 76:15, 80:20, 81:5, 81:16
**looked** [1] - 98:4
**looking** [6] - 44:5, 52:2, 77:13, 77:16, 85:21, 107:8
**looks** [1] - 23:16
**lose** [1] - 108:1
**lost** [3] - 98:24, 99:5, 109:18
**loud** [1] - 57:18
**louder** [1] - 50:4
**love** [1] - 100:19
**lull** [1] - 50:13
**lunch** [2] - 2:17, 41:4
**Lunch** [1] - 41:9

**M**

**ma'am** [1] - 3:24
**Magistrate** [2] - 54:2, 54:3
**mail** [5] - 40:5, 59:4, 59:5, 59:24, 110:19
**mails** [1] - 39:2
**maintain** [1] - 39:21
**maintained** [2] - 40:7, 109:11

**maintains** [1] - 40:3
**majority** [1] - 104:10
**Maldeis** [1] - 38:1
**male** [2] - 97:14, 97:19
**manager** [9] - 26:8, 26:12, 26:15, 26:17, 26:18, 26:21, 26:22, 27:16, 27:19
**manifesting** [2] - 56:24, 56:25
**manner** [2] - 48:25, 50:13
**map** [1] - 57:22
**March** [3] - 24:16, 110:10, 110:17
**mark** [1] - 37:24
**MARYLAND** [1] - 1:1
**Maryland** [9] - 1:9, 1:25, 38:15, 38:20, 39:5, 39:6, 39:20, 81:24, 90:10
**mask** [1] - 4:14
**masking** [1] - 2:8
**masks** [3] - 2:9, 4:8, 4:9
**matter** [37] - 2:3, 2:4, 43:21, 44:2, 44:6, 45:3, 47:12, 55:16, 55:23, 56:20, 60:23, 60:25, 61:4, 61:15, 63:4, 63:15, 63:16, 72:15, 83:21, 86:23, 89:8, 89:11, 89:12, 89:14, 89:17, 89:19, 90:25, 91:17, 92:6, 92:16, 92:20, 93:7, 96:10, 96:13, 105:17, 112:11
**matters** [3] - 81:13, 110:1, 110:8
**Max** [1] - 25:20
**McArthur** [1] - 54:13
**McCray** [1] - 52:22
**mean** [14] - 14:20, 43:9, 48:19, 57:1, 62:24, 87:24, 99:12, 102:7, 106:10, 111:3
**meaning** [3] - 51:18, 67:7, 76:23
**means** [3] - 88:6, 88:7, 88:19
**measure** [1] - 78:12
**meeting** [4] - 31:16, 41:2, 41:3, 69:13
**melissa** [1] - 1:23
**Melissa** [2] - 112:9, 112:13
**member** [3] - 5:13, 82:24, 83:5
**members** [4] - 7:2,

83:20, 100:1, 100:10
**memorandum** [2] - 43:6, 109:24
**memorialized** [2] - 35:16, 35:18
**memory** [5] - 18:22, 34:16, 34:21, 35:4, 111:24
**mention** [2] - 12:8, 63:5
**mentioned** [2] - 20:22, 82:13
**mentioning** [1] - 60:20
**messages** [8] - 68:5, 68:8, 99:25, 100:3, 100:16, 101:12, 101:19, 101:20
**met** [1] - 48:14
**Michael** [1] - 109:1
**Michigan** [1] - 54:22
**microphone** [4] - 3:9, 3:10, 4:1, 17:4
**middle** [2] - 15:25, 67:12
**might** [4] - 29:5, 36:2, 68:7, 108:2
**mind** [1] - 71:25
**minimizes** [1] - 106:7
**Minnesota** [2] - 76:15, 78:5
**minute** [5] - 36:17, 41:4, 89:13, 94:13, 95:2
**minutes** [10] - 10:3, 12:14, 13:1, 13:10, 13:11, 27:5, 36:17, 41:3, 41:5, 79:7
**Miranda** [9] - 9:16, 9:23, 10:2, 10:10, 10:19, 12:7, 16:13, 29:17, 29:18, 34:7
**Mirandized** [1] - 58:15
**mischaracterization** [2] - 66:9, 66:14
**misleading** [5] - 48:17, 67:10, 67:19, 71:22, 71:25
**miss** [1] - 61:12
**missed** [1] - 84:4
**missing** [3] - 80:16, 97:21, 98:25
**misspoke** [1] - 102:23
**moan** [1] - 43:7
**moaning** [1] - 43:7
**moment** [15] - 8:22, 47:2, 47:25, 52:13, 53:8, 53:21, 55:15, 56:12, 65:3, 68:19, 80:11, 85:4, 98:1, 101:19, 111:19

**momentary** [1] - 53:25
**moments** [1] - 99:12
**Monday** [2] - 110:11, 110:12
**monitor** [1] - 76:21
**months** [3] - 65:21, 78:20, 111:9
**Moore** [1] - 25:19
**morning** [15] - 3:2, 6:11, 7:23, 18:14, 19:6, 19:10, 20:11, 50:24, 54:17, 58:13, 76:8, 76:10, 77:6, 79:13, 97:5
**most** [3] - 76:20, 90:1, 109:2
**mother** [2] - 82:24, 83:20
**motion** [24] - 42:2, 42:4, 42:16, 42:17, 42:20, 43:13, 43:21, 44:11, 44:21, 44:22, 45:1, 45:8, 45:10, 45:16, 91:2, 93:16, 93:17, 95:1, 104:1, 104:20, 105:9, 105:20
**motions** [8] - 2:3, 2:5, 36:11, 42:1, 46:8, 61:10, 64:13, 90:24
**MOTIONS** [1] - 1:6
**motorized** [1] - 7:8
**move** [8] - 23:23, 33:8, 53:9, 82:22, 86:8, 87:18, 92:20, 94:15
**moved** [6] - 11:14, 13:5, 30:20, 30:22, 68:18, 87:25
**movement** [2] - 52:4
**moving** [3] - 13:20, 24:7, 52:11
**MR** [27] - 3:6, 4:21, 5:23, 6:2, 6:4, 14:22, 14:24, 15:4, 15:8, 16:23, 17:2, 17:6, 17:11, 21:4, 21:5, 22:22, 23:6, 23:20, 24:22, 25:1, 25:3, 36:4, 36:7, 42:24, 44:24, 45:2, 111:22
**MS** [162] - 2:23, 3:4, 3:17, 36:19, 36:23, 37:2, 37:8, 37:13, 37:17, 37:19, 37:22, 38:8, 40:21, 40:24, 41:19, 41:22, 42:8, 42:11, 42:19, 43:3, 43:17, 43:20, 43:24, 44:9, 44:13, 45:13, 45:18, 45:22, 46:1,

46:4, 46:6, 46:14, 46:25, 47:5, 47:14, 47:17, 48:12, 49:12, 49:16, 50:7, 50:10, 52:9, 52:12, 53:5, 54:5, 54:9, 55:13, 56:12, 57:1, 57:14, 58:4, 58:8, 58:10, 60:22, 61:6, 61:19, 62:13, 62:18, 62:23, 63:6, 63:12, 63:19, 63:24, 64:2, 64:6, 64:9, 64:17, 64:22, 64:24, 65:3, 69:1, 69:12, 69:21, 70:1, 70:6, 70:8, 70:11, 70:15, 70:23, 71:3, 72:21, 73:2, 73:4, 73:6, 73:15, 73:18, 75:10, 80:13, 83:2, 83:8, 84:4, 84:10, 84:13, 84:19, 84:24, 85:3, 85:10, 85:15, 85:25, 86:7, 86:10, 86:15, 87:2, 87:16, 88:3, 88:24, 89:5, 89:21, 90:6, 90:14, 91:6, 92:7, 92:14, 93:12, 93:15, 94:3, 94:5, 94:9, 95:8, 95:10, 95:17, 95:21, 96:1, 96:5, 96:8, 96:17, 98:7, 98:19, 99:16, 99:21, 99:25, 100:7, 100:13, 100:16, 100:25, 101:3, 101:6, 101:9, 101:19, 101:24, 102:6, 102:12, 102:20, 103:3, 103:6, 103:9, 103:15, 104:8, 104:14, 104:16, 104:24, 105:3, 105:6, 105:22, 105:24, 106:12, 107:16, 108:10, 108:19, 110:3, 110:6, 111:1
**multiple** [1] - 81:9
**murder** [20] - 22:2, 22:9, 22:13, 22:25, 23:11, 23:14, 24:3, 24:4, 52:17, 66:5, 72:4, 77:16, 82:23, 83:6, 84:6, 86:13, 86:23, 87:9, 100:22, 100:24
**murders** [7] - 39:13, 68:24, 86:12, 87:21, 88:2, 100:1, 100:9

**must** [1] - 102:4

**N**

**nail** [1] - 105:25
**name** [11] - 4:2, 4:4, 59:4, 59:6, 74:5, 74:16, 75:19, 83:23, 83:25, 85:5
**names** [1] - 25:16
**narcotic** [1] - 5:15
**narcotics** [7] - 19:4, 19:7, 23:25, 55:8, 59:24, 68:13, 96:24
**narrow** [1] - 92:9
**nature** [3] - 72:23, 72:24, 73:6
**near** [1] - 17:4
**necessarily** [3] - 67:24, 69:19, 93:2
**need** [18] - 38:3, 38:4, 56:10, 63:18, 70:3, 70:8, 70:13, 70:16, 70:21, 71:9, 77:19, 81:22, 83:16, 87:13, 94:20, 94:25
**needed** [2] - 13:3, 102:16
**needle** [1] - 111:18
**neighborhood** [2] - 52:14, 52:19
**never** [4] - 65:15, 111:14, 111:18, 111:25
**next** [13] - 3:15, 8:5, 24:1, 24:16, 43:13, 50:15, 57:9, 75:6, 78:21, 87:13, 87:18, 90:23, 110:8
**nexus** [1] - 74:13
**nice** [3] - 3:1, 3:8, 4:19, 106:8
**niece** [3] - 83:12, 85:9, 86:4
**night** [4] - 67:17, 76:2, 76:11, 97:12
**nights** [1] - 76:1
**nine** [2] - 25:23, 27:9
**Ninety** [1] - 45:2
**Ninety-four** [1] - 45:2
**NO** [1] - 1:4
**nobody** [3] - 51:19, 58:17, 98:7
**normal** [4] - 28:23, 28:24, 91:20
**normally** [2] - 92:18, 93:20
**North** [3] - 90:7, 90:10, 90:11
**NORTHERN** [1] - 1:2

**note** [10] - 2:16, 4:7, 14:13, 15:5, 43:12, 109:12, 109:20, 110:9, 110:25, 112:2
**noted** [2] - 109:14, 109:16
**notes** [3] - 44:5, 46:17, 85:21
**nothing** [25] - 29:23, 31:24, 36:7, 48:16, 53:24, 59:21, 59:25, 62:19, 73:14, 74:13, 79:17, 80:1, 81:3, 87:2, 91:12, 92:7, 92:14, 93:11, 93:12, 93:24, 96:11, 108:12, 109:10
**notice** [1] - 70:21
**notified** [1] - 38:25
**noting** [3] - 54:21, 55:4, 59:14
**number** [17] - 37:6, 38:18, 44:25, 45:1, 58:4, 62:10, 63:1, 64:21, 69:8, 72:18, 74:7, 85:2, 91:4, 104:20, 104:22, 105:18, 107:21
**numbers** [4] - 44:23, 61:17
**numerous** [2] - 68:11, 96:22
**nutshell** [2] - 49:11, 93:4

**O**

**o'clock** [5] - 7:23, 36:15, 55:20, 59:2, 67:17
**OAG** [2] - 40:1, 40:10
**objected** [2] - 75:16, 86:17
**objection** [2] - 42:22, 86:19
**observed** [1] - 7:5
**obtain** [1] - 60:25
**obtained** [8] - 39:10, 39:12, 39:15, 54:11, 54:15, 58:10, 88:13, 91:13
**obtaining** [2] - 98:8, 103:23
**obvious** [1] - 75:11
**obviously** [7] - 26:17, 61:21, 65:5, 70:3, 90:19, 101:5, 102:16
**occasion** [1] - 109:17
**occupants** [3] - 59:5, 59:6, 60:9

**occur** [1] - 59:2
**occurred** [8] - 8:5, 9:20, 22:10, 23:16, 68:24, 82:18, 93:8, 99:7
**occurring** [1] - 82:23
**October** [4] - 22:20, 23:11, 23:12, 23:13
**OF** [2] - 1:1, 1:3
**offer** [1] - 8:23
**offered** [2] - 85:7, 103:4
**offers** [1] - 61:16
**Office** [10] - 39:7, 39:8, 39:18, 39:19, 39:21, 39:23, 40:6, 40:9, 40:12, 40:14
**office** [6] - 6:18, 12:16, 13:6, 29:12, 39:24
**officer** [15] - 3:18, 5:2, 5:6, 5:10, 5:11, 19:2, 51:3, 51:12, 51:15, 52:5, 56:23, 68:17, 71:25, 74:22, 80:17
**Officer** [2] - 4:6, 79:5
**officers** [17] - 8:13, 8:14, 25:11, 50:3, 50:14, 50:16, 51:1, 51:25, 52:13, 52:22, 53:6, 53:22, 55:5, 78:18, 80:2, 80:8, 80:15
**Official** [2] - 1:24, 112:14
**old** [1] - 19:15
**Olson** [2] - 76:16, 78:6
**once** [5] - 6:19, 15:25, 65:20, 69:13, 109:9
**one** [45] - 10:24, 15:12, 22:8, 22:12, 29:6, 32:10, 37:18, 38:4, 41:12, 42:16, 42:20, 42:21, 43:8, 43:11, 49:18, 49:23, 49:24, 50:16, 51:2, 51:4, 51:17, 52:11, 53:22, 58:10, 59:5, 59:6, 62:3, 65:14, 67:16, 68:23, 73:22, 73:23, 79:15, 80:11, 80:18, 83:20, 85:4, 90:12, 97:11, 106:3, 108:8, 109:13, 111:24
**ones** [1] - 42:14
**open** [1] - 80:25
**opened** [6] - 51:10, 57:5, 57:7, 57:8, 80:18, 80:22

**opening** [3] - 47:7, 51:11, 56:22
**opens** [1] - 51:5
**operations** [1] - 110:14
**operator** [1] - 12:19
**opinion** [6] - 19:6, 103:21, 107:16, 109:14, 109:22, 110:8
**opinions** [3] - 73:20, 90:1, 107:23
**opportunity** [1] - 17:23
**order** [25] - 39:10, 45:13, 45:17, 47:23, 48:3, 48:7, 48:9, 49:9, 49:19, 49:20, 53:17, 58:5, 58:11, 58:12, 60:19, 68:1, 71:12, 72:25, 73:1, 73:3, 73:4, 73:5, 74:4, 87:4
**ordered** [2] - 8:7, 85:11
**ordering** [1] - 8:18
**orders** [3] - 4:7, 47:20, 99:12
**ordinary** [1] - 50:17
**original** [1] - 40:3
**otherwise** [2] - 88:18, 88:20
**out-of-court** [1] - 90:17
**outline** [1] - 48:6
**outside** [4] - 7:17, 9:14, 55:18, 56:2
**outward** [1] - 51:8
**overnight** [6] - 59:22, 60:1, 60:3, 76:11, 76:18
**overruled** [1] - 86:20
**overwhelming** [3] - 91:12, 96:20, 97:25
**own** [3] - 39:1, 60:7, 76:21

## P

**p.m** [1] - 1:6
**package** [2] - 35:25, 40:6
**packet** [1] - 35:19
**Page** [2] - 84:11, 84:12
**page** [6] - 10:4, 14:17, 34:15, 37:17, 37:18, 75:18
**painted** [1] - 65:8
**Paper** [16] - 42:4, 42:5,

42:17, 43:14, 43:22, 44:3, 44:4, 44:7, 45:5, 45:9, 45:11, 90:24, 90:25, 91:1, 104:20
**Papers** [1] - 44:20
**papers** [8] - 43:16, 47:1, 65:4, 72:22, 72:24, 73:13, 74:16, 97:25
**paragraph** [1] - 14:8
**parcel** [1] - 53:6
**Parker** [1] - 32:7
**part** [8] - 10:12, 21:17, 28:25, 29:1, 31:8, 31:11, 33:15, 53:5
**participate** [3] - 5:19, 13:20, 16:8
**participation** [1] - 32:1
**particular** [4] - 32:6, 57:5, 107:2, 111:13
**particularly** [1] - 39:1
**parties** [4] - 4:10, 36:24, 38:13, 39:3, 45:6, 85:11
**passed** [1] - 13:8
**passenger** [1] - 27:7
**passenger's** [2] - 7:20
**past** [1] - 34:19
**pat** [4] - 53:14, 53:15, 82:1, 82:2
**pat-down** [1] - 82:2
**path** [1] - 103:13
**patrol** [1] - 5:12
**patted** [1] - 56:4
**pattern** [2] - 65:15, 67:5
**Paul** [2] - 1:14, 2:24
**pause** [1] - 109:23
**peephole** [1] - 50:22
**pending** [1] - 42:2
**people** [6] - 15:7, 25:23, 50:20, 55:12, 55:14, 74:8
**per** [1] - 49:8
**Percocets** [1] - 34:18
**perfect** [1] - 37:2
**perhaps** [1] - 49:5
**period** [9] - 27:4, 30:13, 40:15, 55:6, 55:17, 56:2, 58:24, 99:9, 104:10
**permission** [1] - 78:8
**permit** [1] - 54:9
**permits** [1] - 54:13
**person** [40] - 30:23, 42:3, 42:6, 44:19, 45:9, 47:10, 54:23, 56:16, 64:20, 64:21,

65:11, 65:25, 66:4, 66:6, 66:7, 66:8, 66:11, 66:13, 66:17, 66:18, 66:20, 66:21, 66:22, 66:24, 66:25, 67:1, 67:4, 67:16, 71:23, 73:9, 75:3, 78:3, 79:5, 80:21, 82:5, 83:14, 106:13
**person's** [1] - 52:24
**perspective** [1] - 76:19
**phone** [138] - 38:18, 39:15, 40:15, 42:15, 44:3, 44:6, 44:7, 44:8, 44:12, 44:21, 45:4, 45:5, 45:11, 47:12, 47:24, 48:24, 57:22, 57:23, 58:2, 61:2, 61:16, 61:20, 62:9, 62:12, 62:25, 63:2, 64:18, 64:20, 65:14, 67:23, 67:25, 68:2, 68:4, 68:6, 68:10, 68:16, 68:17, 68:18, 69:7, 69:10, 69:15, 69:17, 69:19, 69:20, 69:22, 71:7, 71:8, 71:14, 71:15, 72:5, 72:11, 72:15, 72:17, 72:20, 73:14, 74:7, 74:11, 74:14, 74:18, 75:3, 75:13, 76:5, 76:6, 76:25, 77:1, 78:24, 79:20, 79:24, 80:4, 80:5, 82:6, 82:10, 82:18, 87:4, 88:5, 88:7, 88:25, 89:1, 91:3, 91:11, 91:18, 91:21, 91:23, 92:5, 92:10, 93:6, 93:18, 93:25, 94:6, 94:7, 96:12, 96:20, 97:18, 98:15, 99:7, 99:15, 100:15, 101:8, 101:10, 101:15, 102:15, 102:19, 102:22, 102:24, 103:23, 103:24, 104:16, 104:21, 104:22, 105:16, 105:17, 105:21, 106:16, 106:17, 106:19, 106:22, 106:23, 107:2, 107:8, 107:9, 107:11, 107:25, 108:2, 108:8, 108:11, 108:13, 108:23, 109:1, 109:3, 109:9, 109:11

**phones** [6] - 38:11, 61:10, 61:11, 69:17, 97:19, 107:17
**physical** [2] - 18:14, 51:20
**pick** [4] - 26:12, 26:23, 97:14, 110:21
**picture** [1] - 65:7
**ping** [6] - 61:2, 61:17, 61:19, 62:12, 63:4, 63:7
**pinging** [1] - 76:4
**pings** [2] - 57:22, 58:2
**place** [8] - 11:9, 11:13, 12:11, 15:10, 21:12, 76:12, 76:24, 106:24
**placed** [15] - 7:11, 8:25, 9:15, 10:1, 10:12, 11:14, 11:24, 12:7, 13:17, 53:23, 53:24, 79:6, 88:10, 88:20, 106:20
**plain** [3] - 82:2, 82:3, 88:16
**plaintiff** [1] - 1:4
**Plaintiff** [1] - 1:12
**plan** [2] - 65:10, 65:14
**plans** [2] - 66:1, 66:24
**Plasha** [1] - 25:20
**play** [3] - 16:24, 17:7, 71:24
**played** [2] - 17:5, 17:10
**playing** [1] - 17:3
**pleadings** [2] - 83:24, 88:5
**plexiglas** [1] - 2:12
**plurality** [1] - 98:7
**podium** [2] - 46:11, 46:23
**point** [65] - 7:10, 8:8, 18:25, 20:22, 26:17, 27:9, 28:2, 28:7, 28:10, 28:16, 29:7, 30:8, 33:6, 33:8, 34:4, 34:22, 35:9, 40:5, 41:17, 42:7, 42:9, 43:1, 43:16, 43:18, 43:23, 48:22, 49:4, 49:6, 51:23, 53:13, 55:20, 56:24, 57:21, 61:13, 61:20, 64:16, 66:10, 70:13, 73:24, 74:20, 75:7, 75:17, 77:20, 78:5, 79:14, 79:18, 83:7, 84:20, 87:18, 89:21, 90:19, 90:21, 91:11, 91:13, 92:10, 96:21, 97:2, 97:15, 105:8,

106:3, 108:17, 110:2, 110:5
**pointed** [2] - 65:24, 81:2, 99:9
**Police** [10] - 4:25, 5:5, 38:16, 39:12, 39:15, 74:2, 80:25, 81:11, 102:24, 106:6
**police** [34] - 5:7, 48:2, 49:25, 50:2, 52:18, 56:23, 57:4, 57:6, 57:8, 57:10, 57:17, 58:20, 59:10, 68:11, 71:5, 71:6, 74:6, 74:9, 75:21, 75:22, 77:12, 80:2, 80:17, 80:21, 80:23, 81:8, 81:9, 81:11, 81:14, 81:15, 100:8, 106:15, 107:5
**policy** [4] - 106:9, 106:20, 107:1, 107:3
**Poma** [1] - 25:20
**Poo** [1] - 86:3
**portion** [2] - 16:24, 23:21
**position** [9] - 49:7, 49:11, 64:4, 64:8, 64:9, 70:3, 71:4, 77:18, 93:4
**positioned** [2] - 9:2, 9:3
**possession** [1] - 23:2
**possessory** [3] - 78:18, 104:11, 104:12
**possibility** [1] - 57:16
**possible** [2] - 58:23, 98:9
**post** [2] - 29:16
**posture** [1] - 111:7
**potentially** [1] - 53:7
**practical** [2] - 45:22, 96:9
**practice** [2] - 49:5
**Pratt** [17] - 92:10, 98:1, 98:13, 98:23, 102:8, 103:19, 103:21, 105:10, 105:13, 105:24, 108:22, 109:5, 109:6, 109:9, 109:10, 109:20
**pre** [3] - 48:24, 70:5, 110:17
**pre-trial** [1] - 110:17
**precarious** [1] - 104:3
**precisely** [1] - 76:19
**prediction** [1] - 66:19
**prefers** [1] - 37:3

**preliminary** [1] - 34:5
**premises** [1] - 78:13
**prepare** [1] - 43:5
**prepared** [3] - 45:6, 95:5, 102:17
**preponderance** [2] - 46:19, 109:4
**presence** [1] - 57:17
**present** [3] - 9:12, 9:20, 79:21
**Present** [1] - 1:19
**presented** [5] - 80:1, 93:24, 94:25, 106:13, 108:15
**presenting** [1] - 94:12
**preserved** [3] - 96:6, 105:15, 107:25
**presiding** [2] - 2:11, 4:9
**presumably** [1] - 101:4
**pretrial** [2] - 110:10, 110:21
**pretty** [6] - 43:6, 43:10, 43:25, 52:2, 102:4, 110:15
**prevent** [1] - 57:16
**previous** [1] - 94:5
**previously** [3] - 2:8, 2:13, 2:14
**primary** [1] - 9:9
**printer** [1] - 38:24
**prison** [1] - 22:23
**privacy** [18] - 56:21, 57:21, 59:19, 59:22, 60:3, 60:7, 60:17, 76:20, 76:24, 77:1, 77:19, 78:3, 78:6, 78:9, 89:16, 108:1, 108:5
**private** [1] - 76:24
**probable** [37] - 48:4, 48:8, 48:10, 49:2, 49:19, 55:9, 55:25, 56:1, 61:13, 65:6, 65:9, 65:23, 67:22, 67:23, 68:2, 68:9, 68:19, 70:18, 71:13, 71:14, 72:2, 72:9, 74:10, 74:24, 75:2, 78:23, 79:25, 80:5, 82:18, 87:20, 88:18, 91:8, 91:11, 96:18, 96:20, 97:24
**problem** [2] - 42:13, 47:4
**problems** [1] - 99:8
**procedure** [3] - 28:13, 91:20, 92:19
**proceed** [5] - 2:15,

3:15, 38:7, 47:6, 87:12
**proceeded** [2] - 17:17, 47:8
**proceeding** [1] - 2:7
**proceedings** [1] - 112:11
**Proceedings** [2] - 1:8, 112:5
**proceeds** [1] - 50:12
**process** [2] - 19:21, 49:2
**production** [2] - 38:16, 39:9
**proffered** [1] - 85:22
**proffering** [1] - 69:16
**prohibit** [2] - 99:1, 99:3
**promised** [1] - 20:19
**promises** [1] - 30:8
**proof** [1] - 46:18
**properly** [1] - 79:25
**property** [5] - 54:10, 54:14, 54:15, 59:3, 78:3
**proportional** [1] - 53:20
**proposed** [2] - 110:11, 110:22
**protect** [2] - 53:8
**protecting** [1] - 53:1
**protections** [1] - 60:2
**protective** [6] - 53:13, 53:20, 81:22, 81:23, 82:5, 82:7
**prove** [1] - 99:2
**proves** [1] - 62:25
**provide** [5] - 18:17, 20:17, 21:22, 38:23, 90:1
**provides** [3] - 48:3, 48:8, 76:20
**providing** [1] - 20:19
**prudence** [1] - 48:25
**public** [2] - 2:9, 4:8
**pull** [5] - 4:14, 26:3, 26:6, 85:1, 85:3
**pulled** [2] - 4:9, 28:19
**pulls** [1] - 27:16
**purposes** [2] - 36:14, 45:22
**Purpura** [10] - 1:17, 3:6, 24:25, 36:5, 46:12, 62:3, 92:15, 104:7, 111:12, 111:20
**PURPURA** [7] - 3:6, 5:23, 25:1, 25:3, 36:4, 42:24, 111:22
**pursuant** [2] - 6:5,

98:21
**push** [1] - 110:14
**put** [21] - 8:7, 8:19, 28:10, 28:14, 37:9, 57:4, 58:18, 59:18, 60:5, 62:19, 66:4, 71:7, 74:7, 74:16, 76:3, 82:9, 88:25, 91:9, 98:11, 106:24, 109:11
**putting** [1] - 98:11

## Q

**quarter** [2] - 2:18, 12:24
**questioned** [1] - 18:16
**questioning** [3] - 10:23, 10:25, 30:24
**questions** [18] - 4:15, 11:1, 11:2, 16:9, 18:13, 18:17, 19:24, 20:3, 20:24, 24:23, 31:3, 34:5, 34:25, 35:1, 36:4, 61:7, 76:1, 111:17
**quick** [2] - 84:5, 102:21
**quickly** [8] - 43:6, 43:10, 44:1, 52:1, 79:2, 83:6, 103:18, 103:19
**quite** [4] - 14:23, 54:8, 65:12, 103:19
**quote** [2] - 50:18, 74:25
**quoted** [2] - 109:18, 109:20

## R

**raise** [2] - 3:20, 107:17
**raised** [2] - 48:13, 98:2
**ram** [1] - 81:9
**rather** [4] - 39:23, 71:6, 103:13, 104:2
**RDB-20-139** [3] - 1:5, 2:5, 41:15
**reach** [2] - 65:19, 67:5
**reached** [1] - 36:24
**read** [8] - 9:24, 10:19, 11:4, 16:17, 36:20, 37:3, 37:6, 37:15
**reading** [2] - 67:7, 84:17
**ready** [4] - 3:15, 36:20, 41:23, 95:5
**real** [2] - 55:18, 72:10
**reality** [1] - 49:6

**realize** [1] - 95:6
**really** [21] - 45:23, 47:20, 49:21, 51:23, 55:16, 55:22, 59:18, 67:9, 72:7, 72:14, 72:15, 81:20, 91:11, 92:9, 93:17, 94:24, 98:12, 98:22, 102:11, 105:13, 106:5
**rear** [1] - 30:21
**reason** [13] - 3:10, 59:13, 60:10, 67:18, 68:7, 68:16, 68:19, 71:5, 77:11, 80:7, 97:16, 97:22, 110:23
**reasonable** [9] - 40:11, 51:14, 51:15, 53:20, 56:15, 65:17, 81:6, 106:16
**reasons** [1] - 67:25
**received** [2] - 39:24, 40:11
**receives** [1] - 40:4
**receiving** [1] - 40:8
**recently** [2] - 17:12, 90:1
**recess** [3] - 41:6, 41:8, 41:9
**recognize** [1] - 13:25
**recollection** [2] - 83:8, 83:10, 87:3
**record** [24] - 4:3, 45:7, 80:1, 80:14, 83:4, 83:16, 84:1, 84:23, 86:10, 86:11, 87:8, 87:10, 87:22, 88:11, 89:18, 89:23, 96:6, 96:10, 98:3, 103:20, 107:21, 108:21, 111:17, 112:11
**recorded** [3] - 13:15, 16:11, 97:6
**recorder** [1] - 21:2
**Recording** [2] - 17:5, 17:10
**recording** [8] - 13:22, 14:17, 16:21, 17:13, 17:20, 19:18, 19:21, 21:9
**records** [4] - 38:17, 43:14, 43:22, 94:18
**recovered** [2] - 55:21, 65:13
**redacted** [1] - 85:5
**redirect** [1] - 36:6
**refer** [3] - 54:3, 54:7, 83:22
**reference** [3] - 54:6, 63:3, 76:23

**referenced** [2] - 18:24, 35:7
**references** [1] - 100:23
**referred** [1] - 83:24, 85:23
**referring** [3] - 5:25, 58:2, 83:23
**reflect** [2] - 83:5, 87:10
**reflecting** [1] - 40:4
**reflects** [3] - 84:2, 86:10, 86:11
**refuse** [1] - 20:2
**refused** [1] - 57:9
**regard** [6] - 72:22, 73:18, 88:25, 95:13, 105:24, 110:25
**regarding** [1] - 75:1
**regards** [1] - 80:15
**regional** [1] - 5:13
**regular** [1] - 28:21
**reiterate** [1] - 108:20
**reiterating** [1] - 60:20
**relate** [1] - 40:15
**related** [5] - 24:19, 38:9, 45:17, 98:5, 106:17
**relating** [1] - 23:1, 38:9
**relationship** [5] - 82:25, 86:17, 101:1, 101:20, 101:23
**relative** [1] - 15:23, 97:8
**reliance** [2] - 74:3, 74:23
**relied** [1] - 103:20
**rely** [5] - 45:19, 49:20, 106:4, 107:2, 107:4
**relying** [2] - 88:13, 88:14
**remain** [4] - 3:20, 10:21, 12:11, 54:4
**remained** [2] - 13:5, 29:7
**remaining** [2] - 43:11, 44:10
**remains** [1] - 110:12
**remember** [12] - 11:18, 31:24, 33:4, 34:25, 35:8, 35:19, 35:21, 35:22, 84:15, 85:19, 108:6, 108:9
**remind** [1] - 15:15
**removed** [2] - 8:8, 8:19
**rental** [1] - 27:13
**reorganize** [1] - 65:4
**report** [1] - 10:13

**Reported** [1] - 1:22
**Reporter** [2] - 1:24, 112:14
**reports** [1] - 80:21
**represent** [1] - 98:4
**representative** [1] - 40:9
**request** [1] - 10:24
**requested** [1] - 39:9
**requests** [2] - 106:21, 106:22
**require** [3] - 4:7, 49:13, 83:16
**required** [2] - 53:6, 87:7
**requirement** [2] - 49:7, 49:17
**requirements** [1] - 48:4
**requires** [1] - 2:9
**residence** [6] - 42:3, 42:6, 44:19, 45:9, 47:10, 55:1
**residences** [2] - 61:11
**residue** [2] - 35:20, 35:22
**resist** [1] - 28:5
**resistance** [1] - 8:24
**respect** [28] - 42:5, 42:15, 47:17, 47:18, 49:1, 50:8, 59:23, 60:16, 60:23, 62:5, 62:12, 69:15, 75:9, 83:21, 86:14, 89:13, 91:3, 91:7, 91:21, 92:8, 93:19, 93:24, 93:25, 96:12, 96:18, 103:8, 104:4, 109:19
**respectful** [1] - 33:19
**respects** [1] - 49:25
**respond** [2] - 62:2, 62:4
**responded** [1] - 111:2
**responding** [1] - 56:22
**response** [4] - 34:17, 56:17, 74:17, 82:12
**responses** [1] - 18:18
**rest** [2] - 17:24, 78:7
**restraints** [2] - 16:4, 53:24
**restricted** [1] - 78:11
**result** [8] - 22:23, 26:11, 39:2, 92:22, 96:14, 99:15, 99:24, 101:8
**resumes** [1] - 41:10
**retired** [1] - 54:3
**retrieve** [1] - 59:11
**return** [1] - 40:4

**returned** [1] - 40:14
**review** [3] - 10:15, 22:4, 49:3
**reviewed** [8] - 10:16, 14:3, 21:6, 21:7, 31:22, 98:8, 98:10
**RICARDO** [1] - 1:6
**RICHARD** [1] - 1:11
**Rickberg** [1] - 25:20
**rights** [6] - 11:6, 11:7, 11:19, 11:25, 60:2
**Rights** [7] - 9:16, 9:23, 10:2, 10:10, 10:19, 12:8, 16:13
**Riley** [4] - 73:8, 73:10, 99:6, 107:23
**rise** [3] - 41:7, 65:16, 72:10
**risk** [2] - 52:14, 52:19
**Road** [1] - 6:22
**road** [1] - 104:3
**robbery** [4] - 23:2, 23:24, 24:4, 24:5
**room** [18] - 13:12, 13:15, 13:17, 13:18, 15:2, 15:9, 15:11, 15:20, 15:25, 16:17, 17:20, 17:24, 18:7, 21:3, 30:11, 52:11, 53:22, 83:11
**roommate** [2] - 83:12, 86:16
**rooms** [1] - 15:6
**round** [1] - 47:1
**routinely** [1] - 70:24
**RPR** [2] - 1:23, 112:9
**rule** [2] - 43:5, 80:16
**ruled** [9] - 44:3, 44:5, 44:6, 44:8, 44:9, 44:13, 44:14, 45:6
**rules** [1] - 2:8
**ruling** [1] - 109:25
**running** [1] - 2:19
**runs** [1] - 52:5

**S**

**safety** [2] - 53:1, 76:22
**Samsung** [1] - 58:7
**sat** [5] - 15:12, 15:23, 16:1, 16:2
**satisfied** [1] - 109:9
**satisfies** [1] - 48:4
**saving** [1] - 108:12
**saw** [6] - 13:8, 19:13, 26:17, 51:10, 67:2, 71:24
**schedule** [1] - 110:25
**scheduled** [1] - 110:10

**scheduling** [1] - 36:14
**screen** [2] - 10:4, 10:7
**se** [1] - 49:8
**search** [107] - 6:5, 38:11, 38:17, 39:1, 39:2, 39:9, 39:14, 40:11, 42:3, 42:5, 42:6, 44:12, 44:19, 44:22, 45:4, 45:8, 45:11, 45:16, 45:18, 45:20, 45:23, 47:10, 49:8, 50:5, 51:23, 53:18, 53:21, 54:10, 54:14, 54:16, 54:19, 54:20, 54:23, 54:25, 55:7, 55:8, 57:11, 57:15, 57:18, 60:23, 61:1, 61:3, 61:4, 61:14, 61:21, 61:23, 62:5, 62:8, 62:15, 63:3, 63:10, 63:16, 69:5, 73:9, 73:10, 75:12, 79:12, 79:13, 79:22, 80:9, 81:21, 81:23, 81:25, 88:15, 88:16, 88:18, 89:3, 89:20, 91:3, 91:7, 91:8, 91:11, 92:1, 92:4, 92:9, 92:21, 93:10, 94:15, 95:4, 95:11, 95:18, 95:24, 96:2, 96:14, 96:18, 96:20, 98:15, 98:24, 99:5, 99:7, 99:15, 99:24, 101:8, 102:15, 102:17, 103:11, 103:23, 104:4, 106:7, 106:16, 108:23, 109:3, 109:5
**searched** [7] - 54:15, 77:10, 91:23, 95:21, 103:9, 105:19, 106:6
**searches** [4] - 42:15, 63:23, 82:15, 109:17
**seat** [2] - 7:20, 7:21
**seated** [2] - 3:25, 9:7
**second** [14] - 16:13, 24:4, 24:6, 24:8, 24:10, 24:11, 24:12, 24:16, 24:17, 32:24, 65:4, 66:17, 66:22, 67:20
**second-to-last** [2] - 66:17, 66:22
**secondary** [1] - 104:9
**section** [1] - 11:3
**secure** [1] - 81:24
**security** [1] - 76:22
**sedans** [2] - 29:4

**see** [32] - 3:1, 3:8, 5:22, 8:18, 10:7, 26:3, 26:6, 36:16, 37:25, 50:15, 50:21, 51:19, 51:25, 65:10, 65:14, 66:1, 66:4, 66:6, 66:8, 66:11, 66:13, 66:18, 66:24, 66:25, 76:14, 77:5, 80:19, 82:3, 83:14, 97:10
**seeing** [2] - 52:3, 52:20
**seeking** [6] - 49:2, 92:3, 93:17, 99:20, 99:23, 103:12
**seeks** [1] - 76:19
**sees** [1] - 81:14
**seize** [10] - 63:7, 67:22, 67:23, 68:2, 68:10, 68:16, 68:20, 80:4, 82:3, 82:4
**seized** [16] - 35:17, 35:20, 38:11, 38:20, 39:16, 40:15, 61:21, 62:10, 63:10, 72:15, 75:12, 79:25, 82:18, 91:19, 93:3, 103:24
**seizing** [2] - 62:9, 105:20
**seizure** [9] - 62:25, 88:21, 88:22, 89:14, 94:8, 105:16, 105:17, 108:22, 109:3
**sell** [1] - 100:2
**selling** [1] - 100:3
**send** [2] - 26:11, 110:19
**sense** [1] - 36:16
**sentence** [1] - 22:24
**sentenced** [1] - 23:17
**separate** [6] - 23:24, 47:12, 61:25, 98:13, 109:24, 109:25
**separately** [2] - 47:11, 61:25, 85:10
**September** [3] - 38:14, 39:4, 106:19
**Sergeant** [2] - 52:22, 79:12
**seriatim** [1] - 42:14
**series** [2] - 61:9, 61:10
**session** [2] - 41:1, 41:10
**set** [7] - 48:9, 49:19, 67:25, 74:19, 91:8, 110:12, 110:17
**sets** [2] - 24:6, 65:9
**seven** [1] - 19:16

**Seventh** [3] - 90:2, 109:21, 109:22
**several** [13] - 7:6, 8:6, 18:24, 22:2, 25:12, 25:13, 25:15, 35:7, 35:9, 65:21, 89:25, 91:13
**shackled** [1] - 16:6
**shape** [1] - 106:12
**share** [1] - 78:9
**shared** [2] - 60:6, 60:14
**Shawn** [1] - 25:20
**shelter** [1] - 76:19
**sheltered** [1] - 60:14
**shelters** [1] - 60:7
**shift** [1] - 50:23
**shirt** [1] - 59:10
**shoe** [1] - 60:16
**shooting** [1] - 53:7
**shootings** [1] - 52:15
**short** [3] - 30:13, 76:25, 91:12
**shortly** [4] - 9:15, 13:23, 79:2, 82:23
**show** [10] - 2:13, 10:4, 13:24, 24:13, 53:11, 56:15, 58:12, 58:20, 81:19
**showed** [1] - 57:22
**showing** [1] - 14:16
**shows** [2] - 58:12, 95:23
**shut** [1] - 107:14
**shutting** [1] - 52:11
**side** [3] - 15:12, 91:9, 97:11
**sight** [1] - 52:18
**signature** [1] - 14:9
**signed** [4] - 14:9, 14:11, 14:13, 14:15
**silence** [1] - 111:21
**silent** [1] - 10:21
**similar** [3] - 73:9, 74:3, 81:24
**simple** [2] - 63:9, 76:14
**simply** [5] - 57:16, 59:25, 71:11, 98:3, 98:9
**single** [1] - 21:15
**sister** [1] - 85:20
**sit** [2] - 15:14, 92:11
**site** [6] - 6:15, 6:17, 6:20, 25:8, 26:8, 97:10
**sitting** [5] - 7:20, 27:22, 97:9, 107:5, 107:6
**situation** [3] - 9:4,

74:4, 102:4
**six** [10] - 81:10, 93:23, 98:17, 102:10, 102:13, 102:18, 103:17, 105:12, 105:19, 106:2
**six-year** [3] - 93:23, 105:12, 106:2
**sleep** [2] - 58:19, 75:24
**sleeping** [1] - 78:1
**slept** [1] - 60:1
**slight** [1] - 77:19
**slightly** [2] - 38:9, 74:21
**sloppily** [1] - 107:3
**sloppy** [1] - 99:12
**slower** [1] - 50:14
**small** [4] - 14:8, 15:11, 16:24, 17:2
**smartphone** [1] - 97:21
**smiling** [1] - 15:5
**smoke** [1] - 17:24
**social** [1] - 101:12
**solicited** [1] - 92:8
**someone** [5] - 28:7, 41:12, 72:4, 72:6, 82:1
**sometime** [1] - 84:6
**sometimes** [1] - 76:13
**somewhat** [1] - 32:21
**somewhere** [1] - 79:11
**son** [2] - 66:16, 96:23
**sorry** [21] - 12:3, 15:17, 19:22, 22:14, 22:16, 22:18, 22:19, 23:3, 23:12, 36:21, 36:23, 38:5, 44:22, 46:16, 46:21, 84:12, 84:24, 85:3, 89:5, 98:6
**Sorry** [2] - 41:11, 73:4
**sort** [5] - 48:13, 55:5, 76:13, 99:8, 104:18
**sought** [1] - 39:10
**sound** [1] - 17:2
**Sound** [1] - 25:21
**sounds** [1] - 105:4
**source** [1] - 97:1
**South** [1] - 90:11
**Southern** [2] - 90:4, 90:15
**southern** [2] - 90:8, 90:12
**span** [1] - 53:23
**speaking** [3] - 4:1, 34:19, 111:24
**Special** [10] - 1:20,

2:25, 9:6, 10:1, 18:16, 25:18, 30:3, 30:24, 34:12, 95:23
**specific** [2] - 70:21, 102:2
**specifically** [7] - 5:18, 31:24, 39:14, 73:22, 91:1, 100:23
**spell** [1] - 4:2
**Spelzer** [1] - 25:18
**spent** [2] - 5:8, 102:9
**split** [1] - 78:14
**splitting** [1] - 78:15
**spoken** [2] - 55:24, 56:5
**sport** [1] - 29:5
**square** [1] - 29:6
**stack** [1] - 50:12
**stairwell** [1] - 80:20
**stamp** [1] - 35:24
**stamped** [1] - 37:9
**stand** [3] - 36:11, 46:11, 105:7
**standard** [4] - 9:4, 51:14, 81:5, 109:17
**standing** [11] - 3:20, 4:7, 50:15, 74:19, 75:7, 75:8, 75:11, 75:14, 76:17, 108:4, 108:5
**stands** [3] - 41:6, 68:17, 112:3
**start** [8] - 2:17, 22:7, 41:3, 41:4, 50:25, 54:18, 70:2, 82:15
**started** [3] - 5:12, 29:7, 47:22, 59:2
**starting** [3] - 6:12, 21:23, 36:16
**state** [2] - 4:2, 93:21
**State** [1] - 39:20
**statement** [6] - 56:11, 58:15, 60:11, 72:1, 90:18, 93:19
**statements** [6] - 42:15, 42:16, 42:20, 56:8, 56:9, 89:17
**STATES** [2] - 1:1, 1:3
**States** [8] - 2:4, 2:24, 41:15, 54:11, 103:21, 107:17, 109:15, 109:21
**stating** [1] - 64:4
**station** [6] - 55:16, 55:22, 79:4, 79:19, 79:23, 88:9
**status** [3] - 2:14, 8:11, 16:4
**stay** [4] - 23:8, 46:23, 47:2, 53:10

**stayed** [2] - 50:19, 76:1
**staying** [3] - 59:13, 59:16, 77:24
**stays** [1] - 107:25
**steaded** [1] - 24:2
**stenographic** [1] - 112:10
**step** [7] - 36:9, 48:21, 49:23, 89:6, 89:7, 100:5
**stepped** [1] - 81:3
**stepping** [2] - 51:11, 60:18
**steps** [1] - 106:16
**still** [10] - 11:16, 13:12, 30:15, 30:17, 42:1, 42:2, 81:21, 81:22, 97:20, 111:8
**stipulate** [3] - 5:23, 38:13, 39:3
**stipulated** [1] - 5:25
**stipulation** [11] - 36:20, 36:23, 37:5, 37:7, 37:12, 37:15, 37:16, 39:18, 40:18, 91:25, 94:17
**stipulations** [1] - 38:9
**stolen** [1] - 104:18
**stone** [1] - 110:15
**stood** [2] - 80:17, 111:16
**stop** [10] - 2:17, 11:1, 19:21, 36:15, 53:25, 54:24, 55:3, 56:7, 56:9
**stopped** [2] - 17:20, 20:1
**street** [1] - 67:17
**Street** [5] - 1:24, 66:13, 66:15, 66:18, 85:1
**stressful** [1] - 50:4
**strong** [1] - 78:22
**struggle** [1] - 28:16
**stupid** [1] - 76:14
**subject** [1] - 58:4
**submission** [1] - 42:25
**submit** [8] - 42:24, 42:25, 43:20, 45:6, 72:24, 73:11, 97:24, 111:17
**submitted** [3] - 73:12, 85:7, 89:17
**subpoena** [6] - 38:15, 38:22, 39:5, 39:8, 39:17, 40:8
**subsequent** [2] - 70:25, 97:6

**subsequently** [2] - 39:20, 109:18
**Suburbans** [2] - 29:3, 29:4
**suddenly** [1] - 95:6
**suggest** [19] - 15:7, 30:3, 71:17, 71:22, 72:2, 72:3, 75:13, 77:9, 77:18, 80:1, 80:6, 81:3, 82:9, 88:24, 107:1, 107:10, 107:20, 110:18, 110:19
**suggested** [1] - 111:2
**suggestions** [1] - 30:6
**suitcase** [1] - 104:18
**summarized** [1] - 60:25
**summary** [1] - 21:22
**summers** [1] - 54:22
**Sun** [2] - 63:21, 64:11
**supervisor** [2] - 25:18, 26:23
**supervisor/manager** [1] - 27:3
**supplement** [2] - 44:20, 90:25
**supplemental** [1] - 42:4
**supplemented** [1] - 45:9
**supply** [1] - 97:1
**support** [5] - 61:14, 62:15, 63:17, 65:9, 108:12
**supports** [3] - 63:17, 73:8
**supposed** [3] - 40:5, 65:7, 99:10
**suppress** [18] - 42:3, 42:4, 42:16, 43:14, 43:22, 44:11, 44:21, 44:22, 45:3, 45:8, 45:11, 45:16, 61:10, 91:2, 93:17, 93:18, 99:23, 103:12
**suppressed** [3] - 92:3, 92:22, 92:24
**suppression** [3] - 64:12, 90:18, 98:25
**Supreme** [9] - 54:1, 54:12, 54:22, 76:14, 76:16, 76:17, 78:7, 78:14, 89:25
**surprised** [1] - 8:23
**suspect** [2] - 79:15, 79:17
**suspected** [4] - 55:8, 55:20, 59:24, 68:13
**suspects** [1] - 74:8

**suspended** [1] - 23:21
**suspicion** [2] - 66:6, 66:15
**sweep** [6] - 53:13, 53:20, 81:22, 81:23, 82:5, 82:7
**sworn** [1] - 3:22

**T**

**table** [6] - 9:7, 15:11, 15:25, 16:2, 46:11, 46:23
**tactical** [3] - 13:7, 50:12, 50:22
**taint** [4] - 95:17, 95:19, 98:1, 98:3
**Taint** [1] - 98:9
**taints** [1] - 96:2
**talks** [3] - 59:2, 64:11, 81:25
**tape** [1] - 31:2
**task** [7] - 3:17, 5:2, 5:6, 5:10, 5:11, 5:13, 28:25
**team** [2] - 7:6, 7:17, 8:6
**technically** [1] - 88:12
**telephone** [10] - 58:3, 62:9, 62:10, 63:11, 63:16, 89:20, 91:3, 105:18
**temporary** [1] - 76:23
**ten** [8] - 2:16, 36:15, 36:17, 41:3, 41:5, 81:10, 109:2
**ten-minute** [1] - 36:17
**tense** [1] - 34:19
**Teresa** [2] - 1:16, 3:4
**term** [1] - 84:15
**termination** [1] - 104:22
**terms** [34] - 17:17, 47:10, 48:25, 49:10, 56:24, 58:6, 61:8, 61:13, 61:17, 62:4, 62:11, 62:16, 63:2, 63:3, 63:13, 69:2, 69:14, 70:10, 87:19, 89:15, 92:16, 92:17, 93:23, 94:25, 96:10, 97:24, 105:1, 105:9, 106:5, 108:8, 109:13, 109:22, 110:14, 110:23
**Terry** [5] - 52:12, 53:15, 81:24, 81:25, 82:8
**test** [4] - 71:10, 72:10, 76:11, 76:12

**tested** [1] - 94:16
**testified** [14] - 3:23, 52:14, 52:22, 54:17, 77:4, 77:22, 77:23, 77:25, 79:5, 79:21, 83:2, 83:10, 85:15, 97:3
**testifies** [1] - 77:15
**testify** [1] - 83:3
**testimony** [22] - 23:10, 36:9, 47:8, 48:15, 49:5, 50:11, 50:14, 69:3, 69:16, 71:19, 77:7, 80:22, 80:24, 81:19, 85:12, 85:22, 87:3, 90:20, 91:19, 92:8, 97:13, 107:20
**text** [1] - 68:5
**TFO** [4] - 5:8, 5:14, 5:17, 108:25
**that..** [1] - 34:20
**THE** [204] - 1:1, 1:1, 1:11, 2:2, 3:1, 3:8, 3:13, 3:14, 3:19, 3:20, 3:24, 3:25, 4:4, 4:6, 4:13, 4:14, 4:18, 4:19, 5:25, 14:20, 14:23, 15:1, 15:5, 17:1, 22:18, 22:19, 22:21, 23:3, 23:7, 23:12, 23:19, 24:24, 36:5, 36:8, 36:12, 36:13, 36:21, 36:25, 37:4, 37:11, 37:14, 37:18, 37:20, 37:23, 38:5, 38:6, 40:17, 40:22, 40:25, 41:7, 41:10, 41:11, 41:20, 41:23, 42:9, 42:12, 42:20, 42:25, 43:4, 43:18, 43:21, 43:25, 44:10, 44:14, 44:17, 44:25, 45:3, 45:15, 45:21, 45:25, 46:2, 46:5, 46:7, 46:16, 47:3, 47:9, 47:15, 48:11, 48:18, 49:15, 50:6, 50:8, 52:7, 52:10, 53:3, 54:2, 54:7, 55:11, 56:9, 56:18, 57:12, 58:1, 58:6, 58:9, 60:21, 60:23, 61:8, 61:24, 62:14, 62:21, 62:24, 63:8, 63:13, 63:20, 63:25, 64:4, 64:7, 64:10, 64:19, 64:23, 65:2, 68:23, 69:2, 69:14, 69:23, 70:5, 70:7, 70:9, 70:12,

70:20, 71:2, 72:14, 73:1, 73:3, 73:5, 73:12, 73:16, 75:9, 80:12, 82:21, 83:4, 83:15, 84:5, 84:12, 84:17, 84:21, 85:2, 85:6, 85:14, 85:21, 86:1, 86:8, 86:12, 86:19, 87:5, 87:17, 89:4, 89:6, 90:5, 90:8, 90:22, 91:17, 92:12, 92:15, 93:13, 93:16, 94:4, 94:7, 94:11, 95:9, 95:16, 95:19, 95:25, 96:4, 96:6, 96:9, 98:6, 98:17, 99:14, 99:18, 99:22, 100:5, 100:8, 100:14, 100:23, 101:1, 101:4, 101:7, 101:18, 101:22, 101:25, 102:7, 102:14, 102:23, 103:4, 103:7, 103:10, 103:16, 104:12, 104:15, 104:19, 104:25, 105:4, 105:8, 105:23, 106:11, 107:15, 108:6, 108:14, 109:12, 110:4, 110:7, 111:3, 111:23
**theft** [1] - 5:13
**themselves** [2] - 2:21, 53:8
**thereafter** [5] - 57:16, 79:2, 82:23, 92:25, 109:10
**therefore** [1] - 67:2
**they've** [5] - 2:14, 2:15, 48:14, 79:14, 81:8
**thinking** [3] - 48:20, 52:23, 80:15
**third** [1] - 55:14
**Thirty** [1] - 19:16
**Thirty-seven** [1] - 19:16
**threatened** [1] - 20:16
**three** [8] - 15:21, 18:7, 44:10, 50:2, 51:1, 55:14, 70:14, 98:12
**throughout** [2] - 18:9, 19:18
**ties** [1] - 74:13
**timing** [1] - 79:9
**Timothy** [1] - 25:19
**today** [6] - 2:6, 2:17, 5:22, 18:15, 80:16,

111:21
**together** [1] - 65:22
**tolled** [1] - 25:23
**tone** [2] - 8:15, 11:18
**Tony** [2] - 59:7, 77:12
**took** [13] - 13:3, 13:4, 13:6, 13:17, 15:10, 21:12, 27:1, 35:16, 53:3, 53:4, 71:17, 76:15, 80:8
**tooth** [1] - 21:14
**top** [4] - 54:21, 58:15, 65:19, 68:9
**total** [1] - 15:20
**totally** [7] - 53:14, 63:17, 74:19, 87:21, 105:13, 106:1, 108:6
**towards** [4] - 14:5, 19:22, 20:22
**Toy** [1] - 25:19
**track** [2] - 48:23, 58:11
**tracking** [32] - 45:13, 45:16, 45:23, 47:11, 47:23, 48:3, 48:7, 48:9, 49:9, 49:19, 49:24, 53:17, 58:5, 58:11, 58:12, 60:19, 62:20, 64:3, 64:25, 68:1, 70:2, 71:3, 71:18, 71:21, 72:8, 73:1, 73:4, 73:5, 73:18, 74:4, 89:15
**trafficking** [4] - 68:12, 72:25, 73:2, 73:3
**trailer** [7] - 6:18, 7:10, 7:12, 7:15, 8:4, 9:15, 27:17
**transactions** [1] - 87:4
**Transcript** [1] - 1:8
**transcript** [14] - 14:17, 21:6, 21:11, 33:1, 33:19, 34:16, 75:18, 77:4, 84:11, 84:12, 84:19, 85:8, 85:13, 112:10
**transcripts** [1] - 75:16
**transportation** [2] - 29:16, 29:21
**transported** [11] - 6:17, 6:19, 12:15, 12:16, 12:18, 29:10, 32:16, 55:16, 55:22, 59:12, 79:6
**transports** [1] - 79:9
**traveling** [1] - 97:10
**trial** [9] - 9:7, 83:9, 89:24, 90:3, 90:17, 110:12, 110:17, 111:7, 111:9
**tries** [1] - 106:4

**trigger** [1] - 66:5
**trouble** [1] - 36:22
**true** [1] - 55:23
**truth** [2] - 77:9, 94:21
**try** [5] - 28:16, 36:15, 42:1, 71:18, 94:20
**trying** [29] - 44:17, 50:20, 61:8, 61:12, 61:24, 61:25, 62:1, 62:4, 62:21, 63:22, 64:7, 64:11, 64:16, 73:13, 83:15, 84:22, 86:9, 87:7, 87:23, 87:25, 89:9, 92:20, 93:8, 94:13, 94:14, 99:18, 102:1, 103:2, 103:11
**turn** [1] - 64:25
**turned** [1] - 21:2
**turning** [1] - 97:25
**twice** [1] - 65:21
**two** [21] - 2:5, 6:10, 13:21, 15:13, 38:3, 38:8, 51:20, 52:21, 55:17, 59:15, 61:11, 67:7, 68:11, 69:13, 70:14, 73:25, 84:9, 84:24, 97:22, 106:3, 111:9
**two-hour** [1] - 59:15
**type** [3] - 29:2, 30:4, 108:10
**typically** [3] - 31:19, 35:25, 40:1
**typo** [1] - 38:19
**Tyrell** [2] - 59:7, 75:20

## U

**U.S** [7] - 38:14, 38:22, 39:4, 39:17, 90:14, 98:23, 111:14
**ultimate** [1] - 60:6
**ultimately** [6] - 51:9, 55:7, 55:14, 60:25, 68:1, 79:3
**unclear** [1] - 51:25
**uncontroverted** [1] - 50:1
**Under** [3] - 48:11, 48:12, 49:20
**under** [18] - 7:11, 11:24, 14:7, 18:12, 19:3, 19:7, 32:23, 49:17, 51:16, 52:12, 52:23, 53:17, 56:16, 57:2, 79:23, 88:10, 88:20, 109:6
**undercuts** [1] - 74:23
**underneath** [1] - 11:3

**understood** [6] - 11:5, 11:25, 15:4, 47:14, 104:24, 105:9
**undertaken** [1] - 39:1
**undertook** [1] - 40:10
**unfortunate** [2] - 103:17, 103:18
**unfortunately** [1] - 47:1
**UNITED** [2] - 1:1, 1:3
**United** [8] - 2:4, 2:24, 41:15, 54:11, 103:21, 107:17, 109:15, 109:21
**unlawful** [1] - 53:24
**unless** [5] - 36:17, 42:13, 68:21, 90:24, 111:16
**unlikely** [1] - 78:10
**unmarked** [1] - 27:12
**unreasonable** [4] - 60:8, 60:15, 98:14, 103:25
**untouched** [1] - 92:11
**up** [43] - 2:12, 8:7, 8:17, 8:18, 8:19, 13:3, 15:15, 26:3, 26:6, 26:12, 26:24, 27:16, 28:8, 28:11, 28:19, 35:19, 37:17, 41:12, 47:4, 56:9, 58:12, 58:17, 58:19, 59:1, 60:13, 67:16, 68:17, 79:3, 85:1, 85:3, 89:22, 92:24, 94:1, 94:25, 97:14, 103:7, 105:7, 107:14, 108:16, 110:24, 111:10, 111:16
**upset** [1] - 58:21
**utility** [1] - 29:5
**utilized** [3] - 62:15, 92:5, 93:3

## V

**vaccinated** [4] - 2:11, 2:15, 4:11, 4:12
**vaccination** [1] - 2:14
**vacuum** [1] - 87:8
**valid** [1] - 48:3
**variety** [1] - 22:17
**various** [3] - 21:22, 38:17, 61:9
**vast** [1] - 104:10
**vehicle** [17] - 7:8, 7:9, 7:11, 7:15, 8:7, 8:8, 8:20, 8:22, 11:10, 11:11, 11:12, 11:14,

Case 1:20-cr-00139-RDB   Document 171   Filed 04/29/22   Page 128 of 128

128

12:6, 12:8, 12:12, 12:19, 12:20, 29:5
**vehicles** [9] - 27:10, 27:11, 28:21, 28:22, 28:23, 28:24, 29:2
**verify** [1] - 87:7
**versus** [10] - 2:4, 41:15, 74:2, 76:15, 78:6, 81:25, 103:21, 107:17, 109:15, 109:21
**victim** [8] - 66:4, 66:11, 66:13, 66:19, 71:24, 72:5, 82:24, 83:23
**victim's** [2] - 66:1, 106:18
**victims** [1] - 83:20
**video** [1] - 59:9
**view** [22] - 41:17, 42:7, 42:10, 43:1, 43:16, 43:18, 43:23, 48:2, 48:22, 49:4, 49:6, 56:25, 61:13, 75:15, 82:2, 82:3, 88:16, 89:24, 90:2, 108:17, 110:2, 110:5
**violating** [2] - 106:25, 107:3
**violations** [1] - 5:15
**violence** [2] - 22:1, 22:3
**violent** [2] - 23:15, 77:13
**Virginia** [6] - 90:5, 90:6, 90:9, 90:11, 90:13, 90:16
**visibly** [1] - 58:21
**vocal** [1] - 8:17
**voice** [4] - 11:19, 15:15, 17:9
**voices** [1] - 17:8
**voir** [2] - 110:11, 110:22
**voluntarily** [1] - 81:7
**voluntary** [1] - 81:20
**vs** [1] - 1:5
**vulnerable** [1] - 76:21

## W

**wait** [1] - 106:25
**waiting** [4] - 6:18, 41:12, 50:15, 80:9
**waiver** [1] - 14:8
**waiving** [1] - 72:23
**wakes** [2] - 58:19, 59:1
**walk** [3] - 6:11, 15:25, 40:5

**wall** [2] - 2:12, 16:1
**wants** [4] - 60:19, 68:21, 89:18, 102:8
**warnings** [2] - 29:17, 29:19
**warrant** [112] - 6:5, 6:6, 6:7, 6:9, 38:11, 38:18, 39:2, 39:10, 39:14, 39:22, 39:24, 40:1, 40:3, 40:4, 40:6, 45:16, 45:18, 45:20, 45:23, 48:7, 48:9, 48:23, 49:2, 49:8, 49:13, 49:20, 49:24, 50:5, 50:12, 51:24, 54:11, 54:14, 54:16, 54:19, 54:23, 54:25, 55:2, 55:5, 55:7, 57:11, 57:15, 57:18, 60:25, 61:14, 61:5, 65:5, 67:14, 68:1, 69:5, 70:2, 70:3, 70:14, 70:16, 70:18, 70:21, 71:3, 71:18, 71:21, 72:8, 73:18, 74:4, 74:7, 79:5, 79:16, 88:11, 88:13, 88:14, 89:16, 91:7, 91:8, 91:22, 92:1, 92:4, 92:9, 92:18, 92:21, 92:23, 93:20, 93:21, 94:15, 95:4, 95:7, 95:14, 95:15, 95:24, 96:2, 96:14, 96:18, 97:2, 98:8, 98:15, 98:21, 98:24, 99:5, 99:7, 99:24, 102:15, 102:17, 103:23, 103:24, 106:8, 108:23, 109:2, 109:3, 109:5, 109:7, 109:8, 109:9, 109:18
**warrant's** [1] - 99:2
**warrantless** [2] - 54:10, 54:13
**warrants** [5] - 39:12, 39:21, 47:20, 70:25, 99:13
**Watts** [2] - 109:15, 109:18
**WATTS** [1] - 109:16
**weapon** [4] - 8:11, 8:12, 24:9, 52:24
**weapons** [2] - 8:14, 53:14
**wear** [1] - 78:1
**wearing** [1] - 59:9
**weave** [1] - 64:13
**Weaver** [39] - 1:20,

2:25, 9:7, 9:19, 9:22, 10:1, 10:15, 10:16, 10:18, 11:4, 11:5, 12:2, 12:19, 13:6, 13:14, 13:19, 14:12, 15:21, 18:16, 19:19, 20:8, 21:19, 25:19, 29:10, 30:3, 30:24, 31:21, 33:7, 33:18, 34:4, 34:13, 34:16, 34:25, 35:18, 91:9, 95:23, 106:21, 107:7, 107:8
**Weaver's** [4] - 11:12, 11:18, 17:9, 19:17
**Wednesday** [3] - 1:8, 41:2, 110:10
**week** [6] - 65:21, 69:13, 85:22, 110:8, 110:19, 111:6
**welcome** [2] - 4:16, 4:19
**Wellman** [1] - 90:15
**West** [5] - 90:5, 90:6, 90:9, 90:13, 90:16
**west** [2] - 90:9, 90:10
**WHALEN** [58] - 3:4, 40:21, 40:24, 41:22, 42:11, 42:19, 43:17, 45:13, 45:18, 45:22, 46:1, 46:4, 46:6, 46:14, 70:1, 70:6, 70:8, 70:11, 70:15, 70:23, 71:3, 72:21, 73:2, 73:4, 73:6, 73:15, 73:18, 75:10, 80:13, 83:2, 83:8, 84:4, 86:10, 86:15, 87:2, 87:16, 88:3, 89:5, 93:15, 94:3, 94:5, 94:9, 95:8, 95:10, 95:17, 95:21, 96:1, 96:5, 96:8, 105:3, 105:6, 105:22, 105:24, 106:12, 107:16, 108:10, 110:6, 111:1
**Whalen** [25] - 1:16, 3:4, 3:9, 40:20, 41:21, 42:9, 42:18, 43:16, 46:10, 46:20, 62:3, 69:25, 70:22, 82:21, 86:8, 89:13, 91:10, 92:15, 93:14, 96:7, 96:16, 104:7, 105:2, 110:4, 110:16
**whatsoever** [4] - 30:6, 31:3, 101:11, 109:6
**wheel** [1] - 7:9
**white** [1] - 59:9

**who've** [1] - 91:14
**whole** [6] - 28:13, 33:22, 65:7, 70:24, 75:1, 102:3
**Wilder** [1] - 85:19
**William** [2] - 1:17, 3:6
**willing** [1] - 78:9
**winding** [1] - 108:16
**window** [1] - 52:25
**wing** [1] - 53:23
**Winter** [1] - 111:17
**witness** [13] - 3:16, 3:17, 3:25, 14:14, 23:4, 36:10, 36:17, 36:18, 80:16, 85:22, 90:18, 97:18
**WITNESS** [7] - 3:24, 4:4, 4:13, 4:18, 22:19, 23:12, 36:12
**witnessed** [1] - 14:12
**witnesses** [6] - 4:10, 41:16, 41:20, 68:11, 91:14, 96:22
**woke** [1] - 58:17
**woman** [3] - 52:17, 60:10, 65:20
**Wong** [2] - 63:21, 64:11
**word** [1] - 51:19
**words** [4] - 51:19, 67:7, 71:24, 106:22
**worn** [2] - 2:9, 4:8
**worth** [4] - 54:21, 55:4, 59:14, 60:19
**writing** [1] - 16:15
**written** [2] - 60:11, 67:11
**wrote** [1] - 107:16

## Y

**y'all** [1] - 29:6
**year** [6] - 5:7, 22:9, 93:23, 99:6, 105:12, 106:2
**years** [14] - 5:8, 18:24, 19:2, 23:18, 35:7, 35:10, 35:12, 70:14, 98:17, 102:10, 102:13, 102:18, 103:17, 105:19
**yell** [1] - 43:9
**yelling** [2] - 28:8, 51:7
**yellow** [4] - 35:19, 35:21, 35:23
**you-all** [6] - 8:22, 26:3, 27:9, 27:23, 33:16, 56:11
**young** [1] - 111:14
**yourself** [3] - 25:20,

29:10, 34:12

## Z

**zero** [1] - 42:1
**zip** [1] - 35:21
**Ziplock** [1] - 36:3
**Zippies** [1] - 35:23