```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                       NORTHERN DIVISION

 3    UNITED STATES OF AMERICA,)   CRIMINAL CASE NO.
            Plaintiff,         )   RDB-20-139
 4                            )
          vs.                 )
 5                            )   JURY TRIAL DAY 7
      ANDRE RICARDO BRISCOE,   )   KIARA HAYNES
 6          Defendant.        )   DIRECT -EXAMINATION
      _____ )   CROSS-EXAMINATION
 7
                   EXCERPT TRANSCRIPT OF KIARA HAYNES
 8             BEFORE THE HONORABLE RICHARD D. BENNETT
                    UNITED STATES DISTRICT JUDGE
 9                  WEDNESDAY, JUNE 1 2022
                      BALTIMORE, MARYLAND
10
      For the Plaintiff:
11      Dana Brusca, AUSA

12      Paul Budlow, AUSA

13
      For the Defendant:
14      Teresa Whalen, Esq.

15      William Purpura, Esq.

16
      Also Present:  Javon Weaver, Special Agent ATF
17
        Jeffrey Kelly, Special Agent, FBI
18
        Andrew Murray, Paralegal
19
        Robert Cadle, Paralegal
20

21        (Computer-aided transcription of stenotype notes.)

22    _____

                         Reported by:
23
                      Melissa L. Clark, RPR
24             Federal Official Court Reporter
               101 W. Lombard Street, 4th Floor
25               Baltimore, Maryland  21201
                        410-962-4474
```

```
 1                      P R O C E E D I N G S

 2          (2:13 p.m.)

 3              THE COURT:  Good afternoon, everyone.  We will have

 4      Kiara Haynes, who is in custody, be brought in.  She'll be

 5      placed over there in the witness box.  We will bring the jury

 6      in, and she will stand and be sworn.  So we'll proceed

 7      accordingly.

 8              MS. BRUSCA:  Thank you.

 9              THE COURT:  If you'll come forward, please,

10      Ms. Haynes, and go over there to the witness box.

11          All right.  With that, now we'll bring the jury in.

12              THE CLERK:  All rise for the jury.

13          (Jury enters courtroom 2:18 p.m.)

14              THE COURT:  Good afternoon, everyone.

15              THE JURY:  Good afternoon.

16              THE COURT:  All right.  We'll all be seated and

17      we'll be going -- we'll stop promptly at 5 o'clock today.

18      We'll see about whether we take a break or not, but don't

19      hesitate, if any of you feel like you need a facilities break

20      at some point in time in the afternoon, just put your hand up

21      and Mr. Gurevich will keep and eye on it, and we'll take a

22      break.

23          So with that, the next Government witness, Mr. Budlow?

24              MR. BUDLOW:  Your Honor, the Government calls Kiara

25      Haynes.
```

 1          **THE COURT:**  Ms. Haynes, if you'll please stand and

 2   be sworn.

 3       **KIARA HAYNES,** having been duly sworn, was examined and

 4   testified as follows:

 5          **THE WITNESS:**  Yes.

 6          **THE CLERK:**  Thank you.  You may have a seat.  And

 7   while speaking clearly into the microphone, can you please

 8   state and spell your full name for the record?

 9          **THE WITNESS:**  Kiara Haynes.  K-i-a-r-a, H-a-y-n-e-s.

10          **THE COURT:**  Good afternoon, Ms. Haynes.  I'm Judge

11   Bennett, the presiding judge here.  Under the standing rules

12   of our court, masks are to be worn in all public areas, as

13   continued precautions to the COVID-19 pandemic, with the

14   exception that in the courtroom, in the discretion of the

15   presiding judge, masks may be pulled down and taken off while

16   a witness is testifying or while lawyers are asking questions

17   if they have been fully vaccinated.  Meaning if they've had

18   two vaccinations shots or, perhaps, one with Johnson &

19   Johnson.

20       Have you been fully vaccinated?

21          **THE WITNESS:**  Yes.

22          **THE COURT:**  All right.  Then you may pull your mask

23   down while testifying.  You don't have to, but you're free to

24   do so.

25       With that, Mr. Budlow, you may proceed.

```
 1              MR. BUDLOW:  Thank you.
 2            D I R E C T  E X A M I N A T I O N
 3    BY MR. BUDLOW:
 4    Q.   Ms. Haynes, you're currently incarcerated?
 5    A.   Yes.
 6    Q.   What crimes are you charged with?
 7    A.   Aiding and abetting with a firearm that resulted in
 8    murder.
 9    Q.   Are you guilty of those crimes?
10    A.   Yes.
11    Q.   Did you shoot anyone?
12    A.   No.
13    Q.   Who did?
14    A.   Andre Briscoe.
15    Q.   What did you do?
16    A.   I provided the gun and got rid of it afterwards.
17    Q.   Where did the gun come from?
18    A.   My nephew, Tariek Powell.
19    Q.   I'm showing you on the screen in front of you,
20    Government's Exhibit 12.8.
21         Do you recognize people in that photograph?
22    A.   Yes.
23    Q.   Who is on the right of the photograph?
24    A.   Me.
25    Q.   Who is in the center?
```

```
 1    A.    Jennifer.

 2    Q.    And who is Jennifer to you?

 3    A.    A lifetime friend.

 4    Q.    Did you consider her your best friend?

 5    A.    Yes.

 6    Q.    Showing you now Government's Exhibit 12.10, starting

 7    first with the photograph on your left, who are the two people

 8    depicted in that photograph?

 9    A.    Me and K.

10    Q.    What did you call K?

11    A.    Tone Tone.

12    Q.    Did you refer to him as a relative of yours?

13    A.    Yes.

14    Q.    How so?

15    A.    My nephew.

16    Q.    What did he call you?

17    A.    Aunt Kiara.

18    Q.    Do you know Andre Briscoe?

19    A.    Yes.

20    Q.    Is that him over here on the right in the blue shirt?

21    A.    Yes.

22              THE COURT:  Let the record reflect the witness has

23    identified the Defendant, Andre Briscoe.

24    BY MR. BUDLOW:

25    Q.    Are you related to him?
```

```
1    A.   Yes.

2    Q.   When did you meet the Defendant?

3    A.   Valentine's Day 2015.

4    Q.   Can you describe the nature of your relationship moving

5    forward from that day?

6    A.   We had a sexual relationship.

7    Q.   And over the course of the next few months, how did you

8    come to feel about the Defendant?

9    A.   I was in love with him.

10   Q.   For about how long?

11   A.   Maybe a few months.

12   Q.   The night before your best friend and nephew were

13   murdered, were you in east Baltimore?

14   A.   Yes.

15   Q.   Whose house were you at?

16   A.   His girlfriend, Tiffany's, house.

17   Q.   Who were you with at Tiffany's house?

18   A.   Andre.

19   Q.   The Defendant?

20   A.   Yes.

21   Q.   Did you discuss any plans with the Defendant that night?

22   A.   Yes.

23   Q.   What was the plan?

24   A.   He came to me and told me that he had planned to take

25   Jennifer's drugs and kill her.
```

```
 1    Q.   What did you say?

 2    A.   What do you want me to do, do you want me to get the gun?

 3    Q.   What did he say?

 4    A.   He said, Yes.

 5    Q.   It was your idea to get the gun?

 6    A.   Yes.

 7    Q.   Did you get the gun?

 8    A.   Yes.

 9    Q.   From who?

10    A.   My nephew's brother, Tarrell.

11    Q.   And so who is your nephew?  Is that Tariek Powell that

12    you mentioned earlier?

13    A.   Yes.

14    Q.   And how did you make that happen that you got the gun

15    from Tariek and Tarrell Powell?

16    A.   I tried to contact Tariek on Facebook, and his brother

17    contacted me back and told me that he was incarcerated.

18    Q.   And then what?

19    A.   So he called me back on the three-way when Tariek called

20    him and I met Tarrell to get the gun.

21         MR. BUDLOW:  Your Honor, at this time I would ask if

22    we could hand out the transcript binders and direct the jury

23    to 6.5T, for identification purposes only.  And when that's

24    done I'm going to play Government's Exhibit 6.5.

25         THE COURT:  Government's Exhibit 6.5 is the tape
```

```
 1    recording itself of the statement; is that correct?
 2              MR. BUDLOW:  Your Honor, Government's Exhibit 6.5 is
 3    a call, recorded jail call.
 4              THE COURT:  Recorded jail call, okay.
 5              MR. BUDLOW:  It's from May 26, 2015, at 9:19p.m.
 6              THE COURT:  It's a phone call from whom to whom?
 7              MR. BUDLOW:  I'm going to let the -- that will
 8    be hard to --
 9              THE COURT:  Okay.
10    BY MR. BUDLOW:
11    Q.   If I direct you to any of the transcripts, this is 6.5T,
12    I'll let you know, okay?
13    A.   Okay.
14    Q.   All right.  Again, it's 6.5T.
15         (Recording played.)
16    BY MR. BUDLOW:
17    Q.   Ms. Haynes, whose voices did you just hear?
18    A.   Tariek and Tarrell.
19    Q.   And you said they're your nephews, can you describe how
20    you're related to them?
21    A.   Tariek is my brother's son.
22    Q.   And Tarrell?
23    A.   Tarrell is his brother.
24    Q.   And does Tariek have a nickname?
25    A.   Yes.
```

```
1    Q.   What is that?

2    A.   Freaky.

3    Q.   Showing you Government's Exhibit 17.3.  All right.  Let's

4    go to 16.10.  16.10, do you recognize that photograph?

5    A.   Yes.

6    Q.   Who is that?

7    A.   Tariek.

8    Q.   17.13, who is that?

9    A.   Tarrell.

10         MR. BUDLOW:  Your Honor, I would ask the members of

11   the jury to turn to their binders, Government's Exhibit 16.6T

12   again, for identification purposes only.  I will then play

13   Government's Exhibit 6.6.

14     (Recording played.)

15         MR. BUDLOW:  Your Honor, for the record, I neglected

16   to mention the date and time of this call.

17         THE COURT:  Yes.  It's May 26, 2015; correct?

18         MR. BUDLOW:  Yes, at 9:19 p.m.

19         THE COURT:  Yes.

20         MR. BUDLOW:  Just shortly after the last call we

21   just heard.

22      (Recording played.)

23   BY MR. BUDLOW:

24   Q.   Ms. Haynes, whose voices did you hear on that call?

25   A.   Me and Tariek.
```

```
1    Q.   Anybody else?

2    A.   No.

3    Q.   When you said, "Fam, it's blood," who were you talking

4    about?

5    A.   Andre Briscoe.

6    Q.   Why would you refer to Andre Briscoe as "fam" or "blood"?

7    A.   Because he's blood.  He's my family.

8    Q.   You said, There is a girl sitting on a cut.  Who is that

9    in reference to?

10   A.   Jennifer.

11   Q.   What does sitting on it mean?

12   A.   That she has it in her house in her possession.

13   Q.   What's "it"?

14   A.   Heroin.

15   Q.   At some point in the call you said, "Boy," that was your

16   whole sentence.  "Boy," what does that mean?

17   A.   That's a street name used for heroin.

18   Q.   You told Tariek that there was 30 yaz in it for him.  Did

19   I say that right?

20   A.   Yes.

21   Q.   What are 30 yaz?

22   A.   Thirty grams of heroin.

23   Q.   When did you first learn that Jennifer Jeffrey was

24   sitting on drugs?

25   A.   At Tiffany's house that night -- at Tiffany house earlier
```

```
 1    that day.

 2    Q.   Who did you learn that from?

 3    A.   Andre.

 4    Q.   When you say "Andre," do you mean the Defendant?

 5    A.   Yes.  Yes.

 6    Q.   What did you mean by, "The bitch?"

 7    A.   The bitch.  I don't recall saying that.

 8    Q.   Well, let me rephrase it.

 9    A.   Okay.

10    Q.   The first call that you heard between Tariek and Tarrell,

11    did you hear them use the term, "The bitch?"

12    A.   Yes.

13    Q.   Do you know what they were referring to?

14    A.   Yes, the gun.

15    Q.   So later on the call that you were on with Tariek, he

16    said -- he was talking about his brother being on standby, and

17    he said, So when you're done, you can give him my bitch back,

18    yo.  What were you talking about when he said, Give him his

19    bitch back?

20    A.   Give him his gun back.

21    Q.   How did you get to Tarrell?

22    A.   My friend drove me.

23    Q.   What is your friend's name?

24    A.   Martin DaShields.

25    Q.   And in relation to that call when?
```

```
 1   A.   Can you repeat the question?
 2   Q.   Had you already called Mr. DaShields at the time that you
 3   had this call with Tariek?
 4   A.   Yes.
 5   Q.   When did -- if you recall, when did Mr. DaShields pick
 6   you up?
 7   A.   Either while I was on the call or shortly after.  I think
 8   I was getting into his car when I was on the call.
 9   Q.   Who were you with at the time?
10   A.   Andre.
11   Q.   Who went to get the gun?  Who all was in the car?
12   A.   Me, Andre, and Martin.
13   Q.   Did you make any stops along the way?
14   A.   I think we made a stop to get some molly or something.
15   I'm not sure.
16   Q.   Do you recall if there were any other stops?
17   A.   I'm not sure.
18   Q.   Where did you go to get the gun?
19   A.   Edmondson and Warwick.
20   Q.   Did you get out of the car?
21   A.   Yes.
22   Q.   At first when you got out, did the Defendant get out
23   also?
24   A.   No.
25   Q.   What did you do when you got out of the car?
```

```
 1    A.    I got out of the car and I went to Edmondson and Warwick

 2    on the corner, and I met Tarrell right there.

 3    Q.    What happened when you met Tarrell?

 4    A.    He gave me the gun, and he said that it was 16 in the

 5    chamber, one in the head, and it was a lemon squeeze.

 6    Q.    He told you it was a lemon squeeze?

 7    A.    Yes.

 8    Q.    Do you have any idea what that meant?

 9    A.    No.

10    Q.    Did he tell you what caliber the gun was?

11    A.    Yes.

12    Q.    What did he say?

13    A.    A 45.

14    Q.    Did the Defendant get out of the car?

15    A.    Yes.

16    Q.    Where did he go?

17    A.    When I was coming back to the car, he got out of the car

18    and was talking to Tarrell.

19    Q.    And how long did the Defendant spend with Tarrell?

20    A.    About two or three minutes.

21    Q.    Did you get back in the car?

22    A.    Yes.

23    Q.    Did the Defendant get back in the car?

24    A.    Yes.

25    Q.    Where did you go?
```

```
 1    A.    To my apartment.

 2    Q.    How did you get there?

 3    A.    Martin drove us.

 4    Q.    Was the Defendant in the car -- when you said "us," was

 5    he in the car from drive to Edmondson and Warwick back to your

 6    house?

 7    A.    Yes.

 8    Q.    Showing you Government -- I'm sorry, Defense Exhibit 78,

 9    do you see the photo on the screen?

10    A.    Yes.

11    Q.    Do you recognize that person?

12    A.    No.

13    Q.    Was he in the car with you at Edmondson and Warwick?

14    A.    No.

15    Q.    Was he in the car with you at any time that night with

16    Martin DaShields?

17    A.    No.

18    Q.    When you got back to your houses, did you go inside?

19    A.    Yes.

20    Q.    Where were you dropped off, do you recall?

21    A.    In front of my apartment.

22    Q.    And did the Defendant go inside your apartment?

23    A.    Yes.

24    Q.    Did he stay there?

25    A.    For about 15 minutes.
```

```
1     Q.   Did he it tell you where he was going?

2     A.   Yes.

3     Q.   Where did he say he was going?

4     A.   To Jennifer's house.

5     Q.   Did he leave?

6     A.   Yes.  Yes.

7     Q.   Do you know how he got there?

8     A.   He walked.

9     Q.   How do you know that?

10    A.   Because it's only about a five-minute walk from my house.

11    Q.   When he walked to Jennifer's house, were you at home?

12    A.   Yes.

13    Q.   What was your address at the time?

14    A.   100 Diener Place.

15    Q.   I'm showing you Government's Exhibit 15.4, is this

16    your -- the building that you lived in at the time?

17    A.   Yes.

18    Q.   And the area to the bottom right where it says Diener

19    Place here, is this your apartment?

20    A.   That's how you enter the apartment.

21    Q.   Is that the door to your apartment?

22    A.   Yes.

23    Q.   Showing you page 3, do you see those stairs?

24    A.   Yes.

25    Q.   On the top right?
```

```
 1    A.    Yes.
 2    Q.    If you were to walk from your apartment to Jennifer's, is
 3    that the direction that you would go?
 4    A.    Yes.
 5    Q.    When you got to the stairs, what direction would you
 6    turn, right or left to get to Jennifer's house?
 7    A.    Right.
 8    Q.    Did you go to Jennifer's house later that night, hours
 9    later?
10    A.    Yes.
11    Q.    What did you do when you got there?
12    A.    Banged on the door and demanded for Andre to come
13    outside.
14    Q.    How much time had passed roughly from the time that he
15    left your house to the time that you walked to Jennifer's?
16    A.    Maybe about five or six hours.
17    Q.    How long did you stay outside of Jennifer's house?
18    A.    About 10 or 15 minutes.
19    Q.    Did you see or talk to the Defendant while you were
20    there?
21    A.    No.
22    Q.    Did you see or talk to Jennifer while you were there?
23    A.    No.
24    Q.    Who did you talk to, if anyone?
25    A.    I talked to her niece through the door.  She never opened
```

```
 1      the door, but we talked through the door.
 2      Q.   When you say talk, what level -- what loudness of voice
 3      were the two of you talking in?
 4      A.   We were yelling.
 5      Q.   Do you know her niece's name?
 6      A.   Yes.
 7      Q.   What is it?
 8      A.   Brianna.
 9      Q.   And did Brianna stay there occasionally?
10      A.   Yes.
11      Q.   Did she have any children?
12      A.   Yes.
13      Q.   One daughter?
14      A.   Yes.
15      Q.   About how old?
16      A.   I think she was like one.
17      Q.   When you left Jennifer's front, from outside of her
18      house, where did you go?
19      A.   Home.
20      Q.   When did the Defendant come back to your house?
21      A.   Early that morning.
22      Q.   Did you know he was coming?
23      A.   Yes, he called.
24      Q.   And did he tell you what he was doing while -- when he
25      called?
```

```
 1     A.   He said he was on his way back to my house.

 2     Q.   Did he come inside?

 3     A.   Yes.

 4     Q.   Did you talk to him when he came inside?

 5     A.   Yes.

 6     Q.   What did he tell you -- what was his demeanor towards

 7     you?

 8     A.   Oh, he was frustrated.  He said that I needed to

 9     apologize to Jennifer for coming to her house banging on the

10     door, I was going to mess everything up.

11     Q.   He was mad at you for making a scene?

12     A.   Yes.

13     Q.   What did he tell you about his night at Jen's?

14     A.   That he had seen the drugs and it was the most drugs he

15     had ever seen in his life at one point in time, altogether.

16     Q.   Did he tell you who else was there?

17     A.   Yes.

18     Q.   Who did he tell you was also there besides Jen?

19     A.   Her niece and her son.

20     Q.   "Her niece," you mean Jen's niece, Brianna?

21     A.   Yes.

22     Q.   And "her son," you mean Tone Tone?

23     A.   Yes.

24     Q.   Did he tell you anything else about Tone Tone?

25     A.   Yes, I had asked him, Did Jennifer drop him off on her
```

```
 1    way taking Tone Tone to school?  And he said, No.  Tone Tone

 2    was sick he had -- his asthma was acting up.

 3    Q.   While the Defendant was at your house, did he make any

 4    phone calls?

 5    A.   Yes.

 6    Q.   Where were you when he was making the calls?

 7    A.   I think in the living room.

 8    Q.   Were you inside the house, though?

 9    A.   Yes.

10    Q.   Could you hear what the Defendant was saying?

11    A.   Yes.

12    Q.   Do you know who he was talking to?

13    A.   Yes.

14    Q.   How do you know he -- who he was talking to?

15    A.   He said it, that I'm talking to Jennifer.

16    Q.   What did you hear him say on the call?

17    A.   What are you making for breakfast?

18    Q.   Ms. Haynes, who is Shawn Gardner?

19    A.   My husband.

20    Q.   Was he in jail in May of 2015?

21    A.   Yes.

22    Q.   He was your boyfriend at the time?

23    A.   Yes.

24    Q.   Did you call him multiple times on May 27th, 2015?

25    A.   Can you repeat the question?
```

```
 1    Q.    Sure.  Did you call him on May 27th, 2015?

 2    A.    Did I call who?

 3    Q.    Shawn Gardner, or did he call you -- withdrawn.

 4          Did you speak to him that same morning May 27, 2015?

 5    A.    Yes.

 6              MR. BUDLOW:  Your Honor, at this time the Government

 7    will be playing Government's Exhibit 6.7, and would ask the

 8    members of the jury to turn to 6.7T --

 9              THE COURT:  Government's 6.7, as to the others, the

10    recording will come in and the transcript is marked for

11    identification.

12          (Recording played.)

13    BY MR. BUDLOW:

14    Q.    Whose voices did you hear on that call?

15    A.    Me and Shawn.

16    Q.    He's not James Williams?

17    A.    No.

18    Q.    Now, 6.8 and 6.8T for identification purposes.

19          (Recording played.)

20              MR. BUDLOW:  And Your Honor, for the record, this is

21    a call -- I'm sorry, the last call was on May 27th, 2015, at

22    9:43 a.m., that was 6.7, call 6.8 is --

23              THE COURT:  6.7 -- I'm sorry, hold on one second.

24    6.7 was at 9:00- -- 6.7 is May 27, 2015, at 9:43 a.m. in the

25    morning.
```

```
 1              MR. BUDLOW:  Yes.  Thank you, Your Honor.
 2              THE COURT:  And now we're listening to 6.8, which is
 3    that same morning at 9:58 a.m.; is that correct?
 4              MR. BUDLOW:  Yes.  Thank you.
 5         (Recording played.)
 6    BY MR. BUDLOW:
 7    Q.   Ms. Haynes, who were the people on the call?
 8    A.   Me and Shawn.
 9    Q.   Did you reference somebody else by name during the call?
10    A.   Yes.
11    Q.   Who?
12    A.   Andre.
13    Q.   How did you refer to him on the call?
14    A.   Poo.
15    Q.   Is that a nickname that you use for the Defendant?
16    A.   Yes.
17    Q.   The call talked about getting cigarettes.  Did the
18    Defendant leave your house at some point that morning?
19    A.   Yes.
20    Q.   Was that call one of those times?
21    A.   Yes.
22    Q.   How many times did he leave?
23    A.   Twice.
24    Q.   Tell us about the first time that he left, you were just
25    discussing on that call.
```

```
 1    A.   The first time, he said he was going to the bar.  I told
 2    him to get some cigarettes when he was at the bar.
 3    Q.   Did he go to the bar?
 4    A.   I think so, yes.
 5    Q.   When he came back, what did he have with him?
 6    A.   I think a drink in his back pocket.
 7    Q.   How about cigarettes?
 8    A.   Yes, cigarettes.
 9    Q.   You said there were two times that he left that day; is
10    that right?
11    A.   Yes.
12    Q.   What did the Defendant tell you before he left the second
13    time?
14    A.   That he was going to go get the drugs from Jennifer.
15    Q.   Did he have anything with him when he left?
16    A.   Yes.
17    Q.   What?
18    A.   The gun.
19    Q.   What was the gun in?
20    A.   A blue and white rainbow bag.
21    Q.   How do you know that he had that gun in there?
22    A.   Because he got if from under my mattress.
23    Q.   Was the bag under your mattress, or just the gun?
24    A.   Just the gun.
25    Q.   Tell the members of the jury what you observed in terms
```

```
 1    of him getting the gun?

 2    A.   Oh, he got the gun and put it in the bag.

 3    Q.   Did he leave?

 4    A.   Yes.

 5    Q.   Did you leave the house while the Defendant was gone?

 6    A.   No.

 7    Q.   Did you call the Defendant at any time after he left?

 8    A.   Yes.

 9    Q.   Did he answer?

10    A.   No.

11    Q.   Why did you call him?

12    A.   Because I wanted him to turnaround.  I had changed my

13    mind.  I didn't want to do it anymore.

14    Q.   But you didn't go run after him?

15    A.   No.

16    Q.   Did you see the Defendant again that day?

17    A.   Yes.

18    Q.   Where?

19    A.   He came back to my apartment after.

20    Q.   What did he tell you when he got back to your apartment?

21    A.   I asked him what happened.  He said they were both laying

22    on the kitchen floor dead.

23    Q.   How did you react?

24    A.   I threw my hands up over my head.  I put my head down and

25    I started crying and I said, "Oh, my God."
```

```
 1    Q.   What did the Defendant do?

 2    A.   He grabbed me and said, "Don't bitch up on me now."

 3    Q.   When he came back from Jennifer's house, did he have

 4    anything with him?

 5    A.   Yes.

 6    Q.   What was that?

 7    A.   He had the blue rainbow bag and another bag full of

 8    drugs.

 9    Q.   So first, with respect to the blue rainbow bag, was

10    anything in it?

11    A.   The gun was in there.

12    Q.   And what was the other bag?

13    A.   A bag of drugs.

14    Q.   Can you describe it?

15    A.   It was a black plastic bag.  Is was pretty full.

16    Q.   While he was at your house that morning after coming back

17    from Jennifer's, did he give you anything?

18    A.   Yes.

19    Q.   What did he give you?

20    A.   He gave me a bag with drugs in it and said, this was my

21    cut.

22    Q.   How did he give it to you?

23    A.   He threw it at me.

24    Q.   Did he give you anything else?

25    A.   Yes, he gave me another bag with capsules of drugs and
```

```
 1    said that this was for my nephew for letting him borrow the

 2    gun.

 3    Q.   Did you hold onto the bags?

 4    A.   Yes.

 5    Q.   You kept them?

 6    A.   Yes.

 7    Q.   Did there come a time that morning, that day, I should

 8    say, when you left the apartment?

 9    A.   Yes.

10    Q.   Who left?

11    A.   Me and Andre.

12    Q.   Anybody else with you?

13    A.   I don't think so, no.

14    Q.   How were you traveling?

15    A.   In a HAC.

16    Q.   Where did you go first in the HAC?

17    A.   Dropped Andre off on Orleans Street, so he could go back

18    to Tiffany's house.

19    Q.   Where is Orleans Street in reference to Tiffany's house?

20    A.   The projects are right off of Orleans.

21    Q.   Where did you go next?

22    A.   I went to my cousin Tiera's house.

23    Q.   Where does she live?

24    A.   She lives on Juneway in east Baltimore.

25    Q.   Did you talk to the Defendant on the phone later that
```

1    day?

2    A.   Yes.

3    Q.   I'll show you Government's Exhibit 11.2, page 3.

4         Do you see the calls between your phone and Mr. Briscoe's

5    phone at 2:29, 3:45 p.m., and 5:16 p.m., do you see those?

6    A.   Yes.

7    Q.   I want to ask you a couple of questions about this.

8    First of all, did you go to Tiffany's again that night?

9    A.   Yes.

10   Q.   In the context of those three calls in green, 2:29, 3:45,

11   and 5:16, do you know when it was that you went to Tiffany's

12   house?  Before?  Middle?  After?

13   A.   Probably like the middle.

14   Q.   So before 5:16 p.m., that's the last one of the three?

15   A.   Yes.

16   Q.   Why did you go to Tiffany's house?

17   A.   To retrieve the gun.

18   Q.   Did you get the gun back?

19   A.   Yes.

20   Q.   From who?

21   A.   Andre.

22   Q.   How did he give it back to you?  How was it packaged, if

23   at all?

24   A.   He just handed it to me, and I said I wasn't touching it.

25   And he took a shirt and wiped it off, wrapped it up in his

```
 1        shirt, put it in a bag, and gave it to me.
 2        Q.   Where did you go after getting the gun?
 3        A.   I went to meet Tarrell to give him the gun back.
 4        Q.   Did you only give him the gun?
 5        A.   No, I gave him the bag of drugs that Andre had given me
 6        to give to him.
 7        Q.   Did you give him any more drugs than just that?
 8        A.   Yes, I took a portion of mine and put it in the bag with
 9        his, because he didn't give him what he said he was going to.
10        Q.   Did you tell Tarrell that that gun had been used in a
11        murder?
12        A.   No.
13        Q.   Did you tell Tarrell that gun had been used in a robbery?
14        A.   Yes.
15        Q.   Following the murders, did you stay in Baltimore?
16        A.   No.
17        Q.   Where did you go?
18        A.   To Cambridge.
19        Q.   Why Cambridge?
20        A.   That's where my family was at, that's where Andre was at.
21        Q.   Did have you a conversation with Andre about Cambridge
22        before you went to Cambridge?
23        A.   Yes.
24        Q.   What did he say?
25        A.   He said he felt safer if I was down there with him.
```

```
1     Q.    How did you get there?

2     A.    I caught a HAC.

3     Q.    And who paid for the HAC?

4     A.    I gave him $50 in Baltimore.  Andre gave him $50 when we

5     got to Cambridge.

6     Q.    Where did you get the money for the HAC?

7     A.    I sold the drugs that Andre had given me.

8     Q.    The drugs he stole from Jennifer?

9     A.    Yes.

10    Q.    How much money did you make from selling those drugs?

11    A.    Only about $375.

12    Q.    After you sold all of the drugs that you got?

13    A.    Yes.

14          MR. BUDLOW:   Court's indulgence.

15    BY MR. BUDLOW:

16    Q.    Ms. Haynes, have you been interviewed regarding this

17    investigation on many occasions?

18    A.    Yes.

19    Q.    Have you lied about Jen and K's murders?

20    A.    Yes.

21    Q.    To who?

22    A.    To FBI agents, the Baltimore City police, the Grand Jury,

23    Federal prosecutors, family, friends.

24    Q.    ATF?

25    A.    ATF.
```

```
 1      Q.   Everyone?

 2      A.   Everyone.

 3      Q.   You lied under oath to a Federal Grand Jury?

 4      A.   Yes.

 5      Q.   How about the homicide detectives?

 6      A.   Yes.

 7      Q.   That was before you pled guilty?

 8      A.   Yes.

 9      Q.   Who were you protecting?

10      A.   Myself.

11      Q.   Originally when you first lied to BPD, the FBI, and ATF,

12      were you only protecting yourself or were you protecting

13      others, too?

14      A.   I was protecting Andre as well.

15      Q.   Every one of those times you lied, were you covering up

16      your own guilt?

17      A.   Yes.

18      Q.   Are you covering up your own guilt now?

19      A.   No.

20      Q.   You pled guilty, right?

21      A.   Yes.

22      Q.   And you were indicted by a Federal Grand Jury?

23      A.   Yes.

24      Q.   You came into this courtroom to plead guilty?

25      A.   Yes.
```

```
 1    Q.   What did you plead guilty to?

 2    A.   Aiding and abetting in the use of a firearm that resulted

 3    in murder.

 4    Q.   Who did you aide and abet?

 5    A.   Andre Briscoe.

 6    Q.   The Defendant?

 7    A.   Yes.

 8    Q.   You had an attorney then, like you do now?

 9    A.   Yes.

10    Q.   And in that plea, did you admit your role in the crime?

11    A.   Yes.

12    Q.   And there was a long stipulation of agreed facts that you

13    agreed to?

14    A.   Yes.

15    Q.   And part of that plea agreement was to cooperate and

16    testify truthfully; is that right?

17    A.   Yes.

18    Q.   Did that include giving truthful testimony about your

19    role?

20    A.   Yes.

21    Q.   Did it include giving truthful testimony about other

22    people's roles?

23    A.   Yes.

24    Q.   You had a signed agreement with the United States

25    Government when you plead guilty?
```

```
 1    A.    Yes.

 2    Q.    And you're testifying here today as part of that

 3    agreement?

 4    A.    Yes.

 5    Q.    Who signed the agreement on your behalf?

 6    A.    Me and my lawyers.

 7          MR. BUDLOW:  Your Honor, I have Government's

 8    Exhibit 17 point for identification purposes only.

 9          May I approach the witness.

10          THE COURT:  Yes.  Bring it up first so I can see it,

11    Mr. Budlow.

12          MR. BUDLOW:  Yes.

13          THE COURT:  All right.  First of all, what's the

14    exhibit number on that.

15          MR. BUDLOW:  17.6.

16          THE COURT:  Government Exhibit -- hold on one

17    second, 3.6 --

18          MR. BUDLOW:  17.6, your Honor.

19          THE COURT:  I'm sorry, 17.6.  All right.  As opposed

20    to trying to do the headsets, which have not worked, we all

21    agree, I need to do an evidentiary matter.  Ladies and

22    gentlemen, you need to go into the jury room just very

23    briefly.  Just very briefly.

24          (Jury exits courtroom 3:05 p.m.)

25          THE COURT:  All right.  And Marshal, you'll need to
```

1   take her through here.  Just very briefly she'll need to leave

2   the courtroom.

3          **THE MARSHAL:**  Yes, Your Honor.

4      (Witness exits courtroom 3:06 p.m.)

5          **THE COURT:**  The witness is off the witness stand and

6   is out of the courtroom.  The jury is out of the courtroom.

7   Just so we're clear on this, is the Government seeking to

8   introduce -- the Government, under the *Henderson* case, the

9   Fourth Circuit case, the Government -- actually it's the

10  *Henderson* case, the Fourth Circuit case, 717 F.2d 1345,

11  certiorari was denied by the Supreme Court.  The Government

12  may introduce terms of a cooperating witness plea agreement,

13  but the caveat is that a statement of facts cannot be included

14  with it, in terms of coming into evidence.

15         So I'm looking at the plea agreement that was entered and

16  filed when she pled guilty before me back in November, and

17  there is the plea agreement, which can come into evidence.

18  And there is the sealed supplement with respect to cooperation

19  which can come into evidence, but not the statement of facts

20  absent the stipulation, because there are certain hearsay

21  stipulations as to that.  I'm trying to make sure we're all

22  clear on that is the point.

23         **MR. BUDLOW:**  Yes, Your Honor, and I'll tell you,

24  I -- certainly, that's the way we plan on proceeding -- even

25  less so -- and I think Defense Counsel is aware of this and is

1    on board.

2        My plan is simply to show the witness the documents so

3    she can identify the signature, so we all known we're

4    dealing --

5            **THE COURT:**  I understand.

6            **MR. BUDLOW:**  -- with the same documents.  I

7    certainly plan on asking her questions about the terms, but

8    not having her read it unless --

9            **THE COURT:**  All right.  The point is that the reason

10   I'm trying to make sure we cross T's and dot I's, here.  You

11   are certainly free to introduce the plea agreement letter or

12   sealed supplement.  For that matter, the Defense is free to

13   ask that the plea agreement be introduced into evidence, as

14   well as the sealed supplement if the Defense so chooses.  The

15   point is that in terms of the statement of facts that are

16   included, as a stipulation, that does not come into evidence

17   and we -- the document is stapled together, that's what I'm

18   trying to deal with here in terms of -- if you all agree it's

19   not going to come into evidence at all, that's fine.  But my

20   point is that the Defense has the right -- if you chose not to

21   introduced it into evidence, the Defense has the right to ask

22   if it wants to come into evidence, and either side can seek to

23   introduce it into evidence, under Fourth Circuit case law, but

24   not the statement of facts attached.  So we need to make sure

25   it's two separate matters so --

1        **MR. BUDLOW:**  I think we are all in agreement.

2        **THE COURT:**  That's fine.  I just want to hear from

3  the Defense on this before it comes in, because I thought it

4  was -- and it is, that he's got the statement of facts

5  attached to it.

6        Now, from the point of view of the Government, you're

7  just marking it for identification and going to question her

8  about it, and you're not offering it into evidence; is that

9  right?

10        **MR. BUDLOW:**  That is correct.

11        **THE COURT:**  Now, Mr. Purpura, Ms. Whalen, what is

12  your position on this?  You concur it, it will not come into

13  evidence it will just be marked for identification?

14        **MS. WHALEN:**  The statement of facts, yes.

15        **THE COURT:**  Well, no.  I'm asking about the plea

16  agreement and the sealed supplement is also just being marked

17  for identification.

18        Either one of you can address me, Mr. Purpura can as

19  well.  I'm just trying to clarify that if -- I don't want to

20  waste time with the jury, but if you're seeking to have some

21  of it come in, but not all of it, I need to deal with that.

22  You're not seeking to have the plea agreement itself come into

23  evidence?

24        **MS. WHALEN:**  Not at this time, Your Honor.  If I --

25  somehow if something happens where I want to change that, I

1     will alert that.

2             **THE COURT:**  That's fine.  Okay.  So we're perfectly

3     clear.  And in that case, just so the record is clear under

4     case law, you would be permitted to do so.  But again, it's a

5     plea agreement and the sealed supplement, not the statement of

6     facts --

7             **MS. WHALEN:**  I understand.

8             **THE COURT:**  -- by either side.  If there were an

9     agreement on that, Government is free to proceed as you

10    wanted, Mr. Budlow, just mark it for identification and we'll

11    deal with it in that fashion.

12            **MR. BUDLOW:**  Thank you.

13            **THE COURT:**  So I didn't mean to stop everything, but

14    it's important that we clarify this before -- obviously, we do

15    it on a bench conference, but we can't, and the microphones

16    have not been working well for all of us on that.

17        So with that, we'll bring the witness back in and then

18    we'll go get the jury.  Bring Ms. Haynes back in.

19            **MR. BUDLOW:**  For scheduling purposes, Your Honor, I

20    probably have five minutes.

21            **THE COURT:**  I'm sorry?

22            **MR. BUDLOW:**  I probably have five minutes for

23    scheduling purposes.  I just want the Court to be aware.

24    Direct Examination should be concluded in five minutes.

25            **THE COURT:**  Oh, okay.  That's fine.  Take your time.

```
 1    Take your time.
 2            (Witness resumes witness stand.)
 3               THE COURT:  All right.  You may get the jury,
 4    Mr. Gurevich.
 5            (Jury enters courtroom 3:10 p.m.)
 6               THE COURT:  All right.  Ladies and gentlemen, thank
 7    you very much.  By the time we try to listen with the white
 8    noise, it's just quicker to do it that way.  Thank you.  You
 9    may be seated.  Be seated Ms. Haynes.
10        You may continue, Mr. Budlow.
11               MR. BUDLOW:  Thank you.  May I approach?
12               THE COURT:  Sorry to interrupt you all, but I wanted
13    to clarify an evidentiary matter.  Yes, you may go right
14    ahead.
15    BY MR. BUDLOW:
16    Q.  For the record, I'm showing you 17.6 for ID only.  Do you
17    recognize this as your plea agreement?
18    A.  Yes.
19    Q.  And I just ask you to take a look at the signatures on
20    page 9 and page 5 of the supplement.  That's your signature on
21    both of those?
22    A.  Yes.
23    Q.  What is your understandings of what you are obligated to
24    do under that plea agreement?
25    A.  To tell the truth.
```

```
 1    Q.   If you fulfill your obligations under that plea

 2    agreement, what is your understanding of what the Government

 3    will do for you?

 4    A.   Lower the guidelines and get rid of the mandatory

 5    minimum.

 6    Q.   What do you hope will happen if the Government makes that

 7    motion to lower the guidelines and to change the -- get rid of

 8    the mandatory minimum?

 9    A.   That I'll be able to see my kids grow up.

10    Q.   Has the Government made you any promises about what

11    sentence you will receive if you were to fully cooperate?

12    A.   No.

13    Q.   Who will determine what sentence you will receive?

14    A.   The judge.

15    Q.   What do you understand will happen if you do not tell the

16    truth?

17    A.   That my plea agreement will be null and void.

18    Q.   That cooperation agreement will be torn up?

19    A.   Yeah.

20    Q.   Will you be allowed to withdraw your guilty plea if that

21    happens?

22    A.   No.

23    Q.   And does the Government's making a motion for cooperation

24    depend in anyway on the outcome of any trial?

25    A.   No.
```

```
 1    Q.   That plea agreement, does it include the types of
 2    conduct, or the things that you could do that would violate
 3    the agreement and allow the Government to tear it up?
 4    A.   Yes.
 5    Q.   Does that include you lying?
 6    A.   Yes.
 7    Q.   Does it include you minimizing your own conduct?
 8    A.   Yes.
 9    Q.   And do you understand what it means to minimize your own
10    conduct?
11    A.   Yes.
12    Q.   Does it include falsely implicating someone else?
13    A.   Yes.
14    Q.   Meaning making someone else look guilty who isn't guilty?
15    A.   Yes.
16    Q.   And that would violate your plea agreement?
17    A.   Yes.
18              MR. BUDLOW:  That's all I have.
19              THE COURT:  Thank you, Mr. Budlow.
20         Cross-examination, Ms. Whalen?
21              MS. WHALEN:  Thank you, Your Honor.
22                   C R O S S - E X A M I N A T I O N
23    BY MS. WHALEN:
24    Q.   Good afternoon, Ms. Haynes.  My name is Teresa Whalen and
25    we haven't met before; have we?
```

```
 1    A.    No.

 2    Q.    And you were asked a question about whether you had met

 3    multiple times with law enforcement agents or prosecuting

 4    attorneys, and you said yes, right?

 5    A.    Yes.

 6    Q.    Okay.  And do you know about how many times you've met?

 7    A.    No.

 8    Q.    Ms. Jeffrey, you said was a lifelong friend and a best

 9    friend, right?

10    A.    Yes.

11    Q.    So close that you ran together, hung together, partied

12    together, right?

13    A.    Yes.

14    Q.    And you considered her son, Tone Tone, to be a nephew?

15    A.    Yes.

16    Q.    Was he like a godson as well?

17    A.    Yes.

18    Q.    Now, I'm going to show you a photograph, 16.1.

19    Government's Exhibit 16.1.

20          Does that appear to be a picture of Ms. Jeffrey?

21                THE COURT:  This is Government's Exhibit what again?

22    I'm sorry, Ms. Whalen.

23                MS. WHALEN:  16.1.

24                THE COURT:  All right.  Thank you.

25    BY MS. WHALEN:
```

```
1     Q.   Does that appear to be Ms. Jeffrey?

2     A.   Yes.

3     Q.   Do you recall that from her Facebook page?

4     A.   Yes.

5     Q.   Is that pretty much how she appeared back in 2015?

6     A.   Yes.

7     Q.   Now, yesterday -- or excuse me.

8          Earlier, you were shown a photograph of yourself, and

9    Ms. Jeffrey, and a third woman.

10         Do you recall that?

11    A.   Yes.

12    Q.   And was that a photograph that was placed on a Facebook

13   account?

14    A.   Yes.

15    Q.   Posted on Facebook?

16    A.   Yes.

17    Q.   Did you post it?

18    A.   I don't remember.

19    Q.   And -- but you recognize the picture, right?

20    A.   Yes.

21    Q.   And was that how you appeared back in 2015?

22    A.   Yes.

23    Q.   And again, Ms. -- was that picture taken somewhere in the

24   timeframe of 2015?

25    A.   Yes.
```

```
 1     Q.   Let me show you the third page of 16.1, that's a
 2   photograph of Ms. Jeffrey and Tone Tone, right?
 3     A.   Yes.
 4     Q.   And that appears, maybe, to be Halloween; correct?
 5     A.   Possibly, yes.
 6     Q.   Did you celebrate Halloween with Tone Tone when this
 7   picture -- or the year this picture was taken?
 8     A.   I don't recall.
 9     Q.   Were you part of all of the special occasions in Tone
10   Tone's life?  Birthday parties, that kind of thing?
11     A.   Yes.
12     Q.   Would you consider yourself to be a special aunt back
13   then?
14     A.   Yes.
15     Q.   You've known her about 13 years, right?
16     A.   Yes.
17     Q.   And, of course, Tone Tone all of his life, right?
18     A.   Yes.
19     Q.   And you knew she had gotten involved in drugs at some
20   point; correct?
21     A.   Yes.
22     Q.   She was selling Percocet, right?
23     A.   Yes.
24     Q.   You purchased a Percocet, at least on one occasion from
25   her, right?
```

```
 1    A.    Yes.

 2    Q.    And those Percocets were sold for $20 a piece?

 3    A.    Yes.

 4    Q.    Do you remember whether her prescription bottle was 120

 5    to 130 pills?

 6    A.    Yes.

 7    Q.    And each month she would sell all of them?

 8    A.    Yes.

 9    Q.    So she was bringing in quite a bit of money by selling

10    the pills; correct?

11    A.    Yes.

12    Q.    Do you know if she had a real job, like a job where she

13    went somewhere and got paid a salary?

14    A.    No, she did not.

15    Q.    And at some point her drug dealing began to involve other

16    people; is that right?

17    A.    Yes.

18    Q.    Okay.  So you saw her at some times picking up bags for

19    people and/or money for people?

20    A.    Yes.

21    Q.    All right.  And you also saw her distributing, or

22    selling, or giving drugs to people?

23    A.    Yes.

24    Q.    Other than the Percocet I'm talking about now?

25    A.    Yes.
```

Case 1:20-cr-00139-RDB   Document 233   Filed 06/13/22   Page 43 of 114

43

```
 1    Q.   And so that would be heroin?

 2    A.   Yes.

 3    Q.   Cocaine?

 4    A.   Yes.

 5    Q.   Any other drugs that you recall?

 6    A.   Not that I recall, no.

 7    Q.   But suffice it to say, in all of this activity, you

 8    thought she was making a lot of money, right?

 9    A.   Yes.

10    Q.   She certainly had more money than you?

11    A.   Yes.

12    Q.   You didn't have a job, right?

13    A.   No.

14    Q.   You were on food stamps?

15    A.   Yes.

16    Q.   And how many children did you have at this time?

17    A.   One.

18    Q.   How old was your child?

19    A.   Four.

20    Q.   A son, right?

21    A.   Yes.

22    Q.   Were you the sole support for your son?

23    A.   Yes.

24    Q.   Now, you said it was a five- to ten-minute walk

25    Jennifer's house, right?
```

```
 1      A.   Yes.

 2      Q.   And you walked there many, many times, right?

 3      A.   Yes.

 4      Q.   Did she walk that same distance to your house?

 5      A.   No, she would drive.

 6      Q.   She would drive, okay.

 7           Now, you mentioned that you have some family in the

 8      Cambridge area, right?

 9      A.   Yes.

10      Q.   Did you go there, I think, as a little girl and stay with

11      some family?

12      A.   I used to go visit my grandmother.

13      Q.   And it was a place that you loved and was special to you,

14      right?

15      A.   Yes.

16      Q.   And you were always dreaming to get back to Cambridge;

17      correct?

18      A.   Yes.

19      Q.   And so in February, actually Valentine's Day, you met

20      Andre Briscoe; correct?

21      A.   Yes.

22      Q.   And you didn't know, at the time, that this was a, maybe,

23      second cousin of yours, right?

24      A.   Yes.

25      Q.   But you figured that out, right?
```

```
 1     A.    Yes.

 2     Q.    And then you started a relationship with him?

 3     A.    Yes.

 4     Q.    Now, in February or March of that year, 2015, Andre

 5     Briscoe decided he was going to move back to Cambridge;

 6     correct?

 7     A.    Yes.

 8     Q.    And he did so, right?

 9     A.    Yes.

10     Q.    Now, you knew a person by the name of Tiffany Jackson,

11     right?

12     A.    Yes.

13     Q.    You're looking at me funny.  Did you just know her as

14     Tiffany?

15     A.    Yes, just Tiffany.

16     Q.    Okay.  You didn't know her last name?

17     A.    No.

18     Q.    And she lived in the Perkins Home Projects, right?

19     A.    Yes.

20     Q.    You had been to the that development or, I guess, it's

21     called a project, but you had been there on multiple occasions

22     before 2015; is that right?

23     A.    I don't recall.

24     Q.    Okay.  Had you been in, not necessarily Tiffany's home,

25     but had you been to that location where the apartment
```

```
1    buildings are?
2    A.   Yes.
3    Q.   Okay.  And the reception, cell phone reception, is
4    sometimes spotty there, is it not?
5    A.   I don't know.
6    Q.   At some point in the spring of 2015, Ms. Jeffrey decides
7    that she's going to marry Kester Browne, who is in prison; is
8    that right?
9    A.   Yes.
10   Q.   And she decides she would like to take a road trip with
11   you down to Cambridge, right?
12   A.   Yes.
13   Q.   And that made you all excited because you would be able
14   to get down there again, right?
15   A.   Yes.
16   Q.   Because you didn't have a car?
17   A.   Right.
18   Q.   And that trip was for Ms. Jeffrey to meet family, right?
19   A.   Yes.
20   Q.   And would you call it, kind of, like a bachelorette, sort
21   of?
22   A.   Yes, that's what we called it.
23   Q.   You did, okay?
24        And was it your belief that Ms. Jeffrey was going on that
25   trip to have a one-night stand?
```

```
 1    A.    Possibly.  Knowing her, yes.
 2    Q.    And you say "knowing her," you knew her very well, right?
 3    A.    Yes.
 4    Q.    And you believed that she would have sex with just about
 5    anybody, right?
 6    A.    Yes.
 7    Q.    Including your boyfriend, right?
 8    A.    Yes.
 9    Q.    Was that a bone of contention for you?
10          In other words, you would get upset with Ms. Jeffrey for
11    doing that kind of thing, right?
12    A.    Yes.
13    Q.    And that kind of -- can I call it annoyance with her or
14    anger with her?  Would anger really be the proper term for
15    someone that sleeps with your boyfriend?
16    A.    Yes.
17    Q.    And especially if that's your best friend, right?
18    A.    Yes.
19    Q.    Okay.  So that kind of anger occurred on more than one
20    occasion; did it not?
21    A.    No.
22    Q.    How many times did you get angry at her for sleeping with
23    someone?
24    A.    With my boyfriend?
25    Q.    With someone, anyone.  Let's start there.
```

```
 1    A.    Oh, yes that happened more than once.

 2    Q.    And did it happen more than once with your boyfriend or

 3    just once?

 4    A.    Just once.

 5    Q.    During this trip, you and Ms. Jeffrey decide that you

 6    were going to help her make a -- I believe it was a wedding

 7    veil; is that correct?

 8    A.    Yes.

 9    Q.    And you had some skills, I guess, with a sewing machine?

10    A.    Yes.

11    Q.    So you stop off at a store, and you get the lace or

12    material, and you help her make that veil?

13    A.    Yes.

14    Q.    Now, she was, kind of, a flirtatious type; is that

15    correct?

16    A.    Yes.

17    Q.    People gravitated to her?

18    A.    Yes.

19    Q.    And when you brought her down to Cambridge, all of the

20    guys wanted to talk to her, right?

21    A.    Yes.

22    Q.    And Cambridge is, kind of, a small community, at least in

23    this group; is that correct?

24    A.    Yes.

25    Q.    And so this was the new girl in town, right?
```

```
 1    A.    Yes.

 2    Q.    And the night of Ms. Jeffrey's wedding, do you recall

 3    that Tony and Andre came back to Baltimore from Cambridge, and

 4    stayed with Ms. Jeffrey?

 5    A.    Yes.

 6    Q.    There was a point in time when Ms. Jeffrey and Tony began

 7    to see each other romantically; right?

 8    A.    Yes.

 9    Q.    And was that a fairly frequent occurrence to your memory,

10    that they would see each other?

11    A.    Yes.

12    Q.    Tony has now been introduced to you as, also, a new

13    cousin that you didn't know about from Cambridge, right?

14    A.    Yes.

15    Q.    And at some point you learned that Ms. Jeffrey was having

16    communication with Tony, and you were not involved in it,

17    right?

18    A.    Can you repeat that?

19    Q.    At some time you learned that Ms. Jeffrey was talking

20    with Tony, and you were not a part of those conversations?

21    A.    No.

22    Q.    No?

23    A.    No.

24    Q.    So you were always on a three-way with Tony and

25    Ms. Jeffrey when they spoke?
```

```
 1    A.   No, I was not.
 2    Q.   At some point did you learn that Ms. Jeffrey was seeing
 3    the Cambridge -- whether it be Tony or Andre -- and you were
 4    not a part of that meeting?
 5    A.   No, I was always there.
 6    Q.   All right.  You came to know a person by the name of CJ
 7    Williams, right?
 8    A.   Yes.
 9    Q.   And Mr. Williams, at some point, moved into the basement
10    of Ms. Jeffrey's apartment?
11    A.   Yes, house.
12    Q.   House, excuse me.
13         And Mr. Williams was involved in the drug trade, right?
14    A.   Yes.
15    Q.   And you knew that Jennifer began helping him out with his
16    drug trade, right?
17    A.   Yes.
18    Q.   There came a point that you were mad at Jennifer and you
19    de-friended her from your Facebook account; correct?
20    A.   Yes.
21    Q.   And around that same time, Andre knew, Andre Briscoe,
22    knew that you and Jennifer were having words or having
23    problems, right?
24    A.   Yes.
25    Q.   And you were telling him about it, right?
```

```
 1    A.    Yes.
 2    Q.    Because you wanted him to know what Jen was doing that
 3    you didn't like, right?
 4    A.    Yes.
 5    Q.    You wanted your cousin, Andre Briscoe, to know that she
 6    was not being nice to you, right?
 7    A.    Yes.  Well, she would do it in front of their faces,
 8    so...
 9    Q.    And sometimes she -- so she would do it in front of their
10    faces?  What is the "it" that she was doing that would make
11    you angry?
12    A.    She would say certain things, like calling me broke, or
13    say that she was going to the store to get -- purchase
14    something to eat that was expensive, and I couldn't take part
15    of it because I was a quote/unquote, in her words, broke
16    bitch.
17    Q.    So things like she would say, I'm going to go eat, steak
18    and get some champagne, but you got to go use your food,
19    stamps, right?
20    A.    Yes.
21    Q.    And that was a routine thing that she would do?
22    A.    No.
23    Q.    But flaunting her money in front of you when you had
24    none, that became somewhat routine; did it not?
25    A.    Yes.
```

```
 1    Q.   And that was making you even more angry, right?
 2    A.   I guess, yes.
 3    Q.   And I'm going to ask you to really think hard about 2015,
 4    you weren't happy with her one bit, right?
 5    A.   No.
 6    Q.   And in that same timeframe, you had been fronted, in
 7    other words, Jennifer gave you a Percocet pill, and you owed
 8    her $20, right?
 9    A.   Yes.
10    Q.   And you never paid that -- well, for a long period of
11    time, you never paid that $20, right?
12    A.   Yes.
13    Q.   And she kept hounding you for that $20, right?
14    A.   Yes.
15    Q.   And you thought that was really unfair?
16    A.   Yes.
17    Q.   And you made sure to post it on Facebook because you
18    thought it was so unfair, you wanted others to know what she
19    was doing?
20    A.   I don't recall that, but --
21    Q.   You don't recall putting it on Facebook?
22    A.   No, I don't.
23    Q.   All right.  And do you recall that you wanted Tony and
24    Andre to know the real Jennifer Jeffrey, who was hounding you
25    for $20 for a Percocet pill?
```

```
 1    A.    She would do it in their face, so...

 2    Q.    So you didn't have to go follow up, is that what you're

 3    saying?

 4    A.    No.

 5    Q.    Now, at some point, you knew that CJ Williams, through

 6    Jennifer, was giving Tony some drugs, right?

 7    A.    Yes.

 8    Q.    And Andre Briscoe wanted to get drugs in the same manner,

 9    in other words, from CJ Williams, to Jen, to him?

10    A.    Yes.

11    Q.    Now, about this anger that we were talking about with

12    regard to the Percocet pill and the things that Jennifer was

13    saying to you, that all began about what, like 30, 45 days

14    before she was killed, right?

15    A.    Yes.

16    Q.    During that timeframe, you also knew she had a gun in her

17    purse, right?

18    A.    Yes.

19    Q.    And she actually pulled the gun on you at one point,

20    right?

21    A.    No, she did not.

22    Q.    She didn't pull it on you?

23    A.    No.

24    Q.    Did you tell law enforcement on July 15, 2020, that she

25    pulled the gun on me for that $20 bill?
```

```
1    A.   No, I did not.

2    Q.   You're sure of that, right?

3    A.   I'm sure.  She threatened with me with the gun, she did

4    not pull it on me.

5    Q.   Tell me how she threatened you with the gun?

6    A.   We were arguing, and I told her to pull the car over, I

7    was going to beat her ass, and she said, Oh, I'm too cute to

8    fight, but you know what I keep in my purse.  And I told her

9    that her hands better not move off that steering wheel.

10   Q.   And what was going to happen if her hands did move from

11   the steering wheel?

12   A.   Then we was all going over the bridge.

13   Q.   And didn't you want her to pull the car over so you could

14   fight her?

15   A.   Yes.

16   Q.   And had she pulled the car over, you were going to fight

17   her, right?

18   A.   Yes.

19   Q.   And by fight, I don't mean a sissy way of fighting with

20   words, right?  You were going to fight her with your arms,

21   your hands, your body, whatever you had, right?

22   A.   Yes.

23   Q.   You were going to punch her?

24   A.   Yes.

25   Q.   Beat her?
```

```
 1      A.   Yes.
 2      Q.   Now, you did ultimately get $20 to pay Ms. Jeffrey back,
 3      right?
 4      A.   Yes.
 5      Q.   And you held onto it for a few days rather than just
 6      giving it to her, right?
 7      A.   No.
 8      Q.   Did you tell law enforcement that you held onto it for a
 9      few days?
10      A.   I don't recall, no.
11      Q.   Detective Lewis from the Baltimore City Police
12      Department, do you remember saying that to him?
13      A.   No, I don't.
14      Q.   And then you ended up paying her back, right?
15      A.   Yes.
16      Q.   And do you remember you thought that Jennifer Jeffrey
17      thought things were fine now between you, but it wasn't fine
18      for you, right?
19      A.   No.
20      Q.   All right.  You still were holding that grudge, right?
21      A.   Yes.
22      Q.   And you were angry still that you even had to pay 20
23      bucks back, right?
24      A.   No, I was not angry about having to pay the 20 bucks
25      back.
```

```
1    Q.   Well, she didn't need $20?

2    A.   No, she didn't.

3    Q.   And you had asked for some help with rent, but she

4    wouldn't help with rent either, right?

5    A.   Right.

6    Q.   Now, on May 26th of 2015, Mr. Briscoe came to see you,

7    right?

8    A.   Yes.

9    Q.   And at that point, you had paid $50 for a HAC to get him

10   to Baltimore, right?

11   A.   Yes.

12   Q.   You spent some time together on that day, right?

13   A.   Yes.

14   Q.   But then in the evening hours, some time late 10:30,

15   11:00, something like that, he's decides he's going to go to

16   Jennifer's house, right?

17   A.   Yes.

18   Q.   And that instantly made you mad, right?

19   A.   No.

20   Q.   How long did it take before you got mad?

21   A.   Probably about 4 o'clock in the morning, 3:00 or

22   4 o'clock in the morning.

23   Q.   And during that timeframe, you realized he's not coming

24   back, right?

25   A.   Yes.
```

```
 1     Q.   And you knew from Tony Harris, that there was a rumor
 2     that Andre Briscoe was having sex with Jennifer Jeffrey,
 3     right?
 4     A.   I don't remember who I heard that rumor from, but yes, I
 5     knew it was a rumor.
 6     Q.   All right.  So now you're thinking, he's not coming back,
 7     so you start calling him, right?
 8     A.   Yes.
 9     Q.   And you called him multiple times; correct?
10     A.   Yes.
11     Q.   But he wasn't answering, right?
12     A.   No.
13     Q.   And then you started calling Ms. Jeffrey, but she didn't
14     answer; correct?
15     A.   I don't recall calling Jennifer until I got outside her
16     house.
17     Q.   And tell us about going over to her house?
18     A.   I walked up there.  I banged on the door.  I demanded for
19     Andre to come outside.  I called Jennifer's phone.  Jennifer
20     niece came down to the door, she did not open it, she just
21     screamed through the door, Kiara, you need to go home, there's
22     kids in here sleep.  And I said, I don't care, tell Andre to
23     come outside.  And she said, He's not coming outside.  You
24     need to go home or I'm going to call the police, and I went
25     home.
```

```
1    Q.   Now, it was about a -- you told us earlier it was about a
2    10 or 15 minute event, right?
3    A.   Yes.
4    Q.   So for ten minutes, you are yelling at Andre to come out,
5    right?
6    A.   Yes.
7    Q.   And you're saying, I know he's in there, right?
8    A.   Yes.
9    Q.   And you're not talking like you're talking today;
10   correct?
11   A.   No.
12   Q.   You're yelling at the top of your lungs, right?
13   A.   Yes.
14   Q.   You wanted to make sure he heard you, right?
15   A.   Right.
16   Q.   Because you believed he was in there --
17   A.   Yes.
18   Q.   -- correct?
19        And you actually believed he was in Ms. Jeffrey's bed
20   with her?
21   A.   I don't know what I believed at the time.
22   Q.   Well, you heard the rumor and you walked over to her
23   house, right, to get him out of there, right?
24   A.   Yes.
25   Q.   You wanted to make sure that she wasn't sleeping with
```

```
1    your boyfriend again, right?

2    A.   Yeah.

3    Q.   All right.  And that yelling went on for 10 to

4    15 minutes, right?

5    A.   Yes.

6    Q.   And Ms. Street is yelling back at you to get out of

7    there, right?

8    A.   Yes.

9    Q.   She's going to call the police, right?

10   A.   Yes.

11   Q.   And you're actually saying, Call the police.  I don't

12   care, right?

13   A.   I don't recall.

14   Q.   What else did you say while banging on that door?

15   A.   I don't recall.

16   Q.   Well, that banging on the door wasn't just like a knock,

17   like this?  (Indicates.)

18   A.   No, it was not.

19   Q.   Okay.  Tell us what it was like.

20   A.   I was banging on the door.

21   Q.   Banging on the door so loud that Brianna Street is going

22   to call the police on you, right?

23   A.   Yes.

24   Q.   And did you know that Jennifer Jeffrey had pulled her gun

25   inside the house?
```

```
1    A.    No.
2    Q.    Did you try to open the door while you were banging on
3    it?
4    A.    I don't recall.
5    Q.    Do you remember if you opened the screen door and banged
6    on the wooden door?
7    A.    I don't even recall if there was a screen door or not.
8    Q.    All right.  Did it hurt your hand the number of times you
9    banged?
10   A.    I don't recall.
11   Q.    Well, I'm going to ask you to think back.  The next
12   day -- well, really hours after, does your hand hurt because
13   you banged on it so much?
14   A.    I don't recall.
15   Q.    Now, you've told us that sometime in the early morning
16   hours after this incident of you banging on the door and
17   yelling, Mr. Briscoe came back to your home, right?
18   A.    Yes.
19   Q.    And he called you to say, I'm coming, right?
20   A.    Yes.
21   Q.    And he told you that you needed to apologize, that it was
22   disrespectful?
23   A.    Yes.
24   Q.    He said it was disrespectful to the kids, too, right?
25   A.    Yes.
```

```
 1    Q.   And he told you that he -- that this was something that
 2    basically you shouldn't have done, right?
 3    A.   He said I was going to mess everything up.
 4    Q.   Right.  And he had already told you that he wanted to
 5    have CJ and Jen give him drugs, right?
 6    A.   No, that's not what he told me before he went over there.
 7    No, it's not.
 8    Q.   So you knew that he was selling small amounts of heroin,
 9    right?
10    A.   Yes.
11    Q.   Now, do you remember that after he told you should
12    apologize, you were like, No, I'm not going to do that?
13    A.   Yes.
14    Q.   And you were kind of known for flying off the handle like
15    that, right?
16    A.   No.
17    Q.   Well, do you remember telling Detective Lewis that you
18    were known for that, when you were talking about the banging
19    incident?
20    A.   No, I don't.
21            MS. WHALEN:   Court's indulgence.
22    BY MS. WHALEN:
23    Q.   You know that the interview with Detective Lewis was
24    recorded back in May of 2015?
25    A.    No, I didn't.
```

```
 1    Q.   Let me show you --

 2              MS. WHALEN:  Counsel, it's page 38, and this is for

 3    identification only.  Exhibit 66 for identification only.

 4              THE COURT:  All right.  Defense Exhibit 66 for

 5    identification only.

 6    BY MS. WHALEN:

 7    Q.   I'm going to ask you to read this paragraph right here,

 8    please, to yourself.

 9              MR. BUDLOW:  Ms. Whalen, can you tell me the first

10    number of that paragraph.  There's numbers on it.

11              MS. WHALEN:  Middle paragraph.

12              MR. BUDLOW:  Okay.  Thanks.

13              THE COURT:  You've shown her Defendant's Exhibit 66

14    to refresh her recollection with respect to what was said?

15              MS. WHALEN:  Yes, Your Honor.

16              THE COURT:  All right.  That is not a statement

17    under oath; correct?

18              MS. WHALEN:  That's correct, Your Honor.

19              THE COURT:  Okay.  Fine.

20    BY MS. WHALEN:

21    Q.   And does that help you remember that during the

22    conversations with Detective Lewis about the this incident of

23    you banging on the door, you let him know that you were acting

24    crazy and you were known for that?

25    A.   Yes.
```

```
 1    Q.   You never did apologize; did you?
 2    A.   No.
 3    Q.   Now, at some point, Mr. Briscoe went to the store or the
 4    bar, it's the same thing; correct?
 5    A.   Yes.
 6    Q.   And he came back with a bottle, you believe?
 7    A.   Yes.
 8    Q.   And cigarettes?
 9    A.   Yes.
10    Q.   Now, do you recall that, again, that May discussion with
11    Detective Lewis, that you actually indicated that he didn't
12    really go anywhere else, you two caught HAC and you went down
13    to Perkins Homes?
14    A.   Yes, I lied.
15    Q.   When Mr. Briscoe came back to your house in the early
16    morning hours or at any time that day, there was no blood on
17    him, right?
18    A.   Not that I recall, no.
19    Q.   You would have seen that, right?
20    A.   Yes.
21    Q.   After you learned that Ms. Jeffrey and her son had been
22    killed, there were rumors flying everywhere, right?
23    A.   Yes.
24    Q.   Rumors that you were involved; correct?
25    A.   Yes.
```

```
1    Q.   And, in fact, her family contacted you and others in
2    Cambridge, and claimed that you were involved in this?
3    A.   Yes.
4    Q.   And they also said that they knew that Andre Briscoe had
5    met Ms. Jeffrey through you, right?
6    A.   Yes.
7    Q.   And they also told you that he was there the whole night
8    before?
9    A.   Yes.
10   Q.   And they were asking, What happened?  What did you guys
11   do?  Did you have anything to do with it?  Right?
12   A.   Yes.
13   Q.   And it got a little ugly with Danielle Wilder, the sister
14   of Ms. Jeffrey; did it not?
15   A.   Not really, no.
16   Q.   Well, she was accusing you of killing your best friend,
17   right?
18   A.   She was accusing me of knowing something about it.
19   Q.   Okay.  And she -- the two of you had conversation on a
20   Facebook post, messaging, back and forth about this, right?
21   A.   Yes.
22   Q.   And you told her you had nothing to do with it?
23   A.   Yes.
24   Q.   And you couldn't believe that she would, in any way,
25   infer that you did have something to do with it, right?
```

```
 1     A.    Yes.

 2     Q.    And you told her that over and over again, right?

 3     A.    Yes.

 4     Q.    And you didn't go to Ms. Jeffrey's funeral?

 5     A.    No, I did not.

 6     Q.    Tone Tone's funeral?

 7     A.    No.

 8     Q.    There were other rumors swirling around, too, besides you

 9     and Mr. Briscoe might have had something to do with this,

10     right?

11     A.    I think, I'm not sure.

12     Q.    Do you remember rumors relating to other drugs being in

13     the house?

14     A.    Other drugs being in the house?

15     Q.    Yes, Ms. Haynes.

16     A.    Yes.

17     Q.    So there was just regular news media accounts; correct?

18     A.    Regular what?

19     Q.    News media accounts on regular TV, right, of what

20     happened?

21     A.    Yes.

22     Q.    There was also social media postings about what happened,

23     right?

24     A.    Yes.

25     Q.    And did you see things on YouTube as well?
```

```
1    A.    No.

2    Q.    So people in your community were talking about it;

3    correct?

4    A.    Yes.

5    Q.    I'm going to show you what is Defendant's Exhibit 125.

6    So Ms. Haynes, whether you remember the dates or not, in May,

7    shortly after the murders of Jennifer and Tone Tone, you

8    talked to Detective Lewis from the Baltimore Police

9    Department, right?

10   A.    Yes.

11   Q.    And in that timeframe or during that statement, you had

12   learned from Jennifer's family that he might want to talk to

13   you, right?

14   A.    Yes.

15   Q.    So you contact him and say, I want to come in and talk to

16   you, right?

17   A.    Yes.

18   Q.    You knew that Detective Lewis, or whoever from the police

19   department, knew about the incident where you had gone over at

20   4:00 in the morning, screaming and ranting at Jennifer, right?

21   A.    Yes.

22   Q.    And so you knew at that point that they might be looking

23   at you, right?

24   A.    Yes.

25   Q.    But after you gave your statement to Detective Lewis on
```

```
 1      May 29th of 2015, nobody asked to search your phone; did they?

 2      A.   No.

 3      Q.   Nobody asked to come and search your house; did they?

 4      A.   No.

 5      Q.   And they didn't get a search warrant that allowed them to

 6      break the door down and look in your house, right?

 7      A.   No.

 8      Q.   And they didn't get a search warrant, at that time, that

 9      allowed them to go through your phone, right?

10      A.   No.

11      Q.   Okay.  During that statement to Detective Lewis, you

12      say -- you tell them about the banging incident, right?

13      A.   Yes.

14      Q.   And you tell him about Andre Briscoe being there the

15      night before, right?

16      A.   Yes.

17      Q.   And you tell him that Andre came back in the morning,

18      right?

19      A.   Yes.

20      Q.   And you tell him that Andre didn't have anything from

21      Jennifer's house or anything in his hands when he came back,

22      right?

23      A.   Yes.

24      Q.   And you say that at some point you may have had sex with

25      Andre, right?
```

```
 1    A.    Yes.

 2    Q.    And you say that you slept a bit, right?

 3    A.    Yes.

 4    Q.    And then you and he caught a HAC?  He to Perkins Homes

 5    and you to Tiera's house, right?

 6    A.    Yes.

 7    Q.    That was the statement on May 29th of 2015, in sum and

 8    substance, right?

 9    A.    Uh-huh.

10    Q.    Okay.  And after that, you don't hear from law

11    enforcement again until Special Agent Weaver comes to you when

12    you were living in Pennsylvania, right?

13    A.    Yes.

14    Q.    And that, do you recall, being February 24th of 2020?

15    A.    Yes.

16    Q.    All right.  Now, would you agree with me, Ms. Haynes,

17    that if the statement that you made to Detective Lewis in May

18    of 2015 was the truth, then mostly everything that you said

19    about Andre Briscoe's conduct with regard to these murders is

20    a lie?

21              MR. BUDLOW:  Objection.

22              THE COURT:  Overruled.  Overruled.

23              THE WITNESS:  I lied in 2015, I did not tell the

24    truth to Detective Lewis.

25    BY MS. WHALEN:
```

 1    Q.   And if it were the truth, the other things are the lies,

 2    right?

 3    A.   It was not.  I did not tell the truth in 2015.

 4    Everything I'm saying today is the truth.

 5    Q.   Now, let's go to February of 2020, okay?

 6         Special Agent Weaver comes to your house, you say to him,

 7    Andre Briscoe left, went to the store or the bar, and he came

 8    back with a bottle in his pocket, right?

 9    A.   Uh-huh.

10    Q.   And you don't say anything more, except for that you guys

11    catch a HAC, right?

12    A.   Yes.

13    Q.   Okay.  So in February of 2020, when you first talk to ATF

14    Agent Weaver, that's what you said, right?

15    A.   Yes.

16    Q.   And then July 15th of 2020, you are now interviewed, but

17    you have a lawyer, right?

18    A.   Yes.

19    Q.   And his name was Henslee, right?

20    A.   Yes.

21    Q.   That is because you had received a Grand Jury summons,

22    right?

23    A.   Yes.

24    Q.   Then you were entitled to have a lawyer appointed for

25    you; correct?

```
 1    A.    Yes.

 2    Q.    Now, you certainly met with Mr. Henslee before you were

 3    going to testify before the Grand Jury, right?

 4    A.    No.

 5    Q.    Never met with him at all?

 6    A.    No.

 7    Q.    Did you meet with him here at the courthouse with the

 8    U.S. attorneys?

 9    A.    Yes.

10    Q.    And maybe Special Agent Weaver too, right?

11    A.    Yes.

12    Q.    And did you talk to him about what is happening?

13    A.    Yes.

14    Q.    And on July 15th of 2020, you tell everyone that, Andre

15    Briscoe came back to my house.  He left, went to the store or

16    the bar, came back, later we caught a HAC, went down to

17    Perkins Home, right?

18    A.    Yes.

19    Q.    And that's with your lawyer present, right?

20    A.    Yes.

21    Q.    And certainly your lawyer said, Hey, you're going to have

22    to testify under oath, you better give it up, right?

23              MR. BUDLOW:   Objection to any communication

24    between --

25              THE WITNESS:   No.
```

```
 1              MS. WHALEN:  I can rephrase.

 2              THE COURT:  Overruled.  Overruled.  Just rephrase --

 3      sustained.  Rephrase the question.

 4              MS. WHALEN:  Thank you, I will.

 5              THE COURT:  Ask the question.  Rephrase the

 6      question.  Don't discuss what she discussed with her lawyer,

 7      just rephrase the question.

 8              MS. WHALEN:  Thank you, Your Honor.

 9      BY MS. WHALEN:

10      Q.   You knew that you were ultimately going to have to

11      testify under oath about all of this, right?

12      A.   Yes.

13      Q.   And that you could be subject to perjury charges if you

14      lied, right?

15      A.   Yes.

16      Q.   And you knew, I imagine, that perjury carries up to a

17      maximum of ten years in jail, right?

18      A.   Yes.

19      Q.   And who knows what else could have happened if you lied

20      besides the perjury, right?

21      A.   Yes.

22      Q.   So this is July 15, 2020, right?

23      A.   Uh-huh.

24      Q.   And then you come back July 22nd, 2020, and that's the

25      Grand Jury, right?
```

```
 1    A.    Yes.
 2    Q.    Now, before you go to the Grand Jury, you sit down again
 3    with prosecutors, Special Agent Weaver, and you still have
 4    Mr. Henslee with you, right?
 5    A.    Yes.
 6    Q.    And in that conversation -- actually, it kind of went on
 7    for a little bit of time, right?
 8    A.    Yes.
 9    Q.    Maybe a couple of hours?
10    A.    Yes.
11    Q.    And you still knew the same thing that you knew like a
12    week before, which is that if you lied before the Grand Jury
13    you would be in trouble, right?
14    A.    Yes.
15    Q.    In that interview before you testified before the Grand
16    Jury, you for the very first time say, Andre left to get some
17    drugs from Jennifer, right?
18    A.    Yes.
19    Q.    But actually, that came out after you took a break with
20    Mr. Henslee, and came back in and someone discussed that you
21    were concerned about being in trouble for your previous lies
22    or statements, right?
23    A.    Yes.
24    Q.    So it wasn't until you are told you're not going to get
25    in any trouble, that you then say, that he left to get some
```

```
 1    drugs from Jennifer, right?

 2    A.   I don't recall being told I wasn't going to get in any

 3    trouble.

 4    Q.   You don't recall agents, or -- Special Agent Weaver, or

 5    one of the prosecutors saying that?

 6    A.   No.

 7    Q.   In this very first time, after you spoken to Mr. Henslee,

 8    you say, He was going to take the drugs.  He came back with a

 9    bag that had an imprint of a gun in it, right?

10    A.   Yes.

11    Q.   An imprint of a gun, right?

12    A.   Yes.

13    Q.   And you had -- you said you didn't see the inside of the

14    bag?

15    A.   Yes.

16    Q.   And he had a second bag, right?

17    A.   Yes.

18    Q.   So this is the very first time you're saying this?

19    A.   Yes.

20    Q.   Now, you want to be a witness at this point, right, like

21    you don't want to get charged with any crime; correct?

22    A.   Correct.

23    Q.   And you know that currently you are just a witness for

24    the Grand Jury, right?

25    A.   Yes.
```

```
1    Q.   You're not being charged, right?

2    A.   Right.

3    Q.   So you give them that kind of information on this

4    occasion, right, that there was an imprint of a gun?

5    A.   Yes.

6    Q.   But you also tell them earlier in the interview that he

7    said he got some drugs, but not everything, do you remember

8    that?

9    A.   No, I don't remember that.

10   Q.   Don't you remember telling them that it was at lie later,

11   that he didn't say, I got some drugs, but not all of them?

12   A.   I don't recall saying that.

13            MS. WHALEN:   Court's indulgence.  This is for

14   identification only.  Government 70 and it's page 3.

15            MR. BUDLOW:   70?

16            MS. WHALEN:   70.

17            THE COURT:   What exhibit is this, Ms. Whalen?

18            MS. WHALEN:   Your Honor, it is Defendant's Exhibit

19   for identification only, 70.

20            THE COURT:   Okay.

21   BY MS. WHALEN:

22   Q.   I'm going to show you, Ms. Haynes, and direct your

23   attention to .11, please.  Take a look at that and read it to

24   yourself?

25   A.   I don't recall saying it.
```

```
 1    Q.   At all?

 2    A.   No, I don't.

 3    Q.   Okay.  You do not recall, at this time, saying, She gave

 4    me some --

 5              THE COURT:  Ms. Whalen, is that Grand Jury testimony

 6    under oath or is it just a statements?

 7              MS. WHALEN:  It's a statement, Your Honor.

 8              THE COURT:  You cannot read from it, it's not in

 9    evidence.

10              MS. WHALEN:  Just making sure that --

11              THE COURT:  No, you can't read from it and ask for

12    her to respond.  It's not appropriate.  It was not given under

13    oath.

14    BY MS. WHALEN:

15    Q.   I won't, but I want to clarify and make sure you don't

16    recall saying --

17    A.   I said I don't recall.

18    Q.   Okay.  Now, you go into the Grand Jury on that same day,

19    July 22nd, 2020; correct?

20    A.   Yes.

21    Q.   And basically what you say there --

22              MS. WHALEN:  Court's indulgence.

23    BY MS. WHALEN:

24    Q.   -- is similar to what you had finally revealed in this

25    meeting, right?
```

```
 1    A.    Yes.
 2    Q.    Now, you never said you went back to Tiffany's house when
 3    you testified in the Grand Jury; correct?
 4    A.    Correct.
 5    Q.    And you never said that you contacted Tarrell and that
 6    you got a gun, right?
 7    A.    Correct.
 8    Q.    And you did say, however, that Andre Briscoe had the bags
 9    when he got out at Perkins Homes to go to Tiffany's house,
10    right?
11    A.    Yes.
12    Q.    Now, at some point on October 15th, I believe it was, you
13    met with the Defense investigator; correct?
14    A.    Yes.
15    Q.    And on that occasion you told the investigator that you
16    caught this HAC --
17              MR. BUDLOW:  Objection.  Did you say this?
18              THE COURT:  Just a minute, Mr. Budlow.  This is,
19    again, a statement that you believe was made, but is not a
20    statement under oath; is that correct?
21              MS. WHALEN:  That's correct, Your Honor.
22              THE COURT:  All right.  Then you can't go into the
23    contents of it.  If it was under oath, it's a different
24    matter.  You can ask her the topics.
25              MS. WHALEN:  And that's, I think, what I'm doing.
```

```
 1              THE COURT:  That's fine.  Objection is sustained in
 2    that regard.
 3              MS. WHALEN:  Thank you.
 4    BY MS. WHALEN:
 5    Q.   You talked to the investigator, right?
 6    A.   Yes.
 7    Q.   And he asked you questions about what happened on the
 8    27th, right?
 9    A.   Yes.
10    Q.   And you told him that you caught a HAC, right, with
11    Andre?
12    A.   Yes.
13    Q.   And you also told him he didn't have a gun, right?
14    A.   Yes.
15    Q.   And he didn't have any bags with drugs, right?
16    A.   Yes.
17    Q.   And this was after, of course, in time you had testified
18    before the Grand Jury, right?
19    A.   Yes.
20    Q.   Now, you don't have a deal with the Government at all at
21    this point, right?
22    A.   No.
23    Q.   And at some point, and I believe it was on December 1st
24    of 2020, you get what's called a target letter; correct?
25    A.   Yes.
```

```
 1    Q.   And a target letter is a letter to you informing you that
 2    you may be charged with a crime and suggesting you get a
 3    lawyer; correct?
 4    A.   Yes.
 5    Q.   So you took that pretty seriously because now you're not
 6    going to be just a witness, you're going to be maybe charged
 7    with a crime, right?
 8    A.   Yes.
 9    Q.   So you got appointed a different lawyer; correct?
10    A.   Yes.
11    Q.   And that was Mr. Ruter, right?
12    A.   Yes.
13    Q.   And at this point, you learn that the Government wants to
14    talk to you again, right?
15    A.   Yes.
16    Q.   And you, of course, met with Mr. Ruter and talked to him
17    about all of these circumstances, right?
18    A.   We spoke over the phone.
19    Q.   Of course, this is all during the pandemic, right?
20    A.   Yes.
21    Q.   December 9th of that same year, you met with a Defense
22    investigator again, right?
23    A.   Yes.
24    Q.   And pretty much nothing -- he asked you questions, right?
25    A.   Yes.
```

```
1    Q.   All right.  And nothing really changed in your story,
2    right?
3    A.   Yes, it did.
4    Q.   Not about Andre Briscoe and a gun or --
5    A.   I told him that Andre had a bag of drugs when he --
6    Q.   You told that to the Defense investigator?
7    A.   Yes.
8    Q.   Okay.  Now, you're still not talking about that gun,
9    right?
10   A.   No.
11   Q.   And so on March 8th of 2021, you and Mr. Ruter come back
12   down here to Baltimore, and you then meet with the Government?
13   A.   Yes.
14   Q.   Special Agent Weaver, right?
15   A.   Yes.
16   Q.   And now you know that the Government knows about a gun,
17   right?
18   A.   Yes.
19   Q.   So you know now things are going to be worse for you;
20   correct?
21   A.   Yes.
22   Q.   And you know now, that they're going to confront you with
23   the fact that you got a gun, right?
24   A.   I'm not sure if I knew that or not, I don't recall.
25   Q.   All right.  But certainly things are tightening up and
```

```
 1    getting a little bit worse at that point, right?
 2    A.   Yes.
 3    Q.   You could be charged with a crime; correct?
 4    A.   Yes.
 5    Q.   At this interview, you say now, the imprint of the gun
 6    was a lie.  He had a gun, right?
 7    A.   Yes.
 8    Q.   You own up to the gun finally, right?
 9    A.   Yes.
10    Q.   You come back in on May 15th, 2021, with Mr. Ruter,
11    right?
12    A.   Yes.
13    Q.   And they now play you that call with Tariek and Tarrell,
14    right?
15    A.   Yes.
16    Q.   After they play you that call, you have a discussion
17    about the gun, right?
18    A.   Yes.
19    Q.   But now, you also tell them for the very first time, that
20    you overheard a telephone call between Jennifer and Mr.
21    Briscoe --
22    A.   No.
23    Q.   -- regarding a ride?
24         Did you say no?
25    A.   No, I told them that on the 8th as well.
```

```
1    Q.   You're sure of that?

2    A.   I'm positive.

3    Q.   And in that telephone conversation, there was discussion

4    about a ride back to Cambridge?

5    A.   Yes.

6    Q.   And it made you mad, and that was because you thought

7    that Andre could get a ride back for free with Jennifer;

8    correct?

9    A.   That's because he asked me to pay $50 for him to ride

10   back to Cambridge.

11   Q.   And you also said to the agents and prosecutors, that he

12   was going to meet his connect, meaning CJ Williams, get some

13   drugs, and go to Cambridge, right?

14   A.   I'm not sure if that's how I worded it, no.

15   Q.   But the sum and substance of that was what was going to

16   happen is what you told them, right?

17   A.   No.

18   Q.   You told him he was going to meet Jennifer's connect,

19   right?

20   A.   I'm not sure.

21   Q.   And you told them that he was going to get some drugs,

22   hopefully, from Jennifer or her connect?

23   A.   Or that he was going to try to butter her up for the

24   drugs, to get the drugs from her.  Yes, I said that.

25   Q.   And did you say, also, that he was going to go sell them
```

```
 1    in Cambridge or words to that effect?
 2    A.    Probably so, yes.
 3    Q.    Now, you still don't have a deal with the Government at
 4    that point, right?
 5    A.    No.
 6    Q.    But you know that things are tightening a little bit
 7    tighter, right?
 8    A.    Yes.
 9    Q.    All right.  Now, in all of these meetings that we're
10    taking about, people would say to you things suggesting that
11    maybe there was more you knew, right?
12    A.    Yes.
13    Q.    And that went on over and over again, right?
14    A.    Yes.
15    Q.    And you would have discussions with your lawyer not --
16    don't tell me what he said to you, but you would have
17    discussions relating to the fact that they keep wanting to
18    talk to me, right?
19    A.    I guess so.  I'm not sure.
20    Q.    Okay.  But they -- they weren't -- they weren't satisfied
21    with everything that you were saying; correct?
22    A.    Correct.
23    Q.    And at this point, are you beginning to feel like you are
24    no longer a witness but you might get charged?
25    A.    I always knew I was going to get charged.
```

```
 1    Q.   And then on June 18th of 2021, you're actually arrested

 2    in Houston, Texas?

 3    A.   No, Richardson, Texas.

 4    Q.   Richardson, pardon me.  Is that near Houston?

 5    A.   No.

 6    Q.   And you had moved down to Texas?

 7    A.   Yes.

 8    Q.   When did you move there?

 9    A.   February 28th.

10    Q.   Long distance from Baltimore, right?

11    A.   Yes.

12    Q.   You're trying to put this all behind you?

13    A.   No, I was trying to get my kids settled in Texas because

14    I knew that I was going to get arrested.

15    Q.   And so then following the last of the -- not the last,

16    but the timeline, September 10th of '21, you and Mr.

17    Proctor -- another lawyer who was appointed for you -- came in

18    to speak with the Government; correct?

19    A.   Yes.

20    Q.   And for the first time in this meeting, you still --

21    well, strike that.

22         You still don't have a deal with the Government, right?

23    A.   No.

24    Q.   You know that they're not satisfied with everything that

25    you're telling them, right?
```

1    A.   I guess.  I don't know.

2    Q.   And for the very first time, you talk again about that

3    call that you overheard between Mr. Briscoe and Jennifer,

4    right?

5    A.   What date is this?

6    Q.   September 10th, 2021, this is after your arrest.

7    A.   And I was supposed to be here?

8    Q.   Do you remember meeting with Special Agent Weaver and

9    prosecutors, with Mr. Proctor your --

10   A.   Oh, yes, yes.  Yes, I do.

11   Q.   In fact, I think Mr. Proctor is here, right?  Right

12   behind me, can you see him?

13   A.   Yes.

14   Q.   And in that meeting, for the first time, you now say,

15   that this phone call with Jennifer that you had earlier, said

16   was relating to a ride back to Cambridge, that he said after

17   the call, Hey, sorry.  I didn't tell you this before, but I'm

18   going to rob and kill your best friend and your godson?

19   A.   No, that's not correct.  That's not the first time I told

20   the Government that.  I told them that on the 8th, I just told

21   you that.

22   Q.   You're sure about that?

23   A.   Yes.

24   Q.   All right.  And you also for the first time, tell them

25   that Andre Briscoe saw bags and bags of drugs?

```
1    A.    No, that's not the first time that I told them that

2    either.

3    Q.    Again on the 8th?

4    A.    Yes.

5    Q.    Now, still don't have your deal, do you?

6    A.    No.

7    Q.    And I'm sure you learned that the way in which you get a

8    cooperation deal, is you do a proffer?  Meaning you tell the

9    Government what you know, right?

10   A.    No, I did not know that.

11   Q.    Well, that's what you were doing in all of these

12   meetings, right?

13   A.    Yes.

14   Q.    All right.  And then after that, they will decide whether

15   they want to give you a cooperation deal, right?

16   A.    Yes.

17   Q.    And that's what happened; correct?

18   A.    Yes.

19   Q.    Because now you have November 1st of 2021, a plea letter,

20   a letter that you identified for us earlier, right?

21   A.    Yes.

22   Q.    And that plea letter, signed by you, was signed on

23   November 8th of '21, do you remember that?

24   A.    Yes.

25   Q.    Okay.  And that was certainly after you had spoken with
```

```
 1    your attorney, Mr. Proctor?

 2    A.   Yes.

 3    Q.   And at that time, you told the ladies and gentleman of

 4    the jury that you were hoping to see your kids grow up, right?

 5    A.   Yes.

 6    Q.   That's what you hope to get for trading information with

 7    the Government; correct?

 8    A.   Yes.

 9    Q.   And how old is your son now?

10    A.   Eleven.

11    Q.   And how old -- you have a daughter now?

12    A.   A daughter, yes.

13    Q.   And how old is she?

14    A.   Five.

15    Q.   And grow up means grow up till they are adult age?

16    A.   Yes.

17    Q.   The plea offer that you got, finally, was to a count that

18    knew carried a maximum penalty of life without the possibility

19    of release ever again, right?

20    A.   Yes.

21    Q.   And you wanted to avoid that at all costs; correct?

22    A.   Yes.

23    Q.   You also knew that there was a mandatory minimum for that

24    plea offer, right?

25    A.   Yes.
```

```
 1    Q.   And the mandatory minimum means, judge has no discretion

 2    at all, whether you corporate or not, you have to do the

 3    mandatory minimum that the statute says; correct?

 4    A.   Yes.

 5    Q.   And what was the mandatory minimum you were told?

 6    A.   Ten years per charge.

 7    Q.   Ten years per charge, all right.  And that would have

 8    been a floor, or bottom of 20 years; correct?

 9    A.   Yes.

10    Q.   You would get 20 to life, right?

11    A.   Yes.

12    Q.   And that's only with that -- those two charges; correct?

13    A.   Yes.

14    Q.   All right.  Because you could have been charged with

15    other things, right?

16    A.   Like what?

17    Q.   Could you have been charged with other things?

18    A.   No.

19    Q.   And Ms. Haynes, you knew that in each one of these

20    meetings with the prosecution team, that what you said to them

21    could not be used against you because you had signed a proffer

22    letter, right?

23    A.   Yes.

24    Q.   So even if you had gone in there and confessed to ten

25    murders, they couldn't use it against you, right?
```

```
 1    A.   Right.

 2    Q.   Your words?

 3    A.   Yes.

 4         MS. WHALEN:  Your Honor, if the anyone is interested

 5    in a break, this might be a good time.

 6         THE COURT:  Does anybody need a break over there?

 7         MS. WHALEN:  Okay.

 8         THE COURT:  Seems like they're okay.

 9         MS. WHALEN:  Wonderful.  Thank you.

10         MR. PURPURA:  Can I raise my hand, too?

11         THE COURT:  I'm sorry.  Mr, Purpura, do you need a

12    break?

13         MR. PURPURA:  That would be helpful.

14         THE COURT:  All right.  That's fine.  We'll take

15    a -- we're going to not go past 5 o'clock.  So we'll take a

16    ten-minute recess.  Ten-minute recess.

17         THE CLERK:  All rise.  Court stands in recess.

18    (Jury exits courtroom 4:10 p.m.)

19    (Short recess taken.)

20         THE COURT:  Counsel, we'll be stopping promptly at

21    5:00 today.  And I mentioned, I've got to perform a wedding

22    and be at a rehearsal dinner Friday evening.  And my wife let

23    me know that if I screw that up and was late, I'd be facing

24    divorce matters, not just marriage matters.  I'm teasing here.

25    Bottom line is, my plan is to stop around 3 o'clock or 3:30 on
```

1  Friday.  I'll tell the jury that at the end of the day.

2          **MR. PURPURA:**  No objection, Your Honor.

3          **THE COURT:**  That's fine.  Over my potential divorce

4  if I'm late or what --

5          **MR. PURPURA:**  That I object to.  3:30 is perfect.

6          **THE COURT:**  It was not quite as emphatic July 4th

7  weekend as I told you all before, but it was pretty emphatic.

8          **THE CLERK:**  All rise for the jury.

9      (Jury enters 4:26 p.m.)

10         **THE COURT:**  Thank you, all.  Ladies and gentlemen,

11 we'll stop promptly at 5 o'clock.  And actually, a little bit

12 before 5:00, probably.  I have to go over some scheduling with

13 you all.  With that, you're still under oath, Ms. Haynes.  If

14 you'll be seated, please.

15     Ms. Whalen, you may continue?

16         **MS. WHALEN:**  Thank you, Your Honor.

17 **BY MS. WHALEN:**

18 Q.  Ms. Haynes, let me just finish up with the plea agreement

19 that you signed.  You indicated that you have to testify

20 truthfully, right?

21 A.  Yes.

22 Q.  All right.  And the people that decide whether you

23 testify truthfully, and therefore, make a motion to get you

24 potentially less jail time, are the United States Government

25 prosecuting attorneys, right?

```
 1    A.   Yes.
 2    Q.   And it's Judge Bennett, himself, that will decide what
 3    the sentence will be; correct?
 4    A.   Yes.
 5    Q.   Now, do you recall telling Martin DaShields, Marty,
 6    something about what you were going to do with the gun?
 7    A.   Yes.
 8    Q.   And do you also -- he discussed it with you and said, Do
 9    you really want to do this?
10    A.   Yes.
11    Q.   And you said, I don't care about the -- pardon my
12    language -- but fucking bitch, right?
13    A.   Yes.
14    Q.   And you told Tiera Haynes something about what happened,
15    right?
16    A.   Something about what happened?
17    Q.   Something about the murders, right?
18    A.   Yes.
19    Q.   And this was when you went back to her house, or some
20    time later?
21    A.   I'm pretty sure it was when I went back --  when I went
22    to her house.
23    Q.   And she said to you, God doesn't like ugly, right?
24    A.   Yes.
25    Q.   And that you interrupted as being, the ugly was Jennifer,
```

```
1    right?

2    A.   Yes.

3    Q.   Now, you remember having phone conversations with

4    Mr. Briscoe in June of 2020 over the jail phone; correct?

5    A.   Yes.

6    Q.   Multiple phone calls, right?

7    A.   Yes.

8    Q.   Half hour periods of time, right?

9    A.   Yes.

10   Q.   Generally?

11   A.   Yes.

12   Q.   And do you remember that on June 10th of 2020, you said,

13   They want me to talk against you?

14   A.   I don't recall the date saying that, no, I don't.

15   Q.   But you do recall a conversation like that?

16   A.   Probably, yes.

17   Q.   Okay.  And the "they" would be the United States

18   government, right?

19   A.   Yes.

20   Q.   And do you recall that Mr. Briscoe --

21             MR. BUDLOW:  Objection.

22             THE COURT:  Sustained.  Rephrase the question.

23   BY MS. WHALEN:

24   Q.   Well, Mr. Briscoe responded to you, right?

25             MR. BUDLOW:  Objection.
```

```
 1              THE COURT:  I'm sorry.  Objection is sustained on
 2    that.  Objection is sustained.
 3    BY MS. WHALEN:
 4    Q.  Mr. Briscoe told you --
 5              MR. BUDLOW:  Objection.  Sustained.
 6              THE COURT:  We're going to probably stop -- we can
 7    stop now, today and we can finish up tomorrow on this if we're
 8    going to go down this route, Ms. Whalen.
 9    BY MS. WHALEN:
10    Q.  At no time did Mr. Briscoe indicate you shouldn't
11    cooperate?
12              MR. BUDLOW:  Objection.
13              THE COURT:  Sustained.  Sustained.
14        Why don't we just call it a day here now.  We're going to
15    deal with some evidentiary matters --
16              MS. WHALEN:  I'll move on, Your Honor.
17              THE COURT:  Well, you can't testify.  Lawyers can't
18    testify, Ms. Whalen.  That's as simple as that.
19              MS. WHALEN:  Thank you, Your Honor.
20              THE COURT:  Just go ahead.  Just keep moving on.
21    BY MS WHALEN:
22    Q.  Now, are Tariek Powell and -- well, let's start at
23    Tariek.  Is he a member of a gang?
24    A.  I'm not sure.
25    Q.  You're not sure.  And how about his brother, Tarrell
```

```
 1    Powell?
 2    A.   I don't know.
 3    Q.   And Shawn Gardner, your later husband, he's a member of
 4    BGF, you think, right?
 5    A.   No.
 6    Q.   What gang is he a member of?
 7    A.   Cripps.
 8    Q.   Cripps, pardon me.  Another big gang in Baltimore, to
 9    your knowledge?
10    A.   Yes.
11    Q.   Now, Ms. Haynes, you talked to Shawn Gardner about
12    deleting Ms. Jeffrey from your Facebook account; correct?
13    A.   I don't recall, but I probably did.
14    Q.   And do you remember telling him about an argument that
15    you and Ms. Jeffrey had where she, meaning Ms. Jeffrey, in
16    some way said that she and her connect were going to kill you
17    and clean your body up, do you remember that?
18    A.   I don't recall telling him that.
19    Q.   You don't recall telling Shawn Gardner that?
20    A.   No, I don't recall that.
21    Q.   Now, Shawn Gardner was in prison, right?
22    A.   Yes.
23    Q.   And he was calling from a jail phone, right?
24    A.   Yes.
25    Q.   And those phone calls are recorded, right?
```

```
 1    A.    Yes.

 2    Q.    This is Defense 74B.  I'm going to show you with the

 3    Court's permission, please.

 4              MS. WHALEN:  Can I approach?

 5              THE COURT:  Yes, certainly.

 6    BY MS. WHALEN:

 7    Q.    I'm going to show you what's been marked for

 8    identification only, Your Honor, as 74B.  I'm going to direct

 9    your attention, first, to the top.  Does that appear to note

10    May 1st of 2015?

11              THE COURT:  What is that exhibit number again, I'm

12    sorry?

13              MS. WHALEN:  74B.

14              THE COURT:  Okay.  Thank you.

15    BY MS. WHALEN:

16    Q.    Did you have a chance to see the date?

17    A.    Oh, yes.

18    Q.    And what is the date?

19    A.    May 1st, 2015.

20    Q.    That was May 1st, 2015?

21    A.    Yes.

22    Q.    Now, I'm going to direct you to the bottom of the page,

23    if you would read that to yourself, please.  Finished it?

24    A.    Yes.

25    Q.    All right.  Does that help you remember that on this date
```

 1    you told Shawn Gardner, We got into an argument --

 2              **MR. BUDLOW:**  Objection, Your Honor.  I actually have

 3    no objection to the audio being played, but the transcript is

 4    not in evidence.

 5              **THE COURT:**  Yes.  This is marked for identification

 6    only; correct?

 7              **MS. WHALEN:**  Yes.

 8              **THE COURT:**  All right.  You can ask her questions

 9    about it, you can play the audio.  And again, the same rule

10    applies, you can actually put the -- what you believe is a

11    transcript, up on the screen, Ms. Whalen, and the jury can

12    look at it and determine if they think it's an accurate

13    depiction or not of what was said.  That's fine.  As was done

14    with the Government exhibits.

15              **MS. WHALEN:**  Thank you, Your Honor.  At this point,

16    I was refreshing recollection.

17              **THE COURT:**  Okay.  That's fine.  That's fine.

18    **BY MS. WHALEN:**

19    Q.  Does that help you remember, you did get -- you told them

20    about an argument that you had with Jennifer Jeffrey, right?

21    A.  Yes.  I told him about an argument, but I don't remember

22    exactly what I said.  It was seven years ago.

23    Q.  Okay.

24              **MS. WHALEN:**  Court's indulgence.

25    **BY MS. WHALEN:**

```
 1   Q.   Do you remember saying -- and of course it's a long time
 2   ago, but do you also remember saying to Shawn Gardner that
 3   there had been a time when Jennifer said that she was going to
 4   have her connect kill you?
 5   A.   I don't remember saying that.
 6   Q.   And did this transcript help you to remember or refresh
 7   your recollection?
 8   A.   It helped me remember Jennifer saying that to me, but I
 9   don't remember telling Shawn that.
10   Q.   So tell us what Jennifer said to you about killing you?
11   A.   I guess she just said that she was going to kill me and
12   have her connect clean me up.  I don't recall exactly what was
13   said.  It just reflects -- it refreshes my memory a little bit
14   of that conversation that me and her had.
15   Q.   All right.  And do you recall telling him, also, that
16   you've been catching bodies since you were five?
17   A.   No, I don't.
18   Q.   And that piece of paper, that transcript, didn't help you
19   remember?
20   A.   No.
21   Q.   Do you recall on another day, May 9th of 2015, talking to
22   Shawn Gardner again?
23   A.   I don't know.
24   Q.   And do you recall telling Shawn Gardner that you, the
25   night before, dressed up all in black, and went over to
```

1      Jennifer's house?

2      A.   Yes, I recall saying that, but that's not what happened.

3      Q.   Do you recall telling him that you went to the front door

4      and the back door at Jennifer's house, right?

5      A.   Yes, I recall saying that, but that's not what happened.

6      Q.   And you also told Shawn Gardner that you were there -- I

7      tried it.  You said, How could I kill her?  I tried it without

8      getting caught.

9           Do you remember saying that to him?

10     A.   No, I don't.

11     Q.   Do you remember saying, I'm not scared to hurt nobody, to

12     Shawn Gardner?

13     A.   No.  No, I don't.

14     Q.   And do you remember saying to -- let me strike that for a

15     moment.

16          Would looking at a transcript help you to remember?

17     A.   No, it would not.

18     Q.   And do you recall, also, telling him that you weren't

19     scared, right?

20     A.   No, I don't.

21     Q.   I mean well, in general, you've been on the streets all

22     of your life before you got incarcerated, right?

23     A.   I don't know what you mean on the streets.

24     Q.   You weren't scared to be out there, were you?

25     A.   Yes, I was.

```
 1    Q.   And do you remember saying to Shawn Gardner, I tried to
 2    throw -- pardon my language, mother fucking toilet paper with
 3    gasoline, set the house on fire.  Remember telling him that?
 4    A.   No, I don't.
 5    Q.   Do you remember telling him you had to pretty much tell
 6    yourself to just runaway from the scene, right, or from the
 7    house, right?
 8    A.   I don't recall telling him that, no.
 9    Q.   And do you remember telling Shawn Gardner that, The next
10    person I let close, I'm going -- excuse me.
11         The next person I let close and cross me, I'm going to
12    kill?
13    A.   No, I don't recall telling him that.
14    Q.   Would seeing the transcripts help you to remember this
15    conversation?
16    A.   No, it would not.
17    Q.   You don't dispute that you had multiple conversations
18    with Shawn Gardner?
19    A.   I don't dispute that at all, no.
20    Q.   And you don't dispute that you would tell him about your
21    problems with Jennifer Jeffrey, right?
22    A.   Yes, I would.
23    Q.   And do you remember at the end -- well, strike that.
24         Do you remember Shawn Gardner basically saying, Take care
25    of that?
```

```
1    A.    No.

2    Q.    Would seeing a transcript help you to remember that,

3    Ms. Haynes?

4    A.    No.

5           MS. WHALEN:  Court's indulgence.  Would the court

6    indulge showing the tapes that she can't recall?

7           THE COURT:  How long are these tapes?

8           MS. WHALEN:  Very short.

9           THE COURT:  Okay.  That's fine.  We'll do it right

10   now, that's fine.  So we're going to have -- just so I'm

11   clear, we're going to have Defendant's Exhibit 74.  And again,

12   there is no prejudice as to subsequent motions, I'm just going

13   to clarify.  We're going to have Defendant's Exhibit 74 and

14   Defendant's Exhibit 75 being in the actual audio recordings.

15   And then you will have transcripts that you'll put up on the

16   ELMO that the jury can see, as was done with the Government

17   transcripts; correct, Ms. Whalen?

18          MS. WHALEN:  Thank you, Your Honor.

19          THE COURT:  Ladies and gentlemen, as same rules

20   apply with the Government, the audio comes into evidence, the

21   transcripts are just for your benefit, and you can look on

22   your screen to see the transcripts.

23          MS. WHALEN:  Having a little bit of difficulty.  I

24   apologize.

25          THE COURT:  That's all right.
```

1          **MS. WHALEN:**  Trying to get both things on the

2      screen.

3          **THE COURT:**  That's fine.  These are Defendant's

4      Exhibit 74, the May 1, 2015, telephone call and Defendant's

5      Exhibit 75, the May 9, 2015 telephone call.

6          I think we're just going to stop for the day.  I'll go

7      over some scheduling matters.  The jury is going to be

8      excused.  You stay where you are, Ms. Haynes.  The jury will

9      be excused.

10          Let me give you some scheduling matters while we're here.

11      We're going to start tomorrow at 9:30, okay?  Is that good

12      with you, Melissa, can you do that?

13          **THE REPORTER:**  Yes, that's fine.

14          **THE COURT:**  Denis?

15          **THE CLERK:**  Yes, Judge.

16          **THE COURT:**  We're going to start tomorrow at 9:30

17      and we're going to start Friday at 9:30 and we're going to go

18      tomorrow until 5 o'clock.  But Friday, I have to perform a

19      wedding ceremony, I have to have a rehearsal matter and then a

20      wedding ceremony on Saturday.  So I promised my wife we're

21      going to stop around 3:00.  It's my fault, not the lawyers'

22      fault.  We're going to have to stop around 3:30 on Friday, or

23      thereabouts because I've got to get to this rehearsal.

24          So we're going to start at 9:30 Friday, go right to

25      around 3:30 Friday, maybe have a shorter lunch and that will

1    be Friday.  And tomorrow we're going to start at 9:30 and go

2    until 5:00.  We definitely are going to drift until next

3    Monday or Tuesday without question in this case, it appears.

4         So with that you all are excused for the evening and I

5    have I to just go over a few other matters here.

6         (Jury exits courtroom 4:44 p.m.)

7              **THE COURT:**  All right.  With that, Ms. Haynes,

8    you're excused and you're not to discuss your testimony with

9    anyone because you'll be back on the witness stand tomorrow at

10   9:30.

11             **THE WITNESS:**  Okay.

12             **THE COURT:**  All right.  With that Counsel, let's go

13   over a little bit of scheduling here, if we can, it might be

14   an appropriate point.  Those in the back can all be seated.

15   I'm just going to quickly go over a few things.

16        Thank you, Mr. Cadle, on that.  And we're going to get --

17   Mr. Murray, you've been -- thank you for your assistance on

18   this tape recordings.  And Mr. Candle, perhaps, you can

19   coordinate with Mr. Murray, but let's get this all teed up,

20   ready to go at 9:30 tomorrow morning on these tapes.

21        Ms. Whalen, I had no problem with you actually asking

22   specific questions on those because I was told, and clearly,

23   there was a tape that the jury can listen to with respect to

24   that and then it's whatever the jury determines is on the

25   recording.

 1          Well, how are we looking in terms of the scheduling for

 2     tomorrow and Friday and going into Monday?  We've been working

 3     on instructions and trying to get them narrowed down because

 4     they're not so voluminous and we'll be ready.  I'm hoping that

 5     we can -- the schedule is such that we clearly aren't going to

 6     get to the jury Monday, I don't think.  But I'm hoping to have

 7     closing argument Tuesday.

 8          Does that seem to be a reasonable target from the point

 9     of view of the Government?

10               **MS. BRUSCA:**  I think it is, Your Honor.

11               **THE COURT:**  From the point of view of the defense,

12     does that seem like a reasonable?  No?

13               **MR. PURPURA:**  No, it does not.

14               **THE COURT:**  Okay.  All right.  That's what I'm

15     asking.  I just need --

16               **MR. PURPURA:**  I apologize.

17               **THE COURT:**  That's okay.

18               **MR. PURPURA:**  And we're -- obviously, Mr. Briscoe

19     has the right to testify or not testify --

20               **THE COURT:**  I'm going to go over that with him at

21     the appropriate time.

22               **MR. PURPURA:**  We're still discussing that with him.

23               **THE COURT:**  I understand.

24               **MR. PURPURA:**  So the answer is, I believe at the

25     very best, honestly, the very best we're going to get to the

1    jury for close Wednesday morning.

2              **THE COURT:**  Okay.  That's fine.  That's fine.  I've

3    got a little bit of fudge room here on this.  And there is a

4    lengthy sentencing that I have that that the lawyers in that

5    cases thought it was going to be a two-and-a-half day

6    sentencing.  I've never had a two-and-a-half day sentencing.

7    I think Counsel is going to realize we're not going to have

8    that one in that case either.

9        So I've kept some fudge room here on that.  And I'll

10   leave to Mr. Budlow to explain that to Mr. Jefferson Gray from

11   the point of the Government.  I'll leave that to you,

12   Mr. Budlow, to explain that to him.

13             **MR. BUDLOW:**  It would be my pleasure.

14             **THE COURT:**  All right.  Okay.  With that, anything

15   else from the point of view from the Government?

16             **MS. BRUSCA:**  No, Your Honor.

17             **THE COURT:**  For the Defense?

18             **MS. WHALEN:**  No, Your Honor.

19             **THE COURT:**  Thank you all very much.  This Court

20   stands adjourned for the day.

21             **THE CLERK:**  All rise.  Court stands adjourned.

22        (Proceedings concluded 4:47 p.m.)

23

24

25

1          I, Melissa L. Clark, RPR, do hereby certify that

2    the foregoing is a correct transcript from the stenographic

3    record of proceedings in the above-entitled matter.


5                    _____/S/_____
                              Melissa L. Clark
6                          Official Court Reporter

## $

**$20** [8] - 42:2, 52:8, 52:11, 52:13, 52:25, 53:25, 55:2, 56:1
**$375** [1] - 28:11
**$50** [4] - 28:4, 56:9, 81:9

## '

**'21** [2] - 83:16, 85:23

## /

**/S** [1] - 104:5

## 1

**1** [2] - 1:9, 100:4
**10** [3] - 16:18, 58:2, 59:3
**100** [1] - 15:14
**101** [1] - 1:24
**10:30** [1] - 56:14
**10th** [1] - 83:16, 84:6, 91:12
**11** [1] - 74:23
**11.2** [1] - 26:3
**11:00** [1] - 56:15
**12.10** [1] - 5:6
**12.8** [1] - 4:20
**120** [1] - 42:4
**125** [1] - 66:5
**13** [1] - 41:15
**130** [1] - 42:5
**1345** [1] - 32:10
**15** [6] - 14:25, 16:18, 53:24, 58:2, 59:4, 71:22
**15.4** [1] - 15:15
**15th** [4] - 69:16, 70:14, 76:12, 80:10
**16** [1] - 13:4
**16.1** [4] - 39:18, 39:19, 39:23, 41:1
**16.10** [2] - 9:4
**16.6T** [1] - 9:11
**17** [1] - 31:8
**17.13** [1] - 9:8
**17.3** [1] - 9:3
**17.6** [4] - 31:15, 31:18, 31:19, 36:16
**18th** [1] - 83:1
**1st** [5] - 77:23, 85:19, 94:10, 94:19, 94:20

## 2

**20** [4] - 55:22, 55:24,

**87:8, 87:10
2015** [29] - 6:3, 8:5, 9:17, 19:20, 19:24, 20:1, 20:4, 20:21, 20:24, 40:5, 40:21, 40:24, 45:4, 45:22, 46:6, 52:3, 56:6, 61:24, 67:1, 68:7, 68:18, 68:23, 69:3, 94:10, 94:19, 94:20, 96:21, 100:4, 100:5
**2020** [2] - 53:24, 68:14, 69:5, 69:13, 69:16, 70:14, 71:22, 71:24, 75:19, 77:24, 91:4, 91:12
**2021** [5] - 79:11, 80:10, 83:1, 84:6, 85:19
**2022** [1] - 1:9
**21201** [1] - 1:25
**22nd** [2] - 71:24, 75:19
**24th** [1] - 68:14
**26** [2] - 8:5, 9:17
**26th** [1] - 56:6
**27** [2] - 20:4, 20:24
**27th** [4] - 19:24, 20:1, 20:21, 77:8
**28th** [1] - 83:9
**29th** [2] - 67:1, 68:7
**2:13** [1] - 2:2
**2:18** [1] - 2:13
**2:29** [2] - 26:5, 26:10

## 3

**3** [4] - 15:23, 26:3, 74:14, 88:25
**3.6** [1] - 31:17
**30** [3] - 10:18, 10:21, 53:13
**38** [1] - 62:2
**3:00** [2] - 56:21, 100:21
**3:05** [1] - 31:24
**3:06** [1] - 32:4
**3:10** [1] - 36:5
**3:30** [4] - 88:25, 89:5, 100:22, 100:25
**3:45** [2] - 26:5, 26:10

## 4

**4** [2] - 56:21, 56:22
**410-962-4474** [1] - 1:25
**45** [2] - 13:13, 53:13
**4:00** [1] - 66:20
**4:10** [1] - 88:18
**4:26** [1] - 89:9

**4:44** [1] - 101:6
**4:47** [1] - 103:22
**4th** [2] - 1:24, 89:6

## 5

**5** [5] - 2:17, 36:20, 88:15, 89:11, 100:18
**5:00** [1] - 88:21, 89:12, 101:2
**5:16** [3] - 26:5, 26:11, 26:14

## 6

**6.5** [3] - 7:24, 7:25, 8:2
**6.5T** [3] - 7:23, 8:11, 8:14
**6.6** [1] - 9:13
**6.7** [6] - 20:7, 20:9, 20:22, 20:23, 20:24
**6.7T** [1] - 20:8
**6.8** [3] - 20:18, 20:22, 21:2
**6.8T** [1] - 20:18
**66** [2] - 62:3, 62:4, 62:13

## 7

**7** [1] - 1:5
**70** [4] - 74:14, 74:15, 74:16, 74:19
**717** [1] - 32:10
**74** [3] - 99:11, 99:13, 100:4
**74B** [3] - 94:2, 94:8, 94:13
**75** [2] - 99:14, 100:5
**78** [1] - 14:8

## 8

**8th** [5] - 79:11, 80:25, 84:20, 85:3, 85:23

## 9

**9** [2] - 36:20, 100:5
**9:00** [1] - 20:24
**9:19** [1] - 9:18
**9:19p.m** [1] - 8:5
**9:30** [7] - 100:11, 100:16, 100:17, 100:24, 101:1, 101:10, 101:20
**9:43** [2] - 20:22, 20:24
**9:58** [1] - 21:3
**9th** [2] - 78:21, 96:21

## A

**a.m** [3] - 20:22, 20:24, 21:3
**abet** [1] - 30:4
**abetting** [2] - 4:7, 30:2
**able** [2] - 37:9, 46:13
**above-entitled** [1] - 104:3
**absent** [1] - 32:20
**accordingly** [1] - 2:7
**account** [3] - 40:13, 50:19, 93:12
**accounts** [2] - 65:17, 65:19
**accurate** [1] - 95:12
**accusing** [2] - 64:16, 64:18
**acting** [2] - 19:2, 62:23
**activity** [1] - 43:7
**actual** [1] - 99:14
**address** [2] - 15:13, 34:18
**adjourned** [2] - 103:20, 103:21
**admit** [1] - 30:10
**adult** [1] - 86:15
**afternoon** [6] - 2:3, 2:14, 2:15, 2:20, 3:10, 38:24
**afterwards** [1] - 4:16
**age** [1] - 86:15
**Agent** [10] - 1:16, 1:17, 68:11, 69:6, 69:14, 70:10, 72:3, 73:4, 79:14, 84:8
**agents** [4] - 28:22, 39:3, 73:4, 81:11
**ago** [2] - 95:22, 96:2
**agree** [3] - 31:21, 33:18, 68:16
**agreed** [2] - 30:12, 30:13
**agreement** [23] - 30:15, 30:24, 31:3, 31:5, 32:12, 32:15, 32:17, 33:11, 33:13, 34:1, 34:16, 34:22, 35:5, 35:9, 36:17, 36:24, 37:2, 37:17, 37:18, 38:1, 38:3, 38:16, 89:18
**ahead** [2] - 36:14, 92:20
**aide** [1] - 30:4
**aided** [1] - 1:21
**aiding** [2] - 4:7, 30:2
**alert** [1] - 35:1
**allow** [1] - 38:3

**allowed** [3] - 37:20, 67:5, 67:9
**altogether** [1] - 18:15
**AMERICA** [1] - 1:3
**amounts** [1] - 61:8
**Andre** [50] - 4:14, 5:18, 5:23, 6:18, 10:5, 10:6, 11:3, 11:4, 12:10, 12:12, 16:12, 21:12, 25:11, 25:17, 26:21, 27:5, 27:20, 27:21, 28:4, 28:7, 29:14, 30:5, 44:20, 45:4, 49:3, 50:3, 50:21, 51:5, 52:24, 53:8, 57:2, 57:19, 57:22, 58:4, 64:4, 67:14, 67:17, 67:20, 67:25, 68:19, 69:7, 70:14, 72:16, 76:8, 77:11, 79:4, 79:5, 81:7, 84:25
**ANDRE** [1] - 1:5
**Andrew** [1] - 1:18
**anger** [4] - 47:14, 47:19, 53:11
**angry** [5] - 47:22, 51:11, 52:1, 55:22, 55:24
**annoyance** [1] - 47:13
**answer** [3] - 23:9, 57:14, 102:24
**answering** [1] - 57:11
**anyway** [1] - 37:24
**apartment** [12] - 14:1, 14:21, 14:22, 15:19, 15:20, 15:21, 16:2, 23:19, 23:20, 25:8, 45:25, 50:10
**apologize** [6] - 18:9, 60:21, 61:12, 63:1, 99:24, 102:16
**appear** [2] - 39:20, 40:1, 94:9
**appeared** [2] - 40:5, 40:21
**applies** [1] - 95:10
**apply** [1] - 99:20
**appointed** [2] - 69:24, 78:9, 83:17
**approach** [2] - 31:9, 36:11, 94:4
**appropriate** [3] - 75:12, 101:14, 102:21
**area** [2] - 15:18, 44:8
**areas** [1] - 3:12
**arguing** [1] - 54:6
**argument** [5] - 93:14, 95:1, 95:20, 95:21,

102:7
**arms** [1] - 54:20
**arrest** [1] - 84:6
**arrested** [2] - 83:1,
83:14
**ass** [1] - 54:7
**assistance** [1] -
101:17
**asthma** [1] - 19:2
**ATF** [5] - 1:16, 28:24,
28:25, 29:11, 69:13
**attached** [2] - 33:24,
34:5
**attention** [2] - 74:23,
94:9
**attorney** [2] - 30:8,
86:1
**attorneys** [3] - 39:4,
70:8, 89:25
**audio** [4] - 95:3, 95:9,
99:14, 99:20
**aunt** [2] - 5:17, 41:12
**AUSA** [2] - 1:11, 1:12
**avoid** [1] - 86:21
**aware** [2] - 32:25,
35:23

**B**

**bachelorette** [1] -
46:20
**bag** [18] - 22:20,
22:23, 23:2, 24:7,
24:9, 24:12, 24:13,
24:15, 24:20, 24:25,
27:1, 27:5, 27:8,
73:9, 73:14, 73:16,
79:5
**bags** [6] - 25:3, 42:18,
76:8, 77:15, 84:25
**Baltimore** [13] - 1:25,
6:13, 25:24, 27:15,
28:4, 28:22, 49:3,
55:11, 56:10, 66:8,
79:12, 83:10, 93:8
**BALTIMORE** [1] - 1:9
**banged** [5] - 16:12,
57:18, 60:5, 60:9,
60:13
**banging** [10] - 59:14,
59:14, 59:16, 59:20,
59:21, 60:2, 60:16,
61:18, 62:23, 67:12
**bar** [6] - 22:1, 22:2,
22:3, 63:4, 69:7,
70:16
**basement** [1] - 50:9
**beat** [2] - 54:7, 54:25
**became** [1] - 51:24
**bed** [1] - 58:19

**BEFORE** [1] - 1:8
**began** [4] - 42:15,
49:6, 50:15, 53:13
**beginning** [1] - 82:23
**behalf** [1] - 31:5
**behind** [2] - 83:12,
84:12
**belief** [1] - 46:24
**bench** [1] - 35:15
**benefit** [1] - 99:21
**Bennett** [2] - 3:11,
90:2
**BENNETT** [1] - 1:8
**best** [8] - 5:4, 6:12,
39:8, 47:17, 64:16,
84:18, 102:25
**better** [2] - 54:9, 70:22
**between** [6] - 11:10,
26:4, 55:17, 70:24,
80:20, 84:3
**BGF** [1] - 93:4
**big** [1] - 93:8
**bill** [1] - 53:25
**binders** [2] - 7:22,
9:11
**birthday** [1] - 41:10
**bit** [11] - 42:9, 52:4,
68:2, 72:7, 80:1,
82:6, 89:11, 96:13,
99:23, 101:13, 103:3
**bitch** [8] - 11:6, 11:7,
11:11, 11:17, 11:19,
24:2, 51:16, 90:12
**black** [2] - 24:15,
96:25
**blood** [4] - 10:3, 10:6,
10:7, 63:16
**blue** [4] - 5:20, 22:20,
24:7, 24:9
**board** [1] - 33:1
**bodies** [1] - 96:16
**body** [2] - 54:21, 93:17
**bone** [1] - 47:9
**borrow** [1] - 25:1
**bottle** [3] - 42:4, 63:6,
69:8
**bottom** [4] - 15:18,
87:8, 88:25, 94:22
**box** [2] - 2:5, 2:10
**Boy** [1] - 10:15
**boy** [1] - 10:16
**boyfriend** [6] - 19:22,
47:7, 47:15, 47:24,
48:2, 59:1
**BPD** [1] - 29:11
**break** [8] - 2:18, 2:19,
2:22, 67:6, 72:19,
88:5, 88:6, 88:12
**breakfast** [1] - 19:17
**Brianna** [4] - 17:8,

17:9, 18:20, 59:21
**bridge** [1] - 54:12
**briefly** [3] - 31:23,
32:1
**bring** [5] - 2:5, 2:11,
31:10, 35:17, 35:18
**bringing** [1] - 42:9
**BRISCOE** [1] - 1:5
**Briscoe** [31] - 4:14,
5:18, 5:23, 10:5,
10:6, 30:5, 44:20,
45:5, 50:21, 51:5,
53:8, 56:6, 57:2,
60:17, 63:3, 63:15,
64:4, 65:9, 67:14,
69:7, 70:15, 76:8,
79:4, 80:21, 84:3,
84:25, 91:4, 91:20,
91:24, 92:10, 102:18
**briscoe** [1] - 92:4
**Briscoe's** [2] - 26:4,
68:19
**broke** [2] - 51:12,
51:15
**brother** [5] - 7:10,
7:16, 8:23, 11:16,
92:25
**brother's** [1] - 8:21
**brought** [2] - 2:4,
48:19
**Browne** [1] - 46:7
**BRUSCA** [3] - 2:8,
102:10, 103:16
**Brusca** [1] - 1:11
**bucks** [2] - 55:23,
55:24
**Budlow** [10] - 1:12,
2:23, 3:25, 31:11,
35:10, 36:10, 38:19,
76:18, 103:10,
103:12
**BUDLOW** [49] - 2:24,
4:1, 4:3, 5:24, 7:21,
8:2, 8:5, 8:7, 8:10,
8:16, 9:10, 9:15,
9:18, 9:20, 9:23,
20:6, 20:13, 20:20,
21:1, 21:4, 21:6,
28:14, 28:15, 31:7,
31:12, 31:15, 31:18,
32:23, 33:6, 34:1,
34:10, 35:12, 35:19,
35:22, 36:11, 36:15,
38:18, 62:9, 62:12,
68:21, 70:23, 74:15,
76:17, 91:21, 91:25,
92:5, 92:12, 95:2,
103:13
**building** [1] - 15:16
**buildings** [1] - 46:1

**butter** [1] - 81:23
**BY** [28] - 4:3, 5:24,
8:10, 8:16, 9:23,
20:13, 21:6, 28:15,
36:15, 38:23, 39:25,
61:22, 62:6, 62:20,
68:25, 71:9, 74:21,
75:14, 75:23, 77:4,
89:17, 91:23, 92:3,
92:9, 94:6, 94:15,
95:18, 95:25

**C**

**Cadle** [2] - 1:19,
101:16
**caliber** [1] - 13:10
**Cambridge** [20] -
27:18, 27:19, 27:21,
27:22, 28:5, 44:8,
44:16, 45:5, 46:11,
48:19, 48:22, 49:3,
49:13, 50:3, 64:2,
81:4, 81:10, 81:13,
82:1, 84:16
**Candle** [1] - 101:18
**cannot** [2] - 32:13,
75:8
**capsules** [1] - 24:25
**car** [18] - 12:8, 12:11,
12:20, 12:25, 13:1,
13:14, 13:17, 13:21,
13:23, 14:4, 14:5,
14:13, 14:15, 46:16,
54:6, 54:13, 54:16
**care** [4] - 57:22, 59:12,
90:11, 98:24
**carried** [1] - 86:18
**carries** [1] - 71:16
**case** [9] - 32:8, 32:9,
32:10, 33:23, 35:3,
35:4, 101:3, 103:8
**CASE** [1] - 1:3
**cases** [1] - 103:5
**catch** [1] - 69:11
**catching** [1] - 96:16
**caught** [7] - 28:2,
63:12, 68:4, 70:16,
76:16, 77:10, 97:8
**caveat** [1] - 32:13
**celebrate** [1] - 41:6
**cell** [1] - 46:3
**center** [1] - 4:25
**ceremony** [2] -
100:19, 100:20
**certain** [2] - 32:20,
51:12
**certainly** [9] - 32:24,
33:7, 33:11, 43:10,
70:2, 70:21, 79:25,

85:25, 94:5
**certify** [1] - 104:1
**certiorari** [1] - 32:11
**chamber** [1] - 13:5
**champagne** [1] -
51:18
**chance** [1] - 94:16
**change** [2] - 34:25,
37:7
**changed** [2] - 23:12,
79:1
**charge** [2] - 87:6, 87:7
**charged** [10] - 4:6,
73:21, 74:1, 78:2,
78:6, 80:3, 82:24,
82:25, 87:14, 87:17
**charges** [2] - 71:13,
87:12
**child** [1] - 43:18
**children** [2] - 17:11,
43:16
**chooses** [1] - 33:14
**chose** [1] - 33:20
**cigarettes** [5] - 21:17,
22:2, 22:7, 22:8,
63:8
**Circuit** [2] - 32:9,
32:10, 33:23
**circumstances** [1] -
78:17
**City** [2] - 28:22, 55:11
**CJ** [5] - 50:6, 53:5,
53:9, 61:5, 81:12
**claimed** [1] - 64:2
**clarify** [5] - 34:19,
35:14, 36:13, 75:15,
99:13
**Clark** [3] - 1:23, 104:1,
104:5
**clean** [2] - 93:17,
96:12
**clear** [5] - 32:7, 32:22,
35:3, 99:11
**clearly** [3] - 3:7,
101:22, 102:5
**CLERK** [6] - 2:12, 3:6,
88:17, 89:8, 100:15,
103:21
**close** [4] - 39:11,
98:10, 98:11, 103:1
**closing** [1] - 102:7
**cocaine** [1] - 43:3
**coming** [9] - 13:17,
17:22, 18:9, 24:16,
32:14, 56:23, 57:6,
57:23, 60:19
**communication** [2] -
49:16, 70:23
**community** [2] -
48:22, 66:2

computer [1] - 1:21
computer-aided [1] - 1:21
concerned [1] - 72:21
concluded [2] - 35:24, 103:22
concur [1] - 34:12
conduct [4] - 38:2, 38:7, 38:10, 68:19
conference [1] - 35:15
confessed [1] - 87:24
confront [1] - 79:22
connect [6] - 81:12, 81:18, 81:22, 93:16, 96:4, 96:12
consider [2] - 5:4, 41:12
considered [1] - 39:14
contact [2] - 7:16, 66:15
contacted [3] - 7:17, 64:1, 76:5
contention [1] - 47:9
contents [1] - 76:23
context [1] - 26:10
continue [2] - 36:10, 89:15
continued [1] - 3:13
conversation [7] - 27:21, 64:19, 72:6, 81:3, 91:15, 96:14, 98:15
conversations [4] - 49:20, 62:22, 91:3, 98:17
cooperate [3] - 30:15, 37:11, 92:11
cooperating [1] - 32:12
cooperation [5] - 32:18, 37:18, 37:23, 85:8, 85:15
coordinate [1] - 101:19
corner [1] - 13:2
corporate [1] - 87:2
correct [56] - 8:1, 9:17, 21:3, 34:10, 41:4, 41:20, 42:10, 44:17, 44:20, 45:6, 48:7, 48:15, 48:23, 50:19, 57:9, 57:14, 58:10, 58:18, 62:17, 62:18, 63:4, 63:24, 65:17, 66:3, 69:25, 73:21, 73:22, 75:19, 76:3, 76:4, 76:7, 76:13, 76:20, 76:21, 77:24, 78:3, 78:9, 79:20, 80:3, 81:8,

82:21, 82:22, 83:18, 84:19, 85:17, 86:7, 86:21, 87:3, 87:8, 87:12, 90:3, 91:4, 93:12, 95:6, 99:17, 104:2
costs [1] - 86:21
Counsel [5] - 32:25, 62:2, 88:20, 101:12, 103:7
count [1] - 86:17
couple [2] - 26:7, 72:9
course [6] - 6:7, 41:17, 77:17, 78:16, 78:19, 96:1
court [2] - 3:12, 99:5
COURT [93] - 1:1, 2:3, 2:9, 2:14, 2:16, 3:1, 3:10, 3:22, 5:22, 7:25, 8:4, 8:6, 8:9, 9:17, 9:19, 20:9, 20:23, 21:2, 31:10, 31:13, 31:16, 31:19, 31:25, 32:5, 33:5, 33:9, 34:2, 34:11, 34:15, 35:2, 35:8, 35:13, 35:21, 35:25, 36:3, 36:6, 36:12, 38:19, 39:21, 39:24, 62:4, 62:13, 62:16, 62:19, 68:22, 71:2, 71:5, 74:17, 74:20, 75:5, 75:8, 75:11, 76:18, 76:22, 77:1, 88:6, 88:8, 88:11, 88:14, 88:20, 89:3, 89:6, 89:10, 91:22, 92:1, 92:6, 92:13, 92:17, 92:20, 94:5, 94:11, 94:14, 95:5, 95:8, 95:17, 99:7, 99:9, 99:19, 99:25, 100:3, 100:14, 100:16, 100:7, 101:12, 102:11, 102:14, 102:17, 102:20, 102:23, 103:2, 103:14, 103:17, 103:19
Court [7] - 1:24, 32:11, 35:23, 88:17, 103:19, 103:21, 104:6
Court's [1] - 94:3
court's [6] - 28:14, 61:21, 74:13, 75:22, 95:24, 99:5
courthouse [1] - 70:7
courtroom [11] - 2:13, 3:14, 29:24, 31:24,

32:2, 32:4, 32:6, 36:5, 88:18, 101:6
cousin [4] - 25:22, 44:23, 49:13, 51:5
covering [2] - 29:15, 29:18
COVID-19 [1] - 3:13
crazy [1] - 62:24
crime [5] - 30:10, 73:21, 78:2, 78:7, 80:3
crimes [2] - 4:6, 4:9
CRIMINAL [1] - 1:3
Cripps [2] - 93:7, 93:8
cross [3] - 33:10, 38:20, 98:11
CROSS [1] - 1:6
cross-examination [1] - 38:20
CROSS-EXAMINATION [1] - 1:6
crying [1] - 23:25
custody [1] - 2:4
cut [2] - 10:8, 24:21
cute [1] - 54:7

D

Dana [1] - 1:11
Danielle [1] - 64:13
DaShields [5] - 11:24, 12:2, 12:5, 14:16, 90:5
date [6] - 9:16, 84:5, 91:14, 94:16, 94:18, 94:25
dates [1] - 66:6
daughter [3] - 17:13, 86:11, 86:12
DAY [1] - 1:5
days [3] - 53:13, 55:5, 55:9
de [1] - 50:19
de-friended [1] - 50:19
dead [1] - 23:22
deal [10] - 33:18, 34:21, 35:11, 77:20, 82:3, 83:22, 85:5, 85:8, 85:15, 92:15
dealing [3] - 33:4, 42:15
December [2] - 77:23, 78:21
decide [4] - 48:5, 85:14, 89:22, 90:2
decided [1] - 45:5
decides [3] - 46:6, 46:10, 56:15

Defendant [27] - 1:6, 1:13, 5:23, 6:2, 6:8, 6:19, 6:21, 11:4, 12:22, 13:14, 13:19, 13:23, 14:4, 14:22, 16:19, 17:20, 19:3, 19:10, 21:15, 21:18, 22:12, 23:5, 23:7, 23:16, 24:1, 25:25, 30:6
Defendant's [8] - 62:13, 66:5, 74:18, 99:11, 99:13, 99:14, 100:3, 100:4
Defense [13] - 14:8, 32:25, 33:12, 33:14, 33:20, 33:21, 34:3, 62:4, 76:13, 78:21, 79:6, 94:2, 103:17
defense [1] - 102:11
definitely [1] - 101:2
deleting [1] - 93:12
demanded [2] - 16:12, 57:18
demeanor [1] - 18:6
denied [1] - 32:11
Denis [1] - 100:14
department [1] - 66:19
Department [2] - 55:12, 66:9
depicted [1] - 5:8
depiction [1] - 95:13
describe [3] - 6:4, 8:19, 24:14
Detective [10] - 61:17, 61:23, 62:22, 63:11, 66:8, 66:18, 66:25, 67:11, 68:17, 68:24
detective [1] - 55:11
detectives [1] - 29:5
determine [2] - 37:13, 95:12
determines [1] - 101:24
development [1] - 45:20
Diener [2] - 15:14, 15:18
different [2] - 76:23, 78:9
difficulty [1] - 99:23
dinner [1] - 88:22
DIRECT [1] - 1:6
direct [5] - 7:22, 8:11, 74:22, 94:8, 94:22
Direct [1] - 35:24
direction [2] - 16:3, 16:5
discretion [2] - 3:14, 87:1

discuss [3] - 6:21, 71:6, 101:8
discussed [3] - 71:6, 72:20, 90:8
discussing [2] - 21:25, 102:22
discussion [3] - 63:10, 80:16, 81:3
discussions [2] - 82:15, 82:17
dispute [3] - 98:17, 98:19, 98:20
disrespectful [2] - 60:22, 60:24
distance [2] - 44:4, 83:10
distributing [1] - 42:21
DISTRICT [3] - 1:1, 1:1, 1:8
DIVISION [1] - 1:2
divorce [2] - 88:24, 89:3
document [1] - 33:17
documents [2] - 33:2, 33:6
done [5] - 7:24, 11:17, 61:2, 95:13, 99:16
door [22] - 15:21, 16:12, 16:25, 17:1, 18:10, 57:18, 57:20, 57:21, 59:14, 59:16, 59:20, 59:21, 60:2, 60:5, 60:6, 60:7, 60:16, 62:23, 67:6, 97:3, 97:4
dot [1] - 33:10
down [16] - 3:15, 3:23, 23:24, 27:25, 46:11, 46:14, 48:19, 57:20, 63:12, 67:6, 70:16, 72:2, 79:12, 83:6, 92:8, 102:3
dreaming [1] - 44:16
dressed [1] - 96:25
drift [1] - 101:2
drink [1] - 22:6
drive [3] - 14:5, 44:5, 44:6
drop [1] - 18:25
dropped [2] - 14:20, 25:17
drove [2] - 11:22, 14:3
drug [3] - 42:15, 50:13, 50:16
drugs [35] - 6:25, 10:24, 18:14, 22:14, 24:8, 24:13, 24:20, 24:25, 27:5, 27:7, 28:7, 28:8, 28:10,

28:12, 41:19, 42:22, 43:5, 53:6, 53:8, 61:5, 65:12, 65:14, 72:17, 73:1, 73:8, 74:7, 74:11, 77:15, 79:5, 81:13, 81:21, 81:24, 84:25
**duly** [1] - 3:3
**during** [8] - 21:9, 48:5, 53:16, 56:23, 62:21, 66:11, 67:11, 78:19

**E**

**early** [3] - 17:21, 60:15, 63:15
**east** [2] - 6:13, 25:24
**eat** [2] - 51:14, 51:17
**Edmondson** [4] - 12:19, 13:1, 14:5, 14:13
**effect** [1] - 82:1
**either** [7] - 12:7, 33:22, 34:18, 35:8, 56:4, 85:2, 103:8
**eleven** [1] - 86:10
**ELMO** [1] - 99:16
**emphatic** [2] - 89:6, 89:7
**end** [2] - 89:1, 98:23
**ended** [1] - 55:14
**enforcement** [4] - 39:3, 53:24, 55:8, 68:11
**enter** [1] - 15:20
**entered** [1] - 32:15
**enters** [3] - 2:13, 36:5, 89:9
**entitled** [2] - 69:24, 104:3
**especially** [1] - 47:17
**Esq** [2] - 1:14, 1:15
**evening** [3] - 56:14, 88:22, 101:4
**event** [1] - 58:2
**everywhere** [1] - 63:22
**evidence** [15] - 32:14, 32:17, 32:19, 33:13, 33:16, 33:19, 33:21, 33:22, 33:23, 34:8, 34:13, 34:23, 75:9, 95:4, 99:20
**evidentiary** [3] - 31:21, 36:13, 92:15
**exactly** [2] - 95:22, 96:12
**Examination** [1] - 35:24
**EXAMINATION** [2] -

1:6, 1:6
**examination** [1] - 38:20
**examined** [1] - 3:3
**except** [1] - 69:10
**exception** [1] - 3:14
**EXCERPT** [1] - 1:7
**excited** [1] - 46:13
**excuse** [3] - 40:7, 50:12, 98:10
**excused** [4] - 100:8, 100:9, 101:4, 101:8
**exhibit** [3] - 31:14, 74:17, 94:11
**Exhibit** [26] - 4:20, 5:6, 7:24, 7:25, 8:2, 9:3, 9:11, 9:13, 14:8, 15:15, 20:7, 26:3, 31:8, 31:16, 39:19, 39:21, 62:3, 62:4, 62:13, 66:5, 74:18, 99:11, 99:13, 99:14, 100:4, 100:5
**exhibits** [1] - 95:14
**exits** [4] - 31:24, 32:4, 88:18, 101:6
**expensive** [1] - 51:14
**explain** [2] - 103:10, 103:12
**eye** [1] - 2:21

**F**

**F.2d** [1] - 32:10
**face** [1] - 53:1
**Facebook** [9] - 7:16, 40:3, 40:12, 40:15, 50:19, 52:17, 52:21, 64:20, 93:12
**faces** [2] - 51:7, 51:10
**facilities** [1] - 2:19
**facing** [1] - 88:23
**fact** [4] - 64:1, 79:23, 82:17, 84:11
**facts** [8] - 30:12, 32:13, 32:19, 33:15, 33:24, 34:4, 34:14, 35:6
**fairly** [1] - 49:9
**falsely** [1] - 38:12
**fam** [1] - 10:6
**Fam** [1] - 10:3
**family** [8] - 10:7, 27:20, 28:23, 44:7, 44:11, 46:18, 64:1, 66:12
**fashion** [1] - 35:11
**fault** [2] - 100:21, 100:22
**FBI** [3] - 1:17, 28:22,

29:11
**February** [6] - 44:19, 45:4, 68:14, 69:5, 69:13, 83:9
**Federal** [4] - 1:24, 28:23, 29:3, 29:22
**felt** [1] - 27:25
**few** [6] - 6:7, 6:11, 55:5, 55:9, 101:5, 101:15
**fight** [5] - 54:8, 54:14, 54:16, 54:19, 54:20
**fighting** [1] - 54:19
**figured** [1] - 44:25
**filed** [1] - 32:16
**finally** [2] - 75:24, 80:8, 86:17
**fine** [19] - 33:19, 34:2, 35:2, 35:25, 55:17, 62:19, 77:1, 88:14, 89:3, 95:13, 95:17, 99:9, 99:10, 100:3, 100:13, 103:2
**finish** [2] - 89:18, 92:7
**finished** [1] - 94:23
**fire** [1] - 98:3
**firearm** [2] - 4:7, 30:2
**first** [25] - 5:7, 10:23, 11:10, 12:22, 21:24, 22:1, 24:9, 25:16, 26:8, 29:11, 31:10, 31:13, 62:9, 69:13, 72:16, 73:7, 73:18, 80:19, 83:20, 84:2, 84:14, 84:19, 84:24, 85:1, 94:9
**five** [8] - 15:10, 16:16, 35:20, 35:22, 35:24, 43:24, 86:14, 96:16
**five-minute** [1] - 15:10
**flaunting** [1] - 51:23
**flirtatious** [1] - 48:14
**floor** [2] - 23:22, 87:8
**Floor** [1] - 1:24
**flying** [2] - 61:14, 63:22
**follow** [1] - 53:2
**following** [2] - 27:15, 83:15
**follows** [1] - 3:4
**food** [2] - 43:14, 51:18
**FOR** [1] - 1:1
**foregoing** [1] - 104:2
**forth** [1] - 64:20
**forward** [2] - 2:9, 6:5
**four** [1] - 43:19
**Fourth** [3] - 32:9, 32:10, 33:23
**freaky** [1] - 9:2
**free** [5] - 3:23, 33:11,

33:12, 35:9, 81:7
**frequent** [1] - 49:9
**Friday** [9] - 88:22, 89:1, 100:17, 100:18, 100:22, 100:24, 100:25, 101:1, 102:2
**friend** [9] - 5:3, 5:4, 6:12, 11:22, 39:8, 39:9, 47:17, 64:16, 84:18
**friend's** [1] - 11:23
**friended** [1] - 50:19
**friends** [1] - 28:23
**front** [7] - 4:19, 14:21, 17:17, 51:7, 51:9, 51:23, 97:3
**fronted** [1] - 52:6
**frustrated** [1] - 18:8
**fucking** [2] - 90:12, 98:2
**fudge** [2] - 103:3, 103:9
**fulfill** [1] - 37:1
**full** [2] - 3:8, 24:7, 24:15
**fully** [3] - 3:17, 3:20, 37:11
**funeral** [2] - 65:4, 65:6
**funny** [1] - 45:13

**G**

**gang** [3] - 92:23, 93:6, 93:8
**Gardner** [16] - 19:18, 20:3, 93:3, 93:11, 93:19, 93:21, 95:1, 96:2, 96:22, 96:24, 97:6, 97:12, 98:1, 98:9, 98:18, 98:24
**gasoline** [1] - 98:3
**general** [1] - 97:21
**generally** [1] - 91:10
**gentleman** [1] - 86:3
**gentlemen** [4] - 31:22, 36:6, 89:10, 99:19
**girl** [3] - 10:8, 44:10, 48:25
**girlfriend** [1] - 6:16
**given** [3] - 27:5, 28:7, 75:12
**God** [2] - 23:25, 90:23
**godson** [2] - 39:16, 84:18
**Government** [34] - 2:23, 2:24, 14:8, 20:6, 30:25, 31:16, 32:7, 32:8, 32:9, 32:11, 34:6, 35:9,

37:2, 37:6, 37:10, 38:3, 74:14, 77:20, 78:13, 79:12, 79:16, 82:3, 83:18, 83:22, 84:20, 85:9, 86:7, 89:24, 95:14, 99:16, 99:20, 102:9, 103:11, 103:15
**government** [1] - 91:18
**Government's** [16] - 4:20, 5:6, 7:24, 7:25, 8:2, 9:3, 9:11, 9:13, 15:15, 20:7, 20:9, 26:3, 31:7, 37:23, 39:19, 39:21
**grabbed** [1] - 24:2
**grams** [1] - 10:22
**Grand** [14] - 28:22, 29:3, 29:22, 69:21, 70:3, 71:25, 72:2, 72:12, 72:15, 73:24, 75:5, 75:18, 76:3, 77:18
**grandmother** [1] - 44:12
**gravitated** [1] - 48:17
**Gray** [1] - 103:10
**green** [1] - 26:10
**group** [1] - 48:23
**grow** [4] - 37:9, 86:4, 86:15
**grudge** [1] - 55:20
**guess** [6] - 45:20, 48:9, 52:2, 82:19, 84:1, 96:11
**guidelines** [2] - 37:4, 37:7
**guilt** [2] - 29:16, 29:18
**guilty** [10] - 4:9, 29:7, 29:20, 29:24, 30:1, 30:25, 32:16, 37:20, 38:14
**gun** [49] - 4:16, 4:17, 7:2, 7:5, 7:7, 7:14, 7:20, 11:14, 11:20, 12:11, 12:18, 13:4, 13:10, 22:18, 22:19, 22:21, 22:23, 22:24, 23:1, 23:2, 24:11, 25:2, 26:17, 26:18, 27:2, 27:3, 27:4, 27:10, 27:13, 53:16, 53:19, 53:25, 54:3, 54:5, 59:24, 73:9, 73:11, 74:4, 76:6, 77:13, 79:4, 79:8, 79:16, 79:23, 80:5, 80:6, 80:8, 80:17, 90:6

**Gurevich** [2] - 2:21, 36:4
**guys** [3] - 48:20, 64:10, 69:10

## H

**H-a-y-n-e-s** [1] - 3:9
**HAC** [12] - 25:15, 25:16, 28:2, 28:3, 28:6, 56:9, 63:12, 68:4, 69:11, 70:16, 76:16, 77:10
**half** [3] - 91:8, 103:5, 103:6
**Halloween** [2] - 41:4, 41:6
**hand** [5] - 2:20, 7:22, 60:8, 60:12, 88:10
**handed** [1] - 26:24
**handle** [1] - 61:14
**hands** [5] - 23:24, 54:9, 54:10, 54:21, 67:21
**happy** [1] - 52:4
**hard** [2] - 8:8, 52:3
**Harris** [1] - 57:1
**Haynes** [26] - 2:4, 2:10, 2:25, 3:1, 3:9, 3:10, 4:4, 8:17, 9:24, 19:18, 21:7, 28:16, 35:18, 38:24, 65:15, 66:6, 68:16, 74:22, 87:19, 89:13, 89:18, 90:14, 93:11, 99:3, 100:8, 101:7
**haynes** [1] - 36:9
**HAYNES** [3] - 1:5, 1:7, 3:3
**head** [3] - 13:5, 23:24
**headsets** [1] - 31:20
**hear** [8] - 8:17, 9:24, 11:11, 19:10, 19:16, 20:14, 34:2, 68:10
**heard** [5] - 9:21, 11:10, 57:4, 58:14, 58:22
**hearsay** [1] - 32:20
**held** [2] - 55:5, 55:8
**help** [12] - 48:6, 48:12, 56:3, 56:4, 62:21, 94:25, 95:19, 96:6, 96:18, 97:16, 98:14, 99:2
**helped** [1] - 96:8
**helpful** [1] - 88:13
**helping** [1] - 50:15
**Henderson** [2] - 32:8, 32:10
**Henslee** [4] - 69:19,

70:2, 72:4, 73:7
**henslee** [1] - 72:20
**hereby** [1] - 104:1
**heroin** [5] - 10:14, 10:17, 10:22, 43:1, 61:8
**hesitate** [1] - 2:19
**himself** [1] - 90:2
**hold** [3] - 20:23, 25:3, 31:16
**holding** [1] - 55:20
**Home** [2] - 45:18, 70:17
**home** [7] - 15:11, 17:19, 45:24, 57:21, 57:24, 57:25, 60:17
**Homes** [3] - 63:13, 68:4, 76:9
**homicide** [1] - 29:5
**honestly** [1] - 102:25
**Honor** [33] - 2:24, 7:21, 8:2, 9:10, 9:15, 20:6, 20:20, 21:1, 31:7, 31:18, 32:3, 32:23, 34:24, 35:19, 38:21, 62:15, 62:18, 71:8, 74:18, 75:7, 76:21, 88:4, 89:2, 89:16, 92:16, 92:19, 94:8, 95:2, 95:15, 99:18, 102:10, 103:16, 103:18
**HONORABLE** [1] - 1:8
**hope** [2] - 37:6, 86:6
**hopefully** [1] - 81:22
**hoping** [3] - 86:4, 102:4, 102:6
**hounding** [2] - 52:13, 52:24
**hour** [1] - 91:8
**hours** [7] - 16:8, 16:16, 56:14, 60:12, 60:16, 63:16, 72:9
**house** [55] - 6:15, 6:16, 6:17, 10:12, 10:25, 14:6, 15:4, 15:10, 15:11, 16:6, 16:8, 16:15, 16:17, 17:18, 17:20, 18:1, 18:9, 19:3, 19:8, 21:18, 23:5, 24:3, 24:16, 25:18, 25:19, 25:22, 26:12, 26:16, 43:25, 44:4, 50:11, 50:12, 56:16, 57:16, 57:17, 58:23, 59:25, 63:15, 65:13, 65:14, 67:3, 67:6, 67:21, 68:5, 69:6, 70:15, 76:2, 76:9, 90:19,

90:22, 97:1, 97:4, 98:3, 98:7
**houses** [1] - 14:18
**Houston** [2] - 83:2, 83:4
**hung** [1] - 39:11
**hurt** [3] - 60:8, 60:12, 97:11
**husband** [2] - 19:19, 93:3

## I

**I's** [1] - 33:10
**ID** [1] - 36:16
**idea** [2] - 7:5, 13:8
**identification** [16] - 7:23, 9:12, 20:11, 20:18, 31:8, 34:7, 34:13, 34:17, 35:10, 62:3, 62:5, 74:14, 74:19, 94:8, 95:5
**identified** [2] - 5:23, 85:20
**identify** [1] - 33:3
**imagine** [1] - 71:16
**implicating** [1] - 38:12
**important** [1] - 35:14
**imprint** [4] - 73:9, 73:11, 74:4, 80:5
**IN** [1] - 1:1
**incarcerated** [3] - 4:4, 7:17, 97:22
**incident** [5] - 60:16, 61:19, 62:22, 66:19, 67:12
**include** [6] - 30:18, 30:21, 38:1, 38:5, 38:7, 38:12
**included** [2] - 32:13, 33:16
**including** [1] - 47:7
**indicate** [1] - 92:10
**indicated** [2] - 63:11, 89:19
**indicates** [1] - 59:17
**indicted** [1] - 29:22
**indulge** [1] - 99:6
**indulgence** [6] - 28:14, 61:21, 74:13, 75:22, 95:24, 99:5
**infer** [1] - 64:25
**information** [2] - 74:3, 86:6
**informing** [1] - 78:1
**inside** [7] - 14:18, 14:22, 18:2, 18:4, 19:8, 59:25, 73:13
**instantly** [1] - 56:18
**instructions** [1] -

102:3
**interested** [1] - 88:4
**interrupt** [1] - 36:12
**interrupted** [1] - 90:25
**interview** [4] - 61:23, 72:15, 74:6, 80:5
**interviewed** [2] - 28:16, 69:16
**introduce** [4] - 32:8, 32:12, 33:11, 33:23
**introduced** [3] - 33:13, 33:21, 49:12
**investigation** [1] - 28:17
**investigator** [5] - 76:13, 76:15, 77:5, 78:22, 79:6
**involve** [1] - 42:15
**involved** [5] - 41:19, 49:16, 50:13, 63:24, 64:2
**itself** [2] - 8:1, 34:22

## J

**Jackson** [1] - 45:10
**jail** [7] - 8:3, 8:4, 19:20, 71:17, 89:24, 91:4, 93:23
**James** [1] - 20:16
**Javon** [1] - 1:16
**Jefferson** [1] - 103:10
**Jeffrey** [32] - 1:17, 10:23, 39:8, 39:20, 40:1, 40:9, 41:2, 46:6, 46:18, 46:24, 47:10, 48:5, 49:4, 49:6, 49:15, 49:19, 49:25, 50:2, 52:24, 55:2, 55:16, 57:2, 57:13, 59:24, 63:21, 64:5, 64:14, 93:12, 93:15, 95:20, 98:21
**Jeffrey's** [4] - 49:2, 50:10, 58:19, 65:4
**Jen** [5] - 18:18, 28:19, 51:2, 53:9, 61:5
**Jen's** [2] - 18:13, 18:20
**Jennifer** [37] - 5:1, 5:2, 10:10, 10:23, 16:22, 18:9, 18:25, 19:15, 22:14, 28:8, 50:15, 50:18, 50:22, 52:7, 52:24, 53:6, 53:12, 55:16, 57:2, 57:15, 57:19, 59:24, 66:7, 66:20, 72:17, 73:1, 80:20, 81:7, 81:22, 84:3, 84:15, 90:25,

95:20, 96:3, 96:8, 96:10, 98:21
**Jennifer's** [19] - 6:25, 15:4, 15:11, 16:2, 16:6, 16:8, 16:15, 16:17, 17:17, 24:3, 24:17, 43:25, 56:16, 57:19, 66:12, 67:21, 81:18, 97:1, 97:4
**job** [3] - 42:12, 43:12
**Johnson** [2] - 3:18, 3:19
**JUDGE** [1] - 1:8
**Judge** [3] - 3:10, 90:2, 100:15
**judge** [4] - 3:11, 3:15, 37:14, 87:1
**July** [5] - 53:24, 69:16, 70:14, 71:22, 71:24, 75:19, 89:6
**JUNE** [1] - 1:9
**June** [3] - 83:1, 91:4, 91:12
**Juneway** [1] - 25:24
**jury** [24] - 2:5, 2:11, 2:12, 7:22, 9:11, 20:8, 22:25, 31:22, 32:6, 34:20, 35:18, 36:3, 86:4, 89:1, 89:8, 89:9, 95:11, 99:16, 100:7, 100:8, 101:23, 101:24, 102:6, 103:1
**JURY** [2] - 1:5, 2:15
**Jury** [19] - 2:13, 28:22, 29:3, 29:22, 31:24, 36:5, 69:21, 70:3, 71:25, 72:2, 72:12, 72:16, 73:24, 75:5, 75:18, 76:3, 77:18, 88:18, 101:6

## K

**K's** [1] - 28:19
**keep** [4] - 2:21, 54:8, 82:17, 92:20
**Kelly** [1] - 1:17
**kept** [3] - 25:5, 52:13, 103:9
**Kester** [1] - 46:7
**Kiara** [5] - 2:4, 2:24, 3:9, 5:17, 57:21
**KIARA** [4] - 1:5, 1:7, 3:3, 3:9
**kids** [5] - 37:9, 57:22, 60:24, 83:13, 86:4
**kill** [6] - 6:25, 84:18, 93:16, 96:4, 96:11, 97:7, 98:12

**killed** [2] - 53:14, 63:22
**killing** [2] - 64:16, 96:10
**kind** [10] - 41:10, 46:20, 47:11, 47:13, 47:19, 48:14, 48:22, 61:14, 72:6, 74:3
**kitchen** [1] - 23:22
**knock** [1] - 59:16
**knowing** [3] - 47:1, 47:2, 64:18
**knowledge** [1] - 93:9
**known** [5] - 33:3, 41:15, 61:14, 61:18, 62:24
**knows** [2] - 71:19, 79:16

## L

**lace** [1] - 48:11
**ladies** [5] - 31:21, 36:6, 86:3, 89:10, 99:19
**language** [2] - 90:12, 98:2
**last** [6] - 9:20, 20:21, 26:14, 45:16, 83:15
**late** [3] - 56:14, 88:23, 89:4
**law** [6] - 33:23, 35:4, 39:3, 53:24, 55:8, 68:10
**lawyer** [9] - 69:17, 69:24, 70:19, 70:21, 71:6, 78:3, 78:9, 82:15, 83:17
**lawyers** [4] - 3:16, 31:6, 92:17, 103:4
**lawyers'** [1] - 100:21
**laying** [1] - 23:21
**learn** [4] - 10:23, 11:2, 50:2, 78:13
**learned** [5] - 49:15, 49:19, 63:21, 66:12, 85:7
**least** [2] - 41:24, 48:22
**leave** [8] - 15:5, 21:18, 21:22, 23:3, 23:5, 32:1, 103:10, 103:11
**left** [15] - 5:7, 16:6, 16:15, 17:17, 21:24, 22:9, 22:12, 22:15, 23:7, 25:8, 25:10, 69:7, 70:15, 72:16, 72:25
**lemon** [2] - 13:5, 13:6
**lengthy** [1] - 103:4
**less** [2] - 32:25, 89:24

**letter** [8] - 33:11, 77:24, 78:1, 85:19, 85:20, 85:22, 87:22
**letting** [1] - 25:1
**level** [1] - 17:2
**Lewis** [1] - 55:11, 61:7, 61:23, 62:22, 63:11, 66:8, 66:18, 66:25, 67:11, 68:17, 68:24
**lie** [3] - 68:20, 74:10, 80:6
**lied** [9] - 28:19, 29:3, 29:11, 29:15, 63:14, 68:23, 71:14, 71:19, 72:12
**lies** [2] - 69:1, 72:21
**life** [6] - 18:15, 41:10, 41:17, 86:18, 87:10, 97:22
**lifelong** [1] - 39:8
**lifetime** [1] - 5:3
**line** [1] - 88:25
**listen** [2] - 36:7, 101:23
**listening** [1] - 21:2
**live** [1] - 25:23
**lived** [2] - 15:16, 45:18
**lives** [1] - 25:24
**living** [2] - 19:7, 68:12
**location** [1] - 45:25
**Lombard** [1] - 1:24
**look** [6] - 36:19, 38:14, 67:6, 74:23, 95:12, 99:21
**looking** [5] - 32:15, 45:13, 66:22, 97:16, 102:1
**loud** [1] - 59:21
**loudness** [1] - 17:2
**love** [1] - 6:9
**loved** [1] - 44:13
**lower** [2] - 37:4, 37:7
**lunch** [1] - 100:25
**lungs** [1] - 58:12
**lying** [1] - 38:5

## M

**machine** [1] - 48:9
**mad** [5] - 18:11, 50:18, 56:18, 56:20, 81:6
**mandatory** [6] - 37:4, 37:8, 86:23, 87:1, 87:3, 87:5
**manner** [1] - 53:8
**March** [2] - 45:4, 79:11
**mark** [1] - 35:10
**marked** [5] - 20:10, 34:13, 34:16, 94:7,

95:5
**marking** [1] - 34:7
**marriage** [1] - 88:24
**marry** [1] - 46:7
**Marshal** [1] - 31:25
**MARSHAL** [1] - 32:3
**Martin** [5] - 11:24, 12:12, 14:3, 14:16, 90:5
**Marty** [1] - 90:5
**MARYLAND** [2] - 1:1, 1:9
**Maryland** [1] - 1:25
**mask** [1] - 3:22
**masks** [2] - 3:12, 3:15
**material** [1] - 48:12
**matter** [6] - 31:21, 33:12, 36:13, 76:24, 100:19, 104:3
**matters** [7] - 33:25, 88:24, 92:15, 100:7, 100:10, 101:5
**mattress** [2] - 22:22, 22:23
**maximum** [2] - 71:17, 86:18
**mean** [10] - 10:11, 10:16, 11:4, 11:6, 18:20, 18:22, 35:13, 54:19, 97:21, 97:23
**meaning** [5] - 3:17, 38:14, 81:12, 85:8, 93:15
**means** [3] - 38:9, 86:15, 87:1
**meant** [1] - 13:8
**media** [3] - 65:17, 65:19, 65:22
**meet** [7] - 6:2, 27:3, 46:18, 70:7, 79:12, 81:12, 81:18
**meeting** [5] - 50:4, 75:25, 83:20, 84:8, 84:14
**meetings** [3] - 82:9, 85:12, 87:20
**melissa** [1] - 1:23
**Melissa** [3] - 100:12, 104:1, 104:5
**member** [3] - 92:23, 93:3, 93:6
**members** [9] - 9:10, 20:8, 22:25
**memory** [2] - 49:9, 96:13
**mention** [1] - 9:16
**mentioned** [3] - 7:12, 44:7, 88:21
**mess** [2] - 18:10, 61:3
**messaging** [1] - 64:20

**met** [13] - 7:20, 13:2, 13:3, 38:25, 39:2, 39:6, 44:19, 64:5, 70:2, 70:5, 76:13, 78:16, 78:21
**microphone** [1] - 3:7
**microphones** [1] - 35:15
**middle** [2] - 26:12, 26:13
**Middle** [1] - 62:11
**might** [6] - 65:9, 66:12, 66:22, 82:24, 88:5, 101:13
**mind** [1] - 23:13
**mine** [1] - 27:8
**minimize** [1] - 38:9
**minimizing** [1] - 38:7
**minimum** [6] - 37:5, 37:8, 86:23, 87:1, 87:3, 87:5
**minute** [6] - 15:10, 43:24, 58:2, 76:18, 88:16
**minutes** [8] - 13:20, 14:25, 16:18, 35:20, 35:22, 35:24, 58:4, 59:4
**molly** [1] - 12:14
**moment** [1] - 97:15
**Monday** [3] - 101:3, 102:2, 102:6
**money** [7] - 28:6, 28:10, 42:9, 42:19, 43:8, 43:10, 51:23
**month** [1] - 42:7
**months** [2] - 6:7, 6:11
**morning** [15] - 17:21, 20:4, 20:25, 21:3, 21:18, 24:16, 25:7, 56:21, 56:22, 60:15, 63:16, 66:20, 67:17, 101:20, 103:1
**most** [1] - 18:14
**mostly** [1] - 68:18
**mother** [1] - 98:2
**motion** [3] - 37:7, 37:23, 89:23
**motions** [1] - 99:12
**move** [5] - 45:5, 54:9, 54:10, 83:8, 92:16
**moved** [2] - 50:9, 83:6
**moving** [2] - 6:4, 92:20
**MR** [58] - 2:24, 4:1, 4:3, 5:24, 7:21, 8:2, 8:5, 8:7, 8:10, 8:16, 9:10, 9:15, 9:18, 9:20, 9:23, 20:6, 20:13, 20:20, 21:1,

21:4, 21:6, 28:14, 28:15, 31:7, 31:12, 31:15, 31:18, 32:23, 33:6, 34:1, 34:10, 35:12, 35:19, 35:22, 36:11, 36:15, 38:18, 62:9, 62:12, 68:21, 70:23, 74:15, 76:17, 88:10, 88:13, 89:2, 89:5, 91:21, 91:25, 92:5, 92:12, 95:2, 102:13, 102:16, 102:18, 102:22, 102:24, 103:13
**MS** [62] - 2:8, 34:14, 34:24, 35:7, 38:21, 38:23, 39:23, 39:25, 61:21, 61:22, 62:2, 62:6, 62:11, 62:15, 62:18, 62:20, 68:25, 71:1, 71:4, 71:8, 71:9, 74:13, 74:16, 74:18, 74:21, 75:7, 75:10, 75:14, 75:22, 75:23, 76:21, 76:25, 77:3, 77:4, 88:4, 88:7, 88:9, 89:16, 89:17, 91:23, 92:3, 92:9, 92:16, 92:19, 92:21, 94:4, 94:6, 94:13, 94:15, 95:7, 95:15, 95:18, 95:24, 95:25, 99:5, 99:8, 99:18, 99:23, 100:1, 102:10, 103:16, 103:18
**multiple** [6] - 19:24, 39:3, 45:21, 57:9, 91:6, 98:17
**murder** [3] - 4:8, 27:11, 30:3
**murdered** [1] - 6:13
**murders** [6] - 27:15, 28:19, 66:7, 68:19, 87:25, 90:17
**Murray** [3] - 1:18, 101:17, 101:19

## N

**name** [10] - 3:8, 10:17, 11:23, 17:5, 21:9, 38:24, 45:10, 45:16, 50:6, 69:19
**narrowed** [1] - 102:3
**nature** [1] - 6:4
**near** [1] - 83:4
**necessarily** [1] - 45:24
**need** [13] - 2:19, 31:21, 31:22, 31:25,

32:1, 33:24, 34:21,
56:1, 57:21, 57:24,
88:6, 88:11, 102:15
**needed** [2] - 18:8,
60:21
**neglected** [1] - 9:15
**nephew** [6] - 4:18,
5:15, 6:12, 7:11,
25:1, 39:14
**nephew's** [1] - 7:10
**nephews** [1] - 8:19
**Never** [1] - 70:5
**never** [7] - 14:25,
52:10, 52:11, 63:1,
76:2, 76:5, 103:6
**new** [2] - 48:25, 49:12
**news** [2] - 65:17,
65:19
**next** [7] - 2:23, 6:7,
25:21, 60:11, 98:9,
98:11, 101:2
**nice** [1] - 51:6
**nickname** [2] - 8:24,
21:15
**niece** [5] - 16:25,
18:19, 18:20, 57:20
**niece's** [1] - 17:5
**night** [12] - 6:12, 6:21,
10:25, 14:15, 16:8,
18:13, 26:8, 46:25,
49:2, 64:7, 67:15,
96:25
**NO** [1] - 1:3
**nobody** [3] - 67:1,
67:3, 97:11
**noise** [1] - 36:8
**none** [1] - 51:24
**NORTHERN** [1] - 1:2
**note** [1] - 94:9
**notes** [1] - 1:21
**nothing** [3] - 64:22,
78:24, 79:1
**November** [3] - 32:16,
85:19, 85:23
**null** [1] - 37:17
**number** [4] - 31:14,
60:8, 62:10, 94:11
**numbers** [1] - 62:10

---

## O

**o'clock** [7] - 2:17,
56:21, 56:22, 88:15,
88:25, 89:11, 100:18
**oath** [9] - 29:3, 62:17,
70:22, 71:11, 75:6,
75:13, 76:20, 76:23,
89:13
**object** [1] - 89:5
**objection** [13] - 68:21,

70:23, 76:17, 77:1,
89:2, 91:21, 91:25,
92:1, 92:2, 92:5,
92:12, 95:2, 95:3
**obligated** [1] - 36:23
**obligations** [1] - 37:1
**observed** [1] - 22:25
**obviously** [2] - 35:14,
102:18
**occasion** [4] - 41:24,
47:20, 74:4, 76:15
**occasionally** [1] - 17:9
**occasions** [3] - 28:17,
41:9, 45:21
**occurred** [1] - 47:19
**occurrence** [1] - 49:9
**October** [1] - 76:12
**OF** [3] - 1:1, 1:3, 1:7
**offer** [2] - 86:17, 86:24
**offering** [1] - 34:8
**Official** [2] - 1:24,
104:6
**old** [7] - 17:15, 43:18,
86:9, 86:11, 86:13
**once** [4] - 48:1, 48:2,
48:3, 48:4
**one** [20] - 3:18, 13:5,
17:13, 17:16, 18:15,
20:23, 21:20, 26:14,
29:15, 31:16, 34:18,
41:24, 43:17, 46:25,
47:19, 52:4, 53:19,
73:5, 87:19, 103:8
**one-night** [1] - 46:25
**open** [2] - 57:20, 60:2
**opened** [2] - 16:25,
60:5
**opposed** [1] - 31:19
**originally** [1] - 29:11
**Orleans** [3] - 25:17,
25:19, 25:20
**outcome** [1] - 37:24
**outside** [7] - 16:13,
16:17, 17:17, 57:15,
57:19, 57:23
**overheard** [2] - 80:20,
84:3
**overruled** [4] - 68:22,
71:2
**owed** [1] - 52:7
**own** [5] - 29:16, 29:18,
38:7, 38:9, 80:8

---

## P

**p.m** [13] - 2:2, 2:13,
9:18, 26:5, 26:14,
31:24, 32:4, 36:5,
88:18, 89:9, 101:6,
103:22

**packaged** [1] - 26:22
**page** [9] - 15:23, 26:3,
36:20, 40:3, 41:1,
62:2, 74:14, 94:22
**paid** [5] - 28:3, 42:13,
52:10, 52:11, 56:9
**pandemic** [2] - 3:13,
78:19
**paper** [2] - 96:18, 98:2
**paragraph** [3] - 62:7,
62:10, 62:11
**Paralegal** [2] - 1:18,
1:19
**pardon** [4] - 83:4,
90:11, 93:8, 98:2
**part** [6] - 30:15, 31:2,
41:9, 49:20, 50:4,
51:14
**partied** [1] - 39:11
**parties** [1] - 41:10
**passed** [1] - 16:14
**past** [1] - 88:15
**Paul** [1] - 1:12
**pay** [4] - 55:2, 55:22,
55:24, 81:9
**paying** [1] - 55:14
**penalty** [1] - 86:18
**Pennsylvania** [1] -
68:12
**people** [11] - 4:21, 5:7,
21:7, 42:16, 42:19,
42:22, 48:17, 66:2,
82:10, 89:22
**people's** [1] - 30:22
**per** [2] - 87:6, 87:7
**Percocet** [6] - 41:22,
41:24, 42:24, 52:7,
52:25, 53:12
**Percocets** [1] - 42:2
**perfect** [1] - 89:5
**perfectly** [1] - 35:2
**perform** [2] - 88:21,
100:18
**perhaps** [3] - 3:18,
101:18
**period** [1] - 52:10
**periods** [1] - 91:8
**perjury** [5] - 71:13,
71:16, 71:20
**Perkins** [5] - 45:18,
63:13, 68:4, 70:17,
76:9
**permission** [1] - 94:3
**permitted** [1] - 35:4
**person** [5] - 14:11,
45:10, 50:6, 98:10,
98:11
**phone** [16] - 8:6, 19:4,
25:25, 26:4, 26:5,
46:3, 57:19, 67:1,

67:9, 78:18, 84:15,
91:3, 91:4, 91:6,
93:23, 93:25
**photo** [1] - 14:9
**photograph** [9] - 4:21,
4:23, 5:7, 5:8, 9:4,
39:18, 40:8, 40:12,
41:2
**pick** [1] - 12:5
**picking** [1] - 42:18
**picture** [5] - 39:20,
40:19, 40:23, 41:7
**piece** [2] - 42:2, 96:18
**pill** [3] - 52:7, 52:25,
53:12
**pills** [2] - 42:5, 42:10
**place** [1] - 44:13
**Place** [2] - 15:14,
15:19
**placed** [2] - 2:5, 40:12
**Plaintiff** [2] - 1:3, 1:10
**plan** [5] - 6:23, 32:24,
33:2, 33:7, 88:25
**planned** [1] - 6:24
**plans** [1] - 6:21
**plastic** [1] - 24:15
**play** [5] - 7:24, 9:12,
80:13, 80:16, 95:9
**played** [7] - 8:15, 9:14,
9:22, 20:12, 20:19,
21:5, 95:3
**playing** [1] - 20:7
**plea** [22] - 30:10,
30:15, 32:12, 32:15,
32:17, 33:11, 33:13,
34:15, 34:22, 35:5,
36:17, 36:24, 37:1,
37:17, 37:20, 38:1,
38:16, 85:19, 85:22,
86:17, 86:24, 89:18
**plead** [3] - 29:24, 30:1,
30:25
**pleasure** [1] - 103:13
**pled** [3] - 29:7, 29:20,
32:16
**pocket** [2] - 22:6, 69:8
**point** [38] - 2:20,
10:15, 18:15, 21:18,
31:8, 32:22, 33:9,
33:15, 33:20, 34:6,
41:20, 42:15, 46:6,
49:6, 49:15, 50:2,
50:9, 50:18, 53:5,
53:19, 56:9, 63:3,
66:22, 67:24, 73:20,
76:12, 77:21, 77:23,
78:13, 80:1, 82:4,
82:23, 95:15,
101:14, 102:8,
102:11, 103:11,

103:15
**Police** [2] - 55:11,
66:8
**police** [6] - 28:22,
57:24, 59:9, 59:11,
59:22, 66:18
**Poo** [1] - 21:14
**portion** [1] - 27:8
**position** [1] - 34:12
**positive** [1] - 81:2
**possession** [1] -
10:12
**possibility** [1] - 86:18
**possibly** [2] - 41:5,
47:1
**post** [3] - 40:17,
52:17, 64:20
**posted** [1] - 40:15
**postings** [1] - 65:22
**potential** [1] - 89:3
**potentially** [1] - 89:24
**Powell** [5] - 4:18, 7:11,
7:15, 92:22, 93:1
**precautions** [1] - 3:13
**prejudice** [1] - 99:12
**prescription** [1] - 42:4
**present** [1] - 70:19
**Present** [1] - 1:16
**presiding** [2] - 3:11,
3:15
**pretty** [7] - 24:15,
40:5, 78:5, 78:24,
89:7, 90:21, 98:5
**previous** [1] - 72:21
**prison** [2] - 46:7,
93:21
**problem** [1] - 101:21
**problems** [2] - 50:23,
98:21
**proceed** [3] - 2:6,
3:25, 35:9
**proceeding** [1] - 32:24
**Proceedings** [1] -
103:22
**proceedings** [1] -
104:3
**Proctor** [5] - 83:17,
84:9, 84:11, 86:1
**proffer** [2] - 85:8,
87:21
**project** [1] - 45:21
**projects** [1] - 25:20
**Projects** [1] - 45:18
**promised** [1] - 100:20
**promises** [1] - 37:10
**promptly** [3] - 2:17,
88:20, 89:11
**proper** [1] - 47:14
**prosecuting** [2] -
39:3, 89:25

**prosecution** [1] - 87:20
**prosecutors** [5] - 28:23, 72:3, 73:5, 81:11, 84:9
**protecting** [4] - 29:9, 29:12, 29:14
**provided** [1] - 4:16
**public** [1] - 3:12
**pull** [5] - 3:22, 53:22, 54:4, 54:6, 54:13
**pulled** [5] - 3:15, 53:19, 53:25, 54:16, 59:24
**punch** [1] - 54:23
**purchase** [1] - 51:13
**purchased** [1] - 41:24
**purposes** [6] - 7:23, 9:12, 20:18, 31:8, 35:19, 35:23
**Purpura** [4] - 1:15, 34:11, 34:18, 88:11
**PURPURA** [9] - 88:10, 88:13, 89:2, 89:5, 102:13, 102:16, 102:18, 102:22, 102:24
**purse** [2] - 53:17, 54:8
**put** [8] - 2:20, 23:2, 23:24, 27:1, 27:8, 83:12, 95:10, 99:15
**putting** [1] - 52:21

**Q**

**questions** [7] - 3:16, 26:7, 33:7, 77:7, 78:24, 95:8, 101:22
**quicker** [1] - 36:8
**quickly** [1] - 101:15
**quite** [2] - 42:9, 89:6
**quote/unquote** [1] - 51:15

**R**

**rainbow** [3] - 22:20, 24:7, 24:9
**raise** [1] - 88:10
**ran** [1] - 39:11
**ranting** [1] - 66:20
**rather** [1] - 55:5
**RDB-20-139** [1] - 1:3
**react** [1] - 23:23
**read** [6] - 33:8, 62:7, 74:23, 75:8, 75:11, 94:23
**ready** [2] - 101:20, 102:4
**real** [2] - 42:12, 52:24

**realize** [1] - 103:7
**realized** [1] - 56:23
**really** [8] - 47:14, 52:3, 52:15, 60:12, 63:12, 64:15, 79:1, 90:9
**reason** [1] - 33:9
**reasonable** [2] - 102:8, 102:12
**receive** [2] - 37:11, 37:13
**received** [1] - 69:21
**reception** [2] - 46:3
**recess** [4] - 88:16, 88:17, 88:19
**recognize** [5] - 4:21, 9:4, 14:11, 36:17, 40:19
**recollection** [3] - 62:14, 95:16, 96:7
**record** [7] - 3:8, 5:22, 9:15, 20:20, 35:3, 36:16, 104:3
**recorded** [4] - 8:3, 8:4, 61:24, 93:25
**recording** [9] - 8:1, 8:15, 9:14, 9:22, 20:10, 20:12, 20:19, 21:5, 101:25
**recordings** [2] - 99:14, 101:18
**refer** [3] - 5:12, 10:6, 21:13
**reference** [3] - 10:9, 21:9, 25:19
**referring** [1] - 11:13
**reflect** [1] - 5:22
**reflects** [1] - 96:13
**refresh** [2] - 62:14, 96:6
**refreshes** [1] - 96:13
**refreshing** [1] - 95:16
**regard** [3] - 53:12, 68:19, 77:2
**regarding** [2] - 28:16, 80:23
**regular** [3] - 65:17, 65:18, 65:19
**rehearsal** [3] - 88:22, 100:19, 100:23
**related** [2] - 5:25, 8:20
**relating** [3] - 65:12, 82:17, 84:16
**relation** [1] - 11:25
**relationship** [3] - 6:4, 6:6, 45:2
**relative** [1] - 5:12
**release** [1] - 86:19
**remember** [42] - 40:18, 42:4, 55:12, 55:16, 57:4, 60:5,

61:11, 61:17, 62:21, 65:12, 66:6, 74:7, 74:9, 74:10, 84:8, 85:23, 91:3, 91:12, 93:14, 93:17, 94:25, 95:19, 95:21, 96:1, 96:2, 96:5, 96:6, 96:8, 96:9, 96:19, 97:9, 97:11, 97:14, 97:16, 98:1, 98:3, 98:5, 98:9, 98:14, 98:23, 98:24, 99:2
**rent** [2] - 56:3, 56:4
**repeat** [3] - 12:1, 19:25, 49:18
**rephrase** [7] - 11:8, 71:1, 71:2, 71:3, 71:5, 71:7, 91:22
**Reported** [1] - 1:22
**REPORTER** [1] - 100:13
**Reporter** [2] - 1:24, 104:6
**respect** [4] - 24:9, 32:18, 62:14, 101:23
**respond** [1] - 75:12
**responded** [1] - 91:24
**resulted** [2] - 4:7, 30:2
**resumes** [1] - 36:2
**retrieve** [1] - 26:17
**revealed** [1] - 75:24
**RICARDO** [1] - 1:5
**RICHARD** [1] - 1:8
**Richardson** [2] - 83:3, 83:4
**rid** [2] - 4:16, 37:4, 37:7
**ride** [5] - 80:23, 81:4, 81:7, 81:9, 84:16
**rise** [4] - 2:12, 88:17, 89:8, 103:21
**road** [1] - 46:10
**rob** [1] - 84:18
**robbery** [1] - 27:13
**Robert** [1] - 1:19
**role** [2] - 30:10, 30:19
**roles** [1] - 30:22
**romantically** [1] - 49:7
**room** [4] - 19:7, 31:22, 103:3, 103:9
**roughly** [1] - 16:14
**route** [1] - 92:8
**routine** [2] - 51:21, 51:24
**RPR** [1] - 1:23, 104:1
**rule** [1] - 95:9
**rules** [2] - 3:11, 99:19
**rumor** [4] - 57:1, 57:4, 57:5, 58:22
**rumors** [4] - 63:22,

63:24, 65:8, 65:12
**run** [1] - 23:14
**runaway** [1] - 98:6
**Ruter** [4] - 78:11, 78:16, 79:11, 80:10

**S**

**safer** [1] - 27:25
**salary** [1] - 42:13
**satisfied** [2] - 82:20, 83:24
**Saturday** [1] - 100:20
**saw** [3] - 42:18, 42:21, 84:25
**scared** [3] - 97:11, 97:19, 97:24
**scene** [2] - 18:11, 98:6
**schedule** [1] - 102:5
**scheduling** [7] - 35:19, 35:23, 89:12, 100:7, 100:10, 101:13, 102:1
**school** [1] - 19:1
**screamed** [1] - 57:21
**screaming** [1] - 66:20
**screen** [7] - 4:19, 14:9, 60:5, 60:7, 95:11, 99:22, 100:2
**screw** [1] - 88:23
**sealed** [5] - 32:18, 33:12, 33:14, 34:16, 35:5
**search** [4] - 67:1, 67:3, 67:5, 67:8
**seat** [1] - 3:6
**seated** [5] - 2:16, 36:9, 89:14, 101:14
**second** [5] - 20:23, 22:12, 31:17, 44:23, 73:16
**see** [20] - 2:18, 14:9, 15:23, 16:19, 16:22, 23:16, 26:4, 26:5, 31:10, 37:9, 49:7, 49:10, 56:6, 65:25, 73:13, 84:12, 86:4, 94:16, 99:16, 99:22
**seeing** [3] - 50:2, 98:14, 99:2
**seek** [1] - 33:22
**seeking** [3] - 32:7, 34:20, 34:22
**seem** [2] - 102:8, 102:12
**sell** [2] - 42:7, 81:25
**selling** [5] - 28:10, 41:22, 42:9, 42:22, 61:8
**sentence** [4] - 10:16,

37:11, 37:13, 90:3
**sentencing** [3] - 103:4, 103:6
**separate** [1] - 33:25
**September** [2] - 83:16, 84:6
**seriously** [1] - 78:5
**set** [1] - 98:3
**settled** [1] - 83:13
**seven** [1] - 95:22
**sewing** [1] - 48:9
**sex** [3] - 47:4, 57:2, 67:24
**sexual** [1] - 6:6
**Shawn** [19] - 19:18, 20:3, 20:15, 21:8, 93:3, 93:11, 93:19, 93:21, 95:1, 96:2, 96:9, 96:22, 96:24, 97:6, 97:12, 98:1, 98:9, 98:18, 98:24
**shirt** [3] - 5:20, 26:25, 27:1
**shoot** [1] - 4:11
**short** [2] - 88:19, 99:8
**shorter** [1] - 100:25
**shortly** [3] - 9:20, 12:7, 66:7
**shots** [1] - 3:18
**show** [9] - 26:3, 33:2, 39:18, 41:1, 62:1, 66:5, 74:22, 94:2, 94:7
**showing** [8] - 4:19, 5:6, 9:3, 14:8, 15:15, 15:23, 36:16, 99:6
**shown** [2] - 40:8, 62:13
**sick** [1] - 19:2
**side** [2] - 33:22, 35:8
**signature** [2] - 33:3, 36:20
**signatures** [1] - 36:19
**signed** [6] - 30:24, 31:5, 85:22, 87:21, 89:19
**similar** [1] - 75:24
**simple** [1] - 92:18
**simply** [1] - 33:2
**sissy** [1] - 54:19
**sister** [1] - 64:13
**sit** [1] - 72:2
**sitting** [3] - 10:8, 10:11, 10:24
**six** [1] - 16:16
**skills** [1] - 48:9
**sleep** [1] - 57:22
**sleeping** [2] - 47:22, 58:25
**sleeps** [1] - 47:15

**slept** [1] - 68:2
**small** [2] - 48:22, 61:8
**so..** [2] - 51:8, 53:1
**social** [1] - 65:22
**sold** [3] - 28:7, 28:12, 42:2
**sole** [1] - 43:22
**someone** [6] - 38:12, 38:14, 47:15, 47:23, 47:25, 72:20
**sometime** [1] - 60:15
**sometimes** [2] - 46:4, 51:9
**somewhat** [1] - 51:24
**somewhere** [2] - 40:23, 42:13
**son** [8] - 8:21, 18:19, 18:22, 39:14, 43:20, 43:22, 63:21, 86:9
**sorry** [11] - 14:8, 20:21, 20:23, 31:19, 35:21, 36:12, 39:22, 84:17, 88:11, 92:1, 94:12
**sort** [1] - 46:20
**speaking** [1] - 3:7
**special** [3] - 41:9, 41:12, 44:13
**Special** [9] - 1:16, 1:17, 68:11, 69:6, 70:10, 72:3, 73:4, 79:14, 84:8
**specific** [1] - 101:22
**spell** [1] - 3:8
**spend** [1] - 13:19
**spent** [1] - 56:12
**spoken** [2] - 73:7, 85:25
**spotty** [1] - 46:4
**spring** [1] - 46:6
**squeeze** [2] - 13:5, 13:6
**stairs** [2] - 15:23, 16:5
**stamps** [2] - 43:14, 51:19
**stand** [6] - 2:6, 3:1, 32:5, 36:2, 46:25, 101:9
**standby** [1] - 11:16
**standing** [1] - 3:11
**stands** [3] - 88:17, 103:20, 103:21
**stapled** [1] - 33:17
**start** [8] - 47:25, 57:7, 92:22, 100:11, 100:16, 100:17, 100:24, 101:1
**started** [3] - 23:25, 45:2, 57:13
**starting** [1] - 5:6

**state** [1] - 3:8
**statement** [17] - 8:1, 32:13, 32:19, 33:15, 33:24, 34:4, 34:14, 35:5, 62:16, 66:11, 66:25, 67:11, 68:7, 68:17, 75:7, 76:19, 76:20
**statements** [2] - 72:22, 75:6
**States** [3] - 30:24, 89:24, 91:17
**STATES** [3] - 1:1, 1:3, 1:8
**statute** [1] - 87:3
**stay** [6] - 14:24, 16:17, 17:9, 27:15, 44:10, 100:8
**stayed** [1] - 49:4
**steak** [1] - 51:17
**steering** [2] - 54:9, 54:11
**stenographic** [1] - 104:2
**stenotype** [1] - 1:21
**still** [11] - 55:20, 55:22, 72:3, 72:11, 79:8, 82:3, 83:20, 83:22, 85:5, 89:13, 102:22
**stipulation** [3] - 30:12, 32:20, 33:16
**stipulations** [1] - 32:21
**stole** [1] - 28:8
**stop** [11] - 2:17, 12:14, 35:13, 48:11, 88:25, 89:11, 92:6, 92:7, 100:6, 100:21, 100:22
**stopping** [1] - 88:20
**stops** [2] - 12:13, 12:16
**store** [5] - 48:11, 51:13, 63:3, 69:7, 70:15
**story** [1] - 79:1
**Street** [4] - 1:24, 25:17, 25:19, 59:21
**street** [2] - 10:17, 59:6
**streets** [2] - 97:21, 97:23
**strike** [3] - 83:21, 97:14, 98:23
**subject** [1] - 71:13
**subsequent** [1] - 99:12
**substance** [2] - 68:8, 81:15
**suffice** [1] - 43:7

**suggesting** [2] - 78:2, 82:10
**sum** [2] - 68:7, 81:15
**summons** [1] - 69:21
**supplement** [6] - 32:18, 33:12, 33:14, 34:16, 35:5, 36:20
**support** [1] - 43:22
**supposed** [1] - 84:7
**Supreme** [1] - 32:11
**Sustained** [1] - 92:5
**sustained** [7] - 71:3, 77:1, 91:22, 92:1, 92:2, 92:13
**swirling** [1] - 65:8
**sworn** [3] - 2:6, 3:2, 3:3

# T

**T's** [1] - 33:10
**tape** [3] - 7:25, 101:18, 101:23
**tapes** [3] - 99:6, 99:7, 101:20
**target** [3] - 77:24, 78:1, 102:8
**Tariek** [17] - 4:18, 7:11, 7:15, 7:16, 7:19, 8:18, 8:21, 8:24, 9:7, 9:25, 10:18, 11:10, 11:15, 12:3, 80:13, 92:22, 92:23
**Tarell** [19] - 7:10, 7:15, 7:20, 8:18, 8:22, 8:23, 9:9, 11:10, 11:21, 13:2, 13:3, 13:18, 13:19, 27:3, 27:10, 27:13, 76:5, 80:13, 92:25
**team** [1] - 87:20
**tear** [1] - 38:3
**teasing** [1] - 88:24
**teed** [1] - 101:19
**telephone** [4] - 80:20, 81:3, 100:4, 100:5
**ten** [8] - 43:24, 58:4, 71:17, 87:6, 87:7, 87:24, 88:16
**ten-minute** [3] - 43:24, 88:16
**Teresa** [2] - 1:14, 38:24
**term** [2] - 11:11, 47:14
**terms** [7] - 22:25, 32:12, 32:14, 33:7, 33:15, 33:18, 102:1
**testified** [4] - 3:4, 72:15, 76:3, 77:17

**testify** [10] - 30:16, 70:3, 70:22, 71:11, 89:19, 89:23, 92:17, 92:18, 102:19
**testifying** [3] - 3:16, 3:23, 31:2
**testimony** [4] - 30:18, 30:21, 75:5, 101:8
**Texas** [4] - 83:2, 83:3, 83:6, 83:13
**THE** [10] - 1:1, 1:1, 1:8, 2:3, 2:9, 2:12, 2:14, 2:15, 2:16, 3:1, 3:5, 3:6, 3:9, 3:10, 3:21, 3:22, 5:22, 7:25, 8:4, 8:6, 8:9, 9:17, 9:19, 20:9, 20:23, 21:2, 31:10, 31:13, 31:16, 31:19, 31:25, 32:3, 32:5, 33:5, 33:9, 34:2, 34:11, 34:15, 35:2, 35:8, 35:13, 35:21, 35:25, 36:3, 36:6, 36:12, 38:19, 39:21, 39:24, 62:4, 62:13, 62:16, 62:19, 68:22, 68:23, 70:25, 71:2, 71:5, 74:17, 74:20, 75:5, 75:8, 75:11, 76:18, 76:22, 77:1, 88:6, 88:8, 88:11, 88:14, 88:17, 88:20, 89:3, 89:6, 89:8, 89:10, 91:22, 92:1, 92:6, 92:13, 92:17, 92:20, 94:5, 94:11, 94:14, 95:5, 95:8, 95:17, 99:7, 99:9, 99:19, 99:25, 100:3, 100:13, 100:14, 100:15, 100:16, 101:7, 101:11, 101:12, 102:11, 102:14, 102:17, 102:20, 102:23, 103:2, 103:14, 103:17, 103:19, 103:21
**thereabouts** [1] - 100:23
**therefore** [1] - 89:23
**they've** [1] - 3:17
**thinking** [1] - 57:6
**third** [2] - 40:9, 41:1
**Thirty** [1] - 10:22
**threatened** [2] - 54:3, 54:5
**three** [5] - 7:19, 13:20, 26:10, 26:14, 49:24

**three-way** [2] - 7:19, 49:24
**threw** [2] - 23:24, 24:23
**throw** [1] - 98:2
**Tiera** [1] - 90:14
**Tiera's** [2] - 25:22, 68:5
**Tiffany** [4] - 10:25, 45:10, 45:14, 45:15
**Tiffany's** [11] - 6:16, 6:17, 10:25, 25:18, 25:19, 26:8, 26:11, 26:16, 45:24, 76:2, 76:9
**tightening** [2] - 79:25, 82:6
**tighter** [1] - 82:7
**timeframe** [5] - 40:24, 52:6, 53:16, 56:23, 66:11
**timeline** [1] - 83:16
**today** [6] - 2:17, 31:2, 58:9, 69:4, 88:21, 92:7
**together** [5] - 33:17, 39:11, 39:12, 56:12
**toilet** [1] - 98:2
**tomorrow** [8] - 92:7, 100:11, 100:16, 100:18, 101:1, 101:9, 101:20, 102:2
**Tone** [22] - 5:11, 18:22, 18:24, 19:1, 39:14, 41:2, 41:6, 41:9, 41:17, 65:6, 66:7
**Tone's** [2] - 41:10, 65:6
**Tony** [10] - 49:3, 49:6, 49:12, 49:16, 49:20, 49:24, 50:3, 52:23, 53:6, 57:1
**took** [4] - 26:25, 27:8, 72:19, 78:5
**top** [3] - 15:25, 58:12, 94:9
**topics** [1] - 76:24
**torn** [1] - 37:18
**touching** [1] - 26:24
**towards** [1] - 18:6
**town** [1] - 48:25
**trade** [2] - 50:13, 50:16
**trading** [1] - 86:6
**transcript** [9] - 7:22, 20:10, 95:3, 95:11, 96:6, 96:18, 97:16, 99:2, 104:2
**TRANSCRIPT** [1] - 1:7

transcription [1] - 1:21
transcripts [6] - 8:11, 98:14, 99:15, 99:17, 99:21, 99:22
traveling [1] - 25:14
TRIAL [1] - 1:5
trial [1] - 37:24
tried [4] - 7:16, 97:7, 98:1
trip [4] - 46:10, 46:18, 46:25, 48:5
trouble [4] - 72:13, 72:21, 72:25, 73:3
truth [7] - 36:25, 37:16, 68:18, 68:24, 69:1, 69:3, 69:4
truthful [2] - 30:18, 30:21
truthfully [3] - 30:16, 89:20, 89:23
try [3] - 36:7, 60:2, 81:23
trying [9] - 31:20, 32:21, 33:10, 33:18, 34:19, 83:12, 83:13, 100:1, 102:3
Tuesday [2] - 101:3, 102:7
turn [3] - 9:11, 16:6, 20:8
turnaround [1] - 23:12
TV [1] - 65:19
twice [1] - 21:23
two [11] - 3:18, 5:7, 13:20, 17:3, 22:9, 33:25, 63:12, 64:19, 87:12, 103:5, 103:6
two-and-a-half [2] - 103:5, 103:6
type [1] - 48:14
types [1] - 38:1

**U**

U.S [1] - 70:8
ugly [3] - 64:13, 90:23, 90:25
ultimately [2] - 55:2, 71:10
under [17] - 3:11, 22:22, 22:23, 29:3, 32:8, 33:23, 35:3, 36:24, 37:1, 62:17, 70:22, 71:11, 75:6, 75:12, 76:20, 76:23, 89:13
understandings [1] - 36:23
unfair [2] - 52:15,

52:18
United [3] - 30:24, 89:24, 91:17
UNITED [3] - 1:1, 1:3, 1:8
unless [1] - 33:8
up [35] - 2:20, 12:6, 18:10, 19:2, 23:24, 24:2, 26:25, 29:15, 29:18, 31:10, 37:9, 37:18, 38:3, 42:18, 53:2, 55:14, 57:18, 61:3, 70:22, 71:16, 79:25, 80:8, 81:23, 86:4, 86:15, 88:23, 89:18, 92:7, 93:17, 95:11, 96:12, 96:25, 99:15, 101:19
upset [1] - 47:10

**V**

vaccinated [2] - 3:17, 3:20
vaccinations [1] - 3:18
Valentine's [2] - 6:3, 44:19
veil [2] - 48:7, 48:12
view [4] - 34:6, 102:9, 102:11, 103:15
violate [2] - 38:2, 38:16
visit [1] - 44:12
voice [1] - 17:2
voices [3] - 8:17, 9:24, 20:14
void [1] - 37:17
voluminous [1] - 102:4
vs [1] - 1:4

**W**

walk [4] - 15:10, 16:2, 43:24, 44:4
walked [6] - 15:8, 15:11, 16:15, 44:2, 57:18, 58:22
wants [2] - 33:22, 78:13
warrant [2] - 67:5, 67:8
Warwick [4] - 12:19, 13:1, 14:5, 14:13
waste [1] - 34:20
Weaver [9] - 1:16, 68:11, 69:6, 69:14, 70:10, 72:3, 73:4, 79:14, 84:8

wedding [5] - 48:6, 49:2, 88:21, 100:19, 100:20
Wednesday [1] - 103:1
WEDNESDAY [1] - 1:9
week [1] - 72:12
weekend [1] - 89:7
WHALEN [59] - 34:14, 34:24, 35:7, 38:21, 38:23, 39:23, 39:25, 61:21, 61:22, 62:2, 62:6, 62:11, 62:15, 62:18, 62:20, 68:25, 71:1, 71:4, 71:8, 71:9, 74:13, 74:16, 74:18, 74:21, 75:7, 75:10, 75:14, 75:22, 75:23, 76:21, 76:25, 77:3, 77:4, 88:4, 88:7, 88:9, 89:16, 89:17, 91:23, 92:3, 92:9, 92:16, 92:19, 92:21, 94:4, 94:6, 94:13, 94:15, 95:7, 95:15, 95:18, 95:24, 95:25, 99:5, 99:8, 99:18, 99:23, 100:1, 103:18
whalen [1] - 62:9
Whalen [13] - 1:14, 34:11, 38:20, 38:24, 39:22, 74:17, 75:5, 89:15, 92:8, 92:18, 95:11, 99:17, 101:21
wheel [2] - 54:9, 54:11
white [2] - 22:20, 36:7
whole [2] - 10:16, 64:7
wife [2] - 88:22, 100:20
Wilder [1] - 64:13
William [1] - 1:15
Williams [7] - 20:16, 50:7, 50:9, 50:13, 53:5, 53:9, 81:12
wiped [1] - 26:25
withdraw [1] - 37:20
withdrawn [1] - 20:3
witness [18] - 2:5, 2:10, 2:23, 3:16, 5:22, 31:9, 32:4, 32:5, 32:12, 33:2, 35:17, 36:2, 73:20, 73:23, 78:6, 82:24, 101:9
WITNESS [6] - 3:5, 3:9, 3:21, 68:23, 70:25, 101:11
Witness [1] - 36:2
woman [1] - 40:9

wonderful [1] - 88:9
wooden [1] - 60:6
worded [1] - 81:14
words [8] - 47:10, 50:22, 51:15, 52:7, 53:9, 54:20, 82:1, 88:2
worn [1] - 3:12
worse [2] - 79:19, 80:1
wrapped [1] - 26:25

**Y**

yaz [2] - 10:18, 10:21
year [3] - 41:7, 45:4, 78:21
years [6] - 41:15, 71:17, 87:6, 87:7, 87:8, 95:22
yelling [6] - 17:4, 58:4, 58:12, 59:3, 59:6, 60:17
yesterday [1] - 40:7
yo [1] - 11:18
yourself [7] - 29:12, 40:8, 41:12, 62:8, 74:24, 94:23, 98:6
YouTube [1] - 65:25